No. 25-4312

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

PEDRO VASQUEZ PERDOMO, et al.,

Plaintiffs-Appellees,

v.

KRISTI NOEM, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Central District of California
District Court Case No. 2:25-cv-5605

———————————

**EMERGENCY MOTION UNDER CIRCUIT RULE 27-3
FOR STAY PENDING APPEAL AND IMMEDIATE ADMINISTRATIVE STAY
RELIEF REQUESTED BY JULY 18, 2025**

———————————

BRETT A. SHUMATE
Assistant Attorney General
Civil Division
YAAKOV M. ROTH
Principal Deputy Assistant Attorney
General
DREW C. ENSIGN
Deputy Assistant Attorney General
TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General
JOHN W. BLAKELEY
Senior Counsel
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice

P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 514-1679

1

BILAL A. ESSAYLI
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
DANIEL A. BECK
Assistant United States Attorney
Chief, Complex and Defensive Litigation
Section

ALEXANDER L. FARRELL (SBN 335008)
PAULINE H. ALARCON (SBN 345785)
Assistant United States Attorneys
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Tel: (213) 894-2400

2

## CIRCUIT RULE 27-3 CERTIFICATE

Undersigned counsel certifies that the following is the information required by

Circuit Rule 27-3:

**(1) Telephone numbers and addresses of attorneys for the parties**

Counsel for Defendants-Appellants:

> Brett A. Shumate (brett.a.shumate@usdoj.gov)
> Yaakov M. Roth (yaakov.m.roth@usdoj.gov)
> Drew C. Ensign (drew.c.ensign@usdoj.gov)
> Tiberius Davis (Tiberius.Davis@usdoj.gov)
> Sean Skedzielewski (Sean.Skedzielewski@usdoj.gov)
> John W. Blakeley (john.blakeley@usdoj.gov)
> United States Department of Justice, Civil Division
> Office of Immigration Litigation
> P.O. Box 878, Ben Franklin Station
> Washington, DC 20044
> (202) 514-1679
> Bilal A. Essayli (bilal.essayli@usdoj.gov)
> David M. Harris (david.m.harris@usdoj.gov)
> Daniel A. Beck (Daniel.Beck@usdoj.gov)
> Pauline H. Alarcon (Pauline.Alarcon@usdoj.gov)
> Alexander L. Farrell (alexander.farrell@usdoj.gov

Counsel for Plaintiffs-Appellees:

> Stacy Tolchin
> stacy@tolchinimmigration.com
> Law Offices of Stacy Tolchin
> 776 E. Green St., Suite 210
> Pasadena, CA 91101
> Telephone: (213) 622-7450
> Facsimile: (213) 622-7233
> Mohammad Tajsar (mtajsar@aclusocal.org)
> Mayra Joachin (mjoachin@aclusocal.org)
> Eva Bitran (ebitran@aclusocal.org)
> Dae Keun Kwon  (akwon@aclusocal.org)

Oliver Ma (oma@aclusocal.org)
Stephanie Padilla (spadilla@aclusocal.org)
Diana Sanchez (dianasanchez@aclusocal.org)
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017-4022
Telephone: (213) 977-5232
Facsimile: (213) 201-7878
Counsel for Stop/Arrest Plaintiffs

Mark Rosenbaum (mrosenbaum@publiccounsel.org)
Rebecca Brown (rbrown@publiccounsel.org)
Sophia Wrench (swrench@publiccounsel.org)
Ritu Mahajan (rmahajan@publiccounsel.org)
Gina Amato (gamato@publiccounsel.org)
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977
Counsel for All Plaintiffs

**(2) Facts showing the existence and nature of emergency**

As set forth more fully in the motion, the district court has entered a sweeping, district-wide injunction placing coercive restraints on lawful immigration enforcement affecting every immigration stop and detention. The district court thought the issues presented were sufficiently urgent that she afforded the government only two business days to respond to hundreds of pages of submissions and issued the injunction in a written decision only days later.  And, as explained below, the injunction with respect to Fourth Amendment stops is inflicting irreparable harm by preventing the Executive from ensuring that immigration laws are enforced, severely infringing on the President's

Article II authority. These harms will be compounded the longer that injunction is in place.

**(3) When and how counsel notified**

Defendants' counsel notified counsel for Plaintiffs by email on July 13, 2025, of Defendants' intention to file this motion. On July 13, 2025, counsel for Plaintiffs' responded that they opposed Defendants' motion and that they plan to expeditiously file an opposition setting forth their position on the administrative stay request. Service will be effected by electronic service through the CM/ECF system.

**(4) Submissions to the district court**

Defendants have requested a stay pending appeal from the district court. During a July 10, 2025 hearing on the ex parte order, the government requested a 7-day stay of any order issuing an injunction. The court denied a stay. Dkt. 48 at 1.[1] Additionally, out of an abundance of caution, Defendants are filing an additional stay motion in district court on this date.

**(5) Decision requested by**

A decision on the motion for a stay pending appeal is requested as soon as possible, with an administrative stay in the interim.

Counsel for Defendants/Appellants

BRETT A. SHUMATE
*Assistant Attorney General*

---

[1] Docket citations are to No. 25-cv-5605 unless otherwise noted.

Civil Division
YAAKOV M. ROTH
    *Principal Deputy Assistant Attorney General*
*DREW C. ENSIGN*
    *Deputy Assistant Attorney General*
*TIBERIUS DAVIS*
*SEAN SKEDZIELEWSKI*
    *Counsel to the Assistant Attorney General*

JOHN W. BLAKELEY
    *Senior Counsel*
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20530
Tel. (202) 514-1679

## INTRODUCTION

This was originally a routine habeas action filed by three individual aliens seeking release from immigration detention. But, apparently seeking to manipulate the process of judicial assignment, the original petitioners' counsel then filed an amended complaint adding a host of new individual and organizational plaintiffs, leveling systemic challenges to federal immigration enforcement in the Los Angeles area. And a day later, on the eve of the July 4 holiday, they filed an "emergency" *ex parte* motion asking the court to impose a straight-jacket injunction that would vastly restrict the government's ability to stop and detain anyone on suspicion of being unlawfully present in the United States. The court gave the government just two business days to respond to hundreds of pages of submissions, and largely rubber-stamped Plaintiffs' proposed order just days later. The result is a sweeping, district-wide injunction that threatens to hobble lawful immigration enforcement by hanging a Damocles sword of contempt over every immigration stop. The government seeks an immediate stay of that untenable order pending appeal, and an administrative stay in the meantime.

Invoking the Fourth Amendment, the court ordered that federal agents cannot conduct any detentive stops without reasonable suspicion—and then purported to identify a host of factors (like an individual's race, language, location, or type of work) that are supposedly irrelevant to reasonable suspicion. That injunction, which appears to be a first step to placing federal immigration enforcement under judicial monitorship, is indefensible on every level.

1

At the outset, Plaintiffs have no standing to seek it. The individual Plaintiffs allege they were previously stopped without reasonable suspicion, but even if that were true (and it is not, although the district court failed to give the government a meaningful opportunity to develop that record), it is black-letter law that past interactions with law enforcement do not suffice to seek a prospective injunction. *See City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). *Lyons* should be the end of this case. The district court tried to evade it by claiming a likelihood that officers will detain *someone* without reasonable suspicion in the future. But that was equally true in *Lyons*. It is the *Plaintiffs* who must show an imminent threat of injury, and they plainly cannot.

On the merits, the injunction badly misunderstands the Fourth Amendment. Of course reasonable suspicion is required for a stop, but an injunction repeating that constitutional standard is an impermissibly vague follow-the-law injunction. And in trying to reduce the Fourth Amendment test to a formula by identifying a list of "irrelevant" factors, the court grievously erred—the whole point of the constitutional "reasonableness" standard is that *no* factor is categorically off the table. The Fourth Amendment imposes a totality-of-the-circumstances test, and it is entirely possible that one's language, location, or type of work could be relevant in a particular factual context. Trying to develop bright-line rules in this context is a fool's errand.

Finally, if nothing else, the district court ignored the Supreme Court's recent decision rejecting universal injunctions. *Trump v. CASA, Inc.*, 2025 WL 1773631 (U.S. June 27, 2025). Violating the equitable principles that the Court articulated just weeks

ago, the court enjoined the government from *any* detentive stops in the Central District of California without following the court's novel rules—whether those stops affect Plaintiffs or not. The district court thought a plaintiff-specific injunction would be unworkable in this context, but *CASA* contains no such exception; the unworkability merely confirms the misguided nature of this type of structural remedy.

Immediate relief is warranted here not only because of the magnitude of the court's legal errors, but also their practical consequences for the separation of powers and the government's sovereign prerogatives. It is untenable for a district judge to single-handedly "restructure the operations" of federal immigration enforcement and usurp "ongoing judicial supervision of an agency normally, and properly, overseen by the executive branch." *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1044 (9th Cir. 1999) (en banc). And make no mistake, that is exactly what this district court is doing. Indeed, the current injunction is only the start; the court has ordered the government to show cause why it should not also be required to develop policies, compel agents to undergo training; and even share records of each and every stop with the ACLU going forward. This judicial takeover cannot be allowed to stand.

For these reasons, this Court should stay the district court's injunction pending appeal and immediately grant an administrative stay while it considers this application. *See, e.g.*, *Newsom v. Trump*, 2025 WL 1712930, at *4 (9th Cir. June 19, 2025) (staying order that purported to block deployment of National Guard).

## STATEMENT

**1.** On June 20, 2025, three individual aliens filed a habeas petition in the district court seeking release from immigration detention. Dkt. 1. Two weeks later, on July 2, they filed an amended complaint adding two other named individual plaintiffs plus four legal services organizations. Dkt. 16. And the next day, before the July 4 holiday, they filed an emergency *ex parte* TRO application. Dkt. 45. These filings, accompanied by more than three hundred pages of exhibits, vastly expanded the scope of the suit to encompass all immigration enforcement throughout the entire district. Dkt. 38, 45.[2]

As relevant here, Plaintiffs alleged that federal agents are engaged in a pattern or practice of unlawful immigration detentions in violation of the Fourth Amendment. Dkt. 45 at 6-13. The three original petitioners are unlawful aliens who were arrested outside a donut shop known to ICE as a location where an illegal immigrant picked up other illegal immigrants for labor. Exhibit A (Second Quinones Decl.). One remains detained; the other two were released on bond pending removal. *Id.* One of the two new Plaintiffs (Hernandez Viramontes) alleges that agents came to the car wash where he works on four occasions in June, and on one of those occasions briefly detained him before verifying his citizenship. Dkt. 45-4. The second new plaintiff (Gavidia) says agents once seized him at a tow yard and asked about his citizenship status. Dkt. 45-9.

---

[2] Plaintiffs actually filed two *ex parte* TRO applications, both of which the court granted. But this motion seeks an emergency stay only as to one of those applications, due to its especially extreme consequences.

4

The three organizational Plaintiffs relevant to this claim are L.A. Worker Center Network, United Farm Workers, and Coalition for Humane Immigrant Rights. Each provides services to immigrants and is concerned with immigrant rights. They generally allege that their members have been detained and fear that immigration agents will detain them again. Dkt. 16, ¶¶ 173, 179, 189.

For relief, Plaintiffs sought a sweeping injunction barring federal agents from conducting any detentive stops without reasonable suspicion, defined to exclude any reliance on race or ethnicity, language, location, or type of work. Dkt. 45-22, at 4-6.2.

The district court gave the government just two business days to respond to the voluminous applications, then held a hearing two days after that. The court issued an order granting the two applications the following day. Dkt. 87 (Op.).

As to standing, the court observed that only one named plaintiff needed to satisfy Article III, and found that Gavidia did so because he had "suffered an invasion of a legally protected interest" and that the conduct complained of would recur. Op.35. As to the merits, the court concluded that Plaintiffs were likely to succeed in showing the government was "conducting seizures that require at least reasonable suspicion," and that "the seizures were not supported by reasonable suspicion." Op.36. The court agreed with Plaintiffs that reliance on race or ethnicity, spoken language, location, and type of work cannot ever satisfy reasonable suspicion, alone or in combination; it further found that, for the relevant stops, immigration officials relied solely upon those enumerated factors. Op.39-45.

5

The court thought Plaintiffs had established irreparable harm based on the risk of future detentive stops. Op.47-48. Accordingly, the court enjoined the government from (i) "conducting detentive stops in this District" absent "reasonable suspicion that the person … is in violation of U.S. immigration law"; and (ii) relying solely on the enumerated factors for reasonable suspicion. The court also ordered the parties to show cause at some later date and time why a broader preliminary injunction should not issue, requiring the government to establish guidance, undergo training, and maintain and regularly share with Plaintiffs' counsel documentation showing reasonable suspicion for all detentive stops going forward. Op.50-51.

## ARGUMENT

A stay pending appeal is warranted because the government can show a strong likelihood of success on the merits, and because the balance of harms and public interest favor a stay. *Nken v. Holder*, 556 U.S. 418, 426 (2009). The district court's injunction plainly fails on standing grounds, merits grounds, and remedial grounds—it is wrong at least thrice over. And it threatens untenable consequences on the ground.

This Court has jurisdiction under the All Writs Act to stay the order. *See Newsom*, 2025 WL 1712930, at *4. The order itself is also appealable because it functions as a preliminary injunction. *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 762–63 (9th Cir. 2018). The parties submitted extensive briefs; the court held an adversarial hearing; and "the court's basis for issuing the order [was] strongly challenged." *Dep't of Educ. v. California*, 145 S.Ct. 966, 968 (2025). The order also includes no expiration date. *See*

*Newsom*, 2025 WL 1712930, at *4. And as explained below, it carries "serious, perhaps irreparable, consequence[s]" to the government by hamstringing the ability of agents to enforce the law. *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981); *see also Newsom*, 2025 WL 1712930, at *4. This order does not maintain the status quo; it micromanages law enforcement. This Court has jurisdiction to review it and to stay it.

## I. The Injunction Is Indefensible.

In considering a stay, the first and most important factor is the movant's likely success on the merits. Here, the government will very likely prevail on appeal, because the district court issued an injunction that (i) Plaintiffs lacked standing to seek; (ii) is contrary to bedrock Fourth Amendment law; and (iii) violates the equitable principles that the Supreme Court articulated just weeks ago.

### A. Plaintiffs Lack Standing for Prospective Injunctive Relief

Plaintiffs must establish Article III standing to seek prospective injunctive relief. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013). That means they must show a future injury that is "imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). They cannot make that showing, and the district court badly erred in concluding otherwise.

**1.** This case is squarely controlled by *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). Lyons was stopped by police officers for a traffic violation and, despite offering no resistance, was seized and placed in a chokehold. *Id.* at 97. The Supreme Court held that, while Lyons could pursue a damages claim for that past injury, he lacked standing

7

for prospective relief because he had not shown that "he was likely to suffer future injury from the use of the chokeholds by police officers." *Id.* at 105. There was no "immediate threat" that he would *again* be "choke[d] … without any provocation or resistance on his part." *Id.* That was so even though the Court accepted as true that the police department had a policy of "routinely apply[ing] chokeholds in situations where they are not threatened by the use of deadly force." *Id.* That still did not mean that *Lyons himself* faced a likely threat of future injury.

That dooms Plaintiffs' standing here. The district court relied solely on Plaintiff Gavidia for standing. He alleges that he suffered a similar Fourth Amendment injury. Instead of a chokehold, agents allegedly stopped him based on his "skin color." Dkt. 45-9, ¶¶ 9, 12. Even assuming those allegations were true (they are not), they do not "establish a real and immediate threat that he would again be [stopped because of his race]." *Lyons*, 461 U.S. at 105.

**2.** The district court misapplied *Lyons* by holding that "there is a real and immediate threat that the conduct complained of will continue." Op.35. Notice what the court did *not* say—that there is a real and immediate threat *to Plaintiffs*. Just as Lyons was not likely to be subject to a chokehold again, the court below never found that Gavidia is likely to be subject to the same violations in the future. Again, the court merely found a likelihood of "recurrent injury." *Id.* But injury *to whom*? The Article III test is whether the *plaintiff* is likely to suffer future injury. But Plaintiffs presented no evidence that Gavidia would be stopped again.

8

**3.**  Nor can the other Plaintiffs fill the gap.  They are all in the same boat (or worse).  Plaintiff Viramontes alleged that agents visited the carwash where he works twice without stopping him, and detained him for about 20 minutes on their third visit until they could verify his citizenship status.  Dkt. 45-4, ¶¶ 6-11.  That single interaction provides no basis to believe there will be any future stops, let alone wrongful ones.  On the contrary, Viramontes's own declaration makes clear that in a fourth encounter with a different group of agents later that same day, no arrests were made.  *Id.* ¶ 14.

Two other plaintiffs, Perdomo and Molina, were detained and later released on bond pending removal proceedings.  Dkt. 81-1, ¶¶ 4-5.  But other than alleging that the government continues to enforce federal immigration law in the district, the only "evidence" of their standing is Perdomo's "belie[f]" that he will be stopped again (Dkt. 45-1, ¶ 11) and Molina's "worr[y]" that he will be arrested again for "look[ing] like an immigrant." (Dkt. 45-1, 45-3).  But subjective fear of a future illegal stop "is not certainly impending" and "cannot manufacture standing." *Clapper*, 568 U.S. at 416.

Finally, Plaintiff Osorto is still detained.  Dkt. 81-1, ¶ 6. He cannot possibly be in "immediate threat" of an unlawful stop by immigration officials since those officials obviously do not attempt to arrest someone already in detention.

The organizational Plaintiffs cannot demonstrate standing for the injunction either.  Associational standing requires the organization to prove, among other things, that "its members would otherwise have standing to sue in their own right" and "neither the claim asserted nor the relief requested requires the participation of individual

9

members in the lawsuit." *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Neither is true here. As to the first, the organizations' members lack standing for the same reasons as the individual Plaintiffs—any risk of future harm is speculative. *See Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1143-44 (9th Cir. 2024) (no associational standing for warrantless searches because it was speculative that any members would be harmed in the future). And, as to the second, a Fourth Amendment claim is the paradigmatic example of one that requires the participation of individual members. "Fourth Amendment rights are personal rights which … may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165 (1969); *see also Rakas v. Illinois*, 439 U.S. 128 (1978); *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1111 (9th Cir. 2001); *Microsoft Corp. v. DOJ*, 233 F. Supp. 3d 887, 913–14 (W.D. Wash. 2017) (collecting cases).

4. Even if Plaintiffs could somehow show the bare minimum for Article III, they cannot come close to showing the "threat of immediate and irreparable harm" that is necessary for an injunction. *Hodgers-Durgin*, 199 F.3d at 1042. *Hodgers-Durgin* was a challenge to CBP practices allegedly in violation of the Fourth Amendment. The en banc court held that, even assuming the plaintiffs there had standing, they still "have not demonstrated a sufficient likelihood of injury to warrant equitable relief" because they were "stopped only once." *Id.* at 1044. So too here. Indeed, Plaintiffs presented evidence of only one *anonymous non-party* who was supposedly stopped by immigration officials twice. Dkt. 38-11, ¶¶ 32-38. But "[i]n the absence of a likelihood of injury to

10

the named plaintiffs, there is no basis for granting injunctive relief that would restructure the operations of the Border Patrol and that would require ongoing judicial supervision of an agency normally, and properly, overseen by the executive branch." *Id.* at 1044 (emphasis added); *see also Lewis v. Casey*, 518 U.S. 343, 359 (1996) ("These two [injuries] were a patently inadequate basis for a conclusion of systemwide violation and imposition of systemwide relief."). So too here.

Notably, Plaintiffs and the district court both cited *LaDuke v. Nelson*, 762 F.2d 1318, 1324–26 (9th Cir. 1985), *amended*, 796 F.2d 309 (9th Cir. 1986), for standing. But the en banc court in *Hodgers-Durgin* narrowed *LaDuke* in light of intervening Supreme Court precedent. *See* 199 F.3d at 1044-45. And even the district court admitted that *LaDuke* is distinguishable on its face, because it involved direct evidence of an unlawful policy, whereas here no such evidence was presented. Op.45 n.33.

In short, whether viewed through the prism of Article III or the equitable factors for injunctive relief, the district court badly erred by turning alleged one-off past interactions into a basis for a sweeping forward-looking remedy.

### B.     The District Court Grossly Misapplied the Fourth Amendment.

The government would be likely to succeed on the merits even supposing the district court had jurisdiction. The court's order enjoining the government's detentive-stop practices rests on a serious misunderstanding of both the court's equitable powers and the governing Fourth Amendment principles.

11

**1.** To start, the injunction improperly orders the government to follow the law, without adequately defining the prohibited actions. Federal Rule of Civil Procedure 65 provides that "[e]very order granting an injunction and every restraining order must," among other things, "state its terms specifically" and "describe in reasonable detail … the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B)-(C). Courts thus may not enter injunctions that do no more than broadly direct defendants to comply with the law; "a bare injunction to follow the law" is impermissible. *E.g., Parsons v. Ryan*, 754 F.3d 657, 689 n.35 (9th Cir. 2014); *see also Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 74-76 (1967) (rejecting decree to enforce "an abstract conclusion of law"); *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).

That limitation on federal courts' equitable powers serves critically important interests, especially with respect to injunctive relief against executive-branch officials. It prevents courts from arrogating to themselves the power to generally superintend the Executive Branch's execution of the laws. *See CASA*, 2025 WL 1773631, at *14 ("the Judiciary does not have unbridled authority to enforce" the Executive's "duty to follow the law"); *Waite v. Macy*, 246 U.S. 606, 609 (1918) ("Courts will not issue injunctions against administrative officers on the mere apprehension that they will not do their duty or will not follow the law."). And it protects defendants from the risk of being held in contempt for violating a court order with ill-defined contours. As the Supreme Court explained in *Longshoremen*: "The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one." 389 U.S.

at 76. "Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid." *Id.*

The district court's detentive-stops injunction blatantly violates the prohibition of "follow the law" injunctions. The Fourth Amendment guarantee against unreasonable searches and seizures "extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest," including stops of individuals suspected of being in the United States illegally. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). By virtue of "the limited nature of the intrusion," however, "stops of this sort may be justified on facts that do not amount to the probable cause required for an arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 880 (1975). Instead, an officer may conduct such a stop based on reasonable suspicion—supported by "specific articulable facts, together with rational inferences from those facts"—that a person is an illegal alien. *Id.* at 884; *see also Terry v. Ohio*, 392 U.S. 1 (1968); 8 C.F.R. § 287.8(b)(2) ("If the immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States, the immigration officer may briefly detain the person for questioning.").

The injunction here simply recapitulates those basic Fourth Amendment principles. It first provides: "Defendants shall be enjoined from conducting detentive stops in this District unless the agent or officer has reasonable suspicion that the person

13

to be stopped is within the United States in violation of U.S. immigration law." Op.50. That just restates the constitutional requirement of reasonable suspicion. It is thus a forbidden "bare injunction to follow the law." *Parsons*, 754 F.3d at 689 n.35.

The second substantive provision of the injunction suffers from much the same defect. Although it enumerates four factors that defendants may not rely on, "alone or in combination, to form reasonable suspicion for a detentive stop," it simultaneously provides that defendants may do so "as permitted by law." Op.50. That is circular and fails to provide the requisite notice. And even if the "except as permitted by law" clause were set aside, the court's opinion leaves significant confusion about which practices the court did and did not intend to enjoin, as discussed further below. The order thus exposes defendants to the threat of judicial contempt based on nothing more than the prospect that the district court may ultimately disagree with an agent's application of the Fourth Amendment. The injunction is fatally flawed on this basis alone.

**2.** Even the injunction's more precise provisions rest on a serious misunderstanding of the Fourth Amendment. Under the injunction, "Defendants may not rely solely on" four factors, "alone or in combination, to form reasonable suspicion for a detentive stop." Op.50. Those factors are: "[a]pparent race or ethnicity"; "[s]peaking Spanish or speaking English with an accent"; "[p]resence at a particular location (e.g. bus stop, car wash, tow yard, day laborer pick up site, agricultural site, etc.)"; or "[t]he type of work one does." *Id.* That directive is flatly inconsistent with black-letter Fourth Amendment doctrine.

14

Insofar as the injunction means to prohibit the government from relying on the four listed factors *at all*, as parts of the court's opinion appear to suggest (Op.42-43, Op.41 n.30), that runs afoul of the basic Fourth Amendment principle that the reasonable-suspicion inquiry entails consideration of the totality of the circumstances, *Arvizu*, 534 U.S. at 273, meaning that no circumstances are categorically off-limits. And that of course goes for the four factors that the court enumerated here. Thus, ethnicity can be a factor supporting reasonable suspicion in appropriate circumstances—for instance, if agents are acting on a tip that identifies that ethnicity—even if it would not be relevant in other circumstances. *See Brignoni-Ponce*, 422 U.S. at 885-86 ("apparent Mexican ancestry" did not "alone" supply reasonable suspicion). It is likewise settled that a person's use of Spanish, "[p]resence at a particular location," or job (Op.50) can contribute to reasonable suspicion in at least some circumstances. *See, e.g., United States v. Manzo-Jurado*, 457 F.3d 928, 937 (9th Cir. 2006) (fact that group was "speaking to each other only in Spanish" was "relevant to the reasonable suspicion inquiry"); *United States v. Montrero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) (en banc) (location can be relevant); *Maldonado v. Holder*, 763 F.3d 155, 161 (2d Cir. 2014) (noting that day labor is "an occupation that is one of the limited options for workers without documents"). The district court practically acknowledged as much by identifying specific locations that are often associated with illegal aliens, thereby refuting its own logic. Op.50 (referring to a "day laborer pick up site[s]"). So to the extent that the injunction bars the government from considering the listed factors, it is egregiously wrong.

15

The injunction is flawed even if it prohibits the government only from relying on the enumerated factors *alone* (singly or in combination) to form reasonable suspicion for a stop. Reflecting the Fourth Amendment's core textual criterion of reasonableness, the Supreme Court has "deliberately avoided reducing" the reasonable-suspicion inquiry to "a neat set of legal rules." *Arvizu*, 534 U.S. at 274; *see also Brignoni-Ponce*, 422 U.S. at 885 n.10. For example, a rule allowing officers to rely on certain evidence of "ongoing criminal behavior" but not "probabilistic" evidence is inconsistent with the flexible nature of the reasonable-suspicion inquiry. *United States v. Sokolow*, 490 U.S. 1, 8 (1989). Categorical rules are foreign to the Fourth Amendment's totality-of-the-circumstances tests, whether they help or hurt the government. *See, e.g., Byrd v. United States*, 584 U.S. 395, 405 (2018) (rejecting *per se* rule that "drivers who are not listed on rental agreements always lack an expectation of privacy in the automobile based on the rental company's lack of authorization alone"); *Barnes v. Felix*, 145 S. Ct. 1353, 1358 (2025) (rejecting "moment of the threat" doctrine in excessive-force context).

The district court's injunction contravenes that principle. As this Court has held, "[t]he nature of the totality-of-the-circumstances analysis … precludes us from holding that certain factors are presumptively given no weight without considering those factors in the full context of each particular case"; "prior decisions holding that certain factors are per se not probative or are per se minimally probative do not … comply with Supreme Court precedent." *United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir.

16

2013) (en banc). Yet the injunction here imposes a categorical rule that the four listed factors cannot support reasonable suspicion for an investigatory stop. *See* Op.50. And it does so even though some combination of the enumerated factors will at least sometimes support reasonable suspicion for a stop. That cannot be correct.

### C.    The Injunction Impermissibly Granted District-Wide Relief.

If nothing else, the court's grant of district-wide relief must be stayed because it flagrantly violates the Supreme Court's recent holding in *CASA*, forbidding the use of universal (*i.e.*, non-party-specific) injunctions. The court did not enjoin the government from detaining *Plaintiffs* without reasonable suspicion; it enjoined the government from stopping or detaining *anyone in the district* without reasonable suspicion. That cannot be squared with *CASA*—and the district court barely tried. Indeed, the court failed even to cite the Supreme Court's ruling, let alone engage with its holding.

In *CASA*, the Supreme Court addressed "universal injunctions," or injunctions that bar the defendant from enforcing "a law or policy against *anyone*," in contrast to injunctions limited to the plaintiff. 2025 WL 1773631, at *4. The Court found that the statutory grant of jurisdiction over suits "in equity" "encompasses only those sorts of equitable remedies traditionally accorded by courts of equity at our country's inception." *Id.* at *5-*6. And "[n]either a universal injunction nor any analogous form of relief was available … at the time of the founding." *Id.* at *6. Rather, "suits in equity were brought by and against individual parties." *Id.* "Because the universal injunction lacks a historical pedigree, it falls outside the bounds of a federal court's equitable

17

authority under the Judiciary Act." *Id.* at *8. At most, a court granting equitable relief "may administer complete relief *between the parties*." *Id.* at *11. "Under this principle, the question is not whether an injunction offers complete relief to everyone potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." *Id.* And even then, "[c]omplete relief is not a guarantee—it is the maximum a court can provide." *Id.* at *12.

The district court nonetheless determined that it "must enjoin the conduct of all law enforcement engaged in immigration enforcement throughout the District." Op.36 Without citing or discussing *CASA*, the court summarily dismissed the government's concerns about universal injunctions as "unavailing" because "the requested injunction is only District-wide and not nationwide." Op.30 n.21. That completely misses the point. Whether nationwide or only district-wide, the injunction goes beyond providing complete relief to *Plaintiffs*.

The district court also thought a narrower injunction would not work, because it would be impractical to expect agents to inquire into whether someone is a plaintiff before conducting a stop or detention. Op.36. But *CASA* cannot be so easily brushed aside. The Court warned that "[c]omplete relief" is not "synonymous with universal relief," but is instead "a narrower concept: The equitable tradition has long embraced the rule that courts generally 'may administer complete relief *between the parties*.'" *CASA*, 2025 WL 1773631, at *11. Thus, although "the complete-relief principle has deep roots in equity," it does not "justif[y] award of relief to nonparties." *Id.* at *10. To be sure,

18

there are cases where "afford[ing] the plaintiff complete relief[] [leaves] the court [with] only one feasible option," which has "the practical effect of benefiting nonparties"— but any such "benefit to nonparties . . . [is] merely incidental." *Id.* at *11. Here, though, the benefit to nonparties is anything but incidental: The court expressly ruled that it would "enjoin the conduct of all law enforcement engaged in immigration enforcement throughout the District." Op.36. *CASA* does not allow that.[3]

If anything, the district court's concerns about a party-specific injunction merely underscore that broad, structural injunctions are rarely appropriate in the Fourth Amendment context. *See* Orin S. Kerr, *The Limits of Fourth Amendment Injunctions*, 7 J. on Telecomm'ns & High Tech. L. 127, 129 (2009) ("Fourth Amendment doctrine is tremendously fact-specific: every fact pattern is different, and even the exceptions to the exceptions have their own exceptions. Courts are poorly suited to design broad injunctive relief in this setting."). They are certainly not a reason to ignore the Supreme Court's warnings about the limits of federal courts' equitable powers.

---

[3] Although Plaintiffs styled their amended complaint as a putative class action, they did not seek certification and the district court expressly did not rely on the class allegations to support the injunction. *See* Op.36 (approving district-wide injunction "without considering the unnamed class members and the propriety of certifying a class"). Accordingly, any injunction had to be limited to the Plaintiffs. *See Nat'l Ctr. for Immigrants Rights, Inc. v. INS*, 743 F.2d 1365, 1371 (9th Cir. 1984) ("in the absence of class certification, [a] preliminary injunction may properly cover only the named plaintiffs"). Of course, had the court tried to certify a class, that would have led to other fatal problems under Rule 23.

19

\*     \*     \*

This sweeping district-wide injunction, under which a single district judge purports to dictate a categorical formula for this sort of individualized inquiry and thereby assume plenary oversight of immigration enforcement in Los Angeles, is contrary to both the Fourth Amendment and basic principles of equity. A stay is required.

## II.   The Balance of Equities and Public Interest Favor a Stay.

The balance of harms, equities, and public interest overwhelmingly favor a stay pending appeal. *See Nken*, 556 U.S. at 435.

The government will suffer irreparable harm if the court's injunction remains in effect. Under federal law, the government only conducts warrantless arrest where officers have reasonable suspicion, based on specific articulable facts. Dkt. 71 (Havrick Decl.), ¶¶ 8-10; Dkt. 71 (Quinones Decl.) ¶¶ 4-5, 8-9. But the court's broad, structural injunction will have a chilling effect on that enforcement, because it threatens officers with contempt sanctions if the court retrospectively disagrees with their view of whether reasonable suspicion was satisfied on particular facts. *Cf. Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982); *see also* Exhibit A ¶¶ 8-10 (describing how the TRO will hamper law enforcement efforts and increase risks to agents); Exhibit B ¶¶ 14-20 (same). And that risk is potent, given that the court reached its judgment about the past arrests of three named Plaintiffs here, without giving the government a meaningful opportunity to marshal the facts and prove that reasonable suspicion *did* exist. Now

20

that it's had more time, the government has provided specific evidence that those arrests resulted from "a targeted enforcement action at a particular location where past surveillance and intelligence had confirmed that the target or individuals associated with him were observed to have recruited illegal aliens to work on landscaping jobs." *Compare* Ex. A – (Second Quinones Decl.) ¶ 6 *with* Dkt 71 (Quinones Decl.).

On the other side of the scale, the Fourth Amendment already applies by its own terms to all law enforcement actions and already provides remedies for violations. *See Egbert v. Boule*, 596 U.S. 482, 484 (2022)(addressing alternative remedies in context of excessive force complaint); *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1045 (1984). Those existing remedies suffice to protect Plaintiffs' interests and the public interest.

Finally, it is important to observe that the court's injunction appears to be only a first step toward an even more wholesale judicial usurpation. As part of the order, the court has directed the government to show cause why an even broader injunction should not issue—one that involves court-supervised training; a directive to develop "guidance" on reasonable suspicion; and (most incredibly) an obligation to maintain and share with Plaintiffs' ACLU counsel on a "regular schedule," "documentation of detentive stops" showing "factors supporting reasonable suspicion." Op.51. Relief is immediately warranted to nip this unconstitutional encroachment in the bud.

## CONCLUSION

For the foregoing reasons, the Court should grant a stay pending appeal.

21

Respectfully submitted,

BRETT A. SHUMATE
   *Acting Assistant Attorney General*

YAAKOV M. ROTH
   *Principal Deputy Assistant Attorney*
    *General*

DREW C. ENSIGN
   *Deputy Assistant Attorney General*

TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
   *Counsel to the Assistant Attorney General*

  *s/ John W. Blakeley*
JOHN W. BLAKELEY
   *Senior Counsel*
   *Office of Immigration Litigation*
   *Civil Division*
   *U.S. Department of Justice*
   *Washington, DC 20530*
   *(202) 514-1679*
   *John.blakeley@usdoj.gov*

July 2025

22

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Ninth Circuit Rules 32-3 and 27-1(1)(d) because it contains 5586 words. This motion also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ John W. Blakeley*
JOHN W. BLAKELEY

## CERTIFICATE OF SERVICE

I hereby certify that, on July 14, 2025, I electronically filed the foregoing docketing statement with the Clerk of the Court by using the Appellate Case Management System.  I further certify that the participants in the case are ACMS users and that service will be accomplished by using the ACMS system.

*s/ John W. Blakeley*
JOHN W. BLAKELEY
   *Senior Counsel*
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20530
Tel. (202) 514-1679

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Pedro Vasquez Perdomo, et al., | Case No. 2:25-cv-05605 |
| Plaintiffs, | **SECOND DECLARATION OF ANDRE QUINONES** |
| v. | |
| Kristi Noem, et al., | |
| Defendants. | |

### SECOND DECLARATION OF ANDRE QUINONES

I, Andre Quinones, hereby declare:

1.      I am employed by the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) and serve as a Deputy Field Office Director (FOD) of the Los Angeles Field Office (ERO Los Angeles).

2.      I have been employed by ICE, or its predecessor legacy Immigration and Naturalization Service (INS), since July 2000. In April 2011, I was promoted to Supervisory Detention and Deportation Officer and in October 2016, I was promoted to Assistant Field Office Director. In June 2020, I was promoted to Deputy Field

1

Office Director (DFOD).

      3.     As DFOD for ERO Los Angeles, I assist the Field Office Director in directing and overseeing ICE's enforcement of federal immigration laws within the Central District of California, which has the same geographic boundaries as the ERO Los Angeles Field Office. The ERO Los Angeles Field Office currently consists of over 290 law enforcement officers in six offices who are responsible for enforcing federal immigration laws in seven California counties with a combined population of over 20 million people.

      4.     The majority of ERO's immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at-large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

      5.     ERO Los Angeles officers are trained that, under the Fourth Amendment, case law, and relevant regulations, brief detention for questioning

requires an immigration officer to have reasonable suspicion, based on specific, articulable facts, that the person being questioned is an alien illegally in the United States. Under a totality of the circumstances approach, a local officer, based on his/her own experience and specialized training, may consider, including and not limited to, the following facts in building reasonable suspicion: the geographical location in which the alien was observed or found; whether that location is known to be frequented by illegal aliens seeking work; whether the location is known to be associated with specific businesses or employment engaged in criminal activity, including the smuggling, trafficking, or employment of illegal aliens; individualized facts, including any suspicious or evasive behavior of the individual observed prior to or during the encounter, or any pattern or practice of such behavior; any investigation or surveillance showing the above; and any other particularized facts justifying an investigatory stop.

6.      Regarding the allegations of Plaintiffs Pedro Vasquez Perdomo, Carlos Alexander Osorto, and Issac Villegas Molina, all three arrests arose or were the result of a targeted enforcement action at a particular location where past surveillance and intelligence had confirmed that the target or individuals associated with him were observed to have recruited illegal aliens to work on landscaping jobs. It was also determined to be a location where the target and the workers would get food before heading off for a job.

3

7.      From June 1, 2025 to the present, ERO has processed approximately 2,805 immigration arrests and numerous criminal arrests in the Los Angeles area.

8.      I have reviewed the July 11, 2025 order in this case, which granted the motions for temporary restraining orders (TROs). The District Court's ruling seems to place burdensome and unclear prohibitions on the use of neutral factors related to location and employment that may be critical to support reasonable suspicion. Investigation and surveillance often involve particular locations where illegal activity is known to be present and facts related to employment or occupations may also have a nexus to illegal activity, including smuggling and human trafficking. By injecting confusion and uncertainty into when and how these factors can be used to build reasonable suspicion, the District Court's ruling will hamper officers' ability to conduct legitimate law enforcement operations.

9.      In my experience, officers develop reasonable suspicion based in part on prior investigation and surveillance but also based on events and interactions occurring in real time on the ground. The District Court's ruling fails to provide clear instructions to the Defendant law enforcement agencies as to how reasonable suspicion must be developed going forward, how the enumerated factors such as location or employment can be used under the ruling and what additional information, if any, would be needed if those factors are used. The ruling is also unclear as to whether federal immigration statutes or federal criminal statutes, or

both, are covered by its prohibitions. The ruling is vague and overbroad as to whether it applies to arrests in which Defendants have judicial warrants, or arrests made without a warrant, or both. This lack of clarity and overbreadth will impair officers' ability to develop reasonable suspicion in the field and impact officers' ability to effectively and efficiently conduct operations because they are concerned with violating the new ruling.

10. The District Court's ruling adds confusion and hampers an officer's ability to act decisively by injecting the threat of violating the ruling into every decision in the field while, at the same time, the officers and agents are subject to attacks and threats in the field. In recent months, incidents of violence and doxxing against ICE officers and agents have increased 700% over past levels nationwide. Individuals attacking and threatening officers and agents have turned what would normally be a routine immigration enforcement action into a highly volatile and dangerous situation for officers in the Los Angeles area who are simply enforcing immigration laws passed by Congress. *See* Democrats Inspire Vicious, Escalating Attacks on ICE, at https//www.whitehouse.gov/articles/2025/07/democrats-inspire-viscious-escalating-attacks-on-ICE (last visited Jul. 13, 2025).

11. For example, on June 24, 2025, ERO Los Angeles officers, detailed ERO officers and Special Agents with the Federal Bureau of Investigation (FBI) Los Angeles arrived at the intersection of East 9th St. and Main St. in Los Angeles, CA,

as part of ongoing Title 8 enforcement operations to engage in enforcement operations, which resulted in an arrest. As officers and agents attempted to leave the area, a crowd gathered, preventing them and their vehicles from departing. The ERO officers exited their vehicles and gave verbal commands to disperse. Three unknown individuals became more aggressive, closing their distance on the ERO officers and yelling obscenities. ERO officers attempted to push them back to create distance, but the individuals continued to advance. One ERO officer deployed oleoresin capsicum (OC) spray on the three individuals, causing two to disperse. The third individual struck an ERO officer in the face. ERO officers and FBI agents on scene immediately attempted to arrest the offender, who actively resisted. ERO officers and FBI agents eventually gained control of the suspect and placed him under arrest. Emergency medical services were called to the scene but could not reach the location due to the size of the crowd. Given these dangerous situations in which multiple, unknown individuals are filming, threatening, or assaulting law enforcement officers, ICE officers are taking precautions, such as masking to prevent doxxing and attempting to control dangerous situations through appropriate crowd control and law enforcement techniques.

12.  In the Los Angeles area, we have observed an increase in targeted action towards ICE personnel, facilities, and operations, including vandalism of ICE facilities, vehicles, and property, doxing of ICE personnel, and video recording and

photographing of ICE personnel and operations. We have received multiple reports of ICE officers in the Los Angeles area being doxed on social media websites including TikTok and YouTube, with death threats to ICE agents and officers' photographs, names, titles, email addresses, hotel and home addresses posted on the social media sites. Flyers containing photographs of multiple ICE officers in Los Angeles have been posted in various neighborhoods. One officer in the Los Angeles area received suspicious packages from Amazon. On Friday, July 4, 2025, a Ford Ranger truck followed an ERO Assistant Field Office Director (AFOD) from the Federal Building at 300 N Los Angeles St, LA, CA 9012 to El Monte, CA on the I-10 freeway. The vehicle was driving aggressively attempting to take the AFOD'S photograph. There are also multiple websites, such as The ICE List and The Crustian Daily, that are focused on posting locations and photos and personal information of officers and agents which encourage people to incite violence and attempt to discover their identities. Multiple ICE officers from Los Angeles are listed on the ICE List. Such sites encourage their users to identify ICE officer profiles and pages on LinkedIn and Facebook, take photographs of officers without masks or of their faces when the mask slips off and report that information to be posted on the website.

///

///

///

7

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 13th day of July 2025.

Andre Quinones
Deputy Field Office Director
DHS ICE ERO Los Angeles

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Pedro Vasquez Perdomo, et al., | Case No. 2:25-cv-05605 |
| Plaintiffs, | **DECLARATION OF DANIEL I. PARRA** |
| v. | |
| Kristi Noem, et al., | |
| Defendants. | |

## DECLARATION OF DANIEL I. PARRA

I, Daniel I. Parra, declare and affirm as follows:

1.  I am employed by U.S. Border Patrol, an operational component of U.S. Customs and Border Protection (CBP) within the Department of Homeland Security (DHS). CBP is charged with enforcing the Nation's immigration laws in order to protect national security and uphold the integrity of the immigration system. As part of this mission, CBP Border Patrol Agents and officers are responsible for preventing the unlawful entry of individuals into the United States, apprehending those who attempt to enter illegally or who have violated the immigration laws in accordance with applicable laws. Through these activities, CBP seeks to secure the

1

border, disrupt human smuggling and trafficking networks, and ensure consistent enforcement of the immigration laws of the United States.

2.    I am the Deputy Chief Patrol Agent of the El Centro Sector and have been in this position since May 8, 2022. In this role, I am responsible for managing U.S. Border Patrol operations and administrative functions within the El Centro Sector, which encompasses 70 miles of land border, as well as inland areas of California extending to the Oregon State line. I oversee a workforce of over 1,200 employees and manage a multimillion-dollar budget.

3.    I entered on duty with the U.S. Border Patrol on July 28, 2002. My first assignment as a Border Patrol Agent was at the El Centro Station, El Centro Sector. Across the span of my career with the U.S. Border Patrol, I have served in a variety of leadership positions ranging in scope and complexity. These assignments include Supervisory Border Patrol Agent and Field Operations Supervisor, Indio Station, El Centro Sector; Executive Officer of Operations, El Centro Sector; Assistant Chief, U.S. Border Patrol Headquarters, Law Enforcement Operations Directorate - Pacific Corridor; Deputy Patrol Agent in Charge of Operations, Ajo Station, Tucson Sector; Patrol Agent in Charge, Blythe Station, Yuma Sector; and Division Chief, Law Enforcement Operational Programs, Tucson Sector. As the Division Chief, I oversaw multiple law enforcement operational programs in Tucson Sector, the largest and one of the busiest sectors in the nation.

4.    My current Role is Incident Commander at the Incident Command Post for the current CBP operation in Los Angeles.  In this position, I have operational oversight and am responsible for all U.S. Border Patrol assets and operations in the greater Los Angeles area.  Furthermore, I ensure that all personnel under my command have the proper resources, not only in terms of materiel, but the requisite training needed to operate in such a complex and fluid environment.  As the Incident Commander, I report directly to the Lead Field Coordinator and National Incident Commander Center.

5.    On June 6, 2025, to support U.S. Immigration and Customs Enforcement (ICE-ERO), CBP agents and officers were deployed to Los Angeles, California, as part of a national, multi-agency operation.  The operation focuses on enhancing public safety and enforcing immigration law through law enforcement efforts.

6.    As part of this operation, CBP agents and officers, in coordination with other federal agencies, along with their federal partners, are involved in a variety of different law enforcement encounters and enforcement actions.  Officers and agents regularly engage in consensual encounters, investigative detentions, warrantless arrests, and arrests pursuant to both immigration and criminal judicial warrants.

7.    I have read the July 11, 2025 order that included a temporary restraining order (TRO).  Based upon my reading of the order, it prohibits our agents and

3

officers from conducting investigative detentions, or "detentive stops," without "reasonable suspicion that the person stopped is within the United States in violation of U.S. immigration law." The order then proceeds to list four general factors that agents and officers are prohibited from using, "alone or in combination," in developing reasonable suspicion:

- apparent race or ethnicity;

- speaking Spanish or English with an accent;

- presence at a particular location (e.g. bus stop, car wash, tow yard, day laborer pick up site, agricultural site, etc.); or

- the type of work one does.

8. From a law enforcement perspective—where agents and officers routinely conduct lawful detentions based on reasonable suspicion as part of daily operations—this order is confusing and impractical to implement. It will likely cause hesitation and delay in the field, which in turn increases the risk of assaults on officers, escalations during volatile encounters, and injuries to both officers and the public, particularly in the already high-risk and unpredictable environment of Los Angeles. It will also severely undermine CBP's ability to successfully execute its mission to enforce federal law.

9. The first part of the order requires CBP agents and officers conducting immigration enforcement activities to have reasonable suspicion that a person is

4

violating federal immigration law before making a detentive stop. But this simply restates what the law already requires, and what our agents and officers are trained to do and regularly carry out in the course of their duties. The officers and agents who have been deployed in this operation have years of experience in the field developing reasonable suspicion based upon the totality of the circumstances, and effectuating lawful detentive stops.

10.     However, it is the second part of the order, listing the four prohibited factors that presents the greater operational challenge. It is unclear exactly what conduct is prohibited by the order. One possible interpretation seems to categorically prohibit certain factors from contributing to reasonable suspicion. Another allows that the same factors may be considered with additional facts. Because of this ambiguity the order is likely to create significant confusion among agents and officers who are trying to ensure compliance in the field.

11.     Under a totality of the circumstances approach, an agent or officer, based on his/her own experience and specialized training, may consider, including and not limited to, the following facts in building reasonable suspicion: the geographical location in which the alien was observed or found; whether that location is known to be frequented by illegal aliens seeking work; whether the location is known to be associated with specific businesses or employment engaged in criminal activity, including the smuggling, trafficking, or employment of illegal

aliens; individualized facts, including any suspicious or evasive behavior of the individual observed prior to or during the encounter, or any pattern or practice of such behavior; any investigation or surveillance showing the above; and any other particularized facts justifying a detentive stop. Location and occupation as part of the totality of the circumstances are factors that contribute to developing reasonable suspicion. But those factors seem to be restricted by the order. Both factors are particularly pertinent in the context of immigration enforcement and excluding them runs counter to well-established practices and training requiring immigration officials to evaluate the totality of the circumstances, which expressly includes considerations such as occupation and location. The order fails to recognize that when agents and officers evaluate certain locations and types of employment (generally considered together) they are part of the totality of the circumstances.

12. Many agents and officers assigned to the Los Angeles operation have extensive tenure and experience working for the agency. Over time, they have developed specialized expertise and practical knowledge of the factors that are likely to indicate reasonable suspicion that a person is illegally present. Their understanding is informed by thousands of stops, arrests, interviews, and operations, as well as surveillance and intelligence reporting regarding migration flow. That experience and information helps them identify businesses and settings where individuals unlawfully present in the country often find work, such as cash-paid day

6

labor locations and occupations.

13.   When conducting a detentive stop, agents consider location and type of work as part of the totality of circumstances along with additional facts stemming from surveillance, agent observations including behavior of individuals, or intelligence. While the order may qualify that agents and officers cannot rely "solely" on these factors in establishing reasonable suspicion, it implies that, when considered along with other information, their use is permissible. However, the simple fact that the order prohibits or restricts consideration of location and types of work from the reasonable suspicion calculation will create immediate confusion and concern for officers and agents.

14.   The fact that the order includes as "examples" many locations and occupations connected to previous enforcement actions that reflect areas historically associated with patterns of unlawful immigration activity through years of enforcement experience and intelligence gathering, creates even more ambiguity and operational problems. In an effort to comply with this order, officers and agents will likely avoid taking lawful enforcement actions when they have sufficient, particularized facts to establish reasonable suspicion, because one of these two prohibited factors formed a part of their suspicion. This same ambiguity will also hinder officers and agents from conducting consensual encounters. Further compounding the practical infeasibility of the order as written, the requirement in

7

the TRO that the defendants can only detain individuals if they have "reasonable suspicion that the person to be stopped is within the United States in violation of immigration law" does not specify which "laws" it contemplates. This is particularly relevant in those situations in which CBP engages in immigration enforcement activities and someone (regardless of citizenship) damages federal property or assaults a federal officer. It is unclear if "detentive stops" relating to such enforcement activities that are adjacent or incidental to immigration enforcement are covered by the order.

15. The resulting uncertainty about what the law allows can cause agents and officers to hesitate in the field, which can have tragic consequences. This danger is magnified exponentially in the volatile and extremely uncertain environment agents and officers are facing.

16. The level of and propensity for violence against our agents and officers are at levels never before seen by CBP. Agents have encountered large-scale protests that turned violent outside of federal buildings in downtown Los Angeles, crowds of rioters descending within minutes of CBP agents and officers arriving at a specific location, and growing violence. On June 7, 2025, in the city of Paramount, crowds in the hundreds amassed at our location and began launching various projectiles at us while we were staged at a HSI facility.

17. Our agents and officers have been assaulted regularly. Often,

8

immediately upon arriving at a particular location, large crowds of people quickly descend on CBP agents and officers. The crowds can amass in numbers upwards of 50-100 people. Crowd members routinely throw rocks, chunks of concrete, frozen water bottles, and other dangerous projectiles at agents and officers. In some of the incidents, such as the Paramount incident, these projectiles have included Molotov cocktails and professional fireworks. CBP agents and officers have been punched, kicked, tackled, and even bitten by some individuals. On July 10th, while executing a criminal warrant on a marijuana grow operation, more than 500 rioters attempted to disrupt operations, damaged government vehicles, and an individual was captured on video firing what looked like a pistol at federal law enforcement. This behavior emboldens others to act in the same manner.

18.    In addition to direct assaults, agents and officers have also faced extensive incidents of vandalism and sabotage. CBP vehicles have sustained extensive damage from thrown projectiles, graffiti, and have had their tires intentionally slashed or spiked. In one instance, a government vehicle was stolen from a parking lot. This also places the detainees in danger as they are passengers within the transport vans that have been rocked and have had their tires slashed. The unruly protests have blocked roadways delaying time in custody for detainees and placing them in danger and delaying custodial requirements. These acts have directly impacted operational effectiveness and placed personnel at further risk as

such acts hinder agents, officers, and the public from promptly exiting hazardous situations.

19.     Compounding these issues, agents have received credible threats targeting them and their families, prompting several to relocate their lodging for safety. There are multiple groups on social media outlets including Reddit, TikTok, Instagram, and NextDoor forums, such as No Sleep for ICE, that are focused on posting locations, photos, and personal information of officers and agents, attempting to discover their identities, and encouraging people to violence against agents and officers. These efforts have included photographing license plates on personal vehicles entering and exiting federal facilities, encouraging tow companies to tow government vehicles, identifying lodging and staging locations, and organizing efforts to disrupt enforcement operations with violence. A newly created app called ICEblock features real-time tracking of CBP and ICE agents, allowing the public to report sightings of agents and officers and notifying those intent on violence of locations to descend upon. These threats extend the danger to agents and officers beyond duty hours. As a result, agents and officers have donned masks to protect their personal identities from doxxing for the safety of themselves and their families.

20.     Due to sanctuary jurisdiction policies, CBP and its federal partners receive little support from state and local law enforcement due to prohibitions in

California and local law. This lack of aid increases the risk for officers in the field. The court's order introduces confusion into operations where agents and officers are already putting their lives at risk.

21.    Although the agency has not yet been ordered to implement additional training and guidance for agents and officers on developing reasonable suspicion, the practical effect of this order is that it will require the development of new training protocols.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 14th day of July 2025.

Daniel I. Parra
Deputy Chief Patrol Agent
DHS CBP, El Centro Sector

11