No. 25-4312

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

PEDRO VASQUEZ PERDOMO, et al.,

Plaintiffs-Appellees,

v.

KRISTI NOEM, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Central District of California
District Court Case No. 2:25-cv-5605-MEMF-SP

RENEWED EMERGENCY MOTION UNDER CIRCUIT RULE 27-3
FOR STAY PENDING APPEAL AND IMMEDIATE ADMINISTRATIVE STAY
RELIEF REQUESTED BY JULY 21, 2025

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney
General

DREW C. ENSIGN
Deputy Assistant Attorney General

TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General

JONATHAN K. ROSS
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-7662

BILAL A. ESSAYLI
United States Attorney

DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division

DANIEL A. BECK
Assistant United States Attorney
Chief, Complex and Defensive Litigation
Section

ALEXANDER L. FARRELL (SBN
335008)
PAULINE H. ALARCON (SBN 345785)
Assistant United States Attorneys
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Tel: (213) 894-2400

# CIRCUIT RULE 27-3 CERTIFICATE

Undersigned counsel certifies that the following is the information required by

Circuit Rule 27-3:

## (1) Telephone numbers and addresses of attorneys for the parties

Counsel for Defendants-Appellants:

> Brett A. Shumate (brett.a.shumate@usdoj.gov)
> Yaakov M. Roth (yaakov.m.roth@usdoj.gov)
> Drew C. Ensign (drew.c.ensign@usdoj.gov)
> Tiberius Davis (Tiberius.Davis@usdoj.gov)
> Sean Skedzielewski (Sean.Skedzielewski@usdoj.gov)
> Jonathan K. Ross (Jonathan.K.Ross@usdoj.gov)
> United States Department of Justice, Civil Division
> Office of Immigration Litigation
> P.O. Box 878, Ben Franklin Station
> Washington, DC 20044
> (202) 305-7662
> Bilal A. Essayli (bilal.essayli@usdoj.gov)
> David M. Harris (david.m.harris@usdoj.gov)
> Daniel A. Beck (Daniel.Beck@usdoj.gov)
> Pauline H. Alarcon (Pauline.Alarcon@usdoj.gov)
> Alexander L. Farrell (alexander.farrell@usdoj.gov)

Counsel for Plaintiffs-Appellees:

> Stacy Tolchin
> stacy@tolchinimmigration.com
> Law Offices of Stacy Tolchin
> 776 E. Green St., Suite 210
> Pasadena, CA 91101
> Telephone: (213) 622-7450
> Facsimile: (213) 622-7233
> Mohammad Tajsar (mtajsar@aclusocal.org)
> Mayra Joachin (mjoachin@aclusocal.org)
> Eva Bitran (ebitran@aclusocal.org)
> Dae Keun Kwon  (akwon@aclusocal.org)

Oliver Ma (oma@aclusocal.org)
Stephanie Padilla (spadilla@aclusocal.org)
Diana Sanchez (dianasanchez@aclusocal.org)
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017-4022
Telephone: (213) 977-5232
Facsimile: (213) 201-7878
Counsel for Stop/Arrest Plaintiffs

Lauren Michel Wilfong (lwilfong@ndlon.org)
NATIONAL DAY LABORER ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689
Counsel for Stop/Arrest Plaintiffs

Matthew J. Craig (mcraig@heckerfink.com)
Mack E. Jenkins (mjenkins@heckerfink.com)
HECKER FINK LLP
1150 South Olive Street, Suite 10-140
Los Angeles, CA 90015
Telephone: (212) 763-0883
Facsimile: (212) 564-0883
Counsel for Access/Conditions Plaintiffs

Mark Rosenbaum (mrosenbaum@publiccounsel.org)
Rebecca Brown (rbrown@publiccounsel.org)
Sophia Wrench (swrench@publiccounsel.org)
Ritu Mahajan (rmahajan@publiccounsel.org)
Gina Amato (gamato@publiccounsel.org)
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977
Counsel for All Plaintiffs

Anne Lai (alai@law.uci.edu)
UCI LAW CLINIC
P.O. Box 5479
Irvine, CA 92616-5479
Telephone: (949) 824-9894
Counsel for All Plaintiffs

Bree Bernwanger (bbernwanger@aclunc.org)
ACLU FOUNDATION OF
NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-1478
Counsel for All Plaintiffs

Brisa Velazquez Oatis (bvoatis@aclu-sdic.org)
ACLU OF
SAN DIEGO AND IMPERIAL COUNTIES
2760 Fifth Ave, Suite 300
San Diego, CA 92103
Telephone: (619) 398-4199
Counsel for All Plaintiffs

## (2) Facts showing the existence and nature of emergency

As set forth more fully in the motion, the district court has entered a sweeping, district-wide injunction placing coercive restraints on lawful immigration enforcement affecting every immigration stop and detention. The district court thought the issues presented were sufficiently urgent that she afforded the government only two business days to respond to hundreds of pages of submissions and issued the injunction in a written decision only days later. And, as explained below, the injunction with respect to Fourth Amendment stops is inflicting irreparable harm by preventing the Executive from ensuring that immigration laws are enforced.

**(3) Explanation for why motion could not have been filed earlier**

The district court issued its order on Friday evening, July 11, 2025, and Defendants sought emergency relief from this Court on Monday, July 14, 2025. The Court denied that motion without prejudice because the district court had not yet ruled on Defendants' stay motion below. The district court denied that motion this evening, and Defendants are now promptly renewing their motion on appeal.

**(4) When and how counsel notified**

This is a renewed motion. Nonetheless, Defendants' counsel notified counsel for Plaintiffs by email on July 17, 2025, of Defendants' intention to file this motion. Plaintiffs stated that they continue to oppose Defendants' renewed motion for the same reasons Plaintiffs set forth previously. Dkt.7. Service will be effected by electronic service through the CM/ECF system.

**(5) Submissions to the district court**

In its previous order, this court denied Defendants' Emergency Motion for a Stay without prejudice because the district court had yet to rule on the stay motion before it under Federal Rule of Appellate Procedure 8. Defendants had previously requested a stay pending appeal from the district court in their opposition to the TRO application (Dkt.71 at 24) and during the July 10, 2025 hearing on the ex parte order. The district court denied the request. Dkt.87 at 52 n.37. Defendants filed an additional stay motion in district court on July 14, 2025. Dkt.94. Given the urgency, Defendants

requested an expedited ruling by July 17 at 5:00 P.M. Dkt.107. On July 17, 2025, the district court denied the application for stay of the TRO. Dkt.108.

## (6) Decision requested by July 21, 2025

A decision on the motion for a stay pending appeal is requested as soon as possible, with an administrative stay in the interim, ideally by July 21, 2025.

Counsel for Defendants/Appellants

BRETT A. SHUMATE
  *Assistant Attorney General*
Civil Division
YAAKOV M. ROTH
  *Principal Deputy Assistant Attorney General*
DREW C. ENSIGN
  *Deputy Assistant Attorney General*
TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
  *Counsel to the Assistant Attorney General*

JONATHAN K. ROSS
  *Senior Litigation Counsel*
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20530
Tel. (202) 305-7662

# INTRODUCTION

This was originally a routine habeas action filed by three individual aliens seeking release from immigration detention.  But, apparently seeking to manipulate the process of judicial assignment, the original petitioners' counsel then filed an amended complaint adding a host of new individual and organizational plaintiffs, leveling systemic challenges to federal immigration enforcement in the Los Angeles area.  And a day later, on the eve of the July 4 holiday, they filed an "emergency" *ex parte* motion asking the court to impose a straight-jacket injunction that would vastly restrict the government's ability to stop and detain anyone on suspicion of being unlawfully present in the United States.  The court gave the government just two business days to respond to hundreds of pages of submissions, and largely rubber-stamped Plaintiffs' proposed order just days later.  The result is a sweeping, district-wide injunction that threatens to hobble lawful immigration enforcement by hanging a Damocles sword of contempt over every immigration stop.  The government seeks an immediate stay of that untenable order pending appeal, and an administrative stay in the meantime.

Invoking the Fourth Amendment, the court ordered that federal agents cannot conduct any detentive stops without reasonable suspicion—and then purported to identify a host of factors (like an individual's race, language, location, or type of work) that are supposedly irrelevant to reasonable suspicion.  That injunction, which appears to be a first step to placing federal immigration enforcement under judicial monitorship, is indefensible on every level.

1

At the outset, Plaintiffs have no standing to seek it. The individual Plaintiffs allege they were previously stopped without reasonable suspicion, but even if that were true (and it is not, although the district court failed to give the government a meaningful opportunity to develop that record), it is black-letter law that past interactions with law enforcement do not suffice to seek a prospective injunction. *See City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). *Lyons* should be the end of this case. The district court tried to evade it by claiming a likelihood that officers will detain *someone* without reasonable suspicion in the future. But that was equally true in *Lyons*. It is the *Plaintiffs* who must show an imminent threat of injury, and they plainly cannot.

On the merits, the injunction badly misunderstands the Fourth Amendment. Of course reasonable suspicion is required for a stop, but an injunction repeating that constitutional standard is an impermissibly vague follow-the-law injunction. And in trying to reduce the Fourth Amendment test to a formula by identifying a list of "irrelevant" factors, the court grievously erred—the whole point of the constitutional "reasonableness" standard is that *no* factor is categorically off the table. The Fourth Amendment imposes a totality-of-the-circumstances test, and it is entirely possible that one's language, location, or type of work could be relevant in a particular factual context. Trying to develop bright-line rules in this context is a fool's errand.

Finally, if nothing else, the district court ignored the Supreme Court's recent decision rejecting universal injunctions. *Trump v. CASA, Inc.*, 2025 WL 1773631 (U.S. June 27, 2025). Violating the equitable principles that the Court articulated just weeks

ago, the court enjoined the government from *any* detentive stops in the Central District of California without following the court's novel rules—whether those stops affect Plaintiffs or not. The district court thought a plaintiff-specific injunction would be unworkable in this context, but *CASA* contains no such exception; the unworkability merely confirms the misguided nature of this type of structural remedy.

Immediate relief is warranted here not only because of the magnitude of the court's legal errors, but also their practical consequences for the separation of powers and the government's sovereign prerogatives. It is untenable for a district judge to single-handedly "restructure the operations" of federal immigration enforcement and usurp "ongoing judicial supervision of an agency normally, and properly, overseen by the executive branch." *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1044 (9th Cir. 1999) (en banc). And make no mistake, that is exactly what this district court is doing. Indeed, the current injunction is only the start; the court has ordered the government to show cause why it should not also be required to develop policies, compel agents to undergo training; and even share records of each and every stop with the ACLU going forward. This judicial takeover cannot be allowed to stand.

For these reasons, this Court should stay the district court's injunction pending appeal and immediately grant an administrative stay while it considers this application. *See, e.g.*, *Newsom v. Trump*, 2025 WL 1712930, at *4 (9th Cir. June 19, 2025) (staying order that purported to block deployment of National Guard).

## STATEMENT

**1.** On June 20, 2025, three individual aliens filed a habeas petition in the district court seeking release from immigration detention. Dkt.1. Two weeks later, on July 2, they filed an amended complaint adding two other named individual plaintiffs plus four legal services organizations. Dkt.16. And the next day, before the July 4 holiday, they filed an emergency *ex parte* TRO application. Dkt.45. These filings, accompanied by more than three hundred pages of exhibits, vastly expanded the scope of the suit to encompass all immigration enforcement throughout the entire district. Dkt.38, 45.[1]

As relevant here, Plaintiffs alleged that federal agents are engaged in a pattern or practice of unlawful immigration detentions in violation of the Fourth Amendment. Dkt.45 at 6-13. The three original petitioners are unlawful aliens who were arrested outside a donut shop known to ICE as a location where an illegal immigrant picked up other illegal immigrants for labor. Dkt.94-1. One remains detained; the other two were released on bond pending removal. *Id.* One of the two new Plaintiffs (Hernandez Viramontes) alleges that agents came to the car wash where he works on four occasions in June, and on one of those occasions briefly detained him before verifying his citizenship. Dkt.45-4. The second new plaintiff (Gavidia) says agents once seized him at a tow yard and asked about his citizenship status. Dkt.45-9.

---

[1] Plaintiffs actually filed two *ex parte* TRO applications, both of which the court granted. But this motion seeks an emergency stay only as to one of those applications, due to its especially extreme consequences.

The three organizational Plaintiffs relevant to this claim are L.A. Worker Center Network, United Farm Workers, and Coalition for Humane Immigrant Rights. Each provides services to immigrants and is concerned with immigrant rights. They generally allege that their members have been detained and fear that immigration agents will detain them again. Dkt.16, ¶¶ 173, 179, 189.

For relief, Plaintiffs sought a sweeping injunction barring federal agents from conducting any detentive stops without reasonable suspicion, defined to exclude any reliance on race or ethnicity, language, location, or type of work. Dkt.45-22, at 4-6.2.

The district court gave the government just two business days to respond to the voluminous applications, then held a hearing two days after that. The court issued an order granting the two applications the following day. Dkt.87 (Op.).

As to standing, the court observed that only one named plaintiff needed to satisfy Article III, and found that Gavidia did so because he had "suffered an invasion of a legally protected interest" and that the conduct complained of would recur. Op.35. As to the merits, the court concluded that Plaintiffs were likely to succeed in showing the government was "conducting seizures that require at least reasonable suspicion," and that "the seizures were not supported by reasonable suspicion." Op.36. The court agreed with Plaintiffs that reliance on race or ethnicity, spoken language, location, and type of work cannot ever satisfy reasonable suspicion, alone or in combination; it further found that, for the relevant stops, immigration officials relied solely upon those enumerated factors. Op.39-45.

5

The court thought Plaintiffs had established irreparable harm based on the risk of future detentive stops. Op.47-48. Accordingly, the court enjoined the government from (i) "conducting detentive stops in this District" absent "reasonable suspicion that the person … is in violation of U.S. immigration law"; and (ii) relying solely on the enumerated factors for reasonable suspicion. The court also ordered the parties to show cause at some later date and time why a broader preliminary injunction should not issue, requiring the government to establish guidance, undergo training, and maintain and regularly share with Plaintiffs' counsel documentation showing reasonable suspicion for all detentive stops going forward. Op.50-51.

The district court denied a stay pending appeal on July 17, 2025. Dkt.108.

## ARGUMENT

A stay pending appeal is warranted because the government can show a strong likelihood of success on the merits, and because the balance of harms and public interest favor a stay. *Nken v. Holder*, 556 U.S. 418, 426 (2009). The district court's injunction plainly fails on standing grounds, merits grounds, and remedial grounds—it is wrong at least thrice over. And it threatens untenable consequences on the ground.

This Court has jurisdiction under the All Writs Act to stay the order. *See Newsom*, 2025 WL 1712930, at *4. The order itself is also appealable because it functions as a preliminary injunction. *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 762–63 (9th Cir. 2018). The parties submitted extensive briefs; the court held a hearing; and "the court's basis for issuing the order [was] strongly challenged." *Dep't of Educ. v. California*,

145 S. Ct. 966, 968 (2025). The order also includes no expiration date, *see Newsom*, 2025 WL 1712930, at *4; the court appears to intend for it to last *months* (Dkt.108 at 10). And as explained below, it carries "serious, perhaps irreparable, consequence[s]" to the government by hamstringing the ability of agents to enforce the law. *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981). This order does not maintain the status quo; it micromanages law enforcement. This Court has jurisdiction to review it and to stay it.

## I. The Injunction Is Indefensible.

In considering a stay, the first and most important factor is the movant's likely success on the merits. Here, the government will very likely prevail on appeal, because the district court issued an injunction that (i) Plaintiffs lacked standing to seek; (ii) is contrary to bedrock Fourth Amendment law; and (iii) violates the equitable principles that the Supreme Court articulated just weeks ago.

### A. Plaintiffs Lack Standing for Prospective Injunctive Relief

Plaintiffs must establish Article III standing to seek prospective injunctive relief. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013). That means they must show a future injury that is "imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). They cannot make that showing, and the district court badly erred in concluding otherwise.

**1.** This case is squarely controlled by *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). Lyons was stopped by police officers for a traffic violation and, despite offering no resistance, was seized and placed in a chokehold. *Id.* at 97. The Supreme Court held

7

that, while Lyons could pursue a damages claim for that past injury, he lacked standing for prospective relief because he had not shown that "he was likely to suffer future injury from the use of the chokeholds by police officers." *Id.* at 105. There was no "immediate threat" that he would *again* be "choke[d] … without any provocation or resistance on his part." *Id.* That was so even though the Court accepted as true that the police department had a policy of "routinely apply[ing] chokeholds in situations where they are not threatened by the use of deadly force." *Id.* That still did not mean that *Lyons himself* faced a likely threat of future injury.

That dooms Plaintiffs' standing here. The district court relied solely on Plaintiff Gavidia for standing. He alleges that he suffered a similar Fourth Amendment injury. Instead of a chokehold, agents allegedly stopped him based on his "skin color." Dkt.45-9, ¶¶ 9, 12. Even assuming those allegations were true (they are not), they do not "establish a real and immediate threat that he would again be [stopped because of his race]." *Lyons*, 461 U.S. at 105.

**2.** The district court misapplied *Lyons* by finding "a real and immediate threat that the conduct complained of will continue." Op.35. Notice what the court did *not* say—that there is a real and immediate threat *to Plaintiffs.* Just as Lyons was not likely to be subject to a chokehold again, the court below never found that Gavidia is likely to be subject to the same violations in the future. Again, the court merely found a likelihood of "recurrent injury." *Id.* But injury *to whom*? The Article III test is whether the *plaintiff* is likely to suffer future injury. Gavidia presented no such evidence.

8

**3.** Nor can the other Plaintiffs fill the gap. They are all in the same boat (or worse). Plaintiff Viramontes alleged that agents visited the carwash where he works twice without stopping him, and detained him for about 20 minutes on their third visit until they could verify his citizenship status. Dkt.45-4, ¶¶ 6-11. That single interaction provides no basis to believe there will be any future stops, let alone wrongful ones. On the contrary, Viramontes's own declaration makes clear that in a fourth encounter with a different group of agents later that same day, no arrests were made. *Id.* ¶ 14.

Two other plaintiffs, Perdomo and Molina, were detained and later released on bond pending removal proceedings. Dkt.81-1, ¶¶ 4-5. But other than alleging that the government continues to enforce federal immigration law in the district, the only "evidence" of their standing is Perdomo's "belie[f]" that he will be stopped again (Dkt.45-1, ¶ 11) and Molina's "worr[y]" that he will be arrested again for "look[ing] like an immigrant." (Dkt.45-3, ¶ 11). Subjective fear of a future illegal stop "is not certainly impending" and "cannot manufacture standing." *Clapper*, 568 U.S. at 416.

Finally, Plaintiff Osorto is still detained. Dkt.81-1, ¶ 6. He cannot possibly be in "immediate threat" of an unlawful stop by immigration officials since those officials obviously do not attempt to arrest someone already in detention.

The organizational Plaintiffs cannot demonstrate standing for the injunction either. Associational standing requires the organization to prove, among other things, that "its members would otherwise have standing to sue in their own right" and "neither the claim asserted nor the relief requested requires the participation of individual

members in the lawsuit." *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Neither is true here. As to the first, the organizations' members lack standing for the same reasons as the individual Plaintiffs—any risk of future harm is speculative. *See Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1143-44 (9th Cir. 2024) (no associational standing for warrantless searches because it was speculative that any members would be harmed in the future). And, as to the second, a Fourth Amendment claim is the paradigmatic example of one that requires the participation of individual members. "Fourth Amendment rights are personal rights which … may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165 (1969); *see also Rakas v. Illinois*, 439 U.S. 128 (1978); *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1111 (9th Cir. 2001); *Microsoft Corp. v. DOJ*, 233 F. Supp. 3d 887, 913–14 (W.D. Wash. 2017) (collecting cases).

**4.** Even if Plaintiffs could somehow show the bare minimum for Article III, they cannot come close to showing the "threat of immediate and irreparable harm" that is necessary for an injunction. *Hodgers-Durgin*, 199 F.3d at 1042. *Hodgers-Durgin* was a challenge to CBP practices allegedly in violation of the Fourth Amendment. The en banc court held that, even assuming the plaintiffs there had standing, they still "have not demonstrated a sufficient likelihood of injury to warrant equitable relief" because they were "stopped only once." *Id.* at 1044. So too here. Indeed, Plaintiffs presented evidence of only one *anonymous non-party* who was supposedly stopped by immigration officials twice. Dkt.38-11, ¶¶ 32-38. But "[i]n the absence of a likelihood of injury to

the named plaintiffs, there is no basis for granting injunctive relief that would restructure the operations of the Border Patrol and that would require ongoing judicial supervision of an agency normally, and properly, overseen by the executive branch." *Id.* at 1044 (emphasis added); *see also Lewis v. Casey*, 518 U.S. 343, 359 (1996) ("These two [injuries] were a patently inadequate basis for a conclusion of systemwide violation and imposition of systemwide relief."). So too here.

Notably, Plaintiffs and the district court both cited *LaDuke v. Nelson*, 762 F.2d 1318, 1324–26 (9th Cir. 1985), *amended*, 796 F.2d 309 (9th Cir. 1986), for standing. But the en banc court in *Hodgers-Durgin* narrowed *LaDuke* in light of intervening Supreme Court precedent. *See* 199 F.3d at 1044-45. And even the district court admitted that *LaDuke* is distinguishable on its face, because it involved direct evidence of an unlawful policy, whereas here no such evidence was presented. Op.45 n.33.

In short, whether viewed through the prism of Article III or the equitable factors for injunctive relief, the district court badly erred by turning alleged one-off past interactions into a basis for a sweeping forward-looking remedy.

## B.    The District Court Grossly Misapplied the Fourth Amendment.

The government would be likely to succeed on the merits even supposing the district court had jurisdiction. The court's order enjoining the government's detentive-stop practices rests on a serious misunderstanding of both the court's equitable powers and the governing Fourth Amendment principles.

11

**1.** To start, the injunction improperly orders the government to follow the law, without adequately defining the prohibited actions. Federal Rule of Civil Procedure 65 provides that "[e]very order granting an injunction and every restraining order must," among other things, "state its terms specifically" and "describe in reasonable detail … the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B)-(C). Courts thus may not enter injunctions that do no more than broadly direct defendants to comply with the law; "a bare injunction to follow the law" is impermissible. *E.g., Parsons v. Ryan*, 754 F.3d 657, 689 n.35 (9th Cir. 2014); *see also Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 74-76 (1967) (rejecting decree to enforce "an abstract conclusion of law"); *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).

That limitation on federal courts' equitable powers serves critically important interests, especially with respect to injunctive relief against executive-branch officials. It prevents courts from arrogating to themselves the power to generally superintend the Executive Branch's execution of the laws. *See CASA*, 2025 WL 1773631, at *14 ("the Judiciary does not have unbridled authority to enforce" the Executive's "duty to follow the law"); *Waite v. Macy*, 246 U.S. 606, 609 (1918) ("Courts will not issue injunctions against administrative officers on the mere apprehension that they will not do their duty or will not follow the law."). And it protects defendants from the risk of being held in contempt for violating a court order with ill-defined contours. As the Supreme Court explained in *Longshoremen*: "The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one." 389 U.S.

12

at 76. "Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid." *Id.*

The district court's detentive-stops injunction blatantly violates the prohibition of "follow the law" injunctions. The Fourth Amendment guarantee against unreasonable searches and seizures "extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest," including stops of individuals suspected of being in the United States illegally. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). By virtue of "the limited nature of the intrusion," however, "stops of this sort may be justified on facts that do not amount to the probable cause required for an arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 880 (1975). Instead, an officer may conduct such a stop based on reasonable suspicion—supported by "specific articulable facts, together with rational inferences from those facts"—that a person is an illegal alien. *Id.* at 884; *see also Terry v. Ohio*, 392 U.S. 1 (1968); 8 C.F.R. § 287.8(b)(2) ("If the immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States, the immigration officer may briefly detain the person for questioning.").

The injunction here simply recapitulates those basic Fourth Amendment principles. It first provides: "Defendants shall be enjoined from conducting detentive stops in this District unless the agent or officer has reasonable suspicion that the person

13

to be stopped is within the United States in violation of U.S. immigration law." Op.50. That just restates the constitutional requirement of reasonable suspicion. It is thus a forbidden "bare injunction to follow the law." *Parsons*, 754 F.3d at 689 n.35.

The second substantive provision of the injunction suffers from much the same defect. Although it enumerates four factors that defendants may not rely on, "alone or in combination, to form reasonable suspicion for a detentive stop," it simultaneously provides that defendants may do so "as permitted by law." Op.50. That is circular and fails to provide the requisite notice. And even if the "except as permitted by law" clause were set aside, the court's opinion leaves significant confusion about which practices the court did and did not intend to enjoin, as discussed further below. The order thus exposes defendants to the threat of judicial contempt based on nothing more than the prospect that the district court may ultimately disagree with an agent's application of the Fourth Amendment. The injunction is fatally flawed on this basis alone.

**2.** Even the injunction's more precise provisions rest on a serious misunderstanding of the Fourth Amendment. Under the injunction, "Defendants may not rely solely on" four factors, "alone or in combination, to form reasonable suspicion for a detentive stop." Op.50. Those factors are: "[a]pparent race or ethnicity"; "[s]peaking Spanish or speaking English with an accent"; "[p]resence at a particular location (e.g. bus stop, car wash, tow yard, day laborer pick up site, agricultural site, etc.)"; or "[t]he type of work one does." *Id.* That directive is flatly inconsistent with black-letter Fourth Amendment doctrine.

14

Insofar as the injunction means to prohibit the government from relying on the four listed factors *at all*, as parts of the court's opinion appear to suggest (Op.42-43, Op.41 n.30), that runs afoul of the basic Fourth Amendment principle that the reasonable-suspicion inquiry entails consideration of the totality of the circumstances, *Arvizu*, 534 U.S. at 273, meaning that no circumstances are categorically off-limits. And that of course goes for the four factors that the court enumerated here. Thus, ethnicity can be a factor supporting reasonable suspicion in appropriate circumstances—for instance, if agents are acting on a tip that identifies that ethnicity—even if it would not be relevant in other circumstances. *See Brignoni-Ponce*, 422 U.S. at 885-86 ("apparent Mexican ancestry" did not "alone" supply reasonable suspicion). It is likewise settled that a person's use of Spanish, "[p]resence at a particular location," or job (Op.50) can contribute to reasonable suspicion in at least some circumstances. *See, e.g., United States v. Manzo-Jurado*, 457 F.3d 928, 937 (9th Cir. 2006) (fact that group was "speaking to each other only in Spanish" was "relevant to the reasonable suspicion inquiry"); *United States v. Montrero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) (en banc) (location can be relevant); *Maldonado v. Holder*, 763 F.3d 155, 161 (2d Cir. 2014) (noting that day labor is "an occupation that is one of the limited options for workers without documents"). The district court practically acknowledged as much by identifying specific locations that are often associated with illegal aliens, thereby refuting its own logic. Op.50 (referring to a "day laborer pick up site[s]"). So to the extent that the injunction bars the government from considering the listed factors, it is egregiously wrong.

15

The injunction is flawed even if it prohibits the government only from relying on the enumerated factors *alone* (singly or in combination) to form reasonable suspicion for a stop. Reflecting the Fourth Amendment's core textual criterion of reasonableness, the Supreme Court has "deliberately avoided reducing" the reasonable-suspicion inquiry to "a neat set of legal rules." *Arvizu*, 534 U.S. at 274; *see also Brignoni-Ponce*, 422 U.S. at 885 n.10. For example, a rule allowing officers to rely on certain evidence of "ongoing criminal behavior" but not "probabilistic" evidence is inconsistent with the flexible nature of the reasonable-suspicion inquiry. *United States v. Sokolow*, 490 U.S. 1, 8 (1989). Categorical rules are foreign to the Fourth Amendment's totality-of-the-circumstances tests, whether they help or hurt the government. *See, e.g., Byrd v. United States*, 584 U.S. 395, 405 (2018) (rejecting *per se* rule that "drivers who are not listed on rental agreements always lack an expectation of privacy in the automobile based on the rental company's lack of authorization alone"); *Barnes v. Felix*, 145 S. Ct. 1353, 1358 (2025) (rejecting "moment of the threat" doctrine in excessive-force context).

The district court's injunction contravenes that principle. As this Court has held, "[t]he nature of the totality-of-the-circumstances analysis … precludes us from holding that certain factors are presumptively given no weight without considering those factors in the full context of each particular case"; "prior decisions holding that certain factors are *per se* not probative or are *per se* minimally probative do not … comply with Supreme Court precedent." *United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir.

16

2013) (en banc). Yet the injunction here imposes a categorical rule that the four listed factors cannot support reasonable suspicion for an investigatory stop. *See* Op.50. And it does so even though some combination of the enumerated factors will at least sometimes support reasonable suspicion for a stop. That cannot be correct.

### C.     The Injunction Impermissibly Granted District-Wide Relief.

If nothing else, the court's grant of district-wide relief must be stayed because it flagrantly violates the Supreme Court's recent holding in *CASA*, forbidding the use of universal (*i.e.*, non-party-specific) injunctions. The court did not enjoin the government from detaining *Plaintiffs* without reasonable suspicion; it enjoined the government from stopping or detaining *anyone in the district* without reasonable suspicion. That cannot be squared with *CASA*—and the district court barely tried. Indeed, the court failed even to cite the Supreme Court's ruling, let alone engage with its holding.

In *CASA*, the Supreme Court addressed "universal injunctions," or injunctions that bar the defendant from enforcing "a law or policy against *anyone*," in contrast to injunctions limited to the plaintiff. 2025 WL 1773631, at *4. The Court found that the statutory grant of jurisdiction over suits "in equity" "encompasses only those sorts of equitable remedies traditionally accorded by courts of equity at our country's inception." *Id.* at *5-*6. And "[n]either a universal injunction nor any analogous form of relief was available … at the time of the founding." *Id.* at *6. Rather, "suits in equity were brought by and against individual parties." *Id.* "Because the universal injunction lacks a historical pedigree, it falls outside the bounds of a federal court's equitable

authority under the Judiciary Act." *Id.* at *8. At most, a court granting equitable relief "may administer complete relief *between the parties*." *Id.* at *11. "Under this principle, the question is not whether an injunction offers complete relief to everyone potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." *Id.* And even then, "[c]omplete relief is not a guarantee—it is the maximum a court can provide." *Id.* at *12.

The district court nonetheless determined that it "must enjoin the conduct of all law enforcement engaged in immigration enforcement throughout the District." Op.36 Without citing or discussing *CASA*, the court summarily dismissed the government's concerns about universal injunctions as "unavailing" because "the requested injunction is only District-wide and not nationwide." Op.30 n.21. That completely misses the point. Whether nationwide or only district-wide, the injunction goes beyond providing complete relief to *Plaintiffs*.

The district court also thought a narrower injunction would not work, because it would be impractical to expect agents to inquire into whether someone is a plaintiff before conducting a stop or detention. Op.36. But *CASA* cannot be so easily brushed aside. The Court warned that "[c]omplete relief" is not "synonymous with universal relief," but is instead "a narrower concept: The equitable tradition has long embraced the rule that courts generally 'may administer complete relief *between the parties*.'" *CASA*, 2025 WL 1773631, at *11. Thus, although "the complete-relief principle has deep roots in equity," it does not "justif[y] award of relief to nonparties." *Id.* at *10. To be sure,

18

there are cases where "afford[ing] the plaintiff complete relief[] [leaves] the court [with] only one feasible option," which has "the practical effect of benefiting nonparties"—but any such "benefit to nonparties . . . [is] merely incidental." *Id.* at *11. Here, though, the benefit to nonparties is anything but incidental: The court expressly ruled that it would "enjoin the conduct of all law enforcement engaged in immigration enforcement throughout the District." Op.36. *CASA* does not allow that.[2]

If anything, the district court's concerns about a party-specific injunction merely underscore that broad, structural injunctions are rarely appropriate in the Fourth Amendment context. *See* Orin S. Kerr, *The Limits of Fourth Amendment Injunctions*, 7 J. on Telecommc'ns & High Tech. L. 127, 129 (2009) ("Fourth Amendment doctrine is tremendously fact-specific: every fact pattern is different, and even the exceptions to the exceptions have their own exceptions. Courts are poorly suited to design broad injunctive relief in this setting."). They are certainly not a reason to ignore the Supreme Court's warnings about the limits of federal courts' equitable powers.

---

[2] Although Plaintiffs styled their amended complaint as a putative class action, they did not seek certification and the district court expressly did not rely on the class allegations to support the injunction. *See* Op.36 (approving district-wide injunction "without considering the unnamed class members and the propriety of certifying a class"). Accordingly, any injunction had to be limited to the Plaintiffs. *See Nat'l Ctr. for Immigrants Rights, Inc. v. INS*, 743 F.2d 1365, 1371 (9th Cir. 1984) ("in the absence of class certification, [a] preliminary injunction may properly cover only the named plaintiffs"). Of course, had the court tried to certify a class, that would have led to other fatal problems under Rule 23.

\*    \*    \*

This sweeping district-wide injunction, under which a single district judge purports to dictate a categorical formula for this sort of individualized inquiry and thereby assume plenary oversight of immigration enforcement in Los Angeles, is contrary to both the Fourth Amendment and basic principles of equity. A stay is required.

## II. The Balance of Equities and Public Interest Favor a Stay.

The balance of harms, equities, and public interest overwhelmingly favor a stay pending appeal. *See Nken*, 556 U.S. at 435.

The government will suffer irreparable harm if the court's injunction remains in effect. Under federal law, the government only conducts warrantless arrest where officers have reasonable suspicion, based on specific articulable facts. Dkt.71 (Havrick Decl.), ¶¶ 8-10; Dkt.71 (Quinones Decl.) ¶¶ 4-5, 8-9. But the court's broad, structural injunction will have a chilling effect on that enforcement, because it threatens officers with contempt sanctions if the court retrospectively disagrees with their view of whether reasonable suspicion was satisfied on particular facts. *Cf. Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982); *see also* Dkt.94-1 ¶¶ 8-10 (describing how the TRO will hamper law enforcement efforts and increase risks to agents); Dkt. 94-2 ¶¶ 14-20 (same). And that risk is potent, given that the court reached its judgment about the past arrests of three named Plaintiffs here, without giving the government a meaningful opportunity to marshal the facts and prove that reasonable suspicion *did* exist. Now that it's had

more time, the government has provided specific evidence that those arrests resulted from "a targeted enforcement action at a particular location where past surveillance and intelligence had confirmed that the target or individuals associated with him were observed to have recruited illegal aliens to work on landscaping jobs." *Compare* Dkt.94-1, ¶ 6, *with* Dkt.71 (Quinones Decl.).

On the other side of the scale, the Fourth Amendment already applies by its own terms to all law enforcement actions and already provides remedies for violations. *See Egbert v. Boule*, 596 U.S. 482, 484 (2022)(addressing alternative remedies in context of excessive force complaint); *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1045 (1984). Those existing remedies suffice to protect Plaintiffs' interests and the public interest.

Finally, it is important to observe that the court's injunction appears to be only a first step toward an even more wholesale judicial usurpation. As part of the order, the court has directed the government to show cause why an even broader injunction should not issue—one that involves court-supervised training; a directive to develop "guidance" on reasonable suspicion; and (most incredibly) an obligation to maintain and share with Plaintiffs' ACLU counsel on a "regular schedule," "documentation of detentive stops" showing "factors supporting reasonable suspicion." Op.51. Relief is immediately warranted to nip this unconstitutional encroachment in the bud.

## CONCLUSION

For the foregoing reasons, the Court should grant a stay pending appeal.

21

Respectfully submitted,

BRETT A. SHUMATE
   *Acting Assistant Attorney General*

YAAKOV M. ROTH
   *Principal Deputy Assistant Attorney*
     *General*

DREW C. ENSIGN
   *Deputy Assistant Attorney General*

TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
   *Counsel to the Assistant Attorney General*

  *s/ Jonathan K. Ross*
JONATHAN K. ROSS
   *Senior Litigation Counsel*
   *Office of Immigration Litigation*
   *Civil Division*
   *U.S. Department of Justice*
   *Washington, DC 20530*
   *(202) 305-7662*
   *Jonathan.K.Ross@usdoj.gov*

July 2025

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Ninth Circuit Rules 32-3 and 27-1(1)(d) because it contains 5566 words. This motion also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word in Garamond 14-point font, a proportionally spaced typeface.

*s/ Jonathan K. Ross*
JONATHAN K. ROSS
*Senior Litigation Counsel*
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20530
Tel. (202) 305-7662

## CERTIFICATE OF SERVICE

I hereby certify that, on July 17, 2025, I electronically filed the foregoing docketing statement with the Clerk of the Court by using the Appellate Case Management System. I further certify that the participants in the case are ACMS users and that service will be accomplished by using the ACMS system.

*s/ Jonathan K. Ross*

JONATHAN K. ROSS
  *Senior Litigation Counsel*
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20530
Tel. (202) 305-7662