No. 25-4312

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

PEDRO VASQUEZ PERDOMO, et al.,

Plaintiffs-Appellees,

v.

KRISTI NOEM, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Central District of California
District Court Case No. 2:25-cv-5605-MEMF-SP

**REPLY IN SUPPORT OF RENEWED EMERGENCY MOTION
UNDER CIRCUIT RULE 27-3 FOR STAY PENDING APPEAL**

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney
General

DREW C. ENSIGN
Deputy Assistant Attorney General

TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General

JONATHAN K. ROSS
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-7662

BILAL A. ESSAYLI
United States Attorney

DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division

DANIEL A. BECK
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section

ALEXANDER L. FARRELL (SBN 335008)
PAULINE H. ALARCON (SBN 345785)
Assistant United States Attorneys
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Tel: (213) 894-2400

## INTRODUCTION

Presented with nothing more than media speculation and a series of declarations by individuals who say they were detained or interrogated by federal agents, the district court almost immediately issued a sweeping, district-wide injunction under the guise of enforcing the Fourth Amendment. That injunction contradicts long-established law on both standing and the merits, plus newly clarified law on scope of relief.

Plaintiffs' response ("Resp.") cannot gloss over the district court's errors. For Article III standing, they invoke findings the court never made and alternative theories the court never reached. But even that revisionism cannot distinguish *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). A person's past interaction with law enforcement cannot support prospective injunctive relief. As for the merits, Plaintiffs implicitly admit that half of the order is an impermissible follow-the-law injunction. They strain to narrow the other half to near-meaninglessness, but even then it remains both fatally vague and irreconcilable with Fourth Amendment jurisprudence. Reasonable suspicion is a fact-intensive totality-of-the-circumstances inquiry; it cannot be cabined by categorical rules or adjudicated by abstraction. Finally, under the Supreme Court's new ruling rejecting universal injunctions, Plaintiffs cannot credibly maintain that district-wide structural relief is necessary to protect a handful of named individuals from detention.

The precise import of this badly flawed injunction may be unclear, but that only heightens its chilling effect on legitimate law-enforcement activities. This Court should grant a stay to prevent that irreparable harm to the government and the public.

1

# ARGUMENT

## I. Plaintiffs' Defenses of the Injunction Do Not Withstand Scrutiny.

On standing, the Fourth Amendment merits, and scope of relief, Plaintiffs fail to rehabilitate the district court's misguided, overbroad injunction.[1]

**A. Standing.** Plaintiffs agree that, for injunctive relief, a plaintiff must show "a realistic threat of future injury." Resp.8. And they admit the district court "focused on Plaintiff Gavidia" as the predicate for standing. Resp.8 n.4.[2] But they are wrong to say the court made a finding that Gavidia faced a "real and immediate threat of repeated injury." *Lyons*, 461 U.S. at 102. The court said only that Gavidia had suffered injury based on one past interaction with agents, and that "there is a real and immediate threat that the conduct complained of will continue"—not that *Gavidia* faced that "real and immediate threat." Op.34-35. That is insufficient. In *Lyons*, there was no standing because "[t]here was no finding that *Lyons* faced a real and immediate threat of again being illegally choked," even though the police "routinely apply chokeholds." 461 U.S. at 105, 110 (emphasis added); *see also id.* at 105 ("Lyons' standing to seek the injunction requested depended on whether *he* was likely to suffer future injury." (emphasis added)). Here too, the court made no finding that *Gavidia* was likely to suffer future harm.

---

[1] Plaintiffs do not contest that the injunction is an appealable order.

[2] Plaintiffs claim the court made findings about "the individual plaintiffs" more generally (Resp.8 n.4), but the court's very next sentence began: "In particular, Gavidia testifies," and the rest of the standing discussion focused on him alone, following which the court "decline[d] to evaluate" the other standing issues. Op.34-35 & n.25.

2

Nor could the court have made such a finding on this record. To start, there is no reason to believe Gavidia "would have another encounter" with agents. *Id.* at 105-06. After all, he was stopped "only once." *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1039 (9th Cir. 1999) (en banc). The court wrongly said he was "subjected to multiple stops" (Op.35); that was clear error (*contra* Dkt.45-9). And while Plaintiffs attempt to distinguish *Lyons* on the ground that Lyons was able to "change [his] behavior" to avoid further interactions (Resp.8), that appears nowhere in the Court's reasoning.

Even if Gavidia did encounter agents again, there is neither a "written policy" endorsing stops in violation of the Fourth Amendment (as Plaintiffs concede), nor any "officially sanctioned" policy of doing so. Resp.7-8. While the district court claimed a "plethora of statements" suggested such approval, its sole example—that one official declared that agents "may well go back to MacArthur Park or other places"—is plainly irrelevant. Op.35 & n.26. Plaintiffs' only support—the Homeland Security Secretary's statement that the injunction would not "change" her agents' "operations" (Resp.8)—cuts exactly the other way: It confirms that official policy is to adhere to the Fourth Amendment, which is why the injunction requires no course-correction.³ Indeed, even the district court later acknowledged that Plaintiffs "have not pointed to any 'official' policy that authorizes" the alleged misconduct. Op.45 n.33. Any finding of an officially sanctioned policy would thus have been clearly erroneous.

---

³ As explained below, that does not mean the injunction is harmless. The threat of contempt proceedings chills even lawful enforcement conduct. *Infra* Part II.

For that reason, *Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012), is inapposite. There, the defendants' "stated policy and practice" was to detain anyone they believed was unlawfully in the country, which this Court held violated the Fourth Amendment because state officials were "not empowered to enforce civil immigration violations." *Id.* at 998, 1001. There is no "stated policy and practice" here. Just the opposite. *See* Dkt.71-1, 71-2 (attesting to how agents are trained to comply with Fourth Amendment). At most, Plaintiffs have identified certain stops they claim lacked reasonable suspicion. Even if they were right (and they are not), that is legally insufficient.[4]

Plaintiffs cannot save the injunction by relying on organizational standing either. Resp.10-12. For one thing, the court made no findings about whether members of the organizations faced a realistic threat of imminent harm. Op.35 n.25. For another, any such findings would fail for the same reasons above. Plaintiffs cannot circumvent the requirements of Article III simply by aggregating individual past harms that themselves cannot support injunctive relief. *See NAACP Delaware v. City of Wilmington,* 2025 WL 1927620, at *5 (D. Del. July 14, 2025) (organization cannot aggregate past stop-and-search injuries of members for future injunction). And for a third, Fourth Amendment claims must be invoked individually. Contra Plaintiffs, that is not merely a limit on the exclusionary remedy. *See Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d

---

[4] Notably, the court never made a finding that *Gavidia's stop* violated the Fourth Amendment. In its standing discussion, the court simply recounted his declaration. Op.34. And in its merits analysis, the court pivoted to address detentions of *other* named Plaintiffs. Op.38-41. This mismatch is another fatal defect.

4

1101, 1111 (9th Cir. 2001) (applying principle in § 1983 case). It reflects a foundational rule: "Fourth Amendment rights are personal rights which … may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165 (1969).

Finally, across all of these points, it bears mention that any factual findings by the district court were a product of fundamentally unfair procedures and should not be credited on the glib claim that the government "rebutted none of it." Resp.1. Plaintiffs dropped dozens of declarations just before a holiday weekend, and the court gave the government just two business days to respond. Dkt.51. That was not a meaningful opportunity to prepare a record covering "specific details" (Op.41 n.29) pertaining to multiple individual stops by multiple agencies dating back weeks. If a court is going to find a systematic official campaign to violate the Fourth Amendment, that should at least be done on a serious record, not "news articles" about what "members of this District feel" or what declarants "believe" (Op.44-45). *Cf. Armstrong v. Davis*, 275 F.3d 849, 857 (9th Cir. 2001) (injunction followed "ten-day bench trial").

**B.    Fourth Amendment.** Plaintiffs make only a limited defense of the district court's injunction on the merits, and even that much fails.

Plaintiffs make no effort to defend the first half of the injunction—the provision ordering the government not to "conduct[] detentive stops in this District unless the agent or officer has reasonable suspicion." Op.50. That is a classically impermissible follow-the-law injunction. Resp.16. It does not apply the law to particular facts; it just repeats a legal truism. That provision should thus be stayed, at minimum.

5

The injunction's more specific provision (prohibiting the four factors, alone or together) presents the same problem, because of its unelaborated "except as permitted by law" clause. Op.50. An injunction that forbids conduct "except as permitted by law" is circular and vague. Plaintiffs suggest this clause "address[es] situations not at issue in this case—for instance, enforcement at the border or at checkpoints." Opp.17 n.11. But they cite nothing in the court's order substantiating that speculative reading, which is particularly dubious given that the Central District of California has no land border and there was no mention in this case of any checkpoints. The order's facial (and fatal) ambiguity thus remains.

Even setting that aside, the injunction's prohibition on the enumerated factors is inconsistent with established Fourth Amendment doctrine. Plaintiffs urge the narrower reading of the order—that the injunction does not bar agents from considering the four enumerated factors *at all*, only from conducting stops based *solely* on those factors alone or together (Resp.2, 17)—but it is far from clear that this interpretation is correct. The district court repeatedly suggested that the four factors categorically contribute little or nothing to reasonable suspicion. Op.41-43. At a minimum, the injunction should be modified to make clear that agents may rely on the four factors in conjunction with other considerations (including agents' experience, recent surveillance, and the like) to formulate reasonable suspicion. *See Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 840 (9th Cir. 2014) (vacating injunction and remanding "to clarify what conduct is and is not enjoined").

6

Regardless, the injunction reflects a fundamental misapplication of the law even on Plaintiffs' reading. The reasonable-suspicion inquiry abhors categorical rules. *See* Mot.16-17; *Missouri v. McNeely*, 569 U.S. 141, 158 (2013) (opinion of Sotomayor, J.) (collecting examples of "fact-intensive, totality of the circumstances analyses," including reasonable suspicion for investigatory stops). As the Supreme Court has repeatedly emphasized, the "overlay of a categorical scheme on the general reasonableness analysis threatens to distort the 'totality of the circumstances' principle, by replacing a stress on revealing facts with resort to pigeonholes." *United States v. Banks*, 540 U.S. 31, 42 (2003). This injunction embodies the same kind of impermissible categorical overlay on the context-specific reasonable-suspicion standard.

Nor does the district court's categorical approach make sense on its own terms. The government agrees that each of the enumerated factors, taken alone, would seldom if ever supply reasonable suspicion. Resp.13-14. But in the real world, factors do not appear in a vacuum or in stylized hypotheticals. And when viewed against the backdrop of agents' experience, recent "surveillance and intelligence," and other contextual data points (Resp.15), some or all of the court's factors certainly could furnish reasonable suspicion. It is unclear whether the injunction forbids a stop in those circumstances. But if it does, that means agents could not stop and question a non-English-speaking person (the second factor) located somewhere known to be frequented by illegal aliens (third factor)—even a place known to host criminal activity, like a marijuana farm— and is dressed in the uniform of an employer notorious for hiring illegal aliens (fourth

7

factor). *Cf.* Press Release, Dep't of Homeland Sec., *ICE, CBP Arrest at Least 361 Illegal Aliens During Marijuana Grow Site Operation, Rescue at Least 14 Children* (July 13, 2025). The Fourth Amendment does not impose such a nonsensical categorical rule.

And Plaintiffs' own cited authorities prove the point. Although plaintiffs invoke decisions of this Court as discounting the probative value of factors like apparent ethnicity or presence at a particular location (Resp.13-14), the cited cases do so only in specific factual contexts; indeed, they suggest that such factors *can* combine to provide reasonable suspicion, which is directly contrary to the district court's analysis.

In *United States v. Manzo-Jurado*, 457 F.3d 928 (9th Cir. 2006), for instance, the Court gave limited weight to the suspects' presence at a high-school football stadium in Montana because that location was not known for "containing illegal immigrants," *id.* at 936—not because location in general constitutes forbidden "demographic profiling" (Opp.2). *See also Manzo-Jurado*, 457 F.3d at 938 (suggesting that suspects' "appearance as a work crew" would have supported reasonable suspicion if employer had been known to employ illegal aliens). In the same vein, *United States v. Montero-Camargo*, 208 F.3d 1122 (9th Cir. 2000) (en banc), downplayed the relevance of Hispanic ethnicity in the specific context of a checkpoint where "the majority of people who pass through … [we]re Hispanic, and thus, presumably ha[d] a Hispanic appearance." *Id.* at 1131. But this Court's cases do not support the broader proposition that the four factors at issue can never combine to provide reasonable suspicion for an investigatory stop.

8

By embracing bright-line rules, the injunction engages in abstract, hypothetical adjudication that is foreign to Fourth Amendment jurisprudence. Whatever it may mean in the real world, on no interpretation does it accurately reflect existing law.

**C.   Scope of Relief.**  Even if Gavidia or any other Plaintiffs had established standing and entitlement to an injunction, the district court defied *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025), by maintaining that it "must enjoin the conduct of all law enforcement engaged in immigration enforcement throughout the District." Op.36. That does not just help non-parties "incidentally," *CASA*, 145 S. Ct. at 2557; it provides relief directly to them—precisely what *CASA* forbids.

Plaintiffs defend this order by citing a pre-*CASA* decision upholding a statewide injunction on the ground that it was "unlikely" that law enforcement "would inquire" into whether someone was covered by the injunction before issuing a citation. Resp.19 (quoting *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1502 (9th Cir. 1996)). But *CASA* rejected the argument that relief to non-parties can be justified as "the only practical" solution; as the Court reiterated, "the policy pros and cons" of universal relief "are beside the point." 145 S. Ct. at 2558, 2560. Any logistical hurdles present a compliance issue for the government to address; not an excuse for courts to exceed their powers. In any case, an injunction limited to Gavidia or other named Plaintiffs would hardly be a "fantasy" to implement. Op.36. They could just identify themselves to agents as injunction-protected.

9

The presence of organizational Plaintiffs affects none of this. *Contra* Opp.20-21. Again, the court did not rely on the organizations for standing; nor did it require them to establish that any of their members had standing. The injunction therefore cannot be justified by a need to protect those members. *See Armstrong*, 275 F.3d at 860 (noting that "where a district court grants system-wide injunctive relief, the issues of standing, class certification, and the propriety and scope of relief are often intermingled").

## II. Plaintiffs Are on the Wrong Side of the Balance of Harms.

The other equitable factors confirm that a stay is warranted.

All Plaintiffs offer by way of irreparable harm is the conclusory statement that "there is little doubt that Plaintiffs would be substantially injured by a stay." Resp.22. Actually, there is considerable doubt. For all the same reasons that Plaintiffs have failed to demonstrate Article III standing to seek prospective relief, they have failed to show that they need this injunction to protect them from irreparable harm. And, as in *Hodgers-Durgin*, "even if we assume that plaintiffs have asserted sufficient likelihood of future injury to satisfy the 'case or controversy' requirement of Article III," an injunction remains "unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff[s] will be wronged again." 199 F.3d at 1042. Plaintiffs did not show a real or immediate threat that they will be stopped again, let alone stopped without reasonable suspicion; nor were the district court's proceedings adequate to make any such finding.

Turning to the government and public interests, Plaintiffs downplay the harm by asserting that there is no legitimate interest in constitutional violations. Resp.22. That misses the point. Not only does the injunction impose restrictions beyond those found in the Fourth Amendment, but it threatens agents with contempt sanctions if Plaintiffs or the court later disagree with their judgments on whether a stop was effectuated, whether reasonable suspicion existed, or whether they relied solely on the enumerated factors. That chills lawful conduct the way any vague rule does. *Cf. Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965). And the government and the public share a strong interest in avoiding rules that "chill law enforcement." *Wayte v. United States*, 470 U.S. 598, 607 (1985). This does not preclude all Fourth Amendment injunctions (Resp.23)—only imprecise and overbroad ones that purport to preemptively adjudicate a fact-bound reasonableness standard in the context of ongoing law-enforcement operations.

## CONCLUSION

The Court should grant a stay pending appeal.

11

Respectfully submitted,

BRETT A. SHUMATE
  *Acting Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant Attorney General*

DREW C. ENSIGN
  *Deputy Assistant Attorney General*

TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
  *Counsel to the Assistant Attorney General*

 *s/ Jonathan K. Ross*
JONATHAN K. ROSS
  *Senior Litigation Counsel*
  *Office of Immigration Litigation*
  *Civil Division*
  *U.S. Department of Justice*
  *Washington, DC 20530*
  *(202) 305-7662*
  *Jonathan.K.Ross@usdoj.gov*

July 2025

12

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Ninth Circuit Rules 32-3 and 27-1(1)(d) because it contains 2800 words. This motion also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word in Garamond 14-point font, a proportionally spaced typeface.

*s/ Jonathan K. Ross*
JONATHAN K. ROSS
　*Senior Litigation Counsel*
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20530
Tel. (202) 305-7662

## CERTIFICATE OF SERVICE

I hereby certify that, on July 23, 2025, I electronically filed the foregoing docketing statement with the Clerk of the Court by using the Appellate Case Management System. I further certify that the participants in the case are ACMS users and that service will be accomplished by using the ACMS system.

*s/ Jonathan K. Ross*
JONATHAN K. ROSS
  *Senior Litigation Counsel*
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20530
Tel. (202) 305-7662