# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PEDRO VASQUEZ PERDOMO, et al.,

    Plaintiffs-Appellees,

      v.

KRISTI NOEM, in her official capacity
as Secretary of the Department of Homeland Security, et al.,

    Defendants - Appellants.

Case No. 25-4312

July 28, 2025

D.C. No. 2:25-CV-05605-MEMF-SP Central District of California

---

## BRIEF OF AMICUS CURIAE
## MARTIN AKERMAN, CHIEF DATA OFFICER (44 U.S.C. § 3520)
## OF THE NATIONAL GUARD BUREAU (10 U.S.C. § 10501)
## IN SUPPORT OF APPELLEES

---

Martin Akerman
PO BOX 100057
Arlington, VA 22210
(202) 656-5601
makerman.dod@gmail.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................3

STATEMENT OF INTEREST OF AMICUS CURIAE.................................................4

SUMMARY OF ARGUMENT.......................................................................................5

ARGUMENT....................................................................................................................6

    I. A STAY IS UNWARRANTED
    BECAUSE THE GOVERNMENT CANNOT
    MAKE THE REQUIRED "STRONG SHOWING"
    OF LIKELY SUCCESS ON THE MERITS........................................................6

        A. The District Court's Injunction is Firmly Grounded
        in Settled Fourth Amendment Precedent........................................................6

        B. The Government's Actions Reflect a Broader Pattern
        of Using Pretext to Circumvent Constitutional Limits..................................8

        C. The Use of Unidentified Officers and Subsequent Obfuscation
        in Amicus's Case Illustrates the Grave Dangers
        of Unchecked Executive Action.....................................................................9

    II. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST
    WEIGH DECISIVELY AGAINST GRANTING A STAY...............................10

        A. The Government Suffers No Cognizable Harm
        from Being Enjoined from Unconstitutional Conduct, While a Stay Would Inflict Irreparable
        Harm.............................................................................................................10

        B. The Public Interest Demands Judicial Scrutiny, Not Deference,
        When the Executive Branch Engages in Conduct
        That Erodes Public Trust and Hijacks Due Process.....................................11

    III. THE PENDING OFFICE OF SPECIAL COUNSEL INVESTIGATION
    INTO RELATED EXECUTIVE MISCONDUCT
    PROVIDES A COMPELLING, INDEPENDENT REASON
    TO DENY A STAY...........................................................................................12

        A. A Formal Investigation into Allegations
        of Retaliatory Misuse of Federal Authority
        is Underway and Nearing Completion...........................................................13

        B. Granting a Stay Would Create a Judicial Anomaly
        and Undermine the Rule of Law.....................................................................13

CONCLUSION................................................................................................................15

## TABLE OF AUTHORITIES

Cases Page(s)

Akerman v. Kerner, et al.,
Case No. 2:24-cv-01602-GMN-EJY (D. Nev.)...................................................4, 8

Akerman v. The Nevada National Guard, et al.,
Case No. 2:24-cv-01734-RFB-DJA (D.Nev.)....................................................4, 8

Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,
403 U.S. 388 (1971)...................................................................................9

Melendres v. Arpaio,
695 F.3d 990 (9th Cir. 2012)....................................................................... 11

Nken v. Holder,
556 U.S. 418 (2009).............................................................................6, 10

United States v. Brignoni-Ponce,
422 U.S. 873 (1975)...................................................................................7

Winter v. Nat. Res. Def. Council, Inc.,
555 U.S. 7 (2008)...............................................................................passim

Zepeda v. INS,
753 F.2d 719 (9th Cir. 1983)....................................................................... 11


Statutes Page(s)

5 U.S.C. § 1214 (Office of Special Counsel)....................................8, 10, 12, 14

8 U.S.C. § 1357 (General Immigration Enforcement Authority)......... 5, 6, 9, 11

10 U.S.C. § 12406...................................................................................4, 8

18 U.S.C. § 1385 (Posse Comitatus Act)........................................................9, 12


Constitutional Provisions Page(s)

U.S. Const. amend. IV........................................................................... passim

## STATEMENT OF INTEREST OF AMICUS CURIAE

Amicus curiae Martin Akerman is the tenured Chief Data Officer of the National Guard Bureau and a protected federal whistleblower. His interest in this appeal is direct and substantial. He is currently litigating multiple actions against the executive branch, including

Akerman v. The Nevada National Guard, et al., Case No. 2:24-cv-01734-RFB-DJA (D. Nev.), and Akerman v. Kerner, et al., No. 2:24-cv-01602 (D. Nev.), which challenge the use of military authority under 10 U.S.C. § 12406 to conduct domestic law enforcement actions against him as a civilian in alleged reprisal for his protected disclosures. The central legal questions here—concerning the judiciary's role in checking pretextual uses of executive power—are therefore central to his own efforts to seek redress.

## SUMMARY OF ARGUMENT

The district court's Temporary Restraining Order (TRO) was a proper and necessary exercise of its authority to enjoin ongoing constitutional violations supported by a "mountain of evidence". The government now seeks the extraordinary remedy of a stay pending appeal but cannot meet the high bar required, particularly the "strong showing" that it is likely to succeed on the merits. The district court's conclusion—that detaining individuals based solely on their apparent race, language, or location constitutes unreasonable seizure under the Fourth Amendment—is firmly rooted in decades of controlling precedent.

This brief argues that the government's actions in Los Angeles should not be viewed in isolation. Rather, they reflect a broader, documented pattern of using pretextual legal justifications to achieve unconstitutional ends. The pending litigation of amicus—involving the alleged use of an emergency military statute as pretext for retaliating against a whistleblower—provides a chilling, real-world illustration of this pattern. A key feature of this pattern is the use of masked, unidentified officers, which hijacks due process by making it nearly impossible for citizens to seek remedies for constitutional violations. This danger is amplified when, as amicus alleges in his own case, the government later attempts to cover up its actions by altering the official record.

Finally, the public interest weighs decisively against a stay. This is especially true given a critical fact that the parties cannot present: the U.S. Office of Special Counsel is conducting a formal investigation into the related allegations of executive misconduct made by amicus, with a statutory deadline for completion in October 2025. 1  It would be contrary to the public interest and the rule of law for the judiciary to permit the continuation of the challenged conduct in this case while a parallel, independent investigation into similar abuses of power—including allegations of a cover-up—is ongoing. For these reasons, this Court should deny the motion for a stay.

## ARGUMENT

### I. A STAY IS UNWARRANTED BECAUSE THE GOVERNMENT CANNOT MAKE THE REQUIRED "STRONG SHOWING" OF LIKELY SUCCESS ON THE MERITS.

To obtain a stay pending appeal, the government must make a "strong showing that [it] is likely to succeed on the merits". Nken v. Holder, 556 U.S. 418, 434 (2009). It must also show it will be irreparably injured absent a stay, that a stay will not substantially injure the other parties, and that a stay is in the public interest. Id.

The government fails on all factors, but its failure on the first is dispositive. The district court's TRO is a straightforward application of settled Fourth Amendment law to a robust factual record. The government's attempt to characterize its actions as lawful immigration enforcement cannot withstand scrutiny, particularly when viewed as part of a broader pattern of using pretext to circumvent constitutional limits.

### A. The District Court's Injunction is Firmly Grounded in Settled Fourth Amendment Precedent.

The district court's order rests on two foundational findings. First, it found that the government's "roving patrols"—in which "masked and heavily armed federal agents" approach individuals with a "show of authority," issue "verbal commands," and "physically grab" them—constitute seizures under the Fourth Amendment. Second, after reviewing a "mountain of evidence," including seventeen declarations and numerous news articles, the court found that these seizures were conducted without the required individualized, reasonable suspicion.

The court correctly held that relying "solely" on broad demographic factors—such as a person's "(1) apparent race or ethnicity, (2) speaking Spanish or speaking English with an accent; (3) presence at a particular location; or (4) the type of work one does"—is unconstitutional racial profiling, not legitimate law enforcement. This conclusion is not novel; it is mandated by decades of controlling precedent.

In United States v. Brignoni-Ponce, the Supreme Court held that the Fourth Amendment does not allow a roving patrol to stop a vehicle near the border "when the only ground for suspicion is that the occupants appear to be of Mexican ancestry". The Court was clear: "officers may stop vehicles only if they are aware of specific articulable facts, together with rational inferences therefrom, reasonably warranting suspicion that the vehicles contain aliens who may be illegally in the country". Generalizations that "would cast suspicion on large segments of the law-abiding population" are insufficient.

The district court found precisely such reliance on impermissible generalizations here. It cited extensive evidence of agents targeting individuals at "bus stops, parks, gym, and church," and detaining day laborers, car wash workers, and street vendors based on their appearance and location, while ignoring others who appeared to be Caucasian. This is the very conduct Brignoni-Ponce forbids. The government is therefore highly unlikely to succeed in convincing this Court that the district court committed a clear error of law by enjoining these practices.

## B. The Government's Actions Reflect a Broader Pattern of Using Pretext to Circumvent Constitutional Limits.

The Court should view the government's actions in Perdomo not as an isolated law enforcement initiative, but as an example of a recurring methodology of executive overreach: the use of a facially plausible grant of authority as a pretext for achieving unconstitutional objectives. The pending litigation of amicus provides a stark and documented illustration of this "pretext playbook" in action.

In 2021, after making protected whistleblower disclosures, Mr. Akerman entered into a settlement agreement with the government, brokered by the Office of Special Counsel (OSC). He alleges the government breached that agreement almost immediately and, in retaliation for further whistleblowing, deployed a multi-state military force to punish him. Specifically, he alleges that senior officers of the Arizona, Arkansas, and Nevada National Guard, acting under federal command, were used to physically detain him, seize his government equipment, and effectuate his indefinite suspension from his tenured civilian post as Chief Data Officer of the National Guard Bureau.

The government's legal justification for this extraordinary action was a claimed authority under statutes like 10 U.S.C. § 12406—an emergency power authorizing the President to federalize the National Guard to repel an "invasion" or suppress a "rebellion". The pretext is plain: an emergency military statute designed for national crises was allegedly invoked as legal cover for what was, in reality, a domestic law enforcement and personnel action against a single civilian whistleblower.

The parallels between the government's conduct in Perdomo and in Akerman are illuminating and reveal a common methodology of executive overreach.

In Perdomo, the pretext is "immigration enforcement" used to conduct racial profiling. In Akerman, the pretext is "military necessity" used to conduct whistleblower retaliation. When the government's asserted rationale for its actions appears so disconnected from the reality on the ground, it strongly suggests pretext.

**C. The Use of Unidentified Officers and Subsequent Obfuscation
in Amicus's Case Illustrates the Grave Dangers
of Unchecked Executive Action.**

A critical element of this pretextual playbook is the deliberate creation of ambiguity and fear through the use of unidentified officers. The district court found that in Los Angeles, federal agents "often show up masked, without any visible badges or insignia indicating what agency they work for, and have refused to identify themselves when asked". This tactic is not accidental; it is a tool to maximize intimidation and minimize accountability.

This practice directly mirrors the allegations in amicus's case, where the use of military officers to conduct a personnel action against a civilian was itself a violation of the Posse Comitatus Act, but the lack of clear identification compounded the constitutional injury. When officers are unidentifiable, the citizen's path to redress is obstructed from the outset. It becomes nearly impossible to file a complaint, seek a remedy under Bivens, or hold the correct agency accountable when the identity of the violating officer is intentionally concealed.

Worse, this initial lack of transparency can enable a subsequent cover-up. In his own litigation, amicus alleges that after the illegal reprisal was documented, the government attempted to backtrack and alter the record to conceal the misconduct. He alleges that the Merit Systems Protection Board (MSPB), the very body meant to provide a fair hearing, "corrupted" the administrative record by deleting filings.

This alleged spoliation of evidence demonstrates the profound risk of allowing unconstitutional actions to occur in the shadows. When officers are anonymous and records can be altered, due process becomes an illusion. The ongoing OSC investigation into these very matters underscores the seriousness of these allegations.

## II. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH DECISIVELY AGAINST GRANTING A STAY.

The final two factors for a stay—the balance of equities and the public interest—merge when the government is a party. Nken, 556 U.S. at 435.

Both factors weigh heavily in favor of the Appellees and against granting the "extraordinary and drastic remedy" of a stay.

**A. The Government Suffers No Cognizable Harm from Being Enjoined from Unconstitutional Conduct, While a Stay Would Inflict Irreparable Harm.**

The government cannot establish irreparable harm. The only "harm" it suffers from the TRO is being required to comply with the Fourth Amendment's mandate of individualized suspicion before seizing individuals. As this Court has held, the government is not harmed "in any legally cognizable sense by being enjoined from constitutional violations". Zepeda v. INS, 753 F.2d 719, 727 (9th Cir. 1983). The TRO does not prevent the government from lawfully enforcing immigration laws; it merely prohibits the unconstitutional manner in which it has chosen to do so.

Conversely, the harm to the Appellees and the public from a stay is severe and irreparable. The district court found, and the record confirms, that the government's actions have terrorized communities, chilled economic activity, and eroded public trust. A stay would sanction the continuation of these harms. As this Court has recognized, "the deprivation of constitutional rights unquestionably constitutes irreparable injury".

Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012). Every day the injunction is lifted, individuals—including U.S. citizens—face the real and immediate threat of being unconstitutionally seized based on their appearance. This is the definition of irreparable harm.

**B. The Public Interest Demands Judicial Scrutiny, Not Deference, When the Executive Branch Engages in Conduct That Erodes Public Trust and Hijacks Due Process.**

The public has a profound and overriding interest in ensuring that law enforcement, particularly federal enforcement, operates within the clear bounds of the Constitution. The tactics described in the district court's TRO—"masked federal agents brandishing weapons" and conducting indiscriminate seizures in "military style or SWAT clothing"—do more than violate individual rights; they undermine the legitimacy of the government itself. When federal agents operate in a manner that community members describe as "kidnapp[ings]" and "disappear[ances]," the damage to public trust is immense. A stay would signal judicial tolerance for such methods, further damaging the fragile relationship between law enforcement and the communities they serve.

Furthermore, the government's policy of using unidentified officers hijacks the core tenets of due process. Due process requires, at a minimum, notice and an opportunity to be heard. When a person is seized by an anonymous, armed agent of the state, both of these rights are rendered meaningless. There is no one to hold accountable, no agency to sue, and no clear path to a remedy. This creates a system not of law, but of arbitrary power, where constitutional violations are difficult, if not impossible, to remedy. As amicus's case illustrates, this problem is compounded when the government later attempts to conceal its actions by altering the official record. This combination of anonymity on the street and subsequent obfuscation in the record presents a grave threat to the rule of law.

The public interest in maintaining clear constitutional lines is paramount. The facts of amicus's own case serve as a cautionary tale of where the erosion of these norms can lead: the alleged use of the actual military for domestic law enforcement against a civilian, blurring the lines that the Posse Comitatus Act, 18 U.S.C. § 1385, was enacted to preserve. The public interest lies in halting, not sanctioning, a pattern of executive action that shows such disregard for fundamental constitutional boundaries.

### III. THE PENDING OFFICE OF SPECIAL COUNSEL INVESTIGATION INTO RELATED EXECUTIVE MISCONDUCT PROVIDES A COMPELLING, INDEPENDENT REASON TO DENY A STAY.

Beyond the traditional stay factors, there is a unique and compelling circumstance in this case that weighs decisively against granting the government's motion: a parallel, formal investigation by the U.S. Office of Special Counsel (OSC) into amicus's allegations of executive misconduct is currently underway and nearing its statutory completion date.

## A. A Formal Investigation into Allegations of Retaliatory Misuse of Federal Authority is Underway and Nearing Completion.

The OSC is an independent executive agency established by Congress to, among other things, protect federal employees from prohibited personnel practices, including retaliation for whistleblowing. It has the authority to investigate allegations of such retaliation and seek corrective and disciplinary action.

As detailed in his public court filings, amicus filed a complaint with the OSC alleging that senior officials at the Department of Defense and the National Guard Bureau engaged in unlawful retaliation against him for his protected disclosures. This is not a mere allegation that has been ignored. It is the subject of a formal OSC investigation that is statutorily mandated to be completed within 120 days, a period concluding in October 2025. The credibility of these claims is underscored by the OSC's prior admission in Mr. Akerman's long-running case of a "harmful procedural error" that "compromised the OSC's ability to protect the Appellant as a whistleblower" and "prevented the Appellant from receiving proper redress". This history highlights the seriousness with which the OSC views its mandate and the significance of its current investigation.

## B. Granting a Stay Would Create a Judicial Anomaly and Undermine the Rule of Law.

A stay is an extraordinary equitable remedy, and its issuance is a matter of judicial discretion. In exercising that discretion, this Court should not act in a vacuum. It should consider all relevant public interest factors, including the contemporaneous actions of other governmental bodies charged with ensuring executive branch accountability.

Granting a stay would create a profound institutional contradiction. It would mean that the Judicial Branch is authorizing the continuation of "Pattern A"—the alleged use of pretextual immigration authority by unidentified officers to conduct unconstitutional seizures—at the very same time that an independent Executive Branch watchdog, the OSC, is actively investigating "Pattern B"—the alleged use of pretextual military authority to conduct unconstitutional retaliation, followed by an alleged cover-up.

This outcome would be untenable. It would send a damaging public message that the courts will not intervene to halt likely unconstitutional conduct even when there are strong, contemporaneous signals from other official channels that a pattern of executive abuse and obfuscation may exist. It would undermine public confidence in the rule of law by creating the appearance of a judiciary either indifferent to or complicit in the executive's circumvention of constitutional norms.

The most prudent and just course is to deny the stay and maintain the status quo established by the district court's carefully reasoned TRO. This allows the appellate process to proceed on a normal timeline while also allowing the OSC to complete its independent investigation, which may provide further crucial insight into the patterns of executive conduct at issue in this case and others.

## CONCLUSION

The government has failed to make a strong showing of likely success on the merits, and the balance of harms and the public interest weigh decisively against granting a stay. The pending investigation by the Office of Special Counsel provides a powerful, independent reason for this Court to allow the district court's injunction to remain in place. Amicus curiae Martin Akerman respectfully requests that the Court deny the motion for a stay pending appeal.

Dated: July 28, 2025

Respectfully submitted,

Martin Akerman
PO BOX 100057
Arlington, VA 22210
(202) 656-5601
makerman.dod@gmail.com