No. 25-4312

===============================================================

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

PEDRO VASQUEZ PERDOMO, et al.,

Plaintiffs-Appellees,

v.

KRISTI NOEM, et al.,

Defendants-Appellants.

—————————

On Appeal from the United States District Court
for the Central District of California
District Court Case No. 2:25-cv-5605-MEMF-SP
The Honorable Maame Ewusi-Mensah Frimpong

—————————

## DEFENDANTS-APPELLANTS' OPENING BRIEF

—————————

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney
General

DREW C. ENSIGN
Deputy Assistant Attorney General

TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney
General

JONATHAN K. ROSS
Senior Litigation Counsel
STEPHANIE L. GROFF
JASON K. ZUBATA
ANIELLO DESIMONE
JACOB A. BASHYROV
Trial Attorneys
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-7662

BILAL A. ESSAYLI
United States Attorney

DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division

DANIEL A. BECK
Assistant United States Attorney
Chief, Complex and Defensive
Litigation Section

ALEXANDER L. FARRELL
(SBN 335008)
PAULINE H. ALARCON
(SBN 345785)
Assistant United States
Attorneys
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Tel: (213) 894-2400

# TABLE OF CONTENTS

INTRODUCTION .................................................................................1

STATEMENT OF JURISDICTION ....................................................3

STATEMENT OF THE ISSUES .........................................................4

FACTUAL AND PROCEDURAL BACKGROUND ...............................5

    I.    Immigration Enforcement Landscape in the Central District of California ................................................................5

    II.   District Court's Injunction and Denial of Stay Pending Appeal ..........................................................................8

    III.  The Stay Panel's Denial of Stay Pending Appeal ................12

SUMMARY OF THE ARGUMENT ...................................................13

STANDARD OF REVIEW ...............................................................16

ARGUMENT ....................................................................................16

I.    The District Court Clearly Erred in Concluding That Plaintiffs Showed a Likelihood of Success on the Merits .............18

    A.   The District Court Did Not Actually Find a Policy or Practice ......................................................................18

    B.   Even If the Court Had Identified an Actual Policy, the Record Would Not Supply Proof of It ....................................20

    C.   Even Assuming a Policy, *Lyons* is Controlling and Dispositive ..........................................................................22

    D.   The District Court's Reliance on Circumstantial Evidence Cannot Bridge the Gap ........................................26

II.   Specific Policy Issues Aside, the District Court Erred in Holding Article III Standing Was Established and That Plaintiffs Had Established Violations of the Fourth Amendment ...................................................................31

   A.   Plaintiffs Lack Standing for Prospective Injunctive Relief...................................................................31

   B.   The Injunction Improperly Imposes a "Follow the Law" Mandate...................................................................39

   C.   The District Court Grossly Misapplied the Fourth Amendment ...................................................................40

III.  The District Court's Fifth Amendment Findings Were Clearly Erroneous and Unsupported by the Record ...................................51

   A.   The District Court Lacked Jurisdiction Because Section 1252 Channels Plaintiffs' "Access-to-Counsel" Claim to the Petition-for-Review Process...........................................52

   B.   Regardless, the Record Does Not Establish a Systemic Pattern of Interference...........................................53

   C.   The Injunction Expands the Fifth Amendment Right Beyond Its Scope ...................................................54

   D.   The Relief Is Not Narrowly Tailored to the Alleged Harm...................................................................54

   E.   The District Court Disregarded Contrary and Explanatory Evidence ...................................................55

IV.   The Central District-Wide Injunction Vastly Exceeds the District Court's Equitable Authority on Both the Fourth and Fifth Amendment Claims ...................................................57

   A.   The Compressed schedule and reliance on untested declarations denied the government a fair opportunity to rebut ...................................................57

B.      The District-Wide Relief Issued Violates *CASA*..................58

CONCLUSION .........................................................................63

CERTIFICATE OF SERVICE

FORM 17. STATEMENT OF RELATED CASES

FORM 8. CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

**Page(s)**

*Aguilar v. ICE,*
510 F.3d 1 (1st Cir. 2007)......................................................53

*Alderman v. United States,*
394 U.S. 165 (1969) ..............................................................25

*Anderson v. City of Bessemer City,*
470 U.S. 564 (1985) ..............................................................26

*Bresgal v. Brock,*
843 F.2d 1163 (9th Cir. 1987) ..............................................16

*Califano v. Yamasaki,*
442 U.S. 682 (1979) ..............................................................61

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) ...........................................1, 14, 17, 32

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398, 412 (2013) ..................................... 19, *passim*

*Commonwealth v. Biden,*
57 F.4th 545 (6th Cir. 2023)..................................................62

*East Bay Sanctuary Covenant v. Trump,*
932 F.3d 742 (9th Cir. 2018) ..................................................3

*FDA v. Alliance for Hippocratic Med.,*
602 U.S. 367 (2024) .......................................... 19, 25, 31, 63

*Gill v. Whitford,*
585 U.S. 48 (2018) ................................................................61

*Gomez v. Vernon*,
255 F.3d 1118 (9th Cir. 2001) ........................................................ 64

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999) ...................................................................... 59

*Hunt v. Washington St. Apple Adver. Comm'n*,
432 U.S. 333 (1977) ...................................................................... 25

*J.E.F.M. v. Lynch*,
837 F.3d 1026 (9th Cir. 2016) ........................................................ 52

*Kaley v. United States*,
571 U.S. 320 (2014) ...................................................................... 42

*Koon v. United States*,
518 U.S. 81 (1996) ........................................................................ 61

*LaDuke v. Nelson*,
762 F.2d 1318 (9th Cir. 1985) ........................................................ 30

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) ...................................................................... 16

*Maldonado v. Holder*,
763 F.3d 155 (2d Cir. 2014) ...................................................... 47, 49

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ........................................ 30, 36, 37, 38

*Newsom v. Trump*,
141 F.4th 1032 (9th Cir. 2025) ........................................................ 7

*Nken v. Holder*,
556 U.S. 418 (2009) ...................................................................... 15

*Ornelas v. United States*,
517 U.S. 690 ...................................................................... 44, 45, 50

*O'Shea v. Littleton,*
  414 U.S. 488 (1974) .................................................................. 14

*Philadelphia Yearly Meeting of Religious Soc'y of Friends v. DHS,*
  767 F.Supp.3d 293 (D. Md. 2025)......................................... 62

*Rakas v. Illinois,*
  439 U.S. 128 (1978) .................................................................. 25

*Reno Air Racing Ass'n, Inc. v. McCord,*
  452 F.3d 1126 (9th Cir. 2006) ......................................... 2, 40

*Smith v. United States,*
  358 F.2d 833 (D.C. Cir. 1966)................................................ 50

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ......................................................... 2, 26

*Terry v. Ohio,*
  392 U.S. 1 (1968) ..................................................................... 49

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) .................................................................. 35

*Trump v. CASA, Inc.,*
  145 S. Ct. 2540 (2025) ............................................. 3, *passim*

*United States v. Arvizu,*
  534 U.S. 266 (2002) ................................................ 2, *passim*

*United States v. Banks,*
  540 U.S. 31 (2003) ........................................................... 2, 43

*United States v. Brignoni-Ponce,*
  422 U.S. 873 (1975) ...................................... 41, 42, 47, 51

*United States v. Garcia,*
  179 F.3d 265 (5th Cir. 1999) ................................................. 42

*United States v. Hinkson,*
   585 F.3d 1247 (9th Cir. 2009) ............................................. 26

*United States v. Manzo-Jurado,*
   457 F.3d 928 (9th Cir. 2006) ................................... 47, 48, 49

*United States v. Montero-Camargo,*
   208 F.3d 1122 (9th Cir. 2000) ........................................... 46

*United States v. Sokolow,*
   490 U.S. 1 (1989) ................................................ 42, 43, 49

*United States v. Washington,*
   853 F.3d 946 (9th Cir. 2017) ............................................ 16

*Winter v. NRDC,*
   555 U.S. 7 (2008) ................................................... 15, 16

## STATUTES

### Immigration and Nationality Act of 1952, as amended:

8 U.S.C. § 1252(a)(5) .......................................................... 52

8 U.S.C. § 1252(b)(9) .......................................................... 52

28 U.S.C. § 1292(a)(1) .......................................................... 3

28 U.S.C. § 1331 ................................................................. 3

## REGULATIONS

8 C.F.R. § 287.1(g) ........................................................... 21

8 C.F.R. § 287.8(b)(2) .................................................... 21, 41

**L.A. Admin. Code:**

Section § 19.190 et seq. (Ord. No. 188441) ................................6

Section § 19.190(a) ................................................................6

Section § 19.190(b) ................................................................6

Section § 19.190(f) .................................................................6

## FEDERAL RULES OF APPELLATE PROCEDURE

Fed. R. App. P. 29(a)(5) ........................................................69

Fed. R. App. P. 32(a)(5) ........................................................69

Fed. R. App. P. 32(f) .............................................................69

Fed. R. Civ. P. 65(d)(1)(B)-(C) ............................................39

# INTRODUCTION

The district court gravely abused its discretion in issuing an extraordinary, district-wide injunction despite acknowledging that Plaintiffs failed to identify any explicit federal policy or consistent practice violating their rights. Without such a policy or uniform conduct, or indeed any non-speculative prospective injury, Plaintiffs cannot show an immediate risk of harm necessary to confer Article III standing, much less a likelihood of success on the merits—particularly on their sweeping Fourth and Fifth Amendment theories, which rest on isolated incidents and speculation.

The standing inquiry—and ultimately the case itself—is controlled by *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983). There, as here, there was no genuine likelihood of recurrence to the actual plaintiffs, as opposed to nonparties. Indeed, unlike *Lyons*, where the Supreme Court noted evidence that LAPD had a policy of "routinely apply[ing] chokeholds in situations where they are not threatened by the use of deadly force," *id.* at 105, no such policy was even identified or assumed here. At best, the district court's standing analysis rests on mere "assessment of statistical probabilities"—which the Supreme Court

previously reversed this Court for accepting as sufficient. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).

On the merits, the injunction defies black-letter Fourth Amendment law, imposing a straitjacket on law-enforcement efforts that is antithetical to the context- and case-specific totality-of-the-circumstances inquiry that binding precedents demand. The lower court wrongly cabined the reasonable-suspicion inquiry by holding that no combination of the four factors can ever constitute reasonable suspicion, no matter how those factors present in a given stop, because the lower court viewed those factors as too generalized and broadly applicable across the population. That framework narrows reasonable suspicion through the sort of "overlay of a categorical scheme on the general reasonableness analysis" that the Supreme Court has consistently rejected. *United States v. Banks*, 540 U.S. 31, 42 (2003); *see United States v. Arvizu*, 534 U.S. 266 (2002). And its injunction is further a quintessential "follow the law" injunction that does not suffice. *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1134 (9th Cir. 2006).

Even if Plaintiffs could establish a plausible claim, the court further erred by disregarding the limits of the *Winter* framework. It treated

2

unverified anecdotes as proof of irreparable harm while giving no weight to the Government's compelling interests in enforcing federal law, maintaining institutional security, and preserving operational discretion. The injunction also ignores the public interest in allowing lawful enforcement to proceed unimpeded, especially where the challenged conduct is neither systemic nor ongoing.

Compounding these errors, the court crafted an order whose breadth far exceeds any alleged injury. By imposing novel and onerous operational mandates untethered to the evidence, the injunction intrudes into executive functions and risks significant interference with lawful law enforcement activities. And by awarding relief to nonparties, the district court directly violated the Supreme Court's decision in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025).

This Court should reverse.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because the July 11, 2025 temporary restraining order ("TRO") operates as a preliminary injunction. *See East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742,

3

762 (9th Cir. 2018). Defendants timely noticed this appeal on July 13, 2025. 4-ER-780.

## STATEMENT OF THE ISSUES

I.     Whether the district court erred in concluding that Plaintiffs had Article III standing to seek injunctive relief.

II.    Whether the district court erred in concluding Plaintiffs were likely to succeed on their Fourth and Fifth Amendment claims despite finding no explicit federal policy or consistent practice violating those rights.

III.   Whether the district court erred in finding irreparable harm without competent proof and without weighing the Government's operational and public-safety interests.

IV.    Whether the district court abused its discretion by failing to properly balance the equities and public interest under *Winter*.

V.     Whether the injunction's district-wide scope and operational mandates exceed the court's authority and are not narrowly tailored to any established violation.

4

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Immigration Enforcement Landscape in the Central District of California

The Los Angeles area is one of the most important regions for immigration enforcement in the country. According to estimates from DHS data, nearly 4 million illegal aliens are in California, and nearly 2 million are in the Central District of California. Los Angeles County alone had an estimated 951,000 illegal aliens as of 2019—by far the most of any county in the United States. The overwhelming majority of those illegal aliens hail from Mexico, El Salvador, and Guatemala. Migration Policy Inst., *Profile of the Unauthorized Population: Los Angeles County, CA*, https://shorturl.at/OL7jt. Illegal aliens form a significant proportion of California's workforce and are especially highly concentrated in certain sectors, such as agriculture, construction, food services, and transportation. *See* Bay Area Council Econ. Inst., *The Economic Impact of Mass Deportation in California* 24 (2025), https://tinyurl.com/mw3e4354.

ICE's Enforcement and Removal Operations (ERO) field office for Los Angeles, whose jurisdiction is coextensive with the Central District of California, comprises "over 290 law enforcement officers in six offices

5

who are responsible for enforcing federal immigration laws in seven California counties with a combined population of over 20 million people." 2-ER-122,. Based on current estimates, illegal aliens comprise 10 percent of the entire Central District population. Thus, while the previous administration carried out some 26,000 immigration arrests in the Central District, those efforts did little to alter the broader dynamics of illegal aliens entering the country and heading for the Central District, especially given its proximity to the border with Mexico.

Complicating federal efforts further, in December 2024, the Los Angeles City Council enacted a "sanctuary city" ordinance restricting Los Angeles law enforcement and other personnel from cooperating with federal immigration enforcement or participating in such enforcement. L.A. Admin. Code § 19.190 *et seq.* (Ord. No. 188441). For example, the law limits local officers' ability to "[i]nquire into or collect information about an individual's Citizenship or Immigration Status"; "[i]nvestigate, cite, arrest, hold, transfer, or detain any person for the purpose of Immigration Enforcement"; or "[p]articipate in Immigration Enforcement in any operation, joint operation, or joint task force involving any Immigration Agent." § 19.190(a), (b), and (f).

6

In early June, ICE and U.S. Customs and Border Protection commenced efforts to increase immigration enforcement in Los Angeles. *See* 2-ER-132. Large crowds of protesters responded by "thr[owing] 'concrete chunks, bottles of liquid, and other objects' at federal officers" and launching "'mortar-style fireworks with multiple explosions' at them"; protesters also "heavily vandalized" a federal building. *See*, *e.g.*, *Newsom v. Trump*, 141 F.4th 1032, 1041 (9th Cir. 2025). The President deployed the National Guard to protect federal officers performing their duties. *See id.* at 1041-1042.

Despite these challenging conditions, from June 1 to mid-July, ERO "processed approximately 2,805 immigration arrests and numerous criminal arrests in the Los Angeles area." 2-ER-124. The Mayor of Los Angeles responded by describing ICE's enforcement activities as a "reign of terror," Cheyanne M. Daniels, *Mayor Bass calls for end to ICE 'reign of terror' in Los Angeles*, Politico (July 20, 2025), and directed all city departments to conduct trainings on compliance with the sanctuary-city law and "to report any federal immigration enforcement activity on City properties or facilities." Exec. Directive No. 12 (July 11, 2025).

## II.   District Court's Injunction and Denial of Stay Pending Appeal

On June 20, three illegal aliens who were arrested in the Los Angeles area filed a habeas corpus petition in the United States District Court for the Central District of California seeking their release from immigration detention. 4-ER-773. These three petitioners work as day-laborers; they were arrested in Pasadena on June 18 in connection with "a targeted enforcement action at a particular location" (a doughnut shop) "where past surveillance and intelligence had confirmed that the target or individuals associated with him were observed to have recruited illegal aliens to work on landscaping jobs." 2-ER-123; Dkt. 11 at 4; 1-ER-12-13. All three have since been released from immigration detention on bond. 2-ER-58; 1-ER-14-15.

On July 2, Plaintiffs filed an amended class-action complaint adding two United States-citizen individual plaintiffs and four organizational plaintiffs, plus several federal officials as defendants. 4-ER-708. Plaintiffs also filed ex parte applications for temporary restraining orders on July 3. 2-ER-320; 3-ER-626. Plaintiffs' filings vastly expanded the scope of the suit to broadly challenge the government's immigration-enforcement operations in the Los Angeles area. *See* 4-ER-

711-13. As relevant here, Plaintiffs alleged that federal immigration officers "have adopted a policy and practice of conducting immigration operations in violation of their obligation to stop individuals in public only if there is reasonable suspicion." 4-ER-720, 765. Plaintiffs in particular objected that ICE agents were targeting "[c]ertain types of businesses," like "carwashes," because "past experience demonstrated that they are likely to employ persons without legal documentation." 2-ER-283. Plaintiffs also complained, however, that agents "have conducted indiscriminate immigration operations, flooding street corners, bus stops, parking lots, agricultural sites, day laborer corners, and other places." 4-ER-711.

Plaintiffs also alleged Fifth Amendment violations based on access-to-counsel conditions for immigration detainees at the "B-18" room in the Los Angeles federal building. *Id.* They claim that ICE's operation of B-18 creates systemic barriers to attorney access, including delays or denials of entry, limits on visitation hours, inadequate private meeting space, and unjustified interruptions. 4-ER-732-38. Plaintiffs further allege that confidential legal calls are inconsistently allowed, sometimes monitored by officers, and that ineffective scheduling processes result in missed or

shortened consultations, impeding attorneys' ability to communicate with clients and prepare legal filings. *Id*. The district court gave the government just two business days to respond and held a hearing on July 10. *See* 4-ER-873 (scheduling order); 2-ER-143 (transcript).

The next day, July 11, the district court granted Plaintiffs' request and issued a sweeping injunction barring federal agents from conducting any detentive stops without reasonable suspicion. The district court interpreted that prohibition to mean that agents cannot "rely solely" on apparent race or ethnicity, use of Spanish or accented English, presence at a particular location, or type of work, either "alone or in combination," as grounds for reasonable suspicion. 1-ER-51; *see* 1-ER-2-53. The court acknowledged that there was no evidence of any official policy authorizing stops solely on those bases, 1-ER-46 n.33, but inferred from anecdotal evidence that immigration officers were engaged in a practice of stops based solely on those four factors, 1-ER-40-42.

As to standing, the court reasoned that Plaintiffs "have standing for this putative class action" based entirely on Plaintiff Gavidia's allegations that federal agents had detained and questioned him based on his ethnicity. 1-ER-35-36. On the merits, the court concluded that

10

Plaintiffs were likely to succeed on their claim that the four factors Plaintiffs had identified could not suffice to establish reasonable suspicion for a stop. 1-ER-38-46. The court added that insofar as agents relied on other factors, such as a suspect's flight from federal officers, the government "do[e]s not show that they support reasonable suspicion." 1-ER-42 n.30. As to the scope of relief, the court held that Plaintiffs were irreparably harmed by the prospect of future detentive stops, and concluded that "to provide complete relief to the named ... [Plaintiffs]," the court "must enjoin the conduct of all law enforcement engaged in immigration enforcement throughout" the entire Central District of California. 1-ER-37.

The district court accordingly enjoined the government "from conducting detentive stops in this District unless the agent or officer has reasonable suspicion that the person to be stopped is within the United States in violation of U.S. immigration law." 1-ER-51. The order further provided that Defendants, "except as permitted by law," "may not rely solely on" the following four factors, "alone or in combination, to form reasonable suspicion for a detentive stop":

- "Apparent race or ethnicity";

11

- "Speaking Spanish or speaking English with an accent";

- "Presence at a particular location (e.g. bus stop, car wash, tow yard, day laborer pick up site, agricultural site, etc.)"; and

- "The type of work one does."

*Id.*

The district court subsequently denied Defendants' motion for a stay of the order pending appeal. 2-ER-61-67. It scheduled a hearing on whether to issue a preliminary injunction for September 24, 2025, 1-ER-68, meaning the court's order will remain in effect for the fore*see*able future.

## III. The Stay Panel's Denial of Stay Pending Appeal

The stay panel largely declined to stay the district court's injunction pending appeal; the panel only stayed one provision of the injunction authorizing reliance on the four factors "as permitted by law," which the panel acknowledged was vague. Dkt. 49 at 38; *see id.* 1-61. The panel further acknowledged the lack of "evidence of an 'official policy' of making stops based only on the four factors and without reasonable suspicion," but repeated the district court's finding that officers "were routinely doing so" by citing, for instance, public statements by a CBP official

12

generally referring to potential further enforcement operations in Los Angeles. Dkt. 49 at 20; 1-ER-26, 36 n.26.[1]

As to standing, the panel held that all individual Plaintiffs and associational Plaintiffs could seek injunctive relief based on a "realistic threat" that the individual Plaintiffs and members of the organizational Plaintiffs "will be stopped without reasonable suspicion" by immigration agents in the future. Dkt. 49 at 25 (cleaned up); *see id.* at 22-33.

On the merits, the panel concluded that the injunction "prohibit[s] sole reliance on the four factors" identified by the district court but does "not prohibit reliance on those factors in combination with unlisted factors." *Id.* at 40-41. The panel determined that the only vague element was the "except as permitted by law" clause, as to which it granted a stay. *Id.* at 37-39, 61.

## SUMMARY OF THE ARGUMENT

The district court gravely abused its discretion by granting an extraordinary, district-wide injunction despite conceding that Plaintiffs

---

[1] The panel also asserted that Defendants "did not dispute that these detentive stops have been based solely on the four enumerated factors," Dkt. 49 at 21, but that is incorrect—as the district court stated, "Defendants contest the idea that they relied solely on these factors." 1-ER-41.

failed to identify any explicit federal policy or consistent practice violating their constitutional rights. That glaring omission should have been dispositive: without a systemic policy or uniform conduct, Plaintiffs could neither establish Article III standing nor satisfy their burden to show a likelihood of success on their sweeping Fourth and Fifth Amendment theories. *See Lyons*, 461 U.S. at 101-02 (no standing for injunctive relief absent real and immediate threat of future injury); *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974) (same). *Lyons* makes this a case of *déjà vu*—ironically arising again in Los Angeles. Absent some likely recurrence *to Plaintiffs*, Article III precludes standing to seek injunctive relief. Here, the district court premised standing on the prospect of recurrence to either Plaintiff Gavidia (which is not remotely likely) or nonplaintiffs (which is nonjusticiable).

The few isolated incidents Plaintiffs cite—unsupported by competent evidence—cannot justify the extraordinary remedy of enjoining lawful federal enforcement activities. That is particularly true as there is no imminent risk that any named plaintiff—or any specific class member—will be subject to the same alleged conduct again.

14

Even assuming Plaintiffs could establish not only standing but also some likelihood of success on the merits, the district court abused its discretion by misapplying the *Winter* factors. *See Winter v. NRDC*, 555 U.S. 7, 20 (2008) (plaintiffs must establish all four factors). It accepted unverified and stale declarations as proof of irreparable harm while disregarding the Government's compelling interests in law enforcement, institutional security, and operational discretion. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (public interest in enforcement of the law is always substantial). The court gave no meaningful weight to the national-security and operational harms the injunction imposes.

The injunction's breadth exacerbates those errors. As an initial matter, the injunction is a classic "follow the law" injunction, which is too nonspecific to comport with Rule 65 and binding precedent. The district court further failed to tailor relief to any proven violation, instead crafting an injunction that applies across an entire federal district, imposes prescriptive operational mandates, and regulates conduct far beyond the claims at issue. That overreach is inconsistent with the Supreme Court's mandate that injunctions be narrowly drawn and directly address the harm shown. *See CASA*, 145 S. Ct. at 2540; *see also*

15

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (injunctions must burden no more speech or activity than necessary); *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987) (nationwide relief improper absent showing of nationwide injury).

The Constitution and precedent require more than conjecture and isolated anecdotes to justify such sweeping judicial intervention in executive functions. Because Plaintiffs failed to satisfy *Winter* and the district court failed to tailor its relief, the injunction should be reversed.

## STANDARD OF REVIEW

This Court reviews a district court's issuance of a preliminary injunction under three standards: "factual findings for clear error, legal conclusions de novo, and the scope of the injunction for abuse of discretion." *United States v. Washington*, 853 F.3d 946, 962 (9th Cir. 2017).

## ARGUMENT

An injunction is an "extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. A party seeking a preliminary injunction must establish four conditions: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is

16

in the public interest. *Id*. at 20. While courts must consider and balance the parties' competing claims of injury, courts must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id*. at 24 (citations omitted).

Even if Plaintiffs could show an explicit policy, that would not establish the imminent injury required for standing to seek injunctive relief. *See Lyons*, 461 U.S. at 101-02. Regardless, because the district court found no policy or consistent practice causing the alleged harms, the court erred in concluding that Plaintiffs were likely to succeed on the merits. Even if Plaintiffs could make that showing, the court abused its discretion by failing to properly balance the harms and equities. It relied on isolated, anecdotal declarations to find irreparable harm absent an injunction, but gave no meaningful consideration to the Government's inability to carry out lawful security and operational measures without judicial micromanagement. That omission led the court to impose the extraordinary remedy of enjoining the Government from conducting standard searches, monitoring, and access-control procedures essential to the safe and orderly operation of the facility.

17

## I.   The District Court Clearly Erred in Concluding That Plaintiffs Showed a Likelihood of Success on the Merits

This appeal turns in part on the district court's failure to find an explicit policy, which cannot survive appellate scrutiny. *First*, the court never actually identified or found the existence of such a policy. *Second*, its injunction rests on generalized, anecdotal, and in some cases stale declarations that fail to establish an ongoing, system-wide practice. *Third*, the record evidence—including unrebutted declarations from federal officials—affirmatively disproves existence of any such alleged policy. That absence of reliable, specific evidence alone requires reversal. As a result, Plaintiffs neither established Article III standing nor likely success on the merits, as *Winter* demands.

### A. The District Court Did Not Actually Find a Policy or Practice

Standing is jurisdictional, and to invoke a federal court's equitable power, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 380 (2024). Only "actual or imminent" injuries count, *id.* at 381—not allegations that are "too speculative" or

18

merely assert "possible future injury," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citations omitted).

Here, the district court did not find an unlawful policy or practice. Rather, reduced to mere footnotes, it contends that "a pattern of conduct is sufficient" to establish liability and that "policies are being carried out" through the alleged conduct. 1-ER-45 n.33. Those are not findings of a policy; they are conclusory observations about alleged past events that fall short of the standard for standing or for identifying an ongoing, enforceable policy. The district court minimized this issue for good reason: Plaintiffs failed to demonstrate the existence of a policy of engaging in stops without reasonable suspicion, and the Government's evidence confirms no such policy exists. *Id.*; *e.g.*, 2-ER-132-33, 279; *see also* Dkt. 47.

That failure is dispositive. Without a concrete finding of a policy or settled practice, Plaintiffs cannot show the "real and immediate" threat of future injury required by *Lyons* and *O'Shea*. At most, their evidence describes discrete, unconnected encounters—none of which establishes that any named Plaintiff will again be stopped, much less stopped solely on the four prohibited factors. In the absence of an ongoing policy—and

19

even if such a policy existed—any prediction of future harm necessarily rests on a speculative chain of events: that the same plaintiff will be in the same place, encountered by an officer with the same subjective reasoning, and subjected to a stop based on the exact combination of factors the injunction addresses. Article III does not permit injunctive relief supported only by a chain of conjectural premises. The court's inability to identify an actual policy is not a mere evidentiary gap—it is a jurisdictional defect that should have ended the analysis. As such, Plaintiffs lack Article III standing to seek prospective injunctive relief. *See Clapper*, 568 U.S. at 412.

## B. Even If the Court Had Identified an Actual Policy, the Record Would Not Supply Proof of It

To the extent the district court's decision may be read as inferring the existence of a "four-factor only" policy, this inference lacks record support that could establish Article III standing or likely success on the merits. As explained above, the district court never actually found that defendants maintain a formal policy or consistent practice of conducting stops on the four enumerated factors alone. Instead, at best, it inferred such a policy from a handful of anecdotes, many involving materially different facts, while ignoring unrebutted declarations that no such

20

policy exists. Federal regulations confirm this: an ICE officer may briefly detain a person for questioning only if the officer has "reasonable suspicion, based on specific articulable facts" of an immigration or other federal offense. 8 C.F.R. § 287.8(b)(2). ICE guidance likewise describes investigative stops supported by reasonable suspicion as a principal enforcement tool, and agents receive training to base such suspicion on the totality of the circumstances rather than any single factor. *See* ICE, HSI Search and Seizure Handbook 11, 16 (Sept. 14, 2012); 8 C.F.R. § 287.1(g); 2-ER-122-23. These governing standards underscore that the district court's inference of a "four-factor only" policy rests on a misunderstanding of both the law and the record, and thus does not satisfy Plaintiffs' burdens.

Here, Plaintiffs' speculative allegations that assert in conclusory fashion that immigration enforcement officers have engaged in stops without reasonable suspicion cannot support a finding that a policy of engaging in detentive stops without reasonable suspicion exists. Plaintiffs claim that ICE has a practice of relying on just four factors to supply reasonable suspicion for immigration stops, and that those factors could describe broad swaths of the population. But that allegation

effectively refutes their standing; insofar as ICE allegedly stops suspects based on characteristics that could describe many thousands of people, they offer no reason why *Plaintiffs*—out of the 20 million or so inhabitants of the Central District of California—would be stopped again. Plaintiffs and the court below also acknowledge that ICE at least sometimes relies on additional factors, and do not challenge stops that rely on the four factors plus even one additional factor as lacking reasonable suspicion. *See* Dkt. 26 at 17; Dkt. 49 at 40-41. That just aggravates the standing problem: even if Plaintiffs were stopped in the future, they have no basis for alleging that they would be stopped solely based on the four prohibited factors, and not for some additional reasons.

## C. Even Assuming a Policy, *Lyons* is Controlling and Dispositive

Assuming *arguendo* that Plaintiffs could establish that Defendants have a policy of stopping individuals solely based on the four factors, the Supreme Court's decision in *Lyons*, 461 U.S. 95, forecloses Plaintiffs' past-is-prologue theory of standing. There, police officers stopped the plaintiff for a traffic violation, seized him, and placed him in a chokehold. *Id.* at 97. The Supreme Court held that, while the plaintiff could pursue a damages claim for that retrospective injury, Lyons lacked standing for

22

prospective relief because he had not shown that "he was likely to suffer future injury from the use of the chokeholds by police officers." *Id*. at 105. There was no "immediate threat" that he would again be "choke[d] ... without any provocation or resistance on his part." *Id*. That was so even though the Court accepted that the police department had a policy of "routinely apply[ing] chokeholds in situations where they are not threatened by the use of deadly force." *Id*.

If a plaintiff who had personally been subjected to a chokehold, and who could point to a written chokehold policy, could not establish standing for injunctive relief in *Lyons*, then Plaintiffs here—with no written policy and far thinner evidence—cannot possibly clear that bar.

The clarity of the district court's error under *Lyons* is particularly manifest because it, like the *Lyons* district court, was relying on the prospect of recurrence to a single plaintiff. Here, the district court relied solely on Plaintiff Gavidia to establish Article III standing. *See* 1-ER-35-36; *compare* 3-ER-427-28 (Gavidia allegedly stopped based on his "skin color"), with *Lyons*, 461 U.S. at 97-98. As in *Lyons*, Gavidia seeks prospective relief to enjoin the challenged practice (here, reliance solely on the four factors in detentive stops). *Compare Lyons*, 461 U.S. at 99-

23

100 *with* Dkt. 49 at 50. And, as in *Lyons*, Gavidia cannot show standing because he has no basis, beyond rank speculation, to support that he will be stopped again without reasonable suspicion based solely on the four factors. "Absent a sufficient likelihood that [he] will again be wronged in a similar way," he is "no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." *Lyons*, 461 U.S. at 111. Indeed, this case calls to mind the movie Groundhog Day—with the repetition here arising in Los Angeles, rather than Punxsutawney.

The remaining individual Plaintiffs—who the district court did not rely upon for its standing holding—even more clearly lack standing. Plaintiff Viramontes, for example, alleged that agents visited the carwash where he works twice without stopping him, then detained him for about 20 minutes on their third visit until they could verify his citizenship status. 3-ER-382-83. That single interaction provides no basis to believe Viramontes will be subject to any future stops, let alone wrongful ones based solely on the four factors. For two other Plaintiffs, Perdomo and Molina, the only specific "evidence" of their standing is

24

Perdomo's "belie[f]" that he will be stopped again (3-ER-361) and Molina's "worr[y]" that he will be arrested again for "look[ing] like an immigrant" (3-ER-377). But subjective, conjectural fear of a future illegal stop "is not certainly impending" and "cannot manufacture standing." *Clapper*, 568 U.S. at 416.

The organizational Plaintiffs likewise lack standing to pursue prospective injunctive relief. As an initial matter, it is black-letter law that "Fourth Amendment rights are personal rights which ... may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165 (1969); *accord Rakas v. Illinois*, 439 U.S. 128 (1978). Associational standing thus cannot be employed here.

But even if this case arose in a context where associational standing was not doctrinally forbidden, Plaintiffs failed to establish it here. Associational standing requires proof *(inter alia)* that an organization's "members would otherwise have standing to sue in their own right" and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Alliance for Hippocratic Med.*, 602 U.S. at 398 (Thomas, J., concurring) (*quoting Hunt v. Washington St. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). But,

just like the individual Plaintiffs, any risk of future harm for the organizations' members is speculative. *See id.* at 381 (opinion of the Court) (citing *Clapper*, 568 U.S. at 409). At best, the associational standing would add only "statistical probabilities"—which the Supreme Court has held does not suffice for purposes of Article III. *Summers,* 555 U.S. at 498.

### D. The District Court's Reliance on Circumstantial Evidence Cannot Bridge the Gap

The record is built almost entirely from subjective, anecdotal accounts of why declarants believe they were stopped. None of the declarants can testify to the actual bases for the officers' suspicion; none has access to the information known to officers at the time. As courts recognized, reasonable suspicion determinations rest on "the totality of the circumstances"—which often includes confidential intelligence, surveillance observations, or tips from other law-enforcement agencies that are invisible to the suspect. *E.g.*, 2-ER-134-36; 2-ER-279-80; 2-ER-283-84. Plaintiffs cannot establish that any stop was based solely on the four prohibited factors.

Even if the district court intended to find a policy or practice— which, as explained, it did not—that finding would be clearly erroneous

under *Anderson v. City of Bessemer City*, 470 U.S. 564 (1985), and *United States v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009) (en banc). The record contains no evidence—direct or indirect—of any official ICE or CBP policy directing officers to rely solely on four enumerated factors when making investigatory stops. Defendants have consistently denied the existence of such a policy, and the anecdotal declarations Plaintiffs submitted fall far short of establishing a consistent, agency-wide practice.

A review of each declaration confirms the point: Gavidia alleges that agents stopped him once, supposedly based on his appearance. 3-ER-426-28. But his account includes no acknowledgment by agents of his appearance and no other intelligence, surveillance, or contemporaneous investigative leads that might have informed the stop. *Id*. Indeed, Gavidia appears to have initiated the interaction with agents not the other way around, undermining Plaintiffs claim that Gavidia was targeted by agents at all, let alone because of his race. 3-ER-426 ("I heard someone say immigration agents may be at the premises. I was curious and went outside to confirm whether immigration agents were present.").

27

Even if credited, one isolated stop—without proof of agency policy—cannot establish a district-wide practice.

Viramontes describes three agent visits to his workplace, only one of which resulted in a brief detention. 3-ER-382-84. The prior two visits—where he was not stopped at all—undermine any inference of a fixed, uniform policy. *Id*.

Perdomo offers only his belief that he will be stopped again. 3-ER-361. His account provides no basis to conclude that his prior stop was predicated exclusively on the four factors. 3-ER-360-61.

Molina recounts a single detention, attributing it to his appearance. 3-ER-377. But, as with the other declarations, there is no evidence that agents relied on the four factors or lacked other information justifying reasonable suspicion. Even the organizational declarants (from CHIRLA, CLEAN, and others) provide anecdotal reports from unnamed individuals, often second- or third-hand, about isolated encounters. *E.g.*, 3-ER-413-421; 3-ER-454-55; 3-ER-462-63. These hearsay accounts are varied in location, timing, and circumstances, defeating any inference of a standardized practice.

28

Taking these accounts at face value, they reflect scattered events across a sprawling geographic area with no showing that each incident arose from the same operational directive. The leap from such disparate encounters to a district-wide "policy" is speculative, not factual, and thus cannot survive clear-error review.

Plaintiffs' circumstantial showing is particularly deficient in light of the governing standing standard. Under *Clapper*, plaintiffs must demonstrate that a future injury is "certainly impending"—a standard that demands proof of the specific conditions likely to recur. Here, Plaintiffs cannot show that they, or their members, will (1) be stopped again, and (2) be stopped for precisely the same reasons they allege were unlawful in the past. The absence of direct evidence from the decisionmakers—the officers themselves—forecloses any nonspeculative basis for that claim.

The contrast to *Lyons* again underscores the problem. There, the plaintiff had suffered an actual chokehold, and—unlike here—the city actually had a written chokehold policy. Yet the Supreme Court still found no standing for prospective relief because there was no basis to believe the plaintiff would again be subjected to the same practice. If

29

those facts were insufficient in *Lyons*, Plaintiffs' thinner, inferential showing necessarily fails here too.

Moreover, the record contains evidence that affirmatively refutes Plaintiffs' theory. The government submitted declarations indicating that officers routinely rely on additional factors beyond the four listed and Plaintiffs do not challenge stops supported by any additional factor. *E.g.*, 2-ER-134-36; 2-ER-279-80; 2-ER-283-84. That evidence defeats the idea that the alleged "four-factor only" basis is an operational constant. Without evidence that the officers, under the same operational posture, would encounter the same individual again and decide to act for the same allegedly prohibited reason, Plaintiffs' theory fails.

Plaintiffs' allegations rest entirely on circumstantial, anecdotal accounts, none of which establish the kind of "persistent pattern" that might plausibly support an injunction. Unlike in *LaDuke v. Nelson*, 762 F.2d 1318 (9th Cir. 1985), and *Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012), the government here has never admitted the existence of the challenged policy. In both *LaDuke* and *Melendres*, plaintiffs presented undisputed proof—often including written policies—that the defendants systematically engaged in the challenged conduct. By contrast, here

30

there is neither a written directive nor credible testimony tying these incidents to an established agency policy.

The district court's reliance on unsupported assertions in Plaintiffs' declarations ignores *Lyons*, where the Supreme Court assumed the existence of a chokehold policy yet still found no standing for prospective relief because the plaintiff could not show a realistic threat of being subjected to that policy again. 461 U.S. at 105-06. Plaintiffs here have even less: not only is there no realistic threat, there is no proven policy in the first place.

## II. Specific Policy Issues Aside, the District Court Erred in Holding Article III Standing Was Established and That Plaintiffs Had Established Violations of the Fourth Amendment

More broadly, the district court erred in holding that Plaintiffs had established Article III standing and that Defendants engaged in unreasonable seizures in violation of the Fourth Amendment. Its injunction fails on standing, merits, and remedial grounds, and rests on factual findings unsupported by the record.

### A. Plaintiffs Lack Standing for Prospective Injunctive Relief

This injunction never should have issued because Plaintiffs lack Article III standing to seek prospective injunctive relief. *See Clapper*, 568

U.S. at 412. To establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Alliance for Hippocratic Med.*, 602 U.S. at 380. Only "actual or imminent" injuries count, *id.* at 381—not allegations that are "too speculative" or merely assert "*possible* future injury," *Clapper*, 568 U.S. at 409 (citations omitted).

Here, Plaintiffs' allegations are speculative to a fault. They claim that ICE has an unstated practice of relying on just four factors to supply reasonable suspicion for immigration stops, and that those factors could describe broad swaths of the population. But that allegation effectively refutes their standing; insofar as ICE allegedly stops suspects based on characteristics that could describe many thousands of people, Plaintiffs offer no reason why they—out of the 20 million or so inhabitants of the Central District of California—would be stopped again. Plaintiffs and the district court also acknowledge that ICE at least sometimes relies on additional factors, and do not challenge stops that rely on the four factors plus even one additional factor as lacking reasonable suspicion. *See* Dkt.

26 at 17; Dkt. 49 at 40-41. That just aggravates the standing problem: even if Plaintiffs were stopped in the future, they have no basis for alleging that they would be stopped *solely* based on the four prohibited factors, not for some additional reasons.

In *Lyons*, the Supreme Court foreclosed Plaintiffs' past-is-prologue theory of standing. There, police officers stopped the plaintiff for a traffic violation, seized him, and placed him in a chokehold. 461 U.S. at 97. The Court held that, while the plaintiff could pursue a damages claim for that past injury, he lacked standing for prospective relief because he had not shown that "he was likely to suffer future injury from the use of the chokeholds by police officers." *Id.* at 105. There was no "immediate threat" that he would again be "choke[d] ... without any provocation or resistance on his part." *Id.* That was so even though the Court accepted that the police department had a policy of "routinely apply[ing] chokeholds in situations where they are not threatened by the use of deadly force." *Id.*

Plaintiffs' standing theory—particularly as embodied in the allegations by Plaintiff Gavidia, the sole plaintiff for whom the district court found standing, *see* pp. 23-24, *supra*—is a redux of *Lyons*. As in

*Lyons*, Gavidia alleges a past Fourth Amendment injury from law enforcement. *Compare* 3-ER-427 (Gavidia allegedly stopped based on his "skin color"), *with Lyons*, 461 U.S. at 97-98. As in *Lyons*, Gavidia seeks prospective relief to enjoin the challenged practice (here, reliance solely on the four factors in detentive stops). Compare *Lyons*, 461 U.S. at 99-100 with Dkt. 49 at 50. And, as in *Lyons*, Gavidia cannot show standing because he has no basis beyond rank speculation to believe that he will be stopped again without reasonable suspicion based solely on the four factors. "Absent a sufficient likelihood that [he] will again be wronged in a similar way," he is "no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." *Lyons*, 461 U.S. at 111.

The remaining individual Plaintiffs even more clearly lack standing, as explained above.

Similarly, the organizational Plaintiffs likewise lack standing to pursue prospective injunctive relief—both because Fourth Amendment doctrine prohibits vicarious assertion of Fourth Amendment rights by

34

others and because Plaintiffs have failed to establish associational standing in any event. *See supra* at pp. 25-26.

The district court attempted to brush *Lyons* away by emphasizing "a real and immediate threat that the conduct complained of will continue." Dkt. 49 at 35; *see id.* at 28. But the courts failed to identify any realistic immediate threat *to plaintiffs*—the essence of the standing inquiry. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). It was irrelevant to standing in *Lyons* that the police department was generally likely to continue to employ chokeholds; what mattered was whether the *plaintiff* there would likely be subject to a chokehold again. So too here, it is irrelevant to standing that the district court deemed federal agents likely to continue a general, unstated policy of relying solely on the four factors. What matters is that *Plaintiffs* cannot show they will likely be stopped and detained solely based on those factors again. Indeed, Plaintiffs and the district court all but admit as much by alluding to other factors that federal officers sometimes rely on and acknowledging that adding those factors to the mix would not present the same Fourth Amendment problems. *See*, *e.g.*, 1-ER-42 n.29 (acknowledging that "the surveillance and intelligence data ... share[d]

35

with the agents" could give rise to reasonable suspicion but faulting the government for "fail[ing] to provide any concrete details" about that sensitive law-enforcement data).

The district court attempted to paper over this gap by invoking circuit precedent holding that harm inflicted by "a pattern of officially sanctioned behavior" is automatically likely to recur. Dkt. 49 at 25 (quoting *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012)). But *Lyons* rejected that reasoning. *Lyons* accepted *arguendo* allegations that "police officers, 'pursuant to the authorization, instruction and encouragement of defendant City of Los Angeles, regularly and routinely appl[ied]'" the chokeholds that the plaintiff sued to enjoin. 461 U.S. at 98; *see id.* at 113-114 (Marshall, J., dissenting) (observing that "[t]he complaint clearly alleges that the officer who choked Lyons was carrying out an official policy"); *contra* Dkt. 49 at 28. Far from establishing standing, *Lyons* instead dismissed as irrelevant whether the plaintiff "seeks to enjoin only an 'established,' 'sanctioned' police practice assertedly violative of constitutional rights." 461 U.S. at 108. The Court explained that, "to have a case or controversy with the City that could sustain [his claim for injunctive relief], Lyons would have to credibly

36

allege that he faced a realistic threat from the *future application* of the City's policy." *Id.* at 106 n.7 (emphasis added).

The Supreme Court reinforced the point in *Clapper*; even though the plaintiffs there challenged a statutorily authorized surveillance program—a quintessential type of established, sanctioned program—their assertion of "an objectively reasonable likelihood that their communications will be acquired under [that program] at some point in the future ... [wa]s too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending.'" 568 U.S. at 401. Otherwise, under the district court's approach, so long as plaintiffs allege an "officially sanctioned" pattern or policy, plaintiffs would have standing to seek to enjoin ICE's detentive questioning of a mere, say, 100 Los Angeles residents per year, even though that plaintiff faced a vanishingly small statistical chance of ever being subjected to such questioning. *Melendres*, 695 F.3d at 998. Plaintiffs cannot circumvent the imminent-injury requirement just by alleging a pattern or policy.

The stay panel also suggested that the individual Plaintiffs themselves, and at least some members of the organizational Plaintiffs,

face an imminent threat of injury based on pure statistical inference. Because Plaintiffs are sufficiently numerous, and the enforcement action is sufficiently "high-volume," the court projected some overlap between the former and the latter. *See* Dkt. 49 at 28, 30-31 (comparing immigration agents' "high-volume, District-wide practice" with the organizational plaintiffs' "large scale of ... Los Angeles-area memberships"). But the Supreme Court has never accepted such a statistical probability theory of standing, at least when the numbers involve thousands of organizational members across the entirety of California who assert some risk of being detained by immigration officers in a district populated by 20 million people. Dkt. 49 at 14, 16, 18. The stay panel cannot have it both ways: to the extent "the four factors establish only a 'broad profile'" that encompasses too many people to justify individualized reasonable suspicion for Fourth Amendment purposes, *id.* at 41; but it is unclear why any particular member of the large relevant population would have a realistic likelihood of being encountered and detained again. Indeed, the panel recognized that "the record shows only one" anonymous individual (not a named Plaintiff) "has been stopped by Defendants twice." Dkt. 49 at 26.

38

In any event, even if Plaintiffs had a nonspeculative prospect of being stopped again in the future, they have made no showing whatsoever that they would likely be stopped *on the basis prohibited by the injunction—i.e.*, based solely on the four enumerated reasonable-suspicion factors.[2] All agree that any future stops that included even one additional factor would not fall within the injunction—yet no one has offered any basis to think that the same individual will be stopped for the same purportedly impermissible reasons, and *only* those reasons, in any future stop. "Absent a sufficient likelihood that [they] will again be wronged *in a similar way*," *Lyons*, 461 U.S. at 111 (emphasis added), Plaintiffs cannot establish standing to seek an injunction.

## B. The Injunction Improperly Imposes a "Follow the Law" Mandate

As the stay panel already recognized (Dkt. 49 at 38), the district court's injunction restates the Fourth Amendment's reasonable-suspicion requirement. This is precisely the kind of vague "follow the law" order

---

[2] The stay panel thus wrongly found it "significant" that a single anonymous individual has allegedly been stopped "twice." Dkt. 49 at 26. Missing from that inquiry: any analysis of whether either stop (much less both) lacked reasonable suspicion (much less was predicated on the prohibited factors).

that Rule 65 prohibits. It offers no concrete guidance, invites contempt disputes over subjective judgments, and exceeds the court's equitable powers—especially in supervising Executive Branch law enforcement. Fed. R. Civ. P. 65(d)(1)(B)-(C) (requiring specificity and describing conduct to be restrained); *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1134 (9th Cir. 2006).

## C. The District Court Grossly Misapplied the Fourth Amendment

The district court's injunction also misapprehends the Fourth Amendment in ways that call out for review by placing under judicial supervision all immigration-enforcement stops within the Central District. Under the injunction, federal immigration officials "may not rely solely on" four factors, "alone or in combination, to form reasonable suspicion for a detentive stop" when stopping any of the nearly 20 million people in the Central District of California. 1-ER-51. Those factors are: "[a]pparent race or ethnicity"; "[s]peaking Spanish or speaking English with an accent"; "[p]resence at a particular location (e.g. bus stop, car wash, tow yard, day laborer pick up site, agricultural site, etc.)"; or "[t]he type of work one does." *Id.* As the stay panel confirmed, that injunction further bars consideration of officers' experience in connection with the

40

enumerated factors—for example, experience "demonstrat[ing] that illegal aliens utilize or seek work at the[] locations" or that certain jobs are "more often performed by illegal immigrants than are other jobs"— because in the district court's view, past experience does not add anything to the calculus. Dkt. 49 at 43; *see id.* 50 n.13. The injunction contravenes blackletter Fourth Amendment doctrine, which embraces a totality-of-the-circumstances, noncategorical approach that recognizes that particular factors may be stronger or weaker in context and that factors in combination can supply reasonable suspicion even if they do not individually.

The Fourth Amendment guarantee against unreasonable searches and seizures "extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest," including stops of individuals suspected of being in the United States illegally. *Arvizu*, 534 U.S. at 273 (2002). By virtue of "the limited nature of the intrusion," however, "stops of this sort may be justified on facts that do not amount to the probable cause required for an arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 880 (1975). Instead, an officer may conduct such a stop based on reasonable suspicion—supported by "specific articulable facts, together

41

with rational inferences from those facts"—that a person is an illegal alien. *Id.* at 884; *see* 8 C.F.R. § 287.8(b)(2). Reasonable suspicion requires only "'some minimal level of objective justification' for making the stop," a standard that is "obviously less demanding than that for probable cause," *United States v. Sokolow*, 490 U.S. 1, 7 (1989)—which is itself a "not a high bar," *Kaley v. United States*, 571 U.S. 320, 338 (2014). Given that probable cause "is something more than a bare suspicion, but need not reach the fifty percent mark," reasonable suspicion requires *far* less certainty. *See United States v. Garcia*, 179 F.3d 265, 269 (5th Cir. 1999).

The reasonable-suspicion inquiry "turn[s] on the totality of the particular circumstances." *Brignoni-Ponce*, 422 U.S. at 885 n.10; *see Arvizu*, 534 U.S. at 273. By definition, no particular circumstantial factor is categorically off-limits—whether that factor is a person's appearance, behavior, or the officer's past experience with the particular offense or suspect. *See, e.g.*, 2-ER-279 (collecting examples of reasonable-suspicion factors in the immigration-enforcement context). Reasonable suspicion is accordingly context-dependent and cannot be reduced to per se rules that treat certain factors as categorically insufficient. The Supreme Court has thus repeatedly reversed decisions of this Court imposing such rules.

42

In *Arvizu*, the Supreme Court rejected as too rigid the court of appeals' framework deeming seven particular factors as "carr[ying] little or no weight in the reasonable-suspicion calculus." 534 U.S. at 272; *see id.* at 274. And in *Sokolow*, 490 U.S. at 8, the Court rejected a rule allowing officers to rely on certain evidence of "ongoing criminal behavior" but not "probabilistic" evidence. In *Banks*, the Supreme Court similarly rejected a reticulated judicial framework governing the police's entry into a residence after knocking and announcing their presence. 540 U.S. at 34, 41-42. The district court's injunction contravenes those basic principles.

To begin, the injunction ignores the Supreme Court's repeated instructions by categorically barring immigration officers in the Central District from forming reasonable suspicion for an investigatory stop based on the four enumerated factors. 1-ER-51. This panel denied that the district court's injunction "create[s] a categorical rule," noting that it applies only in the Central District of California and does not prohibit stops based on the four enumerated factors in conjunction with others. Dkt. 49 at 41. But those responses are non sequiturs. A categorical rule for a district the size of a small country—with a population equivalent to

the Netherlands or Romania, and more than 46 states—is still categorical. So is a rule providing that stops based solely on four identified factors are never permissible. Thus, the rule in *Arvizu* was considered categorical because the Ninth Circuit refused to consider seven factors as relevant to reasonable suspicion; it was irrelevant there that other factors might support a stop. 534 U.S. at 272-273.

The panel defended the injunction's schematic approach by contending that "[c]ourts routinely assess specific groupings of factors to determine whether those factors together give rise to reasonable suspicion," then apply that holding across like circumstances. Dkt. 49 at 42. But courts cannot convert those like circumstances into a per se rule governing millions of people just based on *ipse dixit*, least of all when the relevant circumstances themselves can vary (e.g., one suspect may not speak English at all and be at a workplace known to have hired 100 illegal aliens the prior week; another may simply be bilingual at a workplace known to have hired one illegal alien years ago).

Nor does *Ornelas v. United States*, 517 U.S. 690, hold otherwise. *Ornelas* simply observed that different cases can occasionally, despite the intensely fact-dependent nature of the reasonableness inquiry, turn on

44

the same specific factors and require the same result. *See id.* at 698; *see id.* (comparing two cases in both of which "the defendant traveled under an assumed name; paid for an airline ticket in cash with a number of small bills; traveled from Miami, a source city for illicit drugs; and appeared nervous in the airport"). *Ornelas* was not referring to broadly framed factors like "location" and "type of work," 1-ER-51, and does not endorse broad categorical rules of the kind imposed here. In *Arvizu*, the Supreme Court warned against similar overextension of "the reasoning of *Ornelas.*" 534 U.S. at 275. The injunction exemplifies the kind of categorical and discretion-limiting framework that "runs counter to [this Court's] cases and underestimates the usefulness of the reasonable-suspicion standard in guiding officers in the field." *Id.*

The injunction also botches basic Fourth Amendment principles and common sense in evaluating the relevancy of the four factors here. Here, the question is what constitutes reasonable suspicion for the extraordinarily pervasive crime of illegal entry into the United States— a crime committed by an estimated 10 percent of the population of the Central District of California, or some 2 million aliens within the district. In that context, the four factors enumerated in the district court's

45

injunction are plainly relevant. To take the most obvious example, if officers know based on their experience or past enforcement history that a particular business (say, a doughnut shop) has a history of employing illegal aliens and has, for instance, been cited 20 times for failing to verify employees' identification, officers may well have reasonable suspicion to stop anyone congregating there looking for work, especially given the concentration of illegal aliens in the Central District. *See*, *e.g.*, *United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) (en banc) (describing relevance of location to reasonable suspicion).

Similarly, if agents know that particular jobs are attractive to illegal aliens because they do not require documentation or verification, that too can support reasonable suspicion. *See*, *e.g.*, *Maldonado v. Holder*, 763 F.3d 155, 161 (2d Cir. 2014) (noting that day labor is "an occupation that is one of the limited options for workers without documents"). The district court practically acknowledged as much by identifying specific jobs and locations that are often associated with illegal aliens. 1-ER-51 (referring to "day laborer pick up site[s]").

Likewise, apparent ethnicity can be a factor supporting reasonable suspicion in appropriate circumstances—for instance, if agents know

that the members of a criminal organization under investigation are disproportionately members of one ethnic group—even if it would not be relevant in other circumstances. *See Brignoni-Ponce*, 422 U.S. at 885-886 ("apparent Mexican ancestry" did not "alone" supply reasonable suspicion). And, in context, officers might reasonably rely on the fact that someone exclusively speaks Spanish to support reasonable suspicion that the person is here illegally, not least because a disproportionate percentage of illegal aliens in the Central District speak Spanish and do not speak English fluently or at all. *See, e.g., United States v. Manzo-Jurado*, 457 F.3d 928, 937 (9th Cir. 2006) (fact that group was "speaking to each other only in Spanish" was "relevant to the reasonable suspicion inquiry"). All of this reflects common sense: the reasonable-suspicion threshold is low, and the number of people who have committed the relevant offense in the Central District is extraordinarily high and starts off at a 1 in 10 probability just among the general population. Adding the four factors at issue into the mix—especially when most illegal aliens in the Central District hail from Mexico and Central America, often speak Spanish exclusively, and seek out jobs that do not require

47

documentation—can obviously support reasonable suspicion for a brief investigatory stop in at least some circumstances.

The district court instead wrongly dismissed the four factors (individually or collectively) as categorically insufficient to supply reasonable suspicion in this context. The court ticked off the four factors listed in the injunction, deemed each one only marginally probative of reasonable suspicion, and then concluded that "[e]ven taken together, the four enumerated factors describe only a 'broad profile' that does not supply the reasonable suspicion required to justify a detentive stop." Dkt. 49 at 48 (quoting *Manzo-Jurado*, 457 F.3d at 939); *see* 1-ER-42-43.

But the Fourth Amendment "precludes this sort of divide-and-conquer analysis" as a basis for rejecting reasonable suspicion under the circumstances as a whole. *Arvizu*, 534 U.S. at 274 (citing *Terry v. Ohio*, 392 U.S. 1, 22 (1968)). Just because the four factors may not supply reasonable suspicion in *some* circumstances does not mean they will *never* do so. Take *United States v. Manzo-Jurado*, which the district court relied on heavily. Dkt. 49 at 45-50; 1-ER-41-45. There, this Court gave little weight to the suspects' location (a football stadium in Montana) and work-crew status because their particular location and employer were

not associated with illegal aliens—not because those factors can never combine to establish reasonable suspicion. 457 F.3d at 936, 938. By contrast, in *Maldonado*, the Second Circuit declined to suppress evidence from a stop in a park where groups of Latinos were known to gather to "to offer themselves for day labor, an occupation that is one of the limited options for workers without documents." 763 F.3d at 161; *see id.* at 160.

Here, that the four factors—even in combination—might describe a "broad profile" is inevitable given that 10 percent of the Central District's population and some 2 million people committed the crime of illegal entry or are otherwise present without permission. *See* pp. 38-39, *supra.* Again, reasonable suspicion is a low bar—lower than probable cause—and the near-ubiquity of the offense *should* enable agents to stop a relatively broad range of individuals (even if the probability of any particular person actually being stopped remains low, as discussed above). "[A] large segment" of the relevant population is engaged in violating the law, and an even larger portion may validly trigger reasonable suspicion—a standard that requires far less than 50-percent certainty. Dkt. 49 at 50; *see Sokolow*, 490 U.S. at 7. By ignoring the context-dependent nature of the Fourth Amendment standard, the district court categorically

49

dismissed factors that are relevant to this offense in this jurisdiction. *See Ornelas*, 517 U.S. at 696.

Further, the district court wrongly dismissed the four factors in combination as less than the sum of their parts. Reasonable suspicion, like probable cause, requires consideration of "the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers," not particular factors in isolation. *Smith v. United States*, 358 F.2d 833, 837 (D.C. Cir. 1966) (Burger, J.), *cert. denied*, 368 U.S. 1008 (1967). Yet, here, the district court's injunction forecloses officers from conducting even highly targeted stops based on factors that would not apply to most of the population: for instance, an officer would lack reasonable suspicion to stop an individual observed at length speaking exclusively Spanish, wearing the uniform of an employer known to employ illegal aliens, and shopping at a business known to be frequented by illegal aliens—simply because suspicion in such a case would be furnished by the suspect's language, job type, and location. (Recall that the injunction bars consideration of officers' experience in connection with the enumerated factors. Dkt. 49 at 43, 50 n.13; *see* 1-ER-45.) *Cf.* 2-ER-279 (discussing the apprehension of the three

50

original plaintiffs in connection with "a targeted enforcement action at a particular location where past surveillance and intelligence had confirmed that the target or individuals associated with him were observed to have recruited illegal aliens to work on landscaping jobs"). That drastically inflates the reasonable-suspicion bar and defies the commonsense, totality-of-the-circumstances approach that governs investigatory stops. That certain factors "alone" may describe large groups—*e.g.*, Hispanic ethnicity, the factor solely relied upon in *Brignoni-Ponce*, 422 U.S. at 885—does not mean that the factors always do so "in combination." Dkt. 49 at 5; 1-ER-51. The district court thus grievously misinterpreted the Fourth Amendment to invent improper limitations on reasonable suspicion.

## III. The District Court's Fifth Amendment Findings Were Clearly Erroneous and Unsupported by the Record

The district court also clearly erred in concluding that Defendants violated Plaintiffs' Fifth Amendment right to counsel. The ruling exceeds the district court's jurisdiction, rests on sparse, disputed evidence, adopts an overbroad view of the constitutional guarantee, and imposes sweeping operational mandates that go far beyond any proven violation. On clear-error review, those findings and the relief they support cannot stand.

51

## A. The District Court Lacked Jurisdiction Because Section 1252 Channels Plaintiffs' "Access-to-Counsel" Claim to the Petition-for-Review Process

As a predicate matter, Congress "channel[ed] judicial review of all immigration decisions" into the petition-for-review process. 8 U.S.C. §§ 1252(a)(5), (b)(9). In *J.E.F.M. v. Lynch*, this Court held that right-to-counsel claims are "part and parcel" of removal and therefore must be raised through petitions for review—not in district court—even when framed as a policy-and-practice challenge. 837 F.3d 1026, 1031-36 (9th Cir. 2016) (quoting *Aguilar v. ICE*, 510 F.3d 1, 13 (1st Cir. 2007)).

Plaintiffs' B-18 "access" theory arises from removal-related actions (initial detention, processing, and charging) and seeks relief that would regulate those proceedings. That places the claim squarely within § 1252(b)(9)'s "breathtaking" sweep. *Id.* at 1031-35. Channeling preserves meaningful review: immigration judges and the Board of Immigration Appeals can address attorney-access issues, and courts of appeals can review any due-process errors on a developed record. *Id.*

Because § 1252 forecloses district-court jurisdiction over Plaintiffs' Fifth-Amendment access-to-counsel claim, the injunction must be vacated on this threshold ground. The Court need not reach the merits.

## B. Regardless, the Record Does Not Establish a Systemic Pattern of Interference

Compounding the lack of jurisdiction, the district court's finding that there is a "pattern" of unconstitutional interference with attorney access at B-18 is unsupported by the record. Plaintiffs' injunction request relied primarily on a small number of declarations describing isolated, sometimes years-old incidents. Several declarants were not themselves parties and described events with little or no corroboration. *E.g.*, 4-ER-661. Others recounted brief delays or minor inconveniences that do not amount to a constitutional violation. *E.g.* 3-ER-665; 3-ER-693; 4-ER-698 4-ER-657.

By contrast, the government submitted unrebutted evidence that attorneys routinely access B-18, meet with clients in person every day of the week, and use confidential attorney rooms. *See, e.g.*, 2-ER-317-18. Agency records show hundreds of attorney visits and calls, often arranged on short notice. *See id*. The district court disregarded this evidence without explanation, instead extrapolating a systemic practice from a narrow, disputed, and stale evidentiary basis. *See generally* 1-ER-2-53. That conclusory finding was clearly erroneous.

53

## C. The Injunction Expands the Fifth Amendment Right Beyond Its Scope

The right to counsel in civil immigration proceedings is qualified and context-specific. It protects against unjustified government interference with a noncitizen's ability to retain counsel of choice, but it does not compel agencies to provide optimal conditions or adopt the precise procedures plaintiffs prefer.

The district court nevertheless imposed detailed operational mandates—such as rigid requirements for legal-call availability, in-person meeting procedures, and pre-approval protocols for attorney entry. These measures are untethered to the constitutional floor and unsupported by evidence of systemic denial. Even assuming *arguendo* that isolated violations occurred, the Fifth Amendment does not authorize federal courts to micromanage day-to-day facility operations under the guise of preventing hypothetical future violations.

## D. The Relief Is Not Narrowly Tailored to the Alleged Harm

An injunction must be narrowly tailored to remedy the specific harm established by the record. *See CASA*, 145 S. Ct. at 2540. The order here fails to meet that standard. It is indefinite in duration and contains no mechanism for sunset or modification based on compliance.

54

By issuing relief untethered to specific, ongoing harm to the named Plaintiffs, the court departed from equitable principles and extended its reach into operational oversight reserved to the Executive Branch. The breadth of the injunction magnifies the impact of the court's factual errors.

### E. The District Court Disregarded Contrary and Explanatory Evidence

The district court's Fifth Amendment findings fail to engage with record evidence—including from Plaintiffs' own declarants—showing that attorneys have met with clients and that officials promptly resolved any isolated disruptions. Multiple declarations and facility logs establish that:

- Attorneys are generally admitted to B-18 without undue delay (*see* 2-ER-318; 3-ER-665; 3-ER-693; 4-ER-698 (attorneys admitted to B-18 after arrival; other declarants describe multiple successful entries and client meetings on different dates));

- Confidential spaces and unmonitored phone lines are available (*see* 2-ER-318 (facility has public visitation area and two private rooms for attorney visits));

55

- Officers accommodate scheduling conflicts and emergencies (*see* 2-ER-318 (visits accommodated if arrival is before 4 p.m. cutoff; during protests, detainees at B-18 or Santa Ana had access to telephones 24 hours a day to contact family or attorneys)); and

- The few documented access problems were promptly addressed once identified (*see* 2-ER-319 (attorney visitation hours at B-18 resumed normal schedule as of June 24)).

The district court either failed to weigh this evidence or dismissed it without adequate explanation, instead crediting select declarants without reconciling inconsistencies or considering the broader evidentiary context. [cite example]. That selective treatment underscores the clear error in its systemic-interference finding.

## IV. The Central District-Wide Injunction Vastly Exceeds the District Court's Equitable Authority on Both the Fourth and Fifth Amendment Claims

### A. The Compressed schedule and reliance on untested declarations denied the government a fair opportunity to rebut

The injunction proceedings below unfolded on an accelerated timetable that materially prejudiced Defendants' ability to present a full record on standing. TROs under Rule 65 are meant to preserve the status quo temporarily, not to serve as a substitute for merits adjudication. Yet

56

here, the compressed schedule effectively foreclosed the core factual development necessary to test Plaintiffs' claims.

Had Defendants been afforded a reasonable period to respond, they could have presented additional, case-specific evidence bearing directly on standing and the merits—evidence that is neither available from Plaintiffs' anecdotal accounts nor fairly assessed on a compressed TRO record. These are standard steps in cases alleging unconstitutional stops, and courts routinely defer merits determinations until such development is complete precisely because standing and Fourth Amendment questions often turn on what the officers knew at the time—information unavailable to the subject of the stop and invisible in an anecdotal declaration.

By truncating the process, the district court proceeded on a one-sided record that magnified the speculative nature of Plaintiffs' claims. The resulting order rests on untested factual assumptions and uncorroborated inferences, not the "concrete evidence" demanded by *Clapper* and *Lyons*. That procedural history further underscores why Plaintiffs have not met, and on this record cannot meet, their burden to establish standing for forward-looking injunctive relief.

57

## B. The District-Wide Relief Issued Violates *CASA*

The district court's grant of district-wide relief flagrantly violates the Supreme Court's recent holding in *CASA*, forbidding the issuance of universal (*i.e.*, nonparty-specific) injunctions. The district court did not merely enjoin the government from detaining *Plaintiffs* without reasonable suspicion; it enjoined the government from conducting such stops and detentions of any of the 20 million people within the Nation's most populous federal judicial district. That extreme mismatch between Plaintiffs' asserted injuries and the district court's universal relief flouts *CASA*, which the district court barely addressed. 1-ER-31 n.21 (obliquely acknowledging "the Supreme Court's recent holding that district courts do not have equitable power to issue a 'universal injunction'").

In *CASA*, the Supreme Court held that the statutory grant of jurisdiction over suits "in equity" "encompasses only those sorts of equitable remedies traditionally accorded by courts of equity at our country's inception." 145 S. Ct. at 2550-2551; *see Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). "Neither a universal injunction nor any analogous form of relief was available ... at the time of the founding." *CASA*, 145 S. Ct. at 2551.

58

Rather, "suits in equity were brought by and against individual parties." *Id.* At most, a court granting equitable relief "may administer complete relief *between the parties*." *Id.* at 2557. Thus, "the question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." *Id.* Even then, "[c]omplete relief is not a guarantee—it is the maximum a court can provide." *Id.* at 2558.

The district court's injunction violates those limits on federal courts' equitable powers. Under *CASA*, any injunctive relief should have applied *only* to named Plaintiffs. Instead, the district court broadly enjoined Defendants "from conducting detentive stops in this District unless the agent or officer has reasonable suspicion that the person to be stopped is within the United States in violation of U.S. immigration law," defining reasonable suspicion to preclude sole reliance on the four factors. 1-ER-51. The district court was not shy about the ultimate scope of its order: its intent was avowedly to "enjoin the conduct of all law enforcement engaged in immigration enforcement throughout the District." 1-ER-37. That injunction triggers all the classic problems with universal injunctions that *CASA* warned against. By covering millions of

59

nonparties, this injunction broadly "halt[s] the enforcement of federal policy" across the Nation's most populous district. The inevitable disruptions necessitate emergency appellate litigation. And the district court's micromanagement of Executive Branch policy and enforcement decisions effects an intolerable transfer of core executive functions to the Judiciary. *See id.* at 2561.

The district court defended the scope of this injunction as "only District-wide and not nationwide," 1-ER-31 n.21; Dkt. 49 at 53-54, but that misses the point. Whether the injunction extends to all 340 million Americans or merely the 20 million residents of the Central District of California, the injunction goes well beyond providing complete relief *to Plaintiffs*—thus triggering all of the requirements and prohibitions of *CASA*.

In its denial of Defendants' emergency motion, the stay panel applied the wrong legal standards. It insisted that the government "establish that 'no reasonable person could take the view adopted by the trial court'" as to the scope of the injunction. That is incorrect. "A district court by definition abuses its discretion when it makes an error of law," such as ignoring an authoritative holding. *Koon v. United States*, 518 U.S.

81, 100 (1996). The Court then reasoned that it cannot even consider whether there is an "injunction that is *more* tailored while providing equal relief." Dkt. 49 at 52. That too is wrong. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 585 U.S. 48, 66 (2018), and "no more burdensome to the defendant than necessary" to provide such redress, *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Hence, in *CASA* the Supreme Court directed the district court on remand to consider "whether a narrower injunction is appropriate." 145 S. Ct. at 2558. Fashioning injunctive relief of appropriate scope is the first duty of courts sitting in equity, not an irrelevant sideshow.

The district court also justified the injunction's breadth on the ground that "it would be a fantasy to expect that law enforcement could and would inquire whether a given individual was" a plaintiff in this case "before proceeding with a seizure," without providing any support beyond a pre-*CASA* circuit case arising in a completely different factual context. 1-ER-37; Dkt. 49 at 54 (similar). But other courts have granted party-limited injunctions in similar contexts. *See*, *e.g.*, *Commonwealth v. Biden*, 57 F.4th 545, 557 (6th Cir. 2023) ("Because an injunction limited to the parties can adequately protect the plaintiffs' interests while the case is

pending disposition on the merits, the district court abused its discretion in extending the preliminary injunction's protection to non-party contractors in the plaintiff States."); *Philadelphia Yearly Meeting of Religious Soc'y of Friends v. DHS*, 767 F.Supp.3d 293, 336 (D. Md. 2025) ("Plaintiffs have provided no basis to conclude that they could not provide to DHS, for purposes of enforcement of the injunction, a list of the locations of their places of worship and of other sites at which they may hold their worship services."). Otherwise, a single plaintiff challenging similar law-enforcement practices could invariably get district-wide (or presumably even broader) relief. Under that rule, federal courts would once again "exercise general oversight of the Executive Branch" in a manner the Supreme Court deemed—just weeks ago—to "exceed [their] power." *CASA*, 145 S. Ct. at 2562.

The stay panel was particularly concerned that "a list-of-protected-people injunction" could not realistically or appropriately "include all of the members of the plaintiff associations." Dkt. 49 at 55-56. If accurate, that is a feature, not a bug: Courts may not grant relief to members who were not identified in the complaint and who did not agree to be bound by the judgment. *See Alliance for Hippocratic Med.*, 602 U.S. at 399

(Thomas, J., concurring). In any event, the court failed to grapple with the experience of courts that *have* effectively tailored injunctive relief to only the associations actually before them. *See supra* pp. 25-26. And any inconvenience of applying the injunction on an associational basis follows directly from the fundamental inequity of granting relief to a vast number of unidentified members; the onus for mitigating such difficulty should not fall on the party resisting the injunction. Nothing in the record suggests that it would be impracticable or unworkable to limit injunctive relief to the parties. *Cf.*, *e.g.*, *Gomez v. Vernon*, 255 F.3d 1118, 1130 (9th Cir. 2001) (holding that a district court "appropriately tailored" and "properly limited" injunctive relief against retaliatory prison practices "to just six inmates"), cert. denied, 534 U.S. 1066 (2001).

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's July 11 injunction.

63

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*

YAAKOV M. ROTH
   *Principal Deputy Assistant*
   *Attorney General*

DREW C. ENSIGN
   *Deputy Assistant Attorney*
   *General*

TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
   *Counsel to the Assistant*
   *Attorney General*

STEPHANIE L. GROFF
JASON K. ZUBATA
ANIELLO DESIMONE
JACOB A. BASHYROV
   *Trial Attorneys*

 *s/ Jonathan K. Ross*
JONATHAN K. ROSS
   *Senior Litigation Counsel*
   *Office of Immigration Litigation*
   *Civil Division*
   *U.S. Department of Justice*
   *Washington, DC 20530*
   *(202) 305-7662*
   *Jonathan.K.Ross@usdoj.gov*

*Counsel for Defendants-Appellants*

*(Additional counsel on next page)*

64

BILAL A. ESSAYLI

*United States Attorney*

DAVID M. HARRIS

*Assistant United States Attorney*

*Chief, Civil Division*

DANIEL A. BECK

*Assistant United States Attorney*

*Chief, Complex and Defensive Litigation Section*

ALEXANDER L. FARRELL

PAULINE H. ALARCON

*Assistant United States Attorneys*

65

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system on August 11, 2025.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

*s/ Jonathan K. Ross*

JONATHAN K. ROSS
   *Senior Litigation Counsel*
   *Office of Immigration Litigation*
   *Civil Division*
   *U.S. Department of Justice*
   *Washington, DC 20530*
   *(202) 305-7662*
   *Jonathan.K.Ross@usdoj.gov*

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6**

**9th Cir. Case Number(s)** <u>25-4312</u>

The undersigned attorney or self-represented party states the following:

[ X ]   I am unaware of any related cases currently pending in this court.

[   ]   I am unaware of any related cases currently pending in this court

other than the case(s) identified in the initial brief(s) filed by the other

party or parties.

[   ]   I am aware of one or more related cases currently pending in this

court. The case number and name of each related case and its

relationship to this case are:

**Signature:** <u>s/ Jonathan K. Ross</u>                    **Date: August 11, 2025**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** <u>25-4312</u>

I am the attorney or self-represented party. **This brief contains 12,075 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties;

    [ ] a party or parties are filing a single brief in response to multiple briefs; or

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

    [ ] complies with the length limit designated by court order dated _____.

    [ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** <u>s/ Jonathan K. Ross</u>        **Date: August 11, 2025**