No. 25-4312

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

PEDRO VASQUEZ PERDOMO, et al.,

Plaintiffs-Appellees,

v.

KRISTI NOEM, et al.,

Defendants-Appellants.

On Appeal from the United States District Court for the Central District of California
Case No. 2:25-cv-5605-MEMF-SPH
Honorable Maame Ewusi-Mensah Frimpong

DEFENDANTS-APPELLANTS' EXCERPTS OF RECORD
VOLUME 2 OF 4

BRETT A. SHUMATE
Assistant Attorney General
Civil Division
YAAKOV M. ROTH
Principal Deputy Assistant Attorney
General
DREW C. ENSIGN
Deputy Assistant Attorney General
TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General

JONATHAN K. ROSS
Senior Litigation Counsel
STEPHANIE L. GROFF
JASON K. ZUBATA
ANIELLO DESIMONE
JACOB A. BASHYROV
Trial Attorneys
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-7662

BILAL A. ESSAYLI
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
DANIEL A. BECK
Assistant United States Attorney
Chief, Complex and Defensive Litigation
Section

ALEXANDER L. FARRELL (SBN
335008)
PAULINE H. ALARCON (SBN
345785)
Assistant United States Attorneys
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Tel: (213) 894-2400

STACY TOLCHIN (SBN 217431)
*stacy@tolchinimmigration.com*
LAW OFFICES OF STACY TOLCHIN
776 E. Green St., Suite 210
Pasadena, CA 91101
Tel: 213-622-7450; Fax: 213-622-7233

MOHAMMAD TAJSAR (SBN 280152)
*mtajsar@aclusocal.org*
MAYRA JOACHIN (SBN 306065)
*mjoachin@aclusocal.org*
EVA BITRAN (SBN 302081)
*ebitran@aclusocal.org*
DAE KEUN KWON (SBN 313155)
*akwon@aclusocal.org*
OLIVER MA (SBN 354266)
*oma@aclusocal.org*
STEPHANIE PADILLA (SBN 321568)
*spadilla@aclusocal.org*
DIANA SANCHEZ (SBN 338871)
*dianasanchez@aclusocal.org*
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017-4022
Tel: 213-977-5232; Fax: 213-201-7878

*Counsel for Stop/Arrest Plaintiffs*

(*Additional counsel listed on next page*)

MARK ROSENBAUM (SBN 59940)
*mrosenbaum@publiccounsel.org*
REBECCA BROWN (SBN 345805)
*rbrown@publiccounsel.org*
SOPHIA WRENCH (SBN 354416)
*swrench@publiccounsel.org*
RITU MAHAJAN (SBN 252970)
*rmahajan@publiccounsel.org*
GINA AMATO (SBN 215519)
*gamato@publiccounsel.org*
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
Tel: 213-385-2977

*Counsel for All Plaintiffs*

ANNE LAI (SBN 295394)
*alai@law.uci.edu*
UC IRVINE SCHOOL OF LAW
IMMIGRANT AND RACIAL JUSTICE
SOLIDARITY CLINIC
P.O. Box 5479
Irvine, CA 92616-5479
Tel: 949-824-9894; Fax: 949-824-2747

*Counsel for Stop/Arrest Plaintiffs*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Pedro VASQUEZ PERDOMO; Carlos Alexander OSORTO; and Isaac VILLEGAS MOLINA; Jorge HERNANDEZ VIRAMONTES; Jason Brian GAVIDIA; LOS ANGELES WORKER CENTER NETWORK; UNITED FARM WORKERS; COALITION FOR HUMANE IMMIGRANT RIGHTS; IMMIGRANT DEFENDERS LAW CENTER, <br><br> Plaintiffs, <br><br> v. <br><br> Kristi NOEM, in her official capacity as Secretary, Department of Homeland | Case No.: 2:25-cv-05605-MEMF-SP <br><br> **JOINT STATUS REPORT REGARDING CASE RE-DESIGNATION** <br><br> Hon. Maame Ewusi-Mensah Frimpong |

-1-

1  Security; Todd M. LYONS, in his official capacity as
2  Acting Director, U.S. Immigration and Customs Enforcement; Rodney S.
3  SCOTT, in his official capacity as Commissioner, U.S. Customs and
4  Border Patrol; Michael W. BANKS, in his official capacity as Chief of U.S.
5  Border Patrol; Kash PATEL, in his official capacity as Director, Federal
6  Bureau of Investigation; Pam BONDI, in her official capacity as U.S.
7  Attorney General; Ernesto SANTACRUZ JR., in his official
8  capacity as Acting Field Office Director for Los Angeles, U.S.
9  Immigration and Customs Enforcement; Eddy WANG, Special
10 Agent in Charge for Los Angeles, Homeland Security Investigations,
11 U.S. Immigration and Customs Enforcement; Gregory K. BOVINO,
12 in his official capacity as Chief Patrol Agent for El Centro Sector of the U.S.
13 Border Patrol; Jeffrey D. STALNAKER, in his official capacity
14 as Acting Chief Patrol Agent, San Diego Sector of the U.S. Border
15 Patrol; Akil DAVIS, in his official capacity as Assistant Director in
16 Charge, Los Angeles Office, Federal Bureau of Investigation; Bilal A.
17 ESSAYLI, in his official capacity as U.S. Attorney for the Central District
18 of California,

19      Defendants.

20

21

22

23

24

25

26

27

28

-2-

JACOB S. KREILKAMP (SBN 248210)
jacob.kreilkamp@mto.com
JAMIE LUMA (SBN 331610)
jamie.luma@mto.com
SARA H. WORTH (SBN 341088)
sara.worth@mto.com
HENRY D. SHREFFLER (SBN 343388)
henry.shreffler@mto.com
MAGGIE BUSHELL (SBN 354048)
maggie.bushell@mto.com
KYLE A. GROVES (SBN 358085)
kyle.groves@mto.com
MUNGER, TOLLES & OLSON LLP
350 S. Grand Ave., 50th Floor
Los Angeles, CA 90071
Tel: 213-683-9100; Fax: 213-683-9100

*Counsel for Stop/Arrest Plaintiffs*

JESSICA K. BANSAL (SBN 277347)
jessica@ndlon.org
LAUREN MICHEL WILFONG*
lwilfong@ndlon.org
NATIONAL DAY LABORER ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Tel: 626-214-5689

*Counsel for Stop/Arrest Plaintiffs*

BREE BERNWANGER (SBN 331731)
bbernwanger@aclunc.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Tel: 415-621-2493

*Counsel for Stop/Arrest Plaintiffs*

BRISA VELAZQUEZ OATIS (SBN 339132)
bvoatis@aclu-sdic.org
ACLU FOUNDATION OF SAN DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Tel: 619-398-4199

*Counsel for Stop/Arrest Plaintiffs*

MATTHEW J. CRAIG (SBN 350030)
mcraig@heckerfink.com
MACK E. JENKINS (SBN 242101)
mjenkins@heckerfink.com
HECKER FINK LLP
1150 South Olive Street, Suite 10-140
Los Angeles, CA 90015
Tel: 212-763-0883; Fax: 212-564-0883

*Counsel for Access/Conditions Plaintiffs*

EDGAR AGUILASOCHO (SBN 285567)
eaguilasocho@farmworkerlaw.com
MARTINEZ AGUILASOCHO LAW, INC.
900 Truxtun Ave, Suite 300
Bakersfield, CA 93301
Tel: 661-859-1174

*Counsel for Plaintiff United Farm Workers*

CARL BERGQUIST*
cbergquist@chirla.org
COALITION FOR HUMANE IMMIGRANT RIGHTS
2351 Hempstead Road
Ottawa Hills, OH 43606
Tel: 310-279-6025

*Counsel for Plaintiff Coalition for Humane Immigrant Rights*

ALVARO M. HUERTA (SBN 274787)
ahuerta@immdef.org
BRYNNA BOLT (SBN 339378)
bbolt@immdef.org
ALISON STEFFEL (SBN 346370)
asteffel@immdef.org
IMMIGRANT DEFENDERS LAW CENTER
634 S. Spring St., 10th Floor
Los Angeles, CA 90014
Tel: 213-634-0999

*Counsel for Plaintiff Immigrant Defenders Law Center*

* Admitted pro hac vice

-3-

Pursuant to Paragraph 3 of the Court's July 11, 2025 Order, Plaintiffs and Defendants submit this Joint Status Report addressing the Court's order instructing the parties to confer "with respect to re-designating this case in light of the Petitioner-Plaintiffs' bond hearings and their outcome" and to file a joint status report "within three (3) days of the outcome of the last bond hearing." ECF No. 87 at 51.

On Tuesday, August 5, 2025, Petitioner-Plaintiff Carlos Osorto was released on bond. As of today, all three Petitioner-Plaintiffs have been released on bond. As a result, Plaintiffs and Defendants have begun to confer about their positions regarding re-designation of the case and whether any information or documents on the docket should be sealed. Due to the press of other matters in this litigation, they need additional time to confer and reach a resolution to these discussions. Accordingly, Plaintiffs and Defendants intend to submit another joint status report by August 13, 2025 with their positions on the case's re-designation consistent with the Court's July 11, 2025 Order.

Dated: August 8, 2025

Respectfully submitted,

*/s/ Mohammad Tajsar*
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017-4022
Telephone: (213) 977-5232
*Counsel for Stop/Arrest Plaintiffs*

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney
General

*/s/ Jonathan K. Ross*
JONATHAN K. ROSS
Senior Litigation Counsel
Office of Immigration Litigation
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-7662
Jonathan.K.Ross@usdoj.gov

*Counsel for Defendants*

-5-

### ATTESTATION OF FILER

I attest that the other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized the filing.

Dated: August 8, 2025                    Respectfully submitted,

                                         */s/ Mohammad Tajsar*
                                         MOHAMMAD TAJSAR

                                         *Counsel for Stop/Arrest Plaintiffs*

-6-

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:25-cv-05605-MEMF-SP                          Date: July 17, 2025

Title   _Pedro Vasquez Perdomo et al v. Kristi Noem et al_

Present: The Honorable:   Maame Ewusi-Mensah Frimpong

| Damon Berry | N/A |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| N/A | N/A |

**Proceedings:**
> **Order DENYING Defendants' Ex Parte Application for Stay of Order Granting Temporary Restraining Order [ECF No. 94];**
> **Order DENYING AS MOOT Proposed Intervenor's Ex Parte Application to Advance Briefing Schedule on Motion to Intervene [ECF No. 93]; and**
> **Order Setting the Briefing Schedule and Hearing on Plaintiffs' Motion for Preliminary Injunction and Order to Show Cause [ECF No. 104].**

Two weeks ago, the individuals and organizations who have brought this lawsuit asked this Court to order the federal government to stop conducting roving patrols without reasonable suspicion. The Court granted that request last week in a temporary restraining order, or TRO.

The Court addresses two new questions in this Order today:

> (1) Should this Court pause last week's TRO so that the federal government can appeal to the Ninth Circuit Court of Appeals?

> (2) Should the cities who want to formally participate in this case be allowed to have an early hearing on their request?

The Court's answer is _no_ to both of these questions. The Court is saying no to the federal government's request to pause the TRO because the federal government did not follow the rules for making this request and because the federal government has not shown that it will be harmed if the Court does not pause the TRO.

ER-0061

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:25-cv-05605-MEMF-SP                          Date: July 17, 2025

Title  _Pedro Vasquez Perdomo et al v. Kristi Noem et al_


In this Order, the Court also sets the deadlines for the individuals and organizations who have
brought this lawsuit to present their arguments on whether the Court should issue a preliminary
injunction order. That preliminary injunction order would last longer than the TRO that the Court
has issued and, in addition to ordering the federal government to stop conducting roving patrols
without reasonable suspicion, would also require the government to take certain additional steps
that are described at the end of last week's TRO.

/ / /

/ / /

/ / /

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:25-cv-05605-MEMF-SP                              Date: July 17, 2025

Title   *Pedro Vasquez Perdomo et al v. Kristi Noem et al*

**DEFENDANTS' EX PARTE APPLICATION FOR STAY OF ORDER GRANTING
TEMPORARY RESTRAINING ORDER [ECF NO. 94]**

The Court is in receipt of Defendants' Ex Parte Application for Stay of Order Granting
Temporary Restraining Order (ECF No. 94 ("Stay Ex Parte Application")) and Plaintiffs'
Opposition thereto (ECF No. 100 ("Opp'n")).[1] For the reasons below, the Court DENIES the
Stay Ex Parte Application.

As a preliminary matter, the Court finds that the Stay Ex Parte Application concerns only the
TRO regarding the Fourth Amendment, which the Court referred to as the "Stop/Arrest TRO" in
its prior TRO Order. ECF No. 87 ("TRO Order"). As such, the Court concludes that the Stay Ex
Parte Application is for the Stop/Arrest TRO *only* and not the "Access/Detention TRO." *See id.*
at 18–30 (Access/Detention TRO based on the Fifth Amendment), 31–48 (Stop/Arrest TRO
based on the Fourth Amendment).

As to the Stop/Arrest TRO, the Court ordered that "Defendants may not rely solely on the factors
below, alone or in combination, to form reasonable suspicion for a detentive stop, except as
permitted by law: [1] Apparent race or ethnicity; [2] Speaking Spanish or speaking English with
an accent; [3] Presence at a particular location (e.g. bus stop, car wash, tow yard, day laborer
pick up site, agricultural site, etc.); or [4] The type of work one does." *Id.* at 50.

**The Court's Jurisdiction Over the Stay Ex Parte Application**

The Court finds that it has jurisdiction "to address aspects of the case that are not the subject of
the appeal." *United States v. Pitner*, 307 F.3d 1178, 1183 n.5 (9th Cir. 2002). Federal Rule of
Civil Procedure 62(d) states that "[w]hile an appeal is pending from an interlocutory order or
final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or
modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for
bond or other terms that secure the opposing party's rights." Fed. R. Civ. P 62(d). Federal Rule
of Appellate Procedure 8(a) similarly contemplates that a party may seek to stay an order
pending appeal. Fed. R. App. P 8(a)(1)(A) ("A party must ordinarily move first in the district

---

[1] The Court is also in receipt of Plaintiffs' Notice of Errata with the corrected version of the Opposition (without the
line numbers unredacted), ECF No. 102, and the parties' Joint Status Report Concerning Jurisdiction Pending
Appeal, ECF No. 101.

ER-0063

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:25-cv-05605-MEMF-SP                              Date: July 17, 2025

Title    _Pedro Vasquez Perdomo et al v. Kristi Noem et al_

court for the following relief: a stay of the judgment or order of a district court pending appeal.") As such, the Court finds that it has jurisdiction to rule on the Stay Ex Parte Application.

**Defendants' Failure to Comply with Local Rule 7-19.1**

The Court finds that Defendants failed to comply with the procedural requirements of filing an ex parte application. The Local Rules state that "[a]n application for an ex parte order shall be accompanied by a memorandum containing, if known, the name, address, telephone number and e-mail address of counsel for the opposing party, the reasons for the seeking of an ex parte order, and points and authorities in support thereof." L.R. 7-19.1. The Stay Ex Parte Application wholly lacks a memorandum containing the information identified in Local Rule 7-19.1. Although Plaintiffs ask this Court to nevertheless consider the Stay Ex Parte Application, this Court's own Civil Standing Order makes clear that "[a]pplications that do not meet the requirements set forth in Local Rule 7-19 will not be considered." Civil Standing Order § XII. Accordingly, the Court DENIES the Stay Ex Parte Application for failure to comply with Local Rule 7-19.1.

\*\*\*

**Even Without the Procedural Defect, the Stay Ex Parte Application Fails**

The Court finds that even without the failure to comply with Local Rule 7-19.1, Defendants' Stay Ex Parte Application fails on the merits because they have not shown that they will suffer irreparable harm.

_Applicable Law_

A stay pending appeal is an "extraordinary remedy." _United States v. Mitchell_, 971 F.3d 993, 999 (9th Cir. 2020). Such a "stay is not a matter of right, even if irreparable injury might otherwise result." _Nken v. Holder_, 556 U.S. 418, 433–34 (2009). In determining whether to grant a stay, a court must consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." _Id._ at 434.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.    2:25-cv-05605-MEMF-SP                          Date: July 17, 2025

Title    _Pedro Vasquez Perdomo et al v. Kristi Noem et al_


Irreparable harm is the threshold inquiry. _See Doe #1 v. Trump_, 957 F.3d 1050, 1058 (9th Cir. 2020) ("_Nken_ instructed that if the petition has not made a certain threshold showing regarding irreparable harm . . . then a stay may not issue, regardless of the petitioner's proof regarding the other stay factors. We therefore begin our _Nken_ analysis with consideration of irreparable harm.") (cleaned up). This Court likewise begins with whether Defendants have shown irreparable harm and finds that they have not.[2]

_Discussion_

Defendants argue that they "will suffer irreparable harm if the Court's injunction remains in effect," as it will have a "chilling effect" on the enforcement of immigration law. Stay Ex Parte Application at 13.

But this argument fails. As the Court found in the TRO Order, "[c]omplying with the law does not impose harm." TRO Order at 47–48; _see Zepeda v. INS,_ 753 F.2d 719, 727 (9th Cir. 1983) (an agency "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations"). In particular, the Court analyzed at length the Fourth Amendment jurisprudence within the Ninth Circuit in its TRO Order, finding that the enumerated factors cannot serve as the sole bases for reasonable suspicion. _See_ TRO Order at 42–46 (analyzing the four enumerated factors). The Court found that the TRO Order aligns directly with the Ninth Circuit's holding in _United States v. Manzo-Jurado. See_ 457 F.3d 928, 939 (9th Cir. 2006) ("Although an officer . . . may rely in part on factors composing a broad profile, he must also observe _additional_ information that winnows the broad profile into an objective and particularized suspicion of the person to be stopped."). The Court so concluded after reviewing the evidence before it and finding that Plaintiffs are likely to succeed in showing the seizures occurred without reasonable suspicion. TRO Order at 37–41. Insofar as the Court found that Defendants' seizures were unconstitutional and the TRO Order enjoins them from constitutional violations, Defendants "cannot reasonably assert that [they are] harmed in any legally cognizable sense." _Zepeda,_ 753 F.2d at 727.

---

[2] Because Defendants failed to satisfy this threshold question, the Court need not evaluate the remaining _Nken_ factors here.

ER-0065

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.    2:25-cv-05605-MEMF-SP                                      Date: July 17, 2025

Title    _Pedro Vasquez Perdomo et al v. Kristi Noem et al_

Relatedly, Defendants provide no evidence that this Order—even if erroneous—will impair their ability to enforce immigration law.

First, although they proffer the declarations of Andre Quinones and Daniel I. Parra, each representing that the Order "will hamper officers' ability to conduct legitimate law enforcement operations," Defendants do not provide any specific instances where their operations _were_ hampered because of the Order. _See_ ECF Nos. 94-1 ("Quinones Declaration" or "Quinones Decl.") ¶¶ 8–9; 94-2 ("Parra Declaration" or "Parra Decl.") ¶ 13.

Second, although they assert that the TRO Order introduces "confusion and uncertainty," s_ee_ Quinones Decl. ¶¶ 8–9; Parra Decl. ¶ 15, the TRO Order is actually very clear: It prohibits Defendants from "rely[ing] _solely_ on the factors . . . , _alone or in combination . . . except as permitted by law_ . . . ." TRO Order at 50 (emphasis added). The two Declarations show that the training already purportedly in effect accounts for this Order in such a way that the four enumerated facts are _part_ of the totality of the circumstances approach:

> ERO Los Angeles officers are trained that, under the Fourth Amendment, case law, and relevant regulations, brief detentions for questioning requires an immigrant officer to have reasonable suspicion, based on specific, articulable facts . . . the geographical location . . . whether that location is known to be frequented by illegal aliens seeking work . . . individualized facts . . . any investigation or surveillance . . . and any other particularized facts . . . .

Quinones Decl. ¶ 5; Parra Decl. ¶ 11 (listing the same factors and representing that "[l]ocation and occupation as _part_ of the totality of the circumstances are factors that contribute to developing reasonable suspicion") (emphasis added). Defendants argued similarly during the hearing. _See_ ECF No. 90 ("Transcript") at 58:22–25 ("Plaintiffs' further suggestion that targeting specific locations or types of work is somehow inappropriate is also simply not the law. Those elements can be considered as _part_ of a totality of the circumstances.") (emphasis added). These representations make clear that Defendants' agents are already trained to consider the four enumerated factors as _part_ of reasonable suspicion formulation, not as _sole_ factors thereof. As such, the Court does not find that the TRO Order introduces confusion or uncertainty.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.    2:25-cv-05605-MEMF-SP                              Date: July 17, 2025

Title    *Pedro Vasquez Perdomo et al v. Kristi Noem et al*

Third, Quinones declares that the TRO Order is "vague and overbroad as to whether it applies to arrests in which Defendants have judicial warrants, or arrests made without a warrant, or both." Quinones Decl. ¶ 9. But what is vague about the TRO? The complaint concerns warrantless arrests, and the TRO Order is directed toward warrantless arrests—that is, those stops that require reasonable suspicion. And the Court explained the scope during the hearing—that it concerns warrantless searches and detentions. *See* Transcript at 48:19–49:7("There have been some arrests pursuant to warrants, which we're not really here to talk about. . . . And then I understand that separate from the targeting of individuals, there's the separate warrantless arrests and detention based upon the totality of the circumstances."). Given what the declarants have described about the nature of the training provided, it is not plausible that officers are of the view that arrests with a warrant also require reasonable suspicion and are therefore also covered by the TRO Order. The TRO Order is neither vague nor overbroad.

Fourth, Defendants argue that the field agents may no longer be able to use their "experience" to formulate reasonable suspicion, but the TRO Order says no such thing. What it does say— consistent with Ninth Circuit law—is that this experience, by itself, "cannot provide unbridled discretion and is no substitute for *objective* facts, *rational* inferences, and *permissible* deductions capable of *rational* explanation." *Compare* Quinones Decl. ¶ 9 *with* TRO Order at 44 (quoting *Orhorhaghe v. INS*, 38 F.3d 488, 499 (9th Cir. 1994)).

In sum, the Court concludes that the declarations are conclusory and speculative[3] and that they do not support a finding of irreparable harm. Defendants have therefore failed to show that they will suffer irreparable harm absent a stay.

**Conclusion**

Because Defendants have failed to show that they will be irreparably injured absent a stay, the Court DENIES the Stay Ex Parte Application.

---

[3] The declarants also testify that the field agents are facing "direct assault" and "extensive incidents of vandalism and sabotage." *See* Quinones Decl. ¶¶ 10–12; Parra Decl. ¶¶ 16–19. According to the declarants, the confusion, uncertainty, and other problems that the TRO Order allegedly introduces will cause field agents to hesitate and therefore be more vulnerable to these assaults, vandalism, and sabotage. As discussed above, the TRO Order does not introduce any confusion or uncertainty or any of the other problems described. Any hesitation would appear to flow from by the Constitutional requirements of forming reasonable suspicion before effectuating a stop, and not due to some defect in the TRO Order. This claim therefore cannot support the grant of a stay.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.    2:25-cv-05605-MEMF-SP                                    Date: July 17, 2025

Title    _Pedro Vasquez Perdomo et al v. Kristi Noem et al_

**EX PARTE APPLICATION TO ADVANCE BRIEFING SCHEDULE ON MOTION TO INTERVENE [ECF NO. 93]**

The Court is in receipt of the Ex Parte Application to Advance Briefing Schedule on Motion to Intervene filed by the City of Los Angeles, the County of Los Angeles, the City of Culver City, the City of Montebello, the City of Monterey Park, the City of Pasadena, the City of Pico Rivera, the City of Santa Monica, and the City of West Hollywood ("Proposed Intervenors"). ECF No. 93 ("Intervenor Ex Parte Application"). Defendants filed their Opposition to the Intervenor Ex Parte Application on July 15, 2025. ECF No. 97. For the reasons below, the Court DENIES the Intervenor Ex Parte Application.

The Proposed Intervenors ask the Court to shorten the briefing schedule for the Motion to Intervene, which is currently scheduled for a hearing on August 21, 2025, such that any opposition would be due by July 16 and any reply would be due by July 17. Intervenor Ex Parte Application at 3. The Proposed Intervenors also request the Motion to Intervene be heard on July 18. _Id_. The Proposed Intervenors argue that this shortened briefing schedule and advancement of the hearing date are necessary for them to "assert their distinct interests in maintaining law and order and preserving crucial tax revenues in the preliminary injunction briefing and hearing, which will proceed and perhaps even finish before Intervenors' Motion [to Intervene] is scheduled to be heard on August 21, 2025." _Id_.

The Court finds that its Order regarding the briefing schedule and hearing for Plaintiffs' Motion for Preliminary Injunction and Order to Show Cause hearing largely moots the Proposed Intervenor's argument. The Court has scheduled the Preliminary Motion hearing for September 24, 2025, which is more than a month after the Proposed Intervenors' Motion to Intervene hearing. By the time the Court hears the Motion to Intervene, the briefing will not have completed for Plaintiffs' Motion for Preliminary Injunction.

Moreover, the Court is not persuaded that the Proposed Intervenors' interests necessarily need to be reflected in a separate set of briefs _as a party_ on Plaintiffs' Motion for Preliminary Injunction, especially when it appears that the Proposed Intervenors' interests are aligned with those of the Plaintiffs and the Proposed Intervenors can seek leave to file an amicus brief as needed.

ER-0068

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   2:25-cv-05605-MEMF-SP                          Date: July 17, 2025

Title    _Pedro Vasquez Perdomo et al v. Kristi Noem et al_


As such, the Court DENIES AS MOOT the Intervenor Ex Parte Application.

/ / /
/ / /

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  2:25-cv-05605-MEMF-SP                              Date: July 17, 2025

Title  *Pedro Vasquez Perdomo et al v. Kristi Noem et al*

**BRIEFING SCHEDULE AND HEARING ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND ORDER TO SHOW CAUSE [ECF NO. 104]**

The Court is in receipt of the parties' Joint Status Report in Response to Court's Order on OSC Hearing and PI Briefing Schedule. ECF No. 104.

The Court ORDERS the following briefing schedule and hearing date for the Motion for Preliminary Injunction and Order to Show Cause hearing.

| Event | Dates |
|---|---|
| Preliminary Hearing Motion | Monday, July 28, 2025 |
| Opposition | Monday, August 25, 2025 |
| Reply | Monday, September 8, 2025 |
| Hearing | Wednesday, September 24, 2025, at 9:00 a.m. |

**IT IS SO ORDERED.**

                                                                                        :

**Initials of Preparer**                                      DBE

1  Stacy Tolchin (CA SBN #217431)
   Law Offices of Stacy Tolchin
2  776 E. Green St., Ste. 210
   Pasadena, CA 91101
3  Telephone: (213) 622-7450
   Facsimile: (213) 622-7233
4  Email: Stacy@Tolchinimmigration.com

5  Counsel for Petitioners

6  BILAL A. ESSAYLI
   United States Attorney
7  DAVID M. HARRIS
   Assistant United States Attorney
8  Chief, Civil Division
   DANIEL A. BECK
9  Assistant United States Attorney
   Chief, Complex and Defensive Litigation Section
10 PAULINE H. ALARCON (Cal. Bar No. 345785)
   Assistant United States Attorney
11     Federal Building, Suite 7516
       300 North Los Angeles Street
12     Los Angeles, California 90012
       Telephone: (213) 894-3992
13     Facsimile: (213) 894-7819
       E-mail: Pauline.Alarcon@usdoj.gov
14 Attorneys for Respondents

15

16              UNITED STATES DISTRICT COURT

17          FOR THE CENTRAL DISTRICT OF CALIFORNIA

18 | Pedro VASQUEZ PERDOMO, *et al*,          | No. 2:25-cv-05605-cv-MEMF-SP
19 |          Petitioners-Plaintiffs,          | **JOINT NOTICE FOLLOWING ORDER**
20 |               v.                          | **VACATING STATUS CONFERENCE**
21 | Kristi NOEM, Secretary, Department of     | Honorable Sheri Pym
22 | Homeland Security, *et al*,               | United States Magistrate Judge
23 |          Respondents-Defendants.          |

24

25

26

27

28

1    Pursuant to the Court's Order Vacating Status Conference (Dkt. 15), counsel

2 informs the Court as follows:

3    Petitioner Carlos Alexander Osorto received a bond hearing on July 16, 2025, and

4 the Immigration Judge denied bond on the grounds that there was a lack of jurisdiction.

5 Following a conference of the parties' counsel on the subject, Respondents will promptly

6 request that Mr. Osorto receive an expedited bond hearing, and will agree there is

7 jurisdiction for a bond hearing for him.

8                                    Respectfully submitted,

9  Dated:  July 17, 2025

10                              */s/ Stacy Tolchin*
                              Stacy Tolchin (CA SBN #217431)*
11                             Law Offices of Stacy Tolchin
                              Counsel for Petitioners
12

13  Dated: July 17, 2025              Respectfully submitted,

14
                                   BILAL A. ESSAYLI
15                                 United States Attorney
                                   DAVID M. HARRIS
16                                 Assistant United States Attorney
                                   Chief, Civil Division
17                                 DANIEL A. BECK
                                   Assistant United States Attorney
18                                 Chief, Complex and Defensive Litigation Section

19                                    */s/ Pauline H. Alarcon*
                                   PAULINE H. ALARCON
20                                 Assistant United States Attorney

21                                 Attorneys for Respondents

22  *Pursuant to Local Rule 5-4.3.4(a)(2), the filer attests that all signatories listed, and on
whose behalf the filing is submitted, concur in the filing's content and have authorized
23  the filing.

24

25

26

27

28

                                        1

STACY TOLCHIN (SBN 217431)
*stacy@tolchinimmigration.com*
LAW OFFICES OF STACY TOLCHIN
776 E. Green St., Suite 210
Pasadena, CA 91101
Telephone: (213) 622-7450
Facsimile: (213) 622-7233

MOHAMMAD TAJSAR (SBN 280152)
*mtajsar@aclusocal.org*
MAYRA JOACHIN (SBN 306065)
*mjoachin@aclusocal.org*
EVA BITRAN (SBN 302081)
*ebitran@aclusocal.org*
DAE KEUN KWON (SBN 313155)
*akwon@aclusocal.org*
OLIVER MA (SBN 354266)
*oma@aclusocal.org*
STEPHANIE PADILLA (SBN 321568)
*spadilla@aclusocal.org*
DIANA SANCHEZ (SBN 338871)
*dianasanchez@aclusocal.org*
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017-4022
Telephone: (213) 977-5232
Facsimile: (213) 201-7878

*Counsel for Stop/Arrest Plaintiffs*

(*additional counsel information on cont. page*)

MARK ROSENBAUM (SBN 59940)
*mrosenbaum@publiccounsel.org*
REBECCA BROWN (SBN 345805)
*rbrown@publiccounsel.org*
SOPHIA WRENCH (SBN 354416)
*swrench@publiccounsel.org*
RITU MAHAJAN (SBN 252970)
*rmahajan@publiccounsel.org*
GINA AMATO (SBN 215519)
*gamato@publiccounsel.org*
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977

*Counsel for All Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Pedro VASQUEZ PERDOMO, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security, *et al.*,<br><br>    Defendants. | Case No.: 2:25-cv-05605-MEMF-SP<br><br>**ERRATA TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' *EX PARTE* APPLICATION FOR STAY OF ORDER GRANTING TEMPORARY RESTRAINING ORDER**<br><br>Hon. Maame Ewusi-Mensah Frimpong |

ANNE LAI (SBN 295394)
alai@law.uci.edu
UC IRVINE SCHOOL OF LAW
IMMIGRANT AND RACIAL
JUSTICE
SOLIDARITY CLINIC
P.O. Box 5479
Irvine, CA 92616-5479
Telephone: (949) 824-9894
Facsimile:  (949) 824-2747

*Counsel for Stop/Arrest Plaintiffs*

LAUREN MICHEL WILFONG*
lwilfong@ndlon.org
NATIONAL DAY LABORER
ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

*Counsel for Stop/Arrest Plaintiffs*

BREE BERNWANGER (SBN 331731)
bbernwanger@aclunc.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

*Counsel for Stop/Arrest Plaintiffs*

BRISA VELAZQUEZ OATIS
(SBN 339132)
bvoatis@aclu-sdic.org
ACLU FOUNDATION OF
SAN DIEGO & IMPERIAL
COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4199

*Counsel for Stop/Arrest Plaintiffs*

MATTHEW J. CRAIG (SBN 350030)
mcraig@heckerfink.com
MACK E. JENKINS (SBN 242101)
mjenkins@heckerfink.com
HELIA BIDAD (SBN 348633)
hbidad@heckerfink.com
HECKER FINK LLP
1150 South Olive Street, Suite 10-140
Los Angeles, CA 90015
Telephone: (212) 763-0883
Facsimile: (212) 564-0883

*Counsel for Access/Conditions Plaintiffs*

EDGAR AGUILASOCHO
(SBN 285567)
eaguilasocho@farmworkerlaw.com
MARTINEZ AGUILASOCHO LAW, INC.
900 Truxtun Ave Suite 300
Bakersfield, CA 93301
Telephone: (661) 859-1174

*Counsel for Plaintiff United Farm Workers*

CARL BERGQUIST**
cbergquist@chirla.org
COALITION FOR HUMANE
IMMIGRANT RIGHTS
2351 Hempstead Road
Ottawa Hills, OH 43606
Telephone: (310) 279-6025

*Counsel for Plaintiff Coalition for Humane Immigrant Rights*

*Application for pro hac vice forthcoming
** Admitted pro hac vice

Plaintiffs respectfully submit this errata to their Opposition [ECF 100] to Defendants' Ex Parte Application for Stay [ECF 94] of the Court's order granting a temporary restraining order [ECF 87]. When Plaintiffs prepared the flattened PDF of their Opposition for filing, they inadvertently redacted the line numbers that appear on the lefthand side of every page. Plaintiffs respectfully submit the attached copy of the file-stamped Opposition [ECF 100] with the mistaken redactions removed.

DATED: July 15, 2025                     ACLU OF SOUTHERN CALIFORNIA


By: /s/ Mohammad Tajsar
                                              Mohammad Tajsar
                                              *Counsel for Plaintiffs*

2

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2025, I electronically filed the foregoing with the Clerk of the U.S. District Court for the Central District of California using the CM/ECF system, which sent notification of such filing to all registered CM/ECF users.

DATED:  July 15, 2025                    ACLU OF SOUTHERN CALIFORNIA

By:    _/s/ Mohammad Tajsar_
        Mohammad Tajsar
        _Counsel for Plaintiffs_

3

1   STACY TOLCHIN (SBN 217431)
    *stacy@tolchinimmigration.com*
2   LAW OFFICES OF STACY TOLCHIN
    776 E. Green St., Suite 210
3   Pasadena, CA 91101
    Telephone: (213) 622-7450
4   Facsimile: (213) 622-7233

5   MOHAMMAD TAJSAR (SBN 280152)
    *mtajsar@aclusocal.org*
6   MAYRA JOACHIN (SBN 306065)
    *mjoachin@aclusocal.org*
7   EVA BITRAN (SBN 302081)
    *ebitran@aclusocal.org*
8   DAE KEUN KWON (SBN 313155)        MARK ROSENBAUM (SBN 59940)
    *akwon@aclusocal.org*             *mrosenbaum@publiccounsel.org*
9   OLIVER MA (SBN 354266)            REBECCA BROWN (SBN 345805)
    *oma@aclusocal.org*               *rbrown@publiccounsel.org*
10  STEPHANIE PADILLA (SBN 321568)    SOPHIA WRENCH (SBN 354416)
    *spadilla@aclusocal.org*          *swrench@publiccounsel.org*
11  DIANA SANCHEZ (SBN 338871)        RITU MAHAJAN (SBN 252970)
    *dianasanchez@aclusocal.org*      *rmahajan@publiccounsel.org*
12  ACLU FOUNDATION OF               GINA AMATO (SBN 215519)
    SOUTHERN CALIFORNIA              *gamato@publiccounsel.org*
13  1313 West Eighth Street          PUBLIC COUNSEL
    Los Angeles, CA 90017-4022       610 South Ardmore Avenue
14  Telephone: (213) 977-5232        Los Angeles, CA 90005
    Facsimile: (213) 201-7878        Telephone: (213) 385-2977
15
16  *Counsel for Stop/Arrest Plaintiffs*    *Counsel for All Plaintiffs*

17  (*additional counsel information on cont.
    page*)

18

19              **UNITED STATES DISTRICT COURT**
20         **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

21  Pedro VASQUEZ PERDOMO, *et al.*,      Case No.: 2:25-cv-05605-MEMF-SP
22      Plaintiffs,                        **PLAINTIFFS' OPPOSITION TO
                                          DEFENDANTS' *EX PARTE***
23      v.                                **APPLICATION FOR STAY OF
                                          ORDER GRANTING TEMPORARY**
24  Kristi NOEM, in her official capacity as  **RESTRAINING ORDER**
25  Secretary, Department of Homeland
    Security, *et al.*,
26      Defendants.                        Hon. Maame Ewusi-Mensah Frimpong

27

28

1    ANNE LAI (SBN 295394)
     alai@law.uci.edu
2    UC IRVINE SCHOOL OF LAW
     IMMIGRANT AND RACIAL
3    JUSTICE
     SOLIDARITY CLINIC
4    P.O. Box 5479
     Irvine, CA 92616-5479
5    Telephone: (949) 824-9894
     Facsimile:  (949) 824-2747
6
7    *Counsel for Stop/Arrest Plaintiffs*

8    LAUREN MICHEL WILFONG*
     lwilfong@ndlon.org
9    NATIONAL DAY LABORER
     ORGANIZING NETWORK
10   1030 S. Arroyo Parkway, Suite 106
     Pasadena, CA 91105
11   Telephone: (626) 214-5689

12   *Counsel for Stop/Arrest Plaintiffs*

13   BREE BERNWANGER (SBN 331731)
     bbernwanger@aclunc.org
14   AMERICAN CIVIL LIBERTIES
     UNION FOUNDATION OF
15   NORTHERN CALIFORNIA
     39 Drumm Street
16   San Francisco, CA 94111
     Telephone: (415) 621-2493
17
     *Counsel for Stop/Arrest Plaintiffs*
18
     BRISA VELAZQUEZ OATIS
19   (SBN 339132)
     bvoatis@aclu-sdic.org
20   ACLU FOUNDATION OF
     SAN DIEGO & IMPERIAL
21   COUNTIES
     P.O. Box 87131
22   San Diego, CA 92138-7131
     Telephone: (619) 398-4199
23
24   *Counsel for Stop/Arrest Plaintiffs*

25

26

27

28

     MATTHEW J. CRAIG (SBN 350030)
     mcraig@heckerfink.com
     MACK E. JENKINS (SBN 242101)
     mjenkins@heckerfink.com
     HELIA BIDAD (SBN 348633)
     hbidad@heckerfink.com
     HECKER FINK LLP
     1150 South Olive Street, Suite 10-140
     Los Angeles, CA 90015
     Telephone: (212) 763-0883
     Facsimile: (212) 564-0883

     *Counsel for Access/Conditions Plaintiffs*

     EDGAR AGUILASOCHO
     (SBN 285567)
     eaguilasocho@farmworkerlaw.com
     MARTINEZ AGUILASOCHO LAW, INC.
     900 Truxtun Ave Suite 300
     Bakersfield, CA 93301
     Telephone: (661) 859-1174

     *Counsel for Plaintiff United Farm Workers*

     CARL BERGQUIST**
     cbergquist@chirla.org
     COALITION FOR HUMANE
     IMMIGRANT RIGHTS
     2351 Hempstead Road
     Ottawa Hills, OH 43606
     Telephone: (310) 279-6025

     *Counsel for Plaintiff Coalition for Humane Immigrant Rights*

     *Application for pro hac vice forthcoming
     ** Admitted pro hac vice

Plaintiffs respectfully submit this opposition to Defendants' *ex parte* application for a stay [ECF 94 ("Mot.")] of the Court's order granting a temporary restraining order [ECF 87 ("Order")].

As an initial matter, Defendants did not comply with the Local Rule 7-19.1, which requires notice of an anticipated *ex parte* application. Defendants have also made no attempt to show that their application meets the standard set forth in *Mission Power Engineering Co. v. Continental Cas. Co.*, 883 F. Supp. 488, 492 (1995). It appears that Defendants made this application only because they realized they had not complied with Fed. R. App. P. 8(a)(1) before requesting a stay from the Ninth Circuit Court of Appeals.

Plaintiffs urge the Court nevertheless to consider but deny Defendants' request for a stay. Defendants cannot demonstrate a likelihood of success or any harm to themselves. Should the Court be persuaded, however, that Defendants have identified any defect in the Order, the Court should not stay the order but instead enter further findings to aid in appellate review.[1]

## ARGUMENT

A stay pending appeal is an "extraordinary remedy." *United States v. Mitchell*, 971 F.3d 993, 999 (9th Cir. 2020). Such a "stay is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433–34 (2009). In determining whether to grant a stay, a court must consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434. "The first two factors are the most critical." *Carey v. J.A.K.'s*

---

[1] *See* Fed. R. Civ. P. 62(d) ("while an appeal is pending," district court "may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights"); *Fed. Trade Comm'n v. Enforma Nat. Prods., Inc.*, 362 F.3d 1204, 1215 n.11 (9th Cir. 2004); *Mayweathers v. Newland*, 258 F.3d 930, 935 (9th Cir. 2001).

2

*Puppies, Inc.*, 2024 WL 5374932, at *2 (C.D. Cal. June 6, 2024) (citing *Nken*, 556 U.S. at 434). All factors weigh against a stay here.

*First*, Defendants have not shown a "strong" likelihood of success. *Washington v. Trump*, 847 F.3d 1151, 1165 (9th Cir. 2017). Defendants make three arguments: (1) Plaintiffs, including the organizational plaintiffs, lack standing to obtain prospective injunctive relief; (2) the injunction "is contrary to bedrock Fourth Amendment law"; and (3) the Court exceeded its authority to tailor relief under *Trump v. CASA, Inc.*, 2025 WL 1773631 (U.S. June 27, 2025). Each argument is likely to fail.

***Standing***. Plaintiffs have standing to seek prospective injunctive relief. The Court so held expressly with respect to plaintiff Brian Gavidia, and the record amply demonstrates that the other plaintiffs likewise have standing to obtain an injunction because they or their members are likely to be subject to Defendants' unlawful practice in the future.

A plaintiff may demonstrate standing to obtain injunctive relief by showing "that the harm is part of a 'pattern of officially sanctioned ... behavior, violative of the plaintiffs' [federal] rights.'" *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001) (quoting *LaDuke v. Nelson*, 762 F.2d 1318, 1323 (9th Cir. 1985)) (alterations in original); *Melendres v. Arpaio*, 695 F.3d 990, 997-98 (9th Cir. 2012) (clarifying that a written policy is not required); *see Mayfield v. United States*, 599 F.3d 964, 971 (9th Cir. 2010) (same).[2]

The Court correctly found, based on public statements, that Defendants' unlawful practice is officially sanctioned. Order at 45 n.33. Further, the officially sanctioned pattern and practice here is independently demonstrated by the sheer number of instances of patently unconstitutional conduct, as a "pattern of officially sanctioned ... behavior" can be shown "where the defendants have repeatedly engaged in the injurious acts in the past."

---

[2] *Hodges-Durgin* did not "narrow[]" *La Duke.* Applying *LaDuke*, that court declined to disturb the district court's factual determination at summary judgment that the plaintiffs failed to establish a likelihood of recurring injury. *See Hodges-Durgin v. de la Vina*, 199 F.3d 1037, 1044 (9th Cir. 1999). Here, the evidence demonstrates that Plaintiffs face a strong likelihood of recurring injury.

3

*Armstrong*, 275 F.3d at 861; *see B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 974 (9th Cir. 2019) (holding that actions that have "continued over time and may occur again" were sufficient to provide standing based on a policy of officially sanctioned behavior).

Although this Court did not expressly reach the question of the organizational Plaintiffs' standing in its discussion about jurisdiction in the Fourth Amendment section of its Order, the record demonstrates that the organizational Plaintiffs have standing to obtain an injunction for similar reasons as Plaintiff Gavidia, *i.e.*, because their members, who are spread throughout the District, are likely to suffer unlawful seizures as a result of Defendants' practice. This also bolsters the case for a District-wide injunction. *See infra* at 6-7.

UFW has standing. One UFW member, "Angel," a U.S. citizen, was seized for no apparent reason other than his Latino appearance and status as a day laborer. Officers pulled up in a show of force and commanded him not to leave until he provided identification. ECF 45-8 ¶¶ 27–28. Officers also "grabbed" Angel's coworker and "loaded him" into a truck simply because he spoke Spanish. *Id.* ¶ 28. Angel reasonably fears that Defendants' unlawful conduct will recur. *Id.* ¶ 29. He is not alone. Other UFW members, including citizens and lawful permanent residents, reasonably fear being subjected to Defendants' unlawful seizures and are staying home, missing work and losing wages. *Id.* ¶¶ 19, 32. That fear is objectively reasonable in light of Defendants' practice.

LAWCN has standing. One Latino member of CLEAN was working at a car wash when six vehicles pulled up to the entrance in a "fast and intimidating" fashion. ECF 45-10 ¶ 4. An armed agent "approached [him angrily] and grabbed [his] arms," and asked for his "papers." *Id.* ¶¶ 6–7. Agents did not detain two light-skinned car wash workers at the same work site. *Id.* ¶¶ 11–12. "Many more members" of CLEAN now "fear going to work, or even going in public, because they are afraid that the language they speak or where they work will subject them to unlawful stops by immigration agents due to racial profiling." ECF 45-13 ¶ 13. That fear is objectively reasonable in light of Defendants' practice.

4

CHIRLA has standing.  CHIRLA's membership consists of predominantly Latine people, including day laborers, carwash workers, street vendors, and others. ECF 38-9 ¶¶ 24–25.  CHIRLA's members reasonably fear being detained because of the way they look and where they work.  *Id.* ¶ 25. One U.S. citizen CHIRLA member whose brother was detained is now "on constant alert" when he goes out in public.  *Id.* ¶ 26.  Other members have changed their routines out of fear of being stopped or assaulted, *id.* ¶ 27, stopped taking the bus to work after encountering immigration agents at a bus stop, *id.* ¶ 28, reduced their work, or withdrawn their children from school. *Id.* ¶¶ 29–30.  Their fear is objectively reasonable in light of Defendants' practice.

Because Plaintiffs have established "a 'credible threat' of recurrent injury," they have standing to seek injunctive relief.  *LaDuke*, 762 F.2d at 1323.

**Fourth Amendment**. On the merits, the only parts of Defendants' stay application that do not rehash arguments this Court already rejected—on a robust factual record—reflect misdescriptions of the Court's order. For example, Defendants insist they should be permitted to consider language and location, and argue that those factors are not "categorically off-limits." Mot. at 10. But the TRO does not place those factors categorically off-limits. It simply prohibits Defendants from relying "solely" on four factors in place of reasonable suspicion. Order at 50; *see also id.* at 42 (considering whether "sole reliance … could give rise to reasonable suspicion"). When Defendants finally acknowledge the Order's actual language, they fail to cite any on-point caselaw that might cast doubt on the Court's decision, let alone identify binding authority that would demonstrate a strong likelihood of success on appeal.  *See* Mot. at 10–11.

Defendants have now, for the first time, filed a declaration that purports to justify the seizures of Plaintiffs Vasquez Perdomo, Osorto, and Molina. Though indefensibly belated, the declaration in fact *confirms* Defendants' unlawful practice. It states that the detentions of these Plaintiffs "arose or were the result of a targeted enforcement action at a particular location where past surveillance and intelligence had confirmed that the target or individuals associated with him were observed to have recruited illegal aliens to work

5

on landscaping jobs." ECF 94-1 ¶ 6. That statement, though not a model of clarity, appears to acknowledge that Plaintiffs were simply present at a "location" where *some* law enforcement "target" had *sometime* in the "past" picked up some *other* people who were undocumented. The declaration says nothing about the Plaintiffs, and it omits that the "particular location" in question was a public bus stop. It cannot be that mere presence at a public bus stop—where at some other time, someone else, associated with different people who lacked legal status, was present—can justify a deprivation of liberty by the federal government. And indeed, that is not the law. *See Perez Cruz v. Barr*, 926 F.3d 1128, 1138 (9th Cir. 2019); *United States v. Manzo-Jurado*, 457 F.3d 928, 936 (9th Cir. 2006). This new declaration does not alter the Court's conclusion that Defendants are engaged in an unlawful practice and in fact supports it.

Nothing in the Order prohibits Defendants from pursuing targeted arrests, executing arrest warrants, appearing at a location of interest (*e.g.*, a bus stop of interest) to engage in voluntary questioning, or detaining a person based on the four enumerated characteristics *in combination with* other individualized facts. The Order reaches only Defendants' illegal policy and practice of substituting broad profiling for reasonable suspicion. Order at 39–46.

Defendants also complain that the Order enjoins Defendants' policy of flouting the reasonable suspicion requirement "except as permitted by law," Mot. at 9, but this caveat makes clear that the Order does not purport to reach enforcement at the border or at checkpoints, or in connection with a specific suspect description, where the law's requirements differ. *See, e.g.*, *United States v. Montero-Camargo*, 208 F.3d 1122, 1134 n. 21 (9th Cir. 2000). This language does not undermine the clarity of the Court's TRO, which is directed at the problematic conduct detailed in Plaintiffs' TRO Application. However, if this is truly of concern, the Court may provide further detail.

***Scope of relief.*** The Court correctly concluded that providing complete interim relief to the named Plaintiffs required pausing Defendants' indiscriminate and unconstitutional seizures District-wide. As the court explained, "it would be a fantasy to

6

expect that law enforcement could and would inquire whether a given individual was among the named Stop/Arrest Plaintiffs . . . before proceeding with a seizure." Order at 36. The Court was correct. Agents and officers stopping individuals based *solely* upon their ethnicity or accent are unlikely to inquire whether a potential detainee is one of the named individual Plaintiffs in this case, or a member of an organizational Plaintiff. And that "fantasy" of individualized compliance, Order at 36, has already collided with reality: Plaintiff Brian Gavidia, UFW member Angel, and LAWCN member Uitz, were illegally seized *before* officers asked for identification. ECF 45-9 ¶ 11 (Gavidia); ECF 45-8 ¶¶ 27–28 (Angel); ECF 45-10 ¶ 6 (Uitz). Defendants make no effort to explain how the Court could have drawn its order more narrowly, and do not even mention *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486 (9th Cir. 1996), which was the basis for this Court's reasoning about the scope necessary to provide "complete relief" to Plaintiffs. Order at 35–36. The Supreme Court's recent decision in *Trump v. CASA, Inc.* affirmed, rather than abrogated, that principle. 2025 WL 1773631 at *15 (limiting several "nationwide," or "universal," injunctions, but "only to the extent that the injunctions are broader than necessary to provide complete relief" to the parties).

    *Second*, Defendants have failed to demonstrate that they would be irreparably harmed absent a stay, or indeed harmed at all. If Defendants *do not have* a practice of conducting unlawful detentive stops predicated solely on the four factors identified in the TRO—as they sometimes claim, Order at 40—then then their conduct will remain unaffected by the Court's order, and they will not suffer any harm. If they *do* have such an unlawful practice—as the Court found, *e.g.*, Order at 47—they still will not suffer irreparable harm, because the government "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983); *cf. Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (Scalia, J., in chambers) ("The likelihood that denying the stay will permit irreparable harm to the applicant may not clearly exceed the likelihood that granting it will cause irreparable harm to others.").

Defendants assert that the TRO "will have a chilling effect on [immigration] enforcement, because it threatens officers with contempt sanctions if the Court retrospectively disagrees with their view of whether reasonable suspicion was satisfied on particular facts." Mot. at 13–14. But the Court already considered, and rejected, this argument too. As the Court held, "requiring law enforcement to comply with the Constitution does not prevent law enforcement from enforcing the law." Order at 48. And if it is Defendants' view that bedrock Fourth Amendment principles stand in the way of their immigration enforcement plans, that makes the TRO all the more important for Plaintiffs and the public, and certainly is not a reason to set the TRO aside.

Defendants have now put in two declarations stating that, *inter alia*, the "impractical" TRO "will likely cause hesitation and delay in the field, which in turn increases the risk of assault on officers, escalations during volatile encounters, and injuries to both officers and the public." *See* ECF No. 94-2 at ¶ 8; *see also* ECF No. 94-1 at ¶¶ 8–10. But those declarations are conclusory, and Defendants offered no evidence to suggest that a TRO that merely applies existing law will cause these harms. Moreover, these declarations are predicated on distorting the Order, which does not disturb Defendants' "reliance on [four] factors *along with other factors*" or "require that Defendants ignore these factors or 'put blinders on' when they run across these factors." *Id.*

*Finally*, because Defendants have "not 'satisfie[d] the first two factors,' [the Court] need not dwell on the final two factors—'harm to the opposing party' and 'the public interest.'" *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 778 (9th Cir. 2018). Nonetheless, the last two factors, which merge when the government is a party, also weigh against a stay. *Nken*, 556 U.S. at 435. As the Court recognized, it is Plaintiffs and their members who have already been irreparably harmed by Defendants' conduct and who face a risk of irreparable harm in the future. Order at 46. And "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 836–37 (9th Cir. 2020).

8

## CONCLUSION

For the foregoing reasons, Defendants' *ex parte* application for a stay should be denied.

DATED: July 15, 2025                ACLU OF SOUTHERN CALIFORNIA


By: */s/ Mohammad Tajsar*
Mohammad Tajsar
*Counsel for Plaintiffs*

9

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2025, I electronically filed the foregoing with the Clerk of the U.S. District Court for the Central District of California using the CM/ECF system, which sent notification of such filing to all registered CM/ECF users.

DATED:  July 15, 2025                    ACLU OF SOUTHERN CALIFORNIA

By:     /s/ Mohammad Tajsar
        _____
        Mohammad Tajsar
        *Counsel for Plaintiffs*

## L.R. 11-6.2 CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies that this filing is 2,606 words and fewer than eight pages, and complies with L.R. 11-6.1 and this Court's standing order.

DATED:  July 15, 2025                    ACLU OF SOUTHERN CALIFORNIA

By: _____/s/ Mohammad Tajsar_____

Mohammad Tajsar
*Counsel for Plaintiffs*

11

STACY TOLCHIN (SBN 217431)
*stacy@tolchinimmigration.com*
LAW OFFICES OF STACY TOLCHIN
776 E. Green St., Suite 210
Pasadena, CA 91101
Telephone: (213) 622-7450
Facsimile: (213) 622-7233

MOHAMMAD TAJSAR (SBN 280152)
*mtajsar@aclusocal.org*
MAYRA JOACHIN (SBN 306065)
*mjoachin@aclusocal.org*
EVA BITRAN (SBN 302081)
*ebitran@aclusocal.org*
DAE KEUN KWON (SBN 313155)
*akwon@aclusocal.org*
OLIVER MA (SBN 354266)
*oma@aclusocal.org*
STEPHANIE PADILLA (SBN 321568)
*spadilla@aclusocal.org*
DIANA SANCHEZ (SBN 338871)
*dianasanchez@aclusocal.org*
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017-4022
Telephone: (213) 977-5232
Facsimile: (213) 201-7878

MARK ROSENBAUM (SBN 59940)
*mrosenbaum@publiccounsel.org*
REBECCA BROWN (SBN 345805)
*rbrown@publiccounsel.org*
SOPHIA WRENCH (SBN 354416)
*swrench@publiccounsel.org*
RITU MAHAJAN (SBN 252970)
*rmahajan@publiccounsel.org*
GINA AMATO (SBN 215519)
*gamato@publiccounsel.org*
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977

*Counsel for Stop/Arrest Plaintiffs*

*Counsel for All Plaintiffs*

(*additional counsel information on cont. page*)

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Pedro VASQUEZ PERDOMO, *et al.*,<br><br>  Plaintiffs,<br><br>  v.<br><br>Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security, *et al.*,<br><br>  Defendants. | Case No.: 2:25-cv-05605-MEMF-SP<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' *EX PARTE* APPLICATION FOR STAY OF ORDER GRANTING TEMPORARY RESTRAINING ORDER**<br><br>Hon. Maame Ewusi-Mensah Frimpong |

ER-0089

ANNE LAI (SBN 295394)
*alai@law.uci.edu*
UC IRVINE SCHOOL OF LAW
IMMIGRANT AND RACIAL
JUSTICE
SOLIDARITY CLINIC
P.O. Box 5479
Irvine, CA 92616-5479
Telephone: (949) 824-9894
Facsimile: (949) 824-2747

*Counsel for Stop/Arrest Plaintiffs*

LAUREN MICHEL WILFONG*
*lwilfong@ndlon.org*
NATIONAL DAY LABORER
ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

*Counsel for Stop/Arrest Plaintiffs*

BREE BERNWANGER (SBN 331731)
*bbernwanger@aclunc.org*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

*Counsel for Stop/Arrest Plaintiffs*

BRISA VELAZQUEZ OATIS
(SBN 339132)
*bvoatis@aclu-sdic.org*
ACLU FOUNDATION OF
SAN DIEGO & IMPERIAL
COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4199

*Counsel for Stop/Arrest Plaintiffs*

MATTHEW J. CRAIG (SBN 350030)
*mcraig@heckerfink.com*
MACK E. JENKINS (SBN 242101)
*mjenkins@heckerfink.com*
HELIA BIDAD (SBN 348633)
*hbidad@heckerfink.com*
HECKER FINK LLP
1150 South Olive Street, Suite 10-140
Los Angeles, CA 90015
Telephone: (212) 763-0883
Facsimile: (212) 564-0883

*Counsel for Access/Conditions Plaintiffs*

EDGAR AGUILASOCHO
(SBN 285567)
*eaguilasocho@farmworkerlaw.com*
MARTINEZ AGUILASOCHO LAW, INC.
900 Truxtun Ave Suite 300
Bakersfield, CA 93301
Telephone: (661) 859-1174

*Counsel for Plaintiff United Farm Workers*

CARL BERGQUIST**
*cbergquist@chirla.org*
COALITION FOR HUMANE
IMMIGRANT RIGHTS
2351 Hempstead Road
Ottawa Hills, OH 43606
Telephone: (310) 279-6025

*Counsel for Plaintiff Coalition for Humane Immigrant Rights*

*Application for pro hac vice forthcoming
** Admitted pro hac vice

Plaintiffs respectfully submit this opposition to Defendants' *ex parte* application for a stay [ECF 94 ("Mot.")] of the Court's order granting a temporary restraining order [ECF 87 ("Order")].

As an initial matter, Defendants did not comply with the Local Rule 7-19.1, which requires notice of an anticipated *ex parte* application. Defendants have also made no attempt to show that their application meets the standard set forth in *Mission Power Engineering Co. v. Continental Cas. Co.*, 883 F. Supp. 488, 492 (1995). It appears that Defendants made this application only because they realized they had not complied with Fed. R. App. P. 8(a)(1) before requesting a stay from the Ninth Circuit Court of Appeals.

Plaintiffs urge the Court nevertheless to consider but deny Defendants' request for a stay. Defendants cannot demonstrate a likelihood of success or any harm to themselves. Should the Court be persuaded, however, that Defendants have identified any defect in the Order, the Court should not stay the order but instead enter further findings to aid in appellate review.[1]

## ARGUMENT

A stay pending appeal is an "extraordinary remedy." *United States v. Mitchell*, 971 F.3d 993, 999 (9th Cir. 2020). Such a "stay is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433–34 (2009). In determining whether to grant a stay, a court must consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434. "The first two factors are the most critical." *Carey v. J.A.K.'s*

---

[1] *See* Fed. R. Civ. P. 62(d) ("while an appeal is pending," district court "may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights"); *Fed. Trade Comm'n v. Enforma Nat. Prods., Inc.*, 362 F.3d 1204, 1215 n.11 (9th Cir. 2004); *Mayweathers v. Newland*, 258 F.3d 930, 935 (9th Cir. 2001).

*Puppies, Inc.*, 2024 WL 5374932, at *2 (C.D. Cal. June 6, 2024) (citing *Nken*, 556 U.S. at 434). All factors weigh against a stay here.

 *First*, Defendants have not shown a "strong" likelihood of success. *Washington v. Trump*, 847 F.3d 1151, 1165 (9th Cir. 2017). Defendants make three arguments: (1) Plaintiffs, including the organizational plaintiffs, lack standing to obtain prospective injunctive relief; (2) the injunction "is contrary to bedrock Fourth Amendment law"; and (3) the Court exceeded its authority to tailor relief under *Trump v. CASA, Inc.*, 2025 WL 1773631 (U.S. June 27, 2025). Each argument is likely to fail.

 ***Standing***. Plaintiffs have standing to seek prospective injunctive relief. The Court so held expressly with respect to plaintiff Brian Gavidia, and the record amply demonstrates that the other plaintiffs likewise have standing to obtain an injunction because they or their members are likely to be subject to Defendants' unlawful practice in the future.

 A plaintiff may demonstrate standing to obtain injunctive relief by showing "that the harm is part of a 'pattern of officially sanctioned ... behavior, violative of the plaintiffs' [federal] rights.'" *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001) (quoting *LaDuke v. Nelson*, 762 F.2d 1318, 1323 (9th Cir. 1985)) (alterations in original); *Melendres v. Arpaio*, 695 F.3d 990, 997-98 (9th Cir. 2012) (clarifying that a written policy is not required); *see Mayfield v. United States*, 599 F.3d 964, 971 (9th Cir. 2010) (same).[2]

 The Court correctly found, based on public statements, that Defendants' unlawful practice is officially sanctioned. Order at 45 n.33. Further, the officially sanctioned pattern and practice here is independently demonstrated by the sheer number of instances of patently unconstitutional conduct, as a "pattern of officially sanctioned ... behavior" can be shown "where the defendants have repeatedly engaged in the injurious acts in the past."

---

[2] *Hodgers-Durgin* did not "narrow[]" *La Duke*. Applying *LaDuke*, that court declined to disturb the district court's factual determination at summary judgment that the plaintiffs failed to establish a likelihood of recurring injury. *See Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1044 (9th Cir. 1999). Here, the evidence demonstrates that Plaintiffs face a strong likelihood of recurring injury.

*Armstrong*, 275 F.3d at 861; *see B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 974 (9th Cir. 2019) (holding that actions that have "continued over time and may occur again" were sufficient to provide standing based on a policy of officially sanctioned behavior).

Although this Court did not expressly reach the question of the organizational Plaintiffs' standing in its discussion about jurisdiction in the Fourth Amendment section of its Order, the record demonstrates that the organizational Plaintiffs have standing to obtain an injunction for similar reasons as Plaintiff Gavidia, *i.e.*, because their members, who are spread throughout the District, are likely to suffer unlawful seizures as a result of Defendants' practice. This also bolsters the case for a District-wide injunction. *See infra* at 6-7.

UFW has standing. One UFW member, "Angel," a U.S. citizen, was seized for no apparent reason other than his Latino appearance and status as a day laborer. Officers pulled up in a show of force and commanded him not to leave until he provided identification. ECF 45-8 ¶¶ 27–28. Officers also "grabbed" Angel's coworker and "loaded him" into a truck simply because he spoke Spanish. *Id*. ¶ 28. Angel reasonably fears that Defendants' unlawful conduct will recur. *Id*. ¶ 29. He is not alone. Other UFW members, including citizens and lawful permanent residents, reasonably fear being subjected to Defendants' unlawful seizures and are staying home, missing work and losing wages. *Id*. ¶¶ 19, 32. That fear is objectively reasonable in light of Defendants' practice.

LAWCN has standing. One Latino member of CLEAN was working at a car wash when six vehicles pulled up to the entrance in a "fast and intimidating" fashion. ECF 45-10 ¶ 4. An armed agent "approached [him angrily] and grabbed [his] arms," and asked for his "papers." *Id*. ¶¶ 6–7. Agents did not detain two light-skinned car wash workers at the same work site. *Id*. ¶¶ 11–12. "Many more members" of CLEAN now "fear going to work, or even going in public, because they are afraid that the language they speak or where they work will subject them to unlawful stops by immigration agents due to racial profiling." ECF 45-13 ¶ 13. That fear is objectively reasonable in light of Defendants' practice.

CHIRLA has standing. CHIRLA's membership consists of predominantly Latine people, including day laborers, carwash workers, street vendors, and others. ECF 38-9 ¶¶ 24–25. CHIRLA's members reasonably fear being detained because of the way they look and where they work. *Id.* ¶ 25. One U.S. citizen CHIRLA member whose brother was detained is now "on constant alert" when he goes out in public. *Id.* ¶ 26. Other members have changed their routines out of fear of being stopped or assaulted, *id.* ¶ 27, stopped taking the bus to work after encountering immigration agents at a bus stop, *id.* ¶ 28, reduced their work, or withdrawn their children from school. *Id.* ¶¶ 29–30. Their fear is objectively reasonable in light of Defendants' practice.

Because Plaintiffs have established "a 'credible threat' of recurrent injury," they have standing to seek injunctive relief. *LaDuke*, 762 F.2d at 1323.

***Fourth Amendment***. On the merits, the only parts of Defendants' stay application that do not rehash arguments this Court already rejected—on a robust factual record—reflect misdescriptions of the Court's order. For example, Defendants insist they should be permitted to consider language and location, and argue that those factors are not "categorically off-limits." Mot. at 10. But the TRO does not place those factors categorically off-limits. It simply prohibits Defendants from relying "solely" on four factors in place of reasonable suspicion. Order at 50; *see also id.* at 42 (considering whether "sole reliance … could give rise to reasonable suspicion"). When Defendants finally acknowledge the Order's actual language, they fail to cite any on-point caselaw that might cast doubt on the Court's decision, let alone identify binding authority that would demonstrate a strong likelihood of success on appeal. *See* Mot. at 10–11.

Defendants have now, for the first time, filed a declaration that purports to justify the seizures of Plaintiffs Vasquez Perdomo, Osorto, and Molina. Though indefensibly belated, the declaration in fact *confirms* Defendants' unlawful practice. It states that the detentions of these Plaintiffs "arose or were the result of a targeted enforcement action at a particular location where past surveillance and intelligence had confirmed that the target or individuals associated with him were observed to have recruited illegal aliens to work

5

on landscaping jobs." ECF 94-1 ¶ 6. That statement, though not a model of clarity, appears to acknowledge that Plaintiffs were simply present at a "location" where *some* law enforcement "target" had *sometime* in the "past" picked up some *other* people who were undocumented. The declaration says nothing about the Plaintiffs, and it omits that the "particular location" in question was a public bus stop. It cannot be that mere presence at a public bus stop—where at some other time, someone else, associated with different people who lacked legal status, was present—can justify a deprivation of liberty by the federal government. And indeed, that is not the law. *See Perez Cruz v. Barr*, 926 F.3d 1128, 1138 (9th Cir. 2019); *United States v. Manzo-Jurado*, 457 F.3d 928, 936 (9th Cir. 2006). This new declaration does not alter the Court's conclusion that Defendants are engaged in an unlawful practice and in fact supports it.

Nothing in the Order prohibits Defendants from pursuing targeted arrests, executing arrest warrants, appearing at a location of interest (*e.g.*, a bus stop of interest) to engage in voluntary questioning, or detaining a person based on the four enumerated characteristics *in combination with* other individualized facts. The Order reaches only Defendants' illegal policy and practice of substituting broad profiling for reasonable suspicion. Order at 39–46.

Defendants also complain that the Order enjoins Defendants' policy of flouting the reasonable suspicion requirement "except as permitted by law," Mot. at 9, but this caveat makes clear that the Order does not purport to reach enforcement at the border or at checkpoints, or in connection with a specific suspect description, where the law's requirements differ. *See, e.g.*, *United States v. Montero-Camargo*, 208 F.3d 1122, 1134 n. 21 (9th Cir. 2000). This language does not undermine the clarity of the Court's TRO, which is directed at the problematic conduct detailed in Plaintiffs' TRO Application. However, if this is truly of concern, the Court may provide further detail.

***Scope of relief.*** The Court correctly concluded that providing complete interim relief to the named Plaintiffs required pausing Defendants' indiscriminate and unconstitutional seizures District-wide. As the court explained, "it would be a fantasy to

6

expect that law enforcement could and would inquire whether a given individual was among the named Stop/Arrest Plaintiffs . . . before proceeding with a seizure." Order at 36. The Court was correct. Agents and officers stopping individuals based *solely* upon their ethnicity or accent are unlikely to inquire whether a potential detainee is one of the named individual Plaintiffs in this case, or a member of an organizational Plaintiff. And that "fantasy" of individualized compliance, Order at 36, has already collided with reality: Plaintiff Brian Gavidia, UFW member Angel, and LAWCN member Uitz, were illegally seized *before* officers asked for identification. ECF 45-9 ¶ 11 (Gavidia); ECF 45-8 ¶¶ 27–28 (Angel); ECF 45-10 ¶ 6 (Uitz). Defendants make no effort to explain how the Court could have drawn its order more narrowly, and do not even mention *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486 (9th Cir. 1996), which was the basis for this Court's reasoning about the scope necessary to provide "complete relief" to Plaintiffs. Order at 35–36. The Supreme Court's recent decision in *Trump v. CASA, Inc.* affirmed, rather than abrogated, that principle. 2025 WL 1773631 at *15 (limiting several "nationwide," or "universal," injunctions, but "only to the extent that the injunctions are broader than necessary to provide complete relief" to the parties).

*Second*, Defendants have failed to demonstrate that they would be irreparably harmed absent a stay, or indeed harmed at all. If Defendants *do not have* a practice of conducting unlawful detentive stops predicated solely on the four factors identified in the TRO—as they sometimes claim, Order at 40—then then their conduct will remain unaffected by the Court's order, and they will not suffer any harm. If they *do* have such an unlawful practice—as the Court found, *e.g.*, Order at 47—they still will not suffer irreparable harm, because the government "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983); *cf. Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (Scalia, J., in chambers) ("The likelihood that denying the stay will permit irreparable harm to the applicant may not clearly exceed the likelihood that granting it will cause irreparable harm to others.").

Defendants assert that the TRO "will have a chilling effect on [immigration] enforcement, because it threatens officers with contempt sanctions if the Court retrospectively disagrees with their view of whether reasonable suspicion was satisfied on particular facts." Mot. at 13–14. But the Court already considered, and rejected, this argument too. As the Court held, "requiring law enforcement to comply with the Constitution does not prevent law enforcement from enforcing the law." Order at 48. And if it is Defendants' view that bedrock Fourth Amendment principles stand in the way of their immigration enforcement plans, that makes the TRO all the more important for Plaintiffs and the public, and certainly is not a reason to set the TRO aside.

Defendants have now put in two declarations stating that, *inter alia*, the "impractical" TRO "will likely cause hesitation and delay in the field, which in turn increases the risk of assault on officers, escalations during volatile encounters, and injuries to both officers and the public." *See* ECF No. 94-2 at ¶ 8; *see also* ECF No. 94-1 at ¶¶ 8–10. But those declarations are conclusory, and Defendants offered no evidence to suggest that a TRO that merely applies existing law will cause these harms. Moreover, these declarations are predicated on distorting the Order, which does not disturb Defendants' "reliance on [four] factors *along with other factors*" or "require that Defendants ignore these factors or 'put blinders on' when they run across these factors." *Id.*

*Finally*, because Defendants have "not 'satisfie[d] the first two factors,' [the Court] need not dwell on the final two factors—'harm to the opposing party' and 'the public interest.'" *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 778 (9th Cir. 2018). Nonetheless, the last two factors, which merge when the government is a party, also weigh against a stay. *Nken*, 556 U.S. at 435. As the Court recognized, it is Plaintiffs and their members who have already been irreparably harmed by Defendants' conduct and who face a risk of irreparable harm in the future. Order at 46. And "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 836–37 (9th Cir. 2020).

8

## CONCLUSION

For the foregoing reasons, Defendants' *ex parte* application for a stay should be denied.

DATED:  July 15, 2025                    ACLU OF SOUTHERN CALIFORNIA


By: */s/ Mohammad Tajsar*
Mohammad Tajsar
*Counsel for Plaintiffs*

ER-0098

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2025, I electronically filed the foregoing with the Clerk of the U.S. District Court for the Central District of California using the CM/ECF system, which sent notification of such filing to all registered CM/ECF users.


DATED:  July 15, 2025                ACLU OF SOUTHERN CALIFORNIA




By:      /s/ Mohammad Tajsar
                                    Mohammad Tajsar
                                    *Counsel for Plaintiffs*

ER-0099

## **L.R. 11-6.2 CERTIFICATE OF COMPLIANCE**

The undersigned counsel of record certifies that this filing is 2,606 words and fewer than eight pages, and complies with L.R. 11-6.1 and this Court's standing order.

DATED:  July 15, 2025                    ACLU OF SOUTHERN CALIFORNIA



By:        _/s/ Mohammad Tajsar_
               Mohammad Tajsar
               _Counsel for Plaintiffs_

ER-0100

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General
Civil Division, U.S. Dept. of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-1697
Email: Sean.Skedzielewski@usdoj.gov

Attorneys for Defendants

BILAL A. ESSAYLI
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
DANIEL A. BECK
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
ALEXANDER L. FARRELL (SBN 335008)
PAULINE H. ALARCON (SBN 345785)
Assistant United States Attorneys
    Federal Building, Suite 7516
    300 North Los Angeles Street
    Los Angeles, California 90012
    Telephone: (213) 894-2400
    E-mail:  Alexander.Farrell@usdoj.gov

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| PEDRO VASQUEZ PERDOMO; *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security; *et al.*,<br><br>Defendants. | No. 2:25-cv-05605-MEMF-SP<br><br>**DEFENDANTS' *EX PARTE* APPLICATION FOR STAY OF ORDER GRANTING TEMPORARY RESTRAINING ORDER (Dkt. 87)**<br><br>[Supporting declarations filed concurrently]<br><br>Hon. Maame Ewusi-Mensah Frimpong<br>United States District Judge |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

I.    INTRODUCTION ........................................................................................... 1

II.   BACKGROUND ............................................................................................. 2

III.  STANDARD OF REVIEW ............................................................................. 3

IV.   ARGUMENT .................................................................................................. 4

      A.    Plaintiffs Lack Standing for Prospective Injunction Relief. .......................... 4

      B.    This Court Grossly Misapplied the Fourth Amendment .............................. 7

      C.    The Injunction Impermissibly Granted District-Wide Relief. .................... 11

      D.    The Balance of Equities and Public Interest Favor a Stay. ........................ 13

V.    CONCLUSION ............................................................................................... 14

i

# TABLE OF AUTHORITIES

**Federal Cases**                                                    **Page(s)**

*Alderman v. United States,*
  394 U.S. 165 (1969)........................................................................6

*Barnes v. Felix,*
  145 S. Ct. 1353 (2025).................................................................11

*Byrd v. United States,*
  584 U.S. 395 (2018).....................................................................11

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983)................................................................1, 4, 5

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013)...................................................................4, 5

*Egbert v. Boule,*
  596 U.S. 482 (2022)....................................................................14

*Harlow v. Fitzgerald,*
  457 U.S. 800 (1982)....................................................................14

*Hodgers-Durgin v. De La Vina,*
  199 F.3d 1037 (9th Cir. 1999).............................................2, 6, 7

*Hunt v. Wash. St. Apple Adver. Comm'n,*
  432 U.S. 333 (1977)......................................................................6

*INS v. Lopez-Mendoza,*
  468 U.S. 1032 (1984)..................................................................14

*Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n,*
  389 U.S. 64 (1967).........................................................................8

*LaDuke v. Nelson,*
  762 F.2d 1318 (9th Cir. 1985) .....................................................7

*Lewis v. Casey,*
  518 U.S. 343 (1996).......................................................................7

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992).......................................................................4

*Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.,*
  237 F.3d 1101 (9th Cir. 2001) .....................................................6

*Maldonado v. Holder,*
  763 F.3d 155 (2d Cir. 2014)........................................................10

*Microsoft Corp. v. DOJ,*
  233 F. Supp. 3d 887 (W.D. Wash. 2017).....................................6

*Nat'l Ctr. for Immigrants Rights, Inc. v. INS,*
  743 F.2d 1365 (9th Cir. 1984) ...................................................13

*Nken v. Holder,*
  556 U.S. 418 (2009)................................................................4, 13

i

*Parsons v. Ryan,*
  754 F.3d 657 (9th Cir. 2014) .................................................................7, 9
*Perdomo, et al. v. Noem, et al.,*
  --- F.Supp.3d ----, 2025 WL 1915964 (C.D. Cal. Jul. 11, 2025)...................1
*Rakas v. Illinois,*
  439 U.S. 128 (1978)..................................................................................6
*Schmidt v. Lessard,*
  414 U.S. 473 (1974)..................................................................................8
*Stavrianoudakis v. U.S. Fish & Wildlife Serv.,*
  108 F.4th 1128 (9th Cir. 2024) ................................................................6
*Terry v. Ohio,*
  392 U.S. 1 (1968)......................................................................................8
*Trump v. CASA, Inc.,*
  2025 WL 1773631 (U.S. June 27, 2025) ....................................1, 8, 12, 13
*United States v. Arvizu,*
  534 U.S. 266 (2002)..............................................................................8, 10
*United States v. Brignoni-Ponce,*
  422 U.S. 873 (1975)..............................................................................8, 10
*United States v. Manzo-Jurado,*
  457 F.3d 928 (9th Cir. 2006) ..................................................................10
*United States v. Montrero-Camargo,*
  208 F.3d 1122 (9th Cir. 2000) ................................................................10
*United States v. Sokolow,*
  490 U.S. 1 (1989)....................................................................................11
*United States v. Valdes-Vega,*
  738 F.3d 1074 (9th Cir. 2013) ................................................................11
*Waite v. Macy,*
  246 U.S. 606 (1918)..................................................................................8

**Federal Regulations**

8 C.F.R. § 287.8(b)(2)..................................................................................8

**Federal Rules**

Fed. R. Civ. P. 23 .......................................................................................7
Fed. R. Civ. P. 62 .......................................................................................7
Fed. R. Civ. P. 65 .......................................................................................7

## I.    INTRODUCTION

On July 14, 2025, this Court issued a memorandum opinion and order in this case. *See Perdomo, et al. v. Noem, et al.*, --- F.Supp.3d ----, 2025 WL 1915964 (C.D. Cal. Jul. 11, 2025). Pursuant to Federal Rule of Civil Procedure 62, Defendants submit this *ex parte* application to stay pending appeal of the Court's July 14, 2025 Order granting Plaintiffs' *ex parte* applications for a Temporary Restraining Order ("TRO") (Dkt. 4, 38, 45). Defendants are concurrently seeking a stay from the Ninth Circuit at the same time as this renewed motion for a stay.

As grounds for relief, Defendants submit that the Court's district-wide order was erroneously entered for a number of reasons. First, Plaintiffs lack standing. Alleging past, isolated stops does not justify prospective injunctive relief under well-settled law. *See City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). The Court sidesteps *Lyons* by speculating about future violations, but that reasoning fails because *Lyons* itself foreclosed it. It is *Plaintiffs* who bear the burden of showing an imminent threat of injury, which they cannot.

Second, on the merits, the injunction misconstrues the Fourth Amendment. While reasonable suspicion is indeed required, courts may not issue vague "follow-the-law" injunctions. Worse still, by excluding entire categories of factors from the suspicion analysis, the Court contradicts the Fourth Amendment's totality-of-the-circumstances standard. Context matters because such factors as language, location, or occupation might be relevant in particular cases. Courts cannot impose such rigid rules where the Constitution demands flexibility.

Third, the injunction ignores the Supreme Court's recent ruling in *Trump v. CASA, Inc.*, 2025 WL 1773631 (U.S. June 27, 2025), which reaffirmed that universal injunctions violate basic equitable principles. Yet here, the Court barred the government from conducting *any* detentive stops in the Central District, regardless of whether the stops involve any of the Plaintiffs. While the Court rejected a narrower remedy as "unworkable," *CASA* makes clear that unworkability is not a ground to disregard constitutional limits on judicial power.

1

An immediate stay of the Court's injunction is warranted, not only because it is legally indefensible, but because it threatens the separation of powers and the government's sovereign prerogatives. It is untenable for a single district judge "to restructure the operations" of federal immigration enforcement and usurp "ongoing judicial supervision of an agency normally, and properly, overseen by the executive branch." *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1044 (9th Cir. 1999) (en banc).

## II.    BACKGROUND

On June 20, 2025, three individual aliens filed a habeas petition in the district court seeking release from immigration detention. Dkt. 1. Two weeks later, on July 2, they filed an amended complaint adding two other named individual plaintiffs plus four legal services organizations. Dkt. 16. And the next day, before the July 4 holiday, they filed an emergency *ex parte* TRO application. Dkt. 45. These filings, accompanied by more than three hundred pages of exhibits, vastly expanded the scope of the suit to encompass all immigration enforcement throughout the entire district. Dkt. 38, 45.

As relevant here, Plaintiffs alleged that federal agents are engaged in a pattern or practice of unlawful immigration detentions in violation of the Fourth Amendment. Dkt. 45 at 6-13. The three original petitioners are unlawful aliens who were arrested outside a donut shop known to ICE as a location where an illegal immigrant picked up other illegal immigrants for labor. Exhibit A (Second Quinones Decl.). One remains detained; the other two were released on bond pending removal. *Id*. One of the two new Plaintiffs (Hernandez Viramontes) alleges that agents came to the car wash where he works on four occasions in June, and on one of those occasions briefly detained him before verifying his citizenship. Dkt. 45-4. The second new plaintiff (Gavidia) says agents once seized him at a tow yard and asked about his citizenship status. Dkt. 45-9.

The three organizational Plaintiffs relevant to this claim are L.A. Worker Center Network, United Farm Workers, and Coalition for Humane Immigrant Rights. Each provides services to immigrants and is concerned with immigrant rights. They generally allege that their members have been detained and fear that immigration agents will detain

2

them again. Dkt. 16, ¶¶ 173, 179, 189.

For relief, Plaintiffs sought a sweeping injunction barring federal agents from conducting any detentive stops without reasonable suspicion, defined to exclude any reliance on race or ethnicity, language, location, or type of work. Dkt. 45-22, at 4-6.2.

The Court gave the government just two business days to respond to the voluminous applications, then held a hearing two days after that. The Court issued an order granting the two applications the following day. Dkt. 87 (Op.).

As to standing, the Court observed that only one named plaintiff needed to satisfy Article III, and found that Gavidia did so because he had "suffered an invasion of a legally protected interest" and that the conduct complained of would recur. Op.35. As to the merits, the Court concluded that Plaintiffs were likely to succeed in showing the government was "conducting seizures that require at least reasonable suspicion," and that "the seizures were not supported by reasonable suspicion." Op.36. The court agreed with Plaintiffs that reliance on race or ethnicity, spoken language, location, and type of work cannot ever satisfy reasonable suspicion, alone or in combination; it further found that, for the relevant stops, immigration officials relied solely upon those enumerated factors. Op.39-45.

The Court thought Plaintiffs had established irreparable harm based on the risk of future detentive stops. Op.47-48. Accordingly, the Court enjoined the government from (i) "conducting detentive stops in this District" absent "reasonable suspicion that the person … is in violation of U.S. immigration law"; and (ii) relying solely on the enumerated factors for reasonable suspicion. The Court also ordered the parties to show cause at some later date and time why a broader preliminary injunction should not issue, requiring the government to establish guidance, undergo training, and maintain and regularly share with Plaintiffs' counsel documentation showing reasonable suspicion for all detentive stops going forward. Op.50-51.

## III.    STANDARD OF REVIEW

A stay pending appeal is warranted because the government can show a strong

3

likelihood of success on the merits, and because the balance of harms and public interest favor a stay. *Nken v. Holder*, 556 U.S. 418, 426 (2009). The Court's injunction plainly fails on standing grounds, merits grounds, and remedial grounds—it is wrong at least thrice over. And it threatens untenable consequences for immigration enforcement on the ground.

## IV.  ARGUMENT

In considering a stay of the injunction, the first and most important factor is the movant's likely success on the merits. Here, the government will very likely prevail on appeal, because the Court issued an injunction that (i) Plaintiffs lacked standing to seek; (ii) is contrary to bedrock Fourth Amendment law; and (iii) violates the equitable principles that the Supreme Court articulated just weeks ago.

### A.    Plaintiffs Lack Standing for Prospective Injunction Relief.

Plaintiffs must establish Article III standing to seek prospective injunctive relief. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013). That means they must show a future injury that is "imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). They cannot make that showing, and this Court badly erred in concluding otherwise.

**1.**    This case is squarely controlled by *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). Lyons was stopped by police officers for a traffic violation and, despite offering no resistance, was seized and placed in a chokehold. *Id.* at 97. The Supreme Court held that, while Lyons could pursue a damages claim for that past injury, he lacked standing for prospective relief because he had not shown that "he was likely to suffer future injury from the use of the chokeholds by police officers." *Id.* at 105. There was no "immediate threat" that he would *again* be "choke[d] … without any provocation or resistance on his part." *Id.* That was so even though the Court accepted as true that the police department had a policy of "routinely apply[ing] chokeholds in situations where they are not threatened by the use of deadly force." *Id.* That still did not mean that *Lyons himself* faced a likely threat of future injury.

4

That dooms Plaintiffs' standing here. This Court relied solely on Plaintiff Gavidia for standing. He alleges that he suffered a similar Fourth Amendment injury. Instead of a chokehold, agents allegedly stopped him based on his "skin color." Dkt. 45-9, ¶¶ 9, 12. Even assuming those allegations were true (they are not), they do not "establish a real and immediate threat that he would again be [stopped because of his race]." *Lyons*, 461 U.S. at 105.

**2.** The Court misapplied *Lyons* by holding that "there is a real and immediate threat that the conduct complained of will continue." Op.35. Notably, the Court did *not* say that there is a real and immediate threat *to Plaintiffs*. Just as Lyons was not likely to be subject to a chokehold again, the Court never found that Gavidia is likely to be subject to the same violations in the future. Again, the Court merely found a likelihood of "recurrent injury." *Id.* But injury *to whom*? The Article III test is whether the *plaintiff* is likely to suffer future injury. But Plaintiffs presented no evidence that Gavidia would be stopped again.

**3.** Nor can the other Plaintiffs fill the gap. They are all in the same boat (or worse). Plaintiff Viramontes alleged that agents visited the carwash where he works twice without stopping him and detained him for about 20 minutes on their third visit until they could verify his citizenship status. Dkt. 45-4, ¶¶ 6-11. That single interaction provides no basis to believe there will be any future stops, let alone wrongful ones. On the contrary, Viramontes's own declaration makes clear that in a fourth encounter with a different group of agents later that same day, no arrests were made. *Id.* ¶ 14.

Two other plaintiffs, Perdomo and Molina, were detained and later released on bond pending removal proceedings. Dkt. 81-1, ¶¶ 4-5. But other than alleging that the government continues to enforce federal immigration law in the district, the only "evidence" of their standing is Perdomo's "belie[f]" that he will be stopped again (Dkt. 45-1, ¶ 11) and Molina's "worr[y]" that he will be arrested again for "look[ing] like an immigrant." (Dkt. 45-1, 45-3). But subjective fear of a future illegal stop "is not certainly impending" and "cannot manufacture standing." *Clapper*, 568 U.S. at 416.

5

Finally, Plaintiff Osorto is still detained. Dkt. 81-1, ¶ 6. He cannot possibly be in "immediate threat" of an unlawful stop by immigration officials since those officials obviously do not attempt to arrest someone already in detention.

The organizational Plaintiffs cannot demonstrate standing for the injunction either. Associational standing requires the organization to prove, among other things, that "its members would otherwise have standing to sue in their own right" and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Neither is true here. As to the first, the organizations' members lack standing for the same reasons as the individual Plaintiffs—any risk of future harm is speculative. *See Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1143-44 (9th Cir. 2024) (no associational standing for warrantless searches because it was speculative that any members would be harmed in the future). And, as to the second, a Fourth Amendment claim is the paradigmatic example of one that requires the participation of individual members. "Fourth Amendment rights are personal rights which … may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165 (1969); *see also Rakas v. Illinois*, 439 U.S. 128 (1978); *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1111 (9th Cir. 2001); *Microsoft Corp. v. DOJ*, 233 F. Supp. 3d 887, 913–14 (W.D. Wash. 2017) (collecting cases).

**4.**    Even if Plaintiffs could somehow show the bare minimum for Article III, they cannot come close to showing the "threat of immediate and irreparable harm" that is necessary for an injunction. *Hodgers-Durgin*, 199 F.3d at 1042. *Hodgers-Durgin* was a challenge to CBP practices allegedly in violation of the Fourth Amendment. The en banc court held that, even assuming the plaintiffs there had standing, they still "have not demonstrated a sufficient likelihood of injury to warrant equitable relief" because they were "stopped only once." *Id.* at 1044. So too here. Indeed, Plaintiffs presented evidence of only one *anonymous non-party* who was supposedly stopped by immigration officials twice. Dkt. 38-11, ¶¶ 32-38. But "[i]n the absence of a likelihood of injury to the named

6

plaintiffs, there is no basis for granting injunctive relief that would restructure the operations of the Border Patrol and that would require ongoing judicial supervision of an agency normally, and properly, overseen by the executive branch." *Id.* at 1044 (emphasis added); *see also Lewis v. Casey*, 518 U.S. 343, 359 (1996) ("These two [injuries] were a patently inadequate basis for a conclusion of systemwide violation and imposition of systemwide relief."). So too here.

Notably, Plaintiffs and this Court both cited *LaDuke v. Nelson*, 762 F.2d 1318, 1324-26 (9th Cir. 1985), *amended*, 796 F.2d 309 (9th Cir. 1986), for standing. But the en banc court in *Hodgers-Durgin* narrowed *LaDuke* in light of intervening Supreme Court precedent. *See Hodgers-Durgin*, 199 F.3d at 1044-45. And even the Court admitted that *LaDuke* is distinguishable on its face, because it involved direct evidence of an unlawful policy, whereas here no such evidence was presented. Op.45 n.33.

In short, whether viewed through the prism of Article III or the equitable factors for injunctive relief, the Court badly erred by turning alleged one-off past interactions into a basis for a sweeping forward-looking remedy.

### B. This Court Grossly Misapplied the Fourth Amendment.

Even supposing the Court had jurisdiction, the government would be likely to succeed on the merits. The Court's order enjoining the government's detentive-stop practices rests on a serious misunderstanding of both the Court's equitable powers and the governing Fourth Amendment principles.

1. To start, the injunction improperly orders the government to follow the law, without adequately defining the prohibited actions. Federal Rule of Civil Procedure 65 provides that "[e]very order granting an injunction and every restraining order must," among other things, "state its terms specifically" and "describe in reasonable detail … the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B)-(C). Courts thus may not enter injunctions that do no more than broadly direct defendants to comply with the law; "a bare injunction to follow the law" is impermissible. *E.g., Parsons v. Ryan*, 754 F.3d 657, 689 n.35 (9th Cir. 2014); *see also Int'l Longshoremen's Ass'n v. Phila. Marine Trade*

7

*Ass'n*, 389 U.S. 64, 74-76 (1967) (rejecting decree to enforce "an abstract conclusion of law"); *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).

That limitation on federal courts' equitable powers serves critically important interests, especially with respect to injunctive relief against executive-branch officials. It prevents courts from arrogating to themselves the power to generally superintend the Executive Branch's execution of the laws. *See CASA*, 2025 WL 1773631, at *14 ("the Judiciary does not have unbridled authority to enforce" the Executive's "duty to follow the law"); *Waite v. Macy*, 246 U.S. 606, 609 (1918) ("Courts will not issue injunctions against administrative officers on the mere apprehension that they will not do their duty or will not follow the law."). And it protects defendants from the risk of being held in contempt for violating a court order with ill-defined contours. As the Supreme Court explained in *Longshoremen*: "The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one." 389 U.S. at 76. "Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid." *Id.*

This Court's detentive-stops injunction blatantly violates the prohibition of "follow the law" injunctions. The Fourth Amendment guarantee against unreasonable searches and seizures "extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest," including stops of individuals suspected of being in the United States illegally. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). By virtue of "the limited nature of the intrusion," however, "stops of this sort may be justified on facts that do not amount to the probable cause required for an arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 880 (1975). Instead, an officer may conduct such a stop based on reasonable suspicion—supported by "specific articulable facts, together with rational inferences from those facts"—that a person is an illegal alien. *Id.* at 884; *see also Terry v. Ohio*, 392 U.S. 1 (1968); 8 C.F.R. § 287.8(b)(2) ("If the immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to

8

be, engaged in an offense against the United States or is an alien illegally in the United States, the immigration officer may briefly detain the person for questioning.").

The injunction here simply recapitulates those basic Fourth Amendment principles. It first provides: "Defendants shall be enjoined from conducting detentive stops in this District unless the agent or officer has reasonable suspicion that the person to be stopped is within the United States in violation of U.S. immigration law." Op.50. That just restates the constitutional requirement of reasonable suspicion. It is thus a forbidden "bare injunction to follow the law." *Parsons*, 754 F.3d at 689 n.35.

The second substantive provision of the injunction suffers from much the same defect. Although it enumerates four factors that defendants may not rely on, "alone or in combination, to form reasonable suspicion for a detentive stop," it simultaneously provides that defendants may do so "as permitted by law." Op.50. That is circular and fails to provide the requisite notice. And even if the "except as permitted by law" clause were set aside, the Court's opinion leaves significant confusion about which practices the Court did and did not intend to enjoin, as discussed further below. The Order thus exposes defendants to the threat of judicial contempt based on nothing more than the prospect that the Court may ultimately disagree with an agent's application of the Fourth Amendment. The injunction is fatally flawed on this basis alone.

**2.** Even the injunction's more precise provisions rest on a serious misunderstanding of the Fourth Amendment. Under the injunction, "Defendants may not rely solely on" four factors, "alone or in combination, to form reasonable suspicion for a detentive stop." Op.50. Those factors are: "[a]pparent race or ethnicity"; "[s]peaking Spanish or speaking English with an accent"; "[p]resence at a particular location (e.g. bus stop, car wash, tow yard, day laborer pick up site, agricultural site, etc.)"; or "[t]he type of work one does." *Id.* That directive is flatly inconsistent with black-letter Fourth Amendment doctrine.

Insofar as the injunction means to prohibit the government from relying on the four listed factors *at all*, as parts of the Court's opinion appear to suggest (Op.42-43, Op.41

9

n.30), that runs afoul of the basic Fourth Amendment principle that the reasonable-suspicion inquiry entails consideration of the totality of the circumstances, *Arvizu*, 534 U.S. at 273, meaning that no circumstances are categorically off-limits. And that of course goes for the four factors that the Court enumerated here. Thus, ethnicity can be a factor supporting reasonable suspicion in appropriate circumstances—for instance, if agents are acting on a tip that identifies that ethnicity—even if it would not be relevant in other circumstances. *See Brignoni-Ponce*, 422 U.S. at 885-86 ("apparent Mexican ancestry" did not "alone" supply reasonable suspicion). It is likewise settled that a person's use of Spanish, "[p]resence at a particular location," or job (Op.50) can contribute to reasonable suspicion in at least some circumstances. *See, e.g., United States v. Manzo-Jurado*, 457 F.3d 928, 937 (9th Cir. 2006) (fact that group was "speaking to each other only in Spanish" was "relevant to the reasonable suspicion inquiry"); *United States v. Montrero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) (en banc) (location can be relevant); *Maldonado v. Holder*, 763 F.3d 155, 161 (2d Cir. 2014) (noting that day labor is "an occupation that is one of the limited options for workers without documents"). The Court practically acknowledged as much by identifying specific locations that are often associated with illegal aliens, thereby refuting its own logic. Op.50 (referring to a "day laborer pick up site[s]"). So, to the extent that the injunction bars the government from considering the listed factors, it is egregiously wrong.

The injunction is flawed even if it prohibits the government only from relying on the enumerated factors *alone* (singly or in combination) to form reasonable suspicion for a stop. Reflecting the Fourth Amendment's core textual criterion of reasonableness, the Supreme Court has "deliberately avoided reducing" the reasonable-suspicion inquiry to "a neat set of legal rules." *Arvizu*, 534 U.S. at 274; *see also Brignoni-Ponce*, 422 U.S. at 885 n.10. For example, a rule allowing officers to rely on certain evidence of "ongoing criminal behavior" but not "probabilistic" evidence is inconsistent with the flexible nature of the reasonable-suspicion inquiry. *United States v. Sokolow*, 490 U.S. 1, 8 (1989). Categorical rules are foreign to the Fourth Amendment's totality-of-the-circumstances tests, whether

10

1  they help or hurt the government. *See, e.g., Byrd v. United States*, 584 U.S. 395, 405 (2018)

2  (rejecting *per se* rule that "drivers who are not listed on rental agreements always lack an

3  expectation of privacy in the automobile based on the rental company's lack of

4  authorization alone"); *Barnes v. Felix*, 145 S. Ct. 1353, 1358 (2025) (rejecting "moment

5  of the threat" doctrine in excessive-force context).

6        This Court's injunction contravenes that principle. As the Ninth Circuit has held,

7  "[t]he nature of the totality-of-the-circumstances analysis … precludes us from holding

8  that certain factors are presumptively given no weight without considering those factors

9  in the full context of each particular case"; "prior decisions holding that certain factors

10  are per se not probative or are per se minimally probative do not … comply with Supreme

11  Court precedent." *United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013) (en

12  banc). Yet the injunction here imposes a categorical rule that the four listed factors cannot

13  support reasonable suspicion for an investigatory stop. *See* Op.50. And it does so even

14  though some combination of the enumerated factors will at least sometimes support

15  reasonable suspicion for a stop. That cannot be correct.

16        **C.    The Injunction Impermissibly Granted District-Wide Relief.**

17        If nothing else, the Court's grant of district-wide relief must be stayed because it

18  flagrantly violates the Supreme Court's recent holding in *CASA*, forbidding the use of

19  universal (*i.e.*, non-party-specific) injunctions. This Court did not enjoin the government

20  from detaining *Plaintiffs* without reasonable suspicion; it enjoined the government from

21  stopping or detaining *anyone in the district* without reasonable suspicion. That cannot be

22  squared with *CASA*—and the Court barely tried. Indeed, the Court failed even to cite the

23  Supreme Court's ruling, let alone engage with its holding.

24        In *CASA*, the Supreme Court addressed "universal injunctions," or injunctions that

25  bar the defendant from enforcing "a law or policy against *anyone*," in contrast to

26  injunctions limited to the plaintiff. 2025 WL 1773631, at *4. The Court found that the

27  statutory grant of jurisdiction over suits "in equity" "encompasses only those sorts of

28  equitable remedies traditionally accorded by courts of equity at our country's inception."

11

1  *Id.* at \*5-\*6. And "[n]either a universal injunction nor any analogous form of relief was

2  available … at the time of the founding." *Id.* at \*6. Rather, "suits in equity were brought

3  by and against individual parties." *Id.* "Because the universal injunction lacks a historical

4  pedigree, it falls outside the bounds of a federal court's equitable authority under the

5  Judiciary Act." *Id.* at \*8. At most, a court granting equitable relief "may administer

6  complete relief *between the parties*." *Id.* at \*11. "Under this principle, the question is not

7  whether an injunction offers complete relief to everyone potentially affected by an

8  allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs*

9  *before the court*." *Id.* And even then, "[c]omplete relief is not a guarantee—it is the

10 maximum a court can provide." *Id.* at \*12.

11    This Court nonetheless determined that it "must enjoin the conduct of all law

12 enforcement engaged in immigration enforcement throughout the District." Op.36

13 Without citing or discussing *CASA*, the Court summarily dismissed the government's

14 concerns about universal injunctions as "unavailing" because "the requested injunction is

15 only District-wide and not nationwide." Op.30 n.21. That completely misses the point.

16 Whether nationwide or only district-wide, the injunction goes beyond providing complete

17 relief to *Plaintiffs*.

18    The Court also thought a narrower injunction would not work, because it would be

19 impractical to expect agents to inquire into whether someone is a plaintiff before

20 conducting a stop or detention. Op.36. But *CASA* cannot be so easily brushed aside. The

21 Court warned that "[c]omplete relief" is not "synonymous with universal relief," but is

22 instead "a narrower concept: The equitable tradition has long embraced the rule that courts

23 generally 'may administer complete relief *between the parties*.'" *CASA*, 2025 WL

24 1773631, at \*11. Thus, although "the complete-relief principle has deep roots in equity,"

25 it does not "justif[y] award of relief to nonparties." *Id.* at \*10. To be sure, there are cases

26 where "afford[ing] the plaintiff complete relief[] [leaves] the court [with] only one feasible

27 option," which has "the practical effect of benefiting nonparties"—but any such "benefit

28 to nonparties . . . [is] merely incidental." *Id.* at \*11. Here, though, the benefit to nonparties

is anything but incidental: The Court expressly ruled that it would "enjoin the conduct of all law enforcement engaged in immigration enforcement throughout the District." Op.36. *CASA* does not allow that.[1]

If anything, the Court's concerns about a party-specific injunction merely underscore that broad, structural injunctions are rarely appropriate in the Fourth Amendment context. *See* Orin S. Kerr, *The Limits of Fourth Amendment Injunctions*, 7 J. on Telecommc'ns & High Tech. L. 127, 129 (2009) ("Fourth Amendment doctrine is tremendously fact-specific: every fact pattern is different, and even the exceptions to the exceptions have their own exceptions. Courts are poorly suited to design broad injunctive relief in this setting."). They are certainly not a reason to ignore the Supreme Court's warnings about the limits of federal courts' equitable powers.

This sweeping district-wide injunction, under which a single district judge purports to dictate a categorical formula for this sort of individualized inquiry and thereby assume plenary oversight of immigration enforcement in Los Angeles, is contrary to both the Fourth Amendment and basic principles of equity. A stay is required.

### D.    The Balance of Equities and Public Interest Favor a Stay.

The balance of harms, equities, and public interest overwhelmingly favor a stay pending appeal. *See Nken*, 556 U.S. at 435. The government will suffer irreparable harm if the Court's injunction remains in effect. Under federal law, the government only conducts warrantless arrest where officers have reasonable suspicion, based on specific articulable facts. Dkt. 71 (Havrick Decl.), ¶¶ 8-10; Dkt. 71 (Quinones Decl.) ¶¶ 4-5, 8-9. But the Court's broad, structural injunction will have a chilling effect on that enforcement, because it threatens officers with contempt sanctions if the Court retrospectively disagrees

---

[1] Although Plaintiffs styled their amended complaint as a putative class action, they did not seek certification and the Court expressly did not rely on the class allegations to support the injunction. *See* Op.36 (approving district-wide injunction "without considering the unnamed class members and the propriety of certifying a class"). Accordingly, any injunction had to be limited to the Plaintiffs. *See Nat'l Ctr. for Immigrants Rights, Inc. v. INS*, 743 F.2d 1365, 1371 (9th Cir. 1984) ("in the absence of class certification, [a] preliminary injunction may properly cover only the named plaintiffs"). Of course, had the Court tried to certify a class, that would have led to other fatal problems under Rule 23.

13

with their view of whether reasonable suspicion was satisfied on particular facts. *Cf. Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982); *see also* Exhibit A ¶¶ 8-10 (describing how the TRO will hamper law enforcement efforts and increase risks to agents); Exhibit B ¶¶ 14-20 (same). And that risk is potent, given that the Court reached its judgment about the past arrests of three named Plaintiffs here, without giving the government a meaningful opportunity to marshal the facts and prove that reasonable suspicion *did* exist. Now that it's had more time, the government has provided specific evidence that those arrests resulted from "a targeted enforcement action at a particular location where past surveillance and intelligence had confirmed that the target or individuals associated with him were observed to have recruited illegal aliens to work on landscaping jobs." *Compare* Ex. A (Second Quinones Decl.) ¶ 6 *with* Dkt. 71 (Quinones Decl.).

On the other side of the scale, the Fourth Amendment already applies by its own terms to all law enforcement actions and already provides remedies for violations. *See Egbert v. Boule*, 596 U.S. 482, 484 (2022) (addressing alternative remedies in context of excessive force complaint); *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1045 (1984). Those existing remedies suffice to protect Plaintiffs' interests and the public interest.

## V.     CONCLUSION

For these reasons, the Court should stay its Order granting the TRO application.

Dated: July 14, 2025                          Respectfully submitted,

*/s/Sean Skedzielewski*
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General
United States Department of Justice
Civil Division
950 Pennsylvania Ave NW, Ofc. 3631
Washington, DC 20530
Telephone: (202) 307-1697
Email: Sean.Skedzielewski@usdoj.gov

Attorney for Defendants

14

**L.R. 11-6.2 Certificate of Compliance**

The undersigned counsel of record certifies that this filing is fourteen (14) pages which, complies with L.R. 11-6.1 and this Court's standing order.

Dated: July 14, 2025                      /s/Sean Skedzielewski
                                           SEAN SKEDZIELEWSKI
                                           Counsel to the Assistant Attorney General
                                           United States Department of Justice
                                           Civil Division
                                           950 Pennsylvania Ave NW, Ofc. 3631
                                           Washington, DC 20530
                                           Telephone: (202) 307-1697
                                           Email: Sean.Skedzielewski@usdoj.gov

15

# Exhibit A.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Pedro Vasquez Perdomo, et al., | Case No. 2:25-cv-05605 |
| Plaintiffs, | **SECOND DECLARATION OF ANDRE QUINONES** |
| v. | |
| Kristi Noem, et al., | |
| Defendants. | |

## SECOND DECLARATION OF ANDRE QUINONES

I, Andre Quinones, hereby declare:

1.    I am employed by the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) and serve as a Deputy Field Office Director (FOD) of the Los Angeles Field Office (ERO Los Angeles).

2.    I have been employed by ICE, or its predecessor legacy Immigration and Naturalization Service (INS), since July 2000. In April 2011, I was promoted to Supervisory Detention and Deportation Officer and in October 2016, I was promoted to Assistant Field Office Director. In June 2020, I was promoted to Deputy Field

1

ER-0121

Office Director (DFOD).

3.    As DFOD for ERO Los Angeles, I assist the Field Office Director in directing and overseeing ICE's enforcement of federal immigration laws within the Central District of California, which has the same geographic boundaries as the ERO Los Angeles Field Office. The ERO Los Angeles Field Office currently consists of over 290 law enforcement officers in six offices who are responsible for enforcing federal immigration laws in seven California counties with a combined population of over 20 million people.

4.    The majority of ERO's immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at-large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

5.    ERO Los Angeles officers are trained that, under the Fourth Amendment, case law, and relevant regulations, brief detention for questioning

2

requires an immigration officer to have reasonable suspicion, based on specific, articulable facts, that the person being questioned is an alien illegally in the United States. Under a totality of the circumstances approach, a local officer, based on his/her own experience and specialized training, may consider, including and not limited to, the following facts in building reasonable suspicion: the geographical location in which the alien was observed or found; whether that location is known to be frequented by illegal aliens seeking work; whether the location is known to be associated with specific businesses or employment engaged in criminal activity, including the smuggling, trafficking, or employment of illegal aliens; individualized facts, including any suspicious or evasive behavior of the individual observed prior to or during the encounter, or any pattern or practice of such behavior; any investigation or surveillance showing the above; and any other particularized facts justifying an investigatory stop.

6.    Regarding the allegations of Plaintiffs Pedro Vasquez Perdomo, Carlos Alexander Osorto, and Issac Villegas Molina, all three arrests arose or were the result of a targeted enforcement action at a particular location where past surveillance and intelligence had confirmed that the target or individuals associated with him were observed to have recruited illegal aliens to work on landscaping jobs. It was also determined to be a location where the target and the workers would get food before heading off for a job.

3

7.      From June 1, 2025 to the present, ERO has processed approximately 2,805 immigration arrests and numerous criminal arrests in the Los Angeles area.

8.      I have reviewed the July 11, 2025 order in this case, which granted the motions for temporary restraining orders (TROs). The District Court's ruling seems to place burdensome and unclear prohibitions on the use of neutral factors related to location and employment that may be critical to support reasonable suspicion. Investigation and surveillance often involve particular locations where illegal activity is known to be present and facts related to employment or occupations may also have a nexus to illegal activity, including smuggling and human trafficking. By injecting confusion and uncertainty into when and how these factors can be used to build reasonable suspicion, the District Court's ruling will hamper officers' ability to conduct legitimate law enforcement operations.

9.      In my experience, officers develop reasonable suspicion based in part on prior investigation and surveillance but also based on events and interactions occurring in real time on the ground. The District Court's ruling fails to provide clear instructions to the Defendant law enforcement agencies as to how reasonable suspicion must be developed going forward, how the enumerated factors such as location or employment can be used under the ruling and what additional information, if any, would be needed if those factors are used. The ruling is also unclear as to whether federal immigration statutes or federal criminal statutes, or

4

both, are covered by its prohibitions. The ruling is vague and overbroad as to whether it applies to arrests in which Defendants have judicial warrants, or arrests made without a warrant, or both. This lack of clarity and overbreadth will impair officers' ability to develop reasonable suspicion in the field and impact officers' ability to effectively and efficiently conduct operations because they are concerned with violating the new ruling.

10.   The District Court's ruling adds confusion and hampers an officer's ability to act decisively by injecting the threat of violating the ruling into every decision in the field while, at the same time, the officers and agents are subject to attacks and threats in the field. In recent months, incidents of violence and doxxing against ICE officers and agents have increased 700% over past levels nationwide. Individuals attacking and threatening officers and agents have turned what would normally be a routine immigration enforcement action into a highly volatile and dangerous situation for officers in the Los Angeles area who are simply enforcing immigration laws passed by Congress. *See* Democrats Inspire Vicious, Escalating Attacks on ICE, at https//www.whitehouse.gov/articles/2025/07/democrats-inspire-viscious-escalating-attacks-on-ICE (last visited Jul. 13, 2025).

11.   For example, on June 24, 2025, ERO Los Angeles officers, detailed ERO officers and Special Agents with the Federal Bureau of Investigation (FBI) Los Angeles arrived at the intersection of East 9th St. and Main St. in Los Angeles, CA,

5

as part of ongoing Title 8 enforcement operations to engage in enforcement operations, which resulted in an arrest. As officers and agents attempted to leave the area, a crowd gathered, preventing them and their vehicles from departing. The ERO officers exited their vehicles and gave verbal commands to disperse. Three unknown individuals became more aggressive, closing their distance on the ERO officers and yelling obscenities. ERO officers attempted to push them back to create distance, but the individuals continued to advance. One ERO officer deployed oleoresin capsicum (OC) spray on the three individuals, causing two to disperse. The third individual struck an ERO officer in the face. ERO officers and FBI agents on scene immediately attempted to arrest the offender, who actively resisted. ERO officers and FBI agents eventually gained control of the suspect and placed him under arrest. Emergency medical services were called to the scene but could not reach the location due to the size of the crowd.  Given these dangerous situations in which multiple, unknown individuals are filming, threatening, or assaulting law enforcement officers, ICE officers are taking precautions, such as masking to prevent doxxing and attempting to control dangerous situations through appropriate crowd control and law enforcement techniques.

12.    In the Los Angeles area, we have observed an increase in targeted action towards ICE personnel, facilities, and operations, including vandalism of ICE facilities, vehicles, and property, doxing of ICE personnel, and video recording and

6

photographing of ICE personnel and operations. We have received multiple reports of ICE officers in the Los Angeles area being doxed on social media websites including TikTok and YouTube, with death threats to ICE agents and officers' photographs, names, titles, email addresses, hotel and home addresses posted on the social media sites. Flyers containing photographs of multiple ICE officers in Los Angeles have been posted in various neighborhoods. One officer in the Los Angeles area received suspicious packages from Amazon. On Friday, July 4, 2025, a Ford Ranger truck followed an ERO Assistant Field Office Director (AFOD) from the Federal Building at 300 N Los Angeles St, LA, CA 9012 to El Monte, CA on the I-10 freeway. The vehicle was driving aggressively attempting to take the AFOD'S photograph. There are also multiple websites, such as The ICE List and The Crustian Daily, that are focused on posting locations and photos and personal information of officers and agents which encourage people to incite violence and attempt to discover their identities. Multiple ICE officers from Los Angeles are listed on the ICE List. Such sites encourage their users to identify ICE officer profiles and pages on LinkedIn and Facebook, take photographs of officers without masks or of their faces when the mask slips off and report that information to be posted on the website.

///

///

///

7

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 13th day of July 2025.


Andre Quinones
Deputy Field Office Director
DHS ICE ERO Los Angeles

8

ER-0128

# Exhibit B.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Pedro Vasquez Perdomo, et al.,<br><br>                    Plaintiffs,<br><br>    v.<br><br>Kristi Noem, et al.,<br><br>                  Defendants. | Case No. 2:25-cv-05605<br><br>**DECLARATION OF DANIEL I. PARRA** |

## DECLARATION OF DANIEL I. PARRA

I, Daniel I. Parra, declare and affirm as follows:

    1.     I am employed by U.S. Border Patrol, an operational component of U.S. Customs and Border Protection (CBP) within the Department of Homeland Security (DHS). CBP is charged with enforcing the Nation's immigration laws in order to protect national security and uphold the integrity of the immigration system. As part of this mission, CBP Border Patrol Agents and officers are responsible for preventing the unlawful entry of individuals into the United States, apprehending those who attempt to enter illegally or who have violated the immigration laws in accordance with applicable laws. Through these activities, CBP seeks to secure the

1

border, disrupt human smuggling and trafficking networks, and ensure consistent enforcement of the immigration laws of the United States.

2.      I am the Deputy Chief Patrol Agent of the El Centro Sector and have been in this position since May 8, 2022. In this role, I am responsible for managing U.S. Border Patrol operations and administrative functions within the El Centro Sector, which encompasses 70 miles of land border, as well as inland areas of California extending to the Oregon State line. I oversee a workforce of over 1,200 employees and manage a multimillion-dollar budget.

3.      I entered on duty with the U.S. Border Patrol on July 28, 2002. My first assignment as a Border Patrol Agent was at the El Centro Station, El Centro Sector. Across the span of my career with the U.S. Border Patrol, I have served in a variety of leadership positions ranging in scope and complexity. These assignments include Supervisory Border Patrol Agent and Field Operations Supervisor, Indio Station, El Centro Sector; Executive Officer of Operations, El Centro Sector; Assistant Chief, U.S. Border Patrol Headquarters, Law Enforcement Operations Directorate - Pacific Corridor; Deputy Patrol Agent in Charge of Operations, Ajo Station, Tucson Sector; Patrol Agent in Charge, Blythe Station, Yuma Sector; and Division Chief, Law Enforcement Operational Programs, Tucson Sector. As the Division Chief, I oversaw multiple law enforcement operational programs in Tucson Sector, the largest and one of the busiest sectors in the nation.

2

4.      My current Role is Incident Commander at the Incident Command Post for the current CBP operation in Los Angeles.  In this position, I have operational oversight and am responsible for all U.S. Border Patrol assets and operations in the greater Los Angeles area.  Furthermore, I ensure that all personnel under my command have the proper resources, not only in terms of materiel, but the requisite training needed to operate in such a complex and fluid environment.  As the Incident Commander, I report directly to the Lead Field Coordinator and National Incident Commander Center.

5.      On June 6, 2025, to support U.S. Immigration and Customs Enforcement (ICE-ERO), CBP agents and officers were deployed to Los Angeles, California, as part of a national, multi-agency operation.  The operation focuses on enhancing public safety and enforcing immigration law through law enforcement efforts.

6.      As part of this operation, CBP agents and officers, in coordination with other federal agencies, along with their federal partners, are involved in a variety of different law enforcement encounters and enforcement actions.  Officers and agents regularly engage in consensual encounters, investigative detentions, warrantless arrests, and arrests pursuant to both immigration and criminal judicial warrants.

7.      I have read the July 11, 2025 order that included a temporary restraining order (TRO).  Based upon my reading of the order, it prohibits our agents and

3

officers from conducting investigative detentions, or "detentive stops," without "reasonable suspicion that the person stopped is within the United States in violation of U.S. immigration law." The order then proceeds to list four general factors that agents and officers are prohibited from using, "alone or in combination," in developing reasonable suspicion:

- apparent race or ethnicity;

- speaking Spanish or English with an accent;

- presence at a particular location (e.g. bus stop, car wash, tow yard, day laborer pick up site, agricultural site, etc.); or

- the type of work one does.

8.    From a law enforcement perspective—where agents and officers routinely conduct lawful detentions based on reasonable suspicion as part of daily operations—this order is confusing and impractical to implement. It will likely cause hesitation and delay in the field, which in turn increases the risk of assaults on officers, escalations during volatile encounters, and injuries to both officers and the public, particularly in the already high-risk and unpredictable environment of Los Angeles. It will also severely undermine CBP's ability to successfully execute its mission to enforce federal law.

9.    The first part of the order requires CBP agents and officers conducting immigration enforcement activities to have reasonable suspicion that a person is

4

ER-0133

violating federal immigration law before making a detentive stop. But this simply restates what the law already requires, and what our agents and officers are trained to do and regularly carry out in the course of their duties. The officers and agents who have been deployed in this operation have years of experience in the field developing reasonable suspicion based upon the totality of the circumstances, and effectuating lawful detentive stops.

10.     However, it is the second part of the order, listing the four prohibited factors that presents the greater operational challenge. It is unclear exactly what conduct is prohibited by the order. One possible interpretation seems to categorically prohibit certain factors from contributing to reasonable suspicion. Another allows that the same factors may be considered with additional facts. Because of this ambiguity the order is likely to create significant confusion among agents and officers who are trying to ensure compliance in the field.

11.     Under a totality of the circumstances approach, an agent or officer, based on his/her own experience and specialized training, may consider, including and not limited to, the following facts in building reasonable suspicion: the geographical location in which the alien was observed or found; whether that location is known to be frequented by illegal aliens seeking work; whether the location is known to be associated with specific businesses or employment engaged in criminal activity, including the smuggling, trafficking, or employment of illegal

5

aliens; individualized facts, including any suspicious or evasive behavior of the individual observed prior to or during the encounter, or any pattern or practice of such behavior; any investigation or surveillance showing the above; and any other particularized facts justifying a detentive stop. Location and occupation as part of the totality of the circumstances are factors that contribute to developing reasonable suspicion. But those factors seem to be restricted by the order. Both factors are particularly pertinent in the context of immigration enforcement and excluding them runs counter to well-established practices and training requiring immigration officials to evaluate the totality of the circumstances, which expressly includes considerations such as occupation and location. The order fails to recognize that when agents and officers evaluate certain locations and types of employment (generally considered together) they are part of the totality of the circumstances.

12.     Many agents and officers assigned to the Los Angeles operation have extensive tenure and experience working for the agency. Over time, they have developed specialized expertise and practical knowledge of the factors that are likely to indicate reasonable suspicion that a person is illegally present. Their understanding is informed by thousands of stops, arrests, interviews, and operations, as well as surveillance and intelligence reporting regarding migration flow. That experience and information helps them identify businesses and settings where individuals unlawfully present in the country often find work, such as cash-paid day

labor locations and occupations.

13.     When conducting a detentive stop, agents consider location and type of work as part of the totality of circumstances along with additional facts stemming from surveillance, agent observations including behavior of individuals, or intelligence. While the order may qualify that agents and officers cannot rely "solely" on these factors in establishing reasonable suspicion, it implies that, when considered along with other information, their use is permissible.  However, the simple fact that the order prohibits or restricts consideration of location and types of work from the reasonable suspicion calculation will create immediate confusion and concern for officers and agents.

14.     The fact that the order includes as "examples" many locations and occupations connected to previous enforcement actions that reflect areas historically associated with patterns of unlawful immigration activity through years of enforcement experience and intelligence gathering, creates even more ambiguity and operational problems.  In an effort to comply with this order, officers and agents will likely avoid taking lawful enforcement actions when they have sufficient, particularized facts to establish reasonable suspicion, because one of these two prohibited factors formed a part of their suspicion.  This same ambiguity will also hinder officers and agents from conducting consensual encounters. Further compounding the practical infeasibility of the order as written, the requirement in

7

the TRO that the defendants can only detain individuals if they have "reasonable suspicion that the person to be stopped is within the United States in violation of immigration law" does not specify which "laws" it contemplates. This is particularly relevant in those situations in which CBP engages in immigration enforcement activities and someone (regardless of citizenship) damages federal property or assaults a federal officer. It is unclear if "detentive stops" relating to such enforcement activities that are adjacent or incidental to immigration enforcement are covered by the order.

15.    The resulting uncertainty about what the law allows can cause agents and officers to hesitate in the field, which can have tragic consequences. This danger is magnified exponentially in the volatile and extremely uncertain environment agents and officers are facing.

16.    The level of and propensity for violence against our agents and officers are at levels never before seen by CBP. Agents have encountered large-scale protests that turned violent outside of federal buildings in downtown Los Angeles, crowds of rioters descending within minutes of CBP agents and officers arriving at a specific location, and growing violence. On June 7, 2025, in the city of Paramount, crowds in the hundreds amassed at our location and began launching various projectiles at us while we were staged at a HSI facility.

17.    Our agents and officers have been assaulted regularly. Often,

8

immediately upon arriving at a particular location, large crowds of people quickly descend on CBP agents and officers. The crowds can amass in numbers upwards of 50-100 people. Crowd members routinely throw rocks, chunks of concrete, frozen water bottles, and other dangerous projectiles at agents and officers. In some of the incidents, such as the Paramount incident, these projectiles have included Molotov cocktails and professional fireworks. CBP agents and officers have been punched, kicked, tackled, and even bitten by some individuals. On July 10th, while executing a criminal warrant on a marijuana grow operation, more than 500 rioters attempted to disrupt operations, damaged government vehicles, and an individual was captured on video firing what looked like a pistol at federal law enforcement. This behavior emboldens others to act in the same manner.

18.    In addition to direct assaults, agents and officers have also faced extensive incidents of vandalism and sabotage. CBP vehicles have sustained extensive damage from thrown projectiles, graffiti, and have had their tires intentionally slashed or spiked. In one instance, a government vehicle was stolen from a parking lot. This also places the detainees in danger as they are passengers within the transport vans that have been rocked and have had their tires slashed. The unruly protests have blocked roadways delaying time in custody for detainees and placing them in danger and delaying custodial requirements. These acts have directly impacted operational effectiveness and placed personnel at further risk as

9

such acts hinder agents, officers, and the public from promptly exiting hazardous situations.

19.    Compounding these issues, agents have received credible threats targeting them and their families, prompting several to relocate their lodging for safety. There are multiple groups on social media outlets including Reddit, TikTok, Instagram, and NextDoor forums, such as No Sleep for ICE, that are focused on posting locations, photos, and personal information of officers and agents, attempting to discover their identities, and encouraging people to violence against agents and officers. These efforts have included photographing license plates on personal vehicles entering and exiting federal facilities, encouraging tow companies to tow government vehicles, identifying lodging and staging locations, and organizing efforts to disrupt enforcement operations with violence. A newly created app called ICEblock features real-time tracking of CBP and ICE agents, allowing the public to report sightings of agents and officers and notifying those intent on violence of locations to descend upon. These threats extend the danger to agents and officers beyond duty hours. As a result, agents and officers have donned masks to protect their personal identities from doxxing for the safety of themselves and their families.

20.    Due to sanctuary jurisdiction policies, CBP and its federal partners receive little support from state and local law enforcement due to prohibitions in

10

California and local law.  This lack of aid increases the risk for officers in the field. The court's order introduces confusion into operations where agents and officers are already putting their lives at risk.

21.    Although the agency has not yet been ordered to implement additional training and guidance for agents and officers on developing reasonable suspicion, the practical effect of this order is that it will require the development of new training protocols.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 14th day of July 2025.

Daniel I. Parra
Deputy Chief Patrol Agent
DHS CBP, El Centro Sector

11

ER-0140

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

PEDRO VASQUEZ PERDOMO; *et al.*,

                         Plaintiffs,

      v.

KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY; *et al.*,

                         Defendants.

Case No.:  2:25-cv-05605-MEMF-SP

**[PROPOSED ORDER] GRANTING DEFENDANTS' *EX PARTE* APPLICATION FOR STAY OF ORDER GRANTING TEMPORARY RESTRAINING ORDER (Dkt. 87)**

On July 3, 2025, Plaintiffs filed an Ex Parte Application for a Temporary Restraining Order.[1] Plaintiffs asked for injunctive relief instructing Defendants to cease conducting detentive stops related to U.S. immigration law in which reasonable suspicion is developed by relying solely on the factors below, alone or in combination, except as permitted by law:

    a.  Apparent race or ethnicity;

    b.  Speaking Spanish or Speaking English with a Spanish accent;

---

[1] ECF No. 45.

1

c.  Presence at a particular location (e.g. bus stop, car wash, tow yard, day laborer pick up site, agricultural site, etc.); or

d.  The type of work one does.

Defendants request that this Court stay its Order granting Plaintiffs' Ex Parte Application and have concurrently sought stay pending appeal in the United States District Court for the Ninth Circuit at the same time as this renewed motion for stay.

The Court, having considered Defendants' Ex Parte Application for Stay of Order Granting Temporary Restraining Order and finding good cause therefor, hereby **GRANTS** the Application and **ORDERS** as follows:

1.  That this Court's order of July 11, 2025, ECF No. 87, is **STAYED** until the mandate of the United States Court of Appeals for the Ninth Circuit is sent down in Respondents–Defendants' appeal of that order.

IT IS SO ORDERED.

Dated: July __, 2022

_____

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge

2

ER-0142

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| PEDRO VASQUEZ PERDOMO, ET AL, | ) | CASE NO: 2:25-cv-05605-MEMF-SPx |
| | ) | |
| Plaintiffs, | ) | CIVIL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| KRISTI NOEM, ET AL, | ) | Thursday, July 10, 2025 |
| | ) | |
| Defendants. | ) | (1:15 p.m. to 3:37 p.m.) |

HEARING RE:

EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER
[DKT.NOs.38,45]

BEFORE THE HONORABLE MAAME EWUSI-MENSAH FRIMPONG,
UNITED STATES DISTRICT JUDGE

**APPEARANCES**:                 See page 2

Court Reporter:          Recorded; CourtSmart

Courtroom Deputy:        Damon Berry

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES:**


For Plaintiffs:                    MARK D. ROSENBAUM, ESQ.
                                   REBECCA S. BROWN, ESQ.
                                   Public Counsel
                                   610 S. Ardmore Ave.
                                   Los Angeles, CA 90005
                                   213-385-2977

                                   MATTHEW J. CRAIG, ESQ.
                                   Hecker Fink
                                   1150 S. Olive St.
                                   Suite 10-140
                                   Los Angeles, CA 90015
                                   212-763-0883

                                   ANNE LAI, ESQ.
                                   UCI Law Clinic
                                   P.O. Box 5479
                                   Irvine, CA 92616
                                   949-824-9894

                                   STACY E. TOLCHIN, ESQ.
                                   Law Offices of Stacy Tolchin
                                   776 E. Green St.
                                   Suite 210
                                   Pasadena, CA 91101
                                   213-622-7450

                                   ALVARO M. HUERTA, ESQ.
                                   Immigration Defenders Law Center
                                   634 S. Spring St.
                                   10th Floor
                                   Los Angeles, CA 90014
                                   213-338-7542

                                   DAE KEUN KWON, ESQ.
                                   DIANA SANCHEZ, ESQ.
                                   MAYRA B. JOACHIN, ESQ.
                                   MOHAMMAD K. TAJSAR, ESQ.
                                   STEPHANIE PADILLA, ESQ.
                                   ACLU of Southern California
                                   1313 West 8th St.
                                   Suite 200
                                   Los Angeles, CA 90017
                                   213-977-9500

ER-0144

3

**APPEARANCES:**                    (CONTINUED)


For Defendants:              AUSA PAULINE H. ALARCON
                             AUSA ALEXANDER L. FARRELL
                             U.S. Attorney's Office
                             300 N. Los Angeles Street
                             Suite 7516
                             Los Angeles, CA 90012
                             213-894-3992
                             213-894-5557


                             SEAN SKEDZIELEWSKI, ESQ.
                             U.S. Department of Justice Civil Div.
                             950 Pennsylvania Ave. NW
                             Washington, DC 20530
                             202-307-1697

For Intervenors:             JOHN L. SCHWAB, ESQ.
                             WENDY Q. XIAO, ESQ.
                             Munger Tolles & Olson
                             355 S. Grand Ave.
                             50th Floor
                             Los Angeles, CA 90071
                             213-683-9100


                             LILIANA CAMPOS, ESQ.
                             NICOLE A. DAVIS TINKHAM, ESQ.
                             BRIGIT G. ALVAREZ, ESQ.
                             Office of the County Counsel
                             648 Kenneth Hahn Hall of Admin.
                             500 West Temple Street
                             6th Floor
                             Los Angeles, CA 90012
                             213-808-8729


                             MARIA L. COUSINEAU, ESQ.
                             Office of the LA City Attorney
                             Public Rights Branch
                             201 N. Figueroa St.
                             13th Floor
                             Los Angeles, CA 90012
                             213-978-8080

ER-0145

4

**APPEARANCES:**                    (CONTINUED)


For Intervenors:              ANDREW K. AARONIAN, ESQ.
                              ARNOLD F. LEE, ESQ.
                              MICHELE B. BAGNERIS, ESQ.
                              Pasadena City Attorney's Office
                              100 N. Garfield Ave.
                              Room N210
                              Pasadena, CA 91101
                              626-744-4141


Also present:                 COUNCILMEMBER STEVE MADISON

                              MICHAEL J. DUNDAS, ESQ.
                              Los Angeles City Attorney's Office
                              City Hall East
                              200 N. Main Street
                              Suite 800
                              Los Angeles, CA 90012
                              213-978-8130

                              VALERIE L. FLORES, ESQ.
                              Office of the LA City Attorney
                              200 N. Spring Street
                              21st Floor
                              Los Angeles, CA 90012
                              213-978-7178

5

 1       **Los Angeles, California; Thursday, July 10, 2025; 1:15 p.m.**

 2                          **(Call to Order)**

 3       **THE CLERK:**  Face the flag.  In the presence of the

 4   flag emblematic of the constitution and remembering the

 5   principals for which it stands, this United States District

 6   Court for the Central District of California is now in session,

 7   the Honorable Maame Ewusi-Mensah Frimpong, United States

 8   District Judge, presiding.  You may be seated.

 9           Now calling item number 2, case number LA CV 25-

10   05605, *Pedro Vasquez Perdomo, et al., versus Kristi Noem, et*

11   *al.*

12           Counsel, please stand and state your appearances.

13       **MR. ROSENBAUM:**  Good afternoon, Your Honor, Mark

14   Rosenbaum on behalf of plaintiffs from Public Counsel.

15       **MR. CRAIG:**  Matthew Craig from Hecker Fink LLP for

16   plaintiffs.

17       **MS. BROWN:**  Rebecca Brown, Public Counsel, for

18   plaintiffs.

19       **MR. TAJSAR:**  Mohammad Tajsar, ASA of Southern

20   California for the plaintiffs.  Thank you.

21       **MS. LAI:**  Your Honor, Anne Lai from the UCI Law

22   Clinics for the plaintiffs.

23       **MS. JOACHIN:**  Mayra Joachin, ACLU of Southern

24   California for the plaintiffs.

25       **MS. TOLCHIN:**  Good afternoon, Your Honor Stacy

6

1    Tolchin for the plaintiff.

2         **MR. HUERTA:**  Good afternoon, Your Honor, Alvaro

3    Huerta for the plaintiffs.

4         **MR. KWON:**  Good afternoon, Your Honor, Dae Keun Kwon,

5    ACLU So. Cal. for the plaintiffs.

6         **MS. SANCHEZ:**  Good afternoon, Your Honor, Diana

7    Sanchez for the plaintiffs.

8         **MS. PADILLA:**  Good afternoon, Your Honor, Stephanie

9    Padilla for the plaintiffs, ACLU So. Cal.

10        **MS. ALARCON:**  Good afternoon, Assistant United States

11   Attorney Pauline Alarcon on behalf of respondents/defendants.

12        **MR. FARRELL:**  Good afternoon, Assistant United States

13   Attorney Alexander Farrell on behalf of the defendants and

14   respondents.

15        **MR. SKEDZIELEWSKI:**  Good afternoon, Your Honor, Sean

16   Skedzielewski, Assistant -- counsel to the Assistant Attorney

17   General from the Department of Justice on behalf of all

18   defendants.

19        **MR. SCHWAB:**  Good afternoon, Your Honor, John Schwab,

20   Munger Tolles and Olson, on behalf of the proposed intervenors.

21        **MS. XIAO:**  Good afternoon, Your Honor, Wendy Xiao

22   from Munger Tolles and Olson on behalf of the proposed

23   intervenors.

24        **MS. BAGNERIS:**  Good afternoon, Your Honor, Michele

25   Beal Bagneris, Pasadena City Attorney, on behalf of proposed

7

 1   intervenor, City of Pasadena.

 2          **MS. ALVAREZ:**  Good afternoon, Your Honor, Deputy

 3   County Counsel, Brigit Greeson Alvarez, on behalf of proposed

 4   intervenors, County of Los Angeles.

 5          **MS. CAMPOS:**  Good afternoon, Your Honor, Liliana

 6   Campos, Assistant County Counsel, for proposed intervenor,

 7   County of Los Angeles.

 8          **MS. TINKHAM:**  Hello, good afternoon, Your Honor,

 9   Nicole Davis Tinkham with County Counsel, on behalf of proposed

10   intervenor, County of Los Angeles.  Thank you.

11          **MR. LEE:**  Good afternoon, Your Honor, Arnold Lee,

12   Chief Assistant City Attorney for City of Pasadena on behalf of

13   proposed intervenor, City of Pasadena.  And with me is council

14   member Steve Madison of the City of Pasadena.

15          **MR. MADISON:**  Good afternoon, Your Honor.

16          **MS. COUSINEAU:**  Good afternoon, Your Honor, Deputy

17   City Attorney, Maria Louise Cousineau, on behalf of proposed

18   intervenors, the City of Los Angeles.

19          **MR. AARONIAN:**  Good afternoon, Your Honor, Andrew

20   Aaronian, Deputy City Attorney for City of Pasadena on behalf

21   of proposed intervenor, City of Pasadena.

22          **MR. DUNDAS:**  Good afternoon, Your Honor, Chief

23   Assistant City Attorney, Michael Dundas, on behalf of proposed

24   intervenor, City of Los Angeles.

25          **MS. FLORES:**  Good afternoon, Your Honor, Valerie

8

1    Flores, Chief Deputy City Attorney, City of Los Angeles, on

2    behalf of proposed intervenor, City of Los Angeles.

3            **THE COURT:**  Good afternoon to all counsel.

4            There were a couple of counsel who identified

5    themselves who I'm not sure that they're on the docket, so I

6    will just have you address that with Mr. Berry at the end.

7    That's Ms. Flores, Ms. Cousineau, and Mr. -- didn't quite get

8    your name.

9            **MR. DUNDAS:**  Mr. Dundas.

10            **THE COURT:**  Dundas.  Okay.  So you can address with

11    Mr. Berry getting on the docket.

12            And I do want to thank everybody for being here.  We

13    gave you a little bit more time in light of the delay with the

14    tentative and we're ready to go.

15            I do also want to welcome everyone in the gallery and

16    everyone who is watching in the overflow courtroom.  It is

17    truly a delight to have you all here.  I often say that in the

18    courtroom I sit above everybody, but I am really here to serve

19    you, this is you're courtroom, and it is a great honor of mine

20    to serve the people of the Central District.

21            The courts are one of the pillars of our democracy,

22    but most people don't get to see what we do and how we do it,

23    and so I'm privileged to have all of you with me today, and I

24    welcome you.

25            This is not my regular courtroom, but it's a

9

1   beautiful courtroom that can accommodate all of us today.  This

2   is what we refer to as our ceremonial courtroom and it has

3   portraits of the chief judges on whose shoulders I and my

4   colleagues stand starting from the earliest at the back and

5   moving counterclockwise.

6         Okay.  So with that we will begin.  Counsel, I

7   understand that you have received the Court's tentative, and I

8   will collect those from you at the end of the hearing.

9         It is my practice and a practice shared by many of my

10  colleagues here and those across the street in the Superior

11  Court, to provide you with a tentative.  The purpose of the

12  tentative is to give you an understanding of how I see the case

13  based upon the papers alone, but it is truly a tentative, it is

14  not final, there are plenty of times where I change my mind

15  based upon the arguments, so I want that to be clear.

16        And as you saw on the tentative itself, it's not to

17  be copied, it's not to be distributed, it's not to be used as

18  an exhibit, and you'll return it at the end of the hearing.

19        Okay.  And as I advised you this morning, my plan is

20  to -- just to keep this orderly and so we're not here late into

21  the evening, to allot 20 minutes per side for the access

22  detention TRO, that is the TRO concerning access to counsel at

23  B-18 and then 40 minutes per side for the other TRO concerning

24  the various stops and arrests and detentions.

25        I did want to address at the beginning, the

10

1    intervenors -- proposed intervenors had made a request to

2    participate, that was unopposed, and that the Court granted.  I

3    don't know whose speaking on behalf of the intervenors.  Okay.

4         So the request to my recollection did not specify

5    exactly how you wanted to participate, so my understanding was

6    you wanted to be present, sit at the equivalent of counsel

7    table and weigh in if the Court had questions that were

8    specific to you.

9         If however what you intended to do was assert some of

10   your own arguments either in favor of either TRO or to make

11   additional arguments, for instance, as to public interest or

12   the other Winter factors, I will just advise you that I would

13   need of course to give the Government a chance to respond.

14        My intention coming into this hearing given the

15   urgency and the weight of the matters at issue was to issue my

16   ruling tomorrow, which if I allow you to make arguments today

17   and I allow the Government a chance to respond I won't be able

18   to do.

19        So I just wanted to confirm that my original

20   understanding, which is you mainly just wanted to be present,

21   is accurate.

22        **MR. SCHWAB:**  Your Honor, we did originally intend to

23   ask you to actually be heard on a small number of issues that

24   we think are in support of plaintiffs' position here and

25   frankly in support of the tentative.  I hear the Court say that

ER-0152

11

1   that might be a problem for the Court to issue this quickly if

2   that is the case.

3           We think the most important thing is for this relief

4   to be issued as quickly as possible, and so we would not make

5   those arguments if that's what I'm understanding correctly.

6           **THE COURT:**  Yes.  Obviously as I said this is just a

7   tentative, so it may be that I deny the TRO, but if I am to

8   hear new arguments from you that are not in the papers,

9   obviously the Government needs an opportunity to respond and I

10  need a chance to consider them.  So either way I wouldn't be

11  able to issue my ruling tomorrow.

12          So I trust that with that you don't need to be heard

13  today?

14          **MR. SCHWAB:**  Unless the Court has questions or if

15  there's anything the Court thinks would be helpful we do not

16  need to be heard.

17          **THE COURT:**  Okay.  Thank you, I appreciate it.

18          **MR. SCHWAB:**  Thank you, Your Honor.

19          **THE COURT:**  Okay.  With that shall we begin?

20          It is the plaintiffs' motion, so I will let the

21  plaintiffs be heard first, and whoever is speaking on behalf of

22  plaintiffs with respect to what in my head I've been referring

23  to as the access to counsel TRO can take the podium.

24          And I will advise counsel that there is a button to

25  the right of the microphone at the podium that you can use to

12

1   raise or lower the podium if you need to.

2        **MR. ROSENBAUM:**  Good afternoon again, Your Honor,

3   Mark Rosenbaum on behalf of plaintiffs.

4        Your Honor, I want to begin by stating what I'm sure

5   all counsel in this courtroom believe, and that is to say thank

6   you to Your Honor and to your staff for what is clearly the

7   hard work and diligent review of all the papers that were

8   presented.  It is an urgent matter and I know all of us on both

9   sides appreciate the diligence and concern that Your Honor put

10  into these tentatives.

11       I don't have a lot to add to Your Honor's tentative,

12  I want to make just a few comments and then perhaps reserve my

13  right to rebuttal with respect to any points that the

14  Government makes.

15       **THE COURT:**  Absolutely.

16       **MR. ROSENBAUM:**  Your Honor, with respect to the

17  access to counsel, we believe Your Honor has stated the germane

18  cases here.

19       The truth is that there's really not any argument by

20  the Government as to the nature or character of that right, and

21  the way cases like Orantes and Reyes Barrios control this

22  particular matter.

23       In this context this right of access to counsel is

24  the right that is preservative of all rights for our clients,

25  and one would expect that the Government, the Federal

ER-0154

13

1    Government here would bend over backwards to make certain that

2    that right was honored.

3        I want to make specific comment to Your Honor's

4    discussion at pages 23 and 24 of the tentative.  That is it

5    where Your Honor discusses a number of matters with respect to

6    what happened on June 7th, and I want to emphasize a few

7    points.

8        To begin with the declaration submitted by the

9    Government, the Federal Government -- I'm going to call them

10   the Government unless I'm referring to the city -- the

11   argument -- the declaration submitted by the Federal

12   Government, the Uyeda declaration, U-Y-E-D-A, two-page

13   declaration, what's noteworthy about that declaration, Your

14   Honor doesn't refer to it on those pages, nor could Your Honor

15   refer to it on those two pages, because it doesn't reference

16   this incident at all.

17       That is remarkable, Your Honor, that an episode where

18   there are lawyers present and family members present in order

19   to attempt to provide these detainees who are housed in a

20   basement with a knowledge of their basic rights and the

21   response by the Government and the evidence is undisputed

22   referring specifically to the Thompson-Lleres (sic),

23   L-L-E-R-E-S, declaration at paragraph 7, that at that moment,

24   at 8:30 in the morning there was no demonstration in downtown

25   Los Angeles.  The nearest demonstration was Paramount, 20 miles

14

1    away, and that is not acknowledged.

2         But even more significantly Your Honor describes two

3    events that took place.  I believe these events are

4    unprecedented in American history.  That is while detainees

5    were being driven out of that B-18 facility, what the

6    Government did were two things.  The lawyers from IMDEF and

7    CHIRLA, who had not had any access to these individuals, seeing

8    them driving out attempted to shout out basic rights.  Nothing

9    complicated, you have a right to an attorney.  If you fear

10   going back to your country you can apply for asylum.  One would

11   expect the Government to want these detainees to know what

12   their basic rights were.

13        But two things happened.  One is that the drivers of

14   those vans began blaring their horns, honking those horns

15   loudly so the expression of those basic rights could not be

16   heard by any of the detainees.

17        And then shortly thereafter as Your Honor notes, a

18   chemical that caused burning in the eyes and the ears and the

19   nose of those individuals, lawyers, began to burn.  A

20   Government agent did that.

21        Now, what's remarkable is one, that's never

22   acknowledged in the Uyeda declaration, but at pages -- at 4,

23   lines 21 and 22 of the Government's brief, the opposition

24   brief, those drivers that -- and that individual, Government

25   agent who sent out the chemical, I'll refer to, quote, as

15

1    unknown.  How can that be?  How could the Government not take

2    steps to examine what had happened and why it occurred?

3           Now, with all respect, Your Honor, I believe the

4    Court was too generous in suggesting that there may be an

5    innocent explanation.  I will be interested to hear Government

6    counsel, because they didn't do it in their brief and it wasn't

7    in the declaration, I will be interested to hear what that

8    justification is.

9           But here's the reasonable inference, Your Honor.

10   This didn't have anything to do with security, this didn't have

11   anything to do with the pretext that the Government was

12   utilizing.  This was an attempt to make certain that those

13   individuals did not know their rights, and those individuals

14   were ping-ponged back and forth from Santa Ana.  But I think

15   those two episodes, they are the tells as to what the

16   Government's intent was all along, and that was to make sure

17   that these individuals had no awareness of their rights.

18          And Your Honor will recall that the case law in

19   this --

20          **THE COURT:**  If I might interrupt.  Can you address

21   the question of whether in order to find for the plaintiffs

22   with respect to these access to counsel issues the Court needs

23   to find that this was the intent of the Government or not?

24          **MR. ROSENBAUM:**  No.

25          **THE COURT:**  If you could address that that would be

EXCEPTIONAL REPORTING SERVICES, INC

16

1    helpful.  And then please move on.

2          MR. ROSENBAUM:  I'm pleased to address it.  I think

3    the Court got it exactly right, it's not germane.  The issue is

4    whether or not they in fact had access to counsel, access to

5    learn what their rights were, that's the end of the story.

6          THE COURT:  And is there a case that you would cite

7    to for that point?

8          MR. ROSENBAUM:  Oh, goodness.  The Orantes case.  I

9    have to confess, Your Honor, I am biased with respect to that

10   case.  I was the lead trial lawyer in the case 36 years ago, I

11   argued that case to the Nineth circuit 35 years ago.  I

12   probably shouldn't have admitted that.

13       (Laughter)

14          MR. ROSENBAUM:  But I want to say about Orantes, that

15   case was tried before Judge Kennon, a great judge, and the

16   denial of access to counsel was no worse in that case than it

17   is here.

18          In fact if Your Honor looks at page 554 of that

19   decision that's where the court generally -- generously

20   describes -- properly describes that it's a fundamental right,

21   and at page 565 of that decision the Ninth Circuit unanimously

22   said what that right encompasses, how it was being violated,

23   and that included denial of learning about the fact that

24   attorneys are available, that there was privacy -- that there

25   was no privacy for individuals to be able to consult with their

17

1   lawyers.  Precisely the situation in this case, and that is

2   reenforced by the other cases that appear in Your Honor's

3   ruling.  Reyes Barrios which talks about the critical moments.

4   This is at the beginning of their custody.

5          We know from, for example, the Toczylowski

6   supplemental declaration, paragraphs 4 through 9 and 12 and 13,

7   a lot was going on inside that building.  Individuals were

8   being processed, individuals were not being able to have any

9   meaningful contact with counsel who were standing there

10  available to talk to them.

11         Which goes to another point, Your Honor.  That is if

12  when this episode happened there's nothing in the record from

13  the Government that the Government said to the individuals in

14  those vans, hey, we want you to know that there were lawyers

15  there, that there are lawyers who want to talk to you, that

16  there are lawyers who think it's important that you know your

17  rights.  Wouldn't that have been the reasonable thing to do if

18  in fact the Government genuinely cared that that access be

19  delivered?

20         Now again, I want to repeat, I agree with the Court

21  that you don't need to find intent even if somehow this was

22  inadvertent, that's sufficient because of the paramount nature

23  of this right and the urgency of that situation.

24         But common sense tells us that you don't blare those

25  horns and you don't put chemicals at the feet of lawyers unless

18

1  you're trying to deliver a message, and that message was

2  delivered.

3          Something else I want to say about that.  Between

4  June 6th and June 13th and between June 14th and June 17th and

5  then June 23 and 24, our clients, the detainees, they were

6  ping-ponged back and forth to Santa Ana, but that fact would

7  not prevent the Government from taking care of what was inside

8  that basement.

9          Did anyone think to say during that time, because

10 people were staying there 5 days, 7 days, 12 days, record is

11 undisputed with respect to that, anyone think to -- and they

12 were in cell blocks with as many as 60 individuals -- anyone

13 from the Government think to say we ought to get some food

14 instead of frozen burritos and a sandwich sporadically given

15 them instead of juice box given them?  Anyone think to say

16 during that period of time, we ought to put a bed in here or

17 some beds in here so individuals don't have to lean against a

18 wall or somehow lie down on a cold floor in a basement?

19          **THE COURT:**  If I could interrupt you, counsel.

20          Just because I'm not sure that those issues which are

21 addressed are necessarily among the ones that the Court needs

22 to focus on in deciding whether to grant this TRO with respect

23 to access to counsel, and correct me if I'm wrong about that.

24          **MR. ROSENBAUM:**  I want to make two points with

25 respect to that.

19

1          **THE COURT:**  Okay.  And then I did want you to

2    address, because this came up in the Government's papers, I did

3    want you to also address what you understand the current state

4    of affairs to be.

5          **MR. ROSENBAUM:**  Okay.

6          **THE COURT:**  Thank you.  Go ahead.

7          **MR. ROSENBAUM:**  I'm glad to do that.

8          First with respect to -- we did not bring this TRO to

9    deal with those conditions themselves.  I raise those

10   conditions because they are germane, they add to the Court's

11   reasoning with respect to the coercive nature of the situation

12   that these individuals found themselves.

13         Again the Toczylowski supplemental declaration

14   specifically talks about the fact that individuals were saying

15   I'm going to take voluntary departure, because it's really not

16   voluntary, I haven't spoken to a lawyer, these conditions are

17   too much.

18         So for that limited purpose, Your Honor, I raise it,

19   it's not necessary to the Court's decision, even if they were

20   at the Hyatt Regency what the Government did was still a

21   constitutional denial.  But they weren't at the Hyatt Regency,

22   they were in a dank basement and they were dealing with some of

23   the most issues in their lives and the lives of their family.

24         Let me turn to the other question that Your Honor

25   raised, that Your Honor dealt with it quite persuasively in the

20

1   decision itself, but let me specifically talk.

2          The Government's argument is everything is great.

3   Had a rough time at the beginning, but everyone is great now.

4   Hardly.

5          The record in this case demonstrates that the denial

6   of access to counsel can be achieved not just by shutting the

7   doors, by putting a handwritten sign that says all appointments

8   canceled, but it can be denied some might say even more

9   dangerously by opening those doors and not provide counsel an

10  opportunity to speak with these individuals, not inform these

11  individuals that counsel were there.

12         And here are some of the facts.  Again Your Honor

13  quite eloquently described them, but let me just review some of

14  them for you.

15         For example, it is undisputed with respect to the

16  telephones, which is what they hold onto the most, that

17  telephones are not a surrogate for access to counsel, but it's

18  part of the process, it's one of the things that, for example,

19  the Orantes specifically discussed.  But what was the story

20  with these telephones?  The Government says, well there's a

21  telephone in every cell block, maybe six to seven cell block

22  ins that basement.  What they don't say is that there were 50,

23  60 individuals in those cell blocks.  These were not -- this

24  was not a situation where individuals could have confidential

25  conversations, this is an open room filled with other

**EXCEPTIONAL REPORTING SERVICES, INC**

21

1   individuals.

2          And what's so telling about Ms. Uyeda declaration, is

3   that she mentions the telephone, she doesn't mention how many

4   people were in the room, she doesn't mention what those

5   circumstances were, and she also doesn't say that these

6   telephone calls were not monitored.  She doesn't say that they

7   were confidential.  They couldn't have been any way because

8   they -- it was such a public space.

9          But you'd think if it were true they would have added

10  that all such phone calls were confidential the way

11  attorney/client conversations, the way detention standards

12  talk, the way the Bureau of Prisons operates, that's not part

13  of the record itself.

14          **THE COURT:**  And I'll just advice you counsel, you

15  have about three minutes left in your time if you wanted to

16  leave any time for rebuttal.

17          **MR. ROSENBAUM:**  All right, let me just quickly say

18  with respect to other matters that what the undisputed record

19  also reflects, and now I'm referring to the requirement that an

20  A number be provided, when in fact the undisputed record is

21  that it was not provided expeditiously, even though that

22  typically accompanies the arrest of an individual, and what the

23  record reflects and there's a whole -- all the declarations we

24  filed yesterday, Stea (phonetic) and Duran and Thompson-Lleras

25  and the Toczylowski, what they all show is that the Government

22

1  did not know who was in that room, who was in that detention

2  facility, that the Government did not know where individuals

3  were, that the -- some Government agents thought it was above

4  their pay level to in fact provide that sort of information,

5  and that is a denial of access to counsel as dramatic, as

6  unconstitutional as in fact closing the door.

7          If I have any time left I'd like to reserve it for

8  rebuttal.

9          **THE COURT:**  Thank you.

10         And I'll hear from Government counsel.  And the

11 button may be hidden by the tissue box.  Yeah.  Thank you.

12         **MR. SKEDZIELEWSKI:**  May it please the Court, Sean

13 Skedzielewski on behalf of all defendants in their official

14 capacity.

15         Plaintiffs' ex parte application prepared weeks in

16 advance and following the eve of a federal holiday alleging

17 misconduct from a month ago is exactly the type of abusive

18 practice courts in this district have previously rejected, it

19 should do so again here.

20         But procedural defects aside, Your Honor, plaintiffs'

21 claims also fail because they have not alleged facts sufficient

22 to show a violation of either the Fifth or Fourth Amendments --

23 we'll focus on the Fifth here -- but before reaching the merits

24 this Court should deny plaintiffs' request for lack of

25 jurisdiction due to their lack of standing.

**EXCEPTIONAL REPORTING SERVICES, INC**

23

```
 1              The first request for a temporary restraining order
 2     filed on July 2nd concerns organizational plaintiffs' coalition
 3     for humane immigrant rights and immigrant defenders claims
 4     under the Fifth Amendment that stem from their desire for
 5     access to the temporary detention facility, B-18, located at
 6     300 North Los Angeles Street.  But access to B-18 is no longer
 7     under any restrictions, and has been operating on its normal
 8     schedule since June 24th.  It's operating hours were only
 9     modified because of riots immediately outside of the facility.
10     And I'd like sort of address the way that plaintiffs' counsel
11     characterized those events outside of B-18.
12              They emphasize that there were no demonstrations on
13     the morning of June 7th, but their own papers can see that
14     later in that day there were.
15              Plaintiffs were evacuated that morning as well
16     because the riots the previous day were so severe that the
17     agency who managed that facility had a genuine fear that the
18     facility would be breached by rioters.  And I'm not using the
19     word rioter inadvisable, there were assaults on federal, state,
20     and local law enforcement using rocks, fireworks, and other
21     objects, there was damage to federal property, they were spray
22     painting of death threats on federal property, and so the
23     agency that managed that facility took care to protect federal
24     employees and the detainees themselves who could have been
25     injured had a breach occurred.
```

ER-0165

24

1       I'd also like to mention regarding this incident on

2  the morning of June 7th about the honking of the horn, that

3  declarants clearly knew their rights in many cases based on

4  plaintiffs' papers where they're repeatedly not speaking to law

5  enforcement on the basis of their Fifth Amendment right, but

6  even beyond that there is nothing in the evidence to suggest

7  that these horns weren't being honked for the same reasons

8  they're typically used, which is to ask people to get out of

9  the way and to exit the facility, which to my understanding was

10 blocked.

11       And as the court in the Nineth Circuit recently held,

12 the President likely has -- had authority in these

13 circumstances to federalize the California National Guard and

14 that he likely complied with tenuous Code 12-4-06.

15       These were not minor disruptions, but severe

16 disruptions of the peace that federal agents at B-18 responded

17 to in an entirely appropriate manner to protect the employees

18 and the detainees.

19       Your Honor, the most pertinent facts, once we get

20 interest the details of what happened after June 6th, are as

21 follows.  After the riots on June 6th right outside of the

22 facility B-18 the facility was closed a little bit earlier than

23 usual in the afternoon.

24       Then the facility remained closed on June 7th due to

25 the fluid and unknown prospects fit for that day.

25

1          On June 7th detainees were moved again due to fears

2     that the facility would be breached, and they were moved to

3     Santa Ana.

4          And then so from June 7th to 12th and again from June

5     14th to 16 due to ongoing disturbances the detainees remained

6     at Santa Ana.  They came back -- at one point they went back to

7     Santa Ana.

8          Then on June 24th operations went back to normal,

9     namely the operational hours of 8 a.m. to 4 p.m., 7 days per

10    week.

11         Any changes in access at B-18 during this time were

12    solely for the protection of employees and detainees alike, and

13    did not amount under the law to a violation of anyone's Fifth

14    Amendment rights.

15         So, Your Honor, I'd like if I could to take a moment

16    to discuss the ex parte nature of this proceeding.

17         **THE COURT:**  Before you do that if you could just

18    respond to counsel's arguments that the detainees have not had

19    the ability to have private phone calls, that counsel have not

20    been able to let the detainees know that counsel is available,

21    and that the inability to find out who's there and when they're

22    there also impinges upon the right to counsel.

23         **MR. SKEDZIELEWSKI:**  Absolutely.

24         So, Your Honor, one thing that's mentioned in the

25    declarations -- defendants' declarations -- is that sometimes

**EXCEPTIONAL REPORTING SERVICES, INC**

ER-0167

26

1   detainees will misstate their names either to ICE agents in the

2   field or to agents at B-19 (sic), making it very difficult when

3   attorneys appear at the facility to then locate -- and the

4   attorneys are using their correct name, the agents have a false

5   name, it creates a logistical problem, it's not any intent on

6   the part of ats in the facility to deny them access to their

7   attorneys.

8            As far as the --

9            **THE COURT:**  So it's --

10           **MR. SKEDZIELEWSKI:**  Yes, Your Honor.

11           **THE COURT:**  And counsel, so it's your understanding

12   that to the extent that -- because as you've noted the

13   plaintiffs point to numerous examples where counsel had

14   difficulty identifying their clients or people that they knew

15   that were there.  It's your understanding that for the most

16   part that was due to those individuals giving false names?

17           **MR. SKEDZIELEWSKI:**  I don't want to overreach and say

18   that was in every case, Your Honor, but that is a common

19   occurrence at this facility.

20           **THE COURT:**  Okay.

21           **MR. SKEDZIELEWSKI:**  And then in addressing Your

22   Honor's question about the privacy of the conversations.  While

23   there is 24-hour telephone access in each room of B-18, there

24   are also two private attorney/client spaces for confidential

25   meetings.  So this an opportunity, if a private conversation is

27

1   needed, to have one.

2          But again, I'd also like to emphasize the temporary

3   nature of the B-18 facility.  Certainly access to counsel is

4   not denied, a detainee can retain counsel while there, and then

5   once he's -- once he or she has been transferred to a different

6   facility may then be able to have a much more fulsome

7   discussion with counsel.  But no one is intended to be kept at

8   B-18 for months on end and no one has been.

9          So just returning if I could to the -- if that

10  satisfied Your Honor's questions.

11         **THE COURT:**  Yes.

12         **MR. SKEDZIELEWSKI:**  To the ex parte posture here.

13         Plaintiffs have to make a showing on two fronts.

14  First that they'll be irreparably prejudiced if the underlying

15  motion is heard according to the regular notice motion

16  procedures as required by the federal rules, and here

17  plaintiffs' Fifth Amendment allegations principally stem from,

18  as we've been discussing, events that occurred at this point a

19  month ago, and so any emergency warranting the shortened

20  schedule with a limited record has long passed.

21         The second prong of that test --

22         **THE COURT:**  Could I ask -- sorry, counsel.

23         **MR. SKEDZIELEWSKI:**  Yes.

24         **THE COURT:**  Could I ask, so it's the Court's

25  understanding that -- I guess two questions that I have -- it's

28

1   the Court's understanding that the Government's position is

2   that the plaintiffs needed to meet the mission power

3   requirements in addition to the standard for a TRO.  So if you

4   could speak to what authority suggests that.

5          And then if you could speak to the prejudice to the

6   Government in particular what you would have done with more

7   time.  Thank you.

8          **MR. SKEDZIELEWSKI:**  Yes, Your Honor.

9          So I understand that mission power is Southern

10  District, so it's not a controlling precedent here, Your Honor,

11  but this Court I believe as it mentioned in its tentative has

12  relied on it in the past and it is within the Court's

13  discretion to rely on it.  To the extent that the Court finds

14  that precedent persuasive I would just like to emphasize that

15  the second prong which requires or suggests that plaintiffs

16  need to show that they're without fault in creating the crisis

17  that they seek relief from.

18         And so as far as timing goes the nature for the -- or

19  the request for immediate relief, you know, was only days'

20  worth of time for the parties to review the record, that's the

21  crisis that I think is created by the plaintiffs' choice to

22  file this proceeding on the evening of a federal holiday.

23         And this is not just prejudice to the defendants,

24  Your Honor, it's prejudice to the Court who now has the

25  difficult prospect of having to make a decision in a tough case

29

 1  with a much more limited record than it would otherwise be

 2  provided at the preliminary injunction stage, and that leads me

 3  to your other question about what else the Government could or

 4  would provide.

 5        I'll just say this, because without committing the

 6  Government to anything in particular, which is that in

 7  conversations with the agencies there are a lot more facts to

 8  these scenarios that are alleged than we've been able for get

 9  into the record on this shortened timeline.  Without being able

10  to confer and find out exactly what they are I can't say for

11  sure, but I know based on various conversations that there are

12  we would like to say a lot more than we've said here today.

13        So if I could next address the issue of standing.

14  Plaintiffs are looking for affirmative relief in the form of a

15  prospective injunction, and they lack standing there because

16  there's no evidence that the riots that occurred at B-18 on the

17  6th will recur.  It's an extremely unusual circumstance.

18  There's -- to my knowledge there haven't been riots at B-18

19  before and we have no proof that there or really even evidence

20  to suggest there will be any there again.

21        **THE COURT:**  And if I could interrupt you.  I think

22  plaintiffs first of all would challenge the idea that what

23  they're complaining of was -- Mr. Rosenbaum used the word

24  pretext, that may be a bit strong -- but that not all of what

25  they complained about was even related to the riots and it

30

1    certainly has continued past the point where there was active

2    unrest out -- and I'm using riots because that's your word --

3    active unrest outside of B-18.

4         So to the extent that the Court also agrees that the

5    issues raised by counsel were not all related to civil unrest

6    outside of B-18, could you address why there is not a

7    likelihood of recurrence?

8         I understand your first argument being that it was

9    mainly all related to this unrest, that unrest was very

10   unusual, not likely to recur and therefore they don't have

11   standing on that ground, but if you could also address this

12   other point that would be helpful.

13        **MR. SKEDZIELEWSKI:**  Certainly, Your Honor.

14        I think one reason we can expect or hope that riots

15   will not recur at B-18 is that the President thankfully called

16   in the California National Guard.

17        **THE COURT:**  Not that point, I think we can move on

18   from the unrest.

19        **MR. SKEDZIELEWSKI:**  Okay.

20        **THE COURT:**  I'm -- what I'm asking about is to the

21   extent that the Court finds that the access to counsel issues

22   were unrelated to the unrest, on what basis would you say that

23   there is no evidence that this could recur and that on that

24   basis the plaintiffs don't have standing?

25        **MR. SKEDZIELEWSKI:**  Certainly, Your Honor.

31

1          **THE COURT:**  Okay.  Thank you.

2          **MR. SKEDZIELEWSKI:**  So as the declarations show that

3    are accompanied with our opposition, there's 24-hour access to

4    telephones in each holding room, there are two private

5    attorney/client rooms for confidential discussions, there are 8

6    hours a day at a reasonable time, 8 a.m. to 4 p.m., 7 days a

7    week during this counsel can visit.  The situation is fluid.

8    Things can come up.  There's not an infinity of room inside

9    this facility, so there could certainly be times where counsel

10   has to wait outside for a period of time before they could

11   enter, but the policy at B-18 is so long as an attorney makes

12   it to the facility before 4 p.m. if they're in line outside the

13   facility will remain open until that attorney gets to enter the

14   facility and speak with their client.

15          During the emergency a month ago that may not have

16   been the case then, but that is the policy on a going forward

17   basis.

18          So plaintiffs' measures to attempt to gain access,

19   just back to the standing point, their attempts to gain access

20   to B-18 when access was limited can't establish their standing

21   organizationally because the harm is not certainly impending

22   since we're looking forward.

23          Even if everything that they've alleged is true and

24   they were, you know, rebuffed from entering, that's not going

25   to happen again, there's no evidence that it will happen again,

ER-0173

32

1    and so this Court should not grant relief on that basis.

2           And they can continue by the way thinking -- you

3    know, plaintiffs have emphasized a lot, and understandably the

4    individuals inside of B-18, but those are not the plaintiffs

5    here, here the plaintiffs are these two organizations and

6    they're free to continue their mission anywhere they like.  If

7    there's a problem at B-18 they can continue their mission

8    anywhere else in the City of Los Angeles.  At best plaintiffs

9    hypothesize about the recurrence of unrest at B-18.

10          In Clapper versus Amnesty International, Your Honor,

11   the plaintiffs there sought relief based on their fear that the

12   Government would illegally target their international telephone

13   calls.

14          The court considered the many different events that

15   would have to occur in order for any harm to come to plaintiffs

16   on that basis, and held that the highly attenuated chain of

17   possibilities does not satisfy the requirement that threatened

18   injury must be certainly impending.

19          And so I would like to just walk through the highly

20   attenuated chain of assumptions that would have to occur in

21   order to plaintiffs to get to an injury in the future that

22   would require prospective injunctive relief.

23          First they would need there to be more riots at B-18.

24   I should rephrase that.  First there have been to be riots,

25   then they would also be -- they have to somehow descend on B-18

33

1     again specifically.

2             Then the LAPD, the California National Guard, and

3     other law enforcement will all have to fail to swiftly quell

4     those riots.

5             Plaintiffs or their members would have to also be

6     present at B-18 at the moment that order happens to break down.

7             Officials inside of B-18 would again have to decide

8     to shut down the facility in response to those riots.

9             And they would then have to deny plaintiffs access to

10    telephone calls or counsel once that decision is made.

11            That's quite the attenuated list of events that

12    plaintiffs have not even attempted to establish as likely to

13    recur.

14            So to address the merits, Your Honor.  To show a

15    Fifth Amendment violation plaintiffs must show that the

16    cumulative effect of the practices of the defendants here was

17    to prevent aliens from contacting counsel and received any

18    legal advice.  That's Orantes-Hernandez.

19            There may have -- while there may have been some

20    impact on detainees at B-18 during the time in question,

21    perhaps while they were in transit from B-18 to Santa Ana and

22    didn't have access to counsel, you know, while in the van, that

23    is not enough to give a cumulative effect that would prevent

24    those individuals from receiving any legal advice.  They are

25    able to receive it before that trip or after that trip or once

34

1    the disruption, which was at most a few days, ends.

2         So a restriction is unreasonable or restriction on

3    Fifth Amendment rights to counsel is unreasonable or excessive

4    relative to the Government's proffered justification.

5         Here the proffered justification couldn't be more

6    serious, namely those disruptions that occurred on June 6th

7    where there was violence perpetrated against all manner of law

8    enforcement.

9         So plaintiffs' leading case Orantes is

10   distinguishable in a number of ways and I'll tick through them

11   very quickly as I know I'm short on time.

12        There plaintiffs were kept far from potential or

13   existing counsel.  As this courtroom demonstrates downtown Los

14   Angeles is full of attorneys.

15        In Orantes the United States Government did not

16   challenge plaintiff's claim that it has limited access to

17   counsel, but here we do challenge that, we vigorously dispute

18   that there with no access to counsel.  And in Orantes the

19   United States conceded that the detention facilities did not

20   have telephones at all.  Here we have a telephone with 24-hour

21   access in every room.

22        There's also -- I'll just mention quickly -- there's

23   mention that in one of the declarations of plaintiffs that

24   detainees at B-18 have to use a system to put money on a card

25   or to make a call, that's not the case.  Every detainee is able

35

1  to make calls for free to their consulates and collect to

2  anyone else in the country.

3          Also the Fifth Amendment claims here are simply not

4  redressable by this order.  If the Court issues the injunction

5  in the tentative --

6          **THE COURT:**  And you have -- you -- sorry, counsel,

7  you have about a minute left, I just wanted to let you know.

8          **MR. SKEDZIELEWSKI:**  Certainly.

9          **THE COURT:**  Yes.

10          **MR. SKEDZIELEWSKI:**  If the Court issues the tentative

11  as is and riots recur and for the safety of federal employees

12  and detainees alike, the facility needs to be shut down.  Those

13  who manage that facility are going to be in a true bind,

14  because this injunction will prohibit them from taking the

15  steps necessary to protect federal property and the detainees

16  themselves, who plaintiffs' counsel alleges -- or purports

17  rather, to have their interests in minds, but this order would

18  not have their interests in mind at all.

19          With very little time left, Your Honor, I'll just say

20  that as far as the equities and public interest, the protection

21  of federal buildings, personnel, and detainees are a well-

22  established and legitimate Government interest and whatever

23  access issues detainees may have faced were temporary and have

24  been removed.

25          And so for these reasons plaintiffs have failed to

36

1   show they're likely to prevail on the merits not least of all

2   because they lack -- this Court lacks jurisdiction over their

3   claims due to standing issues, but either way merits or

4   standing the defendants respectfully request this Court deny

5   the Fifth Amendment TRO.

6           **THE COURT:**  Thank you, counsel.

7           **MR. SKEDZIELEWSKI:**  Thank you.

8           **THE COURT:**  Mr. Rosenbaum, by my chest clock you have

9   one minute and 52 seconds.

10          **MR. ROSENBAUM:**  On the issue of telephones, Your

11  Honor, counsel did not say that those telephones in those rooms

12  were not monitored.  As I already explained previously those

13  are large common rooms.  The attorney rooms that he talked

14  about don't have telephones in them.

15          On the question of common occurrence, there's nothing

16  in the record to suggest that the individuals give the

17  incorrect name.  Nothing in the record that had anything to do

18  with access, in fact it is the routine of ICE and border patrol

19  to immediately issue A numbers when an individual is taken into

20  custody, when an individual is arrested, that wasn't done here.

21  The undisputed record is that it took more than a week for that

22  in fact to take place.  That was the basis of the declarant to

23  the attorney saying we want to see somebody, well they don't

24  have an A number, you can't see them therefore.

25          Last point, Your Honor, with respect to security.

37

1    Let's talk about what the record really says.

2            First of all there's nothing in the record that says

3    that these -- the lawyers were blocking the ingress and egress

4    to the building.  To the contrary the record is they were right

5    by the door, had nothing to do with that.  That's -- nothing in

6    the record supports that.

7            But let's look specifically at the Uyeda declaration,

8    paragraph 11, all it says is for safety and security.  There's

9    no fact to support what counsel describes as an all-out riot

10   that somehow affects what's inside the facility as opposed to

11   what was taking place outside.

12           You can't just cry security in a crowded basement and

13   say that that's a basis for denying the particular rights here.

14   There's nothing in the record that supports this apocalyptic

15   claim that counsel is offering today.

16           **THE COURT:**  Thank you.

17           Okay, so with that the matter is submitted on that

18   TRO.

19           I will want to address with the parties at the end of

20   the hearing with respect to both TROs, if the Court is to grant

21   either of them, some discussion of how we should address timing

22   going forward, and then I will just mention because I don't

23   want to forget, it's the Court's recollection that everything

24   on the docket for this case is restricted -- and I'm not sure

25   if it's because it was originally filed as an habeas or because

38

1    it's immigration related -- but I did want to address that with

2    the parties as well, to the extent that the parties wanted

3    another approach.

4         Okay.  So with that let us turn to the other TRO, and

5    because there are a number of additional issues with respect to

6    this TRO I indicated to the parties that I would give them 40

7    minutes per side.  Let me set my clock and then whoever is

8    going to handle the argument on behalf of the plaintiffs can

9    begin.  And again, if you need to adjust the podium there's the

10    button to the right of the microphone.

11         **MR. TAJSAR:**  Thank you, Your Honor.  Mohammad Tajsar

12    for the plaintiffs.

13         Your Honor, I'd like to make three brief points, and

14    then I'll reserve the balance of my time for any questions that

15    the Court may have, and then for rebuttal as well.

16         And then just quickly we would like to address the

17    docket issue at the end, so I'm thankful that Your Honor raised

18    that.

19         So, Your Honor, I'd like to make three points, one

20    about the record, one about the reasonableness of the TRO that

21    we're seeking, and then lastly about the -- its necessity.

22         So first on the record.  We have provided an

23    overwhelming record that demonstrates that the Federal

24    Government has a policy and practice of conducting so-called

25    roving patrols throughout this district to stop individuals

EXCEPTIONAL REPORTING SERVICES, INC

ER-0180

39

1    without ever making a particularized, individualized assessment

2    of reasonable suspicion that the person seized is in the United

3    States in violation of the U.S. immigration law.

4          You know, that record consists now of 20 declarations

5    with dozens of specific incidents that show that this practice

6    is ongoing, and has been occurring.  We also cite dozens of

7    news articles that report on this practice.  And we cite

8    numerous public statements and other statements from the

9    defendants themselves or from senior members of the Federal

10   Government that demonstrate that this practice is officially

11   sanctioned.

12         **THE COURT:**  Can I ask this question, and if you're

13   going to get to it later you can do that, and I will have some

14   questions for the Government about this as well.

15         One way of reading the Government's opposition is

16   that the Government agrees with you concerning the requirements

17   for reasonable suspicion, but the Government's view is that the

18   totality of the circumstances approach that they've taken and

19   in particular in looking at the four factors that are in your

20   proposed TRO in combination, do provide the individualized and

21   particularized assessment and they rely on some cases including

22   Brignoni-Ponce and its prodigy to address that.

23         So I will hear if them, maybe I've misunderstood

24   their argument, but if you could address that in the course of

25   your argument that would be helpful why the combination of

40

1   those factors is not an individualized, particularized

2   assessment of reasonable suspicion.

3           Thank you.

4           **MR. TAJSAR:**  Certainly happy to, Your Honor.  I can

5   address that now, actually that was going to be my third point

6   but we'll take that third point here.

7           I mean we somewhere asked for this injunction because

8   we think it is necessary and not burdensome at all for the

9   Federal Government to follow the law.

10          You know, they say they are following the law and

11  that these factors are permissible for them to look at and

12  perhaps in combination with others, but we view that position

13  as a striking admission that they're in fact not following the

14  law.  Right?  And that's the reason why we need this

15  injunction.

16          You know, the citation to Brignoni-Ponce I think is

17  remarkable, because what it does is it completely ignores

18  controlling precedent in this circuit.

19          In Montero Camargo and Manzo-Jurado, that demonstrate

20  that the appearance or, you know, and like race are factors

21  that are categorically forbidden from the assessment of the

22  totality of circumstances --

23          **THE COURT:**  And I'm sorry to interrupt you, counsel,

24  I should have asked this before for some of the other cases,

25  but for the sake of the record can you spell the names of those

41

```
 1   two cases that you mentioned?  At least the first part of the

 2   last name just so that the record is clear.

 3           MR. TAJSAR:  That's right.  Sot the first case,

 4   that's United States v. Montero, M-O-N-T-E-R-O hyphen Camargo,

 5   C-A-M-A-R-G-O.

 6           The second case is it United States v. Manzo-Jurado.

 7   That's M-A-N-Z-O hyphen J-U-R-A-D-O.

 8           THE COURT:  Thank you.

 9           MR. TAJSAR:  And there are other case that we cite in

10   the record.

11           THE COURT:  Of course.

12           MR. TAJSAR:  Both of those cases stand for the

13   proposition that there is a red line that the Government cannot

14   cross, and that line is when you consider, even considering the

15   factors of appearance as they put it, you know, they don't use

16   the word race, but I think that's what they mean when they talk

17   about appearance, you cannot use appearance and you cannot use

18   race as a factor, even in combination with others in a district

19   like this one that has such a high proportion of Latina

20   individuals, that that's categorically forbidden.

21           They evidently don't agree with the controlling

22   Nineth Circuit law on this, and that demonstrates just how

23   necessary this injunction is that they follow the law, because

24   they're clearly not doing it.  That's on that particular

25   factor, Your Honor.
```

42

1          We raise three others in our proposed order.  Those

2   factors, the Nineth Circuit has said in Manzo-Jurado that those

3   are of minimal probative value and the totality of

4   circumstances analysis, and it appears those factors include --

5   excuse me -- speaking Spanish in an accent -- or speaking

6   English in an accent in a Spanish language, workplace -- sort

7   of location and status as a particular work that the person is

8   doing.  So those three factors the Nineth Circuit has said

9   minimally probative, if at all.  Right?

10          So what we say is that at least those three factors,

11   if those are the only ones plus the race, if those are the only

12   ones that the Government is using that cannot suffice.

13          **THE COURT:**  And so just to be clear, because this

14   came up in one of the Government's declarations, so I want to

15   be clear on what you're requesting and we may need some more

16   classification on the distinction between the location and the

17   occupation.

18          But the request is that the defendants may not rely

19   solely on the factors below, a loaner and combination, but

20   presumably aside from what you've said about race or ethnicity,

21   the other factors, in combination with other -- with unlisted

22   factors could be appropriate.

23          **MR. TAJSAR:**  I think that's right, Your Honor.

24          **THE COURT:**  Okay.

25          **MR. TAJSAR:**  I think there is it for instance, I

**EXCEPTIONAL REPORTING SERVICES, INC**

ER-0184

43

1    think it's footnote 21 and 22 in Manzo-Jurado that talk about,

2    for instance, if the Government has -- like is specifically

3    targeting an individual and then use these factors, that might

4    be permissible, and that's permissible because it has these

5    other factors.  And for instance, it has like a target or a

6    final order of removal, whatever the case might be.  So that's

7    an absolute right.

8         They're minimally probative, if they have other

9    information you could use them, but just by themselves with or

10   without race is forboden, the Government cannot do that.

11        So that, the fact that the Government appears to only

12   be using these factors to make these detentive stops is reason

13   enough for imposing this particular injunction.  And for that -

14   - to put a finer point on it, you know, it's precisely because

15   of this misunderstanding of the law that the Government has

16   made so many stops of U.S. citizens throughout the course of

17   this campaign for the last month.

18        You know, including the plaintiff Brian Gavidia who's

19   actually in the courtroom with us this afternoon --

20        **THE COURT:**  Welcome.  Where is he?  I don't know if

21   he wants to identify himself, but welcome.  Thank you for being

22   here.  As the attorneys know we rarely -- we have a lot of

23   plaintiffs and defendants and rarely do we see the actual

24   people named on the captions in court.  So welcome, thank you.

25        **MR. TAJSAR:**  I will say it takes quite a bit of

44

1    courage from Mr. Gavidia to be here --

2         **THE COURT:**  I would agree.

3         **MR. TAJSAR:**  -- to participate in the vindication of

4    those rights.

5              I want to raise his story because it's critically --

6    it shows exactly the consequence of this failure to perform the

7    necessary analysis before detaining individuals.  You know,

8    Mr. Gavidia was physically assaulted, pushed up against the

9    fence and stopped for no other reason than the fact that he's

10   Latino and he was at a tow yard in a predominantly Latinah

11   (phonetic) area.

12             You know, he protested that he was an American

13   citizen during this stop, but that didn't save him.  You know,

14   facts like his are replete in the record.  People who have

15   lawful status within -- here in the United States who are the

16   nevertheless being stopped.  Some of them stopped twice.

17             I mean in the Toczylowski declaration there was an

18   individual who's an asylee, lawfully present, had this happen

19   to them multiple times.  I mean, these stories continue to

20   happen, in fact, just before Your Honor came to the bench we

21   just got word from our clients, the United Farm Workers, that

22   there's an active raid in Camarillo happening at the farm site.

23   And our clients, the United Farm Workers, have members who are

24   in Camarillo and they're trying to respond to them right now.

25             So these incidents are happening right now and

**EXCEPTIONAL REPORTING SERVICES, INC**

45

1    precisely because of this fundamental misunderstanding of the

2    law from the Government.  We have seen so many unconstitutional

3    and unlawful arrests.

4            The final point I'll make and then I'll stop.  Is a

5    point about the reasonableness of the relief that we're seeking

6    here.  You know, what we are seeking mirrors precisely what

7    Judge Thurston in the Eastern District of California ordered in

8    the UFW v Noem case.  You know, a case that challenges actually

9    precisely the same conduct that we're challenging here from of

10   the same defendants, you know.

11           And, in fact, those defendants have actually said

12   that that operation in the Central Valley was a success and

13   they called it a quote proof of concept for what they might

14   unleash here in this district.  It's the same defendants, the,

15   you know, El Central Border Patrol that governs this district

16   as well too.

17           And indeed some of the same -- it's similar sort of -

18   - the same practice of roving patrols.  That -- so I think this

19   Court in issuing an injunction prohibiting this unlawful policy

20   and pattern and practice is not treading new ground here.  This

21   is a well-worn path consistent with what the Court in the

22   Eastern District has done and many other courts have done to

23   enjoin unlawful Fourth Amendment related practices from

24   authorities who enforce immigration law.

25           The final point I'll make relevant to that part of

46

1   the reason why this district-wide relief is reasonable is

2   because we have both the plaintiffs here, both the individuals

3   and the organizations enjoy associational standing to reach the

4   merits of this case.  That is to say that they have, you know,

5   under the Ninth Circuit's precedent in LaDuke and cases

6   thereafter.  LaDuke is L-A-D-U-K-E, and that's v Nelson from

7   1985.

8         Under LaDuke our plaintiffs have standing to seek

9   prospective in -- a prospective injunction both because of this

10  past conduct that I'm referring to and the quote avowed future

11  intent of the defendants.  All -- none of whom have suggested

12  that this -- these practices are going to stop.  In fact, just

13  a few days ago one of the defendants Gregory Gravino in -- as

14  part of a show of force at McArthur Park suggested as much,

15  that we are here in Los Angeles and these raids are going to

16  continue, in fact, intensify.

17        So we certainly have standing as to all of our

18  plaintiffs to reach for the liability phase of this case and

19  the fact that we have these organizations with associational

20  standing supports our request for district-wide relief,

21  precisely because of the factors that Your Honor laid out in

22  the tentative concerning the inability to fashion relief

23  without it being district-wide, per the Easy Rider's decision.

24        So with that, Your Honor, I'm happy to submit on the

25  tentative or address any other questions that you have.

47

1          THE COURT:  I don't have any questions right now.  I

2    may on rebuttal after I hear from the Government.  Thank you.

3          MR. TAJSAR:  Very good, thank you so much.

4          THE COURT:  And I'll hear from defense counsel, thank

5    you.

6          MR. SKEDZIELEWSKI:  You want your water bottle?

7          MR. TAJSAR:  Oh, I'm so sorry, yes.

8          MR. SKEDZIELEWSKI:  Thank you.

9          And we have 40 minutes this time, Your Honor; is that

10   right?

11         THE COURT:  Yes.

12         MR. SKEDZIELEWSKI:  Thank you.  So really I just want

13   to specifically address that was raised by plaintiffs just now.

14   When the Government says appearance, it means appearance and

15   any suggestion to the contrary is I think highly inappropriate.

16         THE COURT:  Then what does appearance mean?

17         MR. SKEDZIELEWSKI:  Every outward sign that a person

18   exhibits clothing, dress, manner, facial expression, anything

19   that you can see with your eyes.

20         THE COURT:  And so -- and I think the Court also

21   understood that by appearance you meant something akin to race,

22   given the cases that you cited to.  And so am I to understand

23   you to say appearances, clothing, dress, facial expressions but

24   not race?  Not that someone appears to be one race or the

25   other?

48

1          **MR. SKEDZIELEWSKI:**  Let me be very clear on this

2    point.

3          **THE COURT:**  Yes, thank you.

4          **MR. SKEDZIELEWSKI:**  The Government is not saying that

5    any of our agents are relying on race.  Period.  However, the

6    case law, irrelevant -- irrespective of what any particular

7    agents may be doing says that as part of a totality of the

8    circumstances, agents do not have to put blinders on and not

9    notice the race or ethnicity or the language or the location of

10   a potential target.  And that's obviously got to be the case.

11         If agents have intelligence that at a particular

12   location criminal conduct is afoot, there are 15 people there

13   and only one of them is a Caucasian and the Caucasian is the

14   one committing the criminal conduct, then they have to take

15   into account race.

16         **THE COURT:**  Can I ask this question to begin with?

17   As I understand it from the Government's opposition and from

18   the declarations there's a number of different things that have

19   been happening.  There have been some arrests pursuant to

20   warrants, which we're not really here to talk about.  Then

21   there has been some targeting of individuals that have been

22   identified in advance and I believe it was the Deputy Field

23   Office Director, Mr. Quinones that mentioned they are targeting

24   packets.  And then I understand that separate from the

25   targeting of individuals, there's the separate warrantless

ER-0190

49

1   arrests and detention based upon the totality of the

2   circumstances.  Am I correct about that?  Meaning, I guess I

3   want to be clear that because there weren't specifics in the

4   Government's opposition, it was not clear to me whether what

5   the Government was saying is, listen, everything that you've

6   seen, everything you've heard about was actually related to the

7   targeting of an individual.

8        And so when we went to call it a car wash, we had

9   information about somebody, John Doe, we went there looking for

10  John Doe.  We didn't have a warrant, but we went there looking

11  for John Doe and then based upon what we saw when we got there,

12  we may have detained or had voluntary conversations with

13  others.

14        So I'm not sure if the Government is saying all of

15  this is that or there's also some other category of, which the

16  declaration seems to suggest there's this other category of

17  determining that some combination of the factors, you've

18  indicated race is not one of the factors, so some combination

19  of car wash plus someone wiping down cars, plus other factors

20  like that, they identify places that they can go that they

21  think will yield people without status.  I hope -- is the

22  Court's question clear?

23        **MR. SKEDZIELEWSKI:**  I think so, Your Honor.

24        **THE COURT:**  Okay.

25        **MR. SKEDZIELEWSKI:**  And I think it's a matter of

ER-0191

50

 1  plaintiff's incorrect framing of these types of actions.

 2          **THE COURT:**  Okay.  So if you could assist with that,

 3  that would be great, especially the actions that are not

 4  related to targeting of an individual in advance by name.

 5          **MR. SKEDZIELEWSKI:**  Totally understood.

 6          **THE COURT:**  Okay.  Thank you.

 7          **MR. SKEDZIELEWSKI:**  So, Your Honor, I think one

 8  category of interaction that agents have with members of the

 9  public that needs to be understood and that plaintiffs allied

10  (phonetic) in their conversation on this, is while agents may

11  be involved in a targeted stop that has a targeting packet

12  associated with, with all that evidence, they might not locate

13  that target.  They might locate the target and locate a number

14  of other individuals who are associating with that target.

15          And in the course of their targeted enforcement of

16  immigration law, they might come upon people engaged in

17  voluntary interactions that lead to a determination of

18  reasonable suspicion using the totality of the circumstances.

19          And so I think that's a key category that we need to

20  understand is that's the regular practice that the plaintiffs -

21  - they say that there's a policy and a practice of

22  indiscriminately, you know, targeting individuals based on

23  ethnicity and so on.  The policy and practice is that agents

24  receive intelligence, act on that intelligence, but then they

25  don't, as I said, put blinders on to the scene that they've

51

1    arrived on and ignore the opportunity to enforce immigration

2    law beyond whatever their original plan may have been.  And

3    that's what the declarations made clear.

4            These are sophisticated operations, Your Honor, where

5    DHS and the component agencies are using these packages that

6    have the immigrant's immigration history, their criminal

7    history, their residence, their employment information all to

8    help protect the country from cross border crime by enforcing

9    the Immigration and Nationality Act.

10           And in addition, as you can see in the Harbert

11   (phonetic) declaration, these agents are acting on information

12   from other law enforcement that they might receive, they're

13   analyzing trends like Your Honor's mentioned, they aren't

14   taking a sort of 30,000 foot view as well as the narrow

15   approach that's the focus of the case law.

16           And the agents in the field are developing facts.

17   They're relaying that back to HQ.  And the officers'

18   observations, training and experience all inform that process.

19   And so one of the main problems with this case as I understand

20   it, I don't see how the Court can effectively resolve at this

21   stage is each stop, to evaluate whether it's appropriate or

22   inappropriate under the law, would require a particular

23   analysis of all the factors that went into that stop.

24           **THE COURT:**  And so thank you for that.  And that is

25   the Court's concern is that it doesn't seem that the Government

52

1   has put into the record beside -- the two declarations to me

2   seem very general and they talk about what the normal practice

3   is or what the intended practice is.  And they therefore don't

4   really engage with the pretty high volume of evidence that the

5   plaintiffs have put in the record about the types of things

6   that we've all seen and heard on the news.

7           And so that's what I'm asking you to sort of bridge

8   that gap for the Court.  I would have thought that the

9   Government, if what you're saying is true, and there have been

10  a number of individuals that have been identified either in the

11  press reports or the plaintiffs themselves, that there would be

12  reports, of course the Court's normal experience in other parts

13  of my job, are with local and federal law enforcement that are

14  targeting people for crimes.

15          And there are reports after they've arrested somebody

16  as to why they arrested this person, how they happened to be

17  where they were and what they did.  And there doesn't seem to

18  be anything like that here which makes it difficult for the

19  Court to accept your description of what is happening.  Because

20  there is no proof that that is what is happening as opposed to

21  what the plaintiffs are saying is happening.

22          And the one piece of evidence that we have, the one

23  form, I've forgotten the name, the parties will remember.  It's

24  123, 113, in any event, the one form about one of the

25  individuals, I won't mention by name, it actually again does

53

1   what appears to be a very general description of this is --

2   these are all the law enforcement agencies involved in this

3   operation, this is generally what we're doing and then we

4   arrested Mr. So and So.

5           And so that's the Court's concern and I don't know if

6   there's anything that you can do to address that because that

7   makes it very hard for the Court to find that the plaintiffs do

8   not have a likelihood of success in showing that the defendants

9   are doing something unlawful and are not doing what you've

10  described.

11          **MR. SKEDZIELEWSKI:**  Thank you, Your Honor.  I think

12  three main points in response to that.

13          **THE COURT:**  Thank you.

14          **MR. SKEDZIELEWSKI:**  First, the lack of evidence that

15  Your Honor mentions is exactly why this Court should not grant

16  plaintiff's ex parte application.

17          The Fifth Amendment ex parte is one thing.  But this

18  ex parte with the volumes of evidence, with defendants having a

19  couple of days to try to identify each individual mentioned,

20  many of them are anonymous in their declarations, defendant

21  agencies have no way to figure out which individual was stopped

22  when they're referred in the plaintiff's declarations merely

23  anonymously.

24          And it would just be procedurally unfair to grant the

25  Fourth Amendment TRO when defendants have not had the

54

```
1    opportunity to muster the evidence that Your Honor requests.

2    So you're right, Your Honor is correct, excuse me, that we --

3    there are certainly more things that the agents considered when

4    they made their determinations of reasonable suspicion in all

5    the cases that plaintiff raised, we just haven't had a chance

6    to a) identify in many cases who the people who were stopped

7    even were, and let alone, over a holiday weekend get ahold of

8    the agents.  I mean, how -- it's really hard to imagine how we

9    could have done that.

10           THE COURT:  And so I understand you to be saying to

11   me it doesn't seem so unreasonable -- the volume that the

12   plaintiffs have put forth actually seems like it would be

13   easier for the Government to -- you could have -- if any one of

14   these people, if there was any one of these people and there

15   was a report about this is how we identified this tow yard

16   parking lot, et cetera, that would have been helpful.  And it's

17   hard for the Court to believe that in the time that you had,

18   you couldn't have done that.

19           So I do have some concerns with that.  And not

20   everybody was anonymous and to the extent that these are all

21   people that the Government is proceeding with proceedings on,

22   then I would think that there are records kept on them.

23           MR. SKEDZIELEWSKI:  Understood, Your Honor.  I would

24   just like to -- two other points on this.

25           THE COURT:  Yes, please, thank you.
```

55

1      **MR. SKEDZIELEWSKI:**  The exhibit, I believe the

2  exhibit you referenced I'll also avoid mentioning the name if

3  that's Your Honor's preference, but in that exhibit, the record

4  of the one named plaintiffs, the plaintiffs here claim that the

5  agents were not engaged in targeted operations.  That was Your

6  Honor's read of it as well.  But in that document, it

7  specifically says that the agents are quote focusing on

8  individuals with executable final orders of removal.  That's

9  what in the -- I can point you out to the page.

10      **THE COURT:**  And remind, just for the sake of the

11  record, remind me what the ECF No. for this one is.

12      **MR. SKEDZIELEWSKI:**  That's 81-1.

13      **THE COURT:**  Okay.  And so --

14      **MR. SKEDZIELEWSKI:**  And it's Exhibit A.

15      **THE COURT:**  -- counsel what I would have expected to

16  see then, what I would have expected to see is -- because that

17  all sounded fine, and then I would expected to see, we were --

18  we had identified person X and again, I'm not familiar with

19  these types of reports, I see them in other types of law

20  enforcement.  We had identified person X and we were going

21  after person X and that's when we came across person Y, but it

22  doesn't say that.  It just says in general this is what we're

23  doing and then it says we arrested this person.

24      So unclear whether this person is -- was the targeted

25  individual or they just came across him or on their way to

56

1    simply saw this.  So that would be helpful.

2         **MR. SKEDZIELEWSKI:**  I understand, Your Honor.  One

3    quick point that I wanted to make a moment ago about

4    plaintiff's evidence and then if I could address this.

5         **THE COURT:**  Yes.

6         **MR. SKEDZIELEWSKI:**  So the evidence is replete with

7    instances of stops.  It is not replete with any evidence that

8    those stops or that the agents in any way failed to follow the

9    law.

10        So there's allegations in some of the declarations

11   that the individuals felt, that's their language, not mine,

12   that they felt they had been targeted for their race, I can

13   understand how someone might feel that way, but of course,

14   that's not proof that the agents only considered race.

15        So it's the plaintiff's burden to demonstrate that

16   the agents acted improperly.  It is not the Government's burden

17   to, at this early stage, to show that every single interaction

18   that each agent had in plaintiff's declarations was above board

19   and they certainly were.

20        So speaking of the law, when making these reasonable

21   suspicion determinations Courts do need to, when they're

22   reviewing these interactions, take the same standard that the

23   agents have in the field and think about the totality of the

24   circumstances and whether there was a particularized and

25   objective basis for suspending or suspecting wrongdoing.  And

57

1   they also are permitted because the agents are to consider the

2   agent's objective, reasonable inferences from the facts.

3          So here, there's no allegations of a pattern and

4   practice of ignoring the requirements of particularized

5   suspicion.  What plaintiffs have shown is that agents are

6   regularly and vigorously enforcing federal immigration law.

7   But that's not evidence that each case involved misconduct.

8          Other than unsupported assertions in the

9   declarations, there's no other evidence that any particular

10  agent neglected to follow the requirements of the Fourth

11  Amendment.

12         So just consider -- and within plaintiff's own

13  evidence there is I think actually ample proof that the agents

14  are considering the totality of the circumstances.

15         So there was a -- the episode at the car wash in

16  Whittier, California that's described in a couple of the

17  declarations, this is the one where there were multiple visits

18  to that same car wash by immigration officials.  So agents

19  there did not indiscriminately stop and detain just anyone,

20  rather each time they spoke to individuals at the car wash and

21  reacted in response to what they learned from those

22  interactions.  You can see in the results.

23         So on day one, they make three arrests and there's

24  one stop.  Just the fact that on day one there's differing

25  results, it's already evidence that they're considering the

58

1    totality of the circumstances.  Three individuals they found

2    that they did have sufficient evidence to make arrests.  And

3    one, they made a stop, and then they didn't make an arrest.

4           On the second day they go back to the same car wash,

5    these days aren't back to back, I don't think, there's days in

6    between and they just make one arrest.  On the third day, and

7    keeping with Your Honor's practice of not mentioning the named

8    plaintiffs, one of the plaintiffs was temporarily stopped

9    over -- you know, a reasonable suspicion of immigration

10   violations and was removed to a different location for a brief

11   period of time to confirm his status and then returned to the

12   car wash.

13          And then another was briefly talked to, spoken to by

14   the agents and then that was it.  They had a voluntary action

15   and no further steps were taken, as far as trying to detain or

16   anything like that.

17          So simply put, declarant's unsupported assertions

18   that these stops were based on ethnicity or other, you know,

19   impermissible characteristics are -- it's not just there in the

20   record.  The results show that the agents are discerning

21   meaningful differences between the evidence in each case.

22          Plaintiff's further suggestion that targeting

23   specific locations or types of work is somehow inappropriate is

24   also simply not the law.  Those elements can be considered as

25   part of a totality of the circumstances.

59

1          The Court, the Supreme Court in Arvizu rejected what

2     it called --

3          **THE COURT:**  Please, and can you spell the name of the

4     record, the case for the record?

5          **MR. SKEDZIELEWSKI:**  Oh, yes, thank you.  It's

6     A-R-V-I-Z-U.

7          The Court there rejected this divide, what they

8     called a divide and conquer approach.  The incorrect way for a

9     Court to review, you know, reasonable suspicion stops is to

10    look at each factor considered by the officer in isolation and

11    then reject each one, if by itself and alone, the factor

12    appears to be innocent.  The Court said that's not taking the

13    totality of the circumstances into account.  Instead, the Court

14    said that the innocent, certain innocent factors, like language

15    or other things like that, which plaintiffs bring up, taken

16    together with surrounding circumstances can warrant further

17    investigation.

18          So we can't draw boundaries around all of these

19    different factors and say this factor, can't consider it, this

20    factor, can't consider it.  It's the totality of the

21    circumstances, not just the circumstances that plaintiffs would

22    like.

23          **THE COURT:**  And I do think, and I think I had counsel

24    clarify that, the four factors that they're talking about,

25    first of all it sounds like race is not an issue for you

60

1    because you've indicated that's not what the officers are

2    doing, that the four -- their problem is with using these four

3    factors alone, solely these factors in combination.

4         So if officers have these four factors and nothing

5    else, that is what they're saying is illegal and improper.  So

6    just to be clear, I'm not sure that it's exactly what you're

7    saying concerning the totality of the circumstances with the

8    exception of the race factor, which they believe shouldn't be

9    considered at all.

10        **MR. SKEDZIELEWSKI:**  Yes.  So, Your Honor, each of the

11   four factors -- let me put it this way.  When an agent is

12   making a voluntary stop after attempting to make a targeted

13   arrest, he's not going to put blinders on and ignore the four

14   factors that plaintiffs list.  And, in fact, to remove location

15   would make it impossible for the agents to react appropriately

16   to circumstances when they arrived at a location where they

17   know criminal activity is afoot.

18        So an agent may appear at a location where they know

19   criminal activity is afoot and then find that there are others

20   involved who they weren't expecting to find there and they

21   can't consider location, that's not consistent with the law.

22   And again, just to emphasize this about innocent seeming

23   factors, the Court in Arvizu considered even something as

24   innocuous as failing to waive to a police officer as a relevant

25   factor because in that context, the police officer and the

61

1    person driving by were the only two persons on a remote desert

2    road where the officer thought it was rather odd that the

3    driver didn't wave.

4         And then additionally, when that driver pulled -- was

5    in the process of tailing that driver, the plaintiff's children

6    were waving out the back window.  And the waving of the

7    children was a legitimate factor for consideration.  It's not

8    because there's anything wrong with children waving to police

9    officers, of course, that's welcome.  But in the totality of

10   the circumstances the officer had a reasonable suspicion that

11   some criminal activity was afoot, and in fact there was, there

12   was drug smuggling going on.

13        So the plaintiff's request for relief that Your Honor

14   just described as the -- with the four factors that they're

15   sort of concerned about would cause officers to have to ignore

16   the totality of the circumstances and would be contrary to the

17   law.  It would require totally revamping the policies and

18   procedures, not because our agents are out there constantly

19   breaking the law, but because this request for preliminary

20   relief is inconsistent with the law.

21        So officers are not required to ignore even the

22   relevant characteristics of a location, in determining whether

23   the circumstances are sufficiently suspicious to warrant

24   further investigation.  And as we've mentioned, appearance also

25   can be considered, but of course, not all by itself.

**EXCEPTIONAL REPORTING SERVICES, INC**

62

1    So, Your Honor, if I could return -- we've

2    discussed -- does Your Honor have any further questions on that

3    particular issue with the characteristics?

4         **THE COURT:**   I must say -- thank you.  I'm not really

5    as satisfied with respect to the characteristics and I do feel

6    like you're speaking in generalities.  I will review, of

7    course, the cases that you've pointed the Court to, but some of

8    the factors they just seem to the Court, even understanding the

9    totality of the circumstances, if you combine the fact that the

10   Government, and I understand it's not the Government's burden

11   to show the absence of X, Y, Z perhaps, if you take the absence

12   of any concrete examples of what this targeting looks like or

13   what the reasonable suspicion analysis is, together with some

14   of these locations seem so general and locations where numerous

15   people could be present and not associated -- and they're

16   places where not necessarily associated with not having status.

17        As they said, bus stop, car wash, tow yard, maybe

18   they're correlated with people who are low income or have low

19   income occupations, maybe they're correlated with race or

20   ethnicity, but they don't seem to be correlated with status.

21   And I'm not -- I guess I'm not hearing how -- I understand what

22   you're saying about the officers should not put blinders on,

23   but what they are considering should be things that give them a

24   reasonable suspicion that this person does not have status.

25   And that's what -- I'm not seeing that correlation.

63

1         But, you know, given the limited time and I

2   understand you've addressed this thoroughly in the papers, if

3   you want to move on to the other arguments, you can do that.

4         **MR. SKEDZIELEWSKI:**  I'll just make one further point

5   on this, Your Honor.

6         **THE COURT:**  Thank you.

7         **MR. SKEDZIELEWSKI:**  Which is that what might seem

8   like an arbitrary stop that comes out of nowhere, cars pull up

9   and there's no preliminary interaction and agents jump out and

10  start speaking with somebody, there are -- agents are

11  performing work in the field all the time before these

12  interactions occur.

13        Right.  And so prior surveillance of that area, of

14  that person, of their interactions that the person who ends up

15  being stopped might be totally unaware of, are informing the

16  agent's decisions to approach in the first place.

17        And so while it might seem to plaintiffs that these

18  stops are only occurring because it's a Home Depot, that's not

19  the case.  And our agents are relying on, as we've said,

20  information from other law enforcement agencies, analysis of

21  trends, rational inferences from facts developed by agents in

22  the field to make these determinations.

23        **THE COURT:**  Thank you.

24        **MR. SKEDZIELEWSKI:**  So -- you're welcome, Your Honor.

25        So to return the standing issue here.  Again, in

**EXCEPTIONAL REPORTING SERVICES, INC**

64

1   Clapper as I emphasized previously, the highly attenuated chain

2   of possibilities does not satisfy the requirements that

3   threaten injury must be certainly impending.

4         So in the Fourth Amendment context, certainly the

5   federal government is going to continue to enforce federal

6   immigration law.  And so to that extent, the plaintiffs are

7   correct.  Yes, stops and arrests, that will all continue.  But

8   what they're not correct about and what the record does not

9   show is that there's going to be a continued violation of the

10  law with agents totally ignoring their training, ignoring

11  policies and procedures, and just ignoring all the intelligence

12  that they receive from headquarters.  You know, they get the

13  targeting package, they just throw that in the trash, I'm going

14  to go just grab somebody because of ethnicity instead of

15  relying on all the good intelligence that I have, that tells me

16  here the actual criminal conduct is and where the actual

17  immigration violations are occurring.

18        That's a huge assumption to make by plaintiffs.

19  There's nothing in the record that shows that.  There's no

20  document in evidence of ICE or CBP agents saying, yeah, we're

21  not interested in following the law, we're going to ignore all

22  the good information that we have, you know, headquarters told

23  us to go to location A today, where we know there's criminal

24  conduct afoot, but forget that, we're going to go and just

25  start grabbing people because of race and ethnicity.

65

1          They've not met that burden and they can't, because

2    that kind of conduct is just not happening.  But that would

3    just the first thing, the first huge assumption that they have

4    to make before they get to an impending and certainly --

5    certain to occur injury.

6          Then the individuals who are inappropriately stopped

7    would have to either be individually named plaintiffs, members

8    of the organizational plaintiffs, or members -- or the

9    organizations themselves if that were conceivable.

10          And so they -- the plaintiffs have not presented any

11    evidence to suggest that this -- even if there is misconduct,

12    that that misconduct is going to specifically target the

13    individuals that are named in the case or their members.

14          **THE COURT:**  And so the fact that -- if I remember

15    correctly some of the named plaintiffs have been stopped more

16    than once, that's not enough?

17          **MR. SKEDZIELEWSKI:**  The fact that some have been

18    stopped more than once?

19          **THE COURT:**  Yes.

20          **MR. SKEDZIELEWSKI:**  If the officers had reasonable

21    suspicion in each of those instances, then they've not shown

22    any violation of the law.  And that is, of course, our

23    position.

24          **THE COURT:**  Understood.

25          **MR. SKEDZIELEWSKI:**  I mean, one would certainly hope

66

1    it would be a very rare thing, but if someone is stopped every

2    day for seven days straight, because they happen to be in

3    circumstances that we could all objectively agree under a

4    totality of the circumstances do give rise to a reasonable

5    suspicion, there'd be nothing violating the Fourth Amendment

6    there.

7          **THE COURT:**  And then that would be that there's no

8    violation, not that whatever it is, is likely to recur.  I

9    thought you were addressing the likelihood of recurrence.

10          **MR. SKEDZIELEWSKI:**  Yes.  Yes, Your Honor.

11          **THE COURT:**  Okay.

12          **MR. SKEDZIELEWSKI:**  Correct.  So for the -- to take a

13    step back.  Once we've gone through the chain of assumptions,

14    the hypotheticals of agents continuing to do the stops and

15    arrests, granted they're going to continue to make stops and

16    arrests, then ignoring the law, acting inappropriately with

17    respect specifically to these plaintiffs and then that the

18    targeted individual has to consent to the stop as well, right,

19    for there to be standing.  There's just a number of assumptions

20    where we're expecting individuals to make decisions that this

21    Court can't possibly know about, that the plaintiffs have shown

22    no evidence of.

23          So in -- the Court in Lyons, the Court considered

24    police department policies there about chokeholds.  The

25    policies weighed against a finding of immediate threat because

67

1   the policies themselves were against chokeholds, right.  The

2   Court thought that was probative there.  The same is true here,

3   DHS policies -- excuse me, DHS has policies and training to

4   ensure compliance with the Fourth Amendent.  It's mandatory,

5   it's not an option for these agents.

6        Similarly, the Court in Rizzo -- excuse me, I should

7   spell the case, Lyons is L-Y-O-N-S.  And Rizzo is R-I-Z-Z-O.

8   So the Court found there that plaintiff's claims that every

9   stop by police would be unconstitutional were no more than mere

10  conjecture --

11       **THE COURT:**  All right.  Counsel, I think I heard a

12  phone going off.  I should have mentioned at the beginning but

13  I think the court security officers have addressed this, no

14  phones.  We don't want to have to stop the hearing and

15  confiscate phones, so whoever it was, turn it off and put it

16  away.  Thank you.  Please proceed, counsel.  I won't count that

17  against your time.

18       **MR. SKEDZIELEWSKI:**  Thank you, Your Honor.  That was

19  a very brief interruption.  So in Rizzo the Court found that

20  the plaintiff's claims that every stop by police in the future

21  would be unconstitutional was no more than a mere conjecture.

22       Plaintiffs essentially are alleging the same thing

23  here that on an ongoing basis, CBP and ICE are just going to

24  engage in one, disregard for the law and violate it with every

25  stop that they interact with.  Because, of course, the relief

68

1   sought is not to prohibit them from doing certain stops in

2   certain areas, but would apply across the board.

3          And also in _Rizzo_ the plaintiffs sought relief from

4   inadequate disciplinary procedures for policeman's conduct.

5   But the Court found that plaintiff's claims to future injury

6   rested on what one of a small unnamed minority of policemen

7   might do to them in the future.

8          The scenario is the same here where what plaintiffs

9   are alleging is that a small unnamed minority of police are

10  going to continue to engage in violations of the law, but they

11  haven't pointed to any specifics that would say, yeah, actually

12  we know it's Agent X, he's the one, he just throws those

13  targeting packages in the trash.

14          **THE COURT:**  And I think this is obvious to everyone,

15  they're going to respond, nobody can identify these agents,

16  because they're all wearing masks.

17          **MR. SKEDZIELEWSKI:**  Your Honor, from the evidence

18  that I've reviewed that plaintiff submitted, the video

19  evidence, it was a little tough to review, without all the

20  videos working correctly, so please don't hold it against me if

21  I misstate something that was in those videos.  But from what I

22  could see, many of the officers had their badges on and when

23  one officer in particular was asked, what's your name, what's

24  your badge number.  He responded, my badge is right here,

25  here's my number and he stated the number out loud.

**EXCEPTIONAL REPORTING SERVICES, INC**

69

1          And the masks are really not at issue in this

2    litigation, but I understand Your Honor's point, but of course,

3    the reason that these agents are taking extra precaution is

4    because of the extraordinary violence that they've encountered

5    in response to them trying to enforce immigration law.

6          So like I was -- in comparing Rizzo to this case,

7    plaintiffs here similarly allege discreet misconduct with

8    respect to, you know, this named plaintiff or to this anonymous

9    declarant.  But yet, they seek agency-wide relief untethered to

10   those specific allegations.

11         So such a fear of unpredictable future misconduct

12   doesn't give plaintiffs standing.  They cite to Havens, H-A-V-

13   E-N-S.  But Havens stood for the proposition that organizations

14   have standing when their business is directly affected in some

15   negative way, but Lyons did not extend that case.  And

16   plaintiff's attorneys seem to be operating just fine, despite

17   immigration enforcement.

18         So, Your Honor, on irreparable harm, moving back to

19   the merits if I could briefly while I'm running out of time

20   here.

21         **THE COURT:**  You have seven minutes.

22         **MR. SKEDZIELEWSKI:**  Oh, seven minutes?  Okay, great.

23         So plaintiffs must show that irreparable harm is

24   likely to result in the absent of the injunction that they're

25   asking the Court for.  And to do that, they have to demonstrate

70

1    immediate threatened injury.

2            Plaintiff's future injuries, though, are speculative

3    and therefore insufficient to demonstrate the likelihood of an

4    irreparable injury.  What they have shown is that the stops and

5    arrests have occurred and that some of those individuals

6    stopped or arrested have made unsupported assertions that they

7    were done for improper motives.  But outside of that, there is

8    no evidence that the motivations were factors considered by the

9    agents were improper.

10           And as I emphasized, you know, agents are operating

11   based on this targeted individualized packages.  As for the

12   balance of the equities and public interest, subjecting the

13   executive here to essentially a pre-clearance regime for

14   immigration enforcement would severely infringe on the

15   President's Article 2 authority.

16           The Government has a legitimate and significant

17   interest in enforcing immigration laws.  It's not just the

18   President who wants to do that.  Congress passed the

19   Immigration and Nationality Act and these agents are carrying

20   out that congressional mandate.

21           **THE COURT:**  Counsel, how do you see this as a pre-

22   clearance regime?  Because I understand, and I will certainly

23   ask them to clarify, I understand the plaintiffs to -- maybe

24   you can explain what you mean by pre-clearance.  To the extent

25   that they're asking that the defendants maintain documentation,

71

1    I don't think they're asking that that documentation be

2    provided to the Court or to counsel in advance of completing

3    the stop, so what makes it a pre-clearance regime to you?

4           MR. SKEDZIELEWSKI:  Allow me to rephrase that, Your

5    Honor.

6           THE COURT:  Okay.

7           MR. SKEDZIELEWSKI:  And I'll withdraw the pre-

8    clearance language.

9           THE COURT:  Okay.

10          MR. SKEDZIELEWSKI:  I don't want to get hung up on

11   that.

12          THE COURT:  Okay.

13          MR. SKEDZIELEWSKI:  What plaintiffs are essentially

14   asking for is a permanent and unending opportunity to engage in

15   discovery with the Government.  There's nothing in the facts

16   that warrants that extensive request.  Where now at some, you

17   know, repeated periods of time the Government is going to have

18   to compile, redact, and you know, mark confidential and then

19   send all these documents to the plaintiffs on an ongoing basis.

20          Congress has the authority to regulate the, you know,

21   executive branch agencies, not plaintiff's counsel.

22          THE COURT:  And so to that point, if we were out of

23   the TRO context and handling this on a regular motion for

24   preliminary injunction or they haven't even sought preliminary

25   relief, they would be entitled, assuming they met the other

72

1  bars, obstacles that you've identified, standing,

2  justiciability, et cetera, jurisdiction, they might be able to

3  engage in discovery and get at this stuff.  You've indicated

4  that there is -- they have these unsupported assertions as to

5  what the agents are making their stops based on, but isn't this

6  documentation precisely what would either prove that they're

7  right or that you're right about what the basis of the stops

8  are?

9        **MR. SKEDZIELEWSKI:**  That may be, Your Honor, except

10  the problem with that is that if that's in a TRO context, then

11  the Government has already had to suffer the burden of shifting

12  its policies and practices to comply with the protective order.

13        **THE COURT:**  And what -- and this is important because

14  I do think it is important for the Court to consider the extent

15  to which the TRO would burden, otherwise lawful, immigration

16  enforcement.  And so it's not clear to me the burden that would

17  be imposed by the TRO that the plaintiffs have asked for.  If

18  what they're asking for again they have clarified that these

19  four factors, they're not claiming that those factors cannot be

20  used in connection with other factors, so according to you,

21  this would be consistent with the training and then the

22  documentation -- unless it's your assertion that this is not

23  documentation that already is kept, which I would have thought

24  and maybe the officers, the two declarations, excuse me, that

25  were filed by the defendants addressed this.  I guess I would

73

1  thought that the training requires some documentation every

2  time there's a stop of the reasons and what led up to the stop.

3       So neither of those seem particularly burdensome if

4  they're consistent with what you explained they're already

5  doing.  So it would be helpful, obviously there's something I'm

6  not seeing about what is particularly burdensome and so would

7  be helpful if you could sort of clarify that for the Court.

8       **MR. SKEDZIELEWSKI:**  Certainly, Your Honor.  So the --

9  as far as I understand and I don't want to overreach, the

10  agencies have not prepared to start, you know, compiling

11  information or documents in advance to comport with what would

12  be required in this request.

13       **THE COURT:**  And it doesn't necessarily need to be in

14  advance, but again taking the analogy that I've been using

15  throughout this hearing of a regular criminal case, the police,

16  the FBI after they arrest somebody, they write a report about

17  why they arrested this person.  And maybe you don't know the

18  answer to whether there is some equivalent in this context.

19       **MR. SKEDZIELEWSKI:**  Yeah, I can't say whether there

20  is an equivalent in this context --

21       **THE COURT:**  Okay.

22       **MR. SKEDZIELEWSKI:**  -- definitively, Your Honor.  I

23  don't want to say --

24       **THE COURT:**  Understood, I appreciate that --

25       **MR. SKEDZIELEWSKI:**  -- something the evidence doesn't

ER-0215

74

1    bear out.

2           **THE COURT:**  -- thank you for your candor.

3           **MR. SKEDZIELEWSKI:**  Yes, absolutely.

4           **THE COURT:**  So what, if you could describe for the

5    Court if what we're talking about is providing the after the

6    fact reports, to the extent that they exist, what is burdensome

7    about that?

8           **MR. SKEDZIELEWSKI:**  Generating the reports, redacting

9    the reports, reviewing the reports, man hours, you know, the

10   Federal Rules of Civil Procedure very tightly govern discovery.

11   This is essentially a discovery order and that's because

12   discovery is enormously burdensome and costly.

13          So, I mean, I think just the fact that there's a

14   request for documents alone is a burden.  Now, of course, the

15   federal rules do provide for discovery and if this case gets to

16   that point, the Government will of course comply with those

17   federal rules.  But it would much rather do so with the benefit

18   and the protection of the Federal Rules of Civil Procedure

19   rather than just this injunction that could sweep, you know,

20   things that are really not warranted into the protective order.

21          **THE COURT:**  Understood.

22          **MR. SKEDZIELEWSKI:**  Yes, Your Honor.

23          **THE COURT:**  You have about 20 seconds left, but in

24   fairness I did take up a lot of your time with my commentary

25   and questions.  So if you need a few more minutes, that's fine.

75

1           **MR. SKEDZIELEWSKI:**  Thank you, Your Honor.  I'll be

2    brief.  Just one more point on the equities.  In <u>Orantes</u>

3    that's -- I think it's already been spelled out for the Court,

4    the U.S. Government could not show that the preliminary

5    injunctive -- injunction caused the burden, but here as I've

6    just said, the burden is clear.  So there's a real distinction

7    between the relief granted there and the relief granted here.

8           And again, I think that the standard with respect to

9    the factors, at the very least, would be incredibly confusing

10   to agents in the field.  So I can consider, but I can't

11   consider them just by -- like they've already received very

12   effective training that they understand what the Fourth

13   Amendment requires, and adding this in would require an entire

14   new training.  It would be a big lift, I can imagine for the

15   agencies, very costly on the Government's expense.

16           And before I conclude, Your Honor, I just want to

17   request, should an injunction issue in this case, the

18   Government does request that plaintiffs post a bond and

19   keeping -- being extremely frugal here and giving only a

20   fraction of what this order, should it issue, cost agencies, we

21   request $30 million.

22           So to conclude, because the plaintiffs have failed to

23   show that they're likely to prevail on the merits, not least of

24   all because this Court lacks jurisdiction over the claims,

25   defendants respectfully request this Court deny both TROs.

76

1          THE COURT:  And the $30 million is meant to capture

2     the cost of doing this document production and the training of

3     the officers?

4          MR. SKEDZIELEWSKI:  I think a lot else as well, Your

5     Honor.  I mean, there's a lot of moving pieces to these

6     operations.  They're very sophisticated with a lot of moving

7     parts, and a lot of those different moving parts are going to

8     have to be shifted around in light of a preliminary injunction

9     here.  So 30 million is a very, very small fraction of the

10    actual cost.

11         THE COURT:  Understood, thank you.

12         MR. SKEDZIELEWSKI:  Yes, Your Honor.

13         THE COURT:  I appreciate it.

14         MR. SKEDZIELEWSKI:  Thank you.

15         THE COURT:  Okay.  Any rebuttal?

16         MR. TAJSAR:  Thank you, Your Honor.  Mohammad Tajsar

17    for the plaintiffs.

18         I'd like to address a few points to the record, this

19    question about targeting and I would like to address standing

20    briefly and then talk about race, so just a few points, I'll

21    stay within my time.

22         So on the first point about the record and the time

23    that they needed to respond, you know, they had time and they

24    have all the evidence.  You know, I would have expected that at

25    the very least they would have offered evidence to dispute five

77

1  of the stops, four, maybe even one or two, but they haven't

2  done that.  We are the ones who provided the I-213 in this

3  case.  You know, they have all of that as Your Honor pointed

4  out.

5          You know, our job is not to convince the Court to

6  conclusively find the existence of this officially sanctioned

7  policy.  Our job is to demonstrate the likelihood of success on

8  the merits, right.

9          We have provided all the evidence that we have

10 including the I-213s and they've provided none.  This case does

11 not involve a dispute of fact.

12         **THE COURT:**  Is there more than one I-213 in the

13 record?

14         **MR. TAJSAR:**  No, there's only one.

15         **THE COURT:**  Okay.  Go ahead.

16         **MR. TAJSAR:**  So far.  And on the question of the I-

17 213s I think Your Honor is absolutely right, if a person is in

18 removal proceedings there should be an I-213.  So to the extent

19 that they are engaged in any kind of enforcement activity in

20 which they place somebody in removal proceedings there should

21 be I-213s that ought to demonstrate the basis for the stops,

22 but they don't.  That's our contention.

23         On the issue of the targeting and the consent.  I

24 think if we think broadly about what's been happening in this

25 district you can put them in two buckets.  The targeting

78

1    buckets and these roving patrol buckets.  We don't address any

2    of the targeting issues, as Your Honor pointed out.  We are

3    addressing the quote/unquote roving patrols and the -- what

4    they claim are the consensual encounters, right.  They say

5    they're consent based, we say they're clearly seizures.  And we

6    cite all -- we have loads and loads of evidence in the record

7    about how they cannot possibly be engaged and consent based

8    encounters with individuals, especially, you know, given how

9    they show up in these raids with guns, not just any ole guns,

10   assault rifles, masks, they're unidentified, they're running

11   aggressively at people.  They're ordering them, demanding them

12   to stop, they're blocking ingress and egress, they're shouting

13   commands, none of this is consent.  They're physically blocking

14   and holding people.

15         So I think that -- and we have evidence in the record

16   about how they're engaging in these stops.  And indeed evidence

17   about both in the -- even evidence about the quote/unquote

18   collateral encounters that my friend from the other side was

19   describing.

20         I point Your Honor to the RHD declaration, that's

21   4516 that describes one of these quote/unquote collateral stops

22   and how it does not comport with the Fourth Amendment

23   requirements.  And, in fact, that particular -- on the question

24   of race, that particular declaration demonstrates that the

25   collateral stops are not happening with individuals who are

79

1   white, right.  I think that's clear for everyone who's been

2   following the news, it's happening with people who appear to be

3   Latino.

4          And on the question of race, you know, they're not

5   going to admit this on the record, but the evidence is clear.

6   They're looking at race, you know.  The -- we -- there's -- the

7   evidence that we have provided -- you know, we have

8   declarations, I mentioned the RHD declaration, the declaration

9   of Mr. Jesus Cruz 4510 was a car wash worker who says that he

10  and his colleagues were stopped by these aggressive raids, but

11  he had colleague -- he had two colleagues who appear white, a

12  person who's of Russian descent and a person who's of Persian

13  descent.  They didn't go after them, you know.

14         There's -- we have -- the record is quite replete

15  about how it is that they're engaging in these encounters.  And

16  the suggestion that they're all consent based, I think is

17  difficult to square with the facts that are here.

18         I mean, for instance, we have -- we've cited to press

19  reports about a raid as a swap meet in Sante Fe Springs in

20  which witnesses reported seeing armed agents grabbing people

21  from bathrooms.  I cannot imagine that there was a consensual

22  encounter happening in a bathroom before somebody gets

23  physically pulled out from there.

24         So the -- I think the practice -- the evidence that

25  we have that's undisputed suggests that they are conducting

80

1   roving patrols in which they are stopping people and asking

2   questions later.

3        On the question of standing, Your Honor, to address

4   the two cases that my friend has raised, Clapper and some

5   discussions about Lyons.  I mean Clapper is not -- is

6   inapplicable for two reasons.  You know, one that case was

7   about individuals who couldn't prove -- the plaintiffs there

8   couldn't show that they had been harmed in the past.  And it

9   was speculative whether they'd be harmed in the future.  You

10  know, that's not this case.

11       You know, we have shown that we have been harmed in

12  the past and we can show that we are likely to be harmed in the

13  future, based on what's happening.  And I think -- and

14  similarly, Lyons doesn't control this case.

15       I point Your Honor, as I did in my opening remarks to

16  LaDuke in which the Ninth Circuit describes some of the factors

17  that are relevant to demonstrating why those plaintiffs there

18  and our plaintiffs here have standing to seek injunctive

19  relief, the fact of the policy being officially sanctioned,

20  which is different from Lyons.  You know, we have record

21  evidence about that, including from, you know, Stephen Miller

22  all the way on down.

23       The fact that these incidents are likely to recur.

24  The fact that this is -- you know, this is a case against the

25  feds rather than against the state, so there's no prudential

81

1  concerns.  You know, LaDuke really lays out the roadmap of why

2  we have standing in this case.

3       **THE COURT:**  If I could interrupt you.  I'm not sure,

4  and maybe you can point the Court to, to the extent that there

5  are official statements, I'm not sure that they're official

6  statements saying that it's officially sanctioned to do stops

7  that are not based on reasonable suspicion.

8       So I think, at best, the official statements seem to

9  indicate that high level government officials approve of what

10  is -- what we're all seeing.  And you have some -- obviously

11  some conclusions that you would like the Court to draw about

12  what we're all seeing and what is happening.  But I'm not sure

13  that is, and please correct me if I'm wrong, that the evidence

14  shows that a policy of disregarding the requirement for

15  reasonable suspicion that there's any evidence that that's been

16  officially sanctioned beyond the inference that the Court could

17  draw from the fact that there seems to be approval of what is

18  happening and what is happening is in the plaintiff's view

19  unlawful.

20       **MR. TAJSAR:**  Thank you, Your Honor.  I think that's a

21  fair question.  I think what we would say is, we certainly have

22  the evidence of the pattern and practice.  The question of

23  what's been officially said, you know, they're not going to

24  come out and say we want you officially to violate the Fourth

25  Amendment.  But what they will say is, they will say quote,

82

1  push the limits.  You know, they will say, turn the creative

2  knob to 11.  They engaged in this practice and specifically

3  instructed their officers and agents and said, if it ends in

4  handcuffs, it's worth pursuing.

5         When Stephen Miller instructs high ranking ICE

6  officials and says, why are you just focused on criminals.  Why

7  aren't you at the 7-11's and the Home Depots.  That's as close

8  as we will get to an officially sanctioned policy that says we

9  don't care about whether they're criminals, whether they're

10  targeted, go out there and get me as many people as possible,

11  especially in the context in which they've imposed a 3,000

12  person arrest quota every day.

13         I mean, it is up for them -- you know, it strikes me,

14  you know, we haven't said this, but it strikes me as seriously

15  impossible to hit 3,000 arrests every day without some rampant

16  illegality going on.

17         The -- on the point about the speculative nature of

18  the allegations here, you know, we have -- sorry.  The

19  speculative nature of the future harm, you know, our -- the

20  member organizations here, the plaintiff's declarations, they

21  lay out exactly what is happening on the ground.

22         I mean, if we look at the CHIRLA declaration, you

23  know, CHIRLA has a membership of about 51,000 people in this

24  state, thousands and thousands of people in this district, most

25  of whom are low wage workers, many are day laborers, street

83

1  vendors, car wash workers, you know, they are -- and we have

2  provided evidence in the record about how all of these

3  industries are specifically being targeted, and indeed how, you

4  know, Mr. Miller and others are specifically targeting these

5  particular industries, right.

6          I mean, we have a member --

7          **THE COURT:**  If I could stop you for a moment.

8          **MR. TAJSAR:**  Please.

9          **THE COURT:**  I'm not sure that opposing counsel would

10  deny that those industries are being targeted.  I think he

11  would argue that it's appropriate to consider that along with

12  other factors.  I think one question I have for you, is for you

13  to respond to the point that opposing counsel made which is

14  that you have evidence of what the individuals detained have

15  experienced, but you don't have direct evidence of what was in

16  the minds of the agents and what they were doing.

17          And so I think he would say, it may appear to you

18  that the stop at, name the location, was just based on race and

19  the fact that it's a bus stop or a tow yard.  But in actual

20  fact, there's a lot that went into it and they have a lot of

21  intelligence that they're relying on and it's a very

22  sophisticated operation.  And ultimately it's your burden, the

23  plaintiff's burden to show that something illegal is happening

24  and a fairly high burden given the relief you're seeking.

25          And so if you could just respond to that point that

84

1    would be extremely helpful to the Court.

2         **MR. TAJSAR:**  Thank you, Your Honor.  On the question

3    of the locations, I raised them to suggest -- I raised them not

4    on the point of the totality of the circumstances, but to

5    demonstrate fear of future harm.

6         I think on the question that -- you know, on what my

7    friend has said about, you know, we don't have all of the

8    facts, fine.  You know, they do, let them bring those facts.

9    In the meantime, they should be ordered to follow the law, no

10   more, no less and if they want to bring in all the facts that

11   they want, to help -- to rebut the evidence that we have

12   provided that says that these stops are happening without any

13   assessment of reasonable suspicion.  It's clear from the

14   witnesses.

15        **THE COURT:**  If you could just again and maybe I'll

16   restate the question.  I think his point would be, the person

17   being detained, they cannot provide the evidence of whether the

18   detention or the stop or the encounter was based on

19   impermissible factors.  They have no idea what the factors

20   were.

21        So if you could address why the Court should find

22   that the plaintiffs are likely to succeed on their claim that

23   these stops actually are devoid of reasonable suspicion, given

24   the nature of the evidence and he didn't say what he's talking

25   about, but we -- I think we can agree.  The plaintiffs don't

85

1   have an agent saying what he said.  I'm going to throw my

2   training in the trash and just go after people because of race,

3   we know that.  And so if you could address that point, that

4   would be extremely helpful to the Court.

5        MR. TAJSAR:  I think what the evidence demonstrates -

6   - well, I'd say two things.  To the extent that the agents

7   have -- if they're engaged in targeted operations, fine.  If

8   they also want to engage on consensual encounters, so that

9   maybe they could draw out the suspicion, also fine.  We don't

10  challenge either of those.  The problem is we are challenging

11  stops in which there's no consent and in which it appears from

12  eyewitnesses and the individuals that no particular assessment

13  is being made.

14        And the reason why it's that, I think that's how I

15  would respond to my friend's suggestion about the, kind of

16  what's in the mindset of these agents is that they have said

17  that they are engaging in these roving patrols.  By definition,

18  they do not have the sort of particularity and the particular

19  assessment associated with that particular person.

20        I mean, mere proximity, for instance, we know is not

21  enough.

22        THE COURT:  And what would you point to in the record

23  to support the idea that defendants have said they're engaging

24  in roving patrols?

25        MR. TAJSAR:  I believe there is -- there's a quote

ER-0227

86

1    specifically from a Border Patrol agent who describes them as

2    roving patrols.  I think it's Kim, if I recall correctly, who

3    says that, you know, that it's difficult for them to do some of

4    the work that they're doing in Los Angeles, so they're

5    resorting to roving patrols.  That's their -- that's them

6    saying that.  I believe it's Kim, Your Honor, I can double-

7    check that with my co-counsel.

8         **THE COURT:**  And then I'll let you move on after

9    asking this --

10        **MR. TAJSAR:**  Sure.

11        **THE COURT:**  -- one different type.

12        You said it appears that there's no particular

13   assessment being made, but is that enough?  Is that appearance

14   enough for this Court to find the likelihood of success and to

15   grant the relief that the plaintiffs are seeking?

16        **MR. TAJSAR:**  I think so because this is not -- this

17   is a common scenario that we are finding ourselves in, in a

18   pattern and practice case alleging Fourth Amendment violations.

19   This is nothing new.  I mean, the same problem that my friend

20   has suggested here about well we don't know what's in the minds

21   of these officers is the same problem that happens in, you

22   know, in LaDuke, in Malindrez (phonetic), in all of these other

23   pattern and practice Fourth Amendment cases.

24        In the UFW case, you know, Anova, in Kidd, another --

25   K-I-D-D in the Central District, all of these cases have the

87

1    same -- except that that is the concern, all of the injunctions

2    that have ever been issued on Fourth Amendment violations

3    suffer from the same problem, we don't know what they have.

4    But that's doesn't save the day.

5         You know, what we need to demonstrate is a likelihood

6    of success based on the facts that's apparent to us and from

7    some of the information that we have from the I-213s, for

8    instance.  So that's like -- the I-213 in the one that we have

9    provided is evidence enough that demonstrates that there's

10   nothing -- at least they haven't said it.  There's nothing in

11   there that would support their position.

12        And then the final thing I'll add, Your Honor, is if

13   they had, if they truly were engaged in these assessments we

14   wouldn't have all of these people with status being stopped.

15   We wouldn't have U.S. citizens being stopped.  I mean, that's

16   part of what's so alarming I think to us, certainly to all the

17   intervenors, to the State, that they're sweeping so broadly and

18   they're doing it without ever conceding that what they're doing

19   is wrong, precisely because they are not engaged in that

20   individualized assessment, regardless of what the facts are,

21   they will stop you.  And that's the way that they've crafted

22   this policy and practice.

23        The final thing I'll say, Your Honor, is you know,

24   they are complaining -- what we want in this TRO is for them to

25   follow the law.  That's what we want in this application.  When

88

1   it comes time for the preliminary injunction, we can deal with

2   the questions around maintaining records, maintaining I-213s,

3   that's fine, we can deal with that later.  Right now, follow

4   the law.

5          To the extent that they think that that is burdensome

6   to them, it seems to me that it is far more burdensome for them

7   to violate the Constitution, than it is perhaps to prepare to

8   save the records concerning our clients that are being

9   impermissibly and unlawfully detained.

10         **THE COURT:**  I want to make sure I understand you.

11  Are you withdrawing the request for the documentation, the

12  guidance and the training?

13         **MR. TAJSAR:**  No.  So I guess what I'm suggesting,

14  Your Honor, is that that's -- our -- that is for the

15  preliminary injunction.  In other words, we would ask for that

16  at the PI stage.  What we're asking right now --

17         **THE COURT:**  I see.

18         **MR. TAJSAR:**  -- for this restraining order is not for

19  any of those things.

20         **THE COURT:**  Understood, understood, thank you.

21         **MR. TAJSAR:**  And then I think we have in our original

22  application the citation, it's footnote 28 on the roving

23  patrols, kind of official statements.  And so I'd direct the

24  Court to that particular footnote.

25         **THE COURT:**  And that ECF 4?

89

1          **MR. TAJSAR:**  Oh, sorry, that's 45.  I'm sorry.

2          **THE COURT:**  ECF 45?

3          **MR. TAJSAR:**  Yeah, that's right.

4          **THE COURT:**  Okay.

5          **MR. TAJSAR:**  And then I wasn't going to address the

6 bond issue, but we think that's inappropriate for the reasons

7 that are raised in the other TRO.  There's really no basis to

8 levy that kind of bond in a scenario in which we're only asking

9 again for them to follow the law and not any of the other

10 matters.

11         **THE COURT:**  Okay.

12         **MR. TAJSAR:**  Thank you so much.

13         **THE COURT:**  Thank you.  If I could -- let me just, on

14 this bond issue, counsel for the Government, if -- I just -- I

15 do have one additional -- two additional questions,

16 Mr. Skedzielewski.

17         **MR. SKEDZIELEWSKI:**  Yes.

18         **THE COURT:**  Skedzielewski, I apologize.

19         Plaintiff's counsel has clarified that the TRO is

20 only seeking the relief concerning the use of these factors and

21 not the documentation.  So I just want it to be clear even just

22 that, you believe the $30 million is appropriate because of

23 what you said about it requiring retraining and all of that.

24         **MR. SKEDZIELEWSKI:**  Yes, absolutely, Your Honor.

25         **THE COURT:**  Okay.  So even though there's no

ER-0231

90

```
 1   additional documentation, no other discovery, the $30 million

 2   is still appropriate.

 3        MR. SKEDZIELEWSKI:  Yes, Your Honor.  My

 4   conversations with the agencies actually didn't even involve

 5   the documentary request --

 6        THE COURT:  Oh, great.

 7        MR. SKEDZIELEWSKI:  -- which I raised today.  It was

 8   actually just squarely focused on, that is the second request

 9   for relief about the factors.

10        THE COURT:  Understood, thank you.

11        And then plaintiff's counsel has -- you did talk

12   about a number of consensual encounters.  Plaintiff's counsel

13   has raised the issue of the way that these encounters, that

14   they have talked about, have occurred and they're not

15   consensual.

16        One of the factors that has been raised is the show

17   of force, the masks, et cetera, you have indicated that the

18   agents have been subjected to extraordinarily violent -- I

19   suppose some -- I can understand how you might argue that they

20   need to surprise people, they need to have weapons in light of

21   the response that they might get, I'm still not under -- sure

22   though that I understand the masks and the failure to identify.

23        So if you could address how that is a precautionary

24   measure with respect to violence that would be helpful.

25   Because it appears to this Court to be unusual in the law
```

91

1    enforcement context.

2         **MR. SKEDZIELEWSKI:**  Understood, Your Honor.  I think

3    the first thing to say is that the masks really are not

4    especially probative in deciding whether or not a detentive

5    stop has occurred, especially in a post COVID 19 environment

6    where I still regularly see people wearing masks all the time.

7         And what was -- the weapons was the other piece or

8    the surprise, I'm sorry, Your Honor?

9         **THE COURT:**  The masks were the main thing.

10        **MR. SKEDZIELEWSKI:**  The masks.  Yeah, so I don't

11   think it's especially probative to determine whether or not

12   there was a stop.

13        **THE COURT:**  But you indicated that they're wearing

14   the masks because of the extraordinary violence that they have

15   been faced with.  And I'm just not sure I understand the

16   correlation, so I wanted to give you the opportunity --

17        **MR. SKEDZIELEWSKI:**  Certainly.

18        **THE COURT:**  -- to address that.

19        **MR. SKEDZIELEWSKI:**  So I think one of the problems

20   that agents are facing is what they call doxxing, where an

21   individual's identity and personally identifying information is

22   released to the public.  So an agent is seen on camera doing

23   his job and then his home address is released.

24        I'm not aware and I don't want to represent to the

25   Court of any specific instances like that that have occurred,

EXCEPTIONAL REPORTING SERVICES, INC

ER-0233

92

1   but I'm aware of it as sort of general concern across the

2   agencies to prevent doxxing.

3            **THE COURT:**  Okay.  Thank you.

4            Okay.  This matter will be taken under submission.

5   Since I have the parties here, let us talk briefly regarding

6   timing.  If the Court is to grant the two TROs, I wanted to

7   talk about timing and sort of procedural issues.

8            What the Court would be inclined to do is to have the

9   parties meet and confer regarding an appropriate briefing

10  schedule for a preliminary injunction and a date for the

11  hearing of that injunction.  I did want to advise the parties

12  that the Court is unavailable the week of July 21st, July 28th,

13  August 4th.

14           So I'll just put that out there for the parties, to

15  the extent in the event that the Court grants the TROs, the

16  Court will be asking the parties to meet and confer on a

17  briefing schedule and a hearing date.  And I just wanted to

18  sort of give the parties the parameters in terms of my timing.

19           Is there anything else we should address with respect

20  to scheduling in the event that the Court grants the TRO?

21  Obviously if the Court decides to do something different than

22  what's in the tentative then I'm not sure that this is as much

23  of an issue.  Yes?

24           **MR. TAJSAR:**  Your Honor, just to clarify the Court's

25  schedule.  Was that the unavailable the week of the 21st?

93

```
 1              THE COURT:  Unavailable the week of July 21st, July
 2   28th, and August 4th.
 3              MR. TAJSAR:  Understood, understood.
 4              THE COURT:  Yes.
 5              MR. TAJSAR:  If I may, we're --
 6              THE COURT:  And just make sure, counsel, that you're
 7   speaking into a microphone.
 8              MR. TAJSAR:  I'll do that.
 9              THE COURT:  Thank you.
10              MR. TAJSAR:  So just on that, Your Honor, we're happy
11   to meet and confer both on the hearing dates and the briefing
12   schedule.  I think on the -- speaking for the stop and arrest
13   plaintiffs we're ready to proceed with a hearing within 14
14   days.  Obviously that's not -- a hearing that's set in 14 days
15   and working backwards, but I gather that doesn't work for the
16   Court, so we can make it work.  That's between the parties.
17              THE COURT:  Okay.  Thank you.
18              MR. TAJSAR:  And actually I'll save that.
19              THE COURT:  Mr. Skedzielewski, would you like to be
20   heard on the timing issue?
21              MR. SKEDZIELEWSKI:  Just very briefly, Your Honor.
22              THE COURT:  Yes.
23              MR. SKEDZIELEWSKI:  And apologies if this is not
24   quite your question, but just if the TROs do issue, the
25   Government does request the seven days delay for the Solicitor
```

EXCEPTIONAL REPORTING SERVICES, INC

94

1    General to make his assessment.

2        **THE COURT:**  Okay.  And I will be candid, I'm not sure

3    that you've made that showing, but obviously you're always --

4    you can always file a motion for a stay at some point and/or

5    seek a stay from a higher court.

6        **MR. SKEDZIELEWSKI:**  Thank you, Your Honor.

7        **THE COURT:**  Thank you.  Okay.  And then let's address

8    the docket.  Again, it's not clear to me if the docket has

9    limited public access because it was originally filed as a

10   habeas or because it involves immigration.  I think either one

11   of those can mean that the docket is somewhat limited.

12       Obviously the case sort of has a different contours

13   than when it was first filed and so I don't know if the parties

14   want to be heard on whether they think the docket should be

15   handled differently or orders going forward should be handled

16   differently.  I -- since we're here, then we can address that,

17   yes.

18       **MR. TAJSAR:**  Thank you, Your Honor.  Yeah, we did

19   want to address this particular issue.  So we would make a

20   request from this Court to recharacterize the case as a civil

21   rights case given what we filed in the amended complaint and

22   that's the -- it's the categorization in that, in the civil

23   case cover sheet that causes this restriction.

24       **THE COURT:**  Okay.

25       **MR. TAJSAR:**  And we think that's appropriate just so

95

1    that the Court is aware, you know, two of the petitioners, the

2    original petitioners have been released on bond and the third

3    has a bond hearing set next week and, you know, we don't know

4    how that's going to go, but if the third is released then we

5    would file an amended complaint.

6         Again, the habeas portion would come out and then

7    that makes it sort of clear.  But regardless of what happens

8    next week, we would request that the Court make that sort of

9    change in the docket.  And we were told from the electronic

10   filing clerk that it is the Court's decision to do that, rather

11   than a clerical matter.

12        **THE COURT:**  Okay.  Understood.  And,

13   Mr. Skedzielewski, do you -- I trust you don't have any

14   objection to that.

15        **MR. SKEDZIELEWSKI:**  Very briefly, Your Honor, we

16   absolutely support a fair and open hearing, but at the moment,

17   only two of the original plaintiffs that were petitioners

18   rather, have been released.  There's one that is still not

19   released, so I don't think at this stage the docket should be

20   opened, while his case is still pending.

21        **THE COURT:**  I'm assuming and counsel can correct me

22   if I'm wrong, I guess I'm assuming that the restrictions on the

23   docket are for the protection of the petitioner and so if the

24   petitioner at any point wants to say, even if the habeas is

25   still proceeding, I don't need this to be restricted, I'm happy

ER-0237

96

1   for it to -- I think that's fine.  But I don't know if it's --

2   if your understanding is that there's something that is

3   protecting the Government and therefore, the Government might

4   object to all of the information on the docket being unsealed,

5   I'm going to use that in a very loose way.

6        MR. SKEDZIELEWSKI:  Yeah, I don't have case law on

7   that, Your Honor.

8        THE COURT:  Okay.

9        MR. SKEDZIELEWSKI:  But that is my instinct is to say

10  yes.  I mean, we've submitted documents on that record, on the

11  understanding that it's closed and I haven't had a chance to

12  even ask the question whether anything on there needs --

13       THE COURT:  Understood, understood.

14       MR. SKEDZIELEWSKI:  -- to be further redacted, yes.

15       THE COURT:  Okay.

16       MR. SKEDZIELEWSKI:  And I'll just also mention

17  quickly, Your Honor, that on pages 8 and 9 of the tentative --

18       THE COURT:  Yes.

19       MR. SKEDZIELEWSKI:  -- two of the detainees are

20  listed as still being detained, but they have been released.

21       THE COURT:  Okay.  Thank you.  We will address that.

22     (Pause)

23       THE COURT:  Okay.  Well, I do want to thank the

24  parties for the very thorough and very quick briefing.  It was

25  extremely helpful to the Court as was this hearing and no

ER-0238

97

1  matter which way the Court goes, it sounds like this case will

2  have a life that continues after today.  I must say,

3  Mr. Skedzielewski, I had your job when I worked at the DOJ some

4  years ago, so maybe at some point you'll have this job if you

5  want it.

6           MR. SKEDZIELEWSKI:  Thank you, Your Honor.

7           THE COURT:  Yes?  Do the proposed intervenors need to

8  be heard?

9           MR. SCHWAB:  My apologies, Your Honor.

10          THE COURT:  Yes.

11          MR. SCHWAB:  Can I be heard briefly just also on a

12  timing matter that relates to our motion to intervene?

13          THE COURT:  Yes, thank you.

14          MR. SCHWAB:  Thank you, Your Honor.  So we have a

15  pending motion to intervene.  We took the earliest hearing date

16  that the Court had which is mid to late August.  Obviously we

17  would like to -- we think we should be allowed to intervene,

18  obviously that's up to the Court.  But if the Court were to

19  decide that we are proper intervenors, that would be important

20  for us to get that as soon as possible.

21          So we plan to file an ex parte to advance the

22  hearing.  I heard the Court's earlier description of available

23  dates.  Is there any other guidance the Court would give us as

24  to when we might seek to have that motion heard?

25          THE COURT:  No.  I don't have any additional guidance

**EXCEPTIONAL REPORTING SERVICES, INC**

Case 2:25-cv-05605-MEMF-SP    Document 90    Filed 07/14/25    Page 98 of 101   Page
ID #:1345

98

1   and I'm not sure.  I guess based upon what -- I think perhaps

2   you should go ahead and file the ex parte, because then you

3   could explain to the Court what the rush is, if -- especially

4   if the Court is going to grant the TROs.  You could explain

5   what the rush is to having the motion to intervene heard sooner

6   and what is going to change if you have to wait a few weeks,

7   so.

8          And to the extent that it is because you want to be

9   heard on the preliminary injunction, I assume that you could

10  work with the parties to figure out timing that works.  But if

11  the question is whether the Court has any availability -- how

12  to put this?

13         I'm not available those three weeks.  Because this

14  happened this week, a lot of what happened this week is moved

15  to next week.  So I pretty much am booked next week.  So I'm

16  not sure that there's time earlier than the time that you have

17  set, but obviously you'll make your arguments and the Court

18  will consider not just the Court's calendar, the Court

19  obviously has to consider the ex parte factors and the law.

20  And to the extent that it's legally required for it to be

21  heard, certainly the Court will endeavor to make that happen.

22         **MR. SCHWAB:**  I appreciate that, Your Honor.  What

23  we'll do is we'll wait to see what the Court decides on the TRO

24  so that we can give you an informed ex parte --

25         **THE COURT:**  Okay.

99

1          MR. SCHWAB:  -- and of course, we'll meet and confer

2     with the parties.

3          THE COURT:  Okay.  Thank you.

4          MR. SCHWAB:  Thank you.

5          THE COURT:  And is there anything else before the

6     clerk closes?  No.

7          MR. SKEDZIELEWSKI:  Very briefly, Your Honor.

8          THE COURT:  Yes.

9          MR. SKEDZIELEWSKI:  We would oppose the filing of an

10    ex parte.  We have not -- counsel has not reached out to me to

11    meet and confer about changing the timeline or anything to that

12    effect, so.

13         THE COURT:  I understood him to be meaning that he's

14    planning on filing one, but not that he's going to dispense

15    with the requirements to meet and confer.

16         MR. SCHWAB:  I believe I just said, Your Honor, that

17    I intend --

18         THE COURT:  Oh, we don't have the microphone, sorry.

19         MR. SCHWAB:  So what I just said, Your Honor, was I

20    intend to meet and confer with both parties --

21         THE COURT:  Oh, great.

22         MR. SCHWAB:  -- about that ex parte and that'll

23    happen.

24         THE COURT:  Okay.  Maybe it wasn't clear to him

25    what --

100

1              MR. SKEDZIELEWSKI:  It was not.  Thank you for the

2      clarification.

3              THE COURT:  Okay.  Thank you.  And again to the

4      people in the gallery and the people in the overflow courtroom,

5      thank you very much for your participation with us.  You're

6      welcome to any and all hearings that we have.  And have a

7      wonderful rest of the afternoon.  Please stay safe, everybody.

8      Take good care and for those coming from Washington, D.C. safe

9      travels.

10             MR. SKEDZIELEWSKI:  Thank you, Your Honor.

11             THE COURT:  Okay.  Court is adjourned.  The parties

12     are excused.

13         **(Proceedings concluded at 3:37 p.m.)**

14

15

16

17

18

19

20

21

22

23

24

25

ER-0242

**<u>CERTIFICATION</u>**

**I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.**

_____

**Signed**

**July 12, 2025**

**Dated**

*TONI HUDSON, TRANSCRIBER*

**EXCEPTIONAL REPORTING SERVICES, INC**

| | |
|---|---|
| 1 | BRETT A. SHUMATE |
| | Assistant Attorney General |
| 2 | Civil Division |
| 3 | ERIC J. HAMILTON | BILAL A. ESSAYLI |
| | Deputy Assistant Attorney General | United States Attorney |
| 4 | | DAVID M. HARRIS |
| | SEAN SKEDZIELEWSKI | Assistant United States Attorney |
| 5 | Counsel to the Assistant Attorney General | Chief, Civil Division |
| | | JOANNE S. OSINOFF |
| 6 | DEVIN BARRETT | Assistant United States Attorney |
| | ALANNA T. DUONG | Chief, Complex and Defensive Litigation Section |
| 7 | Senior Litigation Counsel | DANIEL A. BECK (SBN 204496) |
| | JACOB A. BASHYROV | PAULINE H. ALARCON (SBN 345785) |
| 8 | JAMES A. HURLEY | Assistant United States Attorneys |
| | Trial Attorneys | Federal Building, Suite 7516 |
| 9 | Office of Immigration Litigation | 300 North Los Angeles Street |
| | Civil Division, U.S. Dept. of Justice | Los Angeles, California 90012 |
| 10 | P.O. Box 878, Ben Franklin Station | Telephone: (213) 894-2574 | 3992 |
| | Washington, DC 20044 | E-mail: Daniel.Beck@usdoj.gov |
| 11 | Tel: (202) 305-7040 | Pauline.Alarcon@usdoj.gov |
| | Fax: (202) 305-7211 | |
| 12 | Email: alanna.duong@usdoj.gov | |

13    Attorneys for Defendants

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| PEDRO VASQUEZ PERDOMO; *et al.*, | No. 2:25-cv-05605-MEMF |
| | **DEFENDANTS' OPPOSITION** |
| Plaintiffs, | **TO *EX PARTE* APPLICATION FOR** |
| | **TEMPORARY RESTRAINING ORDER AND** |
| v. | **ORDER TO SHOW CAUSE** |
| | **RE: PRELIMINARY INJUNCTION** |
| KRISTI NOEM, in her official capacity as | **(Dkt. 45)** |
| Secretary of Homeland Security; *et al.*, | |
| | [Supporting declarations filed concurrently] |
| Defendants. | |
| | Hon. Maame Ewusi-Mensah Frimpong |
| | United States District Judge |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     FACTUAL BACKGROUND .............................................................................. 2

        A.      Procedural History ................................................................................. 2

        B.      Federal Law Enforcement Procedures .................................................. 2

        C.      Named Plaintiffs' Allegations ............................................................... 4

III.    STANDARD OF REVIEW ................................................................................. 5

IV.     ARGUMENT ...................................................................................................... 6

        A.      Plaintiffs Have Failed to Establish That They are Entitled to Seek *Ex Parte* TRO
                Relief under the *Mission Power* Standard, As Opposed to Proceeding by Noticed
                Motion for a Preliminary Injunction. ..................................................... 6

        B.      Plaintiffs Seek Overbroad and Insufficiently Specific TRO Relief. ................... 8

        C.      Plaintiffs Lack Standing to Obtain a Prospective Injunction. ......................... 11

                1.      Organizational Plaintiffs Lack Standing Three Ways. ................... 11

                2.      Named Plaintiffs Lack Standing to Seek Relief for Others. .............. 13

        D.      Plaintiffs Are Not Likely To Succeed On The Merits of Their Claim. ............. 14

                1.      The Court Lacks Jurisdiction to Review Plaintiffs' Claims Under
                        8 U.S.C. §§ 1252(a)(5), (b)(9), and (g). ............................................. 14

                2.      Plaintiffs have not shown that Defendants violated any Fourth
                        Amendment rights or acted contrary to 8 U.S.C. § 1357(a)(2)................ 17

        E.      Plaintiffs Have Not Demonstrated Irreparable Harm. ................................. 22

        F.      The Equities Weigh Against Granting the TRO Application. ......................... 22

        G.      Plaintiffs Cannot Obtain Relief on Behalf of an Uncertified Class. ............... 23

        H.      Any Injunction Should Require Bond and Be Properly Limited to Named
                Plaintiffs ............................................................................................... 23

V.      CONCLUSION ................................................................................................ 24

L.R. 11-6.2 Certificate of Compliance

i

# TABLE OF AUTHORITIES

**Federal Cases**

*Abel v. United States,*
   362 U.S. 217 (1960) .................................................................................. 17

*All. For The Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011) .................................................................. 22

*Am. Legion v. Am. Humanist Ass'n,*
   588 U.S. 29 (2019) .................................................................................... 14

*Boardman v. Pacific Seafood Group,*
   822 F.3d 1011 (9th Cir. 2016) .................................................................. 22

*Burton v. City of Belle Glade,*
   178 F.3d 1175 (11th Cir. 1999) ................................................................. 9

*California v. Azar,*
   911 F.3d 558 (9th Cir. 2018) ..................................................................... 5

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ............................................................................. 12, 22

*City of New York v. Mickalis Pawn Shop, LLC,*
   645 F.3d 114 (2d Cir. 2011) ...................................................................... 9

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ................................................................................. 12

*DSE, Inc. v. United States,*
   169 F.3d 21 (D.C. Cir. 1999) ................................................................... 24

*E.E.O.C. v. AutoZone, Inc.,*
   707 F.3d 824 (7th Cir. 2013) ..................................................................... 9

*Echeverria-Perez v. Barr,*
   794 F. App'x 614 (9th Cir. 2019) ............................................................ 17

*Elend v. Basham,*
   471 F.3d 1199 (11th Cir. 2006) ................................................................. 9

*Emanuel v. Morda,*
   No. 2:24-cv-01356, 2025 WL 1532501 (D. Nev. May 28, 2025) ....... 21, 24

*Florida v. Rodriguez,*
   469 U.S. 1 (1984) ..................................................................................... 21

ii

*Garcia v. Google, Inc.,*
   786 F.3d 733 (9th Cir. 2015) ................................................................ 6

*Hamdi v. Rumsfeld,*
   294 F.3d 598 (4th Cir. 2002) ............................................................... 12

*Hunt v. Wash. State Apple Advert. Comm'n,*
   432 U.S. 333 (1977) ..................................................................... 12, 13

*Illinois v. Wardlow,*
   528 U.S. 119 (2000) ..................................................................... 20, 21

*INS v. Lopez-Mendoza,*
   468 U.S. 1032 (1984) ........................................................................ 22

*INS v. St. Cyr,*
   533 U.S. 289 (2001) .......................................................................... 15

*J.E.F.M. v. Lynch,*
   837 F.3d 1026 (9th Cir. 2016) ......................................................... 15, 16

*Jennings v. Rodriguez,*
   583 U.S. 281 (2018) .......................................................................... 16

*Kidd v. Mayorkas,*
   734 F. Supp. 3d 967, (C.D. Cal. 2024) .................................................. 6

*Laker Airways Ltd. v. Sabena, Belgian World Airlines,*
   731 F.2d 909 (D.C. Cir. 1984) ............................................................ 14

*Leal-Burboa v. Garland,*
   No. 21-70279, 2022 WL 17547799 (9th Cir. 2022) ................................ 16

*Lopez v. Brewer,*
   680 F.3d 1068 (9th Cir. 2012) ............................................................. 5

*Lowery v. Circuit City Stores, Inc.,*
   158 F.3d 742 (4th Cir. 1998) ............................................................... 9

*Martinez v. Napolitano,*
   704 F.3d 620 (9th Cir. 2012) ............................................................. 15

*McKay v. Ingleson,*
   558 F.3d 888 (9th Cir. 2009) ............................................................. 18

*Melendres v. Arpaio,*
   784 F.3d 1254 (9th Cir. 2015) .......................................................... 8, 9

iii

*Minnesota v. Carter*,
  525 U.S. 83 (1998) ................................................................................... 11

*Mission Power Engineering Co. v. Continental Cas. Co.*,
  883 F. Supp. 488 (1995) ..................................................................... 1, 6, 7

*Munaf v. Geren*,
  553 U.S. 674 (2008) ................................................................................. 14

*Munns v. Kerry*,
  782 F.3d 402 (9th Cir. 2015) ................................................................... 12

*Nat'l Ctr. for Immigrants Rights, Inc. v. INS*,
  743 F.2d 1365 (9th Cir. 1984) ................................................................ 23

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*,
  434 U.S. 1345 (1977) .............................................................................. 23

*Nicacio v. Immigr. & Naturalization Serv.*,
  797 F.2d 700 (9th Cir. 1985) ................................................................... 21

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................. 22

*Olagues v. Russoniello*,
  770 F.2d 791 (9th Cir. 1985) ................................................................... 22

*Onofre-Rojas v. Sessions*,
  750 F. App'x 538 (9th Cir. 2018) ............................................................ 21

*Orhorhaghe v. Immigr. & Naturalization Serv.*,
  38 F.3d 488 (9th Cir. 1994) ............................................................... 18, 20

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*,
  636 F.3d 1150 (9th Cir. 2011) ................................................................ 22

*Perez Cruz v. Barr*,
  926 F.3d 1128 (9th Cir. 2019) ................................................................ 18

*Rajah v. Mukasey*,
  544 F.3d 427 (2d Cir. 2008) .................................................................... 16

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999) ................................................................................. 15

*Sanchez v. Sessions*,
  904 F.3d 643 (9th Cir. 2018) ............................................................. 16, 18

iv

*Schmidt v. Lessard,*
   414 U.S. 473 (1974)....................................................................................9

*Simon v. E. Ky. Welfare Rights Org.,*
   426 U.S. 26 (1976)....................................................................................12

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.,*
   240 F.3d 832 (9th Cir. 2001)......................................................................5

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014)..................................................................................11

*Tejeda-Mata v. INS,*
   626 F.2d 721 (9th Cir. 1980)....................................................................17

*Terry v. Ohio,*
   392 U.S. 1 (1968)......................................................................................20

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021)..................................................................................13

*Trump v. CASA, Inc.,*
   2025 WL 1773631 (U.S. June 27, 2025)..................................................24

*U.S. v. Texas,*
   599 U.S. 670 (2023)..................................................................................23

*U.S. v. W. T. Grant Co.,*
   345 U.S. 629 (1953)..................................................................................22

*Ubiquity Press Inc. v. Baran,*
   No. 8:20-CV-01809-JLS, 2020 WL 8172983 (C.D. Cal. Dec. 10, 2020)..................8

*United States v. Arvizu,*
   534 U.S. 266 (2002)............................................................................18, 21

*United States v. Brignoni-Ponce,*
   422 U.S. 873 (1975)......................................................................20, 21, 23

*United States v. Cortez,*
   449 U.S. 411 (1981)......................................................................18, 19, 21

*United States v. Enslin,*
   327 F.3d 788 (9th Cir. 2003)....................................................................18

*United States v. Jacobsen,*
   466 U.S. 109 (1984)..................................................................................18

v

*United States v. Meza-Campos,*
  500 F.2d 33 (9th Cir. 1974) ......................................................................... 18

*United States v. Montero-Camargo,*
  208 F.3d 1122 (9th Cir. 2000) ........................................... 18, 19, 20, 21

*United States v. Reyes-Oropesa,*
  596 F.2d 399 (9th Cir. 1979) ......................................................................... 18

*United States v. Sokolow,*
  490 U.S. 1 (1989) .......................................................................... 18, 20, 21

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338 (2011) ......................................................................................... 23

*Warth v. Seldin,*
  422 U.S. 490 (1975) ......................................................................................... 23

*Whitmore v. Arkansas,*
  495 U.S. 149 (1990) ......................................................................................... 12

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ............................................................................................... 5

**Federal Statutes**

8 U.S.C. § 1252 ..................................................................................................... 2

8 U.S.C. § 1252(b)(9) .............................................................................. 14, 15, 16

8 U.S.C. § 1252(g) .................................................................................... 14, 15, 16

8 U.S.C. § 1357 ................................................................................................... 10

8 U.S.C. § 1357(a)(2) ........................................................................ 2, 3, 17, 18

8 U.S.C. § 1252(a)(5) ............................................................................... 14, 15, 16

19 U.S.C. § 1589a .............................................................................................. 10

28 U.S.C. § 2241 ................................................................................................ 15

**Federal Rules**

Federal Rule of Civil Procedure 23(a)(4) ........................................................ 14

Federal Rule of Civil Procedure 65(c) ...................................................... 23, 24

vi

ER-0250

1

**Federal Regulations**

2

8 C.F.R. § 287.3(a) ................................................................................. 17

3

8 C.F.R. § 287.3(d) ................................................................................. 17

4

8 C.F.R. § 287.5 ........................................................................................ 3

5

6

8 C.F.R. § 287.8(b)(2) ......................................................................... 18, 19

7

8 C.F.R. § 287.8(c)(2)(i) .......................................................................... 18

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

Plaintiffs seek the extraordinary remedy of a temporary restraining order and preliminary injunction designed to interfere with the enforcement of federal immigration law. Plaintiffs base their request for emergency injunctive relief on allegedly recurring violations of the Fourth Amendment related to what they claim are stops unsupported by reasonable suspicion. Their *ex parte* application for temporary restraining order (Dkt. 45) (the "TRO") is defective and fails for several reasons.

*First*, Plaintiffs cannot meet their burden of showing that they will be "irreparably prejudiced if the underlying motion is heard according to regular noticed motion procedures." *Mission Power Engineering Co. v. Continental Cas. Co*., 883 F. Supp. 488, 492 (1995). This is especially so because Plaintiffs took weeks to prepare their papers but can provide no explanation why, after that passage of time, bypassing usual notice procedures is suddenly necessary. Plaintiffs' tactics are highly prejudicial to Defendants and impair the proper administration of justice. Plaintiffs' abuse of procedure alone is grounds to deny their application.

*Second*, while Plaintiffs' overbroad requests for relief are both contrary to law and indiscriminate, their requests are not without a certain irony. On the one hand, their request for a TRO that orders the Federal Government to comply with the Fourth Amendment is prohibited because it abstractly commands what is already commanded by the law itself. On the other hand, their request that immigration authorities be enjoined from relying on certain factors like occupation and location flies in the face of established law requiring immigration officials to consider *the totality of the circumstances*, including things like occupation and location. The relief Plaintiffs seek cannot be granted because it is either an impermissible restatement of the law in the form of an injunction or else runs flatly against what the law requires. These improper requests for relief are independent grounds for denying the request for TRO.

*Third*, organizational Plaintiffs lack standing of any kind, including associational or next friend standing, because, despite their broad and generalized asserted interests in aiding immigrants, Plaintiffs have failed to come forward with a member that has suffered an injury-in-fact. Additionally, named Plaintiff cannot seek relief for wholly unknown others whom they have no knowledge of and who themselves do not have standing.

*Fourth*, Plaintiffs cannot demonstrate a likelihood of success on the merits for the threshold reason

1

that this Court lacks jurisdiction to review Plaintiffs' removal related claims. 8 U.S.C. § 1252. Even if the Court had jurisdiction, however, Defendants have acted and continue to act in accord with both their statutory authority and Constitutional requirements by using a totality of the circumstances approach with articulable facts in support of their reasonable suspicion determinations. Given the absence of Constitutional violations, Plaintiffs cannot show that they will suffer irreparable harm in the absence of an injunction. Plus, the Federal Government's strong interest in enforcing the immigration laws tips the balance of the equities in its favor.

Plaintiffs' TRO is procedurally and substantively defective and should, therefore, be denied.

## II.    FACTUAL BACKGROUND

### A.    Procedural History

On July 3, 2025, Plaintiffs, five named individuals and three legal services organizations, filed the instant *ex parte* application for TRO and an order to show cause why a preliminary injunction should not issue pending the final disposition of this action. Dkt. 45. They alleged that, in immigration enforcement operations conducted in June 2025, Defendants violated the Fourth Amendment by conducting illegal stops and arrests.

### B.    Federal Law Enforcement Procedures

On January 22, 2025, Acting DHS Secretary Benjamine C. Huffman issued a memorandum authorizing any law enforcement officials within the Department of Justice including the Federal Bureau of Investigations, U.S. Marshals Service, Drug Enforcement Administration, Bureau of Alcohol, Tobacco, Firearms and Explosives, and Federal Bureau of Prisons to exercise immigration enforcement authorities under Title 8 of the United States Code. Declaration of Andre Quinones ("Quinones Dec.") ¶ 7. On or about February 6, 2025, and on June 5, 2025, the Office of the Principal Legal Advisor, a component within the Department of Homeland Security's ("DHS") Immigration and Customs Enforcement ("ICE") office, offered local law enforcement partners from these agencies Ninth Circuit-specific immigration enforcement training, covering immigration arrests, the requirements of reasonable suspicion and probable cause, brief stops for questioning, and consensual encounters under the Fourth Amendment and the Immigration and Nationality Act ("INA") and implementing regulations. *Id.* ¶ 8.

Offices and agents of U.S. Customs and Border Protection ("CBP"), another component of DHS,

2

receive extensive training during their months-long Basic Academy Training, including comprehensive legal training. Declaration of Kyle C. Harvick ("Harvick Decl.") ¶ 12. CBP agents are required to adhere to standards of enforcement activity set forth in 8 C.F.R. § 287.5. *See id.* ¶ 9. CBP agents can question anyone if the encounter is consensual. *Id.* ¶ 7. CBP agents and officers are trained that, under the Fourth Amendment, they must have a reasonable suspicion based on articulable facts before they can briefly detain an individual for questioning. *Id.* ¶ 9. Under 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.5, CBP agents and officers may effectuate arrests pursuant to administrative and judicial warrants. *Id.* ¶¶ 9-10. CBP agents and officers may conduct warrantless arrests for immigration violations pursuant to applicable legal authorities, including 8 U.S.C. § 1357 and 19 U.S.C. § 1589a. *Id.* ¶ 10.

ICE law enforcement officers participate in multi-agency teams conducting immigration enforcement in the Los Angeles area. Quinones Dec. ¶ 9. In these operations, ICE Enforcement and Removal Operations ("ERO") and Homeland Security Investigations ("HSI") serve as team leads of multi-agency teams on regular, targeted fugitive enforcement operations focusing on individuals with final orders of removal cases or cases with significant criminal history. *Id.* As ERO Los Angeles has been doing for many years, ERO creates individual targeting packets for the individual to be arrested. *Id.* Should other individuals be encountered during the targeted arrest, ICE will conduct consensual interviews to identify whether there is reasonable suspicion that the individuals are illegally in the United States and determine if these individuals are subject to immigration enforcement and arrest. *Id.* ¶ 9.

On June 6, 2025, CBP agents were sent to assist Los Angeles ERO. Harvick Decl. ¶ 5. Typical CBP contact teams consist of three to five agents who contact individuals in public places such as streets, sidewalks, and publicly accessible portions of businesses. *Id.* ¶ 8. Certain types of businesses, including car washes, were selected for encounters because past experience demonstrated that they are likely to employ persons without legal documentation. *Id.* During operations in Los Angeles, CBP agents temporarily detained individuals, and made arrests for immigration violations and federal criminal statutes. *Id.* ¶¶ 5, 10.

3

### C.    Named Plaintiffs' Allegations[1]

Plaintiffs allege unlawful immigration operations by Defendants in Los Angeles and surrounding counties throughout the month of June 2025, but focus on four specific dates: June 9, 12, 14, and 18, 2025. Dkt. 45 at 6-13.

**June 9, 2025**: Named Plaintiffs Hernandez Viramontes and Gamez are both U.S. citizens and co-managers of a car wash in Whitter, California. Dkt. 45-4, ¶¶ 2, 4;Dkt. 45-5, ¶¶ 2-3. Hernandez Viramontes and Gamez allege that immigration agents arrived at the car wash in unmarked vehicles. Dkt. 45-4, ¶ 6; Dkt. 45-5, ¶ 5. Many of the agents were in military uniforms, covered their faces and did not identify themselves. Dkt. 45-4, ¶ 6; Dkt. 45-5, ¶ 5. The agents asked people their immigration status and arrested three workers from the car wash. Dkt. 45-4, ¶ 6; Dkt. 45-5, ¶ 5.

**June 12, 2025**: Gavidia is a U.S. citizen. Dkt. 45-9, ¶ 1. He was repairing his car at a tow yard in Montebello, California, when he heard reports that there were immigration agents outside. *Id.* ¶¶ 6-7. Emerging from the gates of the tow yard, Gavidia encountered an immigration agent in a green uniform, and other agents with "Border Patrol Federal Agent" on their vests. *Id.* ¶ 7. A masked agent told Gavidia to stop when Gavidia attempted to reenter the tow yard. *Id.* ¶ 8. The agent asked Gavidia if he was a U.S. citizen and, when Gavidia told him that he was, he asked Gavidia in which hospital he was born. *Id.* ¶ 9. Gavidia could not name the hospital but produced a REAL ID proving his citizenship. *Id.* ¶¶ 9-11. The agents pushed Gavidia and took Gavidia's REAL ID and phone. *Id.* ¶ 11. After confirming his citizenship, the agents returned Gavidia's phone after 20 minutes but did not return his REAL ID. *Id.* ¶ 11.

**June 14, 2025:** Hernandez Viramontes and Gamez alleged that uniformed CBP agents returned in marked vehicles to the car wash in Whittier, questioned everyone about their immigration status, and arrested one worker.  Dkt. 45-4, ¶ 7; Dkt. 45-5, ¶ 6.

**June 18, 2025:** Hernandez Viramontes and Gamez alleged that immigration agents returned in unmarked vehicles to the car wash in Whittier, questioned workers, and arrested one worker. Dkt. 45-4, ¶ 8; Dkt. 45-5, ¶¶ 7-9. On that date, the agents detained Hernandez Viramontes, transported him to another location where they verified his citizenship, and returned him to the car wash within 20 minutes. Dkt. 45-

---

[1]  Facts in this section are as alleged by named Plaintiffs in their declarations. Defendants do not concede these allegations.

4

4, ¶¶ 9-14; Dkt. 45-5, ¶¶ 8-11. Gamez alleged that another group of agents arrived at the car wash later that day, "said that they were looking for someone," but left without arresting anyone. Dkt. 45-5, ¶ 11.

**June 18, 2025**: Vasquez Perdomo, Osorto, and Villegas Molina are day laborers of unspecified immigration status. Dkt. 45-1, ¶¶ 2-3; Dkt. 45-2, ¶¶ 2-3; Dkt. 45-3, ¶¶ 2-3. Shortly before 6 a.m. PST, Vasquez Perdomo, Osorto, and Villegas Molina, were waiting for work at a bus stop outside of Windell's Donut Shop in Pasadena, California. Dkt. 45-1, ¶ 4; Dkt.45-2, ¶ 4; Dkt. 45-3, ¶ 4. Plaintiffs alleged that four unmarked vehicles appeared at the bus stop and armed men in civilian clothes emerged.[2] Dkt. 45-1, ¶ 5; Dkt. 45-2, ¶ 5; Dkt. 45-3, ¶ 5. Vasquez Perdomo and Osorto attempted to flee, but Villegas Molina remained. Dkt. 45-1, ¶ 6; Dkt. 45-2, ¶ 6; Dkt. 45-3 ¶ 6. The agents asked the men their immigration status, took them to a store parking lot, shackled them at the hands, waist, and feet, and transported the three to a detention facility in downtown Los Angeles. Dkt. 45-1, ¶¶ 7-8; Dkt. 45-2, ¶ 6; Dkt. 45-3, ¶¶ 7-9.

Organizational Plaintiffs, LAWCN, UFW, and CHIRLA, allege that their organization members and those members' relatives have been placed in fear of detention or have been detained by Defendants' immigration enforcement actions. Dkt. 45-8, ¶¶ 16-36; Dkt. 45-12, ¶¶ 25-28; Dkt. 38-9, ¶¶ 24-31.

## III.    STANDARD OF REVIEW

The standard for issuing a TRO and a preliminary injunction are substantially identical. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A TRO is "an extraordinary and drastic remedy ... that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). For a TRO to issue, the movant must demonstrate: (1) a likelihood of success on the merits, (2) a likelihood of suffering irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) the TRO is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 24 (cleaned up). "Likelihood of success on the merits is the most important factor," and if the movant fails to meet this "threshold inquiry," the court "need not consider the other factors." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018). Where, as here, a movant seeks a mandatory injunction that would alter the status quo and impose

---

[2]  Villegas Molina alleged that there were only three vehicles. Dkt. 45-3, ¶ 5.

affirmative requirements on law enforcement officers as they carry out their duties, the burden is even higher standard. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (mandatory injunctions are "particularly disfavored" and the "district court should deny such relief unless the facts and law clearly favor the moving party.") (cleaned up).

## IV.   ARGUMENT

### A.    Plaintiffs Have Failed to Establish That They are Entitled to Seek *Ex Parte* TRO Relief under the *Mission Power* Standard, As Opposed to Proceeding by Noticed Motion for a Preliminary Injunction.

*Ex parte* applications are rarely justified. *See Mission Power*, 883 F. Supp. at 490. To justify the extraordinary remedy of *ex parte* relief, the movant must demonstrate it "is without fault in creating the crisis that requires *ex parte* relief, or that the crisis occurred as a result of excusable neglect." *See id.* at 492. Here, Plaintiffs do not satisfy the *Mission Power* standard for proceeding by an *ex parte* application, as opposed to by a noticed motion. Their application does not even mention this threshold legal standard, which they do not meet. *See* TRO at 18 ("Legal Standard").

Instead, Plaintiffs' TRO application cites caselaw that is limited to the preliminary injunction motion context—as with Plaintiffs' lead citation of *United Farm Workers v. Noem*, 1:25-cv-00246-JLT-CDB (E.D. Cal. April 29, 2025). The *United Farm* complaint was filed on February 26, 2025 (Dkt. 1), a motion for class certification was filed on March 7, 2025 (Dkt. 14), and a motion for a preliminary injunction was filed on March 7, 2025 (Dkt. 15). After that full briefing, the District Court ruled on April 29, 2025 (Dkt. 47). Plaintiffs also cite *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, (C.D. Cal. 2024), but that was a summary judgment decision by Judge Wright—not an *ex parte* TRO application—and an injunction was denied in *Kidd*, moreover.

By contrast, no District Court appears to have accepted the type of blitzkrieg *ex parte* strategy that Plaintiffs have taken here. Rather than following the *United Farm Workers* procedure, Plaintiffs instead made mammoth surprise filings from July 2 to 3, 2025. They filed their sixty-five (65) page First Amended Complaint (Dkt. 16 ("FAC")) shortly after midnight on July 2, 2025, with no advance notice to Defendants or the Court, adding a vast array of new Plaintiffs, twenty-four (24) counsel of record, and new claims, including putative class action claims. Plaintiffs indicated their intention to file two *ex parte*

6

1    TRO applications that same day of July 2, 2025, again having given no advance notice, while insisting

2    Defendants could only have one day to respond—and no more.

3    After Plaintiffs filed their first *ex parte* application on July 2, 2025 (Dkt. 38), they then filed the

4    instant vast *ex parte* TRO application regarding immigration arrests and detentions at 9:55 p.m. on July 3,

5    2025 (Dkt. 45). That second *ex parte* TRO application has twenty-one (21) supporting declarations

6    (264 pages in aggregate length), and cites an enormous array of evidentiary contentions and asserted

7    evidentiary documentations, media, internet links, and citations. Plaintiffs then directly e-mailed the

8    Courtroom Deputy a download link at 9:59 p.m. on July 3, 2025, which they described as the "courtesy

9    copies" of the supporting media files that would be lodged with the Court on Monday, July 7, 2025.

10   Setting aside whether this e-mailing followed the Court's rules on communications with chambers, it was

11   not a proper filing.

12   It is essentially impossible for Defendants (most of which were named on July 2, 2025, for the

13   first time) to fairly respond to the vast array of *ex parte* documentation, declarations, citations, and

14   arguments that Plaintiffs prepared in secret for weeks and then filed late on the evening of July 3, 2025,

15   with a supplemental lodging on July 7, 2025. *Mission Power* warned of how *ex partes* "pose a threat to

16   the administration of justice," calling out situations where "the moving party's papers reflect days, even

17   weeks, of investigation and preparation; the opposing party has perhaps a day or two... The goal often

18   appears to be to surprise opposing counsel or at least to force him or her to drop all other work to respond

19   on short notice." *Mission Power*, 883 F. Supp. at 490. That is precisely what happened here.[3] Plaintiffs'

20   resort to this tactic has created an impaired and unworkable evidentiary record. Indeed, Plaintiffs have

21   pursued every possible avenue for maximizing the prejudicial volume and surprise of their *ex parte* filings

22   on Defendants, rather than properly following the rules.

23   Plaintiffs' July 3rd *ex parte* TRO filing (Dkt. 45) regarding arrests and detentions, along with the

24   media files submitted on July 7th in support of it, is so immense and voluminous that there is no

25   reasonable way Defendants can fairly address its myriad contentions on an expedited basis, particularly

26   with the intervening federal holiday weekend impeding Defendants' ability to contact and work with

27

28   [3]  This followed Plaintiffs' counsel, the ACLU, having pursued the same tactic in *Los Angeles Press Club*
      case, 2:25-cv-05563-SVW-MAA—where the ACLU filed an enormous *ex parte* TRO Application
      shortly after midnight on June 19, 2025 (Dkt. 6).

7

witnesses. These issues regarding the second *ex parte* TRO application cannot fairly be resolved by a July 8 opposition brief and July 10 hearing.

Furthermore, Plaintiffs could have much more promptly sought relief on this point if they were genuinely facing irreparable harm requiring *ex parte* relief. Plaintiffs' *ex parte* application begins by declaring how they have been greatly aggrieved by immigration enforcement since June 6, 2025:

> Starting on or around June 6, 2025, Defendants have deployed marauding, masked, and armed agents to conduct suspicionless stops of thousands of Latine people in this District, in order to meet an arbitrary quota for 3,000 daily arrests imposed by the White House.

TRO at 10. Yet rather than promptly filing a true class action lawsuit (i.e., following the *United Farm Workers* approach and procedure), or else immediately seeking truly exigent relief, the organizational Plaintiffs delayed. They then belatedly tried to weld class action claims onto a preferred existing small habeas petition by suddenly filing an expanded First Amended Complaint, along with two voluminous *ex parte* TRO applications. This does not resemble the situations where courts have found the extraordinary procedural remedy of *ex parte* relief appropriate. "The Court expected to find a detailed explanation as to why Plaintiffs delayed filing their application until a regularly-noticed motion was not an option. Plaintiffs provided nothing; not a single sentence explains why, having had knowledge of [the upcoming protests], they waited until [a federal holiday] to file their Application." *Ubiquity Press Inc. v. Baran*, No. 8:20-CV-01809-JLS, 2020 WL 8172983, at *2 (C.D. Cal. Dec. 10, 2020).

For this threshold reason, the *ex parte* TRO application fails to satisfy the *Mission Power* standard for extraordinary *ex parte* relief. Plaintiffs should be required to follow the preliminary injunction motion standard instead.

**B.    Plaintiffs Seek Overbroad and Insufficiently Specific TRO Relief.**

As Judge Wilson found in denying the ACLU's *ex parte* TRO application on June 20, 2025, in *Los Angeles Press Club v. Kristi Noem et al.*, 2:25-cv-05563-SVW-MAA (Dkt. 19) (Order Denying Plaintiffs' *Ex Parte* TRO Application), the plaintiffs' *ex parte* TRO application there was defective because the requested relief was too broad. The Ninth Circuit has "long held that injunctive relief must be tailored to remedy the specific harm alleged." *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015). "[A]n injunction against state actors must directly address and relate to the constitutional violation itself and must not require more of state officials than is necessary to assure their compliance with the

8

constitution." *Id.* (cleaned up).

Here, Plaintiffs suggest that their requested TRO is not overbroad and is sufficiently specific because it putatively orders the government to comply with extant law. There are multiple threshold defects in that claim however, beyond the fact that Plaintiffs do not correctly explain the extant law. Those threshold defects are as follows.

**First,** while the United States is obligated to obey the U.S. Constitution, a TRO ordering the government to broadly follow existing extant law is not permitted. The relief must be much more specific. *See Elend v. Basham*, 471 F.3d 1199, 1209 (11th Cir. 2006) (court cannot fashion an injunction that abstractly commands the Secret Service to obey the First Amendment, noting that injunction requiring party to do nothing more specific than 'obey the law' is impermissible."); *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 841 (7th Cir. 2013) ("An obey-the-law injunction departs from the traditional equitable principle that injunctions should prohibit no more than the violation established in the litigation or similar conduct reasonably related to the violation."); *see, e.g. Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 767 (4th Cir. 1998) (an "obey the law" injunction "impermissibly subjects a defendant to contempt proceedings for conduct unlike and unrelated to the violation with which it was originally charged"); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th Cir. 1999) ("As this injunction would do no more than instruct the City to 'obey the law,' we believe that it would not satisfy the specificity requirements of [Federal Rule of Civil Procedure] 65(d) and that it would be incapable of enforcement."); *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) ("[A]n injunction [must] be 'more specific than a simple command that the defendant obey the law.'"). As the Supreme Court has explained,

> The specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood. Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed.

*Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (cleaned up). Reiterating existing law as an injunction or TRO does not perform this function.

In violation of these rules, paragraph (a) of Plaintiffs' proposed TRO order gives an incredibly

9

generic recitation of law: "As required by the Fourth Amendment of the United States Constitution, Defendants are enjoined from conducting detentive stops in this District unless the agent or officer has reasonable suspicion that the person to be stopped is within the United States in violation of U.S. immigration law." Dkt. 45-22.

Plaintiffs' other paragraphs are equally unspecific, particularly at the TRO stage, and are much more akin to nascent ambitions to seek a preliminary injunction. They vaguely gesture at Defendants being required (by TRO no less) to develop unspecific "guidance" and "training," but the order says nothing whatsoever about what that would be. *See* Dkt. 45-22. This does not comply with the law interpreting Rule 65(d).

**Second,** Plaintiffs seek relief against an extraordinarily wide and indiscriminate range of federal defendants, unlike the precedent they cite. They request that the Court issue a TRO against Defendants from across the Federal Government, many who have no or only a tenuous connection to the alleged facts. *See* FAC ¶¶ 21-32; Dkt. 45-22. Plaintiffs' indiscriminate challenge to the entirety of federal law enforcement, and almost all involved in it, is the opposite of the requisite narrowly tailored scope of relief.

**Third,** while Plaintiffs argue that being ordered to follow extant law is not burdensome, they ignore the fact that they are *suing Defendants in class action litigation*, and per their FAC, are seeking an award of attorneys' fees from the United States. When a general principle of law is set forth as an *injunction*, plaintiffs and counsel are incentivized to pursue intensive discovery, motion practice, demands for reporting and documentation, along with associated attorney fee claims (commonly sought in the millions of dollars under the Equal Access to Justice Act, to be paid to organizational plaintiffs as federal government funds). If unchecked, this kind of injunction incentivizes private plaintiffs, like Plaintiffs in this case, to pursue a "generalized auditor of the law" function imposes a significantly overbroad impediment on government operations.

Further, insofar as organizational Plaintiffs are publicly dedicated to *preventing and obstructing* federal immigration enforcement, they are especially incentivized to misuse TRO enforcement procedures for that purpose.[4] Overbroad and vague TROs, such as the one they seek here, threaten to

---

[4] For example, having lost their *ex parte* TRO application in *Los Angeles Press Club* (because they failed to establish that they faced likely imminent future injury, and sought overbroad TRO relief), the ACLU

*(footnote cont'd on next page)*

10

1  touch off and facilitate a wildfire of intractable efforts to impair basic government functions, through

2  litigation, as a central goal.

3      **C.**    **Plaintiffs Lack Standing to Obtain a Prospective Injunction.**

4      Because standing is a prerequisite to this Court's jurisdiction, Plaintiffs' claims on the merits have

5  no likelihood of success since they cannot establish standing. *See Susan B. Anthony List v. Driehaus*,

6  573 U.S. 149, 158 (2014) ("The party invoking federal jurisdiction bears the burden of establishing'

7  standing and must do so "the same way as any other matter on which the plaintiff bears the burden of

8  proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation.")

9  (cleaned up).

10      **1.**    **Organizational Plaintiffs Lack Standing Three Ways.**

11      As argued in Defendant's opposition in the *ex parte* application regarding an alleged Fifth

12  Amendment violation, and as applicable here, organizational Plaintiffs lack standing. Unlike certain other

13  constitutional protections, the Fourth Amendment's safeguard against unreasonable searches and seizures

14  is inherently personal and applies only to individuals whose own privacy interests have been infringed.

15  *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (holding that, under Article III doctrine, a party must

16  demonstrate a personal and reasonable expectation of privacy—rooted in property law or societal

17  norms—to establish standing to challenge a search). Hence, the question of standing under the Fourth

18  Amendment centers on whether the individual challenging the search or seizure had their own rights

19  violated, rather than asserting the rights of another. *Id*. This inquiry is a substantive component of a Fourth

20  Amendment claim, separate from the general Article III standing requirements. *Id*. Accordingly, when

21  plaintiffs pursue prospective injunctive and declaratory relief, as in this case, they must present evidence

22  showing that they are "immediately in danger of sustaining some direct injury as a result of the challenged

23  official conduct," and that the risk of harm is "real and immediate, not conjectural or hypothetical"—

24  "abstract injury" will not suffice. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (holding that

25  plaintiff lacked standing to enjoin city from using chokeholds where he could not demonstrate real and

26

27  then immediately—without even meeting and conferring, in violation of Local Rule 7-3—filed a motion

28  asking the Court to authorize immediate discovery, and ordering the defendants to immediately respond. *See* 2:25-cv-05563-SVW-MAA, Dkt. 26. Seeking overbroad injunctive relief and overbroad discovery in this manner imposes severe negative impact on defendants.

11

immediate threat, he would be subject to chokehold again).

Here, Plaintiff legal services organizations have not alleged facts sufficient to demonstrate that they are likely to suffer any injury that is fairly traceable to the actions of Defendants under the relevant provisions of the INA. *See* TRO at 2-18; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending"); *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015) (same). Plaintiff legal services organizations assert two types of injuries: first, that members of UFW, CHIRLA, and LAWCN, have suffered or may suffer unconstitutional arrests and detention as a result of being subject to INA enforcement; and second, that their members are being racially profiled by the immigration authorities and stopped in violation of their Fourth Amendment rights. *See* TRO at 7-9. However, finding standing under these circumstances—either organizational or next friend—would blow the courthouse door open to virtually any conceivable suit by legal services organizations against the government, given that virtually any administration of INA by a federal agency could be cast as creating such derivative effects. *See Whitmore v. Arkansas*, 495 U.S. 149, 164 (1990) (holding that "generalized interest of all citizens in constitutional governance" represents "an inadequate basis on which to grant petitioner standing to proceed"); *see also Hamdi v. Rumsfeld*, 294 F.3d 598, 605 (4th Cir. 2002) (cautioning against permitting lawsuits filed by "someone who seeks simply to gain attention by injecting himself into a high-profile case" as he is "much more likely to be utilizing the real party's injury as an occasion for entry into policy-laden proceedings of all sorts").

Moreover, under the separate doctrine of associational standing, an organization seeks to establish standing "as [a] representative[] of [its] members who have been injured in fact, and thus could have brought suit in their own right." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976). "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). "If an association can satisfy these requirements, [courts] allow the association to pursue its members' claims, without joining those members as parties to the suit." *Id.* Courts have been particularly reluctant to permit

associational standing in the Fourth Amendment context because the right is highly personal and fact-specific. Unless the organization itself has suffered a direct injury, such as its own property being searched, it cannot litigate the Fourth Amendment claims of its members.

Defendants dispute that legal services organizations' mission is germane to the interests it seeks to protect in this litigation, and, more fundamentally, they fail to satisfy the requirements for associational standing. It is not enough for a legal services organization to broadly claim advocacy on behalf of immigrant communities or to monitor legislation; to establish standing under Article III, the organization must specifically identify at least one member who has suffered a concrete and particularized injury as a result of the challenged conduct. The legal services organizations have not identified any individual member with standing, nor has it provided evidence that any such member has suffered an injury-in-fact. *See* FAC ¶¶ 111-64 (experiences of named Plaintiffs, without mentioning that any of them are members), 165-94 (profiles of organizations, without naming any members). Legal services organizations cannot circumvent the constitutional standing requirements by relying solely on their organizational purpose or generalized interests. Without a specifically injured member, they lack the requisite "personal stake" in the litigation and thus cannot establish associational standing, or any standing, to pursue these claims in federal court. Their claims thus fail at this threshold issue.

### 2.    Named Plaintiffs Lack Standing to Seek Relief for Others.

Named Plaintiff Molina is, as of the date of his declaration, detained at Adelanto and therefore in no imminent risk of being stopped by immigration agents in a manner inconsistent with the Fifth Amendment. (Dkt. 45-2 ¶ 11). Plaintiffs also lack standing to bring claims for unknown individuals. A person may maintain a suit in federal court, whether as an individual or as a class member, only if he has standing and has the legal capacity to sue. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 422 (2021). But unknown people—*i.e.*, persons who have not yet been identified, let alone identified as a class member (that has not been certified)—simply lack standing. *See id.* at 424 ("[U]nder Article III, a federal court may resolve only 'a real controversy with real impact *on real persons*.'" (cleaned up)). A judicial order resolving the rights of "parties that did not exist" yet at the time of the decision would raise "significant questions under the Due Process Clause." *McLaughlin Chiropractic Assoc's v. McKesson Corp.*, No. 23-1226 (June 20, 2025), slip op. 11 n.5. The interests of a person who has not been identified

13

1    also cannot be "fairly and adequately protect[ed]," Fed. R. Civ. P. 23(a)(4), given the person's inability

2    to monitor or participate in the litigation. Here, the uncertified class of "Stop/Arrest Plaintiffs" include,

3    "All persons who, since June 6, 2025, have been *or will be* subjected to a detentive stop by federal agents

4    in this District." FAC ¶ 199. This overly speculative and broad definition would include plaintiffs who

5    are not yet in the United States, and who—*by reductio ad absurdum*—are not yet born. Yet, Plaintiffs are

6    attempting to obtain relief for these individuals; they simply cannot assert these unknown individuals'

7    rights for them. *See Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 87 (2019) (Gorsuch, J., concurring)

8    ("Abandoning offended observer standing will mean only a return to the usual demands of Article III,

9    requiring a real controversy with real impact on real persons to make a federal case out of it.").

10       **D.**    **Plaintiffs Are Not Likely To Succeed On The Merits of Their Claim.**

11       For the foregoing reasons, Plaintiffs cannot establish a likelihood of success on the merits of their

12   Fourth Amendment claim, as this Court lacks jurisdiction. Thus, the Court need proceed no further in its

13   analysis to deny the TRO application. *See, e.g.*, *Munaf v. Geren*, 553 U.S. 674, 691 (2008) (noting that

14   jurisdictional issues can make success on the merits "more *unlikely* due to potential impediments to even

15   reaching the merits"); *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 921 (D.C.

16   Cir. 1984). ("If there is no justification for the court's exercise of jurisdiction, the injunctive relief should

17   necessarily fail."). Even so, Plaintiffs' Fourth Amendment claim fails.

18       **1.**    **The Court Lacks Jurisdiction to Review Plaintiffs' Claims Under 8 U.S.C.**

19       **§§ 1252(a)(5), (b)(9), and (g).**

20       Three of the named Plaintiffs (Vasquez Perdomo, FAC ¶ 121; Osorto, FAC ¶ 134; and Villegas

21   Molina, FAC ¶ 146) are in removal proceedings. The INA bars this Court's review of their Fourth

22   Amendment claim. And to the extent that organizational Plaintiffs are bringing a Fourth Amendment

23   claim for an uncertified class of aliens in removal proceedings, their claim would also be barred.

24       Pursuant to the INA, "[j]udicial review of *all questions of law and fact*, including interpretation

25   and application of constitutional and statutory provision, *arising from any action taken or proceeding*

26   *brought* to remove an alien from the United States under this subchapter shall be available only in judicial

27   review of a final [removal] order." 8 U.S.C. § 1252(b)(9) (emphasis added). Section 1252(b)(9) expressly

28   precludes district court review "by habeas corpus … or by any other provision of law (statutory or

14

nonstatutory)" of an order of removal or "questions of law or fact, including interpretation and application of constitutional provisions" arising from any action taken or proceeding brought to remove an alien from the United States. Section 1252(b)(9) is an "unmistakable zipper clause" that channels judicial review of "all questions of law and fact," including both "constitutional and statutory" challenges into a petition for review once administrative immigration proceedings have ended. *Reno v. Am.-Arab Anti-Discrimination Comm. ("AADC")*, 525 U.S. 471, 483, 485 (1999) (emphasis added). When a claim by an alien, "however it is framed, challenges the procedure and substance of an agency determination that is 'inextricably linked' to the order of removal, it is prohibited by section 1252(a)(5) [and (b)(9)]." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032 (9th Cir. 2016) (citing *Martinez v. Napolitano*, 704 F.3d 620, 623 (9th Cir. 2012) (applying this principle in the context of a claim brought under the Administrative Procedure Act)). Indeed, a petition for review filed in the appropriate court of appeals is the sole and exclusive means for judicial review of a final removal order. 8 U.S.C. § 1252(a)(5).

Congress further deprived this Court of jurisdiction over named Plaintiffs' claims through 8 U.S.C. § 1252(g), which strips district courts of jurisdiction "to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [government] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g); *see INS v. St. Cyr*, 533 U.S. 289, 311 n.34 (2001); *J.E.F.M.*, 837 F.3d at 1035 ("We conclude that §§ 1252(a)(5) and 1252(b)(9) channel review of all claims, including policies-and-practices challenges, through the [petition for review] process whenever they 'arise from' removal proceedings."). As the Supreme Court has held, the statute should be narrowly applied "only to [the] three discrete actions" listed. *AADC*, 525 U.S. at 482-83. Even so, by its terms, this jurisdiction stripping provision precludes habeas review under 28 U.S.C. § 2241 (as well as review pursuant to the All Writs Act and Administrative Procedure Act) of claims arising from a decision or action to commence removal proceedings. *See AADC*, 525 U.S. at 482. In short, the decision as to the method by which removal proceedings are commenced, which is the genesis of the named Plaintiffs' (and any other alien's) detention, is a discretionary one that is not reviewable by a district court under §1252(g). *See id.* at 487.

Here, the stops and detentions that Plaintiffs challenge were actions taken to commence removal proceedings and remove named Plaintiffs (and other targeted individuals) from the United States, that is,

to "detain [them] in the first place and seek their removal." *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018); Harvick Decl. ¶¶ 5, 8-9; Quinones Decl. ¶ ¶ 9-12. Plaintiffs challenge the questions of law and fact behind these actions, specifically, whether the immigration agents had reasonable suspicion for the stops. *See* TRO at 18-22. But because Plaintiffs challenge questions of law and fact arising from these actions taken to commence proceedings and remove the named Plaintiffs and other aliens, §§ 1252(a)(5) and (b)(9) require that they bring these claims, first in their removal proceedings before the agency, and then, in petitions for review before the appropriate Court of Appeals. Indeed, petitions for review commonly consider challenges related to whether immigration authorities had reasonable suspicion to stop, or probable cause to arrest, an alien. *See, e.g.*, *Sanchez v. Sessions*, 904 F.3d 643 (9th Cir. 2018); *J.E.F.M.*, 837 F.3d at 1033 (holding that §§ 1252(a)(5) and (b)(9) bar district courts from reviewing legal questions "routinely raised in petitions for review").

Notably, these same legal questions are commonly raised by aliens in removal proceedings asking administrative and federal courts of appeal to suppress evidence of their removability due to Fourth Amendment or regulatory violations, or terminate proceedings due to the same. *See, e.g.*, *Sanchez*, 904 F.3d at 653-54 (alleged race-based stop by Coast Guard challenged in removal proceedings) (citing *Rajah v. Mukasey*, 544 F.3d 427, 446 47 (2d Cir. 2008)); *Leal-Burboa v. Garland*, No. 21-70279, 2022 WL 17547799 (9th Cir. 2022) (alleged race-based stop challenged in removal proceedings). If the legal remedy for unlawful stops and arrests is provided in removal proceedings, *ipso facto* these challenges are part of the decision to remove an alien. It does not matter that a class remedy "might be more efficient than requiring each applicant to file a" petition for review, or preferred as a method to challenge "policy and practice," as § 1252(b)(9) plainly precludes "all district court review of any issue raised in a removal proceeding." *J.E.F.M.*, F.3d at 837 at 1034-35, 1038. Because the stop and arrest of an alien is directly, linearly part of the process to remove an alien—the stops occurred here to investigate immigration status rendering an alien removable—the "legal questions" challenging the stops are directly part of the removal process. *Jennings*, 583 U.S. at 295 n.3. Accordingly, this Court lacks jurisdiction pursuant to 8 U.S.C. §§ 1252(a)(5), (b)(9), and (g).

16

**2.    Plaintiffs have not shown that Defendants violated any Fourth Amendment rights or acted contrary to 8 U.S.C. § 1357(a)(2).**

Defendants have acted, and continue to act, in accordance with the law. The Fourth Amendment provides protection from unreasonable searches and seizures. U.S. Const. amend. IV. Under the INA, immigration officials are empowered to perform the warrantless arrest of:

> [A]ny alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay … before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States.

8 U.S.C. § 1357(a)(2); *see Abel v. United States*, 362 U.S. 217, 232-37 (1960) (discussing longstanding administrative arrest procedures in deportation cases). "Reason to believe" has been equated with the constitutional requirement of probable cause. *See Tejeda-Mata v. INS*, 626 F.2d 721, 725 (9th Cir. 1980). The implementing regulations explain that "an alien arrested without a warrant of arrest … will be examined by an officer other than the arresting officer." 8 C.F.R. § 287.3(a). "If the examining officer is satisfied that there is prima facie evidence that the arrested alien is present in the United States in violation of the immigration laws, the officer will either refer the case to an immigration judge for further inquiry, order the alien removed, or take whatever other action may be appropriate or required under the laws or regulations applicable to the particular case. *Id.* at § 287.3(a)-(b) (cleaned up). DHS ordinarily will make an initial determination within 48 hours of the apprehension whether the alien will remain in custody, be paroled, be released on bond or released on recognizance. 8 C.F.R. § 287.3(d).

Here, Plaintiffs have not shown that Defendants violated any Fourth Amendment rights or acted contrary to 8 U.S.C. § 1357(a)(2). Three of the Plaintiffs were arrested and detained based on statutorily valid grounds, and whether their arrests were legally sound is a question they may raise in removal proceedings. *See* Dkt. 45-1, ¶¶ 7-8; Dkt. 45-2, ¶ 6; Dkt. 45-3, ¶¶ 7-9. The other two Plaintiffs were only subject to investigative detentions that ended when their citizenship status was confirmed. *See* Dkt. 45-4, ¶¶ 9-14; Dkt. 45-5, ¶¶ 8-11; Dkt. 45-9, ¶ 11. Plaintiffs' arguments that the manner of their arrest and detention by federal officers violates their constitutional rights under the Fourth Amendment fail.

As a threshold issue, three of the named Plaintiffs cannot establish that their arrest and detention were unconstitutional given that they are present in this country without valid status. *See Echeverria-*

17

*Perez v. Barr*, 794 F. App'x 614, 616 (9th Cir. 2019) ("The fact that agents detained and arrested Echeverria without first establishing her identity and alienage is of no moment. All the agents needed to make an arrest was 'reason to believe' that Echeverria was an alien illegally in the United States." (citing 8 C.F.R. § 287.8(c)(2)(i) and 8 U.S.C. § 1357(a)(2))). This Court should not consider whether a violation of 8 C.F.R. § 287.8(b)(2) occurred because Plaintiffs did not raise that argument. *See* TRO at 18-22; *McKay v. Ingleson*, 558 F.3d 888, 891 n.5 (9th Cir. 2009). Even so, the Ninth Circuit has recognized that § 287.8(b)(2) "serves a purpose of benefit to the alien" and "was intended to reflect constitutional restrictions on the ability of immigration officials to interrogate and detain persons in this country." *Perez Cruz v. Barr*, 926 F.3d 1128, 1137 (9th Cir. 2019) (quoting *Sanchez*, 904 F.3d at 650-51); *see also id.* at 1137 n.4 ("If anything, the regulation is stricter than the Fourth Amendment."). Second, § 1357(a)(2) "provides that an officer has the authority to arrest any alien in the United States if he has reason to believe that the alien arrested is in violation of an immigration law or regulation and the alien is likely to escape before a warrant can be obtained for his arrest." *United States v. Reyes-Oropesa*, 596 F.2d 399, 400 (9th Cir. 1979) (citing *United States v. Meza-Campos*, 500 F.2d 33 (9th Cir. 1974)). Further, Plaintiffs have failed to provide any proof to challenge the government's determination that they lack valid status.

To determine whether the government's actions constituted a Fourth Amendment seizure, this Court determines whether "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Orhorhaghe v. Immigr. & Naturalization Serv.*, 38 F.3d 488, 494 (9th Cir. 1994) (cleaned up). "Even if the official interference … is brief, provided that it is some sort of 'meaningful interference …. with an individual's freedom of movement,' it constitutes a seizure." *United States v. Enslin*, 327 F.3d 788, 795 (9th Cir. 2003) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 n.5 (1984)).

Turning to the constitutionality of the seizures, to satisfy the Fourth Amendment, "an investigatory stop by the police may be made only if the officer in question has 'a reasonable suspicion supported by articulable facts that criminal activity may be afoot.'" *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (quoting *United States v. Sokolow,* 490 U.S. 1, 7 (1989)). When making reasonable-suspicion determinations, courts "must look at the 'totality of the circumstances' of

18

each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). Reasonable suspicion exists "when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *Montero-Camargo*, 208 F.3d at 1129. The requirement of particularized suspicion encompasses two elements: the officer's assessment is based upon the totality of the circumstances and it arouses a reasonable suspicion that the particular person being stopped has committed or is about to commit a crime. *See id.* (citing *Cortez*, 449 U.S. at 418).

Here, Plaintiffs do not allege facts in their FAC, or submit evidence with their TRO application, that establish that Defendants engaged, or continue to engage, in a pattern and practice that ignores this requirement of particularized suspicion prior to initiating an investigatory stop. Instead, the evidence shows that Defendants' officers use a totality of the circumstances approach when in the field and in determining whether they have reasonable suspicion to target an alien. *See* Harvick Decl. ¶ 8. Consistent with 8 C.F.R. § 287.8(b)(2), the agents' reasonable suspicions are based on "specific articulable facts" that the person being questioned is an alien illegally present in the United States. Quinones Decl. ¶ 5. This analysis is fact-specific and includes factors such as "intelligence sources, querying law enforcement and open-source databases, analysis of trends, facts developed in the field by agents, rational inferences that lead an agent or officer to suspect that criminal activity has or is occurring, and the officers or agents observations, training, and experience." *Id.*

Consistent with the totality of the circumstances approach, agents may consider the location of the encounter, whether it was in a public place or businesses known to employ aliens without documentation, including specific streets, parking lots, and car washes. *See* Harvick Decl. ¶¶ 7-8; Dkt. 45-1, ¶ 4; Dkt.45-2, ¶ 4; Dkt. 45-3, ¶ 4; Dkt. 45-4, ¶ 7; Dkt. 45-5, ¶ 6; Dkt. 45-9, ¶¶ 6-7. "Requiring law enforcement to ignore certain facts in this analysis would be unworkable on a practical level in the operational environment." Harvick Decl. ¶ 8. In public places, individuals may be approached in the context of consensual encounters or with reasonable suspicion necessary to conduct an investigative detention. *See* Quinones Decl. ¶¶ 6, 9. Indeed, "[s]hould other individuals be encountered during the targeted arrest of the fugitive or criminal alien targeted, ICE will conduct consensual interviews to

19

1 identify whether there is reasonable suspicion that the individuals are illegally in the United States and

2 determine if these individuals are subject to immigration enforcement and arrest." Quinones Decl. ¶ 9.

3 When the officers encountered Vasquez Perdomo and Osorto at a bus stop, they attempted to flee, and

4 only Villegas Molina remained. Dkt. 45-1, ¶ 6; Dkt. 45-2, ¶ 6; Dkt. 45-3 ¶ 6. "Any one of these factors

5 is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But … taken

6 together they amount to reasonable suspicion." *United States v. Sokolow*, 490 U.S. 1, 9 (1989); *see also*

7 *Terry v. Ohio*, 392 U.S. 1, 22 (1968) ("Through a series of acts, each of them perhaps innocent in itself,

8 but which taken together warranted further investigation."); *see also United States v. Montero-Camargo*,

9 208 F.3d 1122, 1130 (9th Cir. 2000) ("In short, conduct that is not necessarily indicative of criminal

10 activity may, in certain circumstances, be relevant to the reasonable suspicion calculus.").

11 First, and contrary to Plaintiffs' arguments, it was not their appearance alone that caused the

12 officers to approach Plaintiffs, even though appearance "may in some cases be 'a relevant factor' in

13 determining whether immigration officers were justified in making an investigatory seizure. *Orhorhaghe*

14 *v. Immigr. & Naturalization Serv.*, 38 F.3d 488, 498 (9th Cir. 1994); *see United States v. Brignoni-Ponce*,

15 422 U.S. 873, 885 (1975) (stating appearance could be a factor in a reasonable suspicion calculus, but

16 that "factor alone would justify neither a reasonable belief that they were aliens, nor a reasonable belief

17 that the car concealed other aliens who were illegally in the country"). Instead, "officers and agents are

18 given information on [the targeted individual], which may include immigration and criminal history,

19 biological information, photos (if available), and other relevant information, such as the last known home

20 address or possible workplace of the subject." Harvick Decl. ¶ 10. The information leading to reasonable

21 suspicion may even come from prior "surveillance operations" of the site in question. *Id.*

22 Second, considering the location as part of the totality of the circumstances approach is not

23 prohibited where agents "conduct surveillance in order to identify the location of the subject in order to

24 effectuate the arrest." *Id.* Indeed, officers are trained to use their knowledge, training, and experience

25 when in the field searching for targeted individuals with final orders of removal, and of which they had

26 created targeting packets for the individuals to be arrested. *See* Quinones Decl. ¶ 9; Harvick Decl. ¶¶ 10,

27 12. While this information might not rise to the level of that in *Onofre-Rojas*, "officers are not required

28 to ignore the relevant characteristics of a location in determining whether the circumstances are

20

sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). "'[P]ermissible deductions,' or 'rational inferences' must, however, flow from objective facts and be capable of rational explanation." *Nicacio v. Immigr. & Naturalization Serv.*, 797 F.2d 700, 705 (9th Cir. 1985) (quoting *Cortez,* 449 U.S. at 419 and then *Brignoni-Ponce,* 422 U.S. at 884). That other individuals, like the named Plaintiffs, are encountered during a targeted arrest, the officers, using their training and experience, would evaluate the facts to form rational inferences that those individuals may be undocumented and in the United States illegally. *Cf. Onofre-Rojas v. Sessions*, 750 F. App'x 538, 539 (9th Cir. 2018) (affirming reasonable suspicion finding when officers had a warrant for a location with undocumented workers and petitioner was hiding in a container); *Arvizu*, 534 U.S. at 277 (affirming district court's finding of reasonable suspicion based on officer's observations, registration check, and border patrol experience).

Third, the flight of two Plaintiffs after the detention of another was further relevant to the officers' reasonable suspicion determination. *See* Dkt. 45-1, ¶ 6; Dkt. 45-2, ¶ 6; Dkt. 45-3 ¶ 6. Obvious, unambiguous attempts to evade contact with law enforcement officials is conduct relevant to the reasonable suspicion determination. *See Wardlow*, 528 U.S. at 124 ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); *see, e.g., id.* (unprovoked flight); *Sokolow*, 490 U.S. at 8 (evasive or erratic path through an airport); *Florida v. Rodriguez,* 469 U.S. 1, 6 (1984) (speaking furtively and urging the need to leave). The officers thus followed the law under the totality of the circumstances approach. *See Montero-Camargo*, 208 F.3d at 1130 ("In short, conduct that is not necessarily indicative of criminal activity may, in certain circumstances, be relevant to the reasonable suspicion calculus.").

At bottom, Plaintiffs merely assume Defendants engaged, or continue to engage, in a pattern and practice that ignores this requirement of particularized suspicion prior to initiating an investigatory stop despite no evidence to the contrary. *See Emanuel v. Morda*, 2025 WL 1532501, at *3 (D. Nev. May 28, 2025) (denying motion for temporary restraining order without prejudice because plaintiff "does not identify a threatened immediate and irreparable injury with specific factual allegations, nor does it request specific relief that this Court has the authority to grant"). But that is not so. Accordingly, they cannot show a likelihood of success of their Fourth Amendment claim.

21

### E.    Plaintiffs Have Not Demonstrated Irreparable Harm.

"[P]laintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction." *All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). "The purpose of an injunction is to prevent future violations" and, therefore, requires the movant establish a "cognizable danger of recurrent violation" and not just "the mere possibility" of future harm. *U.S. v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953). To establish a likelihood of irreparable harm, Plaintiff "must do more than merely allege imminent harm sufficient to establish standing; [they] must *demonstrate* immediate threatened injury." *Boardman v. Pacific Seafood Group*, 822 F.3d 1011, 1022 (9th Cir. 2016) (emphasis in original). Where "there is no showing of any real or immediate threat that the plaintiff will be wronged again," there is no irreparable injury supporting equitable relief. *Lyons*, 461 U.S. at 111; *see Olagues v. Russoniello*, 770 F.2d 791, 797 (9th Cir. 1985). Under federal law, the government may conduct warrantless arrest if officers have reasonable suspicion, based on specific articulable facts. *See* Harvick Decl. ¶¶ 8-10; Quinones Decl. ¶¶ 4-5, 8-9. Plaintiffs have presented no evidence that alleged misconduct will occur in the future. *See* TRO at 22-23. At bottom, Plaintiffs' future injuries are not only speculative and, therefore, insufficient to demonstrate the likelihood of irreparable injury, they are premised on generalizations and a lack of understanding of Defendants' procedures for targeting aliens unlawfully in the United States. *See Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) ("An injunction will not issue if the person or entity seeking injunctive relief shows a mere possibility of some remote future injury[.]") (cleaned up).

### F.    The Equities Weigh Against Granting the TRO Application.

When the government is the defendant, the final two factors—the public interest and the balance of equities—merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). These equitable factors cut against the broad remedy proposed by Plaintiffs. Three of the named Plaintiffs are illegally present in the United States; their unlawful presence (and that of other aliens) in the United States is a continuing violation of the law. *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1047 (1984) (discussing that "a person whose unregistered presence in this country, without more, constitutes a crime," and while "the constable's blunder may allow the criminal to go free, we have never suggested that it allows the criminal to continue in the commission of an ongoing crime" (cleaned up)). The government has a legitimate and

22

1  significant interest in ensuring that immigration laws are enforced, and any limitation would severely
2  infringe on the President's Article II authority. *See U.S. v. Texas*, 599 U.S. 670, 679 (2023) (Article II
3  "enforcement discretion" applies in the immigration context, where the Court has stressed that the
4  Executive's enforcement discretion implicates normal domestic law enforcement priorities and foreign-
5  policy objectives). That interest would be compromised if the TRO is granted.  Moreover, it is well-
6  settled that the public's interest in enforcement of U.S. immigration laws is paramount, and even more
7  so where, as here, Congress has exercised its plenary legislative authority and control over immigration
8  issues. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878-79 (1975); *New Motor Vehicle Bd. v. Orrin*
9  *W. Fox Co.*, 434 U.S. 1345, 1351 (1977). Here, Plaintiffs seek an injunction from this Court enjoining
10 the government from allegedly making arrests without reasonable suspicion in violation of the Fourth
11 Amendment. But as discussed, the government's practices comply with the Constitution, and therefore,
12 alteration of the *status quo* is unnecessary. Accordingly, both the public interest and the balance of the
13 equities weigh in favor of denying the application.

14  **G.    Plaintiffs Cannot Obtain Relief on Behalf of an Uncertified Class.**

15  Plaintiffs have neither sought nor obtained class certification. Consequently, the Court cannot
16 issue class-wide relief and, at most, could only provide relief to the Plaintiffs in this case. *See Warth*
17 *v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to
18 protect against injury to the complaining party, even though the court's judgment may benefit others
19 collaterally."); *see also, Nat'l Ctr. for Immigrants Rights, Inc. v. INS*, 743 F.2d 1365, 1371 (9th Cir. 1984)
20 (citing cases and holding "in the absence of class certification, [a] preliminary injunction may properly
21 cover only the named plaintiffs"). Moreover, without demonstrating that its proposed class satisfies the
22 requirements of Rule 23 after a "rigorous analysis," Plaintiffs cannot obtain "an exception to the usual
23 rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores,*
24 *Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (internal citation and quotation marks omitted).

25  **H.    Any Injunction Should Require Bond and Be Properly Limited to Named Plaintiffs**

26  If the Court grants Plaintiffs' requested TRO it should order security. Under Federal Rule of
27 Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security"
28 for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully

23

enjoined." Fed. R. Civ. P. 65(c). If the Court issues a TRO here, it should require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).

On June 27, 2025, the Supreme Court held that district courts do not have equitable powers to issue a "universal injunction," barring the defendant from enforcing "a law or policy against *anyone*." *Trump v. CASA, Inc.*, 2025 WL 1773631, *4 (U.S. June 27, 2025) (emphasis in original). The Court reasoned that "'[c]omplete relief' is not synonymous with 'universal relief.' It is a narrower concept: The equitable tradition has long embraced the rule that courts generally 'may administer complete relief *between the parties*.'" *Id.* at *11 (emphasis in original) ("The individual and associational respondents are therefore wrong to characterize the universal injunction as simply an application of the complete-relief principle."). The Court in *Casa* overturned the lower court's universal injunction as to "all other similarly situated individuals" but left undisturbed the relief granted to named parties. *Id.* If this Court grants injunctive relief to Plaintiffs', that relief should apply *only* as to named Plaintiffs who have applied for such relief, not to anyone and everyone the government may come into contact within the Central District of California whether or not they are parties to this action. (*See Pls.' Proposed Order*, Dkt. 45-22 at 4-5)

Finally, Defendants respectfully request that if this Court does enter injunctive relief, that relief be stayed for a period of seven days to allow the Solicitor General to determine whether to appeal and seek a stay pending appeal.

## V.    CONCLUSION

For these reasons, the Court should deny the *ex parte* TRO application.

Dated:  July 8, 2025                              Respectfully submitted,

*/s/Sean Skedzielewski*
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General
United States Department of Justice
Civil Division
950 Pennsylvania Ave NW, Ofc. 3631
Washington, DC 20530
Telephone: (202) 307-1697
Email: Sean.Skedzielewski@usdoj.gov

Attorney for Defendants

24

**L.R. 11-6.2 Certificate of Compliance**

The undersigned counsel of record certifies that this filing is less than twenty-five (25) pages, which complies with this Court's standing order.

Dated:  July 8, 2025

> */s/Sean Skedzielewski*
> SEAN SKEDZIELEWSKI
> Counsel to the Assistant Attorney General
> United States Department of Justice
> Civil Division
> 950 Pennsylvania Ave NW, Ofc. 3631
> Washington, DC 20530
> Telephone: (202) 307-1697
> Email: Sean.Skedzielewski@usdoj.gov
>
> Attorney for Defendants

25

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

Pedro VASQUEZ PERDOMO, et al.,

Plaintiffs,

v.

KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY, et al.,

Defendants.

Case No. 2:25-cv-05605

**DECLARATION OF ANDRE QUINONES**

## DECLARATION OF ANDRE QUINONES

I, Andre Quinones, hereby declare:

1.    I am employed by the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) and serve as a Deputy Field Office Director (FOD) of the Los Angeles Field Office (ERO Los Angeles).

2.    I have been employed by ICE, or its predecessor legacy Immigration and Naturalization Service (INS), since June 2000. In April 2011, I was promoted to Supervisory Detention and Deportation Officer and in October 2016, I was promoted to Assistant Field Office Director. In June 2020, I was promoted to Deputy Field

1

ER-0277

Office Director (DFOD).

3.    As DFOD for ERO Los Angeles, I assist the Field Office Director in directing and overseeing ICE's enforcement of federal immigration laws within the Central District of California, which has the same geographic boundaries as the ERO Los Angeles Field Office. The ERO Los Angeles Field Office currently consists of over 290 law enforcement officers in six offices who are responsible for enforcing federal immigration laws in seven California counties with a combined population of over 20 million people. ICE is the largest investigative branch of DHS and is charged with the enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001 terrorist attacks, by combining components of the former INS and the former U.S. Customs Service, to more effectively enforce federal immigration and customs laws and to protect the United States against terrorist attacks. The mission of ICE is to protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which includes 25 field offices led by FODs; (2) Homeland Security Investigations (HSI), which includes 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which includes 25 field locations led by Chief Counsel.

2

4.      ERO Los Angeles officers receive Ninth Circuit-specific immigration enforcement training on the requirements of the Fourth Amendment of the U.S. Constitution and the statutory and regulation provisions of the Immigration and Nationality Act (INA) twice per year. This training covers warrantless arrests, the requirements of having and documenting reasonable suspicion and/or probable cause, and consensual encounters.

5.   ERO Los Angeles officers are trained that, under the Fourth Amendment, case law, and relevant regulations, brief detention for questioning requires an immigration officer to have reasonable suspicion, based on specific, articulable facts, that the person being questioned is an alien illegally in the United States. ERO Los Angeles officers are trained that an arrest requires probable cause that the person being arrested is an alien illegally in the United States.

6.      ERO Los Angeles officers are trained to follow ICE procedures for apprehensions of illegal aliens in the United States by using targeted investigations, conducting operations, and making arrests. Individual targeting packages, consisting of the targeted alien's immigration history and/or status, criminal history, last known residence and employment information are prepared during the targeted investigation, prior to contact with the targeted alien.  Targeted investigations focus on aliens with final removal orders and/or serious criminal history. When non-targeted individuals are encountered during the targeted

3

ER-0279

operations, ERO Los Angeles officers are trained to develop reasonable suspicion through consensual encounters. ERO Los Angeles officers identify themselves to the arrestee at the time of arrest/encounter or as soon as practicable when safe to do so.

7.     On January 22, 2025, Acting DHS Secretary Benjamine C. Huffman issued a memorandum authorizing any law enforcement officials within the U.S. Department of Justice including the Federal Bureau of Investigations, U.S. Marshals Service, Drug Enforcement Administration, Bureau of Alcohol, Tobacco, Firearms and Explosives, and Federal Bureau of Prisons to exercise immigration enforcement authorities under Title 8 of the United States Code.

8.     I am aware that on or about February 6, 2025 and on June 5, 2025, the ICE Office of the Principal Legal Advisor offered local law enforcement partners from these agencies Ninth Circuit-specific immigration enforcement training, covering immigration arrests, the requirements of reasonable suspicion and probable cause, brief stops for questioning, and consensual encounters under the Fourth Amendment and the INA statute and regulations.

9.     ICE law enforcement officers are participating in multi-agency teams conducting immigration enforcement in the Los Angeles area. In these operations, ERO and HSI serve as team leads of multi-agency teams on regular, targeted fugitive enforcement operations focusing on individuals with final orders of

4

removal or cases with significant criminal history. As ERO Los Angeles has been doing for many years, ERO creates individual targeting packets for the individual to be arrested. Should other individuals be encountered during the targeted arrest of the fugitive or criminal alien targeted, ICE will conduct consensual interviews to identify whether there is reasonable suspicion that the individuals are illegally in the United States and determine if these individuals are subject to immigration enforcement and arrest.

   Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.


Executed on this 8th day of July 2025.


ANDRE G
QUINONES

Digitally signed by ANDRE G
QUINONES
Date: 2025.07.08 15:15:06
-07'00'

Andre Quinones
Deputy Field Office Director
DHS ICE ERO Los Angeles


5

ER-0281

## DECLARATION OF KYLE C. HARVICK

I, Kyle C. Harvick, declare and affirm as follows:

1.     I am employed by U.S. Customs and Border Protection (CBP).  CBP is charged with enforcing the Nation's immigration laws in order to protect national security and uphold the integrity of the immigration system.  As part of this mission, CBP Border Patrol Agents and officers are responsible for preventing the unlawful entry of individuals into the United States, apprehending those who attempt to enter illegally or who have violated the immigration laws in accordance with applicable laws.  Through these activities, CBP seeks to secure the border, disrupt human smuggling and trafficking networks, and ensure consistent enforcement of the immigration laws of the United States.

2.     I am the Patrol Agent in Charge, El Centro Station. In this role, I drive Border Patrol Operations for the El Centro Station, comprised of 35 miles of land border, a permanent traffic checkpoint, overseeing 320 employees, a 160-vehicle fleet, and a budget of $800,000. I have been in this position since 2023.

3.     I entered on duty with the U.S. Border Patrol on September 10, 2000, with my first duty assignment in the El Paso Sector.  In 2015-2016, I served as Acting Assistant Chief within the Strategic Planning and Analysis Directorate, Operational Requirements Management Division in Washington, D.C.  I have also served as the Deputy Patrol Agent in Charge of the Yuma Sector Border Patrol Station and the first Customs and Border Protection Advisor to Israel, where I was responsible for facilitating in country liaison with various Israeli Law Enforcement entities and Ministry of Defense agencies. I have served in the El Centro Sector since 2021, including service as the Professional Standards Assistant Chief Patrol Agent.

4.     Currently for the Los Angeles operation, I am Deputy Incident Commander and I operate out of the Border Patrol Incident Command Post (BP ICP).  In this position, I oversee all U.S. Border Patrol operations around the Los Angeles area.  I ensure the Border Patrol Agents have all the proper equipment and supplies to do their job.  I

2

1   oversee logistics, prosecutions, use of force events, personnel, and intelligence. I report

2   to the Incident Commander or act as the Incident Commander in his absence. The BP

3   ICP is the operational component of Operation At Large Los Angeles, CA. The BP ICP

4   reports up to the Lead Field Coordinator and National Incident Command Center.

5   5.     On June 6, 2025, in support of U.S. Immigration and Customs Enforcement, CBP

6   agents and officers were sent to Los Angeles, California in support of Immigration and

7   Customs Enforcement-Enforcement and Removal Operations (ICE-ERO). As part of

8   this operation, CBP agents and officers, along with their federal partners, participate in a

9   variety of different law enforcement encounters and enforcement actions as part of the

10   operation in Los Angeles. These activities have included consensual encounters,

11   investigative detentions, warrantless arrests made where probable cause is developed in

12   the field, arrests carried out pursuant to federal immigration warrants, and criminal

13   arrests under judicial warrants.

14   6.     CBP personnel participated in consensual encounters during the operations in Los

15   Angeles. During those consensual encounters, the individuals free to walk away

16   and terminate the encounter, decline to answer questions, and refuse to provide requested

17   identification documents. While some of the individuals encountered freely answered

18   questions about their names and place of birth and provided identification documents,

19   others refused to answer questions and/or walked away from the encounters without any

20   further interaction.

21   7.     CBP agents and officers are typically divided into teams, composed of three to

22   five agents, who contact individuals in public places such as streets and sidewalks,

23   parking lots, or the publicly-accessible portions of businesses. Certain types of

24   businesses, including car washes, have been selected for encounters because past

25   experiences have demonstrated that illegal aliens utilize and seek work at these

26   locations.

27   8.     CBP agents and officers also engaged in lawful investigative detention encounters

28   during the operation in Los Angeles. Prior to engaging in investigative detentions,

3

1  officers and agents had reasonable suspicion that the individual had committed or was
2  committing a federal crime or federal immigration violation. This reasonable suspicion
3  was based on various factors including intelligence sources, information from law
4  enforcement and open-source databases, analysis of trends, facts developed in the field
5  by agents, rational inferences that led an agent or officer to suspect criminal or
6  immigration violations, and the officers or agents' observations, training, and
7  experience.  Officers and agents are trained to consider the totality of the circumstances
8  when determining whether reasonable suspicion exists.  Requiring law enforcement to
9  ignore certain facts in this analysis would be unworkable on a practical level in the
10  operational environment.  For example, the particular location where the stop occurs is
11  relevant to the officer's overall analysis.  As an additional example, an individual's
12  vocation may be relevant to the officer's overall consideration of the totality of the
13  circumstances.  Additionally, 8 C.F.R. § 287.8(b)(2), specifically authorizes CBP officers
14  and agents conducting a temporary, investigative detention based on reasonable
15  suspicion to interrogate any alien or person believed to be an alien concerning his or her
16  right to be, or to remain, in the United States.
17  9.      During the operation in Los Angeles, CBP officers and agents have also
18  conducted warrantless arrests for immigration violations pursuant to applicable legal
19  authorities, including 8 U.S.C. § 1357 and 19 U.S.C. § 1589a.  Also, during the
20  operation in Los Angeles, CBP officers and agents have made warrantless arrests for
21  immigration violations, as well for as violations of federal criminal statutes, such as 18
22  U.S.C. § 111, 21 U.S.C. § 841 and 18 U.S.C. § 1361.
23  10.     During the operation in Los Angeles, CBP agents and officers have effectuated
24  arrests pursuant to federal administrative warrants, specifically, Warrants for Arrest of
25  Alien, referred to as I-200s. Prior to conducting targeted immigration arrests pursuant to
26  an I-200, authorized DHS personnel identify subjects for whom they have developed
27  probable cause to believe are removable from the United States.  This conclusion is
28  based upon specific evidence.  Typically, officers and agents are given information on

4

1    the subject of the I-200, which may include immigration and criminal history, biological

2    information, photos (if available), and other relevant information, such as the last known

3    home address or possible workplace of the subject. This information is gathered from a

4    variety of sources including, but not limited to, systems of record checks, information

5    contained in an individual's immigration file (A-file), information developed from past

6    investigations, open-source information, surveillance operations, and information

7    provided by other federal agencies, particularly the local and regional offices. Officers

8    and agents then typically conduct surveillance in order to identify the location of the

9    subject in order to effectuate the arrest. CBP officers and agents effectuate

10   administrative immigration warrants in public locations.

11   11. During the operation in Los Angeles, CBP agents and officers have also effectuated

12   criminal judicial arrest and search warrants.

13   12.    The actions undertaken by CBP law enforcement officers are informed by their

14   experience and the comprehensive training they receive at various stages of their careers.

15   During the CBP Officer Basic Training program at FLETC, in Glynco, Georgia, and the

16   U.S. Border Patrol Agent Basic Training program in Artesia, New Mexico, trainees

17   receive comprehensive tactical, operational, and legal training over the course of the

18   months-long training program. During this time, they receive approximately 100 hours

19   of legal instruction that is prepared and presented by attorneys within the CBP Office of

20   Chief Counsel (OCC). This legal training provides officers and agents with the

21   framework necessary to recognize violations of the laws they enforce and to take

22   appropriate law enforcement actions. Legal topics covered include criminal law,

23   criminal procedure, courtroom testimony, customs law, forfeiture, immigration law, use

24   of force, nationality law, and report writing. Following their time at the Basic

25   Academies, CBP law enforcement officers receive additional on-the-job training and

26   periodic refreshers on a full range of topics.

27

28

5

1   I declare, under penalty of perjury, that the foregoing is true and correct to the best of my

2   information, knowledge and belief.

3

4   Executed this 8th day of July, 2025, at Long Beach, California.

5

6

7   KYLE C. HARVICK

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6

1  BRETT A. SHUMATE
   Assistant Attorney General
2  Civil Division

3  ERIC J. HAMILTON                          BILAL A. ESSAYLI
   Deputy Assistant Attorney General         United States Attorney
4                                            DAVID M. HARRIS
   SEAN SKEDZIELEWSKI                        Assistant United States Attorney
5  Counsel to the Assistant Attorney General Chief, Civil Division
                                             JOANNE S. OSINOFF
6  ALANNA T. DUONG                           Assistant United States Attorney
   Senior Litigation Counsel                 Chief, Complex and Defensive Litigation Section
7  JACOB A. BASHYROV                         DANIEL A. BECK (SBN 204496)
   JAMES A. HURLEY                           PAULINE H. ALARCON (SBN 345785)
8  Trial Attorneys                           Assistant United States Attorneys
   Office of Immigration Litigation             Federal Building, Suite 7516
9  Civil Division, U.S. Dept. of Justice        300 North Los Angeles Street
   P.O. Box 878, Ben Franklin Station           Los Angeles, California 90012
10 Washington, DC 20044                         Telephone: (213) 894-2574 | 3992
   Tel: (202) 305-7040                             E-mail:  Daniel.Beck@usdoj.gov
11 Fax: (202) 305-7211                                      Pauline.Alarcon@usdoj.gov
   Email: alanna.duong@usdoj.gov
12
   Attorneys for Defendants
13

14

15                UNITED STATES DISTRICT COURT

16            FOR THE CENTRAL DISTRICT OF CALIFORNIA

17                       WESTERN DIVISION

18
                                        No. 2:25-cv-05605-MEMF
19 PEDRO VASQUEZ PERDOMO; *et al.*,
                                        **DEFENDANTS' OPPOSITION
20         Plaintiffs,                   TO *EX PARTE* APPLICATION FOR
                                         TEMPORARY RESTRAINING ORDER AND
21         v.                            ORDER TO SHOW CAUSE RE:
                                         PRELIMINARY INJUNCTION**
22 KRISTI NOEM, in her official capacity as  (Dkt. 38)
   Secretary of Homeland Security; *et al.*,
23                                      [Supporting declarations filed concurrently]
           Defendants.
24                                      Hon. Maame Ewusi-Mensah Frimpong
                                        United States District Judge
25

26

27

28

### TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................... 1

II.   FACTUAL BACKGROUND ................................................................................... 2

      A.    ICE's B-18 Facility and its Access To Counsel ............................................ 2

      B.    Allegations of Plaintiffs' *Ex Parte* TRO Application Regarding Access to
            Counsel at the B-18 Facility ......................................................................... 3

III.  STANDARD OF REVIEW ..................................................................................... 6

IV.   ARGUMENT ........................................................................................................... 6

      A.    Plaintiffs Have Failed to Establish That They are Entitled to Seek *Ex Parte* TRO
            Relief under the *Mission Power* Standard, As Opposed to Proceeding by Noticed
            Motion for a Preliminary Injunction. ........................................................... 6

      B.    Plaintiffs Lack Standing to Obtain a Prospective Injunction. ....................... 8

            1.    Plaintiffs Cannot Establish Third-Party Standing Absent Actual or Future
                  Injury to Themselves ......................................................................... 10

            2.    Plaintiffs Failed to Establish that They Have Standing in This Action as
                  the B-18 Detainees' Putative "Next Friend." .................................... 13

            3.    Plaintiffs Cannot Establish Associational Standing ........................... 14

      C.    Plaintiffs Are Not Likely To Succeed On The Merits of Their Claim. ......... 15

      D.    Plaintiffs Have Not Demonstrated Irreparable Harm. ................................. 19

      E.    The Equities Weigh Against Granting the TRO Application. ........................ 20

      F.    Any Injunction Should Require Bond and Be Properly Limited to Named
            Plaintiffs. ................................................................................................... 20

V.    CONCLUSION ..................................................................................................... 21

L.R. 11-6.2 Certificate of Compliance

i

# TABLE OF AUTHORITIES

Page(s)

## Federal Cases

*Al-Aulaqi v. Obama*,
    727 F. Supp. 2d 1 (D.D.C. 2010) ............................................................ 14

*All. For The Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ............................................................... 19

*Allen v. Wright*,
    468 U.S. 737 (1984) ............................................................................... 10

*Am. Immig. Lawyers Ass'n v. Reno*,
    18 F. Supp. 2d 38, 49 (D.D.C. 1998) ..................................................... 12

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
    526 U.S. 40 (1999) ................................................................................. 16

*Americans for Immigrant Just. v. Dep't of Homeland Sec.*,
    No. CV 22-3118, 2023 WL 1438376 (D.D.C. Feb. 1, 2023) ........... 16, 21

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................... 17

*Block v. Rutherford*,
    468 U.S. 576 (1984) ......................................................................... 16, 17

*Board of Regents v. Roth*,
    408 U.S. 564 (1972) ............................................................................... 18

*Boardman v. Pacific Seafood Group*,
    822 F.3d 1011 (9th Cir. 2016) ............................................................... 19

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) ................................................................... 6

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ..................................................................... 1, 9, 12, 19

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ........................................................................... 9, 11

*Department of State v. Muñoz*,
    602 U.S. 899 (2024) ......................................................................... 15, 18

ii

*Dept. of Health and Human Services*,
  67 F.3d 859 (9th Cir. 1995).................................................................. 18

*DSE, Inc. v. United States*,
  169 F.3d 21 (D.C. Cir. 1999).............................................................. 21

*FDA v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024)................................................................. 9, 10, 11

*Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*,
  566 U.S. 318 (2012).......................................................................... 18

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015)............................................................ 11

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015)................................................................ 6

*Grigoryan v. Barr*,
  959 F.3d 1233 (9th Cir. 2020)............................................................ 19

*Hamdi v. Rumsfeld*,
  294 F.3d 598 (4th Cir. 2002)................................................................ 9

*Hatim v. Obama*,
  760 F.3d 54 (D.C. Cir. 2014).............................................................. 18

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977).......................................................................... 14

*INS v. Lopez-Mendoza*,
  468 U.S. 1032 (1984)........................................................................ 20

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018).......................................................................... 16

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004).......................................................................... 12

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*,
  731 F.2d 909 (D.C. Cir. 1984)............................................................ 15

*Lata v. INS*,
  204 F.3d 1241 (9th Cir. 2000)............................................................ 19

*Lawyers Ass'n v. Reno*,
  18 F. Supp. 2d 38 (D.D.C. 1998)........................................................ 12

iii

*Lewis v. Cont'l Bank Corp.*,
   494 U.S. 472 (1990)..............................................................................13

*Lexmark Intern., Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014)..............................................................................12

*Lopez v. Brewer*,
   680 F.3d 1068 (9th Cir. 2012)...............................................................6

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)...........................................................................9, 11

*Mathews v. Eldridge*,
   424 U.S. 319 (1976)..............................................................................15

*Mission Power Engineering Co. v. Continental Cas. Co.*,
   883 F. Supp. 488 (C.D. Cal. 1995).....................................................6, 7

*Munaf v. Geren*,
   553 U.S. 674 (2008)..............................................................................15

*Munns v. Kerry*,
   782 F.3d 402 (9th Cir. 2015)...............................................................10

*Nken v. Holder*,
   556 U.S. 418 (2009)..............................................................................20

*Olagues v. Russoniello*,
   770 F.2d 791 (9th Cir. 1985)...............................................................19

*Orantes-Hernandez v. Thornburgh*,
   919 F.2d 549 (9th Cir. 1990)..........................................................16, 18

*O'Shea v. Littleton*,
   414 U.S. 488 (1974)................................................................................9

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*,
   636 F.3d 1150 (9th Cir. 2011)...............................................................20

*Powers v. Ohio*,
   499 U.S. 400 (1991)..........................................................................10, 12

*Preiser v. Rodriguez*,
   411 U.S. 475 (1973)..............................................................................14

*Ramirez-Osorio v. INS*,
   745 F.2d...................................................................................................18

iv

*Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ........................................................................................ 10

*Reno v. Flores,*
    507 U.S. 292 (1993) ........................................................................................ 18

*Rizzo v. Goode,*
    423 U.S. 362 (1976) ........................................................................................ 11

*Schroeder v. McDonald,*
    55 F.3d 454 (9th Cir.1995) .............................................................................. 18

*Sharp v. Capitol City Brewing Co., LLC,*
    680 F. Supp. 2d 51 (D.D.C. 2010) .................................................................. 11

*Singleton v. Wulff,*
    428 U.S. 106 (1976) ........................................................................................ 10

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ........................................................................................ 12

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ............................................................................................ 9

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.,*
    240 F.3d 832 (9th Cir. 2001) ............................................................................. 6

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) .......................................................................................... 8

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ........................................................................................ 15

*Trump v. CASA, Inc.,*
    2025 WL 1773631 (U.S. June 27, 2025) ......................................................... 21

*U.S. v. Texas,*
    599 U.S. 670 (2023) ........................................................................................ 20

*U.S. v. W. T. Grant Co.,*
    345 U.S. 629 (1953) ........................................................................................ 19

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,*
    454 U.S. 464 (1982) ........................................................................................ 11

*Warth v. Seldin,*
    422 U.S. 490 (1975) ................................................................................... 9, 13

v

*Washington v. Glucksberg,*
   521 U.S. 702 (1997) ................................................................................................. 15, 18

*Whitmore v. Arkansas,*
   495 U.S. 149 (1990) ................................................................................................... 9, 13

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ....................................................................................................... 6, 20

*Zadvydas v. Davis,*
   533 U.S. 678 (2001) ...................................................................................................... 16

**Federal Rules**

Federal Rule of Civil Procedure 65(c) ............................................................................ 20, 21

vi

ER-0293

## I.    INTRODUCTION

Plaintiffs seek the extraordinary remedy of a temporary restraining order and preliminary injunction that would hinder the ability of federal law enforcement officers to protect federal employees and detainees in federal custody from violence and property damage that the Ninth Circuit panel unanimously held, just weeks ago, likely justified federalizing the California National Guard. *Newsom v. Trump*, No. 25-3727, slip op., at 28-30 (9th Cir. June 19, 2025). Plaintiffs base their request for emergency injunctive relief on alleged violations of the Fifth Amendment in the context of the access to counsel by immigration detainees at the B-18 room of the federal building in Los Angeles, California. Their request for TRO relief is defective and fails for several reasons.

*First,* Plaintiffs fail to justify their request for the extraordinary remedy of *ex parte* relief. In support of their *ex parte* application, Plaintiffs cite riots that occurred a month ago at the federal building, where temporary detention facility B-18 is located, that necessitated the temporary closure of that facility for the safety of visitors and federal employees thereby briefly impacting attorney access to the facility. But Plaintiffs knew about those issues one month ago, and instead of filing for emergency relief at that time, took weeks to prepare their extensive papers with minimal notice. Plaintiffs' prejudicial tactics, and the effects they have on the proper administration of justice, counsel that their *ex parte* application should be denied for abuse of procedure.

*Second*, Plaintiffs lack standing to seek emergency relief. It is well-established that a plaintiff lacks standing to obtain prospective injunctive relief for alleged future injuries based on allegations of prior harm. *See City of Los Angeles v. Lyons,* 461 U.S. 95 (1983). Plaintiffs seek an emergency injunction based on alleged *past* limitations on counsel's access to the B-18 holding facility in Los Angeles. Any such alleged limitations were the product of temporary extraordinary conditions related to the surrounding riots in early June, which no longer exist at B-18. Just as Judge Wilson recently held in a case stemming from the same month-old unrest in Los Angeles at issue here and involving Plaintiff's counsel, the ACLU, "Plaintiffs present no evidence of recurring misconduct during the intervening period through the filing of their TRO on [July 2]." *Los Angeles Press Club et al. v. Kristi Noem et al.*, 2:25-cv-05563-SVW-MAA (June 20, 2025) (Dkt. 19) at 4. On this basis alone, Plaintiffs lack standing. Furthermore, Plaintiffs lack third-party standing because they cannot demonstrate injury in fact; they lack

1

next friend standing because they have no connection or relationship to unidentified detainees at B-18 who have not retained the organizations' services; and they lack associational standing because they have failed to show concrete harm to members.

*Third*, Plaintiffs have not established a likelihood of success on the merits because they have not shown that any Fifth Amendment rights were violated relative to the access of counsel. Even if they could show there was a rights violation here—they cannot—Plaintiffs do not establish that alleged restrictions on their communication with current and prospective clients were unreasonable under the circumstances.

*Fourth*, the balance of the equities and the public interest counsel against granting Plaintiffs' request because the Government has a legitimate and significant interest in ensuring that immigration laws are enforced, and in preserving the safety of detainees and federal employees during extraordinarily dangerous and temporary public unrest.

Plaintiffs' *Ex Parte* Application for Temporary Restraining Order (Dkt. 38 ("TRO")) is thus procedurally and substantively defective and should be denied.

## II.    FACTUAL BACKGROUND

### A.    ICE's B-18 Facility and its Access To Counsel

B-18 is a holding facility used by the Office of Enforcement and Removal Operation ("ERO"), location at 300 N. Los Angeles Street, Los Angeles, CA 90012 ("Federal Building"). Decl. of Lilia A. Uyeda ¶ 4 ("Uyeda Decl."). B-18 is primarily used for the short-term confinement of individuals who have recently been detained, or are being transferred to or from a court, detention facility, other holding facility, or other agency. *Id.*

Each hold room in B-18 is equipped with a telephone, available to detained individuals 24 hours per day. *Id.* at ¶ 4. The telephones provide free access to consular offices. *Id.* ¶ 5. The telephones are capable of making collect calls to all other numbers. *Id.* There is no option for a pre-paid account or any other arrangement. *Id.* There is no time limit on telephone calls. *Id.* Each detainee is provided with an opportunity to make a phone call as they are processed into the holding facility. *Id.* at ¶ 5. Each detainee is given the opportunity to gather any telephone numbers they may have stored in their cell phones or other property before their property is secured in a locker. *Id.* at ¶ 6. It is not uncommon for a detainee to inadvertently delay their own processing and complicate attempts for visitation by providing a false

2

identity at the time of their arrest in the field. *Id.* at ¶ 7. This can cause issues both with ICE's ability to accurately identify where individuals are being held, and frustrate attempts for attorney visitation. *Id.*

B-18 has a public visitation area as well as two private rooms for attorney visits. *Id.* at ¶ 8. Attorney visits are permitted from 8am to 4pm seven days per week. *Id.* So long as an attorney arrives before 4 p.m. deadline, the facility accommodates the attorney visit and extends visitation hours as needed. *Id.* at ¶ 9.

On June 6, 2025, riots erupted in downtown Los Angeles and specifically at the entrance to B-18. *Id.* at ¶ 10. The crowd impeded ICE operations, including the transport of detainees in or out of B-18 sally port and required other sub-offices in the area to re-route arrested individuals to other locations. *Id.* Staff feared that B-18 could be breached by the protestors if the public visitation door was opened. *Id.* Due to the volatile situation, B-18 closed early on the afternoon of June 6, 2025. *Id.* As the protests continued, the entire Federal Building was closed, and all detainees were removed to Santa Ana on June 7, 2025. *Id.* at ¶ 11. The situation was so severe that the California National Guard were deployed to restore the peace. *See infra* at 7. The detainees remained in Santa Ana through June 12. Uyeda Decl. ¶ 11. Detainees were moved back to B-18 overnight on or around June 13, 2025 but had to be moved back to Santa Ana on June 14, 2025 through June 16 2025 for safety and security reasons. *Id.* All detainees were moved back to B-18 by June 17, 2025. *Id.* Due to concerns about the physical safety of federal officers, detainees, and visitors, the Federal Building restricted operational hours to 6am through 2pm from June 17, 2025 through June 23, 2025. *Id.* However, "during the time of the protests, the detainees, whether in B-18 or Santa Ana, had access to telephones to contact family or attorneys regardless of any restrictions on in-person visitation, as the telephones in the holding areas are available twenty-four hours per day." *Id.* Operations normalized as of June 24, 2025. *Id.* Attorney visitation hours at B-18 as of June 24, 2025 have resumed as normal. *Id.* at ¶ 12.

**B.    Allegations of Plaintiffs' *Ex Parte* TRO Application Regarding Access to Counsel at the B-18 Facility**

Plaintiffs' TRO application broadly alleges that immigration detainees are being kept in B-18 and

3

that ICE is depriving them of legal access. TRO at 1.[1] The organizational Plaintiffs bringing this TRO allege that they made repeated efforts throughout the month of June to gain access to B-18 and have largely been denied entry to B-18 and those inside are not permitted to make phone calls or contact potential attorneys. *Id.* at 5-6. Despite alleging ongoing inability to meet with anyone in B-18, the TRO largely points to issues that arose on just five dates: June 6, 7, 8, 16, and 19, 2025.

*June 6, 2025*: Plaintiffs allege that they sought entry into B-18 "to advise detainees of their rights" but were "not permitted to meet with anyone." TRO at 5. Despite alleging that Plaintiffs' employees were "not permitted to meet" clients or potential clients, the supporting declarations reflect a different story. *Id.* One employee was never denied entry by an ICE agent, but was instead told by a different attorney that B-18 was full. *Id.* Plaintiffs ultimately had to leave before meeting with their clients because ICE closed visitation in light of an ongoing "unlawful gathering" and protest at the building. Dkt. 38.9 ¶¶ 14-15. Another attorney was allowed into B-18, where he found attorneys and family members waiting to speak with individuals. Dkt. 38.11 ¶ 10. While this attorney was unable to meet with his client before the protests forced B-18 to close for the night, guards repeatedly tried to help him locate the client. *Id.* ¶¶ 11-12. Another attorney employed by Plaintiff accessed B-18 but failed to locate her client. *Id.* ¶ 13.

*June 7, 2025*: Plaintiffs allege that their employees returned the morning of Saturday June 7 and "were met with frightening force and denied access." TRO at 5. When they approached B-18, they found a note taped to the door, stating "ATTY./FAMILY // VISIT // TEMPORARY CANCELLED TODAY // THANK YOU." Dkt. 38.9 ¶ 17. While outside B-18 (adjacent to the building's secure loading dock), Plaintiffs' employees observed unknown detainees—none of whom Plaintiffs allege were their clients— being loaded into vans and tried to shout legal advice at them. TRO at 5. The unknown van drivers honked their horns and an unknown individual deployed a chemical irritant. *Id.*

*June 8, 2025*: ImmDef employees attempted to access B-18 but saw a sign on the door stating that visits were cancelled that day. TRO at 5. The supporting declaration reflects that they rang the intercom to try and gain entry and after 20 seconds of waiting, they felt a chemical irritant burning their

---

[1] Despite Plaintiffs' TRO application referencing alleged unsuitable conditions inside B-18, the application solely seeks relief in connection with Plaintiffs'—two legal aid groups that regularly represent immigration detainees—ability to contact clients and potential clients whom Plaintiffs believe were being held inside B-18. Accordingly, Defendants will focus on the alleged facts concerning legal access to Plaintiffs' clients.

noses and throats and left because they felt unsafe. Dkt. 38.11 ¶¶ 23-24.[2]

*June 16, 2025*: ImmDef employees arrived around 3:00 p.m., about an hour before B-18 was scheduled to close and were denied access. TRO at 5-6. The supporting declaration does not allege that they were denied access to any clients, but were instead only seeking to speak to "family members of individuals who had called ImmDef's Rapid Response hotline" who may or may not have even been there. Dkt. 38.11 ¶ 28.

*June 19, 2025*: An ImmDef employee was unable to meet with a client who was ill and needed to attend a chemotherapy appointment the next day. TRO at 6. Despite the TRO alleging that "the officers would not allow the attorney to meet with the ill detainee," *id.*, the supporting declaration reflects that ICE officers worked with the attorney to locate the client and she was able to meet with him for about 45 minutes. Dkt. 38.11 ¶¶ 41-44, 46. The client was released from custody the following day. *Id.* ¶ 50.

*Telephone calls*: Despite Plaintiffs' allegation that phone calls at B-18 are "very limited," (TRO at 6), Plaintiffs' declarations indicate this is not so. One detainee was able to contact a family member via telephone on the same day she was detained. Dkt. 38.4 ¶ 8. After his arrest, another detainee contacted his wife on at least two occasions. Dkt. 38.7 ¶¶ 10, 12. Another declarant states that an online system is required for placing telephone calls at B-18. But this is inaccurate. *See* Uyeda Decl. ¶ 5 ("The telephones provide free access to consular offices. The telephones are capable of making collect calls to all other numbers.").

As the supporting declarations for the TRO reflect, federal agents at B-18 are managing a large influx of family and attorneys attempting to speak with clients or solicit potential clients—often in the context of dangerously close riots. *See* Dkt. 38.9 ¶¶ 14-15 (B-18 was "at capacity"; visiting hours closed because of unlawful gathering nearby); Dkt. 38.11 ¶¶ 10, 25 (large number of family and attorneys inside B-18; visiting hours temporarily cancelled at same time as large protest). Despite these challenges, agents repeatedly tried to help Plaintiffs locate their clients. Dkt. 38.9 ¶¶ 11-12, 41-44, 46.

---

[2]  This occurred about the same time that law enforcement was attempting to clear a large protest from an adjacent building. See *Maps and Timeline of the L.A. Immigration Protests and the Federal Response*, N.Y. Times, https://www.nytimes.com/interactive/2025/06/08/us/la-immigration-protests-photos-map.html (last updated June 12, 2025) ("At around 1 p.m. Pacific, California National Guard, Department of Homeland Security and Immigration and Customs Enforcement officers formed a line and attempted to clear protesters away from the Metropolitan Detention Center. Officers deployed tear gas, pepper balls and other crowd-control munitions.").

## III.   STANDARD OF REVIEW

The standard for issuing a TRO and a preliminary injunction are substantially identical. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A TRO is "an extraordinary and drastic remedy ... that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). For a TRO to issue, the movant must demonstrate: (1) a likelihood of success on the merits, (2) a likelihood of suffering irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) the TRO is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 24 (cleaned up). "Likelihood of success on the merits is the most important factor," and if the movant fails to meet this "threshold inquiry," the court "need not consider the other factors." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018). Where, as here, a movant seeks a mandatory injunction that would alter the status quo and impose affirmative requirements on law enforcement officers as they carry out their duties, the burden is even higher standard. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (mandatory injunctions are "particularly disfavored" and the "district court should deny such relief unless the facts and law clearly favor the moving party.") (cleaned up).

## IV.   ARGUMENT

### A.   Plaintiffs Have Failed to Establish That They are Entitled to Seek *Ex Parte* TRO Relief under the *Mission Power* Standard, As Opposed to Proceeding by Noticed Motion for a Preliminary Injunction.

*Ex parte* applications are rarely justified. *See Mission Power Engineering Co. v. Continental Cas. Co.*, 883 F. Supp. 488, 490 (C.D. Cal. 1995). To justify the extraordinary remedy of *ex parte* relief, the movant must demonstrate it "is without fault in creating the crisis that requires *ex parte* relief, or that the crisis occurred as a result of excusable neglect." *See id.* at 492. Here, the sole two organizational Plaintiffs who brought this TRO do not satisfy the *Mission Power* standard for proceeding by an *ex parte* application, as opposed to by a noticed motion. Indeed, their application makes no mention of this threshold legal standard. *See* TRO at 15 ("Legal Standard"). Their own strategic litigation delays and

6

choices have created an extremely shortened schedule. It is not excusable neglect.

Large protests and riots occurred around the Federal Building from June 6 to 9, 2025.[3] Uyeda Decl. ¶¶ 10-12. The facility's surrounding conditions were indeed extraordinarily severe, which is why the U.S. National Guard and U.S. Marines were called in to defend the facility and area.[4] If attorneys had increased restrictions on their access to detainees at the B-18 facility of the Federal Building because of the protests, this was only to provide for the safety of detainees and federal employees. Uyeda Decl. ¶ 10. Many federal employees were forced to flee the area and work at home over the week, and their associated services suffered significant disruptions. But Plaintiffs did not promptly seek exigent *ex parte* relief at or near that time—as they could have done if they were genuinely facing irreparable harm requiring an *ex parte* application.[5]

Plaintiffs have been aware of the riots that impaired access to the facility for more than a month. Indeed, they assert that "since early June 2025" detainees at B-18 have not been "permitted … access to prospective or retained legal counsel required under the Fifth Amendment." TRO at 9. Yet, organizational Plaintiffs did not seek *ex parte* relief in early June. Instead, Plaintiffs and their counsel tarried, taking extensive time to draft and (without any advance notice) filed a lengthy First Amended Complaint on July 2, 2025 (Dkt. 16 ("FAC")), followed by the Plaintiffs' filing of two *ex parte* TRO applications on July 2 and 3, 2025. Dkt. 38, 45.

*Mission Power* warned of how *ex partes* "pose a threat to the administration of justice," calling out situations where "the moving party's papers reflect days, even weeks, of investigation and preparation; the opposing party has perhaps a day or two ... The goal often appears to be to surprise opposing counsel or at least to force him or her to drop all other work to respond on short notice." *Mission*

---

[3] *LAPD declares unlawful assembly on ICE raid protest in downtown LA,* NBC LA News (last updated June 7, 2025 at 10:03 am) https://www.nbclosangeles.com/news/local/ice-raids-prompts-protest-in-front-of-downtown-la-federal-building/3717661/.

[4] *See* Declaration of Ernesto Santacruz, JR., *Newsom, et al. v. Trump et al.*, 25-3727 (June 16, 2025) Dkt. 25.1 ¶¶ 3-5, 7-14 ("Prior to the National Guard's deployment, rioters and protestors assaulted federal, state, and local law enforcement officers with rocks, fireworks, and other objects. They also damaged federal property by spray painting death threats to federal law enforcement officers."

[5] Contrast Plaintiffs' initial counsel in this lawsuit, whose clients were detained on June 18, 2025, and who immediately raised the issue with the government, giving notice (rather than laboring in secrecy for weeks). By June 20, 2025, Plaintiffs' counsel filed a habeas petition (Dkt. 1) and then a concise *ex parte* application for a TRO preventing transfer from the District (Dkt. 4). The result was a timely and exigent resolution.

1   *Power*, 883 F. Supp. at 490. That is precisely what happened here.[6]

2        The highly anomalous procedural status of this case further supports denying TRO relief. The
3   new organizational Plaintiffs and their numerous new counsels did not bring a new lawsuit. Plaintiffs'
4   counsel instead selected a preferred very specific small habeas petition—which was already largely
5   mooted, per the parties' discussion at the teleconference before the Magistrate Judge (Dkts. 13, 14, 15),
6   by its three Petitioners' pursuit of bond hearings—as their preferred Court to suddenly bring a huge new
7   putative class action via the First Amended Complaint, along with filing two TRO applications that seek
8   class-wide relief without even requesting (much less obtaining) class certification. Plaintiffs' case-
9   selection tactic naturally touched off additional efforts by many other groups to introduce and interject
10  new arguments, and new parties, into the TRO context, as the Court has seen. The rapidly mutating
11  procedural status of this case thus diverges even further from proper *ex parte* TRO procedure, and it also
12  diverges markedly from the preliminary injunction procedure used in *United Farm Workers*.

13       The Court's Order granted Defendants additional time to respond. Dkt. 43. But that briefing
14  schedule does not resolve Plaintiffs' underlying failure to satisfy the demanding *Mission Power* standard
15  for justifying their pursuit of relief by an *ex parte* TRO application. While Plaintiffs claim to have suffered
16  because of the detainees' insufficient access to counsel from early June, Plaintiffs unjustifiably delayed
17  their *ex parte* filing until July 2, 2025. Plaintiffs' delayed from June 6th to 9th when the riot conditions
18  existed to Plaintiffs' filing of the TRO on July 2, 2025. Not only is that delay inconsistent with the *Mission*
19  *Power* standard, it also undercuts the evidence that Plaintiffs attempt to rely upon which is now
20  significantly out of date and no longer reflects realities on the ground.

21       **B.    Plaintiffs Lack Standing to Obtain a Prospective Injunction.**

22       The TRO also fails because Plaintiffs lack standing. *See Susan B. Anthony List v. Driehaus*,
23  573 U.S. 149, 158 (2014) ("The party invoking federal jurisdiction bears the burden of establishing
24  standing and must do so the same way as any other matter on which the plaintiff bears the burden of
25  proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation."

26

27  _____
    [6] This followed Plaintiffs' counsel, the ACLU, having pursued the same tactic in *Los Angeles Press Club* case, 2:25-cv-05563-
28  SVW-MAA—where the ACLU filed an enormous *ex parte* TRO Application shortly after midnight on June 19, 2025 (Dkt.
    6) and then refused to grant the government any extension to respond.

(cleaned up)). It is well-established that "before a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue" under Article III of the Constitution. *Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990). The standing doctrine "ensures that the plaintiff has a sufficient personal stake in the outcome of a dispute to render judicial resolution of it appropriate in a society that takes seriously both the idea of separation of powers and, more fundamentally, the system of democratic self-government that such separation serves." *Hamdi v. Rumsfeld*, 294 F.3d 598, 602-03 (4th Cir. 2002) (cleaned up). "In essence, the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

To establish standing, Plaintiffs must show, as "the irreducible constitutional minimum": (1) they have suffered an "injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical[.]" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 395-96 (2024). Where, as here, a party seeks prospective equitable relief, the complaint must contain "allegations of future injury [that are] particular and concrete." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998). Past wrongs may serve as evidence of a "real and immediate threat of repeated injury," but they are insufficient on their own to support standing for prospective relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102-03 (1983). Along with past wrongs, the organization must allege either "continuing, present adverse effects" or a "sufficient likelihood that [it] will again be wronged in a similarly way." *Id.* (citing *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) (recognizing that past harm "[d]oes not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects")).

Here, Plaintiffs do not meet the Article III requirement of standing. First and foremost, Plaintiffs have presented no evidence that any alleged misconduct will occur in the future. *See* TRO at 7-11. The riots and protests occurred beginning June 6, 2025, operations at B-18 normalized on June 24, 2025, and Plaintiffs have not alleged that they have been unable to access existing or potential clients at B-18 since then. *See* TRO at 7-11. Indeed, federal courts have repeatedly held that a chilling effect based on a plaintiff's fear of future injury is too speculative to confer standing for injunctive relief. *See Clapper*

9

*v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending"); *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015) (same).

Moreover, Plaintiffs' mere assertion that Defendants' alleged restrictions of the right to counsel impedes their ability to engage in their mission of representing immigrants and refugees (TRO at 11) is insufficient to establish standing.[7] Indeed, Plaintiffs do not identify any cognizable principle of Article III standing that would permit this Court to exercise jurisdiction over their claims. Their failure to establish a recognized basis for standing means they have not met their burden to demonstrate the existence of a justiciable case or controversy under Article III. This Court thus lacks jurisdiction to consider their claims. *See Allen v. Wright*, 468 U.S. 737, 751 (1984) ("Standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."). As such, the Court should deny the application due to lack of standing.

### 1. Plaintiffs Cannot Establish Third-Party Standing Absent Actual or Future Injury to Themselves.

Plaintiffs lack third-party standing to bring claims on behalf of the unnamed detainees. The Supreme Court has permitted a "limited exception[]" to the general rule that "a litigant must assert his or her own legal rights," provided that "three important criteria are satisfied: [i] the litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute; [ii] the litigant must have a close relation to the third party; and [iii] there must exist some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991) (citations omitted) (quoting *Singleton v. Wulff*, 428 U.S. 106 (1976)). As a threshold matter, Plaintiffs cannot establish third-party standing because they have no relationship with any of the

---

[7]  Plaintiffs cite *Havens* (TRO at 11), but the Supreme Court has noted that the precedential origin of organizational standing doctrine—*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)—"was an unusual case" that it "has been careful not to extend … beyond its context." *Alliance*, 602 U.S. at 396. This Court should heed these words of caution in applying binding precedent here.

10

unnamed detainees currently held at B-18. To satisfy the first element of Article III standing, plaintiffs must show they have personally experienced an actual or imminent injury. *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). Establishing standing becomes significantly more challenging when the organization is not the direct target of the government action at issue. *Lujan*, 504 U.S. at 562. An organization's ability to provide services has only been perceptibly impaired when the defendant's conduct causes an "inhibition of [the organization's] daily operations." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (citation omitted); *see Alliance*, 602 U.S. at 394 (an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action.").

Here, at bottom, Plaintiffs lack standing to pursue claims based on injuries they are unlikely to experience in the future. *See Sharp v. Capitol City Brewing Co., LLC*, 680 F. Supp. 2d 51, 57 (D.D.C. 2010) (requiring plaintiffs to show actual or imminent injury and barring claims based on injuries suffered by others); *cf. Clapper*, 568 U.S. at 402 (holding that plaintiffs "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending"). In fact, Plaintiffs seeking injunctive relief must show that they are in "real and immediate" danger of sustaining direct injury or that future harm is certainly impending, not merely speculative or hypothetical. *Rizzo v. Goode*, 423 U.S. 362, 372 (1976). First, the temporary restrictions on attorney and family access at B-18 were directly tied to the government's response to security threats, not to any ongoing policy. Uyeda Dec. ¶¶ 10-12. Once order was restored, access was reinstated. *Id.* ¶¶ 11-12. Plaintiffs cannot claim that these emergency measures create an *ongoing risk of future injury*, since there is no evidence that such restrictions will recur absent similar extraordinary circumstances. Second, Plaintiffs' inability to show that they will again face the same access limitations, notwithstanding the exigent circumstances limiting access due to the volatile situation (Uyeda Dec. ¶ 10), underscores the lack of any "certainly impending" future injury. *See Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 410 (2013). Their generalized grievance about past conditions is not the concrete threat of future harm required for Article III standing. Finally, because B-18 is designed for short-term detention, Plaintiffs cannot plausibly allege a real and imminent risk of future harm at that facility since they might be released or transferred (Uyeda Dec. ¶ 4). Their claims of possible future injury are inherently speculative and do not satisfy the requirement that a

11

plaintiff must be "imminently threatened with a concrete and particularized 'injury in fact.'" *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014). The Supreme Court has made clear that past injury alone, which is absent here, is insufficient to support standing for prospective relief; there must be a substantial risk of future harm. *Lyons*, 461 U.S. at 110. Plaintiffs have not met that burden. Without a real and immediate risk of future injury, Plaintiffs' claims for injunctive relief must be dismissed for lack of standing.

Plaintiffs also do not have standing for another reason: they identify no statute or regulations that confers on them "legally cognizable interests" to pursue their mission in representing unidentified individuals currently held at B-18. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016) ("Article III standing requires a concrete injury even in the context of a statutory violation. For that reason, Robins could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III."). That Plaintiffs may have to expend effort to communicate with individuals at B-18 that they wish to represent, or that they will be deprived of "prospective clients," TRO at 10, are insufficient to establish Article III standings. *Am. Immig. Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 49 (D.D.C. 1998), *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000) ("With respect to the organizational plaintiffs' argument that they will be deprived of clients, the government argues and the Court agrees, that there is no way to know whether aliens who are denied the opportunity to consult with counsel would have chosen to consult with the plaintiffs had they had the opportunity to do so."). Plaintiffs' argument appears to be based on their desire to have access to the individuals held at B-18 in order to offer legal advice and find new clients. TRO at 9-10. In essence, they suggest that increased efforts to gain access to B-18 establishes a significant relationship beyond mere legal representation. *Id*. The Supreme Court, however, has established that lawyers do not have the necessary close relationship with *potential* clients to claim third-party standing. *See Kowalski v. Tesmer*, 543 U.S. 125, 130-31 (2004). Here, Plaintiffs similarly have no relationship with any of the unnamed detainees held at B-18, whom they identify as potential clients; thus, they cannot show the third-party standing.[8]  At bottom, organizational Plaintiffs

---

[8]  While Plaintiffs allege that the detainees are prevented in their ability to protect their own rights, TRO at 5, 10, the Court does not need to reach this prong because they failed to demonstrate that they suffered injury in fact and that they have a close relationship with the third party. *See Powers*, 499 U.S. at 410-11.

do not have standing, and this Court lacks jurisdiction.

### 2.    Plaintiffs Failed to Establish that They Have Standing in This Action as the B-18 Detainees' Putative "Next Friend."

Plaintiffs lack standing to assert claims on behalf of individuals whom they do not directly represent.[9] The standing doctrine requires that a party demonstrates a concrete and particularized injury to itself, and organizations may not circumvent this requirement by seeking to vindicate the rights of unrepresented third parties. Next friend standing has most often been invoked "on behalf of detained prisoners who are unable, usually because of mental incompetence or inaccessibility, to seek relief themselves." *Whitmore*, 495 U.S. at 162. To prevent third parties seeking to advance their own interests and agendas from litigating another's claims in the guise of a next friend, the Supreme Court thus articulated "at least two firmly rooted prerequisites." *Id.* at 163-64. First, a putative "next friend," like the legal services organizations here, "must provide an adequate explanation—such as inaccessibility, mental incompetence, or other disability—why the real party in interest cannot appear on his own behalf to prosecute the action." *Id.* 163. "Second, the 'next friend' must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate, and it has been further suggested that a 'next friend' must have some significant relationship with the real party in interest." *Id.* at 163-64.

Here, organizational Plaintiffs seek legal access, habeas corpus relief, and vindication of constitutional rights, on behalf of an unspecified number of unidentified individuals currently held at B-18.[10] *See* TRO at 1; FAC ¶¶ 215-47. Yet they fail to meet their burden because they cannot show that they are truly dedicated to the B-18 detainees' best interests, as they have no relationship with the

---

[9]  It is well-established that individual plaintiffs—Vasquez Perdomo, Osotro, Villegas Molina, Hernandes Viramontes, and Gavidia—cannot assert standing to vindicate the rights of others, including those whom organizational Plaintiffs seek to represent. The Supreme Court has made clear that a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Accordingly, these individuals lack standing to pursue claims on behalf of others whose rights could be at issue in this case.

[10]  As a threshold issue, the evidence does not show that the three named Plaintiffs—who did not join in this application and who were detained at B-18 (Vasquez Perdomo (FAC ¶ 120), Osorto (FAC ¶ 133), and Villegas Molina (FAC ¶ 145))]—are not currently held at B-18, nor have they alleged any current barriers to access of counsel. *See* TRO at 7-14. As a result, their claims—and those of any other individuals no longer held at B-18—are moot. Because these individuals are no longer subject to the conditions challenged in the petition, there is no ongoing injury that this Court can remedy through the requested application. Thus, the relief sought cannot apply to the individual Plaintiffs or any similarly situated former detainees. *See Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 478 (1990) (to present a live case or controversy to avoid dismissal on mootness grounds, the plaintiff "must continue to have a 'personal stake in the outcome' of the lawsuit.").

13

unidentified individuals currently held at B-18, much less a "significant" one. No evidence shows any existing relationship between these two organizations and the unidentified detainees, nor is there any indication that the unidentified detainees have requested representation—either by legal counsel generally or by these specific legal services organizations. *See* TRO at 7-11. Without such a relationship or express consent, the organizations cannot claim to represent or vindicate the legal rights of these unidentified, non-party individuals. *See Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 20 (D.D.C. 2010). ("While it may be fair to assume that the detainee wants to be released from detention, there may be reasons why detainees may not want to file habeas petitions as a vehicle for accomplishing this purpose.") (cleaned up). Indeed, "a purported 'next friend' may not simply speculate as to the best interests of the party on whose behalf he seeks to litigate." *Id.*

Indeed, Plaintiffs make no reference to any *specific individual interests* of the unnamed individuals currently held at B-18 that they seek to represent, although B-18 is open. *See* TRO at 7-11; Dkt. 38-2 to 38-12. Distinctly, it is well-established that habeas corpus relief is inherently tied to the detainee's *individual* circumstances, such as their conditions of detention, legal status, or specific allegations against them. *See Preiser v. Rodriguez*, 411 U.S. 475, 498-99 (1973) (individual circumstances of a detainee are "the heart of habeas corpus"). Plaintiffs simply have not demonstrated a concrete connection between their claimed representation and the unique needs or rights of those they purport to represent: They have never met with any of the current unnamed B-18 detainees, have never discussed their immigration cases with them, are unaware of their preferences regarding the pursuit of habeas (or other) relief, and, mostly importantly, have no established relationship with them—even though access has been restored. Consequently, they cannot qualify as proper "next friends" and lack standing to assert unnamed detainees' rights before the Court.

### 3. Plaintiffs Cannot Establish Associational Standing.

Finally, Plaintiffs fail to establish associational standing. An organization has standing to bring suit on behalf of its members when three requirements are met: (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the organization's purpose"; (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Plaintiffs

14

here stumble at the first step: They have failed to allege, let alone show, that any of their individual members would independently have standing to bring a Fifth Amendment access to counsel claim. *See* FAC ¶¶ 72-98. Additionally, as discussed, Plaintiffs have failed to provide any evidence of concrete harm to itself, let alone to individual members. Plaintiffs' FAC and TRO have no claim that such a harm "has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 440 (2021). That inquiry is "[c]entral to assessing concreteness." *Id.* at 417. Plaintiffs must "identif[y] a close historical or common-law analogue for their asserted injury" to demonstrate their asserted injury is concrete. *Id.* at 424. Yet Plaintiffs have not shown how temporary accessibility limits to detainees at B-18 when riots were occurring fits within this framework.  Indeed, normal operations at B-18 have resumed.  *See* Uyeda Dec. ¶¶ 11-12. Accordingly, Plaintiffs' claims for injunctive relief must be dismissed for lack of standing.

## C.    Plaintiffs Are Not Likely To Succeed On The Merits of Their Claim.

First, for the foregoing reasons, Plaintiffs cannot establish a likelihood of success on the merits of their Fifth Amendment claim, as this Court lacks jurisdiction.  Thus, the Court can deny the application on that basis. *See, e.g.*, *Munaf v. Geren*, 553 U.S. 674, 691 (2008) (noting that jurisdictional issues can make success on the merits "more *unlikely* due to potential impediments to even reaching the merits"); *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 921 (D.C. Cir. 1984) ("If there is no justification for the court's exercise of jurisdiction, the injunctive relief should necessarily fail.").

In any event, Plaintiffs have not shown that Defendants violated any Fifth Amendment Rights. The Fifth Amendment's Due Process Clause provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Due Process Clause requires that the Government follow adequate procedures before it can deprive a person of certain liberty or property interests, a protection referred to as "procedural due process." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). The Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997). With respect to such "fundamental right[s]," the government "can act only by narrowly tailored means that serve a compelling state interest." *Department of State v. Muñoz*, 602 U.S. 899, 909-10 (2024). To demonstrate a due process violation, a plaintiff must establish both the existence of a protected liberty

15

and the lack of proper procedures. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59-60 (1999).

First and foremost, Plaintiffs have not established that the process afforded to them at B-18 was insufficient. Notably, here, because Plaintiffs are organizations, they do not possess the same due process protections as individuals applying for relief or protection as a part of removal proceedings under the Immigration and Nationality Act. Indeed, due process protections vary "depending on status and circumstance[s]." *Zadvydas v. Davis*, 533 U.S. 678, 694 (2001); *Jennings v. Rodriguez*, 583 U.S. 281, 314 (2018) (noting that due process claims "call for such protections as the situation demands" (cleaned up)). In the detention context, Plaintiffs must show that "the challenged condition, practice, or policy constitutes punishment." *Block v. Rutherford*, 468 U.S. 576, 583-84 (1984). This standard demands either a "subjective intent to punish" or "that a restriction is unreasonable or excessive relative to the Government's proffered justification." *Americans for Immigrant Just. v. Dep't of Homeland Sec.*, No. CV 22-3118, 2023 WL 1438376, at *11 (D.D.C. Feb. 1, 2023). In particular, the Ninth Circuit has upheld mandatory injunctions designed to remedy government practices only when the "cumulative effect" of such practices "was to prevent aliens from contacting counsel and receiving any legal advice." *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 565 (9th Cir. 1990). Government practices that effectively deny access to counsel include the detention of aliens far from where potential or existing counsel was located, limited attorney visitation hours, a dearth of potential counsel at the new location, inadequate efforts to secure privacy during counsel visits, inadequate notice of counsel arrival, and the processing of aliens at locations where telephones were not available to them. *Id.* at 565-67.

Here, Plaintiffs do not allege facts in their First Amended Complaint that establish restrictions on their communication with current and prospective clients were punitive or excessive. Indeed, the evidence shows that any restrictions on Plaintiffs' access to B-18 detainees were limited only from June 6 through June 23, when riotous crowds descended upon the facility. Uyeda Decl. ¶ 11. And even under such conditions, detainees had 24-hour access to telephones whether they were at B-18 or the Santa Anna facility. *Id.* Nothing shows that the "cumulative effect" of the government's practices during this volatile period "was to prevent aliens from contacting counsel and receiving any legal advice." *Orantes-Hernandez*, 919 F.2d at 565. Although Plaintiffs allege their access to B-18 was prevented between June 6 and 8, and limited on June 16 and 19, they concede that they gained access to B-18 when it reopened

16

on June 9, 2025. TRO at 8-10. Indeed, before June 6, "CHIRLA attorneys and representatives [had] been to B-18 regularly in the past and spoken to ICE without issue." Dkt. 38-9 ¶ 13. To be sure, barring the period when the Federal Building was completely closed to visitors *during the riots and protests* from June 6 to 8, Plaintiffs' own evidence reflects that they were able to gain access to B-18 at various times during the month of June. *See, e.g.*, Dkt. 38-3 (Attorney Barba was admitted to B-18 on June 4); Dkt. 38-5 (Attorney Duran admitted to B-18 on June 6 but was told that the facility would be closing because of protests); Dkt. 38-9 (Attorney Salas reports that Accredited Representative Stringer was not admitted on June 6 because it was "at capacity" and later closed because of protests); Dkt. 38-10 (Attorney Thompson-Lleras unable to enter on June 7 but was retained by family members of B-18 detainee); Dkt. 38-11 (Attorney Toczylowski reports that about 7 ImmDef attorneys as well as attorneys from other organizations were admitted on June 6, but required to leave because of protests; an ImmDef attorney was able to meet detained client on June 19 and secured his release that day; and another attorney was admitted on June 19, and secured release of detained client on June 20; on June 27, an officer at B-18 accommodated another ImmDef attorney who failed to bring her bar card to prove she is an attorney and enabled her to meet with her client despite the lack of identification); and Dkt. 38-12 (family friend of B-18 detainee able to meet him and have him sign a Form G-28 to retain counsel).

Regarding telephone communication, each holding room I B-18 is equipped with a telephone that is available to detainees 24 hours a day, and call times are not limited (*see* Uyeda Dec. ¶ 5), though interruptions may occur due to resource limitations or security issues. *See Block*, 468 U.S. at 586 (recognizing "internal security of detention facilities is a legitimate governmental interest"). Plaintiffs' declarations also undercut their contention that detainees were held "incommunicado." TRO at 11-12; *see* Dkt. 38-3 (Attorney Barba recounts that existing client C.K. contacted her through his daughter). Consequently, Plaintiffs' conclusory statements are insufficient to show any violation. *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[A] complaint [does not] suffice if it tenders naked assertion[s] devoid of 'further factual enhancement.'") (internal citation omitted).

In short, from June 6 to June 23, Defendants have asserted legitimate governmental interests that justify the minimal and temporary restrictions on access to Plaintiffs' current and prospective clients. None of those limitations were aimed at preventing detainees from contacting counsel and receiving any

17

legal advice; instead, they were responsive to the volatile situation at hand. *See Orantes-Hernandez*, 919 F.2d at 565; *cf. Ramirez-Osorio v. INS*, 745 F.2d at 944 (recognizing that aliens in removal proceedings are not entitled to the same bundle of constitutional rights afforded defendants in criminal proceedings). On June 6, "protests erupted in downtown Los Angeles and specifically at the entrance to B-18," and "[t]he crowd impeded ICE operations, including the transport of detainees in or out of B-18 sally port and required other sub-offices in the area to re-route arrested individuals to other locations." Uyeda Dec. ¶ 10. "Staff feared that B-18 could be breached by the protestors if the public visitation door was opened." *Id.* Accordingly, "[d]ue to the volatile situation, B-18 closed early on the afternoon of June 6, 2025." Uyeda Dec. ¶ 10. The restrictions on in-person visits during these extraordinary times are thus not excessive and are rationally related to a non-punitive purpose. The government has a reasonable interest in securing detention and military facilities. *See Hatim v. Obama*, 760 F.3d 54, 59 (D.C. Cir. 2014) ("Prison security … is beyond cavil a legitimate governmental interest"); *see also Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 328 (2012) ("The task of determining whether a policy is reasonably related to legitimate security interests is peculiarly within the province and professional expertise of corrections officials.").

Plaintiffs' due process claim fails for two other independent reasons: they do not identify a liberty interest, nor establish error or prejudice. First, a threshold requirement for establishing a due process violation is identifying a liberty interest. *Erickson v. U.S. ex re. Dept. of Health and Human Services*, 67 F.3d 859, 861 (9th Cir. 1995) (citing *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972), and *Schroeder v. McDonald*, 55 F.3d 454, 462 (9th Cir.1995)). The due process clause protects only "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Muñoz*, 602 U.S. at 910 (quoting *Glucksberg*, 521 U.S. at 720-21). Thus, this Court's "substantive due process analysis must begin with a careful description of the asserted right." *See Reno v. Flores*, 507 U.S. 292, 302 (1993) (noting that liberty interests are narrowly defined); *Glucksberg*, 521 U.S. at 720. While there is no dispute that detainees at B-18 have the right to retain counsel, organizational Plaintiffs fail to identify a qualifying liberty interest as to *their* access to clients and prospective clients that has been unfulfilled or otherwise infringed upon to trigger due process protections under the Fifth Amendment. *See generally* FAC & TRO. Plaintiffs merely assume, without support, that

18

1  they have a liberty interest in contacting existing and prospective clients. But they have not articulated a

2  right "deeply rooted" in the history and tradition of the nation.

3        Second, Plaintiffs fail to establish the error or prejudice due to the alleged error to sustain a due

4  process claim. To prevail on a due process challenge, a plaintiff must show constitutional "error and

5  substantial prejudice." *Grigoryan v. Barr*, 959 F.3d 1233, 1240 (9th Cir. 2020) (*quoting Lata v. INS*,

6  204 F.3d 1241, 1246 (9th Cir. 2000)). Plaintiffs fail to demonstrate prejudice where they fail to offer any

7  reason that the outcome might have been different had the government not committed the alleged error.

8  *See Lata*, 204 F.3d at 1246 ("[W]e will not simply presume prejudice."). That is, they have not alleged

9  any harm arising from being unable to speak with clients during the limited window when access was

10  affected. Nor did they allege a different outcome regarding prospective clients; indeed, it appears that

11  they were able to retain prospective clients regardless of the temporary limited access. *See* Dkt. 38-10

12  (Attorney Thompson-Lleras was retained by family members of B-18 detainee). Defendants have

13  provided Plaintiffs with constitutionally appropriate access to their clients and prospective clients.

14  Plaintiffs' constitutional arguments must fail.

15        **D.**    **Plaintiffs Have Not Demonstrated Irreparable Harm.**

16        "[P]laintiffs may not obtain a preliminary injunction unless they can show that irreparable harm

17  is likely to result in the absence of the injunction." *All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127,

18  1135 (9th Cir. 2011). "The purpose of an injunction is to prevent future violations" and, therefore,

19  requires the movant establish a "cognizable danger of recurrent violation" and not just "the mere

20  possibility" of future harm. *U.S. v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953). To establish a likelihood

21  of irreparable harm, Plaintiff "must do more than merely allege imminent harm sufficient to establish

22  standing; [they] must *demonstrate* immediate threatened injury." *Boardman v. Pacific Seafood Group*,

23  822 F.3d 1011, 1022 (9th Cir. 2016) (emphasis in original). Where "there is no showing of any real or

24  immediate threat that the plaintiff will be wronged again," there is no irreparable injury supporting

25  equitable relief. *Lyons*, 461 U.S. at 111; *see Olagues v. Russoniello*, 770 F.2d 791, 797 (9th Cir. 1985).

26        Plaintiffs' have presented no evidence that alleged misconduct will occur in the future. *See* TRO

27  at 11-12. Operations at B-18 normalized on June 24, 2025, and Plaintiffs have not alleged that they have

28  been unable to access existing or potential clients at B-18 since then. Likelihood of irreparable injury is

prospective, not retrospective; a plaintiff must show that he "is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. But Plaintiffs' future injuries are not only speculative and, therefore, insufficient to demonstrate the likelihood of irreparable injury, they are premised on misstatements and outdated facts that no longer reflect realities on the ground. *See Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) ("An injunction will not issue if the person or entity seeking injunctive relief shows a mere possibility of some remote future injury[.]") (cleaned up).

### E.   The Equities Weigh Against Granting the TRO Application.

When the government is the defendant, the final two factors—the public interest and the balance of equities—merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). These equitable factors cut against the remedy proposed by Plaintiffs. The government has a legitimate and significant interest in ensuring that immigration laws are enforced, and any limitation would severely infringe on the President's Article II authority. *See U.S. v. Texas*, 599 U.S. 670, 679 (2023) (Article II "enforcement discretion" applies in the immigration context, where the Court has stressed that the Executive's enforcement discretion implicates normal domestic law enforcement priorities and foreign-policy objectives); *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1047 (1984) (discussing that "a person whose unregistered presence in this country, without more, constitutes a crime," and while "[t]he constable's blunder may allow the criminal to go free, [] we have never suggested that it allows the criminal to continue in the commission of an ongoing crime"). Plaintiffs' TRO is plainly based on past events when riots and protests required the government to act expeditiously and appropriately to protect the citizenry. *See* Uyeda Dec. ¶¶ 10-12. Indeed, the public interest should favor the government taking prompt, responsive action to preserve the safety of detainees and federal employees alike in light of the extraordinary circumstances it faced. *See* Uyeda Dec. ¶¶ 10-12. Granting a TRO here would provide little incentive for the government to take prompt, responsive actions in the future. Accordingly, both the public interest and the balance of the equities weigh in favor of denying the application.

### F.   Any Injunction Should Require Bond and Be Properly Limited to Named Plaintiffs.

If the Court grants Plaintiffs' requested TRO it should order security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for

20

"costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). If the Court issues a TRO here, it should require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).

On June 27, 2025, the Supreme Court held that district courts do not have equitable powers to issue a "universal injunction," barring the defendant from enforcing "a law or policy against *anyone*." *Trump v. CASA, Inc.*, 2025 WL 1773631, *4 (U.S. June 27, 2025) (emphasis in original). The Court reasoned that "'[c]omplete relief' is not synonymous with 'universal relief.' It is a narrower concept: The equitable tradition has long embraced the rule that courts generally 'may administer complete relief *between the parties*.'" *Id.* at *11 (emphasis in original) ("The individual and associational respondents are therefore wrong to characterize the universal injunction as simply an application of the complete-relief principle."). The Court in *Casa* overturned the lower court's universal injunction as to "all other similarly situated individuals" but left undisturbed the relief granted to named parties. *Id.* If this Court grants injunctive relief to Plaintiffs', that relief should apply *only* as to Plaintiffs ImmDef and CHIRLA who have applied for such relief, not for all "current and prospective attorneys, legal representatives, and legal assistants" (*Pls.' Proposed Order*, Dkt. 38-1 at 2) whether or not they are parties to this action.

Finally, Defendants respectfully request that if this Court does enter injunctive relief, that relief be stayed for a period of seven days to allow the Solicitor General to determine whether to appeal and seek a stay pending appeal.

## V.    CONCLUSION

For these reasons, the Court should deny the *ex parte* TRO application.

21

ER-0314

Dated:  July 8, 2025                                  Respectfully submitted,

                                                     */s/Sean Skedzielewski*
                                                     SEAN SKEDZIELEWSKI
                                                     Counsel to the Assistant Attorney General
                                                     United States Department of Justice
                                                     Civil Division
                                                     950 Pennsylvania Ave NW, Ofc. 3631
                                                     Washington, DC 20530
                                                     Telephone: (202) 307-1697
                                                     Email: Sean.Skedzielewski@usdoj.gov

                                                     Attorney for Defendants

22

**L.R. 11-6.2 Certificate of Compliance**

The undersigned counsel of record certifies that this filing is less than twenty-five (25) pages, which complies with L.R. 11-6.1 and this Court's standing order.

Dated: July 8, 2025

/s/Sean Skedzielewski
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General
United States Department of Justice
Civil Division
950 Pennsylvania Ave NW, Ofc. 3631
Washington, DC 20530
Telephone: (202) 307-1697
Email: Sean.Skedzielewski@usdoj.gov

23

### DECLARATION OF LILIA A. UYEDA

I, Lilia A. Uyeda, do hereby declare and state as follows:

1. I am an Assistant Field Office Director employed by the United States Department of Homeland Security, United States Immigration and Customs Enforcement (ICE), Office of Enforcement and Removal Operation (ERO). I began my career with ICE in September 2006 as an Immigration Enforcement Agent, was promoted to Deportation Officer in 2015, and promoted to Supervisory Detention and Deportation Officer in February 2018.

2. I am currently assigned to the Criminal Alien Program (CAP)/Staging Unit, often referred to as "B-18", under the ERO Los Angeles Field Office. The duties and responsibilities of my position include management of the processing of detained aliens at B-18.

3. I make this declaration based upon my personal knowledge, consultation with colleagues, and my review of official ICE records. If called to testify, I would and could do so competently.

4. B-18 is an ERO holding facility, which contains hold rooms that are primarily used for short-term confinement of individuals who have recently been detained, or are being transferred to or from a court, detention facility, other holding facility, or other agency.

5. Each hold room within the holding facility is equipped with a telephone which is available to detained individuals 24 hours per day. The telephones provide free access to consular offices. The telephones can make collect calls to all other numbers. Detainees are not required to use pre-paid accounts or systems to place calls on the telephones. There is no time limit on telephone calls.

6. Each detainee is provided with an opportunity to make a phone call as they are processed into the holding facility. Each detainee is given the opportunity to record on a property card any telephone numbers they may have stored in their cell phones or other property before their property is secured in storage locker.

1

7.      It is not uncommon for a detainee to inadvertently delay their own processing and complicate attempts for visitation by providing a false identity at the time of their arrest in the field. This can cause issues both with ICE's ability to accurately identify where individuals are being held and frustrate attempts for attorney visitation.

8.      B-18 has a public visitation area as well as two private rooms for attorney visits. Attorney visits are permitted from 8am to 4pm seven days a week.

9.       It is common for attorneys to have to wait for a private room to become available in the facility. So long as an attorney arrives before the 4pm deadline, the facility accommodates the attorney visit and extends visitation hours as needed.

10.     On June 6, 2025, protests erupted in downtown Los Angeles and specifically at the entrance to B-18. The crowd impeded ICE operations, including the transport of detainees in or out of B-18 sally port and required other sub-offices in the area to re-route arrested individuals to other locations.  Staff feared that B-18 could be breached by the protestors if the public visitation door was opened. Due to the volatile situation, B-18 closed early on the afternoon of June 6, 2025.

11.     As the protests continued, the entire Federal Building was closed, and all detainees were removed to Santa Ana on June 7, 2025. All the detainees remained in Santa Ana through June 12. The detainees were moved back to B-18 overnight on or around June 13, 2025 but had to be moved back to Santa Ana on June 14, 2025, through June 16, 2025, for safety and security reasons. All detainees were moved back to B-18 by June 17, 2025. I am aware that during the time of the protests, the detainees, whether in B-18 or Santa Ana, had access to telephones to contact family or attorneys regardless of any restrictions on in-person visitation, as the telephones in the holding areas are available twenty-four hours per day. Due to concerns about protests, the Federal Building restricted operational hours to 6am through 2pm from June 17, 2025, through June 23, 2025. Operations normalized as of June 24, 2025.

2

1      12.    Based on my understanding, attorney visitation hours at B-18 as of June 24,

2    2025, have resumed as normal.

3

4         Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the

5    foregoing is true and correct.

6

7         Executed on this 8th day of July 2025.

8

9                                          Lilia A. Uyeda
                                          Assistant Field Office Director
10                                         U.S. Immigration and Customs Enforcement
                                          U.S. Department of Homeland Security
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

1  STACY TOLCHIN (SBN 217431)
   *stacy@tolchinimmigration.com*
2  LAW OFFICES OF STACY TOLCHIN
   776 E. Green St., Suite 210
3  Pasadena, CA 91101
   Telephone: (213) 622-7450
4  Facsimile:  (213) 622-7233

5  MOHAMMAD TAJSAR (SBN 280152)
   *mtajsar@aclusocal.org*
6  MAYRA JOACHIN (SBN 306065)
   *mjoachin@aclusocal.org*
7  EVA BITRAN (SBN 302081)
   *ebitran@aclusocal.org*
8  DAE KEUN KWON (SBN 313155)
   *akwon@aclusocal.org*                    MARK ROSENBAUM (SBN 59940)
9  OLIVER MA (SBN 354266)                   *mrosenbaum@publiccounsel.org*
   *oma@aclusocal.org*                      REBECCA BROWN (SBN 345805)
10 STEPHANIE PADILLA (SBN 321568)           *rbrown@publiccounsel.org*
   *spadilla@aclusocal.org*                 SOPHIA WRENCH (SBN 354416)
11 DIANA SANCHEZ (SBN 338871)               *swrench@publiccounsel.org*
   *dianasanchez@aclusocal.org*             RITU MAHAJAN (SBN 252970)
12 ACLU FOUNDATION OF                       *rmahajan@publiccounsel.org*
   SOUTHERN CALIFORNIA                      GINA AMATO (SBN 215519)
13 1313 West Eighth Street                  *gamato@publiccounsel.org*
   Los Angeles, CA 90017-4022              PUBLIC COUNSEL
14 Telephone: (213) 977-5232                610 South Ardmore Avenue
   Facsimile: (213) 201-7878                Los Angeles, CA 90005
15                                          Telephone: (213) 385-2977
   *Counsel for Stop/Arrest Plaintiffs*
16 (*additional counsel information on cont.*   *Counsel for All Plaintiffs*
   *page*)

17

18                    **UNITED STATES DISTRICT COURT**

19              **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

20

21 Pedro VASQUEZ PERDOMO; Carlos         Case No.: 2:25-cv-05605-MEMF-SP
   Alexander OSORTO; and Isaac
22 VILLEGAS MOLINA; Jorge               ***EX PARTE* APPLICATION FOR**
   HERNANDEZ VIRAMONTES; Jason          **TEMPORARY RESTRAINING**
23 Brian GAVIDIA; LOS ANGELES           **ORDER AND ORDER TO SHOW**
   WORKER CENTER NETWORK;               **CAUSE RE: PRELIMINARY**
24 UNITED FARM WORKERS;                 **INJUNCTION**
   COALITION FOR HUMANE
25 IMMIGRANT RIGHTS; IMMIGRANT          Hon. Maame Ewusi-Mensah
   DEFENDERS LAW CENTER,                Frimpong
26
          Plaintiffs,
27
       v.
28
   Kristi NOEM, in her official capacity as

---

*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

Secretary, Department of Homeland
Security; Todd M. LYONS, in his official
capacity as Acting Director, U.S.
Immigration and Customs Enforcement;
Rodney S. SCOTT, in his official
capacity as Commissioner, U.S. Customs
and Border Patrol; Michael W. BANKS,
in his official capacity as Chief of U.S.
Border Patrol; Kash PATEL, in his
official capacity as Director, Federal
Bureau of Investigation; Pam BONDI, in
her official capacity as U.S. Attorney
General; Ernesto SANTACRUZ JR., in
his official capacity as Acting Field
Office Director for Los Angeles, U.S.
Immigration and Customs Enforcement;
Eddy WANG, Special Agent in Charge
for Los Angeles, Homeland Security
Investigations, U.S. Immigration and
Customs Enforcement; Gregory K.
BOVINO, in his official capacity as Chief
Patrol Agent for El Centro Sector of the
U.S. Border Patrol; Jeffrey D.
STALNAKER, in his official capacity as
Acting Chief Patrol Agent, San Diego
Sector of the U.S. Border Patrol; Akil
DAVIS, in his official capacity as
Assistant Director in Charge, Los
Angeles Office, Federal Bureau of
Investigation; Bilal A. ESSAYLI, in his
official capacity as U.S. Attorney for the
Central District of California,

     Defendants.

*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

1    ANNE LAI (SBN 295394)
     *alai@law.uci.edu*
2    UC IRVINE SCHOOL OF LAW
     IMMIGRANT AND RACIAL
3    JUSTICE
     SOLIDARITY CLINIC
4    P.O. Box 5479
     Irvine, CA 92616-5479
5    Telephone: (949) 824-9894
     Facsimile:  (949) 824-2747
6
     *Counsel for Stop/Arrest Plaintiffs*
7
     LAUREN MICHEL WILFONG*
8    *lwilfong@ndlon.org*
     NATIONAL DAY LABORER
9    ORGANIZING NETWORK
     1030 S. Arroyo Parkway, Suite 106
10   Pasadena, CA 91105
     Telephone: (626) 214-5689
11
12   *Counsel for Stop/Arrest Plaintiffs*

13   BREE BERNWANGER (SBN 331731)
     *bbernwanger@aclunc.org*
14   AMERICAN CIVIL LIBERTIES
     UNION FOUNDATION OF
15   NORTHERN CALIFORNIA
     39 Drumm Street
16   San Francisco, CA 94111
     Telephone: (415) 621-2493
17
     *Counsel for Stop/Arrest Plaintiffs*
18
     BRISA VELAZQUEZ OATIS
19   (SBN 339132)
     *bvoatis@aclu-sdic.org*
20   ACLU FOUNDATION OF
     SAN DIEGO & IMPERIAL
21   COUNTIES
     P.O. Box 87131
22   San Diego, CA 92138-7131
     Telephone: (619) 398-4199
23
     *Counsel for Stop/Arrest Plaintiffs*

EDGAR AGUILASOCHO
(SBN 285567)
*eaguilasocho@farmworkerlaw.com*
MARTÍNEZ AGUILASOCHO LAW, INC.
900 Truxtun Ave Suite 300
Bakersfield, CA 93301
Telephone: (661) 859-1174

*Counsel for Plaintiff United Farm Workers*

CARL BERGQUIST*
*cbergquist@chirla.org*
COALITION FOR HUMANE
IMMIGRANT RIGHTS
2351 Hempstead Road
Ottawa Hills, OH 43606
Telephone: (310) 279-6025

*Counsel for Plaintiff Coalition for Humane Immigrant Rights*

* Pro hac vice application forthcoming

24
25
26
27
28

*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

ER-0322

1    Plaintiffs Pedro Vasquez Perdomo, Carlos Alexander Osorto, Isaac Villegas Molina, Jorge

2    Hernandez Viramontes, Jason Brian Gavidia, the Los Angeles Worker Center Network, United Farm

3    Workers, and Coalition for Humane Immigrant Rights (collectively "Stop/Arrest Plaintiffs") hereby

4    apply for a temporary restraining order ("TRO") and an order to show cause why a preliminary

5    injunction should not issue pending the final disposition of this action.

6    As set forth in the accompanying memorandum of points and authorities and the attached

7    declarations, Stop/Arrest Plaintiffs are likely to succeed on the merits of their claim that Defendants

8    have an ongoing policy, pattern, and/or practice of conducting detentive stops in this District without

9    reasonable suspicion that the person to be stopped is within the United States in violation of U.S.

10   immigration law, in contravention of the Fourth Amendment to the United States Constitution. See First

11   Amended Petition and Complaint, Dkt. 16, ¶¶ 215–20 (Count One). Emergency relief is necessary and

12   appropriate because Defendants' actions are causing grave and ongoing constitutional injury to Plaintiffs

13   and delay will result in further immediate, irreparable harm.

14   Pursuant to Federal Rule of Civil Procedure 65(b)(1) and Local Rules 7-19 and 65-1, Defendants

15   were advised on July 2, 2025, that Stop/Arrest Plaintiffs planned to file this ex parte application and of

16   the contents of this application by call with Assistant United States Attorneys ("AUSAs") Pauline Helen

17   Alarcon and Daniel Beck of the United States Attorney's Office for the Central District of California.

18   Tolchin Decl. ¶ 5. AUSAs Alarcon and Beck stated that this application is opposed.

19   On July 3, 2025, Stop/Arrest Plaintiffs' counsel Mohammad Tajsar spoke with AUSA Daniel

20   Beck to confirm the filing of this application, and to notify Mr. Beck of Stop/Arrest Plaintiffs' request

21   for the same briefing and hearing schedule as the Court issued for the application filed by the

22   Access/Detention Plaintiffs. Dkt. 42; see Dkt. 41 (Defendants' ex parte request to extend deadline to file

23   oppositions to both applications to no earlier than July 8). Mr. Beck indicated that Defendants request

24   one additional day for each deadline set by the Court's July 3 Order. Given the severity of Defendants'

25   continuing constitutional violations and the ongoing, irreparable harm, Stop/Arrest Plaintiffs request the

26   Court set the same briefing schedule as it set on the Access/Detention TRO application.

27   Counsel for Defendants AUSA Alarcon and Beck have already appeared as counsel in this action

28   for Defendants. See Dkt. 8, 39. AUSA Beck's address is United States Attorney's Office for the Central

*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

District of California, 300 North Los Angeles Street, Suit 7516, Los Angeles, CA 90012. AUSA Beck's

phone number is (213) 894-2574, and his email address is daniel.beck@usdoj.gov.

Dated: July 3, 2025                    By:     _Mohammad Tajsar_____

*Attorney for Stop/Arrest Plaintiffs*

*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND ................................................................................... 2

I.    Defendants are conducting sweeping immigration raids throughout this District. .............................................................................................................. 2

II.    Defendants have a policy and practice of making suspicionless stops based on racial profiling. ......................................................................................... 6

   A.    Defendants' stops are based not on individualized suspicion, but racial profiling. ......................................................................................... 6

   B.    Defendants are conducting stops, not voluntary questioning. ................... 9

   C.    Defendants' policy and practice of unlawful stops is officially sanctioned. ................................................................................................ 13

III.    Defendants' policy and practice is causing ongoing, irreparable harm. ........... 16

LEGAL STANDARD ............................................................................................. 18

ARGUMENT ......................................................................................................... 18

I.    Stop/Arrest Plaintiffs Are Likely to Succeed on the Merits of their Fourth Amendment Claim. ......................................................................................... 18

   A.    Defendants are conducting seizures that require at least reasonable suspicion. ................................................................................................... 18

   B.    Defendants' seizures are not supported by reasonable suspicion. ............ 20

II.    Plaintiffs Will Suffer Irreparable Harm from Defendants' Unlawful Policies and Practices in the Absence of a TRO. ......................................................... 22

III.    The Balance of Hardships Weighs Heavily in Plaintiffs' Favor, and a District-Wide Injunction is Both Permissible and in the Public Interest. .......... 23

CONCLUSION ...................................................................................................... 25

## TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*All for the Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011) ................................................................ 18

*Benitez-Mendez v. I.N.S.,*
   760 F.2d 907 (9th Cir. 1983) .................................................................. 22

*Chalk v. U.S. Dist. Court,*
   840 F.2d 701 (9th Cir. 1988) .................................................................. 23

*Easyriders Freedom F.I.G.H.T. v. Hannigan,*
   92 F.3d 1486 (9th Cir. 1996) .................................................................. 24

*Illinois v. Wardlow,*
   528 U.S. 119 (2000) ................................................................................ 21

*Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson,*
   799 F.2d 547 (9th Cir. 1986) ............................................................ 22, 24

*Kidd v. Mayorkas,*
   734 F. Supp. 3d 967 (C.D. Cal. 2024) .................................................... 24

*LaDuke v. Nelson,*
   762 F.2d 1318 (9th Cir. 1985) .......................................................... 23, 24

*Laws. for Fair Reciprocal Admission v. United States,*
   No. 24-2213, 2025 WL 1717992 (9th Cir. June 20, 2025) ..................... 23

*Leiva-Perez v. Holder,*
   640 F.3d 962 (9th Cir. 2011) .................................................................. 23

*Martinez v. Nygaard,*
   831 F.2d 822 (9th Cir. 1987) .................................................................. 22

*Melendres v. Arpaio,*
   695 F.3d 990 (9th Cir. 2012) ................................................ 22, 23, 24, 25

*Norsworthy v. Beard,*
   87 F. Supp. 3d 1164 (N.D. Cal. 2015) .................................................... 23

*Orhorhaghe v. I.N.S,*
   38 F.3d 488 (9th Cir. 1994) .................................................................... 18

*Perez Cruz v. Barr,*
   926 F.3d 1128 (9th Cir. 2019) ................................................................ 22

-iv-

*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

ER-0326

*Pimentel v. Drefus*,
  670 F.3d 1096 (9th Cir. 2012) ................................................................. 18

*Preminger v. Principi*,
  422 F.3d 815 (9th Cir. 2005) ................................................................... 25

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
  240 F.3d 832 (9th Cir. 2001) ................................................................... 18

*Trump v. CASA, Inc.*,
  ---S.Ct.---, 2025 WL 1773631 (June 27, 2025) ..................................... 25

*United Farm Workers v. Noem*,
  No. 1:25-cv-00246 JLT CDB (E.D. Cal. April 29, 2025) ........................ 1, 15, 23, 24

*United States v. Belin*,
  868 F.3d 43 (1st Cir. 2017) ..................................................................... 19

*United States v. Black*,
  707 F.3d 531 (4th Cir. 2013) ................................................................... 19

*United States v. Brignoni-Ponce*,
  422 U.S. 873 (1975) ................................................................................. 20

*United States v. Brown*,
  925 F.3d 1150 (9th Cir. 2019) ............................................................... 21, 22

*United States v. Brown*,
  996 F.3d 998 (9th Cir. 2021) ................................................................... 19

*United States v. Gallinger*,
  227 F. Supp. 3d 1163 (D. Idaho 2017) ................................................... 19

*United States v. Manzo-Jurado*,
  457 F.3d 928 (9th Cir. 2006) ............................................................. 20, 21, 22

*United States v. Montero-Camargo*,
  208 F.3d 1122 (9th Cir. 2000) ............................................................. 20, 21

*United States v. Rodriguez*,
  976 F.2d 592 (9th Cir. 1992) ..................................................................... 1

*United States v. Washington*,
  387 F.3d 1060 (9th Cir. 2004) ............................................................. 18, 19

*United States v. Washington*,
  490 F.3d 765 (9th Cir. 2007) ........................................................... 18, 19, 20

*Warsoldier v. Woodford*,
  418 F.3d 989 (9th Cir. 2005) ................................................................... 22

-v-

*Washington v. Trump,*
    847 F.3d 1151 (9th Cir. 2017) ........................................................................23

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)...............................................................................................18

*Ybarra v. Illinois,*
    444 U.S. 85 (1979)............................................................................................22

*Zepeda v. I.N.S.,*
    753 F.2d 719 (9th Cir. 1983) .........................................................................25

**CONSTITUTIONAL PROVISIONS**

Fourth Amendment ...........................................................................… passim

*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

## INTRODUCTION

"[N]umbers, pure numbers. Quantity over quality," has been the sum and motto of Defendants' approach to immigration operations in the field in Southern California over the past several weeks.[1] Starting on or around June 6, 2025, Defendants have deployed marauding, masked, and armed agents to conduct suspicionless stops of thousands of Latine people in this District, in order to meet an arbitrary quota for 3,000 daily arrests imposed by the White House. But while Defendants may believe that immigration enforcement can be a numbers game, the Fourth Amendment requires that seizures be reasonable. This means that before requiring an individual to submit to questioning, federal officials must have an objective, particularized basis to believe that a person is present in violation of immigration law. They cannot "draw into the law enforcement net a generality of persons unmarked by any really articulable basis for reasonable suspicion." *United States v. Rodriguez*, 976 F.2d 592, 596 (9th Cir. 1992), *opinion amended on denial of reh'g*, 997 F.2d 1306 (9th Cir. 1993).

Defendants are engaged in an extraordinary campaign of targeting people based on nothing more than the color of their skin, and in some cases, where they live or work. These practices began in a neighboring District earlier this year. A federal judge granted a preliminary injunction against one of the Defendants after finding Border Patrol agents engaged in a policy and practice of conducting detentive stops without individualized reasonable suspicion in likely violation of the Fourth Amendment. *United Farm Workers v. Noem*, No. 1:25-cv-00246 JLT CDB (E.D. Cal. April 29, 2025). Rather than ending this patently illegal practice, Defendants have doubled down, replicating the same lawlessness in immigration operations in Southern California today.

Plaintiffs are five Latino individuals, including U.S. citizens, who have been caught in Defendants' federal immigration dragnet, and three organizations—the Los Angeles Worker Center Network (LACWN), United Farm Workers (UFW), and the Coalition for Humane Immigrant Rights (CHIRLA)—whose members have been and reasonably fear being subjected in the future to

---

[1] Jennie Taer, *Trump admin's 3,000 ICE arrests per day quota is taking focus off criminals and 'killing morale': insiders*, New York Post (June 17, 2025), https://nypost.com/2025/06/17/us-news/trump-admins-3000-ice-arrests-per-day-quota-is-taking-focus-off-criminals-and-killing-morale-insiders/.

*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

Defendants' unlawful policy and practice.[2] Given the ongoing nature of these unconstitutional raids, they face immediate irreparable harm absent intervention by the Court.

Accordingly, to prevent the further deprivation of rights, Plaintiffs seek a temporary restraining order (TRO) prohibiting Defendants from conducting detentive stops for the purposes of immigration enforcement without first establishing individualized, reasonable suspicion that the person to be stopped is unlawfully in the United States. Doing so is within the Court's remedial power, needed to provide Plaintiffs with complete relief, and is no broader than needed to bring Defendants' practices into compliance with the Constitution until further proceedings can be held.

## FACTUAL BACKGROUND

**I.    Defendants are conducting sweeping immigration raids throughout this District.**

In early June, Defendants unleashed agents into the streets, worksites, and neighborhoods of Los Angeles and surrounding counties, creating an unlawful detention and deportation dragnet that shows no signs of ceasing. The agencies involved include the Department of Homeland Security (DHS) and its components, Immigration and Customs Enforcement (ICE), including Enforcement and Removal Operations (ERO) and Homeland Security Investigations (HSI); the U.S. Border Patrol; as well as the Department of Justice (DOJ) law enforcement agencies, such as the Federal Bureau of Investigation (FBI) and others.[3]

Defendants have conducted, and continue to conduct, raids across the District. Operations have been reported across Los Angeles and Orange Counties, the Inland Empire, and the Central Valley, in

---

[2] Consistent with the First Amended Petition and Complaint (Dkt. 16), Moving Plaintiffs applying for this temporary restraining order are referred to as the "Stop/Arrest Plaintiffs," distinguishing them from the "Access/Detention Plaintiffs" concurrently seeking a restraining order on a different set of claims, (Dkt. 38).

[3] *See* Ex. 16, Declaration of R.H.D. ("R.H.D. Decl."), ¶ 4 (describing encounter with ICE and FBI agents); Cameron Kiszla, *Immigration agents raid several L.A. businesses, encounter protestors*, KTLA (June 6, 2025), https://ktla.com/news/local-news/federal-agents-raid-home-depot-in-westlake-district/ ("The FBI confirmed to KTLA that it is participating in the HSI raids, not just in Los Angeles but nationwide, 'as directed by the Attorney General. As we have been asked to do, we are sending Agents to participate in these immigration enforcement efforts,' the statement said.").

-2-
*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

neighborhoods and cities as diverse as Baldwin Park,[4] Cathedral City,[5] Costa Mesa,[6] Downey,[7] Glendale,[8] Hawthorne,[9] Hollywood,[10] Huntington Park,[11] Ladera Heights,[12] Marina Del Rey,[13]

---

[4] *Baldwin Park Among Cities Targeted in Immigration Raids Wednesday Morning*, Baldwin Park News (June 29, 2025), https://baldwinparknewsonline.com/baldwin-park-among-cities-targeted-in-immigration-raids-wednesday-morning/.

[5] Jesus Reyes, *Officials Encourage Residents to 'Know Their Rights' After Border Patrol, ICE Conduct Operation in Cathedral City*, News Channel 3 (June 6, 2025), https://kesq.com/news/2025/06/06/officials-encourage-residents-to-know-their-rights-after-border-patrol-ice-conduct-operation-in-cathedral-city/.

[6] Pat Maio, *Home Depot's day laborer haven turns into immigration target across Southern California*, L.A. Daily News (June 13, 2025), https://www.dailynews.com/2025/06/13/home-depot-a-longtime-destination-for-day-laborers-part-of-symbolic-southern-california-raids/.

[7] Karla Rendon, *Immigration raids reported near Downey churches*, NBC 4 (June 11, 2025), https://www.nbclosangeles.com/news/local/downey-churches-home-depot-immigration-raids/3721686/.

[8] Ex. 19-A, Declaration of Todd W. Price ("Todd W. Price Decl.").

[9] Price Decl., Ex. 19-B.

[10] Brittny Mejia & Rachel Uranga, *Raid at a Home Depot in Hollywood shatters an immigrant refuge*, L.A. Times (June 20, 2025), https://www.latimes.com/california/story/2025-06-20/border-patrol-agents-arrest-street-vendors-outside-hollywood-home-depot.

[11] Pat Maio, *supra* n. 6; Nathan Solis et al., *What businesses are the feds targeting during L.A. immigration sweeps? Here's what we know*, L.A. Times (June 10, 2025), https://www.latimes.com/california/story/2025-06-10/ice-sweep-targets-what-we-know.

[12] Ex. 7, Declaration of A.L. ("A.L. Decl."), ¶ 4.

[13] Price Decl., Ex. 19-C.

---

-3-

Moorpark,[14] Oxnard,[15] Paramount,[16] Pico Rivera,[17] Richgrove,[18] Rosemead,[19] Santa Ana,[20] South Los Angeles,[21] Sylmar,[22] Upland,[23] Westlake,[24] and Whittier.[25]

---

[14] Strater Decl. ¶¶ 17–18 (describing enforcement in Moorpark).

[15] Jessica Garrison et al., *ICE expands immigration raids into California's agricultural heartland*, Los Angeles Times, June 10, 2025, https://www.latimes.com/california/story/2025-06-10/ice-expands-immigration-raids-into-californias-agricultural-heartland

[16] Pat Maio, *supra* n. 6.

[17] Price Decl., Ex. 19-D.

[18] Jessica Garrison et al., *ICE expands immigration raids into California's agricultural heartland*, Los Angeles Times, June 10, 2025, https://www.latimes.com/california/story/2025-06-10/ice-expands-immigration-raids-into-californias-agricultural-heartland

[19] Price Decl., Ex. 19-F, G.

[20] Pat Maio, *supra* n. 6.

[21] Price Decl., Ex. 19-H.

[22] Semantha Raquel Norris, *Federal Immigration Agents Terrorize the Northeast Valley*, San Fernando Valley Sun (June 19, 2025), https://sanfernandosun.com/2025/06/19/federal-immigration-agents-terrorize-the-northeast-valley/.

[23] Helen Jeong, *ICE agents fail to detain day laborers at Upland Home Depot after bystanders intervene*, NBC 4 (Jun. 16, 2025), https://www.nbclosangeles.com/news/local/ice-agents-fail-to-detain-day-laborers-at-upland-home-depot-after-bystanders-intervene/3725645/.

[24] Cameron Kiszla, *Immigration agents raid several L.A. businesses, encounter protesters*, KTLA 5 (June 6, 2025), https://www.latimes.com/business/story/2025-06-09/home-depot-in-the-crosshairs-of-immigrations-raids (reporting that masked officers wearing vests emblazoned with "HSI" took individuals into custody at a Home Depot in Westlake); Helen Jeong, *45 people arrested during ICE raids at 3 downtown LA locations*, NBC 4 (June 6, 2025), https://www.nbclosangeles.com/news/local/45-people-arrested-during-ice-raids-at-3-downtown-la-locations/3717742/ (noting that nearly two dozen individuals were detained in the Home Depot parking lot in Westlake); Price Decl., Ex. 19-I.

[25] Kaitlyn Huamani, *Home Depot caught in the crosshairs of L.A. immigration raids*, LTimes (June 9, 2025), https://www.latimes.com/business/story/2025-06-09/home-depot-in-the-crosshairs-of-immigrations-raids (noting an immigration raid conducted by federal agents at a Home Depot in Whittier); Maanvi Singh, *At Home Depot, Ice raids terrorize the workers who helped build LA: "They just come and grab you"*, The Guardian (June 16, 2025), https://www.theguardian.com/us-news/2025/jun/16/home-depot-ice-raids-los-angeles (same); Tracey Leong & Karla Rendon, *'Hope he comes back.' Long Beach family says father detained outside Whittier Home Depot*, NBC 4, (June 14, 2025), https://www.nbclosangeles.com/news/local/long-beach-grandfather-detained-immigration/3724461/ (highlighting the emotional impact of immigration raids on a Long Beach family after a loved one was detained outside the Whittier Home Depot).

---

*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

Defendants' immigration operations have been driven by an arbitrary arrest quota that has been imposed to try to deliver, in the words of the President, the "largest Mass Deportation Operation" in history.[26] They are a shift from past practice, at least for ICE, in that they are not based on any prior investigation about a person or list of persons. In late May, the White House Deputy Chief of Staff Stephen Miller expressly directed high-level officials in the agency to instead "just go out there and arrest [unauthorized noncitizens]" by rounding up people in public spaces like "Home Depot" and "7-Eleven" stores.[27]

Predictably, Defendants' "roving patrols"[28] have had a devastating impact on day laborers, carwash workers, farm workers, street vendors, and others whose work makes them a visible target for racial profiling. Day laborer pickup locations such as Home Depot parking lots have become central sites of immigration enforcement.[29] In addition, numerous carwashes have been hit.[30] And Defendants have detained and arrested multiple dozens of people at agricultural sites in Ventura and Santa Barbara

---

[26] Ex. 18, Declaration of Diana Sánchez ("Sánchez Decl."), Attach. C.

[27] Elizabeth Findell, et al., *The White House Marching Orders That Sparked the L.A. Migrant Crackdown*, The Wall Street Journal (June 9, 2025), https://www.wsj.com/us-news/protests-los-angeles-immigrants-trump-f5089877.

[28] Brittany Mejia & Rachel Uranga, *Fears of racial profiling rise as Border Patrol conducts 'roving patrols,' detains U.S. Citizens*, L.A. Times (June 15, 2025), https://www.latimes.com/california/story/2025-06-15/latinos-targeted-in-raids-u-s-citizens-detained-indiscriminate-sweeps-home-depot-lots-targeted

[29] Kaitlyn Huamani, *Home Depot caught in the crosshairs of L.A. immigration raids*, L.A. Times (June 9, 2025), https://www.latimes.com/business/story/2025-06-09/home-depot-in-the-crosshairs-of-immigrations-raids (discussing how Home Depots across Southern California have been impacted by the immigration raids); Maanvi Singh, *At Home Depot, Ice raids terrorize the workers who helped build LA: "They just come and grab you"*, The Guardian (June 16, 2025), https://www.theguardian.com/us-news/2025/jun/16/home-depot-ice-raids-los-angeles; Pat Maio, *supra* n. 6.

[30] Emily Baumgaertner Nunn & Anushka Patil, *Carwashes become easy targets in California's ICE raids*, N.Y. Times (June 11, 2025), https://www.nytimes.com/live/2025/06/11/us/los-angeles-protests-trump-ice?smid=url-share#carwashes-become-easy-targets-in-californias-ice-raids; ; Kaitlyn Huamani & Suhauna Hussain, *More L.A. car washes targeted in immigration raids, some closed amid fears of further sweeps*, *L.A. Times* (June 20, 2025), https://www.latimes.com/business/story/2025-06-20/la-car-washes-targeted-immigration-raids-business-closures; Karla Rendon, *Armed, masked federal agents detain 2 car wash employees in Torrance* (June 23, 2025), https://www.nbclosangeles.com/news/local/armed-masked-federal-agents-detain-2-car-wash-employees-in-torrance/3730810/.

---

-5-

Counties.[31] But raids have not been limited to those locations. Agents and officers have also taken over street corners,[32] bus stops,[33] parks,[34] recycling centers,[35] tow yards,[36] a swap meet,[37] a gym,[38] churches,[39] and packing houses.[40] Armed to the hilt, masked, and driving unmarked cars, they have adopted a central strategy of grabbing people first and asking questions later.

**II.    Defendants have a policy and practice of making suspicionless stops based on racial profiling.**

    **A.    *Defendants' stops are based not on individualized suspicion, but racial profiling.***

---

[31] Amy Taxin & Dorany Pineda, *Immigration Raids are threatening businesses that supply America's food, farm bureaus say*, Associated Press (June 13, 2025), https://www.kvpr.org/local-news/2025-06-13/immigration-raids-are-threatening-businesses-that-supply-americas-food-farm-bureaus-sayl.

[32] Leanne Suter, *Community members try to help street vendor taken by federal agents in Ladera Heights, video shows,* ABC7 News (June 27, 2025), https://abc7.com/post/community-members-try-help-street-vendor-taken-ice-ladera-heights/16863236/.

[33] Sophie Flay, *ICE agents detain several people at Pasadena bus stop, conducts raids across the city*, ABC 7 (June 19, 2025), https://abc7.com/post/ice-agents-detain-2-men-pasadena-bus-stop-conduct-raids-city/16785979/.

[34] Douglas Sanders Sr., *OC attorney says she was detained in ICE raid at Santa Ana Park*, Daily Journal (June 19, 2025), https://www.dailyjournal.com/articles/386228-oc-attorney-says-she-was-detained-in-ice-raid-at-santa-ana-park (Latina U.S. citizen attorney detained by ICE in park raid); Gabriel San Román, *ICE didn't raid Disneyland but federal agents arrested a man at a nearby park*, L.A. Times (June 12, 2025), https://www.latimes.com/socal/daily-pilot/entertainment/story/2025-06-12/ice-disney-anaheim.

[35] Ryan P. Cruz, *Immigration Enforcement Shakes Up Communities of Santa Barbara County*, Santa Barbara Independent (June 20, 2025), https://www.independent.com/2025/06/20/immigration-enforcement-shakes-up-communities-of-santa-barbara-county/.

[36] Leo Stallworth, *Man arrested by ICE agents at Montebello tow yard is US citizen, family says*, ABC 7, June 13, 2025, https://abc7.com/post/man-arrested-ice-agents-montebello-towing-yard-is-us-citizen-family-says/16743898/.

[37] Josh Dubose, *Dozens of heavily armed ICE agents swarm popular L.A. County swap meet*, KTLA 5 (June 15, 2025), https://ktla.com/news/local-news/dozens-of-heavily-armed-ice-agents-swarm-popular-l-a-county-swap-meet/.

[38] Ricardo Tovar, *LA County officials say ICE agents targeted individuals at churches*, KSBW 8 (June 12, 2025) https://www.ksbw.com/article/la-county-ice-agents-targeted-individuals-church/65039805.

[39] Vicent Medina, *Tensions high as immigration sweeps reach Downey churches*, The Downey Patriot (June 16, 2025), https://www.thedowneypatriot.com/articles/tensions-high-as-immigration-sweeps-reach-downey-churches; Ricardo Tovar, *LA County officials say ICE agents targeted individuals at churches*, KSBW 8 (June 12, 2025), https://www.ksbw.com/article/la-county-ice-agents-targeted-individuals-church/65039805.

[40] Price Decl., Ex. 19-J.

---

*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

By definition, agents and officers conducting patrols do not have any prior particularized information about any of the individuals they stop and question. Rather, they are resorting to broad stereotypes based on race or ethnicity, accent, a person's presence at a particular location, and/or the type of work one does to determine who they will target.

For instance, when officers descended on the bus stop in Pasadena in the early morning of June 18, where Petitioners-Plaintiffs and day laborers Pedro Vasquez Perdomo, Carlos Alexander Osorto, and Isaac Villegas Molina were waiting to be picked up for a job, all they knew about the three men was that they appeared to be Latino and were dressed in construction work clothes. Ex. 1, Declaration of Pedro Vasquez Perdomo ("Vasquez Perdomo Decl."), ¶¶ 4–8, 11; Ex. 2, Declaration of Carlos Alexander Osorto ("Osorto Decl."), ¶¶ 4-8, 13; Ex. 3, Declaration of Isaac Villegas Molina ("Villegas Molina Decl."), ¶¶ 4–6, 10.

When agents raided a carwash in Whittier on June 18 (for the third time since June 9) that Plaintiff Jorge Hernandez Viramontes has worked at for approximately 10 years, they likewise knew little about him before they began interrogating him. Ex. 4, Declaration of Jorge Hernandez Viramontes ("Hernandez Viramontes Decl."), ¶¶ 2–14. He explained he is a U.S. citizen, but they nevertheless detained him to "verify" his citizenship at an offsite location before bringing him back to the car wash. *Id.* ¶ 10. Mr. Hernandez Viramontes's co-worker Omar Gamez, who also presents as Latino, reports that during the same June 18 raid, three different agents approached Gamez on separate occasions within a short span of time to demand that he tell them if he was a U.S. citizen. Ex. 5, Declaration of Omar Andres Gamez ("Gamez Decl."), ¶ 7. During that same raid, agents "questioned all the workers in one area of the carwash." *Id.*

Plaintiff Jason Brian Gavidia's experience likewise presents a striking example of racial profiling. While doing maintenance on his own car at a tow yard and storage lot in the predominantly Latine Montebello, he was stopped by federal agents who simply saw him there in soiled clothing. Ex. 9, Declaration of Jason Brian Gavidia ("Gavidia Decl."), ¶¶ 6–12 (stating "federal agents stopped me literally based on my skin color, just because of the way I look—because I am brown, Latino"). He told them he was American, but they violently persisted in their questioning, demanding that he tell him what

*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

hospital he was born in, and only let him go after he showed them his Real ID, for which they had not even asked. *Id.* at ¶¶ 9–11.[41]

Members of the organizational Plaintiffs, LAWCN, UFW, and CHIRLA, have also experienced or witnessed this ongoing policy and practice of racial profiling. Ex. 12, Declaration of Armando Gudino ("Gudino Decl."), ¶¶ 25, 27; Ex. 13, Declaration of Flor Melendrez ("Melendrez Decl."), ¶ 14–15, 17–18; Exhibit 8, Declaration of Elizabeth Strater ("Strater Decl."), ¶¶ 29, 32, 35; Ex. 18, Declaration of Angelica Salas ("Salas Decl."), Dkt. 38-9, ¶¶ 24–31. For example, one of LAWCN's worker centers, CLEAN Carwash Worker Center, has a member named Jesus Aristeo Cruz Uitz whom agents grabbed at the Westchester Car Wash on June 8 and began interrogating, knowing nothing more at the time than that he had brown skin and was present at the car wash. Ex. 10, Declaration of Jesus Aristeo Cruz Uitz ("Cruz Uitz Decl."), ¶ 6.[42]

Numerous other community members have described similar incidents. *See, e.g.*, R.H.D. Decl. ¶¶ 4–9 (describing experience with agents who approached and questioned him and his brother-in-law when they were helping to paint a relative's home, while nearby Caucasian people doing yard work were not approached); Ex. 11, Declaration of Jose Antonio Valdez Rios ("Valdez Rios Decl."), ¶¶ 3–5 (describing experience of being detained at a Home Depot while he was looking for work along with other day laborers when agents did not know his identity or anything else about him); *see also* Declaration of Lindsay Toczylowski ("Toczylowski Decl."), Dkt. 38-11, ¶¶ 32–38 (describing Immigrant Defenders Law Center client with asylee status who has been stopped by immigration agents twice already and who was detained most recently on June 19 while standing at a Home Depot with other men looking for work); Ex. 15, Declaration of M.N. ("M.N. Decl.") ¶¶ 5–6 (describing experience with agent who approached him at a car wash raid and detained him before he had answered any

---

[41] *See also* Brittny Mejia, *Video shows immigration agents interrogating a Latino U.S. citizen: 'I'm American, bro!'*, Los Angeles Times (June 13, 2025), https://www.latimes.com/politics/story/2025-06-13/video-shows-immigration-agents-interrogating-a-latino-u-s-citizen-im-american-bro; Jennifer Medina, *'I'm an American, Bro!': Latinos Report Raids in Which U.S. Citizenship Is Questioned*, New York Times (June 15, 2025), https://www.nytimes.com/2025/06/15/us/hispanic-americans-raids-citizenship.html.

[42] Emily Baumgaertner Nunn & Anushka Patil, *supra* n. 30 (discussing customers at a car wash are being interrogated and arrested).

questions); Ex. 6, Declaration of Elvira Padilla ("Padilla Decl."), ¶¶ 4–12 (describing the June 26 detention of four day laborers by armed immigration agents without any apparent suspicion, in an action she described as "like a disappearance"); Ex. 7, Declaration of A.L. ("A.L. Decl."), ¶¶ 2–16 (describing a "violent kidnapping" of a woman during a June 23 Home Depot raid by armed agents without any apparent suspicion).

And news reports and videos further confirm this has been a widespread practice. At a June 8 raid at a Los Angeles Home Depot, agents began handcuffing anyone they could grab, and witnesses said they could not recall another enforcement action in which people had been detained so arbitrarily.[43] And when sixty heavily armed agents raided a swap meet on June 14 in Santa Fe Springs, an onlooker reported that "if you looked Hispanic in any way, they just took you."[44]

> **B.** **Defendants are conducting stops, not voluntary questioning.**

When agents and officers contact community members during the ongoing immigration operations, they do so with a show of force and authority sufficient to lead any reasonable person to believe they are being detained.

**First**, agents and officers typically approach swiftly—by vehicle or foot—in an aggressive and intimidating manner. Petitioner-Plaintiffs Vasquez Perdomo, Osorto, and Villegas Molina describe four to five agents "c[oming] up quickly" on them Osorto Decl. ¶ 5, such that they were "[s]uddenly surrounded by unmarked cars," with masked men "running towards" them. Vasquez Perdomo Decl. ¶¶ 5–6; *see also* Osorto Decl. ¶ 5; Villegas Molina Decl. ¶ 5 (masked men with guns came out "very aggressively"). Their description echoes the accounts of others who experienced or witnessed detentions. *See* Cruz Uitz Decl. ¶ 4 (agents pulled up to car wash in a "very fast an intimidating manner"); Padilla Decl. ¶¶ 6, 10, 12 (describing raid on Latino day laborers as "extremely disorienting" with 8-12 "[m]en in camouflage and balaclavas jump[ing] out of the[ir] cars," at least one with a "huge assault rifle," "were everywhere and moving so fast," and then "sped away . . . in all directions,

---

[43] Arelis R. Hernandez, *'La migra!': Day laborers recount ICE raid outside Los Angeles Home Depot,* The Washington Post (June 8, 2025), https://www.washingtonpost.com/immigration/2025/06/08/ice-los-angeles-home-depot-raid-trump/.

[44] *Id.*

*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

including against traffic"). These actions have led many to liken the detentions to kidnapping or disappearances. Osorto Decl. ¶ 6 (agents felt like "mercenaries, like a kidnapping"); Villegas Molina Decl. ¶ 8 (encounter "felt like a kidnapping); Padilla Decl. ¶ 12 (raid was "like a disappearance"); A.L. Decl. ¶ 16 (raid was like "a violent kidnapping").

**Second**, agents often physically grab, surround, or block people, sometimes holding them at gunpoint. Petitioner-Plaintiffs Vasquez Perdomo and Osorto were both grabbed by agents and handcuffed before they were asked any questions. Vasquez Perdomo Decl. ¶¶ 5–6; Osorto Decl. ¶¶ 6–8 (agent pointed a taser over his heart and said "stop or I'll use it!"). Others also described people being grabbed, tackled, or dragged prior to any questioning. Strater Decl. ¶ 35 (recounting experience of UFW member who is married to a senior citizen who was walking to work and "grabbed . . . forcefully"); Cruz Uitz Decl.. ¶ 6 (member of CLEAN who describes an agent approaching him "angrily and grabbed [his] arms"); M.N. Decl. ¶¶ 5–6 (describing a "man in military clothing with a bulletproof vest[]" who "put his hand on his shoulder"); Ex. 14, Declaration of B.V. ("B.V. Decl."), ¶ 10 (noting "one of the masked individuals was holding [his] little brother by the shoulder"); Padilla Decl. ¶ 7 (observing masked agents chasing a day laborer and tackling him to the ground and handcuffing him, without asking questions); A.L. Decl. ¶¶ 5–9 (describing a man chasing a young Latina street vendor and six more men with "large guns" surrounding her). At the Santa Fe Springs swap meet on June 14, a vendor recounted that agents "were dragging people out of the bathrooms," then questioning them.[45]

When individuals declined to answer questions or tried to terminate encounters, agents did not hesitate to escalate matters. M.N. Decl. ¶¶ 5–6 (when M.N. responded that agent could speak with his boss instead, "two other men put their hands on [him] and put [him] under arrest"); B.V. Decl. ¶ 9 (recounting an agent "on top of a worker" at a car wash "with a knee on his neck"); *see also* Hernandez Viramontes Decl. ¶ 10 (went with agents at car wash to investigate whether he was in fact U.S. citizen because he "didn't want them to handcuff me or worse").

Even when agents did not physically grab people, they would surround and block them, making it difficult for them to leave. *See* Salas Decl. ¶ 27 (recounting experience of CHIRLA member who

---

[45] Josh DuBose, *supra* n. 37.

*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

witnessed "agents jump[] out of a van, rush[] up to [a vendor], surround[] him, and handle[] him violently, though he made no effort to resist or run"); R.H.D. Decl. ¶¶ 7–8 (describing experience of being "surrounded by agents who had their arms out preventing me from walking away," making him "very afraid" and feel that he was not free to leave); Cruz Uitz Decl. ¶ 4 ("six vehicles pull up to the car wash and parked at the entrance"); Price Decl., Ex. 19-K (describing Home Depot raid where agents blocked all entrances and arrested people as they tried to leave).

And if that wasn't enough, agents have shown a willingness to routinely hold people at gunpoint despite no indication that individuals posed a threat. *See, e.g.*, Ex. 17, Declaration of Reverand Tanya Lopez ("Lopez Decl."), ¶¶ 6, 12 (pastor who describes having a gun pointed at her in church parking lot). At a Santa Ana Home Depot, a U.S. asylum seeker recalls that agents "arrived in an aggressive manner," pointing guns, as if "to rob them,"[46] and another permanent resident recounted that an agent detained individuals at gunpoint.[47]

**Third**, agents often *tell* people they are not free to leave or yell commands at them. Numerous individuals were expressly told to stop, including Petitioner-Plaintiff Villegas Molina who stood still as agents approached. Villegas Molina Decl. ¶¶ 5–6 (despite doing his best to stay calm, "masked, aggressive, and armed" agent approached him, yelling at him, "don't run!"); *see also* Gavidia Decl. ¶¶ 8–9 (attempted to head back inside the premises when agent ordered him to "[s]top right there" and "forcefully push[ed] him" up against a metal gated fence while interrogating him about his citizenship); Cruz Uitz Decl. ¶ 5 (agents "chased [workers] and yelled for them to stop" immediately upon arriving at car wash); Valdez Rios Decl. ¶ 4 (masked, armed agents with "rifles in their hands" and "military helmets" were "yelling at [Mr. Valdez Rios] to stop"); Gamez Decl. ¶ 7 (stating that when a coworker asked agents for a warrant at the car wash, the agent told coworker to "shut the fuck up").

---

[46] Hetty Change & Jonathon Lloyd, *Day laborers targeted in raid at Santa Ana Home Depot, OC officials say*, NBC 4 (June 10, 2025), https://www.nbclosangeles.com/news/local/day-laborers-santa-ana-home-depot-immigration-raid/3720487.

[47] *Raids in Southern California rattle immigrant communities – including those in the US legally*, The Tribune (June 11, 2025), https://tribtown.com/2025/06/11/raids-in-southern-california-rattle-immigrant-communities-including-those-in-the-us-legally/.

*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

**Fourth**, the climate of fear and intimidation has been exacerbated by agents' and officers' appearance during the encounters. Agents are masked, armed, wearing either plainclothes with bulletproof vests or dressed in military clothing, and typically moving about in large numbers; community members who encounter agents have expressed being fearful for their safety, and even their lives. *See* Vasquez Perdomo Decl. ¶¶ 5–6; Villegas Molinas Decl. ¶ 5; Hernandez Viramontes Decl. ¶ 6 (describing agents wearing "military style clothing" with "faces covered"); Cruz Uitz Decl. ¶¶ 4, 6 (describing a dozen masked agents in unmarked vehicles and armed); M.N. Decl. ¶ 5 (noting agent wore "military clothing with a bulletproof vest[]"); Valdez Rios Decl. ¶ 4 (describing masked and armed agents with "rifles in their hands" as "very angry and intimidating"); B.V. Decl. ¶¶ 8–9 (U.S. citizen who recounts that "masked individuals came out in military attire, gear, and guns," and began "charging at people" at car wash, which "created a commotion and an environment of fear" and he "did not feel safe"); Gavidia Decl. ¶ 12 (stating that his encounter with agents was one of the worst experiences he has ever had and that he felt like he "was going to die," particularly when "one agent literally racked a chamber in his rifle").

**Finally**, agents' and officers' unwillingness to identify themselves has kept community members in the dark about who or even what type of law enforcement agency they are dealing with, extinguishing any remaining possibility that community members could view the contact as voluntary. Osorto Decl. ¶¶ 5–6 ("They did not identify themselves . . . None of them had visible badges, just a vest."); Villegas Molina Decl. ¶ 6 ("He never told me he was an immigration official."); Hernandez Viramontes Decl. ¶ 12 ("The agents didn't identify themselves to me nor did they have any badges visible."); Gamez Decl. ¶ 5 (describing car wash raid as "disorienting because the agents did not talk to anyone in charge or identify themselves or what agency they were with," and ignored his questions); Valdez Rios Decl. ¶ 4 (describing how "[t]hree men stepped out" with "rifles in their hands," masks covering their faces, "military helmets and bullet proof vests," but "they didn't wear any symbols or badges that identified who they were"); B.V. Decl. ¶ 9 (noting agents were masked and some did not have badges or other identification); Padilla Decl. ¶ 7 (similar); A.L. Decl. ¶¶ 8–10 (describing men with "large guns, wearing camouflage vests, and with neck gators covering their faces" who refused to identify themselves or their agency affiliation). When Pastor Lopez tried to explain to the unidentified agents who were on church

-12-

*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

property that they didn't have permission to be there, one agent "replied that the whole country was their property." Lopez Decl. ¶ 9.

### C.    Defendants' policy and practice of unlawful stops is officially sanctioned.

Defendants' unlawful stops are the intended and predictable result of directives from top officials to not only dramatically increase immigration enforcement, but to do so at any cost, and without regard for their legal obligations.

In January, the government imposed a quota on ICE Field Offices of 75 arrests per day.[48] DHS also dismantled long-standing internal oversight mechanisms and restraints on agents' and officers' conduct.[49] These directives led to increased enforcement at workplaces, ICE check-ins, and courthouses.[50] But that was not enough. Facing pressure to deliver on the promise of "mass deportation," the administration imposed a quota of 3,000 immigration arrests per day and threatened

---

[48] Nick Miroff & Maria Sacchetti, *Trump Officials Issue Quotas to ICE Officers to Ramp Up Arrests*, The Washington Post (last updated Jan. 26, 2025), https://www.washingtonpost.com/immigration/2025/01/26/ice-arrests-raids-trump-quota/.

[49] Nicolae Viorel Butler, *Court Forces DHS to Preserve Immigrant Rights Offices,* Migrant Insider (May 27, 2025), https://migrantinsider.com/p/court-forces-dhs-to-preserve-immigrant; Press Release, Government Accountability Project, *DHS Halted 500+ Civil Rights Investigations When It Shut Down Oversight Office, Whistleblowers Say* (May 15, 2025), https://whistleblower.org/press-release/dhs-halted-500-civil-rights-investigations-when-it-shut-down-oversight-office-whistleblowers-say/; Executive Order 14159 (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/protecting-the-american-people-against-invasion/; Press Release, DHS, *Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole* (Jan. 21, 2025), https://www.dhs.gov/news/2025/01/21/statement-dhs-spokesperson-directives-expanding-law-enforcement-and-ending-abuse (noting a directive "rescind[ing] the Biden Administration's guidelines for . . . enforcement actions that thwart law enforcement in or near so-called "sensitive" areas).

[50] Marianne LeVine, et al., *ICE is Arresting Migrants in Worksite Raids. Employers are Largely Escaping Charges*, The Washington Post (June 30, 2025), https://www.washingtonpost.com/immigration/2025/06/30/ice-raids-arrests-workers-companies/ (noting ICE arrested more than 1,000 workers during Trump's first 100 days and collecting stories of workplace raids); Maanvi Singh & Will Craft, *As deportations ramp up, immigrants increasingly fear Ice check-ins: 'All bets are off'*, The Guardian (Apr. 6, 2025), https://www.theguardian.com/us-news/2025/apr/06/deportations-immigrants-ice-trump; Ximena Bustillo, *ICE's novel strategy allows for more arrests from inside immigration courts*, NPR (June 12, 2025), https://www.npr.org/2025/06/12/nx-s1-5409403/trump-immigration-courts-arrests; *see also* Compl. ¶ 97.

*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

agents and officers with "consequences for not hitting arrest targets."[51] After White House Deputy Miller's directive to begin rounding up people in public places, officers were told to "turn the creativity knob up to 11" and "push the envelope," including by pursuing "[a]ll collaterals."[52] Essentially, "[i]f it involves handcuffs on wrists, it's probably worth pursuing."[53]

Officials knew full well that their directives would lead immigration agents and officers to target individuals based on their race, location, and occupation. As a former ICE official explains, "only raids on 'construction, dairy [and] meat processing facilities, carpet mills' can achieve the high numbers being demanded."[54] "It's these low-wage jobs, that's where you get the numbers."[55] Indeed, they have fostered a culture of impunity by granting agents and officers maximum discretion on how to achieve the quotas imposed upon them. By allowing agents and officers to go into the field masked as a matter of course, and refusing to identify themselves, *see supra* at 11–12, they have further frustrated efforts at accountability, and normalized lawless, even violent, conduct behind the shield of anonymity. Defendants are aware of the numerous reports being made about how their agents and officers are behaving, yet have made no indication they are taking actions to address them. To Plaintiffs' knowledge, not a single agent or officer has been held to account for their actions. To the contrary, Defendants have ratified such conduct, re-iterating, as DHS Secretary Kristi Noem recently did, that agents' and officers' performance will be "judged every day" not by the degree to which comply with the law but "by how many arrests [they], [their] teammates and [their] office are able to effectuate."[56]

---

[51] Elizabeth Findell, et al., *The White House Marching Orders That Sparked the L.A. Migrant Crackdown*, The Wall Street Journal (June 9, 2025), https://www.wsj.com/us-news/protests-los-angeles-immigrants-trump-f5089877.

[52] José Olivares, *US immigration officers ordered to arrest more people even without warrants*, The Guardian (June 4, 2025), https://www.theguardian.com/us-news/2025/jun/04/immigration-officials-increased-detentions-collateral-arrests.

[53] *Id.*

[54] Laura Strickler, Rob Wile, and Didi Martinez, *Trump, in reversal, may exempt farms and hotels from immigration raids*, NBC News (June 15, 2025), https://www.nbcnews.com/politics/immigration/trump-reversal-may-exempt-farms-hotels-immigration-raids-rcna212958.

[55] *Id.*

[56] Tyler Pager, et al., *Trump's Conflicting Messages on Workplace Raids Leave Businesses Reeling*, N.Y. Times (June 17, 2025), https://www.nytimes.com/2025/06/17/us/politics/trump-conflicting-(continued…)

-14-

The operations in Southern California are not slowing down; in fact, driven by the arrest quota, they are escalating by the day. During a June 12 press conference, El Centro Sector Border Patrol Chief Gregory Bovino—whose Sector was the subject of the preliminary injunction in *United Farm Workers v. Noem*—appeared next to Secretary Noem and declared "you'll continue to see us in LA. We're not going anywhere soon."[57] Most recently, on June 30, Department of Justice Chief of Staff Chad Mizelle stated that the government "will keep enforcing federal immigration in Los Angeles, whether or not the city's government or residents agree with it."[58] In just the past 10 days, Defendants have raided a car wash in Torrance on June 22,[59] a Home Depot in Marina Del Rey on June 23,[60] another Home Depot in Huntington Park on June 25,[61] a Filipino neighborhood in Silver Lake on June 26,[62] a Home Depot in Los Angeles on June 26,[63] a Home Depot in Burbank on June 26,[64] a Home Depot in Lake Forest on June 27,[65] a car wash in Downey on June 27,[66] a car wash in Newport Beach on June 29,[67] a Home Depot in Cyprus Park on June 30,[68] and a group of street vendors in Koreatown on July 1.[69]

---

messages-workplace-raids.html.

[57] Andrew Donohue, et al., *He misled the public about his last big immigration sweep. Now he's leading the Border Patrol in LA*, Cal Matters (June 13, 2025), https://calmatters.org/investigation/2025/06/los-angeles-border-patrol-chief/.

[58] Chad Mizelle (@ChadMizelle47), X (June 30, 2025), https://x.com/ChadMizelle47/status/1939735362248610129.

[59] Price Decl., Ex. 19-L.

[60] Price Decl., Ex. 19-C.

[61] Price Decl., Ex. 19-M.

[62] Price Decl., Ex. 19-N.

[63] Price Decl., Ex. 19-H.

[64] Price Decl., Ex. 19-O.

[65] Price Decl., Ex. 19-P.

[66] Price Decl., Ex. 19-Q.

[67] Price Decl., Ex. 19-R.

[68] Jessica Perez et al., *Masked agents seen detaining people outside Cypress Park Home Depot*, BoyleHeightsBeat.com (Jun. 30, 2025), https://boyleheightsbeat.com/home-depot-raid-cypress-park/.

[69] Sánchez Decl., Ex. 18-D.

*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

**III.    Defendants' policy and practice is causing ongoing, irreparable harm.**

As Defendants' raids, and the unlawful policy and practice of suspicionless detentive stops, continue, community members are experiencing profound and irreparable harm. Even U.S. citizens are living in fear that they will be stopped and have begun carrying their U.S. passports on their person for "protection." Ex. 21, Declaration of German Molina Decl. ¶ 7 (describing his fear after recently encountering and being questioned by immigration agents while leaving work); *see* B.V. Decl. ¶¶ 16–18 (describing how he, as a customer at a car wash, had his father and nearly had his younger brother, an 11-year-old U.S. citizen, taken away, and how he now feels "unsafe leaving home" and "not welcome" anymore even though he is a U.S. citizen); *see also* Gamez Decl. ¶ 12 ("I fear for my coworkers and I fear for myself being racial profiled as a U.S. citizen.").[70]

Plaintiffs likewise face a very real risk of being stopped again on the basis of their Latino ethnicity. Plaintiffs Hernandez Viramontes and Gavidia, both U.S. citizens, reasonably fear that they will be profiled again at the car wash and tow yard, respectively, where they were detained previously. Hernandez Viramontes Decl. ¶ 15; Gavidia Decl. ¶¶ 12–13. Indeed, agents have already raided the Whittier car wash where Hernandez Viramontes works three times. Hernandez Viramontes Decl. ¶¶ 5– 14; Gamez Decl. ¶¶ 4–7, 11. And Petitioners-Plaintiffs Vasquez Perdomo, Osorto, and Villegas Molina likewise fear being targeted based on their appearance again. Vasquez Perdomo Decl. ¶ 11; Osorto Decl. ¶ 13; Villegas Molina Decl. ¶¶ 10–11. Hours after they were arrested, the Pasadena City Mayor described a "huge drop in attendance at local community programs," once "vibrant neighborhoods" now "eerily quiet," and business owners "concerned that their workers and customers alike are too afraid to show up."[71]

Members of organizational Plaintiffs also face a real threat of suspicionless detentive stops. LAWCN, UFW, and CHIRLA all have members in low-wage industries that have been profoundly affected by raids. For example, members of LAWCN's worker centers—U.S. citizens and otherwise—

---

[70] *See also* Brittny Mejia, *'Scared to be brown': California residents fearful amid immigration raids*, L.A Times (June 25, 2025), https://www.latimes.com/california/story/2025-06-25/california-residents-fearful-amid-immigration-raids-youre-scared-to-be-brown.

[71] Victor M. Gordo, *Pasadena Mayor: Trump's Immigration Raids Hurt Communities Like Mine,* Time (June 18, 2025), https://time.com/7295305/pasadena-trump-immigration-raids/.

have been afraid to go to work or be in public. Gudino Decl. ¶¶ 13, 25, 27–28. Its worker center member CLEAN, which organizes workers in the carwash industry, has had numerous members stopped and arrested. Melendrez Decl. ¶¶ 15, 17. Its members fear being racially profiled, and even members with legal status are foregoing wages by missing work to shelter at home because of the ongoing raids. *Id.*

Plaintiff UFW has multiple members, U.S. citizens and otherwise, who are living in ongoing fear that they will be racially profiled by agents who patrol the areas where they live, work, and commute. Strater Decl. ¶¶ 16, 19; *id.* ¶¶ 17, 25 (describing "widespread panic" among UFW members). Some have already been stopped. *Id.* ¶¶ 27–29. Further, after hearing about enforcement operations in Ventura County at locations where UFW members work and frequent, many members went home, avoiding roads for fear of being indiscriminately stopped by masked agents. *Id.* ¶¶ 17–18. Members are no longer running errands or making trips to places such as laundromats, and are even keeping their children home from school and avoiding going to the doctor, church, or the store. *Id.* ¶¶ 22-23, 32, 36.

Finally, Plaintiff CHIRLA's members are similarly experiencing significant levels of fear due to the way the raids are being conducted in Southern California. Salas Decl. ¶ 25. CHIRLA's membership consists of predominantly Latine people, including day laborers, carwash workers, street vendors, and others. *Id.* ¶¶ 24–25. One U.S. citizen CHIRLA member, for example, worries that he could be detained by immigration agents because he is Latino—particularly after his brother was detained—and is "on constant alert" when he goes out in public. *Id.* ¶ 26. Another member has changed his routine out of fear that he will be stopped or assaulted. *Id.* ¶ 27. And yet another member has stopped taking the bus to work after seeing immigration agents at a bus stop, instead using Uber, a significant expense for her as a single mother. *Id.* ¶ 28.[72] CHIRLA members have also reduced their work or withdrawn their children from school. *Id.* ¶¶ 29–30. Their experiences underscore the devastating social and economic impact of

---

[72] The Los Angeles County Public Transit system has seen a 10 to 15 percent decline in ridership since the raids began. *See* Jesus Jimenez, *'Completely Disrupted': Fear Upends Life for Latinos in L.A.*, N.Y. Times (Jun. 30, 2025), https://www.nytimes.com/2025/06/30/us/latinos-los-angeles-immigration.html?smid=nytcore-ios-share&referringSource=articleShare.

-17-

Defendants' actions and explain the recent cancellation of community events and Fourth of July celebrations due to the. . . participants, spectators, and volunteers."[73]

### LEGAL STANDARD

Plaintiffs are entitled to a temporary restraining order if they show that (1) they are likely to succeed on the merits of their claims; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A stronger showing on one element may offset a weaker showing on another. *See Pimentel v. Drefus*, 670 F.3d 1096, 1105 (9th Cir. 2012). Under this sliding-scale approach, where a moving party would suffer irreparable harm in the absence of relief and demonstrates that an injunction would be in the public interest, "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

### ARGUMENT

**I.    Stop/Arrest Plaintiffs Are Likely to Succeed on the Merits of their Fourth Amendment Claim.**

   **A.    *Defendants are conducting seizures that require at least reasonable suspicion.***

The Fourth Amendment protects "[t]he right of the people to be secure in their persons … against unreasonable searches and seizures." U.S. Const. amend. IV. "A seizure occurs when a law enforcement officer, through coercion, physical force, or a show of authority, in some way restricts the liberty of a person." *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (cleaned up).

Generally, an officer's actions rise to the level of a seizure if any *one* of the following occurs: "if there is a threatening presence of several officers, a display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Washington*, 490 F.3d 765, 771 (9th Cir. 2007) (internal quotation and citation omitted); *see also Orhorhaghe v. I.N.S*, 38 F.3d 488, 494–96 (9th

---

[73] Irene Cruz, *4th of July celebrations canceled, postponed across LA area over immigration raids*, ABC7 (June 30, 2025), https://abc7.com/post/los-angeles-4th-july-celebrations-canceled-postponed-immigration-raids/16890497/.

*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

Cir. 1994) (similar). As explained in the Factual Background discussion above, Defendants' conduct during the ongoing immigration raids is typically marked by *multiple* of these factors.

Agents and officers typically descend upon a location suddenly, armed (sometimes with military-grade assault rifles), and in numbers, with an overwhelming display of authority. *Supra* at 9 (describing swift approach by groups of masked men and assault rifles); *supra* at 10–11 (describing agents' and officers' practice of surrounding people and/or blocking entry and egress of locations); *supra* at 11–12 (describing agents' and officers' militarized appearance). *See Washington*, 490 F.3d at 773 (authoritative manner of conducting an investigatory stop was "most important" consideration in concluding that a seizure occurred); *United States v. Black*, 707 F.3d 531, 538 (4th Cir. 2013) (stop by seven officers, including two who performed perimeter duty, evinced a "collective show of authority" that constituted a seizure).

Additionally, agents and officers often begin yelling and issuing verbal commands, including commands not to move, almost immediately upon arrival. *Supra* at 11 (describing incidents in which Defendants told people to "stop" and issued other commands). *See United States v. Brown*, 996 F.3d 998, 1006 (9th Cir. 2021) (a consensual "casual and nonthreatening" approach marked by "generic" and "open-ended" questioning transformed into *Terry* stop at the point officer instructed individual to "stand up and turn around"); *United States v. Gallinger*, 227 F. Supp. 3d 1163, 1168 (D. Idaho 2017) (seizure occurred because a command to "stop walking and sit on the curb was a clear expression of authority").

Moreover, Defendants have relied on physical force when making stops. *Supra* at 10 (describing incidents where agents and officers grabbed people violently, surrounded, or blocked them, or even held them at gunpoint); *supra* at 10 (explaining that when individuals declined to answer questions or tried to terminate encounters, Defendants would escalate their use of force); *see also supra* at 7, 11 (describing experiences of Plaintiff Hernandez Viramontes, who was taken blocks from his workplace to "verify" his citizenship, and Plaintiff Gavidia, who was slammed against a metal gate while being interrogated about the hospital where he was born). *See Washington*, 387 F.3d at 1068–69 (finding a seizure where officers moved the suspect "twenty to thirty feet away from his [apartment] door"; *United States v. Belin*, 868 F.3d 43 (1st Cir. 2017) (seizure where officer "grabbed one of Belin's arms").

By the time agents and officers question people, the encounters have long become involuntary. *Cf. Washington*, 490 F.3d at 770 (no seizure occurred during "cordial and courteous" consensual questioning by a police officer who parked behind an individual, did not block the individual's car, and did not activate siren or lights). Any one of the above categories of conduct would render Defendants' raids Fourth Amendment violations. Together, Defendants' pattern and practice is plainly effecting seizures that must be justified by at least reasonable suspicion.

### B.    Defendants' seizures are not supported by reasonable suspicion.

"Except at the border and its functional equivalents," immigration agents may stop individuals in public only after identifying "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that [the persons stopped are noncitizens] who may be illegally in the country." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) (vehicle stops). Reasonable suspicion comprises two elements: the assessment must be based upon the totality of the circumstances, and it "must arouse a reasonable suspicion that *the particular person being stopped* has committed or is about to commit a crime." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (emphasis in original). Defendants' pattern and practice ignores this requirement of *particularized* suspicion prior to initiating an investigatory stop.

The throughline of Defendants' pattern and practice is their deliberate targeting of locations where Latine people live, are visibly present, or are working or looking for work. But perceived race cannot provide the suspicion necessary to justify a seizure. "[T]o establish reasonable suspicion, an officer cannot rely solely on generalizations that, if accepted, would cast suspicion on large segments of the law-abiding population." *United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006). "Where, as here, the majority (or any substantial number) of people share a specific characteristic, that characteristic is of little or no probative value in such a particularized and context-specific analysis." *Montero-Camargo*, 208 F.3d at 1131. The seven counties that make up this District are nearly half Latine, making it impossible—and illegal—to rely on race as a proxy for immigration status.[74] *See id.* at

---

[74] According to 2024 estimates by the U.S. Census Bureau, people who identify as "Hispanic or Latino" across the seven counties that span this District make up approximately 47% of the combined estimated population of this District. *See* Declaration of Diana Sánchez, ¶ 6.

-20-
*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

1135 ("Hispanic appearance is … of such little probative value that it may not be considered as a relevant factor where particularized or individualized suspicion is required."). But Defendants are doing so anyway. *See supra* at 6–9.

For similar reasons, speaking Spanish or other proxies for race or ethnicity cannot form the basis of a stop—especially in a District with such a high proportion of Spanish speakers. *Manzo-Jurado*, 457 F.3d at 937 ("By itself, however, an individual's inability to understand English will not justify an investigatory stop because the same characteristic applies to a sizable portion of individuals lawfully present in this country.").

Nor can the Stop/Arrest Plaintiffs' presence in any specific location, without more particularized indicia of suspicion, justify Defendants' stops. Even in a border town, "a location or route frequented by illegal immigrants, but also by many legal residents, is not significantly probative to an assessment of reasonable suspicion." *Manzo-Jurado*, 457 F.3d at 936. When Defendants' agents and officers base their raids on areas where Latine people live, work, and frequent far from any border—like bus stops, car washes, farm roads, tow yards, swap meets, or any of the other locations described in the record—they make impermissible assumptions about individuals that apply "to entire neighborhoods or communities in which members of minority groups regularly go about their daily business." *Montero-Camargo*, 208 F.3d at 1138; *see Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000) ("presence in an area of expected criminal activity" insufficient for reasonable suspicion); *United States v. Brown*, 925 F.3d 1150, 1157 (9th Cir. 2019) (similar, given resulting disproportionate burden it would impose on minority populations).

Further, targeting a person because they appear to be a laborer, or because they are in proximity to another worker believed to be undocumented, or even at a jobsite where a particular employer may be employing undocumented individuals, does not provide the *particularized* suspicion necessary to stop someone at that location. A group's "appearance as a work crew" is only "marginally relevant to establishing reasonable suspicion," especially where work crews and laborers of all immigration statuses abound in this District. *Manzo-Jurado*, 457 F.3d at 937. Even if agents find an individual near others known to be without legal status, "a person's mere propinquity to others independently suspected of [unlawful] activity does not, without more, give rise to probable cause to search [or seize] that person."

*See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979); *see also Perez Cruz v. Barr*, 926 F.3d 1128, 1138 (9th Cir. 2019) (applying principle in context of a worksite immigration raid). In fact, the Ninth Circuit has consistently invalidated the suspicionless detention of workers where agents had no particularized basis for believing the individual was undocumented. *See Martinez v. Nygaard*, 831 F.2d 822, 827 (9th Cir. 1987); *Benitez-Mendez v. I.N.S.*, 760 F.2d 907, 909 (9th Cir. 1983) ("[Officers] may not detain workers for citizenship status questioning unless the investigators are able to articulate objective facts providing them with a reasonable suspicion that *each questioned person*, so detained, is an [individual] illegally in this country.") (emphasis added)).

The record shows that Defendants have little more than the broad profiles above to go on when they are conducting stops. While they may be willing to take their chances on such profiles, the Constitution is not. The costs are simply too high. *Cf. Manzo-Jurado*, 457 F.3d at 940 (disapproving of enforcement activity based on "a broad profile that would cover many lawful, newly-arrived immigrants" and citizens).[75]

## II.    Plaintiffs Will Suffer Irreparable Harm from Defendants' Unlawful Policies and Practices in the Absence of a TRO.

Defendants' illegal policies and practices are causing and will continue to cause irreparable harm to the individual and organizational Stop/Arrest Plaintiffs and their membership. "It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005) (cleaned up). Suspicionless stop policies and practices that violate the Fourth Amendment constitute a constitutional violation warranting injunctive (including preliminary injunctive) relief. *See Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799

---

[75] While Defendants may try to point to the fact that community members have, sometimes, attempted to flee, the record shows that agents and officers have a policy and practice of seizing people whether or not they flee. *Compare* Osorto Decl. ¶ 6 *with* Villegas Molina Decl. ¶¶ 5-6. Moreover, the Ninth Circuit has made clear that flight alone cannot form the basis for reasonable suspicion, particularly here, where flight is not unprovoked. *Brown*, 925 F.3d at 1157 (recognizing that "racial dynamics in our society—along with a simple desire not to interact with police—offer an 'innocent' explanation of flight"); *United States v. Rodella*, 804 F.3d 1317, 1326 (10th Cir. 2015) (officer provoked flight when approaching an individual aggressively in an unmarked car, not in uniform, and refused to identify himself).

*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

F.2d 547, 553 (9th Cir. 1986); *Melendres*, 695 F.3d at 1002 (irreparable harm exists where plaintiffs face "a real possibility" that they will "again be stopped or detained and subjected to unlawful detention").

Indeed, as a result of Defendants' suspicionless stops, Plaintiffs and their members have experienced significant harm, including the type of emotional harm that courts regularly hold constitutes irreparable injury. *Supra* at 15–17. *See Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (identifying "separated families" as irreparable harm); *Leiva-Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011); *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 709–10 (9th Cir. 1988); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1192 (N.D. Cal. 2015). Moreover, because of the deplorable conditions at B-18 and the denial of access to counsel there, individuals detained in the ongoing operations are at risk of being removed before being able to report what has happened to them or seek redress for the violations of their rights. *See* Dkt. 38 (Access/Detention Plaintiffs' TRO); Dkt. 38-4, Toczylowski Decl. ¶ 54 (discussing recent example of man arrested at a car wash raid on June 19 held at B-18 without attorney access for 12 days). This makes a TRO even more urgent.

These immigration raids are happening daily, affecting countless individuals and families. Due to Defendants' policy and practice, Plaintiffs face an imminent risk of future injury and harm justifying this Court's intervention. *See United Farm Workers*, 2025 WL 1235525, at *51 (defendants' statements indicating desire to continue challenged stops shows likelihood of imminent, irreparable harm).[76]

**III.    The Balance of Hardships Weighs Heavily in Plaintiffs' Favor, and a District-Wide Injunction is Both Permissible and in the Public Interest.**

Temporarily enjoining Defendants' unconstitutional stops in this District is consistent with established precedent, within this Court's equitable powers, imposes no perceptible hardship on Defendants, and is in the public interest.

---

[76] For similar reasons, it is clear that the Plaintiffs have standing. *See LaDuke v. Nelson*, 762 F.2d 1318, 1324-26 (9th Cir. 1985), *amended,* 796 F.2d 309 (9th Cir. 1986) (finding that a "standard pattern" of illicit behavior by federal agents was sufficient to confer standing for future injunctive relief); *see also Laws. for Fair Reciprocal Admission v. United States*, No. 24-2213, 2025 WL 1717992, at *3 (9th Cir. June 20, 2025) (discussing requirements for associational standing).

*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER

*First*, Plaintiff's requested TRO is modest and treads no new ground. Plaintiffs simply ask the Court to order Defendants to adhere to the Fourth Amendment and refrain from making detentive stops in the absence of individualized reasonable suspicion. Courts have granted such injunctions before. In *International Molders' and Allied Workers' Local Union No. 164 v. Nelson*, for example, the Ninth Circuit upheld a preliminary injunction against Border Patrol for detaining and arresting people in workplace enforcement actions without suspicion or cause. 799 F.2d at 551. *See also LaDuke*, 762 F.2d at 1333 (upholding permanent injunction against warrantless searches of workplace housing); *cf. Melendres*, 695 F.3d at 1000 (upholding injunction against state officer practice of detaining people for civil immigration offenses); *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996) (collecting cases awarding injunctions against Fourth Amendment violations). More recently, in *United Farm Workers*, a case arising from stop-and-arrest violations by Border Patrol agents similar to the violations at issue here, the court issued a district-wide injunction requiring Border Patrol agents to comply with federal law when stopping and arresting individuals. 2025 WL 1235525, at *46.

Entering a District-wide TRO is squarely within the Court's equitable power. Defendants' policy and practice of illegality is widespread: as the record confirms, no matter where Plaintiffs are in the District, what time of day, or what type of location, they are susceptible to such policy and practice. Defendant ICE ERO's Los Angeles Field Office, a key player here, has an Area of Responsibility (AOR) that spans all seven counties in the District, with uniform policies and training set at the District level. Accordingly, relief should be District-wide. *See Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 988 (C.D. Cal. 2024) (granting summary judgment in favor of plaintiffs and vacating LA ERO field-office-wide unconstitutional policy).

Moreover, because Plaintiffs include organizations with extensive membership, spread out across the District, a District-wide TRO is necessary to afford them complete relief. *See, e.g.*, *Easyriders*, 92 F.3d at 1502 (explaining that a statewide injunction was necessary and proper where suit was brought by individual plaintiffs and a member organization). Just as in *Easyriders*, it would be impossible for agents and officers to know in advance who is a LAWCN, UFW, or CHIRLA member when making a detentive stop. Thus, it is proper to require Defendants to comply with the Fourth Amendment for all the stops they conduct. *See id.* "[W]hile the court's injunction might have the practical effect of benefiting

-24-

nonparties, that benefit is merely incidental." *Trump v. CASA, Inc.*, ---S.Ct.---, 2025 WL 1773631, at *11 (June 27, 2025) (cleaned up).

*Second*, Defendants will suffer no material harm from Plaintiffs' proposed TRO, let alone any threat of permanent harm. Defendants can hardly complain about being ordered to follow the law. A restraining order pending further proceedings will not prevent federal immigration authorities from conducting immigration-related detentions and arrests, so long as they are complying with the law. *Cf. Zepeda v. I.N.S.*, 753 F.2d 719, 727 1146 (9th Cir. 1983) (an agency "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations"). While Defendants may claim they are already following the law[77], clearly they are not. The Court should not leave it up to Defendants to decide whether or not they will comply with the law.

*Finally*, the balance of equities tips sharply in favor of preliminary relief because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002; *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). This is particularly true here, where Defendants' grave violations of the Fourth Amendment have wreaked such devastating havoc across the entire District. *See supra* at 16–17 (describing impacts in City of Pasadena, and across the region for the upcoming July 4 holiday).

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Stop/Arrest Plaintiffs' application and set this matter for an evidentiary hearing on Plaintiff's request for a preliminary injunction.

/
/
/
/

---

[77] Wendy Fry & Sergio Olmos, *'Brazen, midday kidnappings:' LA immigration sweeps violate Constitution, lawsuit says*, CalMatters (July 2, 2025), https://calmatters.org/justice/2025/07/la-immigration-raids-lawsuit/ (quoting DHS spokesperson who described the allegations in the First Amended Petition and Complaint as "FALSE").

*EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER