No. 25-4312

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

PEDRO VASQUEZ PERDOMO, et al.,

Plaintiffs-Appellees,

v.

KRISTI NOEM, et al.,

Defendants-Appellants.

On Appeal from the United States District Court for the Central District of California
Case No. 2:25-cv-5605-MEMF-SPH
Honorable Maame Ewusi-Mensah Frimpong

DEFENDANTS-APPELLANTS' EXCERPTS OF RECORD
VOLUME 4 OF 4

BRETT A. SHUMATE
Assistant Attorney General
Civil Division
YAAKOV M. ROTH
Principal Deputy Assistant Attorney
General
DREW C. ENSIGN
Deputy Assistant Attorney General
TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General

JONATHAN K. ROSS
Senior Litigation Counsel
STEPHANIE L. GROFF
JASON K. ZUBATA
ANIELLO DESIMONE
JACOB A. BASHYROV
Trial Attorneys
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-7662

BILAL A. ESSAYLI
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
DANIEL A. BECK
Assistant United States Attorney
Chief, Complex and Defensive Litigation
Section

ALEXANDER L. FARRELL (SBN
335008)
PAULINE H. ALARCON (SBN
345785)
Assistant United States Attorneys
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Tel: (213) 894-2400

for a temporary restraining order and order to show cause why a preliminary injunction should not issue pending the final disposition of this action. AUSAs Alarcon and Beck were further advised of the contents of the application.

4.     AUSAs Alarcon and Beck stated that Defendants would oppose the application and requested until July 9, 2025, to file an opposition.

5.     Given the severity of Defendants' continuing constitutional violations and the ongoing, irreparable harm, the Access/Conditions Plaintiffs offered to enter a stipulation by which Defendants would agree to the relief requested in the proposed temporary restraining order pending resolution of the application so as to permit Defendants until July 9 to file an opposition. Defendants refused to agree to the stipulation.

I declare under penalty of perjury that the foregoing is true and correct.

Los Angeles, CA

Dated: July 2, 2025

By: _Mark Rosenbaum_

Mark Rosenbaum

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

Pedro VASQUEZ PERDOMO, *et al.*

   Plaintiffs,

   v.

Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security, *et al.*

   Defendants.

Case No.: 2:25-cv-05605-MEMF-SP

**DECLARATION OF VERONICA BARBA**

Hon. Maame Ewusi-Mensah Frimpong

I, Veronica Barba, declare under penalty of perjury that the following statements are true and correct pursuant to 28 U.S.C. § 1746.

1.     I, Veronica Barba, am a California State licensed attorney who has been practicing in the area of immigration law for over 18 years. I am a principal partner at a law office, specializing in removal defense before the immigration courts. A majority of my clients are in ICE custody.

2.     On Wednesday, June 4, 2025, I accompanied my client, SK, to his ICE check-in at the Los Angeles Federal Building at 300 N. Los Angeles Street. SK was originally scheduled to appear at his check in on June 18, 2025 but had received a message through his Bi-Link application asking him to check-in "Tuesday or Wednesday."

3.     SK and I arrived at the Federal Building around 10am and reported to the basement, Room B-17. Upon entering the room, I noticed that there were far more people reporting than usual. There were many families who brought their young children to the check-in, which is usually not required. Officers were also calling out names very slowly and did not seem to know anything about the cases that they were calling and so would have to return two to three times to talk to a person and there were not many people leaving the room. Usually, officers would know the background of a case once they called someone's name, and the officers would let them know when to return for their next check-in, and then they were free to leave.

4.    At around 3pm, an officer called out SK's name and we proceeded to speak to the officer. The officer asked SK for his passport and SK let the officer know that he had still not been able to acquire a passport. SK updated the officer on his attempts to acquire a passport, including his trips to the consulate in Atlanta, Georgia. The officer didn't seem to know anything about SK's case and asked us to sit back down and he would return.

5.    We did not speak to this officer again and later noticed that the officer began attending to other people. SK and I had not left the basement room since 10am, other than taking bathroom breaks on that same floor. After we met with this officer and saw that he was not going to come back to talk to us, SK started to get more nervous. By this time, we saw more and more people staying in place and some were taken to smaller rooms and their personal belongings were being gathered.

6.    Eventually, everyone remaining in room B17 was taken to a smaller waiting room because the larger room was kept for people that were going to be detained. Once we were moved, many people started to panic. A woman began crying and a father held his daughter and started crying. We noticed that with respect to the families that came in that day, most of the fathers were arrested and the mothers were fit for an ankle bracelet and released with their children. There were also entire families that were arrested.

7.    SK and I were some of the last to be called that day, around 6:30pm. A different officer came in and called his name and I was told that he would be taken into custody. I was not told why or where. I was told that they would not know until he was processed where he would be taken. I let the officer know that SK is diabetic and hadn't eaten all day. I also let them know that he didn't have his medication. I was told that he would be given something to eat and that his medication could be dropped off but that he would be processed and taken to a detention center soon. I told SK I would call his family and left. By that time the building was closed.

8.    I went outside of the federal building and called SK's daughter at 6:50pm, I let her know where he was and that he had asked that she come to the building to pick up his car. I asked her to please keep in touch and let me know as soon as she heard from him.

2

9.    The next day, June 5th, SK's daughter let me know that she had heard from SK and that he needed funds added to his account to make more phone calls. SK's daughter and I both tried to add funds and I checked Talton Communications, the site where we add funds for ICE detention calls, but B-18 was not an option. I emailed a local attorney listserv to ask if anyone had ever added money to accounts for people held at B-18, but no one had.

10.    The afternoon of June 5th, I called any number that I could to get in touch with someone at B-18 to find out if SK was still there. I finally got through to someone at around 2pm and they told me SK was likely not there because no one could be kept there longer than 12 hours. They couldn't find his name in their system so they took my cell phone number and told me that they would call back. They did not call me back.

11.    I kept checking to see if SK was being held at the detention center in Adelanto, CA, as the officer I had gotten in touch with at B-18 told me he was probably not at B-18 since people are not held there for more than 12 hours. The entire time that SK was at B-18 I could not confirm that he was there and I was not able to speak to him.

12.    On Monday, June 9th, I emailed the deportation officer email at Adelanto (#apcero501-999@ice.dhs.gov) and was told that SK was at the detention center in Adelanto. That same day, I emailed the attorney appointment email and made an appointment for a Zoom visit. I was given an appointment that Wednesday, June 11th at 1pm. I was also able to add funds to his account to make calls.

13.    Throughout this time and as of June 26th, SK does not appear on the online ICE detainee locator (https://locator.ice.gov/).

14.    On Tuesday, June 10th, SK was able to call me. He told me that he was transferred to Desert View Saturday morning and that it took them two days to be processed. He said he hadn't received his diabetes medication from the time of his arrest on June 4th until June 10th. I let him know that we would speak more in detail the next day during our Zoom visit.

3

I declare under penalty of perjury that the foregoing is true and correct.

Pasadena, CA

Dated: June 30, 2025

By:

Veronica Barba

4

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

Pedro VASQUEZ PERDOMO, *et al.*

    Plaintiffs,

    v.

Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security, *et al.*

    Defendants.

Case No.: 2:25-cv-05605-MEMF-SP

**DECLARATION OF C.B.**

Hon. Maame Ewusi-Mensah Frimpong

---

I, C.B., declare under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1.    My name is C.B., I am 56 years old, and I reside in Los Angeles.

2.    My sister, E.D.P., was stopped, detained, and arrested by federal agents as she was vending soup and tamales outside of a Home Depot in Hollywood on June 19, 2025. My sister is 58 years old, has three daughters and eight grandchildren, and is the breadwinner of her family. She is a community leader and has been in the United States for 25 years.

3.    My sister has not applied for any type of immigration status and has no removal order in her name. There is no reason she would be known to the federal agents.

4.    I was told by my sister that a dozen heavily armed federal agents, many in masks, appeared at the Home Depot parking lot where my sister was vending, blocking gates and surrounding them. She said the agents did not present any documentation when they arrested anyone, such as a warrant. They did not ask anyone's immigration status before they arrested them. They just approached people who were closest to them when they stopped their car, so they did not seem to have specific targets ahead of time. They rounded up people selling food, and people hanging out in the parking lot.

5.    My sister told me the agents arrested over two dozen brown skinned day laborers, vendors, and customers, including my sister and a U.S. citizen.

ER-0660

6.      On June 19, 2025, I saw a live video posted on social media showing federal agents at the Home Depot near where my sister vends, and I immediately drove there to look for my sister. My sister was nowhere to be found.

7.      On June 19, 2025, after learning that my sister was transferred to B-18 in Downtown Los Angeles by a lawyer who is a friend of the family, I went to the detention center to deliver medications that my sister takes. The staff at the center would not let me deliver the medications. My sister has depression and several medical issues, including diabetes, high blood pressure, and a heart condition, which need attention and for which she takes medication.

8.      My sister called me and my nieces on June 19, 2025. She told us the conditions in B-18 were not good. She was very cold, and there were no blankets or beds. She said she was only given a Capri-Sun and burrito to eat the whole day.

9.      We hired a lawyer to represent my sister, but to my knowledge the lawyer has not been able to talk to my sister about her case. The lawyer told me she was denied access to my sister by officials at B-18 when she tried to visit my sister on the weekend.

10.      On June 21, 2025, I learned from my sister's lawyer that my sister is not well and is being sent to the hospital.

11.      My sister has been at B-18 since June 19, 2025 without adequate food, medication, and living quarters.

12.      I do not have contact with my sister for days at a time, and I am worried for her health and safety. My sister's lawyer is also having trouble getting information on E.D.P.'s case and location. It has been very difficult to figure out whether E.D.P. has been transferred to another detention center because the online detainee locator is inaccurate and is not updated regularly, and it is hard to get in contact with the local detention centers on the phone.

13.      My nieces and I have been deeply distressed and terrified since my sister's arrest. We are very afraid for her, particularly because of her multiple health issues and the poor detention center conditions.

2

I declare under penalty of perjury that the foregoing is true and correct.

Los Angeles, CA

Dated: June 30, 2025

By: _____

C.B.

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

Pedro VASQUEZ PERDOMO, *et al.*

Plaintiffs,

v.

Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security, *et al.*

Defendants.

Case No.: 2:25-cv-05605-MEMF-SP

**DECLARATION OF CHRIS DURAN**

Hon. Maame Ewusi-Mensah Frimpong

I, Chris Duran, declare under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1.      I am an attorney admitted to practice in the courts of the State of California, the U.S. District Court for the Central District of California, the U.S. Court of Appeals for the Ninth Circuit, and the U.S. Supreme Court. My State Bar Number is 110899.

2.      I am currently employed as senior staff counsel in the Removal Defense Unit (the "RDU") with the Coalition for Humane Immigrant Rights in Los Angeles ("CHIRLA").

3.      I have over 40 years of experience working in the field of deportation/removal defense in Los Angeles. The RDU is primarily engaged in pro bono defense of clients in removal proceedings, as well as seeking relief from removal for children who qualify for Special Immigrant Juvenile Status.

4.      In response to the recent Immigration and Customs Enforcement ("ICE") raids being conducted in California, our unit has begun responding to the call for a rapid response to assist detainees and their family members who have been swept up in the raids who are undocumented, have pending removal proceedings, have applications for immigration benefits pending with the United States Citizenship and Immigration Services, as well as some who are legal permanent residents and U.S. Citizens.

5.      We are also responding to the call for monitoring ICE operations as observers

1    and communicating with other immigrant rights organizations.

2        6.    Following ICE arrest operations conducted in Los Angeles during the

3    morning hours of Friday June 6, 2025, I joined my directing attorney Karla Aguayo at the

4    Los Angeles ICE detention facility located in room B-18 within the Federal Building at

5    300 North Los Angeles Street, Los Angeles, California.

6        7.    B-18 is where detainees are interviewed/processed, preferably by a different

7    agent than the one who conducted the arrest. The "processing" requires the ICE officer to

8    fill out a Form I-213 "Record of Deportable Alien" and advising detainees of their right to

9    counsel; this right does not include the right to court-appointed counsel, as in the criminal

10    context. It is unknown whether ICE agents actually give this advice and if they do, whether

11    it comes before or after conducting an interview/interrogation.

12        8.    The door to B-18 is always locked and the only way to communicate with the

13    guards inside is through an intercom-speaker that has very poor audio quality making it

14    very difficult to decipher any instructions relayed by the guards, as well as for them to

15    understand us. Confirming the presence of detained clients can take hours on a "normal"

16    day. On days with large numbers of detainees arriving by the van load, it took at least three

17    to four hours before attorneys were allowed into the B-18 waiting room.

18        9.    I was asked by a U.S.-citizen spouse of a Nicaraguan asylum seeker whom I

19    met outside B-18 to confirm that her husband remained at B-18; he had been able to call

20    her letting her know that he had been there hours before. This man's removal proceedings

21    were already pending, and his attorney had advised him to carry copies of his marriage

22    certificate, which reflected a marriage date in March 2025; his wife's birth certificate,

23    which reflected that she was a native-born U.S. citizen; and the hearing notice for his next

24    removal hearing scheduled for October 2025. He claimed that he presented these

25    documents to the ICE officers processing him and they ignored them. Apparently, a

26    decision to arrest him and commence "expedited removal" against him pursuant to section

27    235(b) of the Immigration and Nationality Act (the "INA") had been made based on his

28    conviction of a Class B misdemeanor for reckless driving of a jet ski in Arizona, which is

2

1  not a crime involving moral turpitude, nor an offense establishing inadmissibility or

2  removability.

3       10.   "Normal" processing of a matter like this would have been to release him

4  pending his next court hearing, since jurisdiction remains with the Executive Office of

5  Immigration Review under section 240 of the INA. It is unknown what the disposition of

6  this man's case was because his attorney then appeared at B-18, and I assumed that he

7  would argue his case from that point. I requested that the guards turn over his car keys to

8  his wife. This request was denied by the guards, who are contractors and not ICE agents.

9       11.   I also met a prospective client's family member who requested my assistance.

10  The guards initially advised me through the intercom that the prospective client was not

11  present. Following my entrance to B-18, I asked about this client once again, and the guards

12  stated that she was in fact there and that I should wait for her to be brought out to the

13  interview rooms. I waited for her for about 20 minutes, at which time I inquired once again,

14  and the guard then said that she was not there. I asked him if he knew where she was, and

15  he stated that she was in El Paso, Texas. I went back outside B-18 to report to the family

16  member, but she had grown very tired during her four-hour wait and departed. We called

17  her later to relay the information regarding her location.

18       12.   When I was leaving B-18 at about 4:15 P.M., a guard informed me and the

19  other attorneys and family members still waiting outside B-18 that, contrary to their

20  promise to stay open late to allow family visits, B-18 would be closing due to the protests

21  beginning in the front of the building where B-18 is housed at 300 North Los Angeles

22  Street.

23       13.   On Saturday morning June 7, 2025, I returned to B-18 with my director, our

24  executive director, additional attorneys, and certified Department of Justice

25  representatives. We had been informed that access was going to be allowed, but when we

26  arrived at B-18, that statement had been revoked. It is noted that no protest was ongoing at

27  the time. We were able to shout advisal to people in ICE vans being staged for transport

28  until the ICE agents began honking the horns. We were then ordered to leave the area by a

3

Bureau of Prisons officer decked out in full military uniform with flak jacket, helmet, etc.

14.     Shortly after our arrival at B-18 that morning we received information that an ICE raid of a meat packing plant was happening in the City of Paramount near a Home Depot on Alondra Blvd., which is a major east-west thoroughfare which runs through Paramount.

15.     Attorney Nicolas Thompson-Lleras and I were assigned to monitor such operations, and we drove down the Long Beach Freeway and took the Alondra offramp going east. The ramp was backed up with traffic because the California Highway Patrol had blocked both sides of the street and were directing traffic onto the Long Beach Freeway northbound. Nicolas exited the car prior to us being redirected from Alondra and made his way across the bridge over the freeway towards the Home Depot.

16.     I drove back north on the Long Beach Freeway, exited at the next major street, and went south back to the intersection of Orange and Alondra. This is about a quarter mile from the protest area made visible by exploding flash bang grenades. I parked at a Pollo Loco restaurant on the corner and started walking west on Alondra. I was stopped by yellow tape installed by the local sheriff's department and informed the officers that I was there to monitor the ICE raid and assist my clients in the event any had been arrested or threatened by arrest. The supervising officer denied my request to enter the taped off area, claiming that "they were throwing bombs." I waited for a few minutes and, when a woman told the officers that she had to go get her 80-year-old father who had joined the protest, I went with her to be of some assistance. A few minutes later as we approached within 50 yards of the protest area, the woman found her father, who had been tear gassed and was walking east back up Alondra Blvd. fleeing the gas. At that moment I noticed the tear gas floating in the air, and as I was downwind from the area. The cloud of gas overtook me, affecting my breathing, vision, and ability to run. I walked back to the corner of Orange and Alondra Blvd., called Nicolas, and told him I would attempt to drive to the other side of the area to try to pick him up. He assured me that he was okay and that he had contacted some other people from CHIRLA and would catch a ride with them.

4

ER-0666

17.    I went home and took a long shower but was suffering the effects of the gas through the following day.

I declare under penalty of perjury that the foregoing is true and correct.

Los Angeles, CA

Dated: June 30, 2025

By: _____

Chris Duran

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

Pedro VASQUEZ PERDOMO, *et al.*

Plaintiffs,

v.

Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security, *et al.*

Defendants.

Case No.: 2:25-cv-05605-MEMF-SP

**DECLARATION OF S.K.**

Hon. Maame Ewusi-Mensah Frimpong

I, S.K., declare under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1.      My name is S.K., I am 50 years old, and I am an immigrant from Nigeria. I have lived in the United States since 2014. I live with my partner and three children, aged 12, 18, and 30, in Northridge, California.

2.      On Wednesday, June 4, 2025, I went to the United States Federal Building in Downtown Los Angeles for an ICE check-in. I complied with my regular ICE check-ins. I had a previously scheduled ICE check-in for June 18, 2025, but received a notification on the ICE Phone Application Bi-Link to come in earlier than expected. The message on the ICE Phone application said, "Come in Tuesday or Wednesday," and so due to this message, I went to the office sooner than originally planned. ICE knows my location at all times because I have an ICE monitoring bracelet.

3.      When I arrived at the Federal Building, at around 10 a.m., there were many more people present than are usually present when I check-in. I was told to wait and did so with my attorney. At around 3 p.m., I was called by an officer and asked for my passport, which I do not have because I have been unsuccessful in getting it from the Nigerian consulate in Atlanta, GA, despite travelling to Atlanta twice in order to request this from the Nigerian consulate. I did not eat anything all day. I was very scared while I was waiting because I had no information and was worried about being taken from my family.

ER-0668

4.    At the very end of the day, around 6:30 p.m., they took me into custody, put shackles on my wrists and ankles, and then transferred me to the B-18 federal immigration processing center. They did not present any documentation for my arrest, like a warrant. I tried to assert my rights by remaining silent and asking for my lawyer but did not resist arrest. They did not tell me anything about why I was being detained. I was terrified about what was going to happen to me.

5.    I was held in the basement of the federal building, B-18, in a room like a tank with fifteen to twenty other men. There was a bathroom in the room, but no windows or view of the outside. I did not get anything to eat until 2 a.m. on Thursday, June 5, 2025. I was given a frozen burrito and a packet of chips. We were not given any new clothing, so I stayed in my street clothing until the Sunday after I was arrested. I was not permitted to leave this room for three days – from Wednesday, June 4, 2025, until Saturday, June 7, 2025. We slept on the floor and on benches with no cots, bedding, or blankets. The room was very cold.

6.    I did not have access to soap, laundry facilities, or recreation facilities while at B-18. I never felt safe in the center as I have PTSD and it is exacerbated in confined conditions. The poor conditions of detention triggered my PTSD, causing me to hear voices.

7.    Nobody in this room, including me, was able to access visits from family members, loved ones, or our attorneys. We were told that we could have 20 seconds to make a phone call, but we needed to add money to an online system and even my attorney was not able to figure out a way to add money to this system in order for me to make a phone call.

8.    I have diabetes and usually take Metformin and Glipitzide, which are oral insulin to manage my condition. I did not receive any of my medications while I was at B-18. My attorney told the guards when I was arrested that I am diabetic and that I had been at the federal building all day without food. The guard said that they would get me food, but they did not. Nobody inside the facility was doing well.

2

9.     The officers at B-18 gave me paperwork to sign but I could not read it. I was so tired, I signed it, but I did not know what it said. They did not give me a copy of the documents.

10.     On Saturday, June 7, 2025, I was placed in ankle and wrist shackles and into a van to transfer me to another detention center. They said that the detention center was not ready for us yet, and so we were kept in handcuffs and leg cuffs for eight hours before being moved. I was taken to a different cell, which I know now was in the Desert View Detention Center in Adelanto, CA. I was kept in a pod with forty-five to fifty other people and that was the first night I slept in a bed. I was still in the same street clothes that I wore from Wednesday, June 4, 2025. On Sunday, June 8, 2025, I was finally able to change out of my old clothes and take a shower for the first time since Wednesday. It was not until Tuesday, June 10, 2025, that I was able to see a doctor and received insulin. By that point, my blood sugar level was 413.

11.     I fear for my safety and my health. I fear also for my family and how my extended detention affects particularly my 12-year-old autistic child who is a U.S. citizen.

I declare under penalty of perjury that the foregoing is true and correct.

Adelanto, CA

Dated: June 30, 2025



By: _____

S.K.

3

ER-0670

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Pedro VASQUEZ PERDOMO, *et al.* | Case No.: 2:25-cv-05605-MEMF-SP |
| Plaintiffs, | |
| v. | **DECLARATION OF S.A.R.** |
| Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security, *et al.* | |
| Defendants. | Hon. Maame Ewusi-Mensah Frimpong |

I, S.A.R., declare under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1.    My name is S.A.R., I reside in Los Angeles, and I have three young children including an infant.

2.    My husband, A.O., was stopped, detained, and arrested by federal agents as he was working at Ambiance Apparel in Los Angeles on June 6, 2025. He has been in the United States for 22 years.

3.    My husband has not applied for any type of status and has no removal order in his name. There is no reason he would be known to the federal agents.

4.    I was told by my husband that dozens of FBI agents arrived at the clothing store and asked them to separate by group Latinos and Koreans. They asked them for their immigration status. No one answered, and the FBI checked the camaras to find out where the employees were hiding, and then the FBI yelled out loud and requested them to get out of their hiding places. They did not have a warrant.

5.    My husband told me that the FBI chained him and others from their feet, waist and wrist, but when the FBI saw that there were protesters outside the store, the FBI removed the chains from the feet and waist and the FBI started to take them out of the store one by one.

6.    The valet parking person outside of the store called me and told me that the

ER-0671

FBI was at the store and not to worry, that everything was going to be fine. I decided to go on social media and see if someone was streaming the raid, and I found a live streaming and saw my husband bound from his hands.

7.      My husband told me they arrested over three dozen workers on June 6, 2025.

8.      My husband was taken around 12:40 p.m. on June 6, 2025. My husband was able to send me a text at 11:54 a.m. and he told me the FBI was going to take them shortly.

9.      On June 6, 2025, after learning from the valet parking person outside of Ambiance Apparel that my husband was transferred to B-18 in Downtown Los Angeles, I went to my children's school and asked the school for help and told them that my husband has been detained by immigration. The school started to help me by looking for resources and legal help.

10.     My husband called us on June 9, 2025. He told me to write down his A number and to please ask for an attorney because he wanted to get out as soon as possible because he missed his children. Also, he told me that calls needed to be short because it was not safe to tell me anything about what is going on because he can get physically punished.

11.     My husband was at B-18 for one night and then he was transferred first to a detention center in Santa Ana and then Adelanto. It has been hard to get information on where my husband is being detained and the status of his case as the online detainee locator is not updated and calls to the detention centers go unanswered.

12.     I spoke to my husband on June 22, 2025 while he was at Adelanto. He told me that sometimes there is not enough food for everyone to eat. Also, the place is very cold and they do not have sweaters or blankets and if the staff provides sweaters, they are very small and do not fit everyone. Also, there are people crying because they cannot tolerate the conditions.

13.     My children have been crying because they were asking where their dad is. Sometimes they do not eat because they miss their dad. Sometimes, I can hear them crying at night because they miss their dad.

14.     My husband is the sole breadwinner of the family. I do not know how we will

pay for rent and food without his support. I am very worried about him.

      I declare under penalty of perjury that the foregoing is true and correct.

Los Angeles, CA

Dated: June 30, 2025

By: _____

S.A.R.

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Pedro VASQUEZ PERDOMO, *et al.* | Case No.: 2:25-cv-05605-MEMF-SP |
| Plaintiffs, | |
| v. | **DECLARATION OF R.P.R.** |
| Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security, *et al.* | |
| Defendants. | Hon. Maame Ewusi-Mensah Frimpong |

I, R.P.R., declare under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1.    I am a 55-year-old resident of Lancaster, California. I am a U.S. citizen.

2.    On Monday, June 2, 2025, my partner, A.P., dropped off our four-year-old son with special needs at his preschool at around 8:30 a.m.

3.    A.P. told me that after she dropped off our son at preschool she was on her way to go grocery shopping at a supermarket called Vallarta when an unmarked Nissan turned on its lights and pulled her over. As soon as she pulled into the parking lot, four unmarked cars – two sedans, one a Nissan, and two SUVs – with flashing lights boxed her in in the parking lot.

4.    An armed and masked male agent in a bulletproof vest approached her window and asked her to roll it down. She rolled it down a crack. They demanded she roll it down further or else they would break the window. She asked why she was pulled over. He told her he would tell her as soon as she showed him some ID.

5.    She replied saying she wanted to know why she was pulled over before providing her ID. They asked for her name, and she told them it was A.P. She asked again why she was pulled over. At that point, two additional agents put their hands in through her window. One unlocked and opened the door from the inside. Then the other unbuckled her seatbelt, dragged her out of the car, and handcuffed her.

ER-0674

6.     She then asked, "have you been following me?" The agent said they'd been doing their homework and that they were ICE. They did not have a warrant.

7.     The officers took her to a processing center in Van Nuys, and then to the B-18 detention center located at 300 North Los Angeles Street. She arrived at the detention center at approximately 3 p.m. She was detained there until nearly midnight on Thursday, June 5, 2025.

8.     I was able to visit her at B-18 on June 4, 2025. I was only able to see her for 5 minutes after waiting for several hours. She told me that the conditions she was held in were absolutely atrocious. The first night she was at B-18 she slept outside in a tent. The only food she received, for four days, were frozen burritos (sometimes cold, sometimes scorched), chips, cookies, and juice. She had no drinkable water other than what came out of the sink/toilet combination in the room. Sometimes she would go 14 hours without anything to eat. When she asked for food, she was told the facility ran out.

9.     I asked an employee at B-18 why they have detainees sleeping on the floor and in such bad conditions. He explained that B-18 is meant as a processing center and people are not meant to be there for more than 12 hours. When I asked why she has been in B-18 for several days, he said he did not have an answer for me.

10.    She told me she was held in a room that was approximately 40 x 8 feet. At one point, there were 35 women in there. They were extremely cramped. The room had only metal benches – no beds, no blankets – and at peak capacity they couldn't all sit, let alone lie, on them. It was extremely cold the whole time.

11.    She had no access to a shower. She was begging for menstrual pads, and had to bang on the gates and scream before they would give them to her.

12.    She regularly takes medication for her blood pressure and for a psychiatric condition, which she was not given for at least a week after she was detained. They would not let me provide medications to her at the center.

13.    Finally, nearing midnight on Thursday, June 5, 2025, she was transferred to the Adelanto ICE Processing Center. She told me that some detainees are not being told

2

about their court hearings, and are then being deported after missing the hearings.

14.    I am extremely worried about A.P.'s health and safety. I am also really concerned about my son. He cries at night, and asks me everyday where his mom is. Despite being potty trained, he is wetting the bed. My son has never spent this long without his mom.

I declare under penalty of perjury that the foregoing is true and correct.

Lancaster, CA

Dated: June 30, 2025

By: _____

R.P.R.

3

ER-0676

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

Pedro VASQUEZ PERDOMO, *et al.*

    Plaintiffs,

    v.

Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security, *et al.*

    Defendants.

Case No.: 2:25-cv-05605-MEMF-SP

**DECLARATION OF ANGELICA SALAS**

Hon. Maame Ewusi-Mensah Frimpong

I, Angelica Salas, make the following statements on behalf of myself and the Coalition for Humane Immigrant Rights. I declare under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1.     I am the Executive Director of the Coalition for Humane Immigrant Rights ("CHIRLA"). I have held this position since 1999. In this capacity, I oversee all of CHIRLA's programs and am responsible for strategic planning and CHIRLA's annual budget.

2.     CHIRLA is a nonprofit organization headquartered in Los Angeles, California, with eight offices throughout California and a national policy office in Washington, D.C. CHIRLA was founded in 1986 and its mission is to advance the human and civil rights of immigrants and refugees and ensure immigrant communities are fully integrated into our society with full rights and access to resources.

3.     Today, CHIRLA is the largest statewide immigrant rights organization in California, with fourteen unique departments and over 185 staff members who provide a range of services to tens of thousands of Californians each year. For example, over the last three years, CHIRLA's education programs have reached over 820,000 people through more than 7,800 events. CHIRLA's legal department has assisted approximately 30,000 people with direct services and legal education.

4.     CHIRLA is a membership organization, with approximately 50,000 active

ER-0677

members across California. Our membership is diverse, and includes U.S. citizens, non-U.S. citizens with lawful status, and non-U.S. citizens without lawful status. Many of our members belong to mixed-status families—that is, families consisting of both individuals with citizenship or lawful status and individuals without. Most of our members are low-income. Many of our members are day laborers, car wash workers, and street vendors. CHIRLA's membership is predominantly Latino. CHIRLA educates its membership as well as our broader community through know your rights trainings, workshops, social media, and educational literature about a variety of social services and benefits, including immigration law, financial literacy, workers' rights, and civic engagement.

5.    Some of CHIRLA's members pay dues to the organization, and those dues help to fund the organization's operations. Other CHIRLA members have become members by virtue of their participation in the organization's meetings, programs, and policy campaigns. The fee for an individual membership starts at $25, and families may become members for $60.

6.    Additionally, there is an overlap between our membership and the clients that our legal services program serves. Some members join CHIRLA first as members and then become legal services clients due to need, while others are clients before they become members.

7.    CHIRLA's members regularly meet with each other in regional committees. Committee meetings can range from a small handful of people to hundreds. In addition, CHIRLA's student members hold regional statewide conference calls and meetings throughout the year. During these meetings, CHIRLA's members plan local advocacy campaigns, share information, and discuss issues that affect them, their families, and their local communities. Information from these meetings is reported to CHIRLA's leadership and used to guide CHIRLA's programmatic agenda.

8.    CHIRLA also holds quarterly membership retreats at which core leaders discuss issues they are seeing in their communities and set priorities for the organization.

9.    Finally, CHIRLA members volunteer their time at events put on by the

2

organization. They help with set up and clean up, especially at large events.

10.      CHIRLA's programs also include a hotline where individuals—including members, clients, and community members—can call with questions. The assistance hotline that CHIRLA operates fields on average 15,000 calls per year. Given CHIRLA's deep community ties and longstanding legal services programs, CHIRLA is often a first point of contact for individuals seeking direct assistance as well as accurate information about recent policy changes impacting immigrants.

11.      Since 2006, CHIRLA has coordinated the Los Angeles Raids Rapid Response Network ("LARRN"), a coalition of immigrant rights organizations, legal service providers, private attorneys, and unions. LARRN's primary mission is to assist community members in the wake of immigration enforcement actions such as the one described below.

**On June 6, 2025, CHIRLA Attorneys and Representatives Were Denied Access to Detained Immigrants at B-18 by Federal Law Enforcement Officers**

12.      On Friday June 6, 2025, CHIRLA's hotline received information of multiple immigration enforcement raids occurring in Downtown Los Angeles, leading to what we believed at the time was about 45 arrests. We learned that those detained were being brought to the detention processing floor of the federal building located at 300 North Los Angeles Street, Los Angeles, California 90012, also known as "B-18." CHIRLA attorneys and Accredited Representatives[1] as well as other members of LARRN went to B-18 to provide legal advice and representation to detainees at B-18.

13.      One CHIRLA employee, Boden Samuel Stringer, a fully Accredited Representative, was outside of the federal building attempting on June 6 to contact Immigration and Customs Enforcement ("ICE") about one of CHIRLA's clients. CHIRLA attorneys and representatives have been to B-18 regularly in the past and spoken to ICE without issue. Mr. Stringer's client was ill and unable to attend her scheduled ICE-check-

---

[1] A fully Accredited Representative is a practitioner who is not an attorney but is approved by federal regulation to represent individuals before the Board of Immigration Appeals, the Immigration Courts, and/or the Department of Homeland Security. 8 C.F.R. § 1292.1(a)(4).

in appointment.

14. After Mr. Stringer buzzed the door to talk to an ICE agent, he was told by another attorney waiting that ICE wasn't allowing attorneys/accredited representatives into B-18 because ICE said they were "at capacity." However, Mr. Stringer was told that there were only four attorneys inside.

15. About 25 minutes later, an officer opened the door, shouted "MAKE ROOM!", and ushered out four attorneys from inside, who complained that they were closing B-18 access until tomorrow at 8:00 am because "ICE had declared the outside protests an unlawful gathering." The attorneys stated that they had sat in the waiting room for hours and had not been able to speak to more than one single detainee.

**On June 7, 2025, CHIRLA Attorneys and Representatives Were Again Denied Access to Detained Immigrants at B-18 by Federal Law Enforcement Officers**

16. On the morning of June 7, 2025, at 8:00 am, I joined CHIRLA's Director of Legal Services Karla Aguayo, Staff Attorney Nicolas Thomson-Lleras, Senior Staff Counsel Chris Duran, and two of CHIRLA's Fully Accredited Representatives, Alexis Hernandez and Boden Samuel Stringer, at the loading ramp behind the Los Angeles Federal Building at 300 North Los Angeles Street, Los Angeles, CA 90012, as directed by ICE officials the previous day.

17. When we arrived at B-18, we found the following words scribbled on a blank piece of paper that was taped to B-18's metal door: "ATTY./FAMILY // VISIT // TEMPORARY CANCELLED TODAY // THANK YOU."

18. Members of Congress, including U.S. Representative Jimmy Gomez, were also at B-18 that morning. They were also restricted from obtaining oversight access to the facility.[2]

19. At about 10:30 am, Hernandez, Stringer, and a few other individuals

---

[2] "Southern California Democrats say they were denied entry to a federal detention center in downtown LA," *Los Angeles Daily News* (June 9, 2025), https://www.dailynews.com/2025/06/07/southern-california-democrats-say-they-were-denied-entry-to-a-federal-detention-center-in-downtown-la/.

4

attempted to communicate with a group of detainees who were being walked through the B-18 garage to the van loading area. They tried to inform them of their rights by shouting "no firme nada sin un abogado;" "si tiene miedo de regresar a su pais, pida entrevista de miedo creible" ("don't sign anything without a lawyer;" "if you're afraid to return to your country, ask for a credible fear interview"). Federal agents began honking their car horns whenever we attempted to inform detainees of their rights, in order to drown out their voices and prevent the detainees from hearing them. Several unmarked vans were also parked inside the garage in such a way as to obstruct the view through the garage gates of detainees being walked through and loaded into vehicles.

20.    At about 11:30 am, federal agents sprayed an unknown chemical irritant in the area where a group of 15 of us (legal representatives, congressional representatives, several members of CHIRLA, media, and family members of detainees) were standing while the detainees were being loaded into unmarked vans. This appeared to be another tactic to prevent detainees from hearing their rights. The irritant caused the group of about 15 people to begin coughing and have trouble breathing.

21.    The unknown chemical irritant that the officers sprayed made it difficult for us to speak loudly and inform the detainees of their rights.

22.    Masks and napkins were passed around the group, which made it easier for us to breathe and speak, and we again began shouting to detainees about their rights.

23.    One day after being sprayed by the irritant, Mr. Stringer began experiencing flu-like symptoms. Over two weeks later, Mr. Stringer continues to experience some residual symptoms, including body aches and feeling feverish.

**Since June 6, 2025, CHIRLA Members are Unable to Conduct Daily Activities in Los Angeles Because They Fear Unlawful Arrest and Forced Disappearance**

24.    Since approximately June 6, 2025, federal immigration authorities have been arresting and detaining predominately Latino people at Home Depots, at carwashes, and

5

on public sidewalks.[3] CHIRLA's membership consists of predominately Latino people, many of whom are day laborers who wait outside Home Depots, carwash workers, and street vendors who sell their products on public sidewalks.

25.    Because immigration authorities are targeting places where CHIRLA members frequent, CHIRLA members are experiencing significant levels of fear over the possibility of being grabbed and snatched in immigration raids in public areas based on racial profiling. One CHIRLA member, who is a US citizen, has a brother who was detained by federal immigration agents. Based on what he has heard about the ongoing immigration raids via posts and live streams on social media, via the news, and by word of mouth from members of his local community, he worries that as a visibly Latino man, he could be detained by immigration agents on this basis alone despite his status. He thought about carrying his U.S. passport with him everywhere he goes but decided against it because he believes that as an American, he should not have to live like that in his own country.

26.    He describes himself as on constant alert any time he leaves the house, always thinking about the possibility of being detained, particularly when he goes to Hispanic grocery stores and gas stations in neighborhoods with large Latino populations, but also when he goes to his children's school to drop them off and pick them up, when he's with his family in the parking lot at Disneyland, and even at Costco—all places he used to visit regularly without fear.

27.    A second CHIRLA member, who has a work permit, began hearing about the raids shortly after they started. News of the raids caused him to change his entire routine. He feared he would be detained by immigration agents because of his Latino appearance. He stopped going to supermarkets, to malls, and to places frequented by Latinos. He also stopped eating out at restaurants, which he used to do twice a week. His fears increased on

---

[3] "'Scared to be brown': California residents fearful amid immigration raids," *Los Angeles Times* (June 25, 2025), https://www.latimes.com/california/story/2025-06-25/california-residents-fearful-amid-immigration-raids-youre-scared-to-be-brown.

June 24, 2025, when he saw immigration agents detain a tamale vendor in Downtown Los Angeles. Without asking the tamale vendor any questions, the agents jumped out of a van, rushed up to him, surrounded him, and handled him violently, though he made no effort to resist or run. This member also observed immigration agents beat a woman on this same occasion. Since then, he has further restricted his activities, avoiding walking in public and driving whenever possible.

28.    A third CHIRLA member, who is a single mother, has great fear of being detained after seeing social media posts depicting immigration agents in Los Angeles detaining people without asking them any questions, and without seemingly knowing anything about them beyond that they appear to be Latino, and detaining them based on an assumption that they lack legal status, an assumption which, in many cases, the agents seem to make no effort to verify. After seeing immigration agents at the bus stop, she stopped taking the bus to work and instead began to take Ubers, a significant expense for her as a single mother. About a week later, as she was going to work in an Uber, she saw immigration agents hovering around the bus stop she would wait at on the way to work. She is very fearful that immigration agents will detain her. She reports experiencing significant trauma, anxiety, and depression as a result of living in this environment of uncertainty and fear.

29.    A fourth CHIRLA member, who has a pending application for permanent residence status, is very fearful of being detained because he is Latino. He has lived in the United States for 25 years. He is in a group chat with his daughter and various neighbors. Those in the group who have valid immigration status are able to come and go from their homes, and they share reports, photos, and videos of what they observe out in public to the group. He understands that immigration agents are targeting Latino people based on their race. Even if a Latino person is not driving poorly or otherwise breaking laws, they are likely to be targeted. Given his skin color and the way he dresses, he feels it is highly likely he will be racially profiled and detained. He has also personally witnessed immigration agents in his San Bernardino neighborhood twice, though he says that he did not see them

7

detain anyone because most residents in his heavily Latino neighborhood were staying off the streets, like he is. Due to his fear of being detained and deported, he has cut back his work schedule to four days a week and took off the entire week of June 23 in order to avoid being detained. He feels a great deal of stress over having to cut back his work schedule, and he feels like a prisoner in his own home, unable to leave lest he be detained on the street.

30.    A fifth CHIRLA member, who is undocumented but applied for permanent residency through one of her children, is extremely fearful of being deported. She heard that her neighborhood is frequently crawling with immigration agents. Based on what she has heard, she believes that her skin color and her visibly Latino appearance would make her a target of these agents. Once, in June 2025, she saw them herself as she was going to buy water, and she hid from them. It was a terrifying experience. She has now almost entirely stopped leaving the house, even when she runs out of household essentials such as food items, because she feels it is not worth the risk. Instead of buying these items herself, she waits for her adult daughter to buy them and bring them by—if and when her daughter has time. Her children urge her not to leave the house for her own safety. She also withdrew her six-year-old son from summer school two weeks into the summer session, despite him needing to take the classes, because she is afraid of being detained at or near the school when picking him up or dropping him off. She fears being detained and deported because she would find it unbearable to live far away from her children in the U.S. She feels it is deeply unfair that her family could be permanently separated for what she believes are racial reasons.

31.    These examples are not exclusive to our members and clients. In my many years with CHIRLA, I have not witnessed anything like what is now taking place throughout our communities whereby detentions and arrests are taking place by no more than Latino appearance and locations targeted. As I discuss below, because reasonable access to detainees has been systematically denied at B-18, it is impossible to identify the exact number of CHIRLA members and clients arrested and detained, but it is reasonable

to assume that the number is not insignificant. We need immediate assistance from the court in order to expeditiously determine how many of our members have been arrested and detained, identify such individuals, and ensure that their rights are respected.

**Since June 6, 2025, CHIRLA Attorneys and Representatives Have Not Been Able to Gain Access to B-18 to Determine the Locations of Any CHIRLA Members Taken, Detained, and Disappeared**

32.   Since June 6, 2025, prospective CHIRLA clients and members have been taken to B-18 and held there. The scale and scope of arrests of community members in Los Angeles and surrounding communities is unprecedented. Detainees' constitutional rights are being violated, and then detainees are disappeared.

33.   To date, access to detainees at B-18 has been sporadic and ineffective. CHIRLA attorneys, representatives, and members are not given adequate information to locate clients and family members. CHIRLA attorneys and representatives have not been able to provide legal advice or representation to detainees at B-18 to assess (1) how many CHIRLA members are being held at B-18 and (2) how CHIRLA members' constitutional rights were and are continuing to be violated.

34.   The length of a detainee's stay at B-18 varies and seems dependent on the government's capacity to process detainees, availability of transport to other processing centers, and capacity at other detention centers. As recently as June 26, 2025, CHIRLA attorneys were informed by community members that detainees are being held for 4-5 days at B-18.

35.   The immigration raids, mass arrests, and barriers at B-18 have put a tremendous burden on CHIRLA staff. Our day-to-day operations have been completely interrupted as we attempt to address clients' and members' fears, while also trying to assess and repair the damage federal immigration authorities have caused by ripping our communities apart.

36.   It is apparent that to shield the standardless stops and warrantless arrests from public and judicial scrutiny, federal agents moved quickly and systematically to put

CHIRLA members and prospective clients into B-18 where family and counsel could not interview them to ascertain necessary facts and representation. The doors of B-18 must be opened so CHIRLA and other counsel can assess the safety and wellbeing of our members and communities.

I declare under penalty of perjury that the foregoing is true and correct.

Los Angeles, CA

Dated: July 1, 2025

By: _____

Angelica Salas

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Pedro VASQUEZ PERDOMO, *et al.* | Case No.: 2:25-cv-05605-MEMF-SP |
| Plaintiffs, | |
| v. | **DECLARATION OF NICOLAS THOMPSON-LLERAS** |
| Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security, *et al.* | |
| | Hon. Maame Ewusi-Mensah Frimpong |
| Defendants. | |

I, Nicolas Thompson-Lleras, make the following statements on behalf of myself and the Coalition for Humane Immigrant Rights. I declare under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1.     I am an attorney admitted to practice in the State of Illinois, State Bar Number 6346605. I am also qualified to practice in front of the Executive Office of Immigration Review, EOIR Number QQ618464.

2.     I am currently employed as a staff attorney in the Removal Defense Unit ("RDU") with the Coalition for Humane Immigrant Rights in Los Angeles ("CHIRLA").

3.     RDU is primarily engaged in the pro bono defense of clients in removal proceedings, as well as the representation of clients seeking certain forms of affirmative relief such as with Special Immigrant Juvenile Status and U-Visas.

4.     Our unit has begun responding to the call for a rapid response to assist detainees who have been swept up in the federal immigration enforcement raids targeting the Los Angeles and southern California area, and the family members of detainees. We are also responding to the call for monitoring Immigration and Customs Enforcement ("ICE") operations as observers and communicating with other important stakeholders such as fellow immigrant rights organizations, elected officials, and community-run initiatives.

5.     On the morning of June 7th, 2025, I was directed to join CHIRLA's Executive

ER-0687

Director Angelica Salas, CHIRLA's Director of Legal Services Karla Aguayo, and two of CHIRLA's Fully Accredited Department of Justice Representatives, Alexis Hernandez and Boden Samuel Stringer, at the loading ramp behind the Los Angeles Federal Building at 300 North Los Angeles Street, Los Angeles, CA 90012. I arrived to find a group of fellow immigration attorneys, journalists, politicians, and family members of those who had recently been detained in Los Angeles.

6.      The loading ramp behind 300 North Los Angeles Street is a significant area for two reasons. First, it is where one can find the public access door to a special room known as Room B-18, or B-18 for short. B-18 is an area in the basement of the federal building where detainees are interviewed and processed and have been housed  prior to transfer to a properly equipped detention facility.

7.      The "processing" of detainees requires the ICE officer—preferably a different agent than the one who conducted the arrest—to fill out a Form I-213 "Record of Deportable Alien" and advise detainees of their right to counsel. However, unlike in criminal proceedings, this is not a right to *court-appointed* counsel. It is unknown whether ICE agents advise detainees of their right to counsel. If they do advise detainees of their right to counsel, it is unclear whether they do so before or after conducting an interview/interrogation.

8.      The second reason the loading ramp behind 300 North Los Angeles Street is a significant area is because just beyond the locked gate at bottom of the ramp there is a door by which at least some of the people detained in B-18 are forced to load into transportation vehicles before their departure to their next destination.

9.      Upon my arrival, I sought out the family member of a recently detained Los Angeles resident. This family member had contacted CHIRLA to ask for assistance in locating their detained family member and advocating for release on their behalf. I found the family member also waiting on the loading ramp and they filled out a Form G-28, authorizing me to communicate with ICE on the detainee's behalf to get information and advocate.

10.     CHIRLA believed that access to B-18 was going to be allowed to attorneys, but as soon as we arrived, we learned that the statement had been revoked. The small group of people assembled were completely peaceful; most of them were either attorneys, journalists, advocates, or family members of detainees. There was no confrontation, violence, or even the vaguest threat of violence. Instead, the federal agents were denying me and other attorneys access to the detainees in B-18.

11.     I approached the loading gate area to observe the loading process from a public area on the outside of the fenced-off loading area. I began to record the scene with my phone and, along with other assembled attorneys and DOJ Representatives, shout basic legal advisals to the group of restrained detainees being loaded into mostly unmarked white transportation vans. I figured that shouting would be the only way to communicate any information to my client as he was loaded into a van for transportation to yet another undisclosed location.

12.     At around 9:49 a.m., federal agents began to maneuver and park transportation vans directly in front of me and the other attorneys in order to block our line of sight to the loading process. Shortly thereafter, an agent got behind the driver's seat of one of the vans and started repeatedly laying on the car horn, in an apparent attempt to antagonize the assembled attorneys and drown out their voices.

I declare under penalty of perjury that the foregoing is true and correct.


Los Angeles, CA

Dated: June 30, 2025

By:  _Nicol̲e̲_

_____

Nicholas Thompson-Lleras

3

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

Pedro VASQUEZ PERDOMO, *et al.*

Plaintiffs,

v.

Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security, *et al.*

Defendants.

Case No.: 2:25-cv-05605-MEMF-SP

**DECLARATION OF
LINDSAY TOCZYLOWSKI**

Hon. Maame Ewusi-Mensah Frimpong

I, Lindsay Toczylowski, make the following statements on behalf of myself and Immigrant Defenders Law Center. I declare under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1.      My name is Lindsay Toczylowski. I make this declaration based on personal knowledge and a review of records related to my position as President and Chief Executive Officer of Immigrant Defenders Law Center ("ImmDef").

2.      I am the President, and Chief Executive Officer of ImmDef, which I co-founded ten years ago. ImmDef is a non-profit organization incorporated in California and based in Los Angeles, with additional offices in Riverside, Santa Ana, and San Diego, California, that serves immigrants and asylum seekers throughout Southern California and across the U.S.-Mexico border in Tijuana, Mexico. It is the largest removal defense nonprofit in Southern California. ImmDef's mission is to provide immigration services through a universal representation model to ensure that no person must face an unjust immigration system alone.

3.      One of ImmDef's key programs is its Community Defense Program ("CDP"). Through CDP, ImmDef strives to make universal representation a reality by partnering with cities and counties to provide affirmative and removal defense legal services in areas with large immigrant populations. In 2025, as ImmDef began to see increased immigration enforcement actions occurring throughout these areas, we shifted resources from our direct

services to include our Rapid Response team and Welcoming Initiative. ImmDef's Welcoming Initiative provides Know Your Rights trainings throughout ImmDef's service area. Our Rapid Response team monitors a hotline and responds to notifications about individuals detained in enforcement actions and takes referrals to represent detained individuals in their immigration removal proceedings within ImmDef's service area. ImmDef also participates in the wider Los Angeles Rapid Response Network, including by responding to a hotline monitored by the Coalition for Humane Immigrant Rights ("CHIRLA") when enforcement actions are taking place.

4.      On June 6, 2025, federal immigration officials began conducting large-scale raids in Southern California. ImmDef attorneys quickly mobilized to observe and provide support to affected community members. My staff kept me informed of what was happening at each site, including at the detention processing floor located in the basement of the Roybal Federal Building, also known as "B-18." Multiple staff members decided to go to B-18 as soon as we started learning about the raids because, based on our experience with similar immigration enforcement actions in the past, we suspected that federal immigration authorities were systematically violating the civil and constitutional rights of the individuals they were arresting. We wanted to ensure that those arrested were given as much information about their rights as possible. We also wanted to meet with referred clients to determine what immigration relief they were eligible for, if any. We were worried that people would sign away their rights before understanding what those rights were or what relief they were eligible for. Over the next few weeks, ImmDef attorneys continued to visit B-18 and report on their ability to meet with clients.

### Attorney Access at B-18 on June 6, 2025

5.      On Friday, June 6, 2025, ImmDef learned of multiple federal immigration raids occurring in Los Angeles, leading to what we believed at the time was about 45 arrests. We learned that federal immigration authorities were taking those detained to B-18 to be processed for further detention. A group of ImmDef attorneys made their way to B-18 to provide legal intake and advice to those who had been arrested.

2

6.     A group of about four ImmDef attorneys arrived at B-18 around 3:00 p.m., and another group of about three arrived around 4:00 p.m. B-18 is accessed from E. Aliso Street, which runs along the north side of the Roybal Federal Building. Upon arriving at the Roybal Federal Building, the attorneys entered the outside area of B-18 via a down ramp. The area directly outside of B-18 consists of a small, approximately 10-by-13-foot cement court with a stairwell on one side, a gate looking into a garage on another, and a hallway leading to a security door with an intercom speaker. On this Friday, there was a group of about 20 to 25 people waiting in the hallway for their turn to be allowed into B-18. This group consisted mostly of family and friends who believed their loved ones were being held at B-18. One or two attorneys from other nonprofit organizations or private law firms were also present.

7.     Upon arriving at B-18, multiple ImmDef attorneys attempted to use the intercom to request access to the facility, but there was no answer. Several times the security door opened to allow family members to exit B-18. Each time the door opened, an ImmDef attorney would ask to enter. The guard at the door repeatedly told them that no attorneys would be allowed to enter because the building was at capacity. Despite the attorneys asking more than once what this meant, the guard provided no further clarification. This guard did not appear to be an ICE officer, but some kind of contractor, based on his uniform.

8.     While ImmDef's attorneys were waiting outside of B-18, they tried to collect information from the family members and friends gathered there about the people detained inside. Multiple family members, however, were turned away by the guard at the door because they did not have the Alien Registration Number ("A-number") assigned to their loved one's case. Some of the individuals detained had never had any encounter with immigration before their arrest, and so they did not have an A-number assigned to their case until that day. Their family members, therefore, had no way of knowing what that number was. These attorneys also began to complete Forms G-28, Notice of Entry of Appearance as Attorney ("Form G-28"), with these family members on behalf of their

3

detained loved ones. Without A-numbers, they filled out the forms using the individual's name and date of birth.

9.     At around 4:25 p.m., one of ImmDef's attorneys, Nicholas Borkowski, was allowed into the waiting room on the other side of the security door of B-18. This waiting area had plenty of open space for people to sit and wait and, unlike the area outside of the security door, it had a restroom and central air conditioning. Mr. Borkowski had at least one client who he knew was being held in B-18 because he had spoken to the client's family members outside, and he intended to meet with other potential clients if he could.

10.     Once inside, Mr. Borkowski observed additional family members and attorneys waiting to speak with loved ones and clients, respectively. Off the waiting room were two smaller rooms that a guard informed Mr. Borkowski were attorney consultation rooms. But Mr. Borkowski saw that only one attorney consultation room was in use while the other had the door closed and lights off. From the waiting room, he could not see where detained individuals were being held.

11.     Mr. Borkowski asked to speak with his client in the empty consultation room. He had with him a Form G-28, and he provided his client's name and date of birth to the guard sitting at the front desk. The guard informed Mr. Borkowski that without an A-number (which Mr. Borkowski did not have because the number would not have been assigned until the client arrived at B-18), he could not guarantee that he would be able to locate Mr. Borkowski's client. When Mr. Borkowski asked why not, he was told it was because the guards were not federal immigration authorities and did not have the information needed to locate the individual being held in the facility.

12.     At around 5:15 p.m., a different guard, Officer V. Mansour, let Mr. Borkowski into an attorney consultation room. But once inside, Office Mansour told Mr. Borkowski that without an A-number, he would not be able to find the client Mr. Borkowski intended to visit. Mr. Borkowski asked how Officer Mansour was searching for his client, and Officer Mansour explained that he had called the client's name in the holding cells, but that no one had responded. The officer then told Mr. Borkowski he could wait back in the

4

waiting area for another 30 minutes while Mr. Mansour tried again to find the client or otherwise come back later. Mr. Borkowski said he would wait for Officer Mansour to try to locate his client, but Officer Mansour never returned to the room. Twice, while Mr. Borkowski was waiting for his client, he heard an officer state that over 200 people were being processed at B-18 that night.

13.     While Mr. Borkowski was inside the B-18 waiting area, the other ImmDef attorneys outside of B-18 continued to ask for access. When the attorneys asked why they were not being given access to the detained individuals, including those for whom the attorneys had Forms G-28, the guards told them multiple times that there were not enough "attorney rooms," to accommodate them, as only "family rooms" were available. When attorneys said they would be willing to use these "family rooms" to speak with clients, the guards told them that was not allowed. Only one other ImmDef attorney was ever given access to the waiting area of B-18 that day, but she was also unable to meet with any clients.

14.     By 5:45 p.m., no more attorneys were being granted access to the building, despite having signed Forms G-28 for specific people detained. At around 6:00 p.m., the guards asked all attorneys to vacate the premises due to a protest occurring outside. From what the attorneys could see, the protest was limited to Alameda Street, while B-18 is located on the E Aliso side of the federal building. The guards told the attorneys to return at 8:00 a.m. the next morning. Attorneys were never given any other explanation as to why they had to leave before seeing their clients.

**Attorney Access at B-18 on June 7-8, 2025**

15.     At around 8:00 a.m. on Saturday, June 7, 2025, ImmDef staff, including multiple attorneys, returned to B-18 to try to speak with those detained at the facility. When our first staff member arrived, he was told by several family members waiting outside of B-18 that no visitors were being allowed in. He then spoke with a guard at the front door of B-18 who confirmed that both family and attorney visits would not be allowed until Monday. Several other ImmDef attorneys then arrived and received the same information.

16.     In addition to ImmDef staff and attorneys, the only other people present in

front of B-18 were several family members hoping to meet with loved ones who they believed were detained at B-18, as well as several attorneys from the nonprofit organization CHIRLA. There were no protests happening directly in front of B-18.

17.     At around 9:00 a.m., ImmDef attorneys saw officers in gray and black uniforms with the words "Detention Officer" on their vests starting to move individuals from B-18 into unmarked white vans. The vans were parked inside of the B-18 garage and behind a metal gate. The agents attempted to obstruct this process from view by parking several additional vans in front of the gate and setting up room dividers between the B-18 entrance and the loading area. Attorneys were still able to see the individuals being moved, however, from a higher vantage point on the ramp leading out of the B-18 entrance. Our attorneys could see that the individuals were in shackles and chained together.

18.     The attorneys gathered in front of B-18 at this point started yelling general legal advice to the people being moved into the vans. The attorneys told them, in Spanish: "*Si tiene miedo de regresar, dígalo claramente.* (If you have a fear of return, state it clearly.)"; "*Tiene derecho a una entrevista de miedo creíble.* (You have a right to a credible fear interview.)"; "*Pida hablar con un abogado.* (Ask to speak to a lawyer.)"; "*No firme nada.* (Do not sign anything.)."

19.     As our attorneys were attempting to convey this advice, the guards began adding additional partitions to obstruct the attorneys' view of the vans. The attorneys' view was limited but they could still hear the chains of the people being moved. The drivers of the federal agency vans also began honking the horns of their vans to drown out the attorneys' advice whenever the attorneys spoke. The attorneys attempted to shout in unison to be heard over the horns, but it was unclear if the detained individuals heard their advice.

20.     At about 10:30 a.m., several ImmDef attorneys then left B-18 to provide assistance at the site of another enforcement action. Only one ImmDef attorney, Francesca Maiotto, and several CHIRLA attorneys remained at B-18.

21.     At approximately 10:45 a.m., while Ms. Maiotto could hear agents loading another van and she was attempting to chant legal advice, her throat began to itch and her

nostrils burned. She and the other people gathered in the entrance outside of B-18, which included attorneys, family members, and several congresspeople, all simultaneously began to cough. Those who had medical-grade and KN-95 masks quickly put them on. It was not possible to see or hear where the substance was coming from, and it was not visible in the air. The sensation, though, was like pepper spray. The sensation seemed to stop after the van left B-18's garage. The feeling returned at about 11:30 a.m., while another van was loading.

22.     By about 12:30 p.m., Ms. Maoitto could no longer hear vans or people being moved. Around the same time, a family member of an individual arrested on Friday arrived and attempted to ask through the intercom to be let into B-18. The officer who responded told her, so that Ms. Maiotto could overhear, that everyone had been moved from B-18 and the facility was empty. Ms. Maiotto left the area soon afterwards. She estimated that between 9:00 a.m. to 12:00 p.m. she saw or heard about five vans being loaded with between 20–30 people each.

23.     On Sunday, June 8, 2025, I visited B-18 personally to try to confirm whether anyone was still being detained at the facility. I arrived with my colleague and ImmDef Directing Attorney Melissa Shepard at approximately 1:40 p.m. When we approached the door of the facility, we saw a handwritten sign that read "Attorney/Family Visit Temporary Cancelled Today."

24.     I rang the doorbell at the intercom to try to speak with a guard but received no response. After about 20 seconds of waiting, I noticed my nose and throat burning. Ms. Shepard confirmed that she was also feeling the same burning. Without knowing what the substance was or if it would have any long-term effects, we did not feel it was safe to stay in the area and we left.

**ImmDef Attorneys Were Consistently Denied Access to B-18 Over the Next Week**

25.     Starting on June 6, 2025, ImmDef began collecting the names of individuals who were taken in the raids and who we believed were being held at B-18. These individuals were referred to us through family members and friends calling into the Rapid

7

Response hotline, as well as from our community partners. We believed they were being held at B-18 because ICE officers had told their family members they were being taken to B-18 and in some cases we could confirm they were there through the ICE detainee locator system.

26.     On Tuesday, June 10, 2025, three ImmDef attorneys, including Legal Services Director Amanda Schuft, attempted to visit B-18 to determine whether any referred clients were still at the facility. As they approached E. Aliso Street, the attorneys saw about a dozen California Highway Patrol ("CHP") officers blocking access. The group could also see several members of the U.S. Marines outside the entrance of B-18.

27.     Ms. Schuft greeted the officers and explained that they were immigration attorneys seeking access to B-18 to meet with anyone detained there. The officers told the group that no one was allowed to access the street. Ms. Schuft showed the officers her bar card, however they repeated they could not let anyone through and that she would have to contact the facility directly to see if they had available appointments. The group then approached B-18 from another entrance on E. Aliso Street, but as they neared the entrance, an officer in the distance waved them away, ordering them back. The group left the area without gaining access to B-18.

28.     On June 16, 2025, ImmDef attorneys, including Managing Attorney Kristen Hunsberger, attempted to meet with clients at B-18. With Ms. Hunsberger and her colleagues was Congressman Jimmy Gomez. The attorneys were specifically trying to meet with family members of individuals who had called ImmDef's Rapid Response hotline.

29.     Ms. Hunsberger arrived at B-18 around 3:00 p.m. She saw that attorney visiting hours were posted outside the security door as being from 8:00 a.m. to 4:00 p.m. However, when she asked to be let into the facility because she had a list of people she wanted to speak with, the guard at the door told her that no visits were being allowed. The guards refused to even look at the list of names that Ms. Hunsberger had with her.

30.     At around 3:50 p.m., while Ms. Hunsberger was still trying to gain access to

8

B-18, four CHP officers arrived and told everyone waiting outside of B-18, including both attorneys and family members who had been called and told to come to B-18 to pick up their loved ones' possessions, to leave. About ten minutes later, an officer with a badge on his uniform identifying him as part of the Department of Homeland Security ("DHS") arrived with a canine. He and the canine then began to pace up and down the ramp outside of B-18's entrance to prevent anyone from approaching the security door.

31.     There were no protests happening on E. Aliso Street at this time, and Ms. Hunsberger observed a group of only about 20 peaceful protestors on Alameda Street as she was leaving. By contrast, she counted 25 law enforcement vehicles, some marked CHP and Los Angeles Police Department ("LAPD") and one brown passenger van parked on E. Aliso Street.

**ImmDef Was Finally Able to Meet with One Long-Term Client at B-18**

32.     On June 19, 2025, an ImmDef attorney, James Nichols, was able to meet with a long-term client, J.M.E., who was being held at B-18. J.M.E. has asylee status and should never have been detained, but this was his second time being stopped by ICE in as many weeks.

33.     Mr. Nichols arrived at B-18 around 12:30 p.m. and asked the guard behind the intercom to speak with J.M.E. He informed the guard of J.M.E.'s asylee status. Mr. Nichols then showed a copy of J.M.E.'s asylum approval notice and was told to keep waiting. Mr. Nichols waited between two to three hours to be let into B-18. Once inside, he spoke with two more guards who took his bar card and J.M.E.'s A-number. Eventually, Mr. Nichols spoke with an ICE officer who introduced himself as Sergeant Vela. Mr. Nichols again explained J.M.E.'s asylee status and Sergeant Vela brought J.M.E. to a consultation room where he was only able to meet with J.M.E. for about 20 minutes.

34.     After speaking with J.M.E., Mr. Nichols again asked that J.M.E. be released. He was told that J.M.E. was scheduled to be sent to Adelanto. If not for Mr. Nichols' intervention, J.M.E. likely would have been sent to Adelanto. Mr. Nichols waited several more hours at B-18 until J.M.E. was released around 5:15 p.m.

9

35.     Since J.M.E. was released, I have spoken with him more about his arrests and the conditions at B-18. The first arrest happened on June 9, 2025, while he was traveling in a car with friends on the 101 freeway. Officers who J.M.E. thinks were ICE officers stopped traffic and pulled the car over. They made everyone in the car get out and tackled J.M.E. to the ground. They then handcuffed and threw J.M.E. and his friends in a van without showing them any warrants. J.M.E. had paperwork with him showing that he was granted asylum, and he told the officers to check it. They refused and eventually pulled over and left J.M.E. and his friends in the van for two to three hours. When they came back, one officer checked the paperwork and let J.M.E. go by dropping him off on the side of the freeway. His friends were not released, and J.M.E. learned later that one of them was transferred to Adelanto Detention Facility. J.M.E. had bruises on his arms and behind his ear from this arrest.

36.     On June 19, 2025, only ten days after J.M.E. was first arrested, he went to Home Depot around 5:00 a.m. to look for work. He was standing by the building with around 20 other people. At around 7:00 a.m., ICE pulled up in several white vans, some with green stripes. They drove up quickly and J.M.E. heard their tires skidding. ICE then grabbed about five of the men, including J.M.E. while the other 15 took off running. J.M.E. was then again handcuffed and thrown into one of the vans. As he was being arrested, J.M.E.'s bag was left behind on the ground. In it, J.M.E. had documents that proved his asylum grant. When he tried to inform the officers of these documents, however, he was told not to speak. The officers left the bag behind on the ground at the Home Depot.

37.     ICE officers then took J.M.E. to B-18. When he arrived around 8:00 a.m., he was given a small peanut butter sandwich but nothing else. He also told the guards that his head was hurting and that he felt like he had high blood pressure, so the guards gave him a pill. J.M.E. was then taken to a room with about seven or eight cells. Some of the cells had around 60 people in them. His cell had about 30 people. The cell he was in was very crowded, and there were no chairs or beds. It was very cold, but the guards did not provide anyone with any blankets. Around 10 a.m., the guards gave J.M.E. some yogurt and milk.

10

1  The yogurt looked expired, so he did not eat it.

2      38.      Finally, at around 12:40 p.m., J.M.E. was given access to the phone, and he

3  called my assistant who sent Mr. Nichols to B-18. Since J.M.E. was released, ImmDef has

4  tried to keep in touch with him. But he has mental health concerns and sometimes does not

5  respond. I am constantly worried that he will be re-arrested.

6      **ImmDef Was Only Able to Meet with One Other Referred Client That Same Day**

7      39.      Also on June 19, 2025, Ms. Hunsberger returned to B-18 to meet with other

8  detained individuals on ImmDef's referral list. We knew one individual, J.A.G., who was

9  detained at B-18 was being treated for cancer and had a chemotherapy appointment

10  scheduled for the next day. Ms. Hunsberger had with her a note from J.A.G.'s

11  chemotherapy provider stating the date and time of his next appointment. The note also

12  explained that missing a chemotherapy appointment would be detrimental to J.A.G.'s

13  treatment.

14      40.      When Ms. Hunsberger attempted to show the note to the guard at the security

15  door, she received no response. She then asked one of the Marines outside of B-18 if he

16  could pass a message to one of the federal immigration officers inside that she needed to

17  speak with an individual who should be released for medical and humanitarian reasons.

18  She told the Marine that the medical reason was a chemotherapy appointment. J.A.G.'s

19  family was also present with his medication but were similarly not being allowed to see

20  him.

21      41.      At around 12:00 p.m., an ICE officer, Officer R. Chavez, according to his

22  nametag, came out of B-18 to speak to Ms. Hunsberger. Ms. Hunsberger explained that she

23  was there to speak to an individual who needed immediate release to attend a chemotherapy

24  appointment in the morning. Officer Chavez told her that he would elevate her concerns to

25  his supervisor.

26      42.      Ms. Hunsberger then waited another two hours outside of B-18. Every 15-30

27  minutes, she would approach the security door and use the intercom to ask for assistance.

28  After about an hour, she received a response that Officer Chavez had gone to speak with a

11

supervisor. About an hour later, another officer came to speak with Ms. Hunsberger. He took her Form G-28 but became angry when he saw the G-28 was only signed by a family member and not J.A.G. Ms. Hunsberger explained she had been retained by the family because no one had been allowed to speak with J.A.G. and his medical condition made securing his release time sensitive. The officer left without providing Ms. Hunsberger any information.

43.     Soon afterwards, Ms. Hunsberger saw Officer Chavez, flagged him down, and again asked about meeting with her client. He told her that he had no way to find J.A.G. because hundreds of people were detained in the facility. Ms. Hunsberger suggested shouting J.A.G.'s name and seeing if whoever came forward could confirm his date of birth. Officer Chavez told her that he would try.

44.     Finally, at around 2:30 p.m., Ms. Hunsberger was told that J.A.G. was being pulled and she could speak with him. Ms. Hunsberger and J.A.G.'s nephew were then let into B-18, where Ms. Hunsberger was given an attorney consultation room to meet with her client.

45.     While Ms. Hunsberger was waiting for J.A.G., she was able to overhear guards in the hallway discussing the large influx of people being brought to B-18. One guard said, "There is nothing we can do, someone needs to tell Trump he needs to slow down." Others were complaining about maintaining health and safety conditions, asking "how are we supposed to house and feed them?," and exclaiming that "the ones who bring the bodies should pat them down."

46.     Ms. Hunsberger was able to meet with J.A.G. for about 45 minutes. He told her that he was arrested in Pasadena with a group of other day laborers. The men who arrested the laborers were masked, carrying guns, and driving unmarked vehicles. No one was shown a warrant of any kind. J.A.G. was physically restrained with both his hands and feet handcuffed. J.A.G. suffers from back pain and difficulty breathing because of his cancer, and the arrest was extremely painful for him. He had tried explaining about his chemotherapy appointment when he was arrested, but none of the officers had responded.

12

47.    After Ms. Hunsberger's interview with J.A.G. she was not able to speak with any other referrals from ImmDef's list. Around 4:00 p.m., a guard informed everyone standing outside of B-18, including attorneys and family members, that no one else would be allowed in the facility that day. Ms. Hunsberger stayed at B-18 until about 10:00 p.m. to continue advocating for J.A.G.'s release, speaking with any ICE or DHS officer she could flag down. But J.A.G. was not released that night.

48.    Another ImmDef attorney, Lavalee Forbes, also went to B-18 that day, but she was not able to meet with any clients. When she arrived at about 2:30 p.m. and requested to see her client over the intercom, an officer told her to wait. At 3:20 p.m., she was told that no more attorney visits could be held that day despite the attorney visitation time ending at 4:00 p.m. Another attorney from a private firm was also at B-18 who was not permitted entry despite asking multiple times and having the A-number for her client.

49.    The next day, June 20, 2025, at about 6:30 a.m., Ms. Hunsberger received a call from an ICE officer who told her that J.A.G. was being processed for release. She asked for an estimated time of release because his chemotherapy appointment was scheduled for 9:00 a.m. The officer could not provide an estimate.

50.    Ms. Hunsberger arrived at B-18 at 7:00 a.m. At 7:20 a.m., an ICE officer told Ms. Hunsberger that J.A.G. had been transferred to Adelanto Detention Center for the night because ICE was aware of his condition and had sent him to Adelanto "so he could have a bed" and because there were no beds at B-18. At 8:45 a.m., another officer told her that J.A.G. had just left Adelanto and was on his way. J.A.G. was finally released at 11:10 a.m., but he had already missed his chemotherapy appointment. Luckily, his family member, who was also at B-18 that morning, was able to reschedule the appointment. ICE released J.A.G. without any paperwork documenting his time in ICE custody.

**The Access to Counsel Issues at B-18 Continue to Persist Today**

51.    On June 27, 2025, ImmDef attorney Morgan Gehrls, went to B-18 at around 12:30 p.m. to meet with a client she represents and who ICE re-arrested on June 26, 2025. Upon arrival, Ms. Gehrls rang the intercom, and an officer asked what she was there for.

13

Ms. Gehrls explained that she was there to meet with her client and gave the officer her client's information. The officer then left, and Ms. Gehrls waited for 20-30 minutes.

52.     When the officer returned, he asked Ms. Gehrls for her bar card. Ms. Gehrls explained that she does not have a bar card because she is licensed in the state of Illinois, and Illinois does not have bar cards. The officer responded to Ms. Gehrls, "well, we're in California." Ms. Gehrls explained that attorneys can practice before the Executive Office for Immigration Review ("EOIR") regardless of which state they are barred in, and that she has an EOIR number. Ms. Gehrls offered to present a complete G-28 and letter of good standing from the Illinois Supreme Court, but the officer refused. Ms. Gehrls explained that an attorney from our office who is licensed in New York was previously permitted entry after explaining that New York attorneys also do not have bar cards. The officer finally allowed Ms. Gehrls to speak to her client, but told her she would not be given attorney access. The officer only permitted Ms. Gehrls to talk with her client for ten minutes. She was not provided with a confidential meeting space to talk with her client and was in an area where staff could overhear their conversation. Ms. Gehrls overheard this officer tell another staff member that she was "not an attorney."

53.     Ms. Gehrls' client, who is a Franco-Gonzalez v. Holder, 2014 WL 5475097 (C.D. Cal. April 23, 2013), class member told her that he has not received his medications since being at B-18, despite telling the guards that he needed the medication and that it was with his possessions. When Ms. Gehrls asked the guard why her client was not receiving his medications, the guard told her that they are unable to give a detainee their medications unless the detainee can tell them when they need it and dosages. Ms. Gehrls explained that her client has been found not competent by an immigration judge and that he also has in his possession paperwork providing this information. The guard told her that too many people are being processed at B-18 for the guards to go through the paperwork that everyone comes in with.

**ImmDef Has Struggled to Locate Individuals It Believes Are Being Held at B-18**

54.     ImmDef attorneys have consistently had difficulty locating individuals we

14

believe are being held at B-18. Individuals held at B-18 do not show up on ICE's detainee locator tool online. Short of an attorney or family member going to B-18 to ask about an individual, there is no way to confirm that person is there. On at least one occasion, guards told an ImmDef attorney that an individual was not at B-18 only for that attorney to later learn through the person's family member that he was indeed there. This man, who federal immigration officials arrested at a carwash on June 19, 2025, and whose family ImmDef has kept in touch with as we consider him for representation, was held at B-18 for 12 days.

55.    Due to the conditions at B-18, ImmDef attorneys are spending significant time and resources traveling to the facility in person and attempting to confirm whether individuals arrested in raids—and who have been referred to our organization by family members or partner organizations—are even located at the facility. This has immensely strained our staff, who already have full caseloads, and is imperiling our staff's ability to meet the needs of their individual cases. Our Rapid Response team is still small, and I have had to ask attorneys from across our direct services teams—including attorneys from our National Qualified Representative Program, Community Defense Program, and Children's Representation Program—to shift their workloads to assist with the urgent project of locating detained individuals. The directors from these teams are also working around the clock to develop new procedures for assigning out both internally and externally the cases referred to us as a result of the raids.

56.    Even when ImmDef attorneys have been able to locate clients and prospective clients at B-18, conditions at the facility have hampered attorneys' ability to provide meaningful representation and constrained attorney-client relationships due to, for example, the lack of confidential meeting space and the short amount of time permitted during legal visits. Hindering ImmDef attorneys' access to B-18 also means, among other things, that clients and prospective clients may sign away their legal rights without the advice of counsel, further undermining ImmDef attorneys' ability to represent individuals in their immigration removal proceedings.

57.    ImmDef's leadership team realized soon after the raids started that our

15

organization would not have the capacity to represent all the individuals detained in their various immigration proceedings. Those being held at B-18 need legal representation in a variety of matters, including at bond hearings, credible fear interviews, and full-scale removal cases. We simply do not have enough attorneys to cover this need.

58.    For those individuals that ImmDef is unable to represent, ImmDef is attempting to connect them to other nonprofit organizations and pro bono private attorneys who can represent them. It is, therefore, critical for us to speak to those who are detained to understand the type of representation they need, and if there are any factors that weigh in favor of ImmDef's immediate representation of them or connecting them with another attorney.

I declare under penalty of perjury that the foregoing is true and correct.

Los Angeles, CA

Dated: July 1, 2025

By: _____

Lindsay Toczylowski

16

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

Pedro VASQUEZ PERDOMO, *et al.*

    Plaintiffs,

    v.

Kristi NOEM, in her official capacity as Secretary, Department of Homeland Security, *et al.*

    Defendants.

Case No.: 2:25-cv-05605-MEMF-SP

**DECLARATION OF MARTHA VASQUEZ**

Hon. Maame Ewusi-Mensah Frimpong

I, Martha Vasquez, declare under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1.    My name is Martha Vasquez, I am 38, and I reside in Los Angeles.

2.    On June 23, 2025, my family friend, AG, age 40, was stopped, detained, and arrested by federal agents as he was parked outside of a Home Depot in the Marina Del Rey/Playa Vista area. He has been in the United States for 20 years. He does construction and demolition work.

3.    He has not applied for any type of status and has no removal order in his name. There is no reason he would be known to the federal agents.

4.    I was told by AG that the agents that confronted him were wearing masks, armed with visible guns, never identified themselves, and did not have badges. They also did not have a warrant. They arrested AG and a worker that was in his vehicle with him.

5.    We had no idea where AG was taken after his arrest. We tried for a day to locate him by using the online detainee locator, but we were unsuccessful. I emailed an ICE Field Office to ask where AG was detained, but did not receive a response. We called different numbers, and finally thought to look for him at the B-18 facility in Downtown LA as we had heard arrested individuals were being taken there.

6.    On June 24, 2025, I went to B-18 to try and visit AG. I waited in line for several hours with many other people and was given the run around by different agents

through the intercom at the facility door. They would not tell me if AG was there or not, and would say "hold on, we'll let you know if you can come in or not," but would not get back to me. They mentioned that they could not tell me who exactly was there since there were so many detainees. One of the agents said they were also backed up because they have had several medical emergencies inside the center. I was finally able to see AG for only two minutes after I said I had a G-28 form that his lawyer needed him to sign.

7.    When I went inside the center, the first thing I noticed was that the officer had put black tape over his name on his uniform, and I was unable to see what his name was. I then waited inside for some time and was finally able to go to the window. When I was finally able to see AG, they brought out another detainee that was not him.

8.    Eventually I was able to see AG. He looked sad, concerned, dirty, scared, and very tired. He had on the same clothes from when he was arrested, more than 24 hours before.

9.    We are very concerned about AG's health and safety. AG is the breadwinner of the family and has a wife and four children who depend on him.

I declare under penalty of perjury that the foregoing is true and correct.


Los Angeles, CA

Dated: June 30, 2025

By: _____

Martha Vasquez

2

1  STACY TOLCHIN (SBN 217431)
   *stacy@tolchinimmigration.com*
2  LAW OFFICES OF STACY TOLCHIN
   776 E. Green St., Suite 210
3  Pasadena, CA 91101
   Telephone: (213) 622-7450
4  Facsimile: (213) 622-7233

5  MOHAMMAD TAJSAR (SBN 280152)
6  *mtajsar@aclusocal.org*
   MAYRA JOACHIN (SBN 306065)
7  *mjoachin@aclusocal.org*
   EVA BITRAN (SBN 302081)
8  *ebitran@aclusocal.org*
   DAE KEUN KWON (SBN 313155)
9  *akwon@aclusocal.org*                    MARK ROSENBAUM (SBN 59940)
   OLIVER MA (SBN 354266)                   *mrosenbaum@publiccounsel.org*
10 *oma@aclusocal.org*                       REBECCA BROWN (SBN 345805)
   STEPHANIE PADILLA (SBN 321568)          *rbrown@publiccounsel.org*
11 *spadilla@aclusocal.org*                  SOPHIA WRENCH (SBN 354416)
   DIANA SÁNCHEZ (SBN 338871)              *swrench@publiccounsel.org*
12 *dianasanchez@aclusocal.org*             RITU MAHAJAN (SBN 252970)
   ACLU FOUNDATION OF                       *rmahajan@publiccounsel.org*
13 SOUTHERN CALIFORNIA                      GINA AMATO (SBN 215519)
   1313 West Eighth Street                  *gamato@publiccounsel.org*
14 Los Angeles, CA 90017-4022               PUBLIC COUNSEL
   Telephone: (213) 977-5232                610 South Ardmore Avenue
15 Facsimile: (213) 201-7878                Los Angeles, CA 90005
                                            Telephone: (213) 385-2977
16
17 *Counsel for Stop/Arrest Plaintiffs*
   (*additional counsel information on cont.*   *Counsel for All Plaintiffs*
18 *page*)

19              **UNITED STATES DISTRICT COURT**

20          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

21 Pedro VASQUEZ PERDOMO; Carlos      Case No.: 2:25-cv-05605-MEMF-SP
   Alexander OSORTO; and Isaac
22 VILLEGAS MOLINA; Jorge            **FIRST AMENDED PETITION**
   HERNANDEZ VIRAMONTES; Jason       **FOR WRIT OF HABEAS**
23 Brian GAVIDIA; LOS ANGELES        **CORPUS AND COMPLAINT**
   WORKER CENTER NETWORK;            **FOR DECLARATORY AND**
24 UNITED FARM WORKERS;              **INJUNCTIVE RELIEF**
   COALITION FOR HUMANE
25 IMMIGRANT RIGHTS; IMMIGRANT       **CLASS ACTION**
   DEFENDERS LAW CENTER,
26                                    Hon. Maame Ewusi-Mensah
        Plaintiffs,                   Frimpong
27
           v.
28
                                    -1-
───────────────────────────────────────────────

Kristi NOEM, in her official capacity as
Secretary, Department of Homeland
Security; Todd M. LYONS, in his official
capacity as Acting Director, U.S.
Immigration and Customs Enforcement;
Rodney S. SCOTT, in his official
capacity as Commissioner, U.S. Customs
and Border Patrol; Michael W. BANKS,
in his official capacity as Chief of U.S.
Border Patrol; Kash PATEL, in his
official capacity as Director, Federal
Bureau of Investigation; Pam BONDI, in
her official capacity as U.S. Attorney
General; Ernesto SANTACRUZ JR., in
his official capacity as Acting Field
Office Director for Los Angeles, U.S.
Immigration and Customs Enforcement;
Eddy WANG, Special Agent in Charge
for Los Angeles, Homeland Security
Investigations, U.S. Immigration and
Customs Enforcement; Gregory K.
BOVINO, in his official capacity as Chief
Patrol Agent for El Centro Sector of the
U.S. Border Patrol; Jeffrey D.
STALNAKER, in his official capacity as
Acting Chief Patrol Agent, San Diego
Sector of the U.S. Border Patrol; Akil
DAVIS, in his official capacity as
Assistant Director in Charge, Los
Angeles Office, Federal Bureau of
Investigation; Bilal A. ESSAYLI, in his
official capacity as U.S. Attorney for the
Central District of California,

        Defendants.

-2-
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

1  ANNE LAI (SBN 295394)
   alai@law.uci.edu
2  UC IRVINE SCHOOL OF LAW
   IMMIGRANT AND RACIAL
3  JUSTICE
   SOLIDARITY CLINIC
4  P.O. Box 5479
   Irvine, CA 92616-5479
5  Telephone: (949) 824-9894
   Facsimile: (949) 824-2747
6
7  *Counsel for Stop/Arrest Plaintiffs*

8  LAUREN MICHEL WILFONG*
   lwilfong@ndlon.org
9  NATIONAL DAY LABORER
   ORGANIZING NETWORK
10 1030 S. Arroyo Parkway, Suite 106
   Pasadena, CA 91105
11 Telephone: (626) 214-5689

12 *Counsel for Stop/Arrest Plaintiffs*

13
14 BREE BERNWANGER (SBN 331731)
   bbernwanger@aclunc.org
15 AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION OF
16 NORTHERN CALIFORNIA
   39 Drumm Street
17 San Francisco, CA 94111
   Telephone: (415) 621-2493
18
   *Counsel for Stop/Arrest Plaintiffs*
19
20 BRISA VELAZQUEZ OATIS
   (SBN 339132)
21 bvoatis@aclu-sdic.org
   ACLU FOUNDATION OF
22 SAN DIEGO & IMPERIAL
   COUNTIES
23 P.O. Box 87131
   San Diego, CA 92138-7131
24 Telephone: (619) 398-4199

25 *Counsel for Stop/Arrest Plaintiffs*
26

27

28

MATTHEW J. CRAIG (SBN 350030)
mcraig@heckerfink.com
MACK E. JENKINS (SBN 242101)
mjenkins@heckerfink.com
HECKER FINK LLP
1150 South Olive Street, Suite 10-140
Los Angeles, CA 90015
Telephone: (212) 763-0883
Facsimile: (212) 564-0883

*Counsel for Access/Conditions Plaintiffs*

EDGAR AGUILASOCHO
(SBN 285567)
eaguilasocho@farmworkerlaw.com
MARTINEZ AGUILASOCHO LAW, INC.
1527 19th Street #332
Bakersfield, CA 93301
Telephone: (661) 859-1174

*Counsel for Plaintiff United Farm Workers*

CARL BERGQUIST*
cbergquist@chirla.org
COALITION FOR HUMANE
IMMIGRANT RIGHTS
2351 Hempstead Road
Ottawa Hills, OH 43606
Telephone: (310) 279-6025

*Counsel for Plaintiff Coalition for Humane Immigrant Rights*

ALVARO M. HUERTA (SBN 274787)
ahuerta@immdef.org
BRYNNA BOLT (SBN 339378)
bbolt@immdef.org
ALISON STEFFEL (SBN 346370)
asteffel@immdef.org
IMMIGRANT DEFENDERS LAW
CENTER
634 S. Spring St., 10th Floor
Los Angeles, CA 90014
Telephone: (213) 634-0999

*Counsel for Plaintiff Immigrant Defenders Law Center*

\* Pro hac vice application forthcoming

-3-

ER-0710

## INTRODUCTION

1.     This lawsuit seeks to enjoin Defendants' ongoing pattern and practice of flouting the Constitution and federal law in connection with ongoing immigration raids in the Los Angeles area.

2.     Since early June, this District has been under siege. Masked federal agents, sometimes dressed in military-style clothing, have conducted indiscriminate immigration operations, flooding street corners, bus stops, parking lots, agricultural sites, day laborer corners, and other places, setting up checkpoints, and entering businesses, interrogating residents as they are working, looking for work, or otherwise trying to go about their daily lives, and taking people away.

3.     The raids in this District follow a common, systematic pattern. Individuals with brown skin are approached or pulled aside by unidentified federal agents, suddenly and with a show of force, and made to answer questions about who they are and where they are from. If they hesitate, attempt to leave, or do not answer the questions to the satisfaction of the agents, they are detained, sometimes tackled, handcuffed, and/or taken into custody. In these interactions, agents typically have no prior information about the individual and no warrant of any kind. If agents make an arrest, contrary to federal law, they do not make any determination of whether a person poses a risk of flight before a warrant can be obtained. Also contrary to federal law, the agents do not identify themselves or explain why the individual is being arrested.

4.     Further, apparently to accommodate the sharp rise in arrests, the government has resorted to keeping individuals at what is supposed to be a short-term processing center and ICE basement holding area in downtown Los Angeles, known as "B-18," often for days. In these dungeon-like facilities, conditions are deplorable and unconstitutional. The government has also unlawfully deprived those arrested of access to counsel. Under such conditions, some of those arrested are pressured into accepting voluntary departure. The government is aware that its

-4-

actions are unconstitutional and contrary to officers' training, but deliberately persists because this system allows it to coerce removals, avoid public accountability, and ultimately—given the limited bed space at longer-term detention facilities in the area—keep arrest numbers high.

5.     Federal immigration enforcement is constrained by law. But since the federal government began its mass immigration enforcement operations in this District on June 6, 2025, all of these legal requirements have given way to one overriding consideration: "numbers, pure numbers. Quantity over quality"[1]

6.     In late May, the White House and the Department of Homeland Security imposed a quota of 3,000 immigration-related arrests per day—with "consequences for not hitting arrest targets."[2]  In order to reach this target, White House Deputy Chief of Staff Stephen Miller directed high-level officials to change their approach to stops and arrests in the field. Agents and officers, according to him, should no longer conduct targeted operations based on investigations. Instead, they should "just go out there and arrest [unauthorized noncitizens]" by rounding up people in public spaces like "Home Depot" and "7-Eleven" convenience stores.[3]

7.     This comprehensive scheme has been guised as a crackdown on the "worst of the worst."[4] But the preponderance of individuals stopped and arrested in the raids have not been targeted in any meaningful sense of the word at all, except

---

[1] Jennie Taer, *Trump admin's 3,000 ICE arrests per day quota is taking focus off criminals and 'killing morale': insiders*, New York Post (June 17, 2025), https://nypost.com/2025/06/17/us-news/trump-admins-3000-ice-arrests-per-day-quota-is-taking-focus-off-criminals-and-killing-morale-insiders/.

[2]  Elizabeth Findell, et al., *The White House Marching Orders That Sparked the L.A. Migrant Crackdown*, The Wall Street Journal (June 9, 2025), https://www.wsj.com/us-news/protests-los-angeles-immigrants-trump-f5089877.

[3] *Id*.

[4] *Dep't of Homeland Sec., ICE Captures Worst of the Worst Illegal Alien Criminals in Los Angeles Including Murderers, Sex Offenders, and Other Violent Criminals (June 8, 2025), https://www.dhs.gov/news/2025/06/08/ice-captures-worst-worst-illegal-alien-criminals-los-angeles-including-murderers*

-5-

on the basis of their skin color and occupation.[5] Those who have borne the brunt of Defendants' heavy-handed pattern of unlawful conduct include day laborers, car wash workers, farm workers, street vendors, service workers, caregivers and others who form the lifeblood of communities across Southern California. Over a thousand residents in the District have already been impacted, including a shocking (though hardly surprising) number of U.S. citizens and individuals lawfully present in the country.

8.    This case challenges the government's use of unlawful tactics to achieve its intended arrest numbers in the District. Plaintiffs include five individuals and three membership organizations, the Los Angeles Worker Center Network, United Farm Workers, and the Coalition for Humane Immigrant Rights (together, the "Stop/Arrest Plaintiffs"), who, on behalf of themselves and others similarly situated, bring claims challenging Defendants' unlawful stop and arrest practices. Plaintiffs also include the Immigrant Defenders Law Center, who, alongside the Coalition for Humane Immigrant Rights (together, the "Access/Detention Plaintiffs"), seek to challenge Defendants' denial of access to counsel and illegal conditions of confinement at B-18. Despite the fear and risks associated with speaking publicly, they are taking courageous action to enforce the rule of law. They seek declaratory and injunctive relief as well as relief under the Administrative Procedure Act (APA).

## JURISDICTION AND VENUE

9.    Jurisdiction is proper and relief is available pursuant to 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 702 and 706 (Administrative Procedure Act), 28 U.S.C. § 2241 (federal habeas statute), U.S. Const. art. I, § 9 (Suspension

---

[5] Rachel Uranga, "Most nabbed in L.A. raids were men with no criminal conviction, picked up off street," L.A. Times (June 24, 2025), https://www.latimes.com/california/story/2025-06-24/detention-centers-swell-with-immigrants-with-no-criminal-record.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Clause), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. §§ 2201-02 (Declaratory Judgment Act), and Fed. R. Civ. P. 65 (injunctive relief).

10.    Defendants do not have immunity. *See, e.g.*, 5 U.S.C. § 702; *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–90 (1949); *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 526 (9th Cir. 1989).

11.    Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are officers or employees of the United States and at least one Plaintiff resides in this District; a substantial part of the events or omissions giving rise to the claims occurred in this District; and/or because a Defendant resides in this District.

## **PARTIES**

12.    **Plaintiff-Petitioner Pedro Vasquez Perdomo** is a resident of Pasadena, California who was arrested at a bus stop as he was waiting to be picked up for a job on June 18, 2025. He filed this action while detained in the basement of the Los Angeles downtown federal building, B-18. Because of his Latino ethnicity and identity as a day laborer, he fears being subject to a future stop by federal agents without reasonable suspicion.

13.    **Plaintiff-Petitioner Carlos Alexander Osorto** is a resident of Pasadena, California who was arrested at a bus stop as he was waiting to be picked up for a job on June 18, 2025. He filed this action while detained in the basement of the Los Angeles downtown federal building, B-18. Because of his Latino ethnicity and identity as a day laborer, he fears being subject to a future stop by federal agents without reasonable suspicion.

14.    **Plaintiff-Petitioner Isaac Villegas Molina** is a resident of Pasadena, California who was arrested at a bus stop as he was waiting to be picked up for a job on June 18, 2025. He filed this action while detained in the basement of the Los Angeles downtown federal building, B-18. Because of his Latino ethnicity and identity as a day laborer, he fears being subject to a future stop by federal agents without reasonable suspicion.

-7-

15.    **Plaintiff Jorge Hernandez Viramontes** is a resident of Baldwin Park, California. He works at a car wash in Orange County, California that has been visited three times by immigration agents, most recently on June 18, 2025, when he was questioned and detained by agents despite informing them he is a U.S. citizen. He fears being subjected to similar actions again on the basis of his Latino ethnicity and accent.

16.    **Plaintiff Jason Brian Gavidia** is a resident of East Los Angeles, California. He was stopped and questioned by immigration agents at a tow yard in Los Angeles County on June 12, 2025, despite explaining multiple times he is a U.S. Citizen. Agents pushed him against the metal gated fence, put his hands behind his back, and twisted his arm. He was finally let go, but was terrified by this experience and fears being subjected to similar actions again on the basis of his Latino ethnicity.

17.    **Plaintiff Los Angeles Worker Center Network (LAWCN)** is a multi-racial, multi-ethnic, and multi-industry organization comprised of worker centers and labor organizations that work together to address injustices faced by low-wage workers in the greater Los Angeles area, including immigrant and non-English speaking workers. LAWCN's worker center members include the CLEAN Carwash Worker Center, the Garment Worker Center, the Koreatown Immigrant Workers Alliance, the Los Angeles Black Worker Center, the Philipino Workers Center, and the Warehouse Worker Resource Center. These worker center members in turn have members, including noncitizens with legal status and U.S. citizens, who have been subjected to and are at risk of being subjected in the future to the stop and arrest policies and practices challenged in this case.

18.    **Plaintiff United Farm Workers (UFW)** is the largest farm worker union in the country with approximately 10,000 members, with more members in California than in any other state. UFW aims to improve the lives, wages, and working conditions of agricultural workers and their families, including by

-8-

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

advocating for immigration reform and immigrants' rights. UFW's members in California work at agricultural sites as well as non-agricultural sites within the District. UFW has members, including noncitizens with legal status and U.S. citizens, who have been, and are at risk of being, subjected in the future to the stop and arrest policies and practices challenged in this case.

19.    **Plaintiff Coalition for Humane Immigrant Rights (CHIRLA)** is a nonprofit organization with its principal place of business in Los Angeles, California. CHIRLA was founded in 1986 to advance the human and civil rights of immigrants and refugees. Since then, CHIRLA has become one of the largest and most effective advocates for immigrant rights, organizing, educating and defending immigrants and refugees in the streets, in the courts, and in the halls of power. As a membership organization, CHIRLA has approximately 50,000 members across California, including both U.S. citizens and noncitizens of varying immigration status. CHIRLA has members in every county in the District. CHIRLA's staff also includes attorneys and Department of Justice (DOJ) accredited representatives who provide pro bono legal services to clients in removal proceedings, including those who are detained. Additionally, CHIRLA coordinates the Los Angeles Rapid Response Network (LARRN) and educates its membership as well as the broader community through know-your-rights programming, workshops, social media, and educational literature about a variety of social services and benefits, including immigration law, financial literacy, workers' rights, and civic engagement.

20.    **Plaintiff Immigrant Defenders Law Center (ImmDef)** is a nonprofit organization having its principal place of business in Los Angeles, California. Besides Los Angeles, ImmDef has offices in Riverside, Santa Ana, and San Diego, California, and works across the U.S.-Mexico border in Tijuana. ImmDef was founded in 2015 to protect the due process rights of immigrants facing deportation. At its founding, ImmDef was focused on ensuring that every immigrant before the immigration court had a lawyer by their side. In the years that followed, ImmDef

-9-

1  expanded its mission beyond helping individuals facing deportation to also work

2  towards systemic change that reimagines a more just immigration system. ImmDef

3  provides deportation defense, legal representation, legal education, and social

4  services to detained and non-detained children and adults.

5      21.    **Defendant Kristi Noem** is the Secretary of the Department of

6  Homeland Security (DHS), which is responsible for administering and enforcing the

7  nation's immigration laws pursuant to 8 U.S.C. § 1103(a). In this role, she oversees

8  component agencies such as ICE and U.S. Customs and Border Protection (CBP).

9  Defendant Noem is sued in her official capacity.

10      22.    **Defendant Todd M. Lyons** is the Acting Director of U.S. Immigration

11  and Customs Enforcement (ICE), an agency of the United States and a division of

12  DHS. ICE's mission includes the enforcement of criminal and civil laws related to

13  immigration. Among other things, ICE is responsible for the stops, arrests, and

14  custody of individuals believed to be in violation of civil immigration law.

15  Defendant Lyons is sued in his official capacity.

16      23.    **Defendant Rodney S. Scott** is the Commissioner of CBP, the agency

17  within DHS that is responsible for enforcing immigration laws at or close to the U.S.

18  border. In that capacity, Defendant Scott has direct authority over all CBP policies,

19  procedures, and practices related to stops, arrests, and detention. Defendant Scott is

20  sued in his official capacity.

21      24.    **Defendant Michael W. Banks** is Chief of the U.S. Border Patrol. In

22  that capacity, Defendant Banks has direct authority over all Border Patrol policies,

23  procedures, and practices related to stops, arrests, and detention. Defendant Banks is

24  sued in his official capacity.

25      25.    **Defendant Kash Patel** is Director of the U.S. Federal Bureau of

26  Investigation (FBI). In that capacity, Defendant Patel is responsible for the direction

27  and oversight of all operations of the FBI. Defendant Patel is sued in his official

28  capacity.

26.    **Defendant Pam Bondi** is the U.S. Attorney General. In that capacity, Defendant Bondi is head of the Department of Justice (DOJ) and is responsible for the direction and oversight of all operations of the DOJ, including DOJ law enforcement agencies such as the FBI, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and the Drug Enforcement Administration (DEA). Defendant Bondi is sued in her official capacity.

27.    **Defendant Ernesto Santacruz Jr.** is the Acting Field Office Director for the Los Angeles Field Office of ICE. In that capacity, Defendant Santacruz Jr. is responsible for the supervision of personnel within ICE's Enforcement and Removal Operations (ERO) in the geographic area covered by the Los Angeles Field Office, which comprises the seven counties in the District, and facilities within the District including the basement of the Los Angeles federal building, B-18. Defendant Santacruz Jr. is sued in his official capacity.

28.    **Defendant Eddy Wang** is the U.S. Homeland Security Investigations Special Agent in Charge for Los Angeles. In that capacity, Defendant is responsible for the supervision of agents within ICE's Homeland Security Investigations (HSI) in the Los Angeles Area including as to stops and arrests. Defendant Wang is sued in his official capacity.

29.    **Defendant Gregory K. Bovino** is the Chief Patrol Agent for the El Centro Sector of CBP. In that capacity, Defendant Bovino is responsible for the supervision of agents in the El Centro Sector including as to stops, arrests, and detention. Defendant Bovino is sued in his official capacity.

30.    **Defendant D. Stalnaker** is the Acting Chief Patrol Agent for the San Diego Sector of CBP. In that capacity, Defendant Stalnaker responsible for the supervision of agents in the San Diego Sector including as to stops, arrests, and detention. Defendant Stalnaker is sued in his official capacity.

31.    **Defendant Akil Davis** is the Assistant Director of the Los Angeles Office of the FBI. In that capacity, Defendant Davis is responsible for the

-11-

1    supervision of all agents in the Los Angeles Office including as to stops and arrests.

2    Defendant Davis is sued in his official capacity.

3        32.   **Defendant Bilal A. Essayli** is the U.S. Attorney for the Central District

4    of California. In that capacity, Defendant Essayli has authority over federal law

5    enforcement operations within the District, including those of the FBI, ATF, and

6    DEA. Defendant Essayli is sued in his official capacity.

7    **FACTUAL ALLEGATIONS**

8        33.   Starting on or around June 6, 2025, the federal government unleashed

9    immigration agents and officers into the streets, worksites, and neighborhoods of

10   Los Angeles and surrounding counties, creating an illegal detention and deportation

11   dragnet that shows no signs of ceasing.

12   **A.   Suspicionless Stops Based on Racial Profiling**

13       34.   The constitutional, statutory, and regulatory framework is clear about

14   the practices immigration officers must follow. The Fourth Amendment protects

15   "[t]he right of the people to be secure in their persons . . . against unreasonable

16   searches and seizures." U.S. Const. amend. IV. "Except at the border and its

17   functional equivalents," immigration agents may stop individuals in public only

18   after identifying "specific articulable facts, together with rational inferences from

19   those facts, that reasonably warrant suspicion" of a violation of immigration law.

20   *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975); *Benitez-Mendez v.*

21   *I.N.S.*, 752 F.2d 1309, 1311 (9th Cir. 1983), *amended*, 760 F.2d 907 (9th Cir. 1983);

22   *see also* 8 C.F.R. § 287.8(b)(2). Reasonable suspicion cannot be based "on broad

23   profiles which cast suspicion on entire categories of people without any

24   individualized suspicion of the particular person to be stopped." *United States v.*

25   *Rodriguez Sanchez*, 23 F.3d 1488, 1492 (9th Cir. 1994).

26       35.   Immigration officials in Southern California are not abiding by this

27   framework.

28

-12-

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

36.     One of the clearest patterns that have emerged in the raids in Southern California over the past few weeks has been stops and interrogations based on nothing but broad profiles, including on the basis of apparent race and ethnicity.[6] On information and belief, Defendants have adopted a policy and practice of conducting immigration operations in violation of their obligation to stop individuals in public only if there is reasonable suspicion.

37.     As often happens when agencies adopt a pattern and practice of racial profiling, among those most vulnerable have been individuals whose work makes them a visible target in public spaces.

38.     Day laborer pickup locations have become central sites of immigration enforcement.[7] On June 6, 2025, federal agents detained multiple day laborers outside of the Westlake Home Depot.[8] In the following days, similar raids occurred

[6] Brittany Mejia & Rachel Uranga, *Fears of racial profiling rise as Border Patrol conducts 'roving patrols,' detains U.S. Citizens*, L.A. Times (June 15, 2025), https://www.latimes.com/california/story/2025-06-15/latinos-targeted-in-raids-u-s-citizens-detained-indiscriminate-sweeps-home-depot-lots-targeted

[7] Kaitlyn Huamani, *Home Depot caught in the crosshairs of L.A. immigration raids*, L.A. Times (June 9, 2025), https://www.latimes.com/business/story/2025-06-09/home-depot-in-the-crosshairs-of-immigrations-raids (discussing how Home Depots across Southern California have been impacted by the immigration raids); Maanvi Singh, *At Home Depot, Ice raids terrorize the workers who helped build LA: "They just come and grab you"*, The Guardian (June 16, 2025), https://www.theguardian.com/us-news/2025/jun/16/home-depot-ice-raids-los-angeles; Pat Maio, *Home Depot's day laborer haven turns into immigration target across Southern California*, L.A. Daily News (June 13, 2025), https://www.dailynews.com/2025/06/13/home-depot-a-longtime-destination-for-day-laborers-part-of-symbolic-southern-california-raids/ (listing multiple Home Depot locations in Los Angeles and Orange County where day laborers have been detained).

[8] Cameron Kiszla, *Immigration agents raid several L.A. businesses, encounter protesters*, KTLA 5 (June 6, 2025), https://ktla.com/news/local-news/federal-agents-raid-home-depot-in-westlake-district/ (reporting that masked officers wearing vests emblazoned with "HSI" took individuals into custody at a Home Depot in Westlake); Helen Jeong, *45 people arrested during ICE raids at 3 downtown LA locations*, NBC 4 (June 6, 2025), Telemundo 52, *Actividad de autoridades federales en distintas areas de Los Angeles*, YouTube (June 7, 2025), https://www.youtube.com/watch?v=y-MrC5tzd3o (featuring a day laborer witness who recalled hearing someone yell "la migra, la migra!" and observed officers arrest several day laborers without presenting any documents or warrants; the entire operation reportedly lasted only 20 minutes).

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   at Home Depot stores in Whittier,[9] Huntington Park,[10] Santa Ana,[11] Downey,[12]

2   Upland,[13] Paramount,[14] Hollywood,[15] Costa Mesa,[16] Inglewood,[17] Baldwin Park,[18]

---

[9] Kaitlyn Huamani, *Home Depot caught in the crosshairs of L.A. immigration raids*, L.A. Times (June 9, 2025), https://www.latimes.com/business/story/2025-06-09/home-depot-in-the-crosshairs-of-immigrations-raids (noting an immigration raid conducted by federal agents at a Home Depot in Whittier); Maanvi Singh, *At Home Depot, Ice raids terrorize the workers who helped build LA: "They just come and grab you"*, The Guardian (June 16, 2025), https://www.theguardian.com/us-news/2025/jun/16/home-depot-ice-raids-los-angeles (same); Tracey Leong & Karla Rendon, *'Hope he comes back.' Long Beach family says father detained outside Whittier Home Depot*, NBC 4 (Jun, 14, 2025), https://www.nbclosangeles.com/news/local/long-beach-grandfather-detained-immigration/3724461/ (highlighting the emotional impact of immigration raids on a Long Beach family after a loved one was detained outside the Whittier Home Depot).

[10] Pat Maio, *supra*, note 7; Nathan Solis, et al., *What businesses are the feds targeting during L.A. immigration sweeps? Here's what we know*, L.A. Times (June 10, 2025), https://www.latimes.com/california/story/2025-06-10/ice-sweep-targets-what-we-know.

[11] Pat Maio, *supra*, note 7; Nathan Solis, *supra*, note 10.

[12] Karla Rendon, *Immigration raids reported near Downey churches*, NBC 4 (June 11, 2025), https://www.nbclosangeles.com/news/local/downey-churches-home-depot-immigration-raids/3721686/.

[13] Helen Jeong, *ICE agents fail to detain day laborers at Upland Home Depot after bystanders intervene*, NBC 4 (June 16, 2025), https://www.nbclosangeles.com/news/local/ice-agents-fail-to-detain-day-laborers-at-upland-home-depot-after-bystanders-intervene/3725645/.

[14] Pat Maio, *supra*, note 7.

[15] Brittny Mejia & Rachel Uranga, *Raid at a Home Depot in Hollywood shatters an immigrant refuge*, L.A. Times (June 20, 2025), https://www.latimes.com/california/story/2025-06-20/border-patrol-agents-arrest-street-vendors-outside-hollywood-home-depot.

[16] Pat Maio, *supra*, note 7. .

[17] NBCLA, *Federal agents detain people near Hollywood Home Depot*, YouTube (June 19, 2025), https://www.youtube.com/watch?v=sjCJYBR24gw.

[18] *Baldwin Park Among Cities Targeted in Immigration Raids Wednesday Morning*, Baldwin Park News (June 29, 2025), https://baldwinparknewsonline.com/baldwin-park-among-cities-targeted-in-immigration-raids-wednesday-morning/.

-14-

Sylmar,[19] Glendale, [20] Marina Del Rey,[21] and Los Angeles.[22]  Other day laborer
pickup sites—a 99 cents store in Hawthorne,[23] a shopping center in Los Angeles,[24] a
Walmart in Pico Rivera,[25]—have also been targeted.

39.    Car wash workers have also been heavily impacted. Car washes, in
which workers typically wash, dry, and detail vehicles outdoors, have been hit
across Southern California, including more than once. Indeed, during the initial days
of the raids, between June 7, 2025, and June 11, 2025, federal agents raided at least
nine car washes in Los Angeles and Orange Counties, with at least 25 workers and
one customer arrested.[26]

---

[19] Semantha Raquel Norris, *Federal Immigration Agents Terrorize the Northeast Valley*, San Fernando Valley Sun (June 19, 2025), https://sanfernandosun.com/2025/06/19/federal-immigration-agents-terrorize-the-northeast-valley/.

[20] 209 Drone Shots (@209_drone_shots), Instagram (June 27, 2025), https://www.instagram.com/p/DLZCN6TOHoW.

[21] NBC San Diego (@nbcsandiego), Instagram (June 28, 2025, https://www.instagram.com/p/DLP893MsqS6/

[22] Unión Del Barrio (@uniondelbarrio), Instagram (June 26, 2025), https://www.instagram.com/p/DLYF94bBUYs.

[23] Eric Villagomez (@puroslatinotx), Instagram (June 8, 2025), https://www.instagram.com/p/DKqboCRptBU.

[24] Eric Villagomez (@purolatinostv), Instagram (June 6, 2025), https://www.instagram.com/p/DKkr84sBSgX.

[25] Pico Rivera, California (@picoriveracommunity), Instagram (June 17, 2025), https://www.instagram.com/p/DLA7wZYzlKY; Fox 11 Los Angeles, *Adrian Martinez: Young man detained by ICE outside a Walmart in Pico Rivera*, YouTube (June 17, 2025), https://www.youtube.com/watch?v=iZ6J99cnYqs.

[26] Emily Baumgaertner Nunn & Anushka Patil, *Carwashes become easy targets in California's ICE raids*, N.Y. Times (June 11, 2025), https://www.nytimes.com/live/2025/06/11/us/los-angeles-protests-trump-ice?smid=url-share#carwashes-become-easy-targets-in-californias-ice-raids; Suhauna Hussain, *'They are grabbing people.' L.A. and Orange County car wash workers targeted by federal immigration raids*, L.A. Times (June 11, 2025), https://www.latimes.com/business/story/2025-06-11/l-a-orange-county-car-washes-hit-by-ice-raids.

---

-15-

40.    Additionally, farm and agricultural workers have been targeted. Between Monday, June 9, 2025, and June 13, 2025, at least 43 people were detained on farms in Ventura and Santa Barbara Counties.[27]

41.    The manner in which the foregoing raids have been conducted bears no hallmarks of reasonable suspicion: there are no indicia that agents had any specific articulable facts sufficient to justify a seizure. Instead, those who appear to be non-white have been categorically stopped, sometimes without even being asked for identification.

42.    This pattern has continued with other types of workers as well. On the first day of the raids, HSI agents executed a search warrant and made collateral arrests of workers they encountered as well.[28] The raids have also resulted in interrogation of street vendors[29] and workers at recycling centers,[30] tow yards,[31] and

---

[27] Amy Taxin & Dorany Pineda, *Immigration Raids are threatening businesses that supply America's food, farm bureaus say*, Associated Press (June 13, 2025), https://www.kvpr.org/local-news/2025-06-13/immigration-raids-are-threatening-businesses-that-supply-americas-food-farm-bureaus-say.

[28] Génesis Miranda Miramontes, *US Attorney confirms FBI, federal agencies serve a search warrant in downtown LA*, NBC 4 (June 6, 2025), https://www.nbclosangeles.com/news/local/us-attorney-confirms-fbi-federal-agencies-search-warrant-downtown-los-angeles/3717411/.

[29] Leanne Suter, *Community members try to help street vendor taken by federal agents in Ladera Heights, video shows*, ABC7 (June 27, 2025), https://abc7.com/post/community-members-try-help-street-vendor-taken-ice-ladera-heights/16863236/.

[30] *See, e.g.*, Ryan P. Cruz, *Immigration Enforcement Shakes Up Communities of Santa Barbara County*, Santa Barbara Independent (June 20, 2025), https://www.independent.com/2025/06/20/immigration-enforcement-shakes-up-communities-of-santa-barbara-county/.

[31] *See, e.g.*, Brittny Mejia, *Video shows immigration agents interrogating a Latino U.S. citizen: 'I'm American, bro!'*, L.A. Times (June 13, 2025), https://www.latimes.com/politics/story/2025-06-13/video-shows-immigration-agents-interrogating-a-latino-u-s-citizen-im-american-bro.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

packing houses.[32] Farmers markets and a swap meet have been visited,[33] as well as bus stops,[34] parks,[35] an LA Fitness gym,[36] and a church.[37]

43.     For example, on the morning of June 6, 2025, a local resident, R.H.D., and his brother-in-law were helping their relative paint his home in Orange County. Both are Latino. As they were working outside, a group of ICE and FBI agents approached and began questioning them. This questioning was not voluntary. The

---

[32] Al Rojo Vivo, *Agentes federales realizan redadas en zona industrial de California*, (June 14, 2025), https://www.youtube.com/watch?v=TXMlJqmME0U (reporting that at least two women leaving work at packing house, along with one woman's son who had gone to pick her up, were detained during an immigration raid).

[33] Josh Dubose, *Dozens of heavily armed ICE agents swarm popular L.A. County swap meet*, KTLA 5 (June 15, 2025), https://ktla.com/news/local-news/dozens-of-heavily-armed-ice-agents-swarm-popular-l-a-county-swap-meet/; Jasmine Mendez, et al., *Immigration raids continue as Trump appears to soften on targeting some workplaces*, L.A. Times (June 15, 2025), https://www.latimes.com/california/story/2025-06-15/los-angeles-immigration-raids-continue ("If you looked Hispanic in any way, they just took you."); Tim Pulliam & Amanda Palacios, *Several people taken into custody during immigration raid at Santa Fe Springs Swap Meet*, ABC 7 (June 16, 2025), https://abc7.com/post/several-people-taken-custody-during-immigration-raid-santa-fe-springs-swap-meet/16753752/; Levi Sumagaysay & Lauren Hepler, *From San Diego to the Bay Area, California Restaurants are on Edge Over Immigration Raids*, CalMatters (June 19, 2025), https://calmatters.org/economy/2025/06/california-restaurants-immigration-raids/.

[34] Sophie Flay, *ICE agents detain several people at Pasadena bus stop, conducts raids across the city*, ABC 7 (June 19, 2025), https://abc7.com/post/ice-agents-detain-2-men-pasadena-bus-stop-conduct-raids-city/16785979/.

[35] Douglas Saunders Sr., *OC attorney says she was detained in ICE raid at Santa Ana park*, Daily Journal (June 19, 2025), https://www.dailyjournal.com/articles/386228-oc-attorney-says-she-was-detained-in-ice-raid-at-santa-ana-park#:~:text=Orange%20County%20attorney%20Heidi%20M,an%20operation%20in%20the%20area (detailing how a U.S. citizen and Orange County attorney was detained by ICE agents while walking at a park.)

[36] Ricardo Tovar, *LA County Officials Say ICE Agents Targeted Individuals at Churches*, KSBW8 (June 12, 2025), https://www.ksbw.com/article/la-county-ice-agents-targeted-individuals-church/65039805 ("A council member confirmed that ICE conducted raids at a Home Depot, LA Fitness, and inside and outside of two churches in the city."); Union del Barrio (@uniondelbarrio), Instagram (June 11, 2025), https://www.instagram.com/p/DKxKR5AIOUq/.

[37] Vicent Medina, *Tensions high as immigration sweeps reach Downey churches*, The Downey Patriot (June 16, 2025), https://www.thedowneypatriot.com/articles/tensions-high-as-immigration-sweeps-reach-downey-churches.

-17-

1    agents surrounded the man and prevented him from walking away before they knew

2    who he was. There were several people at nearby residences who appeared

3    Caucasian and were also working outside in their yards, but on information and

4    belief, they were not questioned or detained.

5        44.    At a Home Depot in Santa Ana on June 10, 2025, Junior Ortega

6    recounted that agents arrived in unmarked vehicles and began detaining individuals

7    at gunpoint.[38] An agent approached him, pointed a gun and then demanded to see

8    his identification. He complied, fearing for his safety. After inspecting the

9    identification, the agent released Junior without ever providing a reason for the stop.

10        45.    At the Downey Memorial Christian Church on June 11, 2025, a witness

11    recalled that "the gentleman who they took was dark-skinned and only spoke

12    Spanish. They don't care if you have papers, as long as you look like what they want

13    you to look like, they'll take you."[39] No reason for the stop was provided.

14        46.    At a military-style raid at the Santa Fe Springs swap meet on June 14,

15    2025, 60 heavily armed agents were present.[40] One witness reported that "if you

16    looked Hispanic in any way, they just took you."[41] Another witness described seeing

17    agents pull people from the bathrooms and demand identification from everyone

18    they encountered.[42]

19        47.    It is illegal for Defendants to stop anyone—U.S. citizens or not—

20    without reasonable suspicion. But predictably, in addition to noncitizens,

21    _____

22    [38] *Raids in Southern California rattle immigrant communities – including those in*
      *the US legally*, The Tribune (June 11, 2025), https://tribtown.com/2025/06/11/raids-
23    in-southern-california-rattle-immigrant-communities-including-those-in-the-us-
      legally/.

24    [39] Travis Schlepp, *ICE agents make arrest at Los Angeles area church*, KTLA 5
      (June 11, 2025), https://ktla.com/news/local-news/ice-agents-make-arrest-at-los-
25    angeles-area-
      church/#:~:text=Community%20members%20and%20religious%20leaders,in%20th
26    e%20church%20parking%20lot.

27    [40] Josh Dubose, *supra*, note 33.

      [41] *Id.*
28    [42] *Id.*

-18-

1  Defendants' practices have led to numerous U.S. citizens who work, reside, or just

2  happen to be in neighborhoods with large numbers of people of color also getting

3  swept up.

4      48.    On June 14, 2025, Heidi Plummer, a U.S. citizen, was walking through

5  a park in Santa Ana when she got caught up in an immigration raid occurring there.

6  She was handcuffed, placed in a vehicle with others, and taken to an ICE station in

7  Santa Ana where she was kept for an hour and a half before being released.[43]

8      49.    Additionally, more recently, Andrea Velez, a U.S. citizen, was being

9  dropped off at work in downtown Los Angeles when federal agents grabbed her

10 without explanation. Her mother, who witnessed the incident, described it as looking

11 like "they'e kidnapping [her]." Witnesses said agents never asked Andrea for

12 identification. No justification was provided. Her mother remarked, "the only thing

13 wrong with her . . . was the color of her skin."[44]

14 **B.    A Show of Force: Intimidation, Violence, and Anonymity**

15     50.    While the government may describe the encounters agents and officers

16 are having with individuals as consensual, they are far from that. A stop, even brief,

17 must be supported by reasonable suspicion if "a reasonable person would [believe]

18 that he was not free to leave." *See United States v. Mendenhall*, 446 U.S. 544, 554

19 (1980).

20     51.    In a typical encounter, agents and officers approach suddenly and in

21 large numbers. Typically dressed in military style or SWAT clothing, heavily armed

22 with weapons displayed, and masked, their vests may display only a generic

23 "POLICE" patch (if they display anything at all). For example, an estimated 60 ICE

24

25 [43] Douglas Saunders Sr., *OC Attorney Says She Was Detained in ICE Raid at Santa
   Ana Park*, Daily Journal (June 19, 2025),

26 https://www.dailyjournal.com/articles/386228-oc-attorney-says-she-was-detained-
   in-ice-raid-at-santa-ana-park.

27 [44] Dani Anguiano, *US Citizen Arrested During ICE Raid in What Family Describes
   as 'Kidnapping,'* The Guardian (June 26, 2025), https://www.theguardian.com/us-

28 news/2025/jun/26/immigration-ice-raid-andrea-velez.

-19-

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

1  agents dressed in military tactical gear and carrying rifles raided a swap meet in Los

2  Angeles on June 15, 2025[45]:



*Dozens of heavily armed, masked ICE agents seen raiding a Santa Fe Springs Swap Meet on June 14, 2025. (OnSceneTV)*

52.     This grossly disproportionate display of force is enough to make any

person fear for their safety and feel compelled to comply. Moreover, agents

typically position themselves around individuals, aggressively engage them, and/or

bark commands, making it nearly impossible for individuals to decline to answer

their questions.

53.     When individuals have tried to avoid an encounter with agents and

officers, they have been chased and pushed to the ground, sometimes even beaten,

and then taken away. Such seizures look less like lawful arrests and more like

brazen, midday kidnappings.

54.     These incidents have been widely reported in the news, further

contributing to the climate of intimidation and fear.[46]

---

[45] Josh DuBose, *supra*, note 33.

[46] Alicia A. Caldwell, *Stun grenades, armored trucks in ICE raids spur tensions*,
Bloomberg (June 6, 2025), https://www.bloomberg.com/news/articles/2025-06-
06/rifles-stun-grenades-armored-trucks-in-ice-raids-spur-tensions?srnd=undefined.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

55.   For example, in Westchester on June 8, 2025, several armed agents in camouflage uniforms and helmets tackled a fruit vendor on a corner, pinning him to the ground.[47] A witness recalled: "They had him pressed down on the ground. They had weapons drawn so no one could get near to help him."[48]

56.   At a hand car wash in Culver City also on June 8, 2025, agents dressed in either camouflaged fatigues or plainclothes arrived in unmarked vehicles.[49] A witness, waiting for her car to be washed, recalled seeing "an agent carrying an assault rifle . . . chasing after a customer, pursuing him across a four-lane road," while other customers screamed "Don't shoot!"[50] The federal agent caught the man and took him into custody.[51]

57.   At a Home Depot in Santa Ana on June 9, 2025, a U.S. asylum seeker from Peru was detained and later released upon producing documents. He recalls that "[the agents] arrived in an aggressive manner," pointing guns, as if to "rob them."[52]

58.   At the Downey Memorial Christian Church on June 11, 2025, three SUVs with tinted windows pulled up to the church.[53] Six agents with neck gaiters, hats, and sunglasses, rushed out of unmarked vehicles. Armed, some carrying

---

[47] L.A. Times, *Unidentified agents detain L.A. fruit vendor: 'Like he'd been kidnapped'*, L.A. Times (June 12, 2025), https://www.latimes.com/00000197-61d1-d4a7-addf-f1d59c1d0000-123.

[48] *Id.*

[49] Dani Anguiano, et al., *'Snatching off the streets': Ice targets churches, car washes and workplaces*, The Guardian (June 12, 2025), https://www.theguardian.com/us-news/2025/jun/12/los-angeles-ice-raids.

[50] *Id.*

[51] *Id.*

[52] Hetty Change & Jonathon Lloyd, *Day laborers targeted in raid at Santa Ana Home Depot, OC officials say*, NBC 4 (June 10, 2025), https://www.nbclosangeles.com/news/local/day-laborers-santa-ana-home-depot-immigration-raid/3720487.

[53] Jesus Jiménez & Emily Baumgaertner Nunn, *Church Leaders Shaken After a Man was Detained in Their Parking Lot*, N.Y. Times (June 11, 2025), https://www.nytimes.com/2025/06/11/us/la-protests-ice-raids-church-arrest.html.

-21-

1   assault rifles, they detained a man in the parking lot.[54] The agents refused to identify

2   which agency they worked for and did not provide a warrant.[55] When a senior pastor

3   of the church tried to communicate in Spanish with the man being detained, an agent

4   pointed a gun at her.[56]

5        59.    Recently, in Santa Ana, agents were observed on video repeatedly

6   beating Narciso Barranco, father to three sons who have served in the U.S. Marines,

7   on the head and neck, even though Barranco was already on the ground.[57]

8        60.    Two days later at a Home Depot in Ladera Heights, eight heavily

9   armed masked men surrounded a young woman street vendor clinging to a tree.

10  After they had arrested the woman and were driving away, they threw three tear gas

11  canisters at the small group of community members bearing witness to the arrest.

12  The men refused to identify themselves.[58]

13       61.    When people refuse to answer questions and try to leave, agents

14  respond with violence. In one widely circulated social media video, a driver refused

15  to answer questions and tried to drive away. The undercover agent pointed his

16

17

18  _____

18  [54] Jesus Jiménez & Emily Baumgaertner Nunn, *Church Leaders Shaken After a Man
19  was Detained in Their Parking Lot*, N.Y. Times (June 11, 2025),
    https://www.nytimes.com/2025/06/11/us/la-protests-ice-raids-church-arrest.html.

20  [55] *Id.*; Travis Schlepp, *ICE agents make arrest at Los Angeles area church*, KTLA 5
    (June 11, 2025), https://ktla.com/news/local-news/ice-agents-make-arrest-at-los-
21  angeles-area-
    church/#:~:text=Community%20members%20and%20religious%20leaders,in%20th
22  e%20church%20parking%20lot.

23  [56] Jesus Jiménez & Emily Baumgaertner Nunn, *supra*, note 54.

24  [57] Obed Manuel, *U.S. Marine veteran says father's violent arrest by immigration
    agents was 'inhumane'*, NPR (June 27, 2025), https://www.npr.org/2025/06/27/nx-
    s1-5442653/father-of-u-s-marines-violently-arrested-by-
25  ice#:~:text=Father%20of%20U.S.%20Marines%20violently%20arrested%20by%20
    ICE&text=The%20scene%20in%20Santa%20Ana,when%20the%20agent%20strike
26  s%20him

27  [58] Leanne Suter, *Community members try to help street vendor taken by federal
    agents in Ladera Heights, video shows*, ABC 7 (June 27, 2025),
28  https://abc7.com/post/community-members-try-help-street-vendor-taken-ice-ladera-
    heights/16863236/.

-22-

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

firearm at the driver and said "I'll [expletive] shoot you," before being instructed by another agent to let him go.[59]

62.    Agents and officers have not only employed these tactics with alarming regularity, but they have also refused to identify themselves or what agency they are with when asked. Such refusal to identify themselves endangers public safety,[60] frustrates any efforts at accountability, including in this case, and ultimately normalizes lawless and dangerous conduct behind the shield of anonymity.

## C.    Warrantless Arrests Without an Individualized Determination of Flight Risk

63.    Congress enacted a strong preference that immigration arrests be based on warrants. *See Arizona v. U.S.*, 567 U.S. 387, 407–08 (2012). The Immigration and Nationality Act thus provides immigration agents with only limited authority to conduct warrantless arrests. 8 U.S.C. § 1357(a)(2). Federal regulations track the strict limitations on warrantless arrests. *See* 8 C.F.R. § 287.8(c)(2)(ii).

64.    An immigration officer can make an arrest without a warrant only if they have probable cause to believe that the individual "is in the United States in violation of any [immigration] law or regulation," *and* (2) the individual "is likely to escape before a warrant can be obtained" for his arrest. § 1357(a)(2); § 287.8(c)(2)(ii) (same); *Tejeda-Mata v. INS*, 626 F.2d 721, 725 (9th Cir. 1980). The requirement that officers establish probable cause of flight risk before conducting a warrantless arrest requires a particularized finding of likelihood of escape. *Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir. 1995).

---

[59] Benicia Garcia (@ b_b_b_beniandthejets), Instagram (June 26, 2025), https://www.instagram.com/p/DLXk-kSRRy3/.

[60] *See, e.g.*, Lily Dallow, *L.A. man with previous human smuggling arrest may have been impersonating ICE agent*, KTLA 5 (June 27, 2025), https://ktla.com/news/local-news/l-a-man-arrested-in-huntington-park-for-possibly-impersonating-federal-agent/; José Olivares, *US sees spate of arrests of civilians impersonating Ice officers*, The Guardian (June 28, 2025), https://www.theguardian.com/us-news/2025/jun/28/civilians-impersonating-ice-officers.

-23-

65.    Defendants have a policy and practice of effectuating warrantless arrests without making an individualized flight risk determination.

66.    As one witness to a raid at a Home Depot recounted, the officers "just grab[] people" and "don't ask questions."[61]

67.    For example, on June 8, 2025, Jesus Cruz Uitz, a member of CLEAN Carwash Worker Center, which is part of Plaintiff LAWCN, was working at the car wash he has worked at for approximately 8 years when masked agents arrived. Mr. Cruz Uitz stayed where he was working but an officer angrily approached him, grabbed him by the arms, and ultimately arrested him. The officer did not have a warrant to arrest Mr. Cruz Uitz and did not ask him any questions to assess his individualized flight risk.

68.    On June 9, 2025, a resident, M.N., was working at the same car wash when agents arrested him without a warrant and without asking him any questions relevant to assess his flight risk.

69.    And on June 9, 2025, Jose Valdez Rios was at Home Depot when agents arrested him without a warrant and without asking him any questions relevant to assess his flight risk. Agents never asked him about his job, family, community, or other ties to the United States.

**D.    Arrests Without Identification of Authority or Reason**

70.    Regulations also require immigration officers to (1) identify themselves "as an immigration officer who is authorized to execute an arrest"; and (2) "[s]tate that the person is under arrest and the reason for the arrest," as soon as it is practical and safe to do so. 8 C.F.R. § 287.8(c)(2)(iii).

71.    Defendants have a policy and practice of failing to identify themselves or explain the basis for an arrest upon taking someone into custody. As noted above,

---

[61] Arelis R. Hernández, *'La migra!': Day laborers recount ICE raid outside Los Angeles Home Depot*, The Washington Post (June 8, 2025) https://www.washingtonpost.com/immigration/2025/06/08/ice-los-angeles-home-depot-raid-trump/.

-24-

1 agents and officers have often shown up masked, without any visible badges or

2 insignia indicating what agency they are with, and have refused to identify

3 themselves when asked. This has extended through the time of arrest, with

4 individuals left in the dark about who they are interacting with or why they are

5 under arrest.

6 **E.    Conditions at B-18 and the Denial of Access to Counsel**

7       72.    James Pendergraph, former Executive Director of ICE Office of State

8 and Local Coordination once said, "If you don't have enough evidence to charge

9 someone criminally but you think he's illegal, we can make him disappear."[62] That

10 ethos is animating Defendants' Los Angeles operations today.

11      73.    Individuals detained in immigration operations have a right to counsel

12 that is rooted in the Due Process Clause of the Fifth Amendment. *Usubakunov v.*

13 *Garland*, 16 F.4th 1299, 1304 (9th Cir. 2021); *Biwot v. Gonzales*, 403 F.3d 1094,

14 1098 (9th Cir. 2005); *see also Torres v. United States Dep't of Homeland Sec.*, 411

15 F. Supp. 3d 1036, 1060-61 (C.D. Cal. 2019). When the government detains

16 individuals as part of immigration enforcement efforts, it cannot impose restrictions

17 on access to attorneys that undermine the opportunity to obtain counsel or

18 communicate with retained counsel. *See Orantes-Hernandez v. Thornburgh*, 919

19 F.2d 549, 554, 565 (9th Cir. 1990); *see also Usubakunov*, 16 F.4th at 1300

20 ("Navigating the asylum system with an attorney is hard enough; navigating it

21 without an attorney is a Herculean task."); *Comm. of Cent. Am. Refugees v. INS*, 795

22 F.2d 1434, 1439 (9th Cir. 1986) (recognizing that impediments to communication,

23 especially in connection with a difficult-to-access facility, can constitute a

24

25

26 ───────────────
[62] Debbie Cenziper et. al, *Under Trump, ICE aggressively recruited sheriffs as*

27 *partners to question and detain undocumented immigrants*, The Washington Post (Nov. 23, 2021),

28 https://www.washingtonpost.com/investigations/interactive/2021/trump-ice-sheriffs-immigrants-287g/.

-25-

"constitutional deprivation" where they obstruct an "established on-going attorney-client relationship.").

74.    Further, civil detainees have "a right to adequate food, shelter, clothing, and medical care." *Youngberg v. Romeo*, 457 U.S. 307 (1982). Their conditions of confinement become unconstitutional if they "amount to punishment," *Bell v. Wolfish*, 441 U.S. 520, 535 (1979), in other words, when "the harm or disability caused by the government's action . . . significantly exceed[s], or [is] independent of, the inherent discomforts of confinement[.]" *Demery v. Arpaio*, 378 F.3d 1020, 1030 (9th Cir. 2004). During the ongoing raids, and as an integral part of the policy and pattern of unlawful stops and arrests described above, Defendants have been taking individuals who are swept up en masse to the basement of the federal building at 300 North Los Angeles Street in Los Angeles, commonly referred to as "B-18." B-18 is a facility for immigrant detainees designed to hold a limited number of individuals temporarily so they can be processed and released, or processed and transported to a long-term detention facility. It does not have beds, showers, or medical facilities.

75.    B-18 was previously the subject of litigation in this District, and a lawsuit over the inhumane treatment of detainees there resulted in a 2009 settlement agreement requiring that individuals not be held at B-18 for more than 12 hours. *See Castellano v. Napolitano*, No. 2:09-CV-02281 (C.D. Cal. Sept. 16, 2009). Other provisions of the agreement required that detainees at B-18 be allowed to "visit with current or prospective legal representatives and their legal assistants seven days a week, including holidays, for eight hours per day on regular business days (Monday through Friday), and four hours per day on weekends and holidays."

76.    The settlement agreement has since expired. But under the immense pressure to receive individuals arrested in recent weeks, the unlawful conditions that led to the settlement more than a decade ago are recurring today. Individuals taken to B-18 are being kept in overcrowded, inhumane conditions. They are held in small

-26-

windowless rooms with dozens or more other detainees, in extremely cramped quarters. Some rooms are so cramped that detainees cannot sit, let alone lie down, for hours at a time.

77.     As of June 20, 2025, upon information and belief, over 300 individuals were being held at B-18. They are expected to sleep in cold rooms on floors without cots, bedding, or blankets. Some are even forced to sleep in tents outside.

78.     When asked why detainees have been forced to sleep in such cramped conditions, an officer at B-18 explained that B-18 is meant to be a processing center, not a detention facility. Historically, processing of individuals in removal proceedings would result in the release of an individual detained pending their next court hearing or, barring release, immediate transfer to a detention facility. But B-18 is not being used that way today, and individuals are being held there far longer than 12 hours, often for days on end.

79.     Detainees are also routinely deprived of food. Some have not even been given water other than what comes out of the combined sink and toilet in the group detention room. And upon asking for food, detainees have been told repeatedly that the facility has run out.

80.     Detainees are routinely denied access to necessary medical care and medications, too. Individuals with conditions that require consistent medications and treatment are not given any medical attention, even when that information is brought to the attention of the officers on duty. The facility cannot even provide detainees with basic hygiene. Individuals who are menstruating have had to wait long periods before receiving menstrual pads, if they receive them at all.

81.     To make matters worse—and, indeed, to keep the true nature and scope of Defendants' constitutional violations, including those related to stops and arrest, hidden from the outside world—individuals detained at B-18 have had their access to prospective or retained counsel severely and unconstitutionally restricted.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

82.    On June 6, 2025, attorneys and legal representatives from organizational Plaintiffs CHIRLA and ImmDef attempted to gain access to B-18 to advise detainees of their rights and assess their eligibility for relief, but they were not permitted to enter.

83.    When they returned to B-18 the next morning, attorneys identified a handwritten notice on the door of the family and attorney entrance at B-18 indicating that they would not permit any visits that day. Federal officers then deployed an unknown chemical agent against family members, attorneys, and representatives, including CHIRLA and ImmDef legal staff, who were peacefully requesting access to detained individuals. The chemical agent that federal agents sprayed caused everyone to cough and inflicted a burning sensation in the eyes, nose, and throat.

84.    That same morning, numerous unmarked white vans quickly departed B-18 with a group of detainees. CHIRLA and ImmDef attorneys and representatives attempted to loudly share know your rights information with the detainees in the vans. To prevent the detainees from hearing their rights, and therefore exercising them, the federal agents blasted their horns to drown them out.

85.    On June 7, 2025, another ImmDef attorney arrived at B-18 to find a handwritten notice that the facility was closed to visitation, as shown below:[63]

---

[63] Photos taken by LARRN attorney Helen Boyer Saturday June 7, 2025 at approx 8:50 AM.

-28-

 

86.    As a result, attorneys and family members were unable to access B-18 the entire weekend during the first few days of the raids.

87.    On the rare occasions when attorneys and family members have been allowed access to their clients or loved ones, they have been made to wait hours at a time to see them, and the resulting visits have been limited to a mere five to 10 minutes. Detention officers screen the very limited phone calls that detainees are permitted to make, and phone calls cannot be used for confidential legal communications.

88.    In many cases, attorneys and family members have been unable to determine whether a particular individual is even detained at B-18, or whether they have been transferred to another facility. B-18 officers have refused to provide clear answers to questions about detainees' whereabouts, or refused to answer questions altogether. ICE's online locator, which provides information about detainees' location, is not updated in a timely manner.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

89. The severe access restrictions have persisted as Defendants' mass arrests continue to occur across Southern California.

90. On June 16, 2025, ImmDef attorneys, as well as Congressman Jimmy Gomez, arrived at B-18 around 3:00 p.m. on a day when B-18 was purportedly open for visiting between 8:00 a.m. to 4:00 p.m. But they were denied access, along with family members who had been instructed to go to B-18 to pick up their loved ones' possessions.

91. On June 19, 2025, an ImmDef attorney arrived at B-18 to meet with detainees, including one who was scheduled for a chemotherapy appointment the next day. Despite showing a doctor's note confirming the appointment and specifying that missing the appointment would be detrimental to the detainee's health, the guards repeatedly would not allow the attorney to meet with the ill detainee. One officer told the attorney that he had no way to find the individual because hundreds of people were detained in the facility.

92. B-18 officers have and continue to consistently close the doors to detainees' prospective or retained counsel at unexpected and unexplained times.

93. The use of B-18 as a makeshift, long-term detention center for hundreds of individuals has and continues to cause significant, ongoing harm. Defendants have intentionally restricted detainees' access to those who may be able to intervene on their behalf at a critical time when they are likely to face imminent government action in their case. Indeed, one of ImmDef's clients who has been granted asylum and who should never have been arrested was picked up at a Home Depot looking for work. He would have disappeared into the detention system if not for an ImmDef attorney's last minute intervention at B-18 on June 19, 2025.

94. In fact, some individuals have accepted voluntary departure from this country under 8 U.S.C. § 1229c(a)(1), without having had the opportunity to consult with counsel, even though due process requires that any waiver of a right to a hearing be knowing and voluntary. *See, e.g., United States v. Ramos*, 623 F.3d 672,

-30-

682–83 (9th Cir. 2010). Upon information and belief, the inhumane conditions at B-18 create a coercive environment that pressures some of those detained individuals to take voluntary departure without first consulting with counsel and despite potential deportation relief because they fear lengthy detention in deplorable conditions.

95.    Combined with the continued deplorable conditions at B-18—lack of food, medical care, basic hygiene, and overcrowding—B-18 is a disaster continuing to happen. And until these issues are resolved, the true scale of the legal violations Defendants are engaged in will remain unknown.

**F.    Defendants' Pattern of Illegal Conduct Is Officially-Sanctioned**

96.    Defendants' unlawful stops, arrests, denial of access to counsel and conditions at B-18 are the predictable result of directives from top officials to agents and officers.

97.    In January, the administration gave ICE field offices an arrest quota of 75 arrests a day.[64] As offices attempted to carry out such a mandate, workplace raids increased,[65] ICE check-ins became traps,[66] and courthouse arrests surged.[67]

98.    Also, to help meet the quota, the administration granted agencies outside of DHS immigration enforcement powers.[68]

---

[64] Nick Miroff & Maria Sacchetti, *Trump Officials Issue Quotas to ICE Officers to Ramp Up Arrests*, The Washington Post (last updated Jan. 26, 2025), https://www.washingtonpost.com/immigration/2025/01/26/ice-arrests-raids-trump-quota/.

[65] Marianne LeVine, et al., *ICE is Arresting Migrants in Worksite Raids. Employers are Largely Escaping Charges*, The Washington Post (June 30, 2025), https://www.washingtonpost.com/immigration/2025/06/30/ice-raids-arrests-workers-companies/ (noting an April announcement by ICE officials that the agency had arrested more than 1,000 workers during Trump's first 100 days and collecting stories of workplace raids across the country); Mark Moran, *ICE Detains More than 530 People in Workplace 'Raids' in U.S. Northeast*, United Press International (Jan. 23, 2025), https://www.upi.com/Top_News/US/2025/01/23/ice-details-538-ion-workplace-raids/7811737692376/.

[66] Maanvi Singh & Will Craft, *As deportations ramp up, immigrants increasingly fear Ice check-ins: 'All bets are off'*, The Guardian (Apr. 6, 2025), https://www.theguardian.com/us-news/2025/apr/06/deportations-immigrants-ice-trump; Nidia Cavazos, *Immigrants at ICE check-ins detained, held in basement of federal building in Los Angeles, some overnight*, CBS News (June 7, 2025), https://www.cbsnews.com/news/immigrants-at-ice-check-ins-detained-and-held-in-basement-of-federal-building-in-los-angeles/.

[67] Julia Ainsley, *Trump admin tells immigration judges to dismiss cases in tactic to speed up arrests*, NBC News (June 11, 2025), https://www.nbcnews.com/politics/national-security/trump-admin-tells-immigration-judges-dismiss-cases-tactic-speed-arrest-rcna212138; Luis Ferré-Sadurní, *Inside a Courthouse, Chaos and Tears as Trump Accelerates Deportations*, N.Y. Times (June 12, 2025), https://www.nytimes.com/2025/06/12/nyregion/immigration-courthouse-arrests-trump-deportation.html; Ximena Bustillo, *ICE's novel strategy allows for more arrests from inside immigration courts*, NPR (June 12, 2025), https://www.npr.org/2025/06/12/nx-s1-5409403/trump-immigration-courts-arrests; Martha Bellisle, et al., *Immigration officers intensify arrests in courthouse hallways on a fast track to deportation*, AP News (June 11, 2025), https://apnews.com/article/immigration-court-arrests-ice-deportation-99d822cdc93ae7dc26026c27895d5ea1 (describing new tactic in which immigration judges grant a government motions dismiss deportation proceedings, enabling ICE officers—often masked—to arrest noncitizens immediately outside in the hallway and place them on an expedited path to removal).

[68] Press Release, DHS, *Statement from a DHS Spokesperson on Directive Expanding Immigration Law Enforcement to Some Department of Justice Officials* (Jan. 23, 2025), https://www.dhs.gov/news/2025/01/23/statement-dhs-spokesperson-directive-expanding-immigration-law-enforcement.

-32-

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

99.    Meanwhile, the administration began systematically dismantling internal accountability mechanisms and restraints on immigration agents' and officers' conduct. The administration shut down multiple oversight agencies (retaining only a version of their former selves after the administration was sued).[69] Investigations were closed.[70] Officers no longer had to abide by enforcement priorities.[71] Long-standing guidance restricting enforcement operations in sensitive locations—schools, hospitals, places of worship and public demonstrations—was rescinded.[72]

100.    But these changes were not enough, according to the administration. In late May, Deputy Chief of Staff Stephen Miller summoned 25 ERO Field Office Directors and 25 HSI Special Agents to a meeting to demand that "everybody" be targeted.[73] Under Miller's directive, agents no longer needed to develop vetted target

---

[69] Nicolae Viorel Butler, *Court Forces DHS to Preserve Immigrant Rights Offices*, Migrant Insider (May 27, 2025), https://migrantinsider.com/p/court-forces-dhs-to-preserve-immigrant?utm_source=CLINIC%2BMail&utm_campaign=f9e1ee6428-tips-6-2-25&utm_medium=email&utm_term=0_-663ab9ab77-284225192"https://migrantinsider.com/p/court-forces-dhs-to-preserve-immigrant?utm_source=CLINIC%2BMail&utm_campaign=f9e1ee6428-tips-6-2-25&utm_medium=email&utm_term=0_-663ab9ab77-284225192.

[70] Press Release, Government Accountability Project, *DHS Halted 500+ Civil Rights Investigations When It Shut Down Oversight Office, Whistleblowers Say* (May 15, 2025), https://whistleblower.org/press-release/dhs-halted-500-civil-rights-investigations-when-it-shut-down-oversight-office-whistleblowers-say/.

[71] Press Release, DHS, Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole (Jan. 21, 2025), https://www.dhs.gov/news/2025/01/21/statement-dhs-spokesperson-directives-expanding-law-enforcement-and-ending-abuse (noting a directive "rescind[ing] the Biden Administration's guidelines for . . . enforcement actions that thwart law enforcement in or near so-called "sensitive" areas).

[72] Marisa Kabas, *ICE agents get green light to make unjustified warrantless arrests*, The Handbasket (June 12, 2025), https://www.thehandbasket.co/p/ice-warrantless-arrests-castanon-nava.

[73] Stuard Anderson, *Stephen Miller's Order Likely Sparked Immigration Raids and Protests*, Forbes, Jun. 9, 2025, https://www.forbes.com/sites/stuartanderson/2025/06/09/stephen-millers-order-likely-sparked-immigration-arrests-and-protests/.

-33-

lists of individuals suspected of being in the United States unlawfully.[74] ICE agents were instructed in an email to "turn the creativity knob up to 11" and aggressively "push the envelope," including by pursuing "collaterals"—individuals that by definition would not have warrants.[75] As another e-mail put it: "If it involves handcuffs on wrists, it's probably worth pursuing."[76]

101.    The administration set a new arrest quota of 3,000 arrests per day and reportedly threatened job consequences if officials failed to meet arrest quotas.[77]

102.    The overriding message to agents and officers carrying out immigration operations on the ground was to prioritize arrest numbers, regardless of the law. Agents and officers were granted sweeping discretion to achieve this goal.

## G.    Defendant Agencies Have a History of Unconstitutional and Unlawful Conduct

103.    The agencies involved in the Los Angeles area immigration raids include DHS and its components, ICE ERO, ICE HSI, and the U.S. Border Patrol, as well as DOJ law enforcement agencies including the FBI[78] and others (including

---

[74] Elizabeth Findell, s*upra* note 2 (reporting that agents were no longer required to develop target lists of noncitizens unlawfully present in the U.S., marking a shift from longstanding policy).

[75] José Olivares, *US immigration officers ordered to arrest more people even without warrants*, The Guardian (June 4, 2025), https://www.theguardian.com/us-news/2025/jun/04/immigration-officials-increased-detentions-collateral-arrests.

[76] José Olivares, *US immigration officers ordered to arrest more people even without warrants*, The Guardian, (June 4, 2025), https://www.theguardian.com/us-news/2025/jun/04/immigration-officials-increased-detentions-collateral-arrests.

[77] Elizabeth Findell, et al., s*upra* note 2; Julia Ainsley, et al., *A sweeping new ICE operation shows how Trump's focus on immigration is reshaping federal law enforcement,* NBC News (June 4, 2025), https://www.nbcnews.com/politics/justice-department/ice-operation-trump-focus-immigration-reshape-federal-law-enforcement-rcna193494.

[78] Cameron Kiszla, *Immigration agents raid several L.A. businesses, encounter protestors*, KTLA (June 6, 2025), https://ktla.com/news/local-news/federal-agents-raid-home-depot-in-westlake-district/ ("The FBI confirmed to KTLA that it is participating in the HSI raids, not just in Los Angeles but nationwide, 'as directed by the Attorney General. As we have been asked to do, we are sending Agents to participate in these immigration enforcement efforts,' the statement said.").

-34-

ATF[79] and DEA).[80] A number of these agencies have a history of engaging in unconstitutional and unlawful stops and arrests.

104.    For example, the U.S. Border Patrol has a documented history of Fourth Amendment violations in the U.S. interior: U.S. Border Patrol agents have relied on perceived race or ethnicity to select who to stop, conducted suspicionless stops, executed warrantless home raids, and carried out illegal worksite operations. Courts have repeatedly intervened to curb these practices. *See LaDuke v. Nelson*, 762 F.2d 1318 (9th Cir. 1985), *amended*, 796 F.2d 309 (9th Cir. 1986), *affirmed*, 799 F.2d 547, 551 (9th Cir. 1986) (upholding permanent classwide injunction against warrantless raids on farmworker housing in Washington, Idaho, and Montana); *International Molders' and Allied Workers' Local Union No. 164 v. Nelson*, 643 F. Supp. 884, 887-89, 899-901 (N.D. Cal. 1986) (granting preliminary injunction barring the now-defunct Livermore Border Patrol Sector from replicating the unlawful practices it had used in "Operation Jobs," a weeklong series of about 50 workplace raids across Northern California where agents stopped workers for questioning without reasonable suspicion and arrested people who refused to answer questions, including U.S. citizens).

105.    Most recently, the El Centro Sector of the U.S. Border Patrol, one of the key participants in the raids being challenged in this suit, was the focus of a suit filed in the Eastern District of California over a Kern County operation called "Operation Return to Sender." The tactics challenged here—including widespread racial profiling, suspicionless stops, and warrantless arrests without determination of

---

[79] Press Release, ICE, *ICE Los Angeles announces 239 illegal aliens were arrested during recent operation* (May 14, 2025), https://www.ice.gov/news/releases/ice-los-angeles-announces-239-illegal-aliens-were-arrested-during-recent-operation (confirming ATF's involvement in ICE operations in the Los Angeles area).

[80] *Id*. (confirming DEA's involvement in ICE operations in the Los Angeles area).

-35-

flight risk—bear the unmistakable hallmarks of "Operation Return to Sender."[81] Like the raids challenged here, "Operation Return to Sender" spread through agricultural communities and also targeted day laborer pick up sites. On April 29, 2025, the court granted a preliminary injunction barring the U.S. Border Patrol from engaging in these unlawful practices. *United Farm Workers v. Noem*, No. 1:25-CV-00246 JLT CDB, 2025 WL 1235525, at *1 (E.D. Cal. Apr. 29, 2025). The ruling recognizes that, in the Ninth Circuit, "Hispanic appearance is of little or no use in determining which particular individuals among the vast Hispanic populace should be stopped." *Id.* at *46 (quoting *United States v. Montero-Camargo*, 208 F.3d 1122, 1134 (9th Cir. 2000)). And the El Centro Sector Chief Bovino, who led "Operation Return to Sender," is now at the helm of operations in the Los Angeles area, inviting him to replicate his tactics in this District.

106.    ICE, which typically handles immigration enforcement in the interior and "manag[es] all aspects of the immigration enforcement process, including the identification, arrest, detention, and removal of [noncitizens],"[82] has likewise been found to violate the Fourth Amendment, statutory, and regulatory rights of individuals it encounters in the field.

107.    For instance, in 2008, ICE HSI agents conducted a workplace raid in Van Nuys, California. Agents executed a search warrant but also engaged in detentive stops of workers without individualized reasonable suspicion. The Ninth Circuit eventually ruled that this was unlawful and invalidated the ensuing removal proceedings. *Perez Cruz v. Barr*, 926 F.3d 1128, 1137 (9th Cir. 2019) (citing 8 C.F.R. § 287.8(b)).

---

[81] Sergio Olmos & Wendy Fry, *Border Patrol said it targeted known criminals in Kern County.  But it had no record of 77 of 78 arrestees*, CalMatters (Apr. 8, 2025), https://calmatters.org/economy/2025/04/border-patrol-records-kern-county/.

[82] *Enforcement and Removal Operations*, U.S. Immigration & Customs Enforcement, *https://www.ice.gov/about-ice/ero* (last visited June 30, 2025).

108.   In *Nava v. DHS*, a plaintiff class in Chicago challenged a pattern and practice of ICE conducting warrantless arrests without making required determinations under 8 U.S.C. § 1357. *Nava v. Dep't of Homeland Sec.*, 435 F. Supp. 3d 880, 885 (N.D. Ill. 2020). The case resulted in a settlement that included a nationwide policy about warrantless arrests and vehicle stops.[83] In June 2025, despite a pending motion to enforce the settlement agreement and motion to extend the settlement agreement, ICE terminated its policy under the settlement that required officers to document the circumstances of warrantless arrests and vehicle stops.[84]

109.   Meanwhile, in this District, in May 2024, plaintiffs secured a summary judgment order in *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 982 (C.D. Cal. 2024), holding unlawful ICE's practice of entering onto the curtilage of homes during "knock and talks" for the purpose of carrying out arrests without a judicial warrant. Public reports confirm that in late May, Defendant Essayli, instead directed DOJ law enforcement agencies to take over door knocking tasks.[85]

110.   In sum, Defendants in this case have demonstrated a willingness to bypass basic constitutional, statutory, and regulatory requirements when it comes to immigration enforcement, even before top-down pressure demanded adherence with

---

[83] *See Nava v. DHS*, Proposed Settlement Agreement, https://www.aclu-il.org/sites/default/files/field_documents/proposed_settlement.pdf; see also National Immigrant Justice Center, *Final Settlement Regarding ICE Warrantless Arrests and Vehicle Stops: Overview of Settlement Requirements and Remedies* (last updated Jan. 17, 2025), https://immigrantjustice.org/final-settlement-regarding-ice-warrantless-arrests-and-vehicle-stops-overview-of-settlement-requirements-and-remedies/.

[84] Marisa Kabas, *ICE agents get green light to make unjustified warrantless arrests*, The Handbasket (June 12, 2025), https://www.thehandbasket.co/p/ice-warrantless-arrests-castanon-nava.

[85] Hamed Aleaziz & Todd Heisler, *Under Pressure From the White House, ICE Seeks New Ways to Ramp Up Arrests*, N.Y. Times (June 11, 2025), https://www.nytimes.com/2025/06/11/us/politics/ice-la-protest-arrests.html. Defendants in that case also indicated in a court pleading that they intend to resume ICE knock and talks as of July 1, 2025. Plaintiffs in that case have sought to confirm whether this is still their intent and have not received a response.

-37-

dramatically higher arrest quotas. When their practices have come under scrutiny, rather than take the opportunity to conform their conduct to the law, they have evaded accountability by replicating those practices in another geographic area, declining to document what they do, and directing other federal partners not under court order to take over tasks that have been found to be unconstitutional. It is therefore no surprise that the immigration raids in the Los Angeles area have been marked by systematic disregard of the law.

**H.    Experiences of Individual Plaintiffs**

*Petitioner-Plaintiff Pedro Vasquez Perdomo*

111.    In the early morning of June 18, 2025, in Pasadena, California, Petitioner-Plaintiff Vasquez Perdomo was waiting at a bus stop across the street from Winchell's Donuts with several co-workers to be picked up for a job.

112.    Suddenly, about four cars converged on his location, and about half a dozen masked agents jumped out on either side of him. They had weapons and masks, and did not identify themselves.

113.    To Petitioner-Plaintiff Vasquez Perdomo, it felt like a kidnapping. He tried to leave but was swiftly surrounded, grabbed, handcuffed, and put into one of the vehicles.

114.    At the time he was handcuffed, agents did not have reasonable suspicion of a violation of immigration law.

115.    It was only after he was brought to a nearby CVS parking lot that agents checked Petitioner-Plaintiff Vasquez Perdomo's identification.

116.    No warrant was shown. Upon information and belief, agents did not have a warrant of any kind for Petitioner-Plaintiff Vasquez Perdomo's arrest.

117.    Agents proceeded with a warrantless arrest of Petitioner-Plaintiff Vasquez Perdomo without making an individualized determination of risk of flight.

118.    If agents had evaluated Petitioner-Plaintiff Vasquez Perdomo for risk of flight, they would have learned he had lived in Pasadena for decades.

-38-

119.    Agents did not inform Petitioner-Plaintiff Vasquez Perdomo that they were immigration officers authorized to make an arrest or of the basis for his arrest.

120.    At the time this action was filed, Petitioner-Plaintiff Vasquez Perdomo had been transported to and was being held at the federal building at 300 North Los Angeles St. in B-18. There he experienced extremely crowded and unsanitary conditions, was given little to eat or drink, and slept on the floor. Today he remains in custody at the Adelanto ICE Processing Center.

121.    Petitioner-Plaintiff has representation in his removal proceedings. His counsel is located in Pasadena, California.

122.    Petitioner-Plaintiff's family is located in Pasadena, California.

123.    Petitioner-Plaintiff is diabetic and has felt increasingly ill since his arrest. He has felt depressed since his arrest and reasonably fears being racially profiled again if he is released from detention.

*Petitioner-Plaintiff Carlos Alexander Osorto*

124.    In the early morning of June 18, 2025, in Pasadena, California, Petitioner-Plaintiff Osorto was waiting to be picked up for work with his co-worker Petitioner-Plaintiff Vasquez Perdomo.

125.    When federal agents approached, Petitioner-Plaintiff Osorto was terrified. He had seen videos of what had been happening around Los Angeles and also had heard of masked people who were not even government agents taking community members away. He tried to run, but one of the agents caught up to him and pointed a taser at his head and said "stop or I'll use it!" Petitioner-Plaintiff Osorto stopped immediately.

126.    Petitioner-Plaintiff Osorto was handcuffed and put into a vehicle.

127.    At the time he was handcuffed, agents did not have reasonable suspicion of a violation of immigration law.

128.    It was only after he was brought to a nearby CVS parking lot that agents asked Petitioner-Plaintiff Osorto if he had papers.

-39-

129.  No warrant was shown. Upon information and belief, agents did not have a warrant of any kind for Petitioner-Plaintiff Osorto's arrest.

130.  Agents proceeded with a warrantless arrest of Petitioner-Plaintiff Osorto without making an individualized determination of risk of flight.

131.  If agents had evaluated Petitioner-Plaintiff Osorto for risk of flight, they would have learned he had built homes all around Los Angeles, lived in Pasadena for more than a decade, and had 7 grandchildren who are U.S. citizens.

132.  Agents did not inform Petitioner-Plaintiff Osorto that they were immigration officers authorized to make an arrest or of the basis for his arrest.

133.  At the time this action was filed, Petitioner-Plaintiff Osorto had been transported to and was being held at the federal building at 300 North Los Angeles St. in B-18. The facility was full and when people asked for help officers told them there was no food, no water, and no medicine. Today he remains in custody at the Adelanto ICE Processing Center.

134.  Petitioner-Plaintiff Osorto has representation in his removal proceedings. His counsel is located in Pasadena, California.

135.  Petitioner-Plaintiff Osorto's family is located throughout Los Angeles County, including in Pasadena, California.

136.  Petitioner-Plaintiff Osorto has developed high blood pressure, he believes as a result of the stress he has experienced. He has been scared and overwhelmed by what happened and fears being targeted again, if he is released, for being a Latino person in construction clothes.

*Petitioner-Plaintiff Isaac Antonio Villegas Molina*

137.  In the early morning of June 18, 2025, in Pasadena, California, Petitioner-Plaintiff Villegas Molina was waiting to be picked up for work with his co-workers Petitioner-Plaintiff Vasquez Perdomo and Petitioner-Plaintiff Alexander Osorto.

-40-

138.   When federal agents approached, Petitioner-Plaintiff Villegas Molina was also afraid but tried his best to stay calm.

139.   An agent yelled at Petitioner-Plaintiff Villegas Molina not to run, even though he was still and calm. He was told to provide his ID and he provided his California ID, but the agent kept questioning him. At this point, he did not feel free to leave.

140.   When they were questioning him, agents did not have reasonable suspicion of a violation of immigration law.

141.   No warrant was shown. Upon information and belief, agents did not have a warrant of any kind for Petitioner-Plaintiff Villegas Molina's arrest.

142.   Agents proceeded with a warrantless arrest of Petitioner-Plaintiff Villegas Molina without making an individualized determination of risk of flight.

143.   If agents had evaluated Petitioner-Plaintiff Villegas Molina for risk of flight, they would have learned he had lived in Pasadena for 13 years and had worked at restaurants across Los Angeles.

144.   Agents did not inform Petitioner-Plaintiff Villegas Molina that they were immigration officers authorized to make an arrest or of the basis for his arrest.

145.   At the time this action was filed, Petitioner-Plaintiff Villegas Molina had been transported to and was being held at the federal building at 300 North Los Angeles St. in B-18. He slept on the floor and was given almost nothing to eat. Today he remains in custody at the Adelanto ICE Processing Center.

146.   Petitioner-Plaintiff has representation in his removal proceedings. His counsel is located in Pasadena, California.

147.   Petitioner-Plaintiff has had a difficult time in detention. He fears being targeted again because of his race.

*Plaintiff Jorge Hernandez Viramontes*

148.   On the morning of June 18, 2025, Plaintiff Hernandez Viramontes was working at a car wash in Orange County, where he has worked for approximately 10

-41-

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

years, when immigration agents arrived. This was the third time that agents had raided the carwash since June 9, 2025.

149.   During this visit by agents, like with previous visits, agents did not identify themselves. They did not show a warrant. They simply went from person to person interrogating them about their identity and immigration status.

150.   Agents questioned Plaintiff Hernandez Viramontes' co-worker, a U.S. citizen, about his citizenship *three* separate times in one visit.

151.   When agents got to Plaintiff Hernandez Viramontes, they asked him if he was a citizen, and he replied yes and explained he was a dual citizen of the U.S. and Mexico. They asked for an ID, which he provided. Agents then explained that his ID wasn't enough and since he didn't have his passport, they were taking him.

152.   Agents placed Plaintiff Hernandez Viramontes in a vehicle and transported him away. During this time, Plaintiff Hernandez Viramontes did not know if they were going to take him to a detention center.

153.   Agents verified his citizenship and about 20 minutes later, brought him back to the car wash, but not before his brother called his wife, who had become deeply worried.

154.   When agents brought Plaintiff Hernandez Viramontes back to the car wash, they did not apologize.

155.   Shortly after agents returned Plaintiff Hernandez Viramontes to the car wash, yet *another* group of agents raided the carwash again.

156.   Plaintiff Hernandez Viramontes is shaken by what happened and fears being targeted again on the basis of his Latino appearance and accent.

-42-
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

*Plaintiff Jason Brian Gavidia*

157.   In the afternoon of June 12, 2025, Plaintiff Gavidia, a U.S. citizen, was at a tow yard in Los Angeles County that was visited by immigration agents conducting a roving patrol.[86]

158.   Around 4:30 p.m., upon hearing someone say immigration agents may be at the premises, Plaintiff Gavidia went outside to confirm this. At the time, his clothes were dirty from working on his car.

159.   On the sidewalk outside the gate, Plaintiff Gavidia saw a federal agent between two cars step forward. Soon after, Plaintiff Gavidia saw several other agents wearing similar vests with the words "Border Patrol Federal Agent." He also noticed the agents were carrying handguns and at least two of the agents had a military-style rifle.

160.   As Plaintiff Gavidia attempted to head back inside the tow yard premises, an agent said, "Stop right there." At this point, Plaintiff Gavidia did not feel that he could leave. The agent was masked.

161.   While the agent approached Plaintiff Gavidia, another unmasked agent ran towards him and asked if he was American. Plaintiff Gavidia told the agent that he is American multiple times. The agent responded by asking, "What hospital were you born in?" Plaintiff Gavidia calmly replied that he did not know. The agent repeated the same question two more times, and each time Plaintiff Gavidia provided the same answer. At that point, the agents forcefully pushed Plaintiff Gavidia up against the metal gated fence, put his hands behind his back, and twisted his arm. Plaintiff Gavidia had been on his phone, and the masked agent also took his phone from his hand at that point.

162.   Plaintiff Gavidia explained that the agents were hurting him and that he was American. The unmasked agent asked a final time, "What hospital were you

---

[86] Complaint, *United States v. Javier Ramirez*, No. 2:25-MJ-03646-DUTY (C.D. Cal. June 13, 2025); *see also* Brittny Mejia, *supra* note 23.

-43-

born in?" Plaintiff Gavidia responded again that he did not know and said East L.A. Plaintiff Gavidia then told the agents that he could show them his Real ID. The agents had not asked to see Plaintiff Gavidia's identification.

163.   When Plaintiff Gavidia showed his Real ID to the agents, one of them took it from him. It ultimately took about 20 minutes for -Plaintiff Gavidia to get his phone back. But the agents never returned Plaintiff Gavidia's Real ID.

164.   Plaintiff Gavidia's interaction with the federal agents was one of the worst experiences he has ever had. He is disturbed and deeply concerned about being targeted again because of his race.

I.   **Harms to Organizational Plaintiffs and/or Their Members**

165.   Since they began on June 6, 2025, federal immigration raids have led to the arrest of over 1,500 people and counting, many of whom have been stopped without reasonable suspicion, and/or arrested without probable cause. For those who have been arrested, many have been denied the right to consult with their attorneys, and have been held under conditions with insufficient food, shelter, clothing, and medical care. These conditions, of both arrests and detentions, have caused profound harm to individuals and families, and destabilized entire communities. The chilling effect extends beyond directly impacted individuals. For example, the Mayor of Pasadena described seeing a "huge drop in attendance at local community programs," once "vibrant neighborhoods" now "eerily quiet" and business owners "concerned that their workers and customers alike are too afraid to show up."[87]

166.   These harms have extended to organizational Plaintiffs and/or their members.

---

[87] Victor M. Gordo, *Pasadena Mayor: Trump's Immigration Raids Hurt Communities Like Mine,* Time (June 18, 2025), https://time.com/7295305/pasadena-trump-immigration-raids.

-44-

*Plaintiff Los Angeles Worker Center Network (LAWCN)*

167.   LAWCN is a regional organization made up of eight worker centers and labor organizations that work together to build power and develop worker leadership organizing with Black, immigrant, and refugee workers and other workers of color in the Los Angeles region. LAWCN's member organizations work to improve conditions in low-wage industries, including car wash, garment, home care, restaurant, retail, warehouse, and other low-wage sectors. LAWCN's members each have at least one representative on its Executive Committee, and the Committee has regular standing meetings in which the member organizations provide input on LAWCN's strategic planning and goals, including by having the voting members cast votes on key strategic questions.

168.   LAWCN improves conditions for low-wage workers through capacity building, organizing, services, and policy advocacy at the city, county, and state level. In pursuing LAWCN's mission to build the power and grow the capacity of local worker centers to organize and advocate for low-wage workers, LAWCN has a long term and sustained focus on issues related to immigration and immigrant workers. LAWCN has engaged in policy reform and advocacy aimed at increasing immigrant workers' access to governmental services. Additionally, through its capacity-building efforts, LAWCN's work supports immigrant justice by improving the conditions and dignity of immigrant workers in Southern California.

169.   LAWCN brings this suit on behalf of its member organizations, worker centers that organize and advocate for low-wage workers in the greater Los Angeles region. At least one of LAWCN's member organizations, CLEAN Carwash Worker Center (CLEAN), has been harmed by the ongoing raids in Southern California. CLEAN is a grassroots worker center that fights for the self-determination of immigrant and working-class people by empowering carwash workers to make lasting changes in the carwash industry and their communities.

-45-

170.   CLEAN has approximately 1,800 members who are carwash workers from the greater Los Angeles area. Its members are predominantly Latino and many are immigrants or the children of immigrants. CLEAN has three tiers of membership available to workers, depending on how much each member wishes to participate in CLEAN's organizing work. CLEAN's members help set the priorities for the organization. It holds standing membership meetings during which members provide feedback and input into CLEAN's goals and work.

171.   CLEAN's mission includes fighting for the self-determination of immigrants. A consistent focus of CLEAN's work is to provide its members access to immigration-related support and resources. Some of this work involves providing training and support to members about immigration issues. CLEAN has also organized programming and events, including attending rallies and events, in support of immigration reform.

172.   Carwashes have been a consistent and ongoing target of immigration agents during the course of the raids—at least two dozen have been raided so far.[88] Some carwashes have closed because so many workers have either been detained or fear future raids.[89]

173.   Dozens of CLEAN's members have been detained by immigration agents while at work. At least one identifiable CLEAN member, Jesus Aristeo Cruz Utiz, has been subjected to Defendants' unlawful stop and arrest practices.

174.   Many CLEAN members, regardless of the stability or permanence of their immigration status, fear that immigration agents will subject them to unlawful stops and arrests. They are terrified that masked and unidentifiable immigration agents will invade their workplaces without a warrant, grab them, handcuff them,

---

[88] Kaitlyn Huamani & Suhauna Hussain, *More L.A. car washes targeted in immigration raids, some closed amid fears of further sweeps*, L.A. Times (June 20, 2025), https://www.latimes.com/business/story/2025-06-20/la-car-washes-targeted-immigration-raids-business-closures.

[89] *Id.*

-46-

and take them away. They are fearful of being racially profiled and stopped by immigration agents while in public or at their places of employment.

**Plaintiff United Farm Workers (UFW)**

175. Founded in 1962 by Cesar Chavez, Dolores Huerta, Larry Itliong and other labor leaders, UFW is the largest farm worker union in the country. UFW's mission is to improve the lives, wages, and working conditions of agricultural workers and their families. UFW is dedicated to the cause of eliminating discrimination against farm workers, immigrants, people of color, and any other groups that have been the target of unfair or unlawful treatment. As part of this work, UFW is a national leader in the movement for immigration reform and immigrants' rights.

176. UFW has approximately 10,000 members. California is home to more UFW members than any other state, with members in counties across the Central District of California, such as Los Angeles County, Orange County, Riverside County, Ventura County, and San Bernardino County. UFW membership is voluntary and consists of various categories of members. Among these, contributing or associate members are individuals who make a monthly or annual contribution of a designated amount to UFW. Dues-paying members are those who benefit from a UFW collective bargaining agreement.

177. UFW members play an important role in deciding what activities UFW engages in as an organization. At the UFW's quadrennial Constitutional Convention, members introduce and vote on motions to govern and guide the union's work, and to elect the Union Executive Board. On an ongoing basis, UFW members respond to surveys, provide feedback, and participate in advisory meetings (known as "consejo de base" in Spanish) to actively participate in the Union's decisions. UFW has created various programs in response to members' feedback and requests.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

178.   UFW membership comes with a variety of benefits. Dues-paying members receive protections from collective bargaining in which UFW engages on their behalf. Contributing or associate members (also called "direct" members) receive UFW photographic identification, accidental life insurance of $4,000, access to UFW discounts with private businesses, and other benefits. For services that prioritize agricultural workers, UFW direct membership establishes membership.

179.   UFW brings this action on behalf of its members. UFW's members have been harmed by the ongoing immigration raids in Southern California and fear being subjected to unlawful stops, arrests, and detention practices in the future. At least one UFW member—Angel—has been subjected to Defendants' stop and arrest practices.

180.   Despite UFW's lawsuit against DHS and the Border Patrol, filed on February 26, 2025,[90] these concerns remain today.

181.   Many UFW members, regardless of the stability or permanence of their immigration status, fear that immigration agents will continue to subject farm workers and day laborers to unlawful immigration stops and arrests, especially those who appear non-white. These members face irreparable harm from Defendants' unlawful practices.

***Plaintiff the Coalition for Humane Immigrant Rights (CHIRLA)***

182.   CHIRLA was founded in 1986, and its mission is to advance the human and civil rights of immigrants and refugees. CHIRLA ensures immigrant communities are fully integrated into our society with full rights and access to resources.

183.   As a membership organization, CHIRLA has approximately 50,000 members across California, including both U.S. citizens and noncitizens of varying

---

[90] Complaint, *UFW v. Noem*, No. 1:25-cv-00246 JLT CDB (E.D. Cal. Feb. 26, 2025), https://www.aclusocal.org/sites/default/files/001_complaint.pdf.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   immigration status. CHIRLA has members in every county in this District. Many of
2   CHIRLA members are day laborers, car wash workers, and street vendors.
3   CHIRLA's membership is predominantly Latino.

4       184.    CHIRLA is the largest statewide immigrant rights organization in
5   California, with over 185 staff members who provide services to thousands of
6   Californians each year. Its legal department has assisted approximately 30,000
7   people with direct services and legal education, including numerous CHIRLA
8   members.

9       185.    Some of CHIRLA's members pay dues to the organization, and those
10  dues help fund the organization's operations. Other CHIRLA members have become
11  members by virtue of their participation in the organization's meetings, programs,
12  and policy campaigns.

13      186.    CHIRLA's members regularly meet with each other in regional
14  committees. Committee meetings can range from a small handful of people to
15  hundreds. In addition, CHIRLA's student members hold regional statewide
16  conference calls and meetings throughout the year. During these meetings,
17  CHIRLA's members plan local advocacy campaigns, share information, and discuss
18  issues that affect them, their families, and their local communities. Information from
19  these meetings is reported to CHIRLA's leadership and used to guide CHIRLA's
20  programmatic agenda.

21      187.    CHIRLA also holds quarterly membership retreats at which coreleaders
22  discuss issues they are seeing in their communities and set priorities for the
23  organization.

24      188.    CHIRLA also coordinates the Los Angeles Rapid Response Network
25  (LARRN) and educates its membership as well as the broader community through
26  know your rights programming, workshops, social media, and educational literature
27  about a variety of social services and benefits, including immigration law, financial
28  literacy, workers' rights, and civic engagement. CHIRLA is often a first point of

-49-

contact for individuals seeking direct assistance and accurate information about policy changes impacting immigrants.

189.   CHIRLA brings this action on behalf of its members who reasonably fear being subject to the stop and arrest practices challenged in this case and subsequent detention at B-18. Since immigration authorities began arresting and detaining predominately Latino people across Southern California, including in places where CHIRLA members live and go, they have become terrified that they too will be taken from their families and communities. Indeed, some CHIRLA members, including those with legal status, have begun carrying around their passports, have refrained from being at bus stops, and have reduced how much they go out in public because they are afraid of being stopped and detained unlawfully.

190.   As a result of Defendants' actions, CHIRLA's mission to serve the immigrant community, including through the provision of legal advice and services, is being frustrated. Throughout the last month, CHIRLA's attorneys and representatives have attempted to communicate with individuals at B-18, were denied access, and were thwarted in their efforts to offer legal advice to even those detainees they saw at a distance as government officials used car horns to drown them out. Defendants' actions are also thwarting CHIRLA's work to coordinate the LARRN as other attorneys and representatives summoned by CHIRLA to B-18 have been similarly denied access.

**Plaintiff Immigrant Defenders Law Center (ImmDef)**

191.   ImmDef was founded in 2015 with the mission of protecting the due process rights of immigrants facing deportation. At its inception, it sought to achieve this goal through implementation of the universal representation model—i.e., ensuring that every immigrant appearing before the immigration court was represented by an attorney. ImmDef is now the largest removal defense nonprofit organization in Southern California, providing full-scale deportation defense, legal

-50-

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

representation, legal education, and social services to approximately 30,150 detained and non-detained children and adults annually.

192. ImmDef's Welcoming Project provides "Know Your Rights" trainings throughout ImmDef's service area, which includes the counties of Los Angeles, Orange, Kern, Riverside, San Bernardino, and San Diego. These trainings aim to educate immigrant community members about the immigration system and about their due process and civil rights.

193. ImmDef's Rapid Response team is also part of LARRN, with CHIRLA, and monitors a hotline and responds to notifications about individuals detained in enforcement actions. When possible, ImmDef takes referrals to represent detained individuals in their removal proceedings within ImmDef's service area. If ImmDef is unable to represent an individual referred through LARRN, ImmDef attempts to connect that individual with pro bono representation.

194. ImmDef's attorneys and representatives have been denied access to people in detention, including those being held at B-18. As a result of Defendants' actions, ImmDef's mission to serve the immigrant community, including through the provision of legal advice and services, is being fundamentally frustrated.

**J.    Defendants' Illegal Conduct Will Continue if Not Enjoined**

195. The federal government has repeatedly made clear its intent to continue its operations and unlawful stops, arrests, and detentions. Defendants have been candid about their determination to continue pursuing these unlawful policies and practices, unless this Court enjoins them from doing so.

196. Indeed, federal officials have been open about the ongoing and expanding nature of these unlawful immigration raids.

197. White House official Tom Homan recently maligned Los Angeles as a sanctuary city and vowed, "We're going to send a whole boatload of agents. . . .

-51-
FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

We're going to swamp the city.[91] He has stated, "This operation is not going to end,"[92] and, "Every day in LA we're going to enforce immigration law. I don't care if they like it or not."[93] Kristi Noem has also said, "We're going to stay here and build our operations until we make sure that we liberate the city of Los Angeles."[94] Noem told agents "your performance will be judged every day by how many arrests you, your teammates and your office are able to effectuate. Failure is not an option."[95]

198.   While immigration enforcement may be done lawfully, these statements demonstrate a commitment to continue operations at any cost, including at the expense of individuals' constitutional and legal rights. Plaintiffs have already been harmed, and they face a reasonable likelihood of continuing harm, as a result of Defendants' unlawful policies and practices described herein. Plaintiffs have no

---

[91] Jenny Jarvie & Grace Toohey, *Trump immigration raids: Stunning, yet predictable*, L.A. Times Online (June 15, 2025), https://www.latimes.com/california/story/2025-06-15/clash-trump-los-angeles-immigration-inevitable.

[92] Andrea Castillo, *'We need to find these people': L.A. immigration raids a sign of what's to come, officials say*, L.A. Times Online (June 12, 2025), https://www.latimes.com/politics/story/2025-06-12/we-need-to-find-these-people-l-a-immigration-raids-a-sign-of-whats-to-come-officials-say.

[93] Jacob Soboroff & Doha Madani, *Trump's border czar threatens arrest for immigration interference, warns Newsom and Bass not to 'cross that line'*, NBC (June 8, 2025), https://www.nbcnews.com/news/us-news/tom-homan-trump-border-czar-los-angeles-rcna211701.[94] Adrian Florido & Liz Baker, *DHS vows immigration raids will continue as resistance mounts*, NPR (June 12, 2025), https://www.npr.org/2025/06/12/g-s1-72513/dhs-immigration-raids-los-angeles-protests.[95] Tyler Pager, et al., *Trump's Conflicting Messages on Workplace Raids Leave Businesses Reeling*, N.Y. Times (June 17, 2025), https://www.nytimes.com/2025/06/17/us/politics/trump-conflicting-messages-workplace-raids.html.

[94] Adrian Florido & Liz Baker, *DHS vows immigration raids will continue as resistance mounts*, NPR (June 12, 2025), https://www.npr.org/2025/06/12/g-s1-72513/dhs-immigration-raids-los-angeles-protests.[95] Tyler Pager, et al., *Trump's Conflicting Messages on Workplace Raids Leave Businesses Reeling*, N.Y. Times (June 17, 2025), https://www.nytimes.com/2025/06/17/us/politics/trump-conflicting-messages-workplace-raids.html.

[95] Tyler Pager, et al., *Trump's Conflicting Messages on Workplace Raids Leave Businesses Reeling*, N.Y. Times (June 17, 2025), https://www.nytimes.com/2025/06/17/us/politics/trump-conflicting-messages-workplace-raids.html.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  plain, adequate, or complete remedy at law to address the wrongs described herein.

2  Injunctive and declaratory relief is necessary to redress their ongoing injuries.

3  ### CLASS ACTION ALLEGATIONS

4  199.  The Stop/Arrest Plaintiffs bring this action on behalf of themselves, and

5  in the case of the organizational Stop/Arrest Plaintiffs, their members. In addition,

6  the Stop/Arrest Plaintiffs bring this action under Federal Rules of Civil Procedure

7  23(a) and (b)(2), on behalf of classes of persons similarly situated to themselves and

8  their members. Plaintiffs seek to represent three classes of individuals who have

9  been or will be subjected to several of the unlawful practices this lawsuit challenges:

10  suspicionless stops; warrantless arrests without evaluations of flight risk; and the

11  failure to identify authority and the reason for arrest.

12  ***The Suspicionless Stop Class***

13  The Stop/Arrest Plaintiffs seek to represent a class under Federal Rules of

14  Civil Procedure 23(b)(2) consisting of:

15  All persons who, since June 6, 2025, have been or will be subjected to a

16  detentive stop by federal agents in this District without a pre-stop,

17  individualized assessment of reasonable suspicion concerning whether

18  the person (1) is engaged in an offense against the United States or (2)

19  is a noncitizen unlawfully in the United States.

20  200.  *Numerosity.* The proposed class meets the numerosity requirements of

21  Rule 23(a)(1) because it consists of a large number of similarly situated individuals

22  located within this District, such that joinder of all members of the class is

23  impracticable. Although the number of individuals who have been or will be subject

24  to unconstitutional detentive stops by federal agents is not known with precision,

25  class members number in the thousands. Since June 6, 2025, federal agents have

26  arrested more than 1,500 people within the District, and likely conducted

27  unconstitutional detentive stops on many more.

28

-53-

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

201.   *Common Questions of Law and Fact.* The proposed class meets the commonality requirements of Rule 23(a)(2) because all members of the proposed class have been or will be subjected to the same unconstitutional practices. Thus, there are numerous questions of law and fact common to the proposed class, which predominate over any individual questions, including:

(a)    Whether Defendants have a policy, pattern, or practice of conducting stops without regard to whether reasonable suspicion exists that the person (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully in the United States; and

(b)    Whether Defendants' policy, pattern, or practice of conducting stops without regard to whether reasonable suspicion exists that the person (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully in the United States violates the Fourth Amendment or applicable regulations.

***The Warrantless Arrest Class***

202.   The organizational Stop/Arrest Plaintiffs—LAWCN, UFW, and CHIRLA—also seek to represent a class consisting of:

All persons, since June 6, 2025, who have been arrested or will be arrested in this District by federal agents without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses a flight risk.

203.   *Numerosity.* The proposed class meets the numerosity requirements of Rule 23(a)(1) because it consists of a large number of similarly situated individuals located within this District, such that joinder of all members of the class is impracticable. Although the number of individuals who have been or will be subject to unlawful warrantless arrests by Defendants is not known with precision, class members number in the thousands. Since June 6, 2025, federal agents have arrested more than 1,500 people within the District, with no indications of possessing a

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

1  warrant or conducting any sort of pre-arrest, individualized assessment of probable
2  cause that the person poses a flight risk.

3      204.   *Common Questions of Law and Fact.* The proposed class meets the
4  commonality requirements of Rule 23(a)(2) because all members of the proposed
5  class have been or will be subjected to the same unconstitutional practices. Thus,
6  there are numerous questions of law and fact common to the proposed class, which
7  predominate over any individual questions, including:

8      (a)   Whether Defendants have a policy, pattern, or practice of conducting
9          warrantless arrests without probable cause that an individual is likely to
10         escape before a warrant can be obtained for the arrest;

11     (b)   Whether Defendants' policy, pattern, or practice of conducting stops
12         without probable cause that an individual is likely to escape before a warrant
13         can be obtained for the arrest violates 8 U.S.C. § 1357(a)(2); and

14     (c)   Whether Defendants' policy, pattern, or practice of conducting stops
15         without probable cause that an individual is likely to escape before a warrant
16         can be obtained for the arrest violates 8 C.F.R. § 287.8(c)(2)(ii).

17  ***The Failure to Identify Class***

18     205.   The organizational Stop/Arrest Plaintiffs—LAWCN, UFW, and
19  CHIRLA—also seek to represent a class consisting of:

20         All persons who, since June 6, 2025, have been arrested or will be
21         arrested in this District by federal agents, where agents (1) fail to
22         identify as an immigration officer who is authorized to execute an
23         arrest, and/or (2) fail to state that person is under arrest and the reason
24         for arrest, after it is practical and safe to do so.

25     206.   *Numerosity.* The proposed class meets the numerosity requirements of
26  Rule 23(a)(1) because it consists of a large number of similarly situated individuals
27  located within this District, such that joinder of all members of the class is
28  impracticable. Although the number of individuals who have been or will be subject

to unlawful arrests in which agents failed to identify themselves in the manner required by law is not known with precision, class members number in the thousands. Since June 6, 2025, federal agents have arrested more than 1,500 people within the District, and it has been widely reported that Defendants do not generally identify themselves during these arrests.

207.   *Common Questions of Law and Fact.* The proposed class meets the commonality requirements of Rule 23(a)(2) because all members of the proposed class have been or will be subjected to the same unconstitutional practices. Thus, there are numerous questions of law and fact common to the proposed class, which predominate over any individual questions, including:

(a)     Whether Defendants have a policy, pattern, or practice of (1) failing to (1) identify as an immigration officer who is authorized to execute an arrest, or (2) failing to state that person is under arrest and the reason for arrest, after it is practical and safe to do so; and

(b)     Whether Defendants' policy, pattern, or practice of (1) failing to identify as an immigration officer who is authorized to execute an arrest, or (2) failing to state that person is under arrest and the reason for arrest, after it is practical and safe to do so violates 8 C.F.R. § 287.8(c)(2)(iii).

***Allegations Common to All Classes***

208.   The proposed classes satisfy the requirements of Federal Rule of Civil Procedure 23(a)(1) because they are sufficiently numerous so as to make joinder impracticable.

209.   Joinder is also impractical because the proposed class includes individuals who will be subject to Defendants' unlawful practices in the future and therefore cannot be joined.

210.   *Typicality.* The proposed classes further meet the typicality requirement of Federal Rule of Civil Procedure 23(a)(3). Plaintiffs' legal claims are typical to all members of the proposed classes. Plaintiffs have no interests separate from those of

-56-

the classes they seek to represent, and seek no relief other than the relief sought on behalf of each class. Defendants have acted and intend to act in a manner adverse to the rights of the Suspicionless Stops Class and the Warrantless Arrest Class, making final injunctive and declaratory relief appropriate with regard to each class as a whole.

211.    *Propriety of Class Action Mechanism.* The prosecution of individual actions against Defendants by individual members of the proposed class would be inefficient and create a risk of inconsistent and varying adjudications.

212.    *Adequacy of Class Representation.* The proposed classes meet the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4). Each putative class representative has committed to fairly and adequately representing the interests of the Suspicionless Search Class, the Warrantless Arrest Class, and the Failure to Identify Class. Plaintiffs know of no conflict between their interests and those of the proposed class and, in fact, seek relief identical to the relief sought by all class members.

213.    *Adequacy of Counsel for the Class.* The Stop/Arrest Plaintiffs' counsel are experienced in class action, civil rights, and immigrants' rights litigation. Plaintiffs' counsel have the requisite level of expertise to adequately prosecute this case on behalf of Plaintiffs and the proposed classes. Plaintiffs' counsel will fairly and adequately represent the interests of each class.

214.    Finally, the proposed classes satisfy Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the class, thereby making equitable relief appropriate with respect to the class as a whole.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

### CAUSES OF ACTION

### COUNT ONE

*Violation of Fourth Amendment:*
*Unreasonable Seizures*
*On Behalf of the Stop/Arrest Plaintiffs and the Suspicionless Stop Class*
*Against All Defendants*

215.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

216.    Except at the border and its functional equivalents, the Fourth Amendment prohibits Defendants from conducting a detentive stop to question a person without reasonable suspicion that a person is a noncitizen unlawfully in the United States.

217.    "A person's mere propinquity to others independently suspected of [unlawful] activity does not, without more, give rise to probable cause to search [or seize] that person." *Perez Cruz v. Barr*, 926 F.3d 1128, 1138 (9th Cir. 2019) (quotation omitted). "'Reasonable suspicion' is no different." *Id*.

218.    Defendants have a policy, pattern, and practice of stopping individuals without regard to reasonable suspicion that they are unlawfully in the United States.

219.    As a part of Defendants' policy, pattern, and practice, when conducting stops,  Defendants engage in a show of force so overwhelming that a reasonable person would not feel free to leave.  As a matter of policy, pattern, and practice, Defendants do not evaluate the need for force or tailor the force they use to the circumstances of individual stops and arrests.

220.    Defendants' policy, pattern, and practice violates the Fourth Amendment to the U.S. Constitution.

-58-

ER-0765

## COUNT TWO

### *Violation of 8 U.S.C. § 1357(a)(2)*
### *Warrantless Arrests Without Probable Cause of Flight Risk*
### *On Behalf of Plaintiffs LAWCN, UFW, CHIRLA,*
### *and the Warrantless Arrest Class*
### *Against All Defendants*

221.   Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

222.   8 U.S.C. § 1357(a)(2) requires that arrests without a warrant be accompanied by "reason to believe" that an individual is "likely to escape before a warrant can be obtained for [their] arrest."

223.   Defendants have a policy, pattern, and practice of making arrests without any warrant without making an individualized determination of flight risk. They have no mechanism for ensuring compliance with the statutory limits of agents' and officers' warrantless arrest authority and do not provide guidance to agents and officers on how to make an individualized determination of likelihood of escape. Defendants permit agents and officers to make warrantless arrests *carte blanche* in violation of law.

224.   Defendants' policy, pattern, and/or practice of making warrantless arrests without the required individualized flight risk analysis is "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under 8 U.S.C. § 1357(a)(2). 5 U.S.C. §§ 704, 706(2)(C).

225.   Separate from the APA, Defendants' policy, pattern, and practice of making warrantless arrests without the required individualized flight risk analysis is *ultra vires*.

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## COUNT THREE

***Violation of 8 C.F.R. § 287.8(c)(2)(ii)***
***Standards for Stops and Warrantless Arrests***
***On Behalf of Plaintiffs LAWCN, UFW, CHIRLA,***
***and the Warrantless Arrest Class***
***Against All Defendants***

226.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

227.    Defendants are bound by regulation to conform warrantless arrests to the standards in  8 C.F.R. § 287.8(c), including the requirement at 8 C.F.R. § 287.8(c)(2)(ii) that officers have reason to believe that an individual is "likely to escape before a warrant can be obtained."

228.    Defendants have a policy, pattern, and practice of making arrests without any warrant without making an individualized determination of flight risk. They have no mechanism for ensuring compliance with the regulatory limits of agents' and officers' warrantless arrest authority and do not provide guidance to agents and officers on how to make an individualized determination of likelihood of escape. Defendants permit agents and officers to make warrantless arrests *carte blanche* in violation of law.

229.    Defendants' policy, pattern, and practice is "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under 8 C.F.R. § 287.8(c)(2)(ii). 5 U.S.C. §§ 704, 706(2)(C).

## COUNT FOUR

***Violation of 8 C.F.R. § 287.8(c)(2)(iii)***
***Failure to Identify Authority and Reason for Arrest***
***On Behalf of Plaintiffs LAWCN, UFW, CHIRLA***
***Against All Defendants***

230.    Plaintiffs incorporate the allegations in the paragraphs above as though fully set forth here.

231.    The regulations require agents and officers, at the time of an arrest or as soon as it is practicable and safe to do so, to identify themselves as "an immigration

-60-

officer who is authorized to execute an arrest" and "state that the person is under arrest and the reason for the arrest." 8 C.F.R. § 287.8(c)(3).

232.  Defendants have a policy, pattern, and practice of not timely identifying themselves, their authority to execute an immigration arrest, or the reasons for an arrest.

233.  Defendants' policy, pattern, and practice is a "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under 8 C.F.R. § 287.8(c)(2)(ii). 5 U.S.C. §§ 704, 706(2)(C).

## COUNT FIVE

### Violation of the Fifth Amendment:
### Access to Counsel
### On Behalf of the Access/Conditions Plaintiffs
### Against Defendants Noem, Lyons, and Santacruz Jr.

234.  Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

235.  Individuals detained at B-18 have the right to hire and consult with attorneys. Due process also requires that detainees have adequate opportunities to obtain counsel and to visit and communicate with counsel once counsel is retained. Defendants have a policy, pattern, and practice of turning away attorneys at the door of B-18 and depriving detainees of access to confidential legal consultations by phone. This lack of counsel has severe consequences. Detainees are forced to interact with federal immigration officials without the benefit of legal advice even though it is readily available.

236.  Defendants' actions violate the Fifth Amendment.

## COUNT SIX

### Violation of 8 U.S.C. § 1362
### Access to Counsel
### On Behalf of the Access/Conditions Plaintiffs
### Against Defendants Noem, Lyons, and Santacruz Jr.

237.  Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

-61-

ER-0768

238.    The Immigration and Nationality Act (INA) guarantees noncitizens the right to counsel in connection with inadmissibility and deportability proceedings. 8 U.S.C. §1362; *see also* 8 U.S.C. § 1229a(b)(4)(A); *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000); *Orantes-Hernandez*, 919 F.2d at 564.

239.    This protection necessarily entails the right to consult with an attorney in advance of any hearing—especially a hearing at which a noncitizen faces potentially permanent banishment from the United States. *Rios-Berrios*, 776 F.2d at 862. The same substantive standards that protect the Plaintiffs' right to counsel under the Due Process Clause apply to their statutory rights under the INA. *See Agyeman v. INS*, 296 F.3d 871, 877 (9th Cir. 2002) ("If a[] [noncitizen] is prejudiced by a denial of any of the applicable procedural protections, he is denied his constitutional guarantee of due process.").

240.    Defendants have a policy, pattern, and practice of turning away attorneys at the door of B-18 and depriving detainees of access to confidential legal consultations by phone. This lack of counsel has severe consequences. Detainees are forced to interact with federal immigration officials without the benefit of legal advice even though it is readily available.

241.    Defendants' policy, pattern, and practice of denying detained individuals access to legal advice is "final agency action" that is in excess of statutory authority. *See* 5 U.S.C. §§ 704, 706(2)(C).

## COUNT SEVEN

***Violation of the Fifth Amendment:***
***Conditions of Confinement***
***On Behalf of the Access/Conditions Plaintiffs***
***Against Defendants Noem, Lyons, and Santacruz Jr.***

242.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

243.    Civil detainees' conditions of confinement are unconstitutional if they "amount to punishment." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

-62-

244.   Defendants have allowed conditions to deteriorate at B-18 to an extent that they amount to punishment. They have failed to provide basic necessities like food, water, adequate hygiene facilities, and medical care. Defendants have also violated detainees' constitutional right to due process by subjecting them to overcrowding and failing to provide adequate sleeping accommodations at B-18. Defendants' ongoing violations of the Fifth Amendment directly harm CHIRLA and ImmDef's missions to provide legal services and assistance to community members, and harm CHIRLA members who will be subject to detentions at B-18 by depriving them of their fundamental right to an "appropriate place of detention," and serving to coerce some detained individuals into accepting voluntary departure before they have an opportunity to consult counsel.

## COUNT EIGHT

### *Violation of Fifth Amendment:*
### *Due Process*
### *On Behalf of Petitioner-Plaintiffs Perdomo, Osorto, and Molina*
### *Against Defendants Noem, Lyons, and Santacruz Jr.*

245.   Petitioners-Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

246.   The government may not deprive a person of life, liberty, or property without due process of law. U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that the Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

247.   The government's detention of Petitioners-Plaintiffs violates their rights to due process because they have been detained without lawful authority, infringing on their fundamental right to liberty.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Court grant the following relief:

-63-

(1)   Assume jurisdiction over this matter;

(2)   Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2);

(3)   Appoint the counsel for Stop/Arrest Plaintiffs as class counsel pursuant to Federal Rule of Civil Procedure 23(g);

(4)   Declare that Defendants' policy, pattern, and practice of conducting stops without reasonable suspicion violate the Fourth Amendment of the United States Constitution;

(5)   Declare that Defendants' policy, pattern, and practice of making warrantless arrests without individualized flight risk determinations violate 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii); and the APA;

(6)   Declare that Defendants' policy, pattern, and practice of failing to identify the authority and reasons for arrests violate 8 C.F.R. § 287.8(c)(2)(iii); and the APA;

(7)   Declare that Defendants' denial of access to counsel violates the Due Process Clause of the Fifth Amendment of the United States Constitution;

(8)   Declare that Defendants' policy and practice of denying access to counsel violate the rights of the Access/Detention Plaintiffs under 8 U.S.C. § 1362 and the APA;

(9)   Declare that the conditions of confinement imposed by Defendants at B-18 violate the Fifth Amendment of the United States Constitution;

(10)  Issue a preliminary and permanent injunction enjoining further violations of Plaintiffs' rights;

(11)  Vacate Defendants' unlawful policies and practices that violate statutory and regulatory law under the APA;

(12)  Enjoin Defendants from transferring Petitioner-Plaintiffs outside of this judicial district during the pendency of removal proceedings;

-64-

(13)  Enjoin Defendants from removing Petitioner-Plaintiffs from the United States without the procedures for removal identified in the INA;

(14)  Order the immediate release of Petitioner/Plaintiffs pending these proceedings;

(15)  Award reasonable attorneys' fees, costs, and other disbursements permitted under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable statute, and;

(16)  Order any and all such other relief as the Court deems just, equitable, and proper.

DATED:  July 1, 2025                 Respectfully submitted,


By:    /s/ *Stacy Tolchin*
       Stacy Tolchin
       *Attorneys for Stop/Arrest Plaintiffs*


By:    /s/ *Mohammad Tajsar*
       Mohammad Tajsar
       *Attorney for Stop/Arrest Plaintiffs*


By:    /s/ *Mark Rosenbaum*
       Mark Rosenbaum
       *Attorney for Plaintiffs*

-65-

FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Stacy Tolchin (CA SBN #217431)
Megan Brewer (CA SBN #268248)
Law Offices of Stacy Tolchin
776 E. Green St., Ste. 210
Pasadena, CA 91101
Telephone: (213) 622-7450
Facsimile: (213) 622-7233
Email: Stacy@Tolchinimmigration.com
Email: Megan@Tolchinimmigration.com

Counsel for Petitioners

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Pedro VASQUEZ PERDOMO, Carlos Alexander OSORTO, and Isaac VILLEGAS MOLINA;<br><br>    Petitioners,<br><br>    v.<br><br>Kristi NOEM, Secretary, Department of Homeland Security; Pam BONDI, Attorney General; IMMIGRATION AND CUSTOMS ENFORCEMENT; and Todd LYONS, Acting Los Angeles Field Office Director, Immigration and Customs Enforcement.<br><br>    Respondents. | Civil Case No.:<br><br>**PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.     Petitioners were detained in Pasadena, California on June 18, 2025 for civil immigration violations and are currently being held at the B-18 processing office in downtown Los Angeles.

2.     They were detained without reasonable suspicion, without an arrest warrant, and in violation of the immigration regulations and due process.

3.     Petitioners face transfer outside of this judicial district and away from their family and legal representation. They also face imminent removal from the United States.

4.     Petitioners seek an order from this Court that they be released from custody, and, in the interim, an order from the Court that they are not removed from this judicial district or removed from the United States, pending disposition of their petition for writ of habeas corpus.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction under 28 U.S.C. § 2241 (federal habeas statute); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 2201-2 (declaratory judgment); United States Constitution Article I, Section 9 (Suspension Clause).

6.     Venue properly lies within the Central District of California under 28 U.S.C. § 1391, because this is a civil action in which Respondents are agencies of the United States, Petitioners are detained in this district, and because a substantial part of the events or omissions giving rise to this action occurred in the District.

## PARTIES

7.     Petitioner Pedro Vasquez Perdomo resides in Pasadena, California and is currently detained at the Los Angeles downtown federal building in the basement, Room B-18.

8.     Petitioner Carlos Alexander Osorto resides in Pasadena, California and is currently detained at the Los Angeles downtown federal building in the basement, Room B-18.

2

9.      Petitioner Isaac Villegas Molina resides in Pasadena, California and is currently detained at the Los Angeles downtown federal building in the basement, Room B-18.

10.      Respondent Kristi Noem is the Secretary of the Department of Homeland Security ("DHS"), and is sued in her official capacity. The Secretary of Homeland Security is charged with the administration and enforcement of immigration laws.  8 U.S.C. § 1103(a).

11.      Respondent Pam Bondi is the Attorney General of the United States and is sued in her official capacity as the head of the Department of Justice.  The Attorney General is responsible for the fair administration of the laws of the United States.

12.      Respondent Immigration and Customs Enforcement is the agency responsible for the detention of noncitizens, and the transfer or removal of Petitioners outside of this judicial district.

13.      Respondent Todd Lyons is the Acting Director of the Los Angeles Field Office of the Immigration and Customs Enforcement, Department of Homeland Security, and is sued in his official capacity.  Respondent Lyons is responsible for the detention of noncitizens in the Los Angeles district and for any transfer or removal of Petitioners outside of this judicial district.

## **FACTS**

14.      They were detained by immigration enforcement officers in Pasadena, California on June 18, 2025.

15.      They were sitting at a bus stop on a bench on the corner of Los Robles Ave. and Orange Grove Blvd. in Pasadena when around 5:50 a.m., multiple vehicles pulled up aggressively in front of them.

16.      Agents wearing dark green vests that said POLICE on them exited the vehicles. At least one agent had a vest that said ICE. Petitioners were surrounded.

17.   The agents had guns and were masked so that their faces could not be seen. They were acting aggressively, shouting at Petitioners. Petitioners were not free to leave the area.

18.   Petitioners were petrified. Agents surrounded them and handcuffed them.

19.   Respondents did not have reasonable suspicion that Petitioners were in the United States unlawfully.

20.   After Petitioners were handcuffed, officers demanded Petitioners' identification.

21.   Respondents did not have probable cause for Petitioners' arrest.

22.   Respondents did not have warrants for Petitioners' arrest.

23.   Respondents did not make an individualized finding of flight risk.

24.   Respondents did not identify themselves as immigration agents and did not inform Petitioners of the basis for their arrest.

25.   Petitioners were placed in the agents' vehicles and transported to the federal building at 300 North Los Angeles St. where they have been held in the basement, room B-18, since June 18, 2025.

26.   Petitioners are being processed for removal proceedings to be removed from the United States.

27.   Petitioners have representation in their removal proceedings. Their counsel is located in Pasadena, California.

28.   Petitioners' family is location in Pasadena, California.

29.   Petitioners face imminent transfer outside of this judicial district and face removal from the United States.

4

ER-0776

**CAUSES OF ACTION**

**COUNT ONE**

*Violation of 8 U.S.C. § 1357(a)(2):*

*Warrantless Arrests Without Probable Cause of Flight Risk*

30. Petitioners repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

31. Respondents ICE arrested Petitioners without probable cause and without warrants. Before each arrest, Respondents failed to make an individualized finding of flight risk. The failure to meet these requirements is a violation of 8 U.S.C. § 1357(a)(2).

**COUNT TWO**

*Violation of 8 C.F.R. § 287.8(c)(2)(ii):*

*Warrantless Arrests Without Probable Cause of Flight Risk*

32. Petitioners repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

33. Respondents ICE arrested Petitioners without a warrant and without "reason to believe" that they were "likely to escape before a warrant can be obtained" in violation of 8 C.F.R. § 287.8(c)(2)(ii). The reason to believe standard meets the probable cause standard of the Fourth Amendment. *Perez Cruz v. Barr*, 926 F.3d 1128, 1137 (9th Cir. 2019).

34. Arrest in violation of the regulation is unlawful. *See Sanchez v. Sessions*, 904 F.3d 643, 650 (9th Cir. 2018); *Perez Cruz v. Barr*, 926 F.3d 1128, 1137 (9th Cir. 2019).

**COUNT THREE**

*Fourth Amendment: Arrests Without Probable Cause*

35. Petitioners repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

5

36.     The Fourth Amendment prohibits Respondents from conducting arresting an individual for an immigration violation without probable cause.

37.     Respondents ICE arrested Petitioners without probable cause that any of them was a noncitizen unlawfully in the United States.

## COUNT FOUR

### *(Failure to Identify Officers and Basis for Arrest in Violation of 8 C.F.R. § 287.8(c)(3))*

38.     Petitioners incorporate the allegations in the paragraphs above as though fully set forth here.

39.     The regulations require arresting offers identify themselves as "an immigration officer who is authorized to execute an arrest" and "state that the person is under arrest and the reason for the arrest." 8 C.F.R. § 287.8(c)(3).

40.     Respondent ICE failed to identify themselves at the time of arrest and failed to inform Petitioners of the reasons for their arrest.

## COUNT FIVE

### *(Violation of Due Process )*

41.     Petitioners incorporate the allegations in the paragraphs above as though fully set forth here.

42.     The government may not deprive a person of life, liberty, or property without due process of law. U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that the Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001).

43.     The government's detention of Petitioners violates their rights to due process because they have been detained without lawful authority, infringing on their fundamental right to liberty.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Petitioners pray that this Court grant the following relief:

(1)   Assume jurisdiction over this matter;

(2)   Declare that Petitioners are detained in violation of law;

(3)   Enjoin Respondents from transferring Petitioners outside of this judicial district during the pendency of removal proceedings;

(4)   Enjoin Respondents from removing Petitioners form the United States without the procedures for removal identified in the Immigration and Nationality Act;

(5)   Order the immediate release of Petitioners pending these proceedings;

(6)   Award costs and reasonable attorney fees incurred under this action under 28 U.S.C. § 2412, et. seq. (Equal Access to Justice Act); and

(7)   Grant any further relief that this Court may deem fit and proper.


Dated: June 20, 2025                    Respectfully Submitted,

*S/Stacy Tolchin*
Stacy Tolchin (CA SBN #217431)
Megan Brewer (CA SBN #268248)
Law Offices of Stacy Tolchin
776 E. Green St., Ste. 210
Pasadena, CA 91101
Telephone: (213) 622-7450
Facsimile: (213) 622-7233
Email:
Stacy@Tolchinimmigration.com
Email:
Megan@Tolchinimmigration.com

Counsel for Petitioners

Name __Assistant U.S. Attorney Alexander L. Farrell__

Address __300 North Los Angeles, Suite 7516__

City, State, Zip __Los Angeles, CA 90012__

Phone __(213) 894-5557__

Fax __(213) 894-7819__

E-Mail __Alexander.Farrell@usdoj.gov__

☐ FPD    ☐ Appointed    ☐ CJA    ☐ Pro Per    ☐ Retained

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| Pedro Vasquez Perdomo, et al. | CASE NUMBER: |
|---|---|
| PLAINTIFF(S), | 2:25-cv-05605-MEMF-SP |
| v. | |
| Kristi Noem, et al. | **NOTICE OF APPEAL** |
| DEFENDANT(S). | |

NOTICE IS HEREBY GIVEN that _____Kristi Noem, et al._____ hereby appeals to
                                        *Name of Appellant*
the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☐ Interlocutory Appeals
☐ Sentence imposed:

☐ Bail status:

**Civil Matter**

☒ Order (specify):
   ECF No. 87, Order Granting TRO (No. 45).

☐ Judgment (specify):

☐ Other (specify):

Imposed or Filed on __July 11, 2025__. Entered on the docket in this action on __July 11, 2025__.

A copy of said judgment or order is attached hereto.

__July 13, 2025__                           /s/ Alexander L. Farrell
Date                                        Signature
                                            ☐ Appellant/ProSe    ☒ Counsel for Appellant    ☐ Deputy Clerk

**Note:**  The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the
attorneys for each party. Also, if not electronically filed in a criminal case, the Clerk shall be furnished a sufficient number
of copies of the Notice of Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

A-2 (01/07)                               **NOTICE OF APPEAL**

ER-0780



Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 2 of 53    Page ID #:1196

Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 1 of 52    Page ID #:1141

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

Pedro Vasquez Perdomo, *et al.*,

                      Plaintiffs,

       v.

Kristi Noem, *et al.*,

                  Defendants.

Case No.: 2:25-cv-05605-MEMF-SP

**ORDER GRANTING PLAINTIFFS' EX PARTE APPLICATIONS FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION [ECF NOS. 38, 45]**

On June 6, 2025, federal law enforcement arrived in Los Angeles to participate in what federal officials have described as "the largest Mass Deportation Operation . . . in History."[1] The individuals and organizations who have brought this lawsuit argue that this operation had two key features, both of which were unconstitutional: "roving patrols" indiscriminately rounding up numerous individuals without reasonable suspicion and, having done so, denying these individuals access to lawyers who could help them navigate the legal process they found themselves in. On this, the federal government agrees: Roving patrols without reasonable suspicion violate the Fourth

---

[1] ECF No. 45-19 Att. C.

1

ER-0781

Case 2:25-cv-05605-MEMF-SP   Document 89   Filed 07/13/25   Page 3 of 53   Page ID
#:1197
Case 2:25-cv-05605-MEMF-SP   Document 87   Filed 07/11/25   Page 2 of 52   Page ID
#:1142

1    Amendment to the Constitution and denying access to lawyers violates the Fifth Amendment to the

2    Constitution. What the federal government would have this Court believe—in the face of a mountain

3    of evidence presented in this case—is that none of this is actually happening.

4        Most of the questions before this Court are fairly simple and non-controversial, and both

5    sides in this case agree on the answers.

6        • May the federal government conduct immigration enforcement—even large scale

7          immigration enforcement—in Los Angeles? Yes, it may.

8        • Do all individuals—regardless of immigration status—share in the rights guaranteed

9          by the Fourth and Fifth Amendments to the Constitution? Yes, they do.

10       • Is it illegal to conduct roving patrols which identify people based upon race alone,

11         aggressively question them, and then detain them without a warrant, without their

12         consent, and without reasonable suspicion that they are without status? Yes, it is.

13       • Is it unlawful to prevent people from having access to lawyers who can help them in

14         immigration court? Yes, it is.

15       There are really two questions in controversy that this Court must decide today.

16       First, are the individuals and organizations who brought this lawsuit likely to succeed in

17   proving that the federal government is indeed conducting roving patrols without reasonable

18   suspicion and denying access to lawyers? This Court decides—based on all the evidence

19   presented—that they are.

20       And second, what should be done about it? The individuals and organizations who have

21   brought this lawsuit have made a fairly modest request: that this Court order the federal government

22   to stop.

23       For the reasons stated below, the Court grants their request.

24   ///

25   ///

26   ///

27   ///

28   ///

2

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 4 of 53    Page ID
#:1198
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 3 of 52    Page ID
#:1143

1    Before the Court are two Ex Parte Applications for Temporary Restraining Order and Order

2    to Show Cause Regarding Preliminary Injunction filed by Plaintiffs. ECF Nos. 38, 45. For the

3    reasons stated herein, the Court GRANTS the Ex Parte Applications.

4    **I.    Background**

5         **A. Factual Background**

6         The Court begins by summarizing the allegations in the First Amended Complaint. ECF No.

7    16 ("1AC").

8              i.  Plaintiffs

9         Petitioner-Plaintiffs Pedro Vasquez Perdomo ("Vasquez Perdomo"), Carlos Alexander

10    Osorto ("Osorto"), and Isaac Villegas Molina ("Villegas Molina") are residents of Pasadena,

11    California, who were arrested at a bus stop as they were waiting to be picked up for a job on June 18,

12    2025. 1AC ¶¶ 12–14. They filed this action while detained in the basement of a Los Angeles

13    downtown federal building, B-18. *Id.* ¶¶ 12–14.

14         Plaintiff Jorge Hernandez Viramontes ("Hernandez Viramontes") is a resident of Baldwin

15    Park, California. *Id.* ¶ 15. He works at a car wash in Orange County, California, that has been visited

16    three times by immigration agents, most recently on June 18, 2025, when he was questioned and

17    detained by agents despite informing them that he is a U.S. citizen. *Id.*

18         Plaintiff Jason Brian Gavidia ("Gavidia") is a resident of East Los Angeles, California. *Id.* ¶

19    16. He was stopped and questioned by immigration agents at a tow yard in Los Angeles County on

20    June 12, 2025, despite explaining multiple times that he is a U.S. Citizen. *Id.*

21         Plaintiff Los Angeles Worker Center Network ("LAWCN") is a multi-racial, multi-ethnic,

22    and multi-industry organization comprised of worker centers and labor organizations that work

23    together to address injustices faced by low-wage workers in the greater Los Angeles area, including

24    immigrant and non-English-speaking workers. *Id.* ¶ 17. LAWCN has worker center members, who

25    in turn have individual members, including noncitizens with legal status and U.S. citizens. *Id.*

26         Plaintiff United Farm Workers ("UFW") is a farm worker union with approximately 10,000

27    members, with more members in California than in any other state. *Id.* ¶ 18. UFW's members in

28

3

Case 2:25-cv-05605-MEMF-SP   Document 89   Filed 07/13/25   Page 5 of 53   Page ID
#:1199
Case 2:25-cv-05605-MEMF-SP   Document 87   Filed 07/11/25   Page 4 of 52   Page ID
#:1144

1 California work at agricultural sites as well as non-agricultural sites within the District. *Id*. UFW's
2 members include noncitizens with legal status and U.S. citizens. *Id*.

3 Plaintiff Coalition for Humane Immigrant Rights ("CHIRLA") is a nonprofit organization
4 with its principal place of business in Los Angeles, California. *Id*. ¶ 19. CHIRLA was founded in
5 1986 to advance the human and civil rights of immigrants and refugees. *Id*. As a membership
6 organization, CHIRLA has approximately 50,000 members across California, including both U.S.
7 citizens and noncitizens of varying immigration status. *Id*. CHIRLA has members in every county in
8 the District. *Id*.

9 Plaintiff Immigrant Defenders Law Center ("ImmDef") is a nonprofit organization having its
10 principal place of business in Los Angeles, California. *Id*. ¶ 20. Besides Los Angeles, ImmDef has
11 offices in Riverside, Santa Ana, and San Diego, California, and works across the U.S.-Mexico
12 border in Tijuana. *Id*. ImmDef was founded in 2015 to protect the due process rights of immigrants
13 facing deportation. *Id*.

14 The Court will refer to the five individual plaintiffs, LAWCN, UFW, and CHIRLA as
15 "Stop/Arrest Plaintiffs." The Court will refer to ImmDef and CHIRLA as "Access/Detention
16 Plaintiffs."[2] The Court will address all plaintiffs as "Plaintiffs."

17     ii. Defendants

18 Defendant Kristi Noem ("Noem") is the Secretary of the Department of Homeland Security
19 ("DHS"), which is responsible for administering and enforcing the nation's immigration laws
20 pursuant to 8 U.S.C. § 1103(a). *Id*. ¶ 21. Noem is sued in her official capacity. *Id*.

21 Defendant Todd M. Lyons ("Lyons") is the Acting Director of U.S. Immigration and
22 Customs Enforcement ("ICE"), an agency of the United States within the DHS. *Id*. ¶ 22. ICE is
23 responsible for the stops, arrests, and custody of individuals believed to be in violation of civil
24 immigration law. *Id*. Lyons is sued in his official capacity. *Id*.

---

26 [2] Plaintiffs refer to ImmDef and CHIRLA as "Access/*Conditions*" Plaintiffs and "Access/*Detention*"
27 Plaintiffs in the 1AC. *Compare* 1AC at 61 (referring to "Access/Conditions Plaintiffs" under the fifth and sixth causes of action), 62 (same, under the seventh cause of action) *with* ¶ 8 (referring to "Access/Detention
28 Plaintiffs"), Prayer for Relief ¶ 8 (same). For consistency, the Court will use the term "Access/Detention Plaintiffs" throughout this Order.

4

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 6 of 53    Page ID
#:1200
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 5 of 52    Page ID
#:1145

1    Defendant Rodney S. Scott ("Scott") is the Commissioner of U.S. Customs and Border

2    Protection ("CBP"), the agency within the DHS that is responsible for enforcing immigration laws at

3    or close to the U.S. border. *Id.* ¶ 23. Scott has direct authority over all CBP policies, procedures, and

4    practices related to stops, arrests, and detention. *Id.* Scott is sued in his official capacity. *Id.*

5    Defendant Michael W. Banks ("Banks") is Chief of the U.S. Border Patrol. *Id.* ¶ 24. Banks

6    has direct authority over all Border Patrol policies, procedures, and practices related to stops, arrests,

7    and detention. *Id.* Banks is sued in his official capacity. *Id.*

8    Defendant Kash Patel ("Patel") is Director of the U.S. Federal Bureau of Investigation

9    ("FBI"). *Id.* ¶ 25. In that capacity, Patel is responsible for the direction and oversight of all

10    operations of the FBI. *Id.* Patel is sued in his official capacity. *Id.*

11    Defendant Pam Bondi ("Bondi") is the U.S. Attorney General. *Id.* ¶ 26. Bondi is head of the

12    Department of Justice ("DOJ") and is responsible for the direction and oversight of all operations of

13    the DOJ. *Id.* Bondi is sued in her official capacity. *Id.*

14    Defendant Ernesto Santacruz Jr. ("Santacruz Jr.") is the Acting Field Office Director for the

15    Los Angeles Field Office of ICE. *Id.* ¶ 27. Santacruz Jr. is responsible for the supervision of

16    personnel within ICE's Enforcement and Removal Operations ("ERO") in the geographic area

17    covered by the Los Angeles Field Office, which comprises the seven counties in the District, and

18    facilities within the District, including B-18. *Id.* Santacruz Jr. is sued in his official capacity. *Id.*

19    Defendant Eddy Wang ("Wang") is the U.S. Homeland Security Investigations Special

20    Agent in Charge for Los Angeles. *Id.* ¶ 28. Wang is responsible for the supervision of agents within

21    ICE's Homeland Security Investigations ("HSI") in the Los Angeles area. *Id.* Wang is sued in his

22    official capacity. *Id.*

23    Defendant Gregory K. Bovino ("Bovino") is the Chief Patrol Agent for the El Centro Sector

24    of the CBP. *Id.* ¶ 29. In that capacity, Bovino is responsible for the supervision of agents in the El

25    Centro Sector. *Id.* Bovino is sued in his official capacity. *Id.*

26    Defendant D. Stalnaker ("Stalnaker") is the Acting Chief Patrol Agent for the San Diego

27    Sector of the CBP. *Id.* ¶ 30. In that capacity, Stalnaker is responsible for the supervision of agents in

28    the San Diego Sector. *Id.* Stalnaker is sued in his official capacity. *Id.*

5

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 7 of 53    Page ID
#:1201
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 6 of 52    Page ID
#:1146

1    Defendant Akil Davis ("Davis") is the Assistant Director of the Los Angeles Office of the

2    FBI. *Id.* ¶ 31. In that capacity, Davis is responsible for the supervision of all agents in the Los

3    Angeles Office. *Id.* Davis is sued in his official capacity. *Id.*

4    Defendant Bilal A. Essayli ("Essayli"; together with all other defendants, "Defendants") is

5    the U.S. Attorney for the Central District of California. *Id.* ¶ 32. Essayli has authority over federal

6    law enforcement operations within the District. *Id.* Essayli is sued in his official capacity. *Id.*

7    iii.    Arrests and Detentions

8    On June 6, 2025, federal agents detained multiple day laborers outside of the Westlake Home

9    Depot. *Id.* ¶ 38. In the following days, similar raids occurred throughout the District. *Id.* Car wash

10   workers,[3] farm and agricultural workers, street vendors, recycling center workers, tow yard workers,

11   and packing house workers were targeted. *Id.* ¶¶ 39, 40 ("Between Monday, June 9, 2025, and June

12   13, 2025, at least 43 people were detained on farms in Ventura and Santa Barbara Counties"), 42.

13   Various places have been targeted by federal agents. *Id.* ¶ 42 (listing farmers markets, swap meet,

14   bus stops, parks, gym, and church). In one instance, the agents approached and prevented a non-

15   white individual from walking away but not those who appeared to be Caucasians. *Id.* ¶ 43. In

16   another, the agents arrived in unmarked vehicles, pointed a gun, and demanded to see identification

17   without providing a reason for the stop. *Id.* ¶ 44; *see id.* ¶ 46 (describing "a military-style raid" at a

18   swap meet). Yet in a different context, the agents provided no reason for stopping individuals at a

19   church. *Id.* ¶ 45. Since they began on June 6, 2025, federal immigration raids have led to the arrest of

20   over 1,500 people. *Id.* ¶ 165.

21   Agents and officers approach suddenly and in large numbers in military style or SWAT

22   clothing, heavily armed with weapons displayed, masked, and with their vest displaying a generic

23   "POLICE" patch (if any display at all). *Id.* ¶ 51. Agents typically position themselves around

24   individuals, aggressively engage them, and/or shout commands, making it nearly impossible for

25   individuals to decline to answer their questions. *Id.* ¶ 52. When individuals have tried to avoid an

26

27   [3] One of LAWCN's member organizations is CLEAN Carwash Worker Center ("CLEAN"), on whose behalf
LAWCN brings this suit. 1AC ¶ 169; *see id.* ¶¶ 173 ("Dozens of CLEAN's members have been detained by

28   immigration agents while at work. At least one identifiable CLEAN member, Jesus Aristeo Cruz Utiz, has
been subjected to Defendants' unlawful stop and arrest practices.").

6

1   encounter with agents and officers, they have been followed and pushed to the ground, sometimes

2   even beaten, and then taken away. *Id.* ¶ 53. These incidents have been widely reported in the news.

3   *Id.* ¶ 54.

4       Defendants have a policy and practice of effectuating warrantless arrests without making an

5   individualized flight risk determination. *Id.* ¶ 65. Defendants also have a policy and practice of not

6   identifying themselves or explaining the basis for an arrest upon taking someone into custody. *Id.* ¶

7   71. Agents and officers often show up masked, without any visible badges or insignia indicating

8   what agency they work for, and have refused to identify themselves when asked. *Id.*

9                   iv.   Conditions at B-18

10       During the ongoing raids, and as an integral part of the policy and pattern of unlawful stops

11   and arrests, Defendants have been taking individuals who are swept up to the basement of the federal

12   building at 300 North Los Angeles Street in Los Angeles, commonly referred to as B-18. *Id.* ¶ 74. B-

13   18 is a facility for immigrant detainees designed to hold a limited number of individuals *temporarily*

14   so they can be processed and released, or processed and transported to a long-term detention facility.

15   *Id.* It does not have beds, showers, or medical facilities. *Id.* Individuals taken to B-18 are being kept

16   in small, windowless rooms with dozens or more other detainees in cramped quarters. *Id.* ¶ 76. Some

17   rooms are so cramped that detainees cannot sit, let alone lie down, for hours at a time. *Id.* As of June

18   20, 2025, over 300 individuals were being held at B-18. *Id.* ¶ 77.

19       Detainees are also routinely deprived of food, and some have not even been given water

20   other than what comes out of the combined sink and toilet in the group detention room. *Id.* ¶ 79.

21   Upon asking for food, detainees have been told repeatedly that the facility has run out. *Id.*

22       Detainees are denied access to necessary medical care and medications. *Id.* ¶ 80. Individuals

23   with conditions that require consistent medications and treatment are not given any medical

24   attention, even when that information is brought to the attention of the officers on duty. *Id.*; *see id.* ¶

25   91 ("On June 19, 2025, an ImmDef attorney arrived at B-18 to meet with detainees, including one

26   who was scheduled for a chemotherapy appointment the next day. Despite showing a doctor's note

27   confirming the appointment and specifying that missing the appointment would be detrimental to the

28   detainee's health, the guards repeatedly would not allow the attorney to meet with the ill detainee.").

7

Case 2:25-cv-05605-MEMF-SP     Document 89     Filed 07/13/25     Page 9 of 53     Page ID
#:1203
Case 2:25-cv-05605-MEMF-SP     Document 87     Filed 07/11/25     Page 8 of 52     Page ID
#:1148

1   The facility cannot provide detainees with basic hygiene; individuals who are menstruating have had

2   to wait long periods before receiving menstrual pads, if they receive them at all. *Id.*

3                              v.   Denial of Access to Counsel

4            Individuals detained at B-18 have had their access to prospective or retained counsel

5   restricted. *Id.* ¶ 81. On June 6, 2025, attorneys and legal representatives from CHIRLA and ImmDef

6   attempted to gain access to B-18 to advise detainees of their rights and assess their eligibility for

7   relief, but they were not permitted to enter. *Id.* ¶ 82. When they returned to B-18 the next morning,

8   attorneys identified a handwritten notice on the door of the family and attorney entrance at B-18

9   indicating that B-18 would not permit any visits that day. *Id.* ¶ 83. Federal officers then deployed an

10  unknown chemical agent against family members, attorneys, and representatives. *Id.* The chemical

11  agent caused everyone to cough and inflicted a burning sensation in the eyes, nose, and throat. *Id.*

12  That same morning, numerous unmarked white vans quickly departed B-18 with a group of

13  detainees. *Id.* ¶ 84. CHIRLA and ImmDef attorneys and representatives attempted to loudly share

14  know-your-rights information with the detainees in the vans. *Id.* Federal agents blasted their horns.

15  *Id.*

16           On the rare occasions when attorneys and family members were allowed access to their

17  clients or loved ones, they were made to wait hours at a time to see them, and the resulting visits

18  were limited to a mere five to ten minutes. *Id.* ¶ 87. In many cases, attorneys and family members

19  were unable to determine whether a particular individual is even detained at B-18, or whether they

20  had been transferred to another facility. *Id.* ¶ 88. B-18 officers have refused to provide clear answers

21  to questions about detainees' whereabouts, or refused to answer questions altogether. *Id.* ICE's

22  online locator, which provides information about detainees' location, is not updated in a timely

23  manner. *Id.*

24                            vi.   Officially Sanctioned Conduct

25           In January, the administration gave ICE field offices an arrest quota of seventy-five (75)

26  arrests a day. *Id.* ¶ 97. The administration also shut down multiple oversight agencies. *Id.* ¶ 99. The

27  administration set a new arrest quota of 3,000 arrests per day and reportedly threatened job

28  consequences if officials failed to meet arrest quotas. *Id.* ¶ 101.

8

ER-0788

Case 2:25-cv-05605-MEMF-SP     Document 89     Filed 07/13/25     Page 10 of 53     Page ID
#:1204
Case 2:25-cv-05605-MEMF-SP     Document 87     Filed 07/11/25     Page 9 of 52     Page ID
#:1149

1                        vii.   Individual Plaintiffs' Experiences

2              In the early morning of June 18, 2025, in Pasadena, California, Vasquez Perdomo was

3    waiting at a bus stop across the street from Winchell's Donuts with several co-workers to be picked

4    up for a job. *Id.* ¶ 111. About four cars converged on his location, and about half a dozen masked

5    agents jumped out on either side of him. *Id.* ¶ 112. They had weapons and masks, and did not

6    identify themselves. *Id.* Vasquez Perdomo tried to leave but was surrounded, grabbed, handcuffed,

7    and put into one of the vehicles. *Id.* ¶ 113. No warrant was shown. *Id.* ¶ 115. It was only after he was

8    brought to a nearby CVS parking lot that agents checked Vasquez Perdomo's identification. *Id.* ¶

9    114. Agents did not inform Vasquez Perdomo that they were immigration officers authorized to

10   make an arrest or of the basis for his arrest. *Id.* ¶ 119. At the time this action was filed, Vasquez

11   Perdomo had been transported to and was being held at B-18. *Id.* ¶ 120. There, he experienced

12   extremely crowded and unsanitary conditions, was given little to eat or drink, and slept on the floor.

13   *Id.*

14             In the early morning of June 18, 2025, in Pasadena, California, Osorto was waiting to be

15   picked up for work with his co-worker Vasquez Perdomo. *Id.* ¶ 124. When federal agents

16   approached, he tried to run, but one of the agents caught up to him and pointed a taser at his head

17   and said "stop or I'll use it!" *Id.* ¶ 125. Osorto stopped immediately. *Id.* Osorto was handcuffed and

18   put into a vehicle. *Id.* ¶ 126. It was only after he was brought to a nearby CVS parking lot that agents

19   asked Osorto if he had papers. *Id.* ¶ 128. No warrant was shown. *Id.* ¶ 129. Agents did not inform

20   Osorto that they were immigration officers authorized to make an arrest or of the basis for his arrest.

21   *Id.* ¶ 132. At the time this action was filed, Osorto had been transported to and was being held at B-

22   18. *Id.* ¶ 133. The facility was full, and when people asked for help, officers told them there was no

23   food, no water, and no medicine. *Id.* Today, he remains in custody at the Adelanto ICE Processing

24   Center. *Id.*

25             In the early morning of June 18, 2025, in Pasadena, California, Villegas Molina was waiting

26   to be picked up for work with his co-workers Vasquez Perdomo and Osorto. *Id.* ¶ 137. When federal

27   agents approached, an agent yelled at Villegas Molina not to run, even though he was still and calm.

28   *Id.* ¶ 139. He was told to provide his identification, and he provided his California ID, but the agent

                                                    9

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 11 of 53    Page ID
                                      #:1205
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 10 of 52    Page ID
                                      #:1150

1   kept questioning him. *Id.* No warrant was shown. *Id.* ¶ 141. Agents did not inform Villegas Molina

2   that they were immigration officers authorized to make an arrest or of the basis for his arrest. *Id.* ¶

3   144. At the time this action was filed, Villegas Molina had been transported to and was being held at

4   B-18. *Id.* ¶ 145. He slept on the floor and was given almost nothing to eat. *Id.*

5       On the morning of June 18, 2025, Hernandez Viramontes was working at a car wash in

6   Orange County, where he has worked for approximately ten (10) years, when immigration agents

7   arrived. *Id.* ¶ 148. During this visit, the agents did not identify themselves. *Id.* ¶ 149. Agents asked

8   Hernandez Viramontes whether he was a citizen, and he replied yes and explained that he was a dual

9   citizen of the U.S. and Mexico. *Id.* ¶ 151. They asked for an ID, which he provided. *Id.* Agents then

10  explained that his ID was not enough and because he did not have his passport, they were taking

11  him. *Id.* Agents placed Hernandez Viramontes in a vehicle and transported him away. *Id.* ¶ 152.

12  During this time, Hernandez Viramontes did not know whether they were going to take him to a

13  detention center. *Id.* Agents verified his citizenship and, about twenty minutes later, brought him

14  back to the car wash. *Id.* ¶ 153. When agents brought Hernandez Viramontes back to the car wash,

15  they did not apologize. *Id.* ¶ 154. Shortly after agents returned Hernandez Viramontes to the car

16  wash, yet another group of agents raided the carwash again. *Id.* ¶ 155.

17      In the afternoon of June 12, 2025, Gavidia, a U.S. citizen, was at a tow yard in Los Angeles

18  County that was visited by immigration agents conducting a roving patrol. *Id.* ¶ 157. Around 4:30

19  p.m., upon hearing someone say that immigration agents may be at the premises, Gavidia went

20  outside to confirm this. *Id.* ¶ 158. At the time, his clothes were dirty from working on his car. *Id.* On

21  the sidewalk outside the gate, Gavidia saw a federal agent between two cars step forward. *Id.* ¶ 159.

22  Soon after, Gavidia saw several other agents wearing similar vests with the words "Border Patrol

23  Federal Agent." *Id.* He also noticed that the agents were carrying handguns and at least two of the

24  agents had a military-style rifle. *Id.* When Gavidia attempted to head back inside the tow yard

25  premises, a masked agent said, "Stop right there." *Id.* ¶ 160. While the agent approached Gavidia,

26  another unmasked agent ran toward him and asked if he was American. *Id.* ¶ 161. Gavidia told the

27  agent that he is American multiple times. *Id.* The agent responded by asking, "What hospital were

28  you born in?" *Id.* Gavidia calmly replied that he did not know. *Id.* The agent repeated the same

10

1   question two more times, and each time Gavidia provided the same answer. *Id.* At that point, the

2   agents pushed Gavidia up against the metal gated fence, put his hands behind his back, and twisted

3   his arm. *Id.* Gavidia had been on his phone, and the masked agent also took his phone from his hand

4   at that point. *Id.* Gavidia explained that the agents were hurting him and that he was American. Id. ¶

5   162. The unmasked agent asked a final time, "What hospital were you born in?" *Id.* Gavidia

6   responded again that he did not know and said East L.A. *Id.* Gavidia then told the agents that he

7   could show them his Real ID. *Id.* The agents had not asked to see Gavidia's identification. *Id.* When

8   Gavidia showed his Real ID to the agents, one of them took it from him. *Id.* ¶ 163. It ultimately took

9   about twenty minutes for Gavidia to get his phone back, but the agents never returned his Real ID.

10   *Id.*

11               viii.   Harm to Organizational Plaintiffs and/or Their Members

12          LAWCN is a regional organization made up of eight worker centers and labor organizations

13   that work together to build power and develop worker leadership organizing with Black, immigrant,

14   and refugee workers and other workers of color in the Los Angeles region. *Id.* ¶ 167. At least one of

15   LAWCN's member organizations, CLEAN, has been harmed by the ongoing raids in Southern

16   California. *Id.* ¶¶ 169, 172 ("Carwashes have been a consistent and ongoing target of immigration

17   agents during the course of the raids—at least two dozen have been raided so far.").

18          UFW's members have been harmed by the ongoing immigration raids in Southern California

19   and fear being subjected to unlawful stops, arrests, and detention practices in the future. *Id.* ¶ 179. At

20   least one UFW member has been subjected to Defendants' stop and arrest practices. *Id.*

21          As a result of Defendants' actions, CHIRLA's mission to serve the immigrant community,

22   including through the provision of legal advice and services, is being frustrated. *Id.* ¶ 190.

23   Throughout the month of June 2025, CHIRLA's attorneys and representatives have attempted to

24   communicate with individuals at B-18 but were denied access and thwarted in their efforts to offer

25   legal advice to even those detainees they saw at a distance. *Id.* CHIRLA also coordinates the Los

26   Angeles Rapid Response Network ("LARRN") and educates its membership as well as the broader

27   community through know-your-rights programming, workshops, social media, and educational

28   literature about a variety of social services and benefits, including immigration law, financial

11

ER-0791

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 13 of 53    Page ID
#:1207
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 12 of 52    Page ID
#:1152

1    literacy, workers' rights, and civic engagement. *Id.* ¶ 188. Defendants' actions are also thwarting

2    CHIRLA's work to coordinate the LARRN, as other attorneys and representatives summoned by

3    CHIRLA to B-18 have been similarly denied access. *Id.* ¶ 190.

4        ImmDef's Rapid Response team is also part of LARRN, with CHIRLA, and monitors a

5    hotline and responds to notifications about individuals detained in ICE immigration enforcement

6    actions. *Id.* ¶ 193. As a result of Defendants' actions, ImmDef's mission to serve the immigrant

7    community, including through the provision of legal advice and services, is being fundamentally

8    frustrated. *Id.* ¶ 194.

9        **B. Procedural History**

10       On June 20, 2025, Petitioner-Plaintiffs filed a Petition for Writ of Habeas Corpus. ECF No. 1

11   ("Petition" or "Pet."). The Petition alleged five causes of action: (1) Warrantless Arrests Without

12   Probable Cause of Flight Risk in violation of 8 U.S.C. § 1357(a)(2); (2) Warrantless Arrests Without

13   Probable Cause of Flight Risk in violation of 8 C.F.R. § 287.8(c)(2)(ii); (3) Arrests Without

14   Probable Cause in violation of the Fourth Amendment; (4) Failure to Identify Officers and Basis for

15   Arrest in violation of 8 C.F.R. § 287.8(c)(2)(iii);[4] and (5) Violation of Due Process. *See generally id.*

16       On June 20, 2025, Petitioner-Plaintiffs filed an ex parte application and requested the Court

17   grant their request for a temporary restraining order and enjoin Defendants Noem, Bondi, ICE, and

18   Lyons from transferring Petitioner-Plaintiffs outside of this judicial district. *See generally* ECF No.

19   4. The same day, the parties stipulated to withdraw the ex parte application. ECF No. 9. The Court

20   granted the stipulation on June 23, 2025. ECF No. 11.

21       Following the Magistrate Judge's July 1, 2025 Order Vacating Status Conference (ECF No.

22   15), the parties filed a Joint Notice Following Order Vacating Status Conference (ECF No. 36),

23   through which they informed the Court that the Petitioner-Plaintiffs' bond hearings were set for July

24   3, July 7, and July 8, 2025. On July 8, 2025, the parties filed another Joint Notice Following Order

25   Vacating Status Conference, informing the Court that Vasquez Perdomo was granted bond on July 3,

26   2025, and that Villegas Molina was granted bond on July 7, 2025. ECF No. 62.

27

28   ──────────
     [4] The Court finds that the Petition erroneously cites to 8 C.F.R. § 287.8(c)(3). Reading the regulation, it
     appears to the Court that 8 C.F.R. § 287.8(c)(2)(iii) is the correct citation.

12

Case 2:25-cv-05605-MEMF-SP   Document 89   Filed 07/13/25   Page 14 of 53   Page ID
#:1208
Case 2:25-cv-05605-MEMF-SP   Document 87   Filed 07/11/25   Page 13 of 52   Page ID
#:1153

1    On July 2, 2025, Plaintiffs filed the operative First Amended Complaint. 1AC. The 1AC adds

2    as plaintiffs Viramontes, Gavidia, LAWCN, UFW, CHIRLA, and ImmDef. *Id.* ¶¶ 15–20. The 1AC

3    also adds as defendants Scott, Bank, Patel, Santacruz Jr., Wang, Bovino, Stalnaker, Davis, and

4    Essayli. *Id.* ¶¶ 23–32. Moreover, the 1AC contains class action allegations, *id.* ¶¶ 199–214, seeking

5    to represent a class under Federal Rule of Civil Procedure 23(b)(2) consisting of three classes, *id.* ¶¶

6    199 ("Suspicionless Stop Class"),[5] 202 ("Warrantless Arrest Class"),[6] 205 ("Failure to Identify

7    Class").[7] Plaintiffs allege the following causes of action:

| Count | Cause of Action | On Behalf of: | Against Defendants: |
|---|---|---|---|
| One | Violation of Fourth Amendment, Unreasonable Seizures | Stop/Arrest Plaintiffs and the Suspicionless Stop Class | All Defendants |
| Two | Violation of 8 U.S.C. § 1357(a)(2), Warrantless Arrests Without Probable Cause of Flight Risk | LAWCN, UFW, CHIRLA, and the Warrantless Arrest Class | All Defendants |
| Three | Violation of 8 C.F.R. § 287.8(c)(2)(ii), Standards for Stops and Warrantless Arrests | LAWCN, UFW, CHIRLA, and the Warrantless Arrest Class | All Defendants |
| Four | Violation of 8 C.F.R. § 287.8(c)(2)(iii), Failure to Identify Authority and Reason for Arrest | LAWCN, UFW, CHIRLA | All Defendants |
| Five | Violation of the Fifth Amendment, Access to Counsel | Access/Detention Plaintiffs | Noem, Lyons, and Santacruz Jr. |
| Six | Violation of 8 U.S.C. § 1362, Access to Counsel | Access/ Detention Plaintiffs | Noem, Lyons, and Santacruz Jr. |
| Seven | Violation of the Fifth Amendment, | Access/ Detention Plaintiffs | Noem, Lyons, and Santacruz Jr. |

---

[5] The Suspicionless Stop Class is defined as "[a]ll persons who, since June 6, 2025, have been or will be subjected to detentive stop by federal agents in this District without a pre-stop, individualized assessment of reasonable suspicion concerning whether the person (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully in the United States." 1AC ¶ 199.

[6] The Warrantless Arrest Class is defined as "[a]ll persons, since June 6, 2025, who have been arrested or will be arrested in this District by federal agents without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses a flight risk." 1AC ¶ 202.

[7] The Failure to Identify Class is defined as "[a]ll persons who, since June 6, 2025, have been arrested or will be arrested in this District by federal agents, where agents (1) fail to identify as an immigration officer who is authorized to execute an arrest, and/or (2) fail to state that person is under arrest and the reason for arrest, after it is practical and safe to do so." 1AC ¶ 205.

13

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 15 of 53    Page ID
#:1209
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 14 of 52    Page ID
#:1154

| | Conditions of Confinement | | |
|---|---|---|---|
| Eight | Violation of Fifth Amendment, Due Process | Petitioner-Plaintiffs | Noem, Lyons, and Santacruz Jr. |

On July 2, 2025, the Access/Detention Plaintiffs filed an Ex Parte Application for Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction. ECF No. 38 ("Access/Detention TRO").[8] The same day, the Court ordered the parties to fully brief the Access/Detention TRO by July 9, 2025. ECF No. 42. After the Court's Order, Plaintiffs filed another Ex Parte Application for Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction. ECF No. 45 ("Stop/Arrest TRO"). On July 7, 2025, the Court ordered the parties to follow the same briefing schedule outlined in its July 2, 2025 Order. ECF No. 51. Defendants filed their Oppositions on July 8, 2025. ECF Nos. 70 (Opposition to the Access/Detention TRO), 71 (Opposition to the Stop/Arrest TRO). On July 9, 2025, Plaintiffs filed their Replies. ECF Nos. 81 (Reply to the Stop/Arrest TRO), 82 (Reply to the Access/Detention TRO).

On July 7, 2025, States of Arizona, Colorado, Connecticut, Hawaiʻi, Illinois, Maryland, Maine, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Vermont, Washington, and the Commonwealth of Massachusetts ("Amici States") filed a Motion for Leave to File Brief of Amici Curiae. ECF No. 49. The Court granted the motion on the same day. ECF No. 52; *see* ECF No. 49-1 ("Amici Curieae Brief").

On July 8, 2025, the City of Los Angeles, the County of Los Angeles, the City of Culver City, the City of Montebello, the City of Monterey Park, the City of Pasadena, the City of Pico Rivera, the City of Santa Monica, and the City of West Hollywood ("Plaintiffs-Intervenors") filed an Unopposed Ex Parte Application to Participate in July 10 TRO Hearing. ECF No. 63. The Court granted the ex parte application the same day. ECF No. 69.

On July 8, 2025, the Plaintiffs-Intervenors filed a Motion to Intervene, which remains pending. ECF No. 61. On July 10, 2025, the Court held a hearing on both TROs.

---

[8] The Access/Detention TRO is filed against Defendants Noem, Lyons, Santacruz Jr. *See* Access/Detention TRO at 1 n.1.

14

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 16 of 53    Page ID
#:1210
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 15 of 52    Page ID
#:1155

## II.    **Applicable Law**

The preliminary injunction and temporary restraining order standards are "substantially identical." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Accordingly, the Court will outline the governing law for granting a preliminary injunction. A preliminary injunction is an extraordinary remedy never awarded as of right. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20 ("*Winter* Test").

The Ninth Circuit also recognizes a "serious questions" variation of the *Winter* Test. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this variation, "a preliminary injunction is proper if there are serious questions going to the merits; there is a likelihood of irreparable injury to the plaintiff; the balance of the hardships tips sharply in favor of plaintiff; and injunction is in the public interest." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

A preliminary injunction is "an extraordinary and drastic remedy" and "should not be granted unless the movant, *by clear showing*, carries the burden of persuasion." *Id.* at 1072 (emphasis in original) (quotations omitted). At this stage, the Court is only determining whether Plaintiffs have met their burden for a preliminary injunction. *See Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980). **Accordingly, this Order is not a final decision on the merits of any claim, nor is it a decision on the merits of the factual assertions either party made in support of any claim.**

/ / /

/ / /

/ / /

/ / /

/ / /

15

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 17 of 53    Page ID
#:1211
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 16 of 52    Page ID
#:1156

## EX PARTE APPLICATIONS

### I.  **Applicable Law**

"[C]ircumstances justifying the issuance of an ex parte order are extremely limited." *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1131 (quoting *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438–39 (1974)). "Consistent with [the Supreme Court's] overriding concern, courts have recognized very few circumstances justifying the issuance of an ex parte TRO." *Id.* (discussing parties' failure to provide notice under Fed. R. Civ. P. 65(b)).

In this District, ex parte applications are solely for extraordinary relief and are rarely justified. *Mission Power Eng'g Co. v. Cont'l Cas. Co.*, 883 F. Supp. 488, 490 (C.D. Cal. 1995). A party filing an ex parte application must support its request for emergency relief with "evidence . . . that the moving party's case will be irreparably prejudiced if the underlying motion is heard according to regularly noticed motion procedures," and a showing "that the moving party is without fault in creating the crisis that requires ex parte relief, or that the crisis occurred as a result of excusable neglect." *Id.* at 492. "Ex Parte applications are not intended to save the day for parties who have failed to present requests when they should have." *Id.* at 493 (internal quotation marks omitted).

This Court's operative Civil Standing Order states: "Counsel are reminded that ex parte applications are solely for extraordinary relief. Applications that do not meet the requirements set forth in Local Rule 7-19 will not be considered. Sanctions may be imposed for misuse of ex parte applications." Civil Standing Order § XII.

### II.  **Discussion**

Defendants argue that Plaintiffs cannot establish that they are entitled to seek the instant TRO on an ex parte basis because (1) they delayed filing the 1AC and the two TROs that are before this Court by over a month, and (2) they elected not to file a new case but instead joined a "largely mooted" small habeas petition. ECF No. 70 at 6–7. Defendants further argue that Plaintiffs have not

16

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 18 of 53    Page ID
#:1212
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 17 of 52    Page ID
#:1157

1    satisfied the *Mission Power* standard.[9] *See id.* at 6; ECF No. 71 at 6 ("[Plaintiffs'] application does

2    not even mention [the *Mission Power*] threshold legal standard, which they do not meet."). Plaintiffs

3    have shown that they are entitled to seek relief on an ex parte basis under *Mission Power*.

4        The Court finds that Plaintiffs acted expeditiously in this case. It is undisputed that the events

5    underlying this action started in early June 2025 and that Plaintiffs filed the 1AC on July 2, 2025.

6    Defendants contend that this month-long delay should be construed against Plaintiffs, but provide no

7    authority holding that a month is an unacceptable amount of time for purposes of ex parte

8    applications. *See generally* ECF No. 70 at 6. Rather, the Court finds that a month is a reasonable

9    amount of time for Plaintiffs to prepare a class action complaint alongside the instant TROs in this

10   case, especially considering that Plaintiffs would have needed just as much, if not more, time to

11   intake, investigate, request a summons, and complete service if they decided to file a new case.

12   Similarly, Defendants provide no authority holding that the "highly anomalous procedural status" of

13   a case should be grounds to deny an ex parte application. *See generally id.* at 7. Rather, considering

14   the totality of the circumstances—in particular, the alleged ongoing denial of access to counsel that

15   continued at least until the filing of the instant TRO, *see* ECF No. 38-9 ("Salas Declaration" or

16   "Salas Decl.") ¶ 33 ("To date [July 2, 2025], access to detainees at B-18 has been sporadic and

17   ineffective."); ECF No. 38-11 ("Toczylowski Declaration" or "Toczylowski Decl.") ¶¶ 51–52

18   (testifying that the access to counsel issue persists today based on an ImmDef attorney's failure to

19   have a confidential conversation with a client on June 27, 2025)—the Court finds that Plaintiffs

20   acted swiftly to file the 1AC and the instant TROs.

21        As Plaintiffs also note, there is no binding authority indicating that a party seeking a TRO

22   must meet the *Mission Power* standard in addition to the TRO standard and the requirements of Rule

23

24

---

25   [9] During the hearing, Defendants additionally argued that the ex parte nature of these TROs is inappropriate
26   because it gave too little time for them to review and collect evidence. But the Court is not persuaded. As the
     Court will note later, Defendants did not provide even the documents related to the named individual
27   plaintiffs, such as the *three* Petitioner-Plaintiffs, in support of their Oppositions. The only post-detention
     record related to the Petitioner-Plaintiffs, ECF No. 81-1 at 8–12 (Form I-213, Record of
28   Deportable/Inadmissible Alien), was provided by Plaintiffs, not Defendants, despite the record having been
     prepared by the DHS.

17

1   65.[10] And even if they did, in light of the exigent circumstances alleged in the 1AC and the TROs

2   and the relatively expeditious manner in which Plaintiffs appear to have proceeded, the Court finds

3   that the *Mission Power* standard has been met.

4        As such, the Court proceeds to evaluating the merits of the TROs.

5                    **THE ACCESS/DETENTION TRO [ECF NO. 38]**

6   **I.    Discussion**

7        **A. The Access/Detention Plaintiffs Have Shown that They Have Standing.**

8        The Access/Detention Plaintiffs assert that they have standing because Defendants have

9   impeded their "ability to engage in the representation of immigrants and refugees that is at the core

10  of their founding mission." *See* ECF No. 38 at 11 (collecting cases). Defendants respond that the

11  Access/Detention Plaintiffs have not established standing. *See* ECF No. 70 at 10–15. The Court finds

12  that the Access/Detention Plaintiffs have standing.

13       To establish standing, a plaintiff must show first that they have suffered an "injury in fact –

14  an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual

15  or imminent, not conjectural or hypothetical[.]" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560

16  (1992) (internal quotation marks omitted). The plaintiff must then show causation and redressability.

17  *Id.* at 560–61.

18       Where it is alleged that a defendant's conduct has "perceptibly impaired" an organization's

19  "ability to provide counseling and referral services" for indigent population, "there can be no

20  question that the organization has suffered injury in fact." *Havens Realty Corp. v. Coleman*, 455

21  U.S. 363, 379 (1982); *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (explaining that in

22

23

24

---

25  [10] Although it is true that this Court has relied on *Mission Power* in its past orders on ex parte applications, it
26  has done so as persuasive authority to provide the context in which the Court has made its rulings—that is, the
    parties seeking ex parte applications generally have not shown that a regularly noticed motion is insufficient
27  and that they are not at fault for creating the crisis that requires an ex parte relief. The standard the Court has
    applied—including Rule 65—accomplishes essentially the same purpose here. Considering the totality of
28  circumstances before this Court and the members of this District allegedly face, the Court finds that Plaintiffs'
    failure to make explicit arguments based on *Mission Power* is of no moment for purposes of these TROs.

18

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 20 of 53    Page ID
#:1214
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 19 of 52    Page ID
#:1159

1    *Havens Realty*, "[the defendant's] action directly affected and interfered with [the plaintiff

2    organization's] core business activities").[11]

3          The Court finds that the Access/Detention Plaintiffs have established an injury in fact.

4    Specifically, the Court first finds that Plaintiffs have sufficiently shown that the Access/Detention

5    Plaintiffs' missions are to provide legal representation and counsel to immigrants, such as the

6    detainees at B-18. CHIRLA was founded to "advance the human and civil rights of immigrants and

7    refugees" and that it has become "one of the largest and most effective advocates for immigrant

8    rights, organizing, educating and defending immigrants and refugees in the streets, in the courts, and

9    in the halls of power." 1AC at ¶ 19. Its staff includes "attorneys and Department of Justice (DOJ)

10    accredited representatives who provide pro bono legal services to clients in removal proceedings,

11    including those who are detained." *Id*. Similarly, ImmDef is a nonprofit organization that "focuse[s]

12    on ensuring that every immigrant before the immigration court had a lawyer by their side." *Id*. at ¶

13    20. ImmDef has "expanded its mission beyond helping individuals facing deportation to also work

14    towards systemic changes" and providing "deportation defense, legal representation, legal education,

15    and social services to detained and non-detained children and adults." *Id*. These allegations are

16    supported by the testimony of Angelica Salas, the Executive Director of CHIRLA, and Lindsay

17    Toczylowski, the President and Chief Executive Officer of ImmDef. Salas Decl. ¶¶ 2, 3;

18    Toczylowski Decl. ¶ 2. Defendants have not presented any evidence to seriously dispute this.[12]

19          The Court further finds that Plaintiffs have adequately shown the Access/Detention

20    Plaintiffs' missions have been frustrated by Defendants' actions. In particular, Toczylowski

21    represents that multiple ImmDef attorneys were unable to provide legal counsel to—let alone meet

22    with—clients. *See id*. ¶¶ 5–14 (on June 6, 2025, ImmDef attorneys could not enter B-18; although

23    two attorneys were eventually permitted to enter, they were unable to meet with any clients), 18–19

24    (on June 7, 2025, ImmDef attorneys attempted to yell legal advice to the detainees who were being

25

---

26    [11] In light of the holding in *Alliance for Hippocratic Medicine*, albeit in a different "context" than *Havens
27    Realty*, the Court finds Defendants' warning that *Havens Realty* should not apply here unavailing. *See* ECF
No. 70 at 10 n.7.

28    [12] Instead, they say without support that "organizational Plaintiffs are publicly dedicated to preventing and
obstructing federal immigration enforcement." ECF No. 71 at 10.

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 21 of 53    Page ID
                                    #:1215
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 20 of 52    Page ID
                                    #:1160

1  transported by vans, but the guards added partitions to obstruct the attorneys' view of the vans and

2  began to honk "whenever the attorneys spoke"), 23–24 (on June 8, 2025, a handwritten sign was on

3  the door of the facility, reading, "Attorney/Family Visit Temporary Cancelled Today," without

4  further explanation), 25–31 (ImmDef attorneys were unable to meet with clients the following

5  week); *see also* ECF No. 82-6 ("Toczylowski Supp. Decl.") ¶ 8 (on July 8, 2025, an ImmDef

6  attorney was unable to meet with a person referred to ImmDef). Salas similarly testifies that

7  CHIRLA attorneys and representatives were denied access to the detainees at B-18. *See* Salas Decl.

8  ¶¶ 12–15 (denied access on June 6, 2025), 16–23 (denied access on June 7, 2025), 32–36 ("To date,

9  access to detainees at B-18 has been sporadic and ineffective. CHIRLA attorneys, representatives,

10  and members are not given adequate information to locate clients and family members. CHIRLA

11  attorneys and representatives have not been able to provide legal advice or representation to

12  detainees at B-18 . . . ."); *see also* ECF No. 82-5 ("Thompson-Lleras Supp. Decl.) ¶¶ 13–15

13  (CHIRLA attorney was not able to meet with detainees on July 8, 2025). Toczylowski and Salas

14  further testify that the attorneys were sprayed with "an unknown chemical agent" that caused

15  "everyone to cough and inflicted a burning sensation in the eyes, nose, and throat." *Id.* ¶¶ 17–24;

16  Toczylowski Decl. ¶¶ 21, 24. This testimony aligns with the allegations of the 1AC regarding denied

17  access to counsel. *See* 1AC ¶¶ 81– 92. Again, Defendants do not present evidence controverting this

18  in any meaningful way; they merely attempt to minimize the impact of these facts or characterize

19  them as limited to a short period of time justified by nearby civil unrest.[13]

20

21

---

22  [13] During the hearing, Defendants contended that because normal operations at B-18 have resumed, there is
23  no likelihood that the Access/Detention Plaintiffs would again be sprayed or honked at. This argument misses
    the point. At issue are the denial of access to counsel and interference with the Access/Detention Plaintiffs'
24  core missions, not that the attorneys were sprayed or honked at (although one would hope not to be sprayed or
    honked at during the course of their job). That there is no likelihood of spraying and honking does not
25  eliminate the likelihood that the Access/Detention Plaintiffs' missions will continue to be interrupted,
    especially in light of the evidence submitted alongside the Reply that the attorneys were still denied access as
26  of July 9, 2025. *See* Toczylowski Supp. Decl. ¶¶ 15 (an attorney could not speak with a detainee), 16 (the
    private rooms at B-18 was not accessible).

27

   Considering that the denial of access issue persists despite there being no protests of similar scale, the Court
28  also finds Defendants' arguments based on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)—that
   Plaintiffs rely on a highly attenuated chain of events—fall flat.

20

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 22 of 53    Page ID
#:1216
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 21 of 52    Page ID
#:1161

1    Based on these allegations and supporting testimony, the Court finds that the

2  Access/Detention Plaintiffs have sufficiently established that their missions of providing legal

3  representation to immigrants, such as those allegedly detained at B-18, have been frustrated by

4  Defendants' actions. Further, insofar as the Access/Detention Plaintiffs were not able to

5  meaningfully meet with the detainees at B-18 as of the filing of this TRO and even afterwards, the

6  Court finds that they have alleged "continuing, present adverse effects" *and* a "sufficient likelihood

7  that [they] will again be wronged in a similar way" for purposes of standing.[14] *See City of Los*

8  *Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983).

9    Having found that the Access/Detention Plaintiffs have established injury in fact, the Court

10  also finds that they have sufficiently alleged causation (i.e., Defendants denied access, including by

11  not permitting entry, blocking the attorneys' vision with vans, honking, and spraying chemicals) and

12  redressability (i.e., the instant TRO seeks restoration of opportunities to meet with detainees to

13  resume the Access/Detention Plaintiffs' core missions).

14    The Court also finds that CHIRLA has associational standing. An organization has standing

15  to bring suit on its members' behalf if (1) its members would otherwise have standing to sue in their

16  own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3)

17  neither the claim asserted nor the relief requested requires the participation of individual members in

18  the lawsuit. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Here, the

19  evidence presented shows that the members of CHIRLA satisfy Article III standing on their own in

20  light of their reasonable fear of imminent detention without access to counsel. 1AC ¶ 189; *see* Salas

21  Decl. ¶¶ 24–31 (testifying that CHIRLA's individual members are fearful of being stopped, arrested,

22  detained, and deported). The Court has already found that the Access/Detention Plaintiffs' core

23  missions are being interrupted. Considering the ability of the Access/Detention Plaintiffs to litigate

24  this matter (investigating and collecting evidence, preparing and presenting briefs and arguments),

25

26

27    [14] As such, the Court finds Defendants' repeated arguments that the Access/Detention Plaintiffs failed to
show actual or future injury to themselves unavailing. *See* ECF No. 70 at 9 ("Plaintiffs have presented no

28  evidence that any alleged misconduct will occur in the future."), 11 ("Here, at bottom, Plaintiffs lack standing
to pursue claims based on injuries they are unlikely to experience in the future.").

21

1    the Court finds that neither the claim asserted nor the relief sought requires individual members'

2    participation. As such, the Court finds that CHIRLA also has associational standing.[15]

3        Defendants' arguments against the Access/Detention Plaintiffs are not persuasive. They

4    argue that the Access/Detention Plaintiffs failed to identify any "statute or regulations that confers

5    on them 'legally cognizable interests' to pursue their mission in representing unidentified individuals

6    currently held at B-18," ECF No. 70 at 12 (citing *Spokeo Inc. v. Robins*, 578 U.S. 330, 341 (2016)),

7    but *Spokeo* does not require such a showing. Rather, as Defendants quote, the Supreme Court in

8    *Spokeo* held that "Article III standing requires a *concrete injury* even in the context of a statutory

9    violation"—that is, a plaintiff must satisfy the injury in fact element to establish Article III standing,

10   which this Court has already found that the Access/Detention Plaintiffs have done. *Id*. Moreover, the

11   Court finds Defendants' argument that the Access/Detention Plaintiffs are merely concerned about

12   loss of "prospective clients" to be based on a misreading of the TRO. *See* ECF No. 70 at 12. Rather,

13   as the allegations and the evidence identified above show, the Court finds that the Access/Detention

14   Plaintiffs are asserting injury in fact based on the alleged interference with their ability to carry on

15   their core missions, which is to provide legal services to immigrants and refugees; finding "new

16   clients" is a mischaracterization and improperly focuses on a tangential issue at best. *See* 1AC at ¶¶

17   19, 20; Salas Decl. ¶¶ 2, 3; Toczylowski Decl. ¶ 2. Defendants also argue that the Access/Detention

18   Plaintiffs cannot establish "next friend standing," but as the Court has already found that they have

19   shown organizational standing under *Havens Realty* as well as associational standing, there is no

20   need to evaluate this argument. *See* ECF No. 70 at 13–15.

---

[15] Defendants argue that the Access/Detention Plaintiffs need to assert their own "liberty interest" independent of their members' liberty interest. *See* ECF No. 70 at 18 (quoting *Erickson v. U.S. ex rel. Dep't. of Health and Human Servs*., 67 F.3d 858, 861 (9th Cir. 1995)). But this argument appears to be based on the assumption that the Access/Detention Plaintiffs lack standing to sue on their members' behalf. Because the Court has found that they have associational standing, and Defendants do not provide binding authority holding that an organization that has associational standing needs to have its own, independent liberty interest, the Court finds this argument unavailing.

Even assuming the Access/Detention Plaintiffs are required to show that they have independent liberty interest and could not show it, the Court finds that under the "sliding scale" approach the Ninth Circuit applies to TROs, the evidence submitted show such "serious questions going to the merits" that the requested relief is warranted. *See Lopez*, 680 F.3d at 1072.

22

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 24 of 53    Page ID
                                     #:1218
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 23 of 52    Page ID
                                     #:1163

1    In sum, the Court finds that the Access/Detention Plaintiffs have established standing for this

2    action.

3        **B. The Access/Detention Plaintiffs Have Established that They Are Likely to
4           Succeed on the Merits.**

5    The Access/Detention Plaintiffs argue that they are likely to succeed on their Fifth

6    Amendment-based causes of action. In particular, they argue that Defendants "have obstructed

7    established attorney-client relationship and prevented CHIRLA and ImmDef attorneys from

8    providing legal advice to B-18 detainees." *See id.* at 9–10. They also argue that Defendants

9    prevented the organizations' "prospective clients from accessing CHIRLA's and ImmDef's legal

10   services as well" and that "the lack of contact with the outside world . . . raises the concern that

11   Defendants are holding detainees at B-18 incommunicado, which also violates the Fifth

12   Amendment." *Id.* at 10–11. The Access/Detention Plaintiffs have also alleged and submitted

13   testimony that their members have a fear of being detained. *See* 1AC ¶ 189. Defendants respond that

14   the restrictions on the Access/Detention Plaintiffs' communication with current and prospective

15   clients were not punitive or excessive, and that there is no showing of a liberty interest, ECF No. 70

16   at 18, or error or prejudice, *id.* at 19. The Court finds that the Access/Detention Plaintiffs have

17   established likelihood of success on the merits on the Violation of the Fifth Amendment claim.

18       "Rooted in the Due Process Clause . . . , noncitizens have the right to counsel in removal

19   proceedings[.]" *Usubakunov v. Garland*, 16 F.4th 1299, 1303 (9th Cir. 2021); *see Biwot v. Gonzales*,

20   403 F.3d 1094, 1098 (9th Cir. 2005) ("The right to counsel in immigration proceedings is rooted in

21   the [Fifth Amendment] Due Process Clause[.]"); *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549,

22   554, 565 (9th Cir. 1990) (recognizing that "aliens have a due process right to obtain counsel of their

23   choice at their own expense," and affirming injunction against government practices "the cumulative

24   effect of which was to prevent aliens from contacting counsel and receiving any legal advice,"

25   including the practice of denying visits with counsel); *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir.

26   2000) ("The Fifth Amendment guarantees due process in deportation proceedings. . . . As a result, an

27   alien who faces deportation is entitled to a full and fair hearing of his claims and a reasonable

28   opportunity to present evidence on his behalf."). Consequently, immigrants are entitled to "a

23

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 25 of 53    Page ID
#:1219
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 24 of 52    Page ID
#:1164

1   reasonable time to locate counsel, and permit counsel to prepare for [immigration] hearing." *Rios-*

2   *Berrios v. INS*, 776 F.2d 859, 863 (9th Cir. 1985). The government cannot impose restrictions on

3   access to counsel that undermine the immigrant's opportunity to obtain one. *See Orantes-Hernandez*,

4   919 F.2d at 554, 565 (construing the government's failure to provide an accurate legal services list as

5   "prevent[ing] aliens from contacting counsel and receiving any legal advice"). Such impediments to

6   "an established, on-going attorney-client relationship" constitute a "constitutional deprivation." *See*

7   *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1439 (9th Cir. 1986).

8       CHIRLA has members who this Court finds "reasonably fear being subject to the stop and

9   arrest practices challenged in this case and *subsequent detention at B-18*." 1AC ¶ 189 (emphasis

10  added); *see* Salas Decl. ¶¶ 24–31 (testifying that CHIRLA's individual members are fearful of being

11  stopped, arrested, detained, and deported). In light of the allegations and declaration testimony

12  regarding the ongoing denial of access to counsel and the evidence submitted in support thereof, the

13  Court finds that fear of being detained without access to counsel among the members of CHIRLA in

14  the absence of the requested TRO is well-grounded on the facts of this case and therefore reasonable.

15  And insofar as denial of access to counsel may constitute a violation of CHIRLA's members' Fifth

16  Amendment rights, the Court finds that Access/Detention Plaintiffs have demonstrated the likelihood

17  of success on the merits for the fifth cause of action.

18      The same is true of ImmDef. As another court in this district recently found, standing and

19  likelihood of success may be found where an organization alleges "ongoing or potential relationships

20  with" individual plaintiffs or proposed class. *Immigrant Defenders Law Ctr. v. Noem*, No. CV 20-

21  9893 JGB (SHKx), 2025 WL 1172442, *21, *22 (C.D. Cal. April 16, 2025). Here, the Toczylowski

22  Declaration presents ample anecdotal evidence that ImmDef attorneys have been unable to meet

23  with the detainees at B-18. *See generally* Toczylowski Decl. (recounting repeated failed attempts to

24  meet with the detainees). Moreover, the Court finds that Defendants' arguments that any restrictions

25  on counsel are "not punitive or excessive" are based on the misreading of the TRO and the evidence

26  submitted in support thereof. For instance, contrary to Defendants' argument that there is no

27  evidence of "recurring misconduct," the Access/Detention Plaintiffs' declaration evidence shows

28

24

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 26 of 53    Page ID
                                          #:1220
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 25 of 52    Page ID
                                          #:1165

1    that the attorneys were denied (meaningful) access as recently as July 8, 2025.[16] *See* Salas Decl. ¶

2    33; Toczylowski Decl. ¶ 51–53 (an attorney was denied access on June 27, 2025, because she did not

3    have her "bar card"); Toczylowski Supp. Decl. ¶ 9 ("Another attorney who was at B-18 [on July 8,

4    2025] to visit a client that same day was unable to do so because her potential client had also been

5    transferred."); Thompson-Lleras Supp. Decl. ¶¶ 13–15 (on July 8, 2025, CHIRLA attorney was

6    unable to meet with three detainees). Similarly, Defendants' recount of what happened on various

7    dates in June are not consistent with what the evidence shows. For example, Defendants argue that

8    on June 6, 2025, "one employee [who was told by a different attorney that B-18 was full] was never

9    denied entry," ECF No. 70 at 4, but the TRO and the underlying Salas Declaration show that the

10   attorney was indeed denied access, Salas Decl. ¶¶ 13–15 (CHIRLA employee was not allowed into

11   B-18). Further, based on the events on June 7, 2025, Defendants argue that the Access/Detention

12   Plaintiffs do not allege that any of the detainees are their clients, but the evidence shows that the

13   attorneys could not have had a clear view of the "group" of detainees who were being transported

14   because the agents blocked them with vans. *See* Salas Decl. ¶ 19 ("Several unmarked vans were also

15   parked inside the garage in such a way as to obstruct the view through the garage gates of detainees

16   being walked through and loaded into vehicles."); ECF No. 70 at 4 (omitting Salas's testimony of

17   obstructed view). Most telling, Defendants argue that a chemical was sprayed "about the same time

18   that law enforcement was attempting to clear a large protest from an adjacent building," *id.* at 5 n.2,

19   but the news article in support of this argument shows the date of July 8, 2025, whereas the spray

20   incident occurred the previous day, *see* Salas Decl. ¶ 20 (testifying that "federal agents sprayed an

21   unknown chemical irritant" on July 7, 2025).

---

[16] At the hearing, Defendants argued that because the normal operations at B-18 resumed as of June 24, 2025, the Access/Detention Plaintiffs cannot show that the denial of access issue will reoccur. But the evidence before the Court shows that the harm persists.

Defendants also argued that detainees often provide false names, which contributes to the attorney's inability to meet their clients or prospective clients. But Defendants provide no evidence with regard to the frequency or severity of this false-name issue. As such, the Court finds this argument unconvincing.

25

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 27 of 53    Page ID
                                              #:1221
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 26 of 52    Page ID
                                              #:1166

1      Such misreading of the evidence,[17] coupled with the effect on the Access/Detention Plaintiffs

2   and their members (even if the limitations were "responsive to the volatile situation at hand," ECF

3   No. 70 at 18), compels this Court to conclude that Defendants' conduct—even if not necessarily

4   intended to be so—was punitive and had the effect of unlawfully "prevent[ing] aliens from

5   contacting counsel and receiving any legal advice." *See Block v. Rutherford*, 468 U.S. 576, 583–84

6   (1984); *Orantes-Hernandez*, 919 F.2d at 565. And it was not rationally related to any legitimate

7   purpose as even when there were "no protests happening," B-18 was not accessible to attorneys.[18]

8   Toczylowski Decl. ¶¶ 30–31 (visit on June 16, 2025).

9       As such, the Court finds the first *Winter* factor weighs in favor of granting this TRO.

10      In addition, the injunctive relief requested is tailored to the specific harms identified. *See*

11  *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015). The Access/Detention Plaintiffs merely

12  ask for the same access to legal visitation and confidential telephone calls at B18 as at other

13  locations. Although Defendants argue that the requested TRO is overbroad, ECF No. 82 at 21, the

14  Court finds that restoring visitations and permitting confidential telephone calls are sufficiently

15  narrow and "necessary to give prevailing party the relief to which they are entitled." *E. Bay*

16  *Sanctuary Covenant*, 993 F.3d at 680. Contrary to the Defendants' opposition, *Schmidt* does not

17  stand for the proposition that it is improper to craft an injunction requiring adherence to existing law.

18

19  [17] The Court notes that Defendants miss the point on the telephones. It appears to the Court that in addition to
    lack of access to the telephones at B-18, the Access/Detention Plaintiffs' concern is over the lack of

20  *confidential* telephone conversations. *See* ECF No. 38-1 at 2 (Proposed Order for the Access/Detention TRO,
    seeking Defendants to provide "confidential telephone calls with attorneys . . . ."). Moreover, although

21  Defendants argued at the hearing that there are attorney rooms at B-18 such that attorneys and their clients
    can have confidential conversations, where an attorney is denied access to B-18 (as alleged and shown here)

22  or denied access to a client even when they are permitted to enter B-18 (*see* Toczylowski Supp. Decl. ¶ 15
    (ImmDef attorney was "told that she could not speak to the individual because she did not have the

23  individual's A number"), the existence of these rooms are a moot point. Furthermore, there is evidence that
    the private rooms are insufficient or unavailable. Toczylowski Supp. Decl. ¶ 16 ("[ImmDef attorneys] noted

24  that they could still hear officers clearly from the rooms. One attorney was prevented from using a room at all
    because she did not have a bar card. When she tried explaining to the officer that she did not have a bar card

25  because she was barred in a state that did not provide them and offered to show him her letter of good
    standing, he still refused to give her access to a private room."). Defendants did not dispute this evidence

26  during the hearing, except by repeating that there are private rooms at B-18.

27  [18] At the hearing, Defendants asserted that if "riots" resumed and the requested TRO was in place, they would
    not be able to protect their employees and the detainees at B-18. But granting access to counsel is not the

28  same as granting unrestricted access to the public. Similarly, permitting confidential telephone attorney-client
    calls is not the same as granting physical access into B-18. As such, the argument fails.

26

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 28 of 53    Page ID
#:1222
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 27 of 52    Page ID
#:1167

1   ECF No. 71 at 9; *Schmidt v. Lessard*, 414 U.S. 473 (1974). In *Schmidt*, the injunction—such as it

2   was—merely advised the defendants in these terms: "not to enforce 'the present Wisconsin scheme'"

3   against class members. 414 U.S. at 476. This is a far cry from the specific provisions of the

4   requested TRO here. Further, given that the requested TRO is limited to this one basement facility,

5   the Court finds Defendants' concern over a "universal injunction" unwarranted. *See* ECF No. 38-1 at

6   2 (seeking visitations and confidential telephone calls at B-18).

7        At the hearing, Defendants did raise a legitimate concern about the need to make adjustments

8   to access in exigent circumstances, which the Court has accommodated in its order.

9        ### C. The Access/Detention Plaintiffs Have Established that They Will Suffer
10                Irreparable Harm.

11        The Access/Detention Plaintiffs argue that they have shown that they will suffer irreparable

12   harm. ECF No. 38 at 11–12. The Court finds that they have done so.

13        Government action that frustrates an organization's core missions gives rise to irreparable

14   harm. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677–78 (9th Cir. 2021) (finding

15   irreparable harm where governmental action prompted organizations "to change their core

16   missions"). Expediency in applying for a preliminary injunction (or a TRO) suggests "urgency and

17   impending irreparable harm." *Id.* at 678; *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018)

18   ("That the [state government plaintiffs] filed an action following [the federal government

19   defendants' action] also weighs in their favor.").

20        The Court finds that the Access/Detention Plaintiffs' missions will be—and have been—

21   frustrated by Defendants' actions for the same reasons that the Court has found that they established

22   their standing. *See* Section I.A, *supra*.

23        Considering the fear of being separated from their families as a result of the enforcement

24   actions taken by Defendants, the Court finds that CHIRLA's members are at an imminent risk of

25   irreparable harm. *See Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (finding "separated

26   families" a "substantial," even "irreparable," injury).

27        The Court finds that the alleged irreparable harm is also imminent. The Court finds that

28   Plaintiffs have been expedient in filing this action (June 20, 2025), the 1AC (July 2, 2025), and the

27

ER-0807

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 29 of 53    Page ID
#:1223
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 28 of 52    Page ID
#:1168

1    instant TRO (July 2, 2025). This supports a finding of imminent irreparable harm. *See E. Bay*

2    *Sanctuary Covenant*, 993 F.3d at 678; *Azar*, 911 F.3d at 581. Moreover, that the above-described

3    events at B-18 took place only slightly more than one month ago supports the Court's finding of

4    imminence.

5    In sum, because the Access/Detention Plaintiffs have shown that their core missions have

6    been frustrated by Defendants, that CHIRLA's members will suffer irreparable harm if subjected to

7    detention without meaningful access to counsel, and that they have acted expeditiously and without

8    delay in seeking the TRO, the Court finds that the second *Winter* factor weighs in their favor.

9    **D. The Access/Detention Plaintiffs Have Established that the Balance of Equities**
     **Tips in Their Favor.**

10

11    The Access/Detention Plaintiffs argue that the balance of equities tips in their favor because

12    the requested TRO "merely requires Defendants to comply with a well-established due process right

13    of access to counsel by providing individuals detained at B-18 with the same access that the

14    government already affords those held at immigration detention facilities." ECF No. 38 at 12–13

15    (emphasizing that the requested TRO "is the same legal visiting schedule that the government agreed

16    to" in *Julio Castellano et al v. Janet Napolitano et al*, Case No. 2:09-cv-02281-PA-VBK (C.D. Cal.

17    April 1, 2009)). They further argue that the cost to Defendants would be far outweighed by the harm

18    to constitutional rights in the absence of an injunction. *Id.* at 13 (quoting *Hernandez v. Sessions*, 872

19    F.3d 976, 995 (9th Cir. 2017)). Defendants provide no response on this point. The Court finds that

20    the balance of equities tips in the Access/Detention Plaintiffs' favor.

21    The Court finds that Defendants' National Detention Standards already provide that

22    detainees at their immigration facilities are entitled to "legal visitation seven days a week, including

23    holidays. [Facilities] shall permit legal visits for a minimum of eight hours per day on regular

24    business days, and a minimum of four hours per day on weekends and holidays." U.S. Immigration

25    and Customs Enforcement, National Detention Standards at 166 (2025).[19] Similarly, ICE permits

26    legal visitations at "non-dedicated facilities," such as "facilities that house both inmates and [ICE]

27

28    ───────────────
     [19] The Standards may be found at https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf.

28

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 30 of 53    Page ID
#:1224
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 29 of 52    Page ID
#:1169

1   detainees," under the same schedule. U.S. Immigration and Customs Enforcement, Non-Dedicated

2   Intergovernmental Service Agreement Standards at 11 (2025) ("[T]he Service Provider [county and

3   local government partners] shall permit legal visits seven days per week, for at least eight hours per

4   day on weekdays and four hours per day on weekends and holidays.").[20] Because it appears that

5   Defendants already provide the same visitation schedule to ICE detainees at their facilities, the Court

6   finds that any prejudice to Defendants, e.g., cost of implementing the visitation schedule for B-18

7   detainees, would be minimal. Further, in light of the harm that has been (and likely to be) imposed

8   on the Access/Detention Plaintiffs in that their missions have been obstructed by denied legal

9   visitations, the Court finds that the balance of equities tips in the Access/Detention Plaintiffs' favor.

10      In sum, the third *Winter* factor weighs in favor of granting the TRO.

11          **E.  The Access/Detention Plaintiffs Have Established that the Temporary**
            **Restraining Order is in the Public Interest.**
12

13      The Access/Detention Plaintiffs argue that public interest "heavily favors" them because the

14   requested injunction would "ensure that Defendants' conduct complies with the law." ECF No. 38 at

15   13. Defendants respond that the government has a legitimate and significant interest in ensuring that

16   immigration laws are enforced. ECF No. 70 at 20. The Court finds that the Access/Detention

17   Plaintiffs have made their required showing.

18      "Generally, public interest concerns are implicated when a constitutional right has been

19   violated, because all citizens have a stake in upholding the Constitution." *Preminger v. Principi*, 422

20   F.3d 815, 826 (9th Cir. 2005).

21      Violation of the Fifth Amendment raises public interest concerns, not only for those who are

22   currently detained, but also for those who may be arrested and/or detained in the future. *See* Section

23   I.B, *supra* (collecting cases regarding immigrants' right to counsel). Although the instant TRO was

24   filed by the Access/Detention Plaintiffs, the Court finds that the risk imposed on their core mission

25   and on CHIRLA's members as well as the general public warrants finding that the requested TRO is

26   in the public interest. *See also Preminger*, 422 F.3d at 826 ("The public interest inquiry primarily

27

28   [20] The Non-Dedicated Intergovernmental Service Agreement Standards may be found at
     https://www.ice.gov/doclib/detention-standards/2025/ndids2025.pdf.

29

Case 2:25-cv-05605-MEMF-SP   Document 89   Filed 07/13/25   Page 31 of 53   Page ID
#:1225
Case 2:25-cv-05605-MEMF-SP   Document 87   Filed 07/11/25   Page 30 of 52   Page ID
#:1170

1  addresses [the] impact on non-parties rather than parties.") (citation omitted). Moreover, although it

2  is true that the government has an interest in enforcing immigration laws, Defendants make no

3  showing that immigration enforcement cannot be conducted without undermining the rights afforded

4  to immigrants under the Fifth Amendment. *See generally* ECF No. 70 at 20. As the Ninth Circuit

5  said in a case concerning alleged Fourth Amendment violations by another law enforcement agency,

6  requiring law enforcement to comply with the Constitution does not prevent law enforcement from

7  enforcing the law. *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1502 (9th Cir. 1996).

8  As such, the fourth *Winter* factor weighs in the Access/Detention Plaintiffs' favor.

9      In sum, the Court finds that all four *Winter* factors supporting granting the requested TRO.

10      **F. The Court Does Not Find a Bond Warranted.**

11      "The court may issue a preliminary injunction or a temporary restraining order only if the

12  movant gives security in an amount that the court considers proper to pay the costs and damages

13  sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

14  "Rule 65(c) invests the district court with discretion as to the amount of security required, *if any.*"

15  *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (emphasis in original; cleaned up).

16  "[T]he district court may dispense with the filing of a bond when it concludes there is no realistic

17  likelihood of harm to the defendant from enjoining his or her conduct." *Id.*

18      As the Court has found above, the requested TRO is identical to what Defendants already

19  provide to other detainees at their facilities. *See* Section I.D, *supra*. The Court finds that there is no

20  realistic likelihood of harm to Defendants from requiring them to permit legal visitations in a manner

21  consistent with their existing schedules. As such, the Court concludes that there is no need for a

22  bond. *See* ECF No. 70 at 20–21 (requesting bond without specific amount).[21]

23  / / /

24  / / /

25  / / /

26

27  ————————————
[21] Defendants rely on the Supreme Court's recent holding that district courts do not have equitable power to
28  issue a "universal injunction." *See* ECF No. 70 at 21. Because the requested injunction is only District-wide
and not nationwide, the Court finds Defendants' concerns unavailing.

30

**THE STOP/ARREST TRO [ECF NO. 45]**

I.     **Discussion**

     A. **This Court Has Jurisdiction.**

Similar to the arguments they raised in *United Farm Workers v. Noem*, No. 1:25-cv-00246 JLT CDB (E.D. Cal. April 29, 2025), Defendants contend here that this Court lacks jurisdiction under 8 U.S.C. §§ 1252(a)(5) and (b)(9). ECF No. 71 at 14. Defendants additionally assert that 8 U.S.C. § 1252(g) bars this Court from considering Plaintiffs' claims. *Id.* at 15. Although Defendants raise these arguments under the first *Winter* factor, the Court will address this issue first, as jurisdiction is a "threshold matter." *See Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 94-95 (1998) ("The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States") (cleaned up); *see also Garland v. Gonzalez*, 596 U.S. 543, 548 (2022) (the "threshold question" was "whether the District Courts had jurisdiction to entertain respondents' requests for class-wide injunctive relief").

The Immigration and Nationality Act ("INA") sets forth jurisdictional limitations in Section 1252, entitled "Judicial review of orders of removal." *See* 8 U.S.C. § 1252. Pursuant to Section 1252(a)(5), "a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of [the] Act . . . ." 8 U.S.C. § 1252(a)(5). In addition, Section 1252(b)(9) indicates: "Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final [removal] order under this section." 8 U.S.C. § 1252(b)(9).

This Court rejects Defendants' arguments based upon Sections 1252(a)(5) and (b)(9). The key authority with respect to these provisions is *Jennings v. Rodriguez*, 583 U.S. 281 (2018), *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1907 (2020), and *Gonzalez v. U.S. Immigration & Customs Enf't*, 975 F.3d 788 (9th Cir. 2020). In particular, the binding authority dictates that treating everything related to and leading up to removal proceedings as "arising from" a removal action is an incorrect reading of the relevant statutes. As the Supreme

31

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 33 of 53    Page ID
#:1227
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 32 of 52    Page ID
#:1172

1  Court held in *Jennings*, "cramming review of . . . questions [concerning inhumane detention

2  conditions or a claim related to actions during detention] into the review of final removal orders

3  would be absurd." 583 U.S. at 293. The same is true here. If even challenges to detention conditions

4  are not barred, then it appears to this Court that the manner in which an individual is first arrested

5  and detained is also not barred.[22] Similarly, the Supreme Court held that Section 1252(b)(9) is

6  "certainly not a bar where, as here, the parties are not challenging any removal proceedings."

7  *Regents of the Univ. of California*, 140 S. Ct. at 1907. And as the Ninth Circuit held in *J.E.F.M.*,

8  "claims that are independent of or collateral to the removal process do not fall within the scope of §

9  1252(b)(9)." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032 (9th Cir. 2016). Finally, although a motion to

10  suppress in the context of removal proceedings was permitted in *Sanchez v. Sessions*, 904 F.3d 643

11  (9th Cir. 2018), *Sanchez* does not stand for the provision that all such constitutional claims may only

12  be brought in removal proceedings. And how could they? This would mean that U.S. citizens—who

13  Plaintiffs allege have also been unlawfully stopped, arrested, and detained—would have no venue to

14  raise their claims. *See, e.g.*, ECF No. 45-9 ("Gavidia Declaration" or "Gavidia Decl.") (a U.S. citizen

15  testifying that he was stopped and questioned "just because of the way I look—because I am brown,

16  Latino"). This cannot be, and none of the authority cited by Defendants says it is.[23]

17      The Court similarly finds Defendants' argument based on 8 U.S.C. § 1252(g) without merit.

18  The provision reads: "Except as provided in this section and notwithstanding any other provision of

19  law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus

20  provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause

21  or claim by or on behalf of any alien arising from the decision or action by the Attorney General to

22  commence proceedings, adjudicate cases, or execute removal orders against any alien under this

23  chapter." 8 U.S.C. § 1252(g). The Supreme Court held that "[t]he provision applies only to three

24  discrete actions that the Attorney General may take: her 'decision or action' to '*commence*

25

26  _____

[22] Another district court in this Circuit came to a similar conclusion in a case raising similar facts where the
27  defendants made similar arguments as the Defendants do here. *United Farm Workers v. Noem*, No. 1:25-cv-
00246 JLT CDB (E.D. Cal. April 29, 2025), ECF No. 47

28  [23] *See also Hernandez v. Sessions*, 872 F.3d 976 (2017) (rejecting similar jurisdictional challenges to
immigration-related claims).

32

1  proceedings, *adjudicate* cases, or *execute* removal orders.'" *Reno v. Am.-Arab Anti-Discrimination*

2  *Comm.*, 525 U.S. 471, 482 (1999) (emphasis in original). Plaintiffs are not raising constitutional

3  claims related to the Attorney General's decision or action to commence proceedings, adjudicate

4  cases, or execute removal orders; rather, the claims here concern "issues which ripened before

5  removal proceedings began," such as stop and detention of even those who cannot be subject to

6  removal proceedings without reasonable suspicion. This is in contrast, for instance, from the cases

7  cited by Defendants where the claims did arise from removal proceedings. Insofar as the instant

8  action and the TRO seeks prohibiting Defendants from engaging or ratifying pre-removal-

9  proceeding conduct that may violate the public's constitutional rights, the Court finds that 8 U.S.C. §

10  1252(g) is not a bar to this Court's jurisdiction over this action.

11        As such, the Court finds that the above-referenced statutes do not bar district court

12  jurisdiction over Plaintiffs' Fourth Amendment-based claims.

13                **B. The Requested TRO is Sufficiently Specific.**

14        Defendants argue that the requested TRO is overbroad and insufficiently specific. ECF No.

15  71 at 8–9 ("[The TRO] putatively orders the government to comply with extant law."). The

16  Stop/Arrest Plaintiffs argue that the TRO "specifies the illegal behavior to be enjoined." ECF No. 81

17  at 9. The Court finds that the TRO is sufficiently specific in light of the conduct at issue.

18        "[I]njunctive relief must be tailored to the specific harm alleged." *Melendres v. Arpaio*, 784

19  F.3d 1254, 1265 (9th Cir. 2015). "[A] district court has broad discretion in fashioning a remedy." *Id.*

20        Here, the Stop/Arrest Plaintiffs largely seek to enjoin Defendants from conducting "detentive

21  stops without the legally required reasonable suspicion" and from solely relying on four enumerated

22  factors alone or in combination.[24] ECF No. 81 at 9 (internal quotation marks omitted); ECF No. 45-

23  22 at 5 (Proposed Order). In light of the allegations and the evidence submitted in support thereof,

24  the Court finds that these forms of injunctive relief are "narrowly tailored to remedying the specific

25  constitutional violations at issue." *See Melendres*, 784 F.3d at 1267 (affirming most of the district

26  court's injunction order prohibiting defendants from carrying out "unconstitutional policy of

27

28  [24] The four factors are: (1) apparent race or ethnicity, (2) speaking Spanish or speaking English with an accent; (3) presence at a particular location; or (4) the type of work one does. ECF No. 45-22 at 5.

33

ER-0813

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 35 of 53    Page ID
#:1229
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 34 of 52    Page ID
#:1174

1   considering race as a factor in determining where to conduct patrol operations, in deciding whom to

2   stop and investigate for civil immigration violations, and in prolonging the detentions of Latinos

3   while their immigration status was confirmed"). It is not a mere "obey the law" injunction, and

4   *Schmidt*—cited by Defendants—does not remotely suggest that it is, given the vagueness of the

5   purported injunction in that case. *See* 414 U.S. at 476 ("Rather, the defendants are simply told not to

6   enforce 'the present Wisconsin scheme' against [class members]."). Similarly, the Court finds

7   Defendants' concern over the breadth without justification because, as Defendants concede, "any

8   law enforcement officials within the Department of Justice" are authorized to "exercise immigration

9   enforcement authorities." ECF No. 71 at 2. The Court concludes that the requested TRO is narrowly

10  tailored in light of Defendants' own representation that a broad body of government officials are

11  authorized to conduct—and *are* conducting—immigration enforcement.

12          As such, the Court finds that the requested TRO is sufficiently specific. The Court discusses

13  below—after addressing likelihood of success on the merits—why the specific injunction requested

14  is tailored to the specific harm alleged.

15          **C. Standing is Established.**

16          Defendants argue that (1) the organizational plaintiffs lack standing and (2) the named

17  plaintiffs lack standing to seek relief for others. ECF No. 71 at 11–14.

18          "In a class action, standing is satisfied if at least one named plaintiff meets the requirements."

19  *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir.2007) (en banc).

20          The Court finds that Plaintiffs have established standing for this putative class action at this

21  time. As the Ninth Circuit instructs, only one plaintiff needs to meet the standing requirement in a

22  class action, and the Court finds that the individual plaintiffs here have adequately alleged facts that

23  give rise to standing. In particular, Gavidia testifies that despite being a U.S. citizen, he was stopped,

24  "forcefully pushed up against the metal gated fence," and questioned by individuals wearing "a

25  green vest" and "similar vests with the words 'Border Patrol Federal Agent.'" Gavidia Decl. ¶¶ 7–

26  11. He further testifies that "[i]t was the worst experience I have ever felt. I felt like I was going to

27  die; in fact, one agent literally racked a chamber in his rifle. And going forward, I am disturbed and

28  deeply concerned that federal agents will stop me and violate my rights again for the same reason"—

34

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 36 of 53    Page ID
                                   #:1230
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 35 of 52    Page ID
                                   #:1175

1   "based on my skin color . . . because I am brown, Latino." *Id.* ¶ 12. The Court finds that this

2   testimony sufficiently shows that Gavidia meets the Article III standing requirements under *Lujan*:

3   he has suffered an "invasion of a legally protected interest which is (a) concrete and

4   particularized . . . and (b) actual or imminent, not conjectural or hypothetical[.]" 504 U.S. at 560.

5   And insofar as Gavidia, a named plaintiff, meets this requirement, the Court concludes that Plaintiffs

6   have standing for this putative class action.[25]

7           The Court also rejects Defendants' arguments based upon *Rizzo v. Goode*, 423 U.S. 362, 371

8   (1976) and *City of Los Angeles v. Lyons*, 461 U.S. 95, 110 (1983) that there has not been a requisite

9   showing that the conduct complained of will recur. Those cases are wholly distinguishable. In *Rizzo*,

10  there was no link between various incidents of police misconduct and any plan or policy or other

11  approval or authorization of such conduct. The Stop/Arrest Plaintiffs have pointed to a plethora of

12  statements suggesting approval or authorization pointing to a high likelihood that the conduct will

13  continue.[26] And in *Lyons*, there was no finding that Lyons faced a real and immediate threat of being

14  illegally choked again. Here, this Court affirmatively finds that there is a real and immediate threat

15  that the conduct complained of will continue. Numerous individuals have been subjected to multiple

16  stops, including Gavidia. All of the evidence adduced suggests a high likelihood of recurrent injury,

17  as required. *See LaDuke v. Nelson*, 762 F.3d 1318, 1324 (9th Cir. 1985).

18          **D. Preliminary Injunction is Available Even in the Absence of Class Certification.**

19          Defendants briefly argue that absent class certification, Plaintiffs cannot seek the requested

20  TRO. ECF No. 71 at 23. However, "[w]hile injunctive relief generally should be limited to apply

21  only to named plaintiffs where there is no class certification . . . 'an injunction is not necessarily

22  made overbroad by extending benefit or protection to persons other than prevailing parties in the

23  lawsuit--*if such breadth is necessary to give prevailing parties the relief*

24

---

25  [25] As such, the Court declines to evaluate the remaining arguments about standing. *See* ECF No. 71 at 11–14.

26  [26] One such statement occurred just one day before the hearing. *See* Melissa Gomez et al., *Heavily Armed
    Immigration Agents Descend on L.A.'s MacArthur Park*, L.A. TIMES (July 7, 2025),

27  https://www.latimes.com/california/story/2025-07-07/immigration-agents-descend-on-macarthur-park.
    (describing a "show of force" at MacArthur Park in Los Angeles, and discussing a statement by Defendant

28  Bovino that "We may well go back to MacArthur Park or other places in and around Los Angeles. Illegal
    aliens had the opportunity to self deport, now we'll help things along a bit.").

35

ER-0815

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 37 of 53    Page ID
                                              #:1231
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 36 of 52    Page ID
                                              #:1176

1   *to which they are entitled.*" *Easyriders*, 92 F.3d at 1502 (emphasis in original). As will be discussed

2   below, the Court finds that the breadth of the TRO is necessary to give Plaintiffs what they are

3   entitled to.

4        To be clear—to provide complete relief to the named Stop/Arrest Plaintiffs, even without

5   considering the unnamed class members and the propriety of certifying a class—this Court must

6   enjoin the conduct of all law enforcement engaged in immigration enforcement throughout the

7   District. Particularly given how these enforcement actions appear to have been conducted, it would

8   be a fantasy to expect that law enforcement could and would inquire whether a given individual was

9   among the named Stop/Arrest Plaintiffs or the (putative) class before proceeding with a seizure. *See*

10  *id.* ("Because the CHP policy regarding helmets is formulated on a statewide level, other law

11  enforcement agencies follow the CHP's policy, and it is unlikely that law enforcement officials who

12  were not restricted by an injunction governing their treatment of all motorcyclists would inquire

13  before citation into whether a motorcyclist was among the named plaintiffs or a member of

14  Easyriders, the plaintiffs would not receive the complete relief to which they are entitled without

15  statewide application of the injunction.").

16              **E. The Stop/Arrest Plaintiffs Have Established that They Are Likely to Succeed on
17                  the Merits.**

18        The Stop/Arrest Plaintiffs argue that they are likely to succeed on the merits of their Fourth

19  Amendment-based claims because they are likely to succeed in showing that (1) Defendants are

20  conducting seizures that require at least reasonable suspicion, but (2) their seizures are not supported

21  by reasonable suspicion. ECF No. 45 at 18–22. Defendants respond that the Stop/Arrest Plaintiffs

22  have failed to show likelihood of success because (i) this Court lacks jurisdiction,[27] and (ii) they

23  have not shown violation of the Fourth Amendment or 8 U.S.C. § 1357(a)(7). ECF No. 70 at 17–21.

24  The Court finds that the Stop/Arrest Plaintiffs have sufficiently shown that they are likely to succeed

25  on their Fourth Amendment claims.

26

27  _____

28  [27] Because the Court has already found that it has jurisdiction, Section I.A, *supra*, the Court will address only
    the second of Defendants' arguments.

36

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 38 of 53    Page ID
#:1232
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 37 of 52    Page ID
#:1177

i.   The Stop/Arrest Plaintiffs Are Likely to Succeed in Showing Seizures
     Requiring Reasonable Suspicion Have Occurred.

First, the Court finds that seizures requiring reasonable suspicion have occurred. *Id.* at 18–19.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. "A seizure occurs when a law enforcement officer, through coercion, physical force, or a show of authority, in some way restricts the liberty of a person." *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (cleaned up). Generally speaking, an officer's actions rise to the level of a seizure if any one of the following occurs: "if there is a threatening presence of several officers, a display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Washington*, 490 F.3d 765, 771 (9th Cir. 2007) (internal quotation and citation omitted).

The Stop/Arrest Plaintiffs have provided ample evidence that seizures have occurred. The Petitioner-Plaintiffs testify that when they were waiting at a Metro stop in Pasadena on June 18, 2025, four large, unmarked, tinted cars suddenly pulled up—one crossed in front of them and stopped to their right, the others stopped to their left. ECF No. 45-1 ("Vazquez Perdomo Declaration" of "Vazquez Perdomo Decl.") ¶ 5. Men in masks with guns ran toward them. *Id.* The men grabbed Vazquez Perdomo, put his hands behind his back, and handcuffed him. *Id.* ¶ 6. Vazquez Perdomo was put into a car, still handcuffed; was driven to a nearby CVS and asked for identification; was put in chains on his feet, wrist, and hands; and eventually was taken to a detention center in Los Angeles. *Id.* ¶ 7. Osorto's and Villegas Molina's declarations echo Vazquez Perdomo's testimony. *See* ECF No. 45-2 ("Osorto Declaration" or "Osorto Decl.") ¶¶ 4–8 (testifying that one of the masked men pointed "what looked like a gun" over Osorto's heart and yelled, "Stop or I'll use it!"); ECF No. 45-3 ("Villegas Molina Declaration" or "Villegas Molina Decl.") ¶¶ 4–9 ("Then they shackled us all on our feet, waist, and wrists."). The Petitioner-Plaintiffs all report feeling afraid and that the encounter "felt like a kidnapping." Vazquez Perdomo Decl. ¶ 6; *see* Osorto Decl. ("I was terrified. I didn't know who the men were and I was afraid that they would hurt me."); Villegas Molina Decl. ¶¶ 5, 6 ("I thought we were being kidnapped. . . . I was afraid to

37

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 39 of 53    Page ID
#:1233
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 38 of 52    Page ID
#:1178

1    move."). This testimony adequately shows that there was "a threatening presence of several

2    officers," as well as "a display of a weapon," "physical touching of the person," and "the use of

3    language or tone of voice indicating that compliance with the officer's request might be compelled."

4    *See Washington*, 490 F.3d at 771 (holding that the occurrence of any one of such events is enough to

5    give rise to a seizure). And these seizures do not appear to be isolated or accidental. Plaintiffs point

6    to numerous other similar incidents reported in the media and a plethora of public comments by

7    government officials which appear to support the conduct described. *See* ECF No. 45 at 5–6.

8         Given the Ninth Circuit's guidance as to seizures, and all the evidence submitted by the

9    Stop/Arrest Plaintiffs that such events have occurred on an ongoing basis throughout the District, the

10   Court finds that Defendants are conducting seizures requiring reasonable suspicion. *See* ECF No. 45

11   at 9–13 (describing in detail the most recent stops and arrests with citations to the underlying

12   testimony).

13        Having found that seizures are occurring, the Court considers whether they are supported by

14   reasonable suspicion.

15            ii.   The Stop/Arrest Plaintiffs Are Likely to Succeed in Showing the Seizures Are
                   Not Supported by Reasonable Suspicion.
16

17        The Court also finds that the Stop/Arrest Plaintiffs are likely to succeed in showing the

18   seizures that have occurred are not supported by reasonable suspicion.[28]

19        "Except at the border and its functional equivalents," immigration agents may stop

20   individuals in public only after identifying "specific articulable facts, together with rational

21   inferences from those facts, that reasonably warrant suspicion that [the persons stopped are

22   noncitizens] who may be illegally in the country." *United States v. Brignoni-Ponce*, 422 U.S. 873,

23   884 (1975). Reasonable suspicion comprises two elements: "the assessment must be based upon the

24

25   [28] Defendants argue that the Court "should not consider whether a violation of 8 C.F.R. § 287(b)(2) occurred
     because Plaintiffs did not raise that argument." ECF No. 70 at 18. 8 C.F.R. § 287(b)(2) states: "If the
26   immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being
     questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in
27   the United States, the immigration officer may briefly detain the person for questioning." Contrary to
     Defendants' assertion, the Court finds that Plaintiffs have raised the argument. *See* ECF No. 45 at 20–22
28   (section titled, "Defendants' seizures are not supported by reasonable suspicion."). As such, the Court will
     evaluate whether the seizures were supported by reasonable suspicion.

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 40 of 53    Page ID
#:1234
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 39 of 52    Page ID
#:1179

1    totality of the circumstances," and it "must arouse a reasonable suspicion that *the particular person*

2    *being stopped* has committed or is about to commit a crime." *United States v. Montero-Camargo*,

3    208 F.3d 1122, 1129 (9th Cir. 2000) (emphasis in original). "[T]o establish reasonable suspicion, an

4    officer cannot rely solely on generalizations that, if accepted, would cast suspicion on large segments

5    of the law-abiding population." *United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006).

6    "Where, as here, the majority (or any substantial number) of people share a specific characteristic,

7    that characteristic is of little or no probative value in such a particularized and context-specific

8    analysis." *Montero-Camargo*, 208 F.3d at 1131; *see id.* at 1135 ("Hispanic appearance is … of such

9    little probative value that it may not be considered as a relevant factor where particularized or

10   individualized suspicion is required."); *Manzo-Jurado*, 457 F.3d at 937 ("By itself . . . an

11   individual's inability to understand English will not justify an investigatory stop because the same

12   characteristic applies to a sizable portion of individuals lawfully present in this country.").

13           The Stop/Arrest Plaintiffs have provided ample evidence that seizures occurred based solely

14   upon the four enumerated factors, either alone or in combination, and that reliance solely upon the

15   four enumerated factors either alone or in combination does not meet the requirements of the Fourth

16   Amendment.

17                         *1.    The Stop/Arrest Plaintiffs Are Likely to Succeed in Showing the*
                                  *Seizures Are Based Upon the Four Enumerated Factors*
18

19           The Court begins by addressing the evidence adduced regarding the basis upon which the

20   seizures were made. The Petitioner-Plaintiffs all testify that they were waiting to be picked up for

21   their work on the morning of June 18, 2025, while having coffee. Vazquez Perdomo Decl. ¶ 4;

22   Osorto Decl. ¶ 4; Villegas Molina Decl. ¶ 4. They were suddenly approached by four unmarked cars,

23   and the Petitioner-Plaintiffs were eventually taken to a detention facility. Vazquez Perdomo Decl. ¶

24   5–8; Osorto Decl. ¶¶ 5–8; Villegas Molina Decl. ¶¶ 5–9. Nothing in the Petitioner-Plaintiffs'

25   declarations suggests that they are in the country without proper documentation or otherwise have or

26   are about to commit a crime. *See* ECF No. 81-1 at 11 (Form I-213 for Vazquez Perdomo, indicating

27   no criminal history). Nevertheless, the masked and armed men proceeded to seizing them. In fact,

28   the one report regarding Vazquez Perdomo's seizure provides no details as to how Vazquez

39

Case 2:25-cv-05605-MEMF-SP   Document 89   Filed 07/13/25   Page 41 of 53   Page ID
#:1235
Case 2:25-cv-05605-MEMF-SP   Document 87   Filed 07/11/25   Page 40 of 52   Page ID
#:1180

1   Perdomo was initially identified. *Id*. Rather, it provides only general terms about the various
2   enforcement operations conducted by the government, further supporting the notion that there was
3   no requisite reasonable suspicion here. *Id*. And the other declarations submitted in support of the
4   instant TRO show a similar pattern of seizure without any basis outside of the four enumerated
5   factors. *See* ECF No. 45 at 6–9 (describing in detail the instances of "racial profiling" with citations
6   to the underlying testimony).

7          Defendants contest the idea that they relied solely on these factors. They contend, in reliance
8   on the declarations of Andre Quinones and Kyle C. Harvick, that the seizures were based upon a
9   particularized assessment of reasonable suspicion based upon articulable facts. ECF No. 71 at 19–21.
10  But these declarations do not support this contention in the slightest, particularly as they do not
11  appear to acknowledge the existence of roving patrols at all. For instance, Deputy Field Officer
12  Quinones merely describes what officers are *trained* to do. *See, e.g.*, ECF 71-1 ¶ 5 ("ERO Los
13  Angeles officers are *trained* that . . . brief detention for questioning requires an immigration officer
14  to have reasonable suspicion, based on specific, articulable facts, that the person being questioned is
15  an alien illegally in the United States. ERO Los Angeles officers are *trained* that an arrest requires
16  probable cause that the person being arrested is an alien illegally in the United States."). And Patrol
17  Agent in Charge Harvick speaks only in general terms about what CBP agents and officers have
18  done in Los Angeles. *See* ECF No. 71-2 ¶ 8 ("Prior to engaging in investigative detentions, officers
19  and agents had reasonable suspicion that the individual had committed or was committing a federal
20  crime or federal immigration violation. This reasonable suspicion was based on various factors
21  including intelligence sources, information from law enforcement and open-source databases,
22  analysis of trends, facts developed in the field by agents, rational inferences that led an agent or
23  officer to suspect criminal or immigration violations, and the officers or agents' observations,
24  training, and experience."). And in doing so, he seems to confirm that he and his colleagues are
25  relying solely on these factors. *See id.* ¶ 7 ("CBP agents and officers are typically divided into teams,
26  composed of three to five agents, who contact individuals in public places such as streets and
27  sidewalks, parking lots, or the publicly-accessible portions of businesses. Certain types of
28  businesses, including car washes, have been selected for encounters because past experiences have

40

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 42 of 53    Page ID
#:1236
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 41 of 52    Page ID
#:1181

1    demonstrated that illegal aliens utilize and seek work at these locations."). This evidence is entirely

2    too general to show what factors the agents relied upon in seizing the Petitioner-Plaintiffs. In fact,

3    these two declarations do not even discuss the Petitioner-Plaintiffs or any other individuals at all.

4        During the hearing, Defendants pointed to the arrests effected at consecutive visits to a car

5    wash in Whittier as evidence that their stops are based upon factors beyond the enumerated factors.

6    In particular, Defendants argued that because their first two visits resulted in arrests, this provided a

7    basis to stop and question Omar Andres Gamez, a U.S. citizen. *See* ECF No. 45-5 ("Gamez

8    Declaration" or "Gamez Decl."). But Defendants did not provide any details[29] as to the factors

9    considered other than that Gamez was at the very *location* where the agents previously made arrests.

10   *See Montero-Camargo*, 208 F.3d at 1129; *see also Brignoni-Ponce*, 422 U.S. at 886 n.11 (declining

11   to consider "any weight to the location of the stop" because the officers gave no other meaningful

12   reasons). This reasoning is circular at best, and no details were provided to support the idea that the

13   multiple visits were indeed based upon "intelligence" or investigation rather than reliance upon one

14   of the enumerated factors.

15       And despite having nearly a week to produce information demonstrating the basis of any one

16   of the Stop/Arrest Plaintiffs' arrests or any of the numerous media reports, Defendants have failed to

17   do so. The Court therefore concludes that the Stop/Arrest Plaintiffs have sufficiently shown at this

18   stage a likelihood of success on the question of whether the stops and arrests at issue have been

19   based solely upon the enumerated factors.[30]

20   ///

21   ///

22

---

23   [29] Instead of specific details, Defendants explained that what may appear arbitrary to the public may actually
24   give rise to reasonable suspicion to Defendants' field agents, especially in light of the surveillance and
     intelligence data they share with the agents. Be that as it may, the Court notes that Defendants still failed to
25   provide any concrete details as to what factors led Defendants to stop and question Gamez specifically nor
     indicate the nature of surveillance and intelligence data gathered that would give rise to reasonable suspicion.
26   [30] To the extent that the Defendants point to any specific factors besides these enumerated factors, they do not
     show that they support reasonable suspicion. For example, Defendants do not explain why fleeing upon
27   seeing unidentified masked men with guns exiting from tinted cars without license plates raises suspicion.
     ECF No. 71 at 20, 21; *see United States v. Brown*, 925 F.3d 1150, 1157 (9th Cir. 2019) ("Given that racial
28   dynamics in our society—along with a simple desire not to interact with police—offer an 'innocent'
     explanation of flight . . . .").

41

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 43 of 53   Page ID
#:1237
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 42 of 52   Page ID
#:1182

2. *The Stop/Arrest Plaintiffs Are Likely to Succeed in Showing that Sole Reliance on the Four Enumerated Factors Does Not Constitute Reasonable Suspicion.*

Having reached this conclusion, the Court turns to the question of whether sole reliance on these factors could give rise to reasonable suspicion.

First, the Court considers whether race could give rise to reasonable suspicion.[31] Binding authority makes clear it cannot in these circumstances. The Ninth Circuit's holding in *Montero-Camargo* bears repeating:

> [W]e are confronted with the narrow question of how to square the Fourth Amendment's requirement of individualized reasonable suspicion with the fact that the majority of the people who pass through the checkpoint in question are Hispanic. In order to answer that question, we conclude that, at this point in our nation's history, and given the continuing changes in our ethnic and racial composition, Hispanic appearance is, in general, of such little probative value that it may not be considered as a relevant factor where particularized or individualized suspicion is required. Moreover, we conclude, for the reasons we have indicated, that it is also not an appropriate factor.

*Montero-Camargo*, 208 F.3d at 1135.

Second, the Court considers whether speaking Spanish or speaking English with an accent could give rise to reasonable suspicion. There is no case law that supports that it could. In *United States v. Manzo-Jurado*, 457 F.3d 928, 937 (9th Cir. 2006), the Ninth Circuit indicated that "[a]n individual's *inability to speak English* may support an officer's reasonable suspicion that the individual is in this country illegally, [but] [by] itself, however, an individual's *inability to understand English* will not justify an investigatory stop because the same characteristic applies to a sizable portion of individuals lawfully present in this country." Defendants point to no case law addressing speaking Spanish or speaking English with an accent, and obviously neither of those activities demonstrates an *inability* to speak English. This, therefore, appears to be a factor akin to those described as having "such a low probative value that no reasonable officer would have relied

---

[31] At the hearing, Defendants vehemently denied any reliance on race and disputed that the reference to "appearance" in their briefing was a reference to race, even though the cases cited were specifically speaking about a particular racial appearance. ECF No. 71 at 20; *Orhorhaghe v. I.N.S.*, 38 F.3d 488, 498 (9th Cir. 1994) ("foreign-looking appearance"); *United States v. Brignoni-Ponce*, 422 U.S. 873, 885-886 (1975) ("characteristic appearance of persons who live in Mexico" "apparent Mexican ancestry").");.;

42

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 44 of 53   Page ID
#:1238
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 43 of 52   Page ID
#:1183

1 | on them to make an investigative stop [such that it] must be disregarded as a matter of law."

2 | *Montero-Camargo*, 208 F.3d at 1132.

3 |     Third, the Court considers whether presence at a particular location or the type of work one

4 | does could give rise to reasonable suspicion. The Court considers them together as they appear to be

5 | overlapping factors. With respect to the Petitioner-Plaintiffs, Defendants do not explain why being at

6 | a bus stop in Pasadena raises suspicion that the Petitioner-Plaintiffs may be undocumented

7 | immigrants. *Id.* at 19–20. Although Patrol Agent in Charge Harvick indicates that "past experiences

8 | have demonstrated that illegal aliens utilize and seek work at" "certain types of businesses, including

9 | car washes," this is insufficient to make these factors fit the particularized assessment needed. In

10 | fact, the Ninth Circuit addressed similar factor in *Manzo Jurado*, where one of the factors relied

11 | upon was a group's "appearance as a work crew." *Manzo-Jurado*, 457 F.3d at 937. Although the

12 | agent in that case had experience that local work crews "on occasion included illegal aliens," they

13 | did not provide evidence about how many local work crews did not. *Id.* at 938. Nor did they have

14 | any information about the employer of the specific work crew at issue. *Id.* In the same vein,

15 | knowledge that undocumented individuals use and seek work at car washes falls woefully short of

16 | the reasonable suspicion needed to target any particular individual at any particular car wash.  The

17 | same is true of the other locations and other occupations at issue.

18 |     Defendants' reliance on authority such as *Orhorhaghe v. INS* and *Brignoni-Ponce* to support

19 | seizures based upon the factors identified by the Stop/Arrest Plaintiffs is misplaced. Those cases

20 | actually stand for the proposition that factors like race are insufficient and often wholly improper. To

21 | the extent that either of those cases even permit consideration of "appearance," it is clearly only in

22 | connection with other factors actually correlated to immigration status. *Orhorhaghe*, 38 F.3d 488,

23 | 503 ("Like *one's appearance*, one's name is frequently correlated with one's racial or ethnic

24 | background, and in both instances the racial or ethnic background which results in adverse action by

25 | immigration officers *almost always is that of people of color*") (emphasis added). And as discussed

26 | extensively in *Montero-Camargo*, the Supreme Court's holding in *Brignoni-Ponce* was based upon

27 | outdated census data from three decades ago. 422 U.S. 873, 886 n.12 (1975). The demographics of

28 |

43

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 45 of 53    Page ID
#:1239
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 44 of 52    Page ID
#:1184

1   this district in 2025 are clearly very different from 1970, and Defendants do not point to any

2   demographic data in support of their enforcement approach. *See Montero-Camargo*, 208 F.3d 1136.

3       At best, in support of their reliance on these factors, Defendants rely heavily on the

4   "experience" of law enforcement, but the Ninth Circuit has already held that an agent's experience

5   cannot provide unbridled discretion and is no substitute for objective facts, rational inferences,

6   permissible deductions capable of rational explanation. *Orhorhaghe*, 38 F.3d at 499. The factors that

7   Defendants appear to rely on for reasonable suspicion seem no more indicative of illegal presence in

8   the country than of legal presence—such as working at low wage occupations such as car wash

9   attendants and day laborers. This is insufficient and impermissible, and is the proper subject of an

10   injunction.[32]

11       For the reasons discussed above, the Stop/Arrest Plaintiffs are likely to succeed in showing

12   that the four enumerated factors taken alone or in combination do not demonstrate reasonable

13   suspicion for any particular stop. "Although an officer, to form a reasonable suspicion of criminality,

14   may rely in part on factors composing a broad profile, he must also observe *additional* information

15   that winnows the broad profile into an objective and particularized suspicion of the person to be

16   stopped." *Manzo-Jurado*, 457 F.3d at 939 (emphasis added).

17       During the hearing, Defendants argued that Plaintiffs did not carry their burden of proof by

18   failing to produce evidence that (1) race is a motivating factor of the allegedly unconstitutional stops

19   and arrests, (2) any one particular agent engaged in unconstitutional stops and arrests, and (3) that

20   the stops and arrests are not consensual. But the evidence before the Court at this time portrays the

21   reality differently. For instance, Plaintiffs have provided citations to news articles where those who

22   appear to be the members of this District feel that the stops and arrests are overwhelmingly focused

23

24

---

25   [32] At the hearing, Defendants relied on *U.S v. Arvizu* to argue that even seemingly innocuous actions, such as
children's waiving of hands, can give rise to reasonable suspicion. 534 U.S. 266 (2002). But there, the factors

26   were much more detailed. *See id.* at 277 (the respondent used "little-traveled route"; it was unlikely that the
respondent and the respondent family was on a picnic because "the minivan had turned away from the known

27   recreational areas"; children's knees were "elevated," suggesting "the existence of concealed cargo in the
passenger compartment"; and "the children's mechanical-like waving, which continued for a full four to five

28   minutes"). In contrast, Defendants provided no such detailed factors individualized to any of the Petitioner-
Plaintiffs.

44

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 46 of 53    Page ID
#:1240
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 45 of 52    Page ID
#:1185

1   on Latinos.[33] *See* ECF No. 45 at 3–6; ECF No. 81 at 6. The declarants in support of the TRO also

2   testify that they believe that race is a motivating factor. *E.g.*, Gavidia Decl. ¶ 12; ECF No. 45-12 ¶

3   27 ("Based on the raids I have heard about from LAWCN's member organizations, the immigrant

4   agents seem to target non-white, Spanish-speaking workers, regardless of whether they have long-

5   standing ties to the community or lawful presences in the United States."): ECF No. 45-10 ¶ 11 ("I

6   believe that the agents only stopped people who look Latino. Two of my coworkers at the car wash

7   have light skin. One of them is Persian, and the other is from Russia. Neither of them was

8   approached by immigration agents, and they were not arrested with us."). Moreover, it is undisputed

9   that the agents are masked and often do not identify themselves[34]; absent such identifying

10  information readily available to Plaintiffs, the Court finds Defendants' argument about failure to

11  identify a particular agent unconvincing. Lastly, at least one news article reports that people were

12  dragged out of the *bathrooms* at a swap meet, which makes Defendants' arguments that their stops

13  and arrests are consensual unpersuasive. *See* ECF No. 45 at 6 n.37. In light of this evidence, the

14  Court finds that Plaintiffs have, for purposes of the TRO, shown that they carried their burden.[35]

15

16

---

17  [33] The Court finds that this pattern of conduct is sufficient evidence even if there is no "official" policy to
    engage in "roving patrols." In *LaDuke v. Nelson*, the Ninth Circuit found that the field agents' testimony (that
18  it was "INS policy to conduct complete sweeps of all community residences, with or without information as
    to specific residences"), which contradicted the official policy of the defendant agency (that such sweeps
19  should be done only upon "individualized suspicion"), was sufficient to affirm the district court's grant of an
    injunction. *See* 762 F.2d 1318, 1331, 1327 n.12 (9th Cir. 1985). Here, although there is no testimony from
20  Defendants' field agents with respect to the policy being carried out on the streets, the Court finds that based
    on the evidence that is before the Court, Plaintiffs have sufficiently shown that Defendants' policies are being
21  carried out differently.

22  For this reason, the Court also finds that it is not dispositive that Plaintiffs have not pointed to any "official"
    policy that authorizes or ratifies the alleged "roving patrols" for purposes of this TRO.
23  [34] Defendants speculated in the hearing that the agents may wear masks in light of COVID-19, in light of the
    "extraordinary violence" they have faced, and to avoid "doxing."
24  [35] In the criminal context, such as when a defendant brings a motion to suppress based on a Fourth
    Amendment violation, all a defendant needs to show in the first instance is that there was a warrantless stop or
25  search. *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978). Afterwards, the burden shifts to the government to
    show that the stop or search was justified. *U.S. v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012). Even if no
26  similar burden-shifting operates in the immigration context, it points to the fact that where a person claims to
    have been arrested without probable cause or searched without reasonable suspicion, it will nearly always be
27  the case that she lacks direct evidence of what led to the arrest or search. Therefore, the absence of this direct
    evidence at this stage does not cause this Court to conclude that there is no likelihood of success on the merits
28  of this claim.

45

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 47 of 53    Page ID
#:1241
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 46 of 52    Page ID
#:1186

1       For the foregoing reasons, the Court finds that the Stop/Arrest Plaintiffs have shown that they

2    are likely to succeed on the merits of their Fourth Amendment-based claims.

3       In addition, the Court finds that the injunction they seek is tailored to the specific harm

4    alleged. They seek only to enjoin reliance *solely* on these four enumerated factors alone or in

5    combination. They do not seek to enjoin reliance on these factors along with other factors, nor—

6    contrary to Defendants' mischaracterizations—seek to require that Defendants ignore these factors

7    or "put blinders on" when they run across these factors.

8
9

### F. The Stop/Arrest Plaintiffs Have Established that They Will Suffer Irreparable Harm.

10       The Stop/Arrest Plaintiffs argue that Defendants' policies and practices are causing and will

11    continue to cause irreparable harm to the organizational plaintiffs and their members. ECF No. 45 at

12    22–23. Defendants assert that Plaintiffs have not shown irreparable harm. ECF No. 71 at 22. The

13    Court finds that the Stop/Arrest Plaintiffs have shown that the third *Winter* factor weighs in their

14    favor.

15       "It is well established that the deprivation of constitutional rights unquestionably constitutes

16    irreparable injury." *Melendres*, 695 F.3d at 1002. "When an alleged deprivation of a constitutional

17    right is involved, most courts hold that no further showing of irreparable injury is necessary."

18    *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005) (cleaned up) (quoting from treatise).

19    Irreparable harm exists where plaintiffs face "a real possibility" that they will "again be stopped or

20    detained and subjected to unlawful detention." *Melendres*, 695 F.3d at 1002.

21       The Stop/Arrest Plaintiffs have established that the organizational plaintiffs and their

22    members have experienced significant harm and that they are likely to suffer irreparable harm unless

23    the instant TRO is granted. In particular, with the widespread news reporting of stops and arrests,

24    like the one that the Petitioner-Plaintiffs experienced, the organizational plaintiffs' members have

25    increasingly become afraid to go outside. *See* Salas Decl. ¶ 25 (testifying that CHIRLA members are

26    "experiencing significant levels of fear over the possibility of being grabbed and snatched in

27    immigration raids in public areas based on racial profiling"); ECF No. 45-13 ("Melendrez

28    Declaration" or "Melendrez Decl.") ¶¶ 15–17 (testifying as to awareness of "dozens of CLEAN's

46

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 48 of 53    Page ID
#:1242
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 47 of 52    Page ID
#:1187

1  members [] hav[ing] been stopped and arrested" and that "many members and their families . . . are

2  feeling anxious, worried, and fearful about their safety and the safety of their loved ones because of

3  the ongoing immigration raids happening through Southern California"). Moreover, insofar as

4  Plaintiffs assert the first cause of action—Violation of the Fourth Amendment, Unreasonable

5  Seizures—on behalf of the Suspicionless Stop Class, the Court finds that the broader public may also

6  be in fear of having their constitutional rights violated by seizures without reasonable suspicion,

7  especially in light of the ongoing reports of stops and arrests as recently as July 1, 2025. *See* ECF

8  No. 45 at 15 (listing dates and locations of recent stops and arrests); ECF No. 81 at 6 (listing more

9  dates, with emphasis in early July); *see also* ECF No. 45-18 ("Price Declaration" or "Price Decl.")

10 (containing a list of videos on various social media platforms showing members of the public being

11 detained). The Court finds that this evidence supports a finding of "real possibility" that irreparable

12 harm will continue absent the instant TRO in place.

13       As such, the Court finds that the second *Winter* factor weighs in favor of granting the TRO.

14       **G. The Stop/Arrest Plaintiffs Have Established that the Balance of Hardships Tips
         in Their Favor and that District-Wide Injunction is Permissible and in the
15       Public Interest.**

16       The Stop/Arrest Plaintiffs argue that the requested TRO is warranted because it would simply

17 require Defendants to "adhere to the Fourth Amendment" and it is always in the public interest to

18 prevent constitutional violations. ECF No. 45 at 23–24. Defendants respond that because "the

19 government's practices comply with the Constitution . . . alteration to the status quo is unnecessary."

20 ECF No. 71 at 23. The Court finds that the last two *Winter* factors are in the Stop/Arrest Plaintiffs'

21 favor.

22       The Court does not find prejudice to Defendants. As the Stop/Arrest Plaintiffs point out,

23 compliance with the Fourth Amendment is nothing new, contrary to Defendants' claims. *LaDuke*,

24 762 F.2d at 1333 (upholding permanent injunction against warrantless searches of workplace

25 housing); *Melendres*, 695 F.3d at 1002 (upholding injunction against state officer practice of

26 detaining people for civil immigration offenses); *Easyriders*, 92 F.3d at 1501 (collecting cases

27 awarding injunctions against Fourth Amendment violations). Complying with the law does not

28 impose harm. *Zepeda v. INS*, 753 F.2d 719, 727 1146 (9th Cir. 1983) (an agency "cannot reasonably

47

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 49 of 53    Page ID
#:1243
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 48 of 52    Page ID
#:1188

1  assert that it is harmed in any legally cognizable sense by being enjoined from constitutional

2  violations"). Additionally, the Court has already found that the seizures at issue occurred unlawfully,

3  without reasonable suspicion; therefore, Defendants' arguments regarding an alteration to the status

4  quo fail. *See* ECF No. 71 at 23. And, as stated above, requiring law enforcement to comply with the

5  Constitution does not prevent law enforcement from enforcing the law. As such, the third *Winter*

6  factor is in the Stop/Arrest Plaintiffs' favor.

7       Moreover, as "public interest concerns are implicated when a constitutional right has been

8  violated, because all citizens have a stake in upholding the Constitution," and the instant TRO raises

9  Fourth Amendment issues, the Court finds that the fourth *Winter* factor weighs in favor of granting

10  the TRO. *See Preminger*, 422 F.3d at 826.

11       In sum, the Court finds that all four *Winter* factors point to granting the requested TRO.[36]

12  / / /

13  / / /

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25

26  _____

[36] Defendants additionally argue that bond is necessary. ECF No. 71 at 23–24. At the hearing, Defendants
27  specified that they seek a $30 million bond because they would need to re-train the agents if the instant TRO
were to be issued. The Court concludes that a bond is not necessary, as the TRO does not require any
28  deviation from the training and the policies that appear to be in place, but rather compliance with the existing
law.

48

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 50 of 53    Page ID
#:1244
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 49 of 52    Page ID
#:1189

## CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1. The Access/Detention Plaintiffs' Ex Parte Application for TRO (ECF No. 38) is
    GRANTED.

   a. Defendants Kristi Noem, Todd M. Lyons, and Ernesto Santacruz Jr. shall provide
      access to Room B-18 of the Federal Building located at 300 North Los Angeles
      Street, Los Angeles, CA 90012 ("B-18") for legal visitation by current and
      prospective attorneys, legal representatives, and legal assistants. Legal visitation
      shall be permitted seven days per week, for a minimum of eight hours per day on
      business days (Monday through Friday), and a minimum of four hours per day on
      weekends and holidays. Should exigent circumstances require closure for the
      safety of human life or the protection of property, the Defendants must notify
      Access/Detention Plaintiffs as soon as practicable and certainly within four (4)
      hours to make alternative arrangements for legal visitation and/or notice to
      affected detainees and attorneys, legal representatives, and legal assistants. No
      such closure shall last any longer than reasonably necessary for the safety of
      human life or the protection of property.

   b. Defendants Kristi Noem, Todd M. Lyons, and Ernesto Santacruz Jr. shall provide
      individuals detained at B-18 with access to confidential telephone calls with
      attorneys, legal representatives, and legal assistants at no charge to the detainee.
      Such legal telephone calls shall not be screened, recorded, or otherwise
      monitored.

   c. The Court, having found a strong likelihood of success on the merits and that the
      balance of the equities overwhelmingly favors CHIRLA and ImmDef, further
      ORDERS that no security shall be required under Federal Rule of Civil Procedure
      65(c).

   d. Defendants Kristi Noem, Todd M. Lyons, and Ernesto Santacruz Jr. are each
      hereby ordered to show cause on a date to be set by the Court, or as soon

49

ER-0829

1   thereafter as counsel may be heard in the courtroom of the Honorable Maame

2   Ewusi-Mensah Frimpong, located at 350 West First Street, Los Angeles, CA

3   90012, why they should not be enjoined from further violations of the Fifth

4   Amendment to the United States Constitution pending the final disposition of this

5   action.

6   2.  The Stop/Arrest Plaintiffs' Ex Parte Application for TRO (ECF No. 45) is GRANTED.

7       a.  As required by the Fourth Amendment of the United States Constitution,

8           Defendants shall be enjoined from conducting detentive stops in this District

9           unless the agent or officer has reasonable suspicion that the person to be stopped

10          is within the United States in violation of U.S. immigration law.

11      b.  In connection with paragraph (1), Defendants may not rely solely on the factors

12          below, alone or in combination, to form reasonable suspicion for a detentive stop,

13          except as permitted by law:

14              i.   Apparent race or ethnicity;

15              ii.  Speaking Spanish or speaking English with an accent;

16              iii. Presence at a particular location (e.g. bus stop, car wash, tow yard, day

17                   laborer pick up site, agricultural site, etc.); or

18              iv.  The type of work one does.

19      c.  The Court, having found a strong likelihood of success on the merits and that the

20          balance of equities overwhelmingly favors Plaintiffs, further ORDERS that no

21          security shall be required under Federal Rule of Civil Procedure 65(c).

22      d.  Defendants are each hereby ORDERED TO SHOW CAUSE on a date to be set

23          by the Court or as soon thereafter as counsel may be heard in the courtroom of the

24          Honorable Maame Ewusi-Mensah Frimpong, located at 350 West First Street, Los

25          Angeles, CA 90012, why a preliminary injunction should not issue ordering that:

26              i.   As required by the Fourth Amendment of the United States Constitution,

27                   Defendants are enjoined from conducting detentive stops in this District

28

50

ER-0830

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 52 of 53    Page ID
#:1246
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 51 of 52    Page ID
#:1191

1    unless the agent or officer has reasonable suspicion that the person to be

2    stopped is within the United States in violation of U.S. immigration law;

3        ii.  In connection with paragraph (a), Defendants may not rely solely on the

4    factors below, alone or in combination, to form reasonable suspicion for a

5    detentive stop, except as permitted by law;

6            1.  Apparent race or ethnicity;

7            2.  Speaking Spanish or speaking English with an accent;

8            3.  Presence at a particular location (e.g. bus stop, car wash, tow yard,

9    day laborer pick up site, agricultural site, etc.); or

10           4.  The type of work one does.

11      iii.  Defendants will maintain and provide documentation of detentive stops,

12   including factors supporting reasonable suspicion, to Plaintiffs' counsel on

13   a regular schedule.

14      iv.  Defendants will develop guidance concerning how agents and officers

15   should determine whether "reasonable suspicion" exists when conducting

16   detentive stops.

17       v.  Defendants will implement associated training for Defendants' agents and

18   officers involved in immigration operations in this District.

19     3.  The parties shall meet and confer and file a joint status report with respect to re-

20   designating this case in light of the Petitioner-Plaintiffs' bond hearings and their

21   outcome. The joint status report shall be filed within three (3) days of the outcome of the

22   last bond hearing and shall address whether any of the submissions currently on the

23   docket should be sealed or redacted.

24     4.  In light of the concerns raised by Defendants regarding the time needed to address these

25   issues, the Court shall seek the views of the parties before setting a date for the Order to

26

27

28

51

Case 2:25-cv-05605-MEMF-SP    Document 89    Filed 07/13/25    Page 53 of 53    Page ID
#:1247
Case 2:25-cv-05605-MEMF-SP    Document 87    Filed 07/11/25    Page 52 of 52    Page ID
#:1192

1    Show Cause hearing noted above.[37] The parties shall meet and confer and file a joint

2    status report regarding their proposed date for the Order to Show Cause hearing,

3    including a proposed briefing schedule. The joint status report shall be filed by 5pm

4    Wednesday, July 16, 2025.

5

6    IT IS SO ORDERED.

7

8    Dated: July 11, 2025

9                                              MAAME EWUSI-MENSAH FRIMPONG

10                                                   United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   _____
     [37] The request for a stay is DENIED. Defendants have failed to address the applicable law governing stays or

28   make any showing that such a stay is warranted besides stating that they want time to determine whether to
     appeal and seek a stay pending appeal. ECF No. 71 at 24.

52

ACCO,TRO,194,APPEAL

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
## CIVIL DOCKET FOR CASE #: 2:25-cv-05605-MEMF-SP

| | |
|---|---|
| Pedro Vasquez Perdomo et al v. Kristi Noem et al | Date Filed: 06/20/2025 |
| Assigned to: Judge Maame Ewusi-Mensah Frimpong | Jury Demand: None |
| Referred to: Magistrate Judge Sheri Pym | Nature of Suit: 463 Habeas Corpus - Alien |
| Related Case: 2:25-cv-05923-JFW-SP | Detainee |
| Case in other court: 9th CCA, 25-04312 | Jurisdiction: U.S. Government Defendant |
| Cause: 28:2241 Petition for Writ of Habeas Corpus (federal) | |

**Plaintiff**

**Jorge Hernandez Viramontes**                          represented by     **Anne Lai**
UCI Law Clinic
P.O. Box 5479
Irvine, CA 92616-5479
949-824-9894
Email: alai@law.uci.edu
*ATTORNEY TO BE NOTICED*

**Bree A. Bernwanger**
ACLU Foundation of Northern California
39 Drumm Street
San Francisco, CA 94111
415-621-2493
Fax: 415-255-1478
Email: BBernwanger@aclunc.org *(Inactive)*
*ATTORNEY TO BE NOTICED*

**Brisa Yaneth Velazquez Oatis**
ACLU of San Diego and Imperial Counties
2760 Fifth Ave, Suite 300
San Diego, CA 92103
619-398-4199
Email: bvoatis@aclu-sdic.org
*ATTORNEY TO BE NOTICED*

**Dae Keun Kwon**
ACLU of Southern California
1313 West 8th Street
Ste 200
1313 W 8th Street
Los Angeles, CA 90017
213-977-9500
Email: akwon@aclusocal.org
*ATTORNEY TO BE NOTICED*

**Diana Sanchez**
ACLU of Southern California
1313 West 8th Street, Suite 200

ER-0833

CM/ECF - California Central District

Los Angeles, CA 90017
213-977-9500
Fax: 213-915-0219
Email: dianasanchez@aclusocal.org
*ATTORNEY TO BE NOTICED*

**Eva Lucia Bitran**
ACLU Foundation of Southern California
1313 West 8th Street
Los Angeles, CA 90017
909-380-7505
Email: ebitran@aclusocal.org
*ATTORNEY TO BE NOTICED*

**Gina Bianca Amato**
Public Counsel
610 S. Ardmore Ave
Los Angeles, CA 90005
213-385-2977
Email: gamato@publiccounsel.org
*ATTORNEY TO BE NOTICED*

**Henry David Shreffler**
Munger Tolles and Olson LLP
350 South Grand Avenue 50th Floor
Los Angeles, CA 90071
213-683-9129
Email: henry.shreffler@mto.com
*ATTORNEY TO BE NOTICED*

**Jacob S Kreilkamp**
Munger Tolles and Olson LLP
350 South Grand Avenue 50th Floor
Los Angeles, CA 90071
213-683-9100
Fax: 213-687-3702
Email: jacob.kreilkamp@mto.com
*ATTORNEY TO BE NOTICED*

**Jamie Byrne Luma**
Munger Tolles and Olson LLP
350 S. Grand Ave., Fl. 50
Los Angeles, CA 90071
213-683-9100
Fax: 213-687-3702
Email: jamie.luma@mto.com *(Inactive)*
*ATTORNEY TO BE NOTICED*

**Jessica Karp Bansal**
National Day Laborer Organizing Network
1030 South Arroyo Parkway, Suite 106
Pasadena, CA 91105
626-214-5689
Email: jessica@ndlon.org

CM/ECF - California Central District

*ATTORNEY TO BE NOTICED*

**Kyle Anthony Groves**
Munger, Tolles and Olson LLP
350 S. Grand Ave., 50th Fl.
Los Angeles, CA 90071
213-683-9100
Fax: 213-687-3702
Email: kyle.groves@mto.com
*ATTORNEY TO BE NOTICED*

**Maggie Jane Bushell**
Munger, Tolles and Olson LLP
350 S. Grand Ave., 50th Fl.
Los Angeles, CA 90071
213-683-9100
Fax: 213-687-3702
Email: maggie.bushell@mto.com
*ATTORNEY TO BE NOTICED*

**Mark D Rosenbaum**
Public Counsel
610 South Ardmore Avenue
Los Angeles, CA 90005
213-385-2977
Fax: 213-385-9089
Email: mrosenbaum@publiccounsel.org
*ATTORNEY TO BE NOTICED*

**Mayra Beatriz Joachin**
ACLU of Southern California
1313 West 8th Street
Los Angeles, CA 90017
213-977-5291
Email: mjoachin@aclusocal.org
*ATTORNEY TO BE NOTICED*

**Mohammad K. Tajsar**
ACLU Foundation of Southern California
1313 West 8th Street
Los Angeles, CA 90017
213-977-5200
Fax: 213-977-5297
Email: mtajsar@aclusocal.org
*ATTORNEY TO BE NOTICED*

**Oliver Ma**
American Civil Liberties Union of Southern
California
1313 W 8th Street
Los Angeles, CA 90017
213-977-9500
Email: oma@aclusocal.org
*ATTORNEY TO BE NOTICED*

CM/ECF - California Central District

**Rebecca Sarah Brown**
Public Counsel
610 South Ardmore Avenue
Los Angeles, CA 90005
213-385-2977
Fax: 213-201-4727
Email: rbrown@publiccounsel.org
*ATTORNEY TO BE NOTICED*

**Ritu Mahajan**
Public Counsel
610 S. Ardmore Avenue
Los Angeles, CA 90005
949-295-3354
Email: rmahajan@publiccounsel.org
*ATTORNEY TO BE NOTICED*

**Sara H. Worth**
Munger, Tolles and Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
213-683-9599
Email: sara.worth@mto.com
*ATTORNEY TO BE NOTICED*

**Sophia Louise Wrench**
Public Counsel
610 S Ardmore Ave
Los Angeles, CA 90005
425-301-9709
Email: swrench@publiccounsel.org
*ATTORNEY TO BE NOTICED*

**Stephanie Padilla**
American Civil Liberties Union
1313 West 8th Street
Los Angeles, CA 90017
213-977-9500
Fax: 213-977-5297
Email: spadilla@aclusocal.org
*ATTORNEY TO BE NOTICED*

**Stacy Eva Tolchin**
Law Offices of Stacy Tolchin
776 East Green Street Suite 210
Pasadena, CA 91101
213-622-7450
Fax: 213-622-7233
Email: Stacy@tolchinimmigration.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

ER-0836

**United Farm Workers**                    represented by **Anne Lai**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bree A. Bernwanger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brisa Yaneth Velazquez Oatis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dae Keun Kwon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Diana Sanchez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eva Lucia Bitran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gina Bianca Amato**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Henry David Shreffler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacob S Kreilkamp**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jamie Byrne Luma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jessica Karp Bansal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kyle Anthony Groves**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren M. Wilfong**
National Day Laborer Organizing Network
228 South Ocean Ave
Freeport, NY 11520
551-786-2299
Email: lwilfong@ndlon.org

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Maggie Jane Bushell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark D Rosenbaum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mayra Beatriz Joachin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mohammad K. Tajsar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oliver Ma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Sarah Brown**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ritu Mahajan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sara H. Worth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sophia Louise Wrench**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephanie Padilla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stacy Eva Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Coalition for Humane Immigrant Rights**      represented by   **Anne Lai**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bree A. Bernwanger**
(See above for address)

ER-0838

CM/ECF - California Central District

*ATTORNEY TO BE NOTICED*

**Brisa Yaneth Velazquez Oatis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carl J. Bergquist**
Coalition for Humane Immigrant Rights
2351 Hempstead Road
Ottawa Hills, OH 43606
310-279-6025
Email: cbergquist@chirla.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Dae Keun Kwon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Diana Sanchez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eva Lucia Bitran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gina Bianca Amato**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Helia Bidad**
Hecker Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
646-584-2781
Email: hbidad@heckerfink.com
*ATTORNEY TO BE NOTICED*

**Henry David Shreffler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacob S Kreilkamp**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jamie Byrne Luma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jessica Karp Bansal**
(See above for address)
*ATTORNEY TO BE NOTICED*

ER-0839

**Kyle Anthony Groves**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren M. Wilfong**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mack Eric Jenkins**
Hecker Fink LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
213-459-2997
Email: mjenkins@heckerfink.com
*ATTORNEY TO BE NOTICED*

**Maggie Jane Bushell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark D Rosenbaum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew J. Craig**
Hecker Fink LLP
1150 South Olive Street, Suite 10-140
Los Angeles, CA 90015
929-294-2542
Email: mcraig@heckerfink.com
*ATTORNEY TO BE NOTICED*

**Mayra Beatriz Joachin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mohammad K. Tajsar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oliver Ma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Sarah Brown**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ritu Mahajan**
(See above for address)
*ATTORNEY TO BE NOTICED*

ER-0840

CM/ECF - California Central District

**Sara H. Worth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sophia Louise Wrench**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephanie Padilla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stacy Eva Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jason Brian Gavidia**                    represented by  **Anne Lai**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bree A. Bernwanger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brisa Yaneth Velazquez Oatis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dae Keun Kwon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Diana Sanchez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eva Lucia Bitran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gina Bianca Amato**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Henry David Shreffler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacob S Kreilkamp**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jamie Byrne Luma**

ER-0841

CM/ECF - California Central District

(See above for address)
*ATTORNEY TO BE NOTICED*

**Jessica Karp Bansal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kyle Anthony Groves**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maggie Jane Bushell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark D Rosenbaum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mayra Beatriz Joachin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mohammad K. Tajsar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oliver Ma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Sarah Brown**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ritu Mahajan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sara H. Worth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sophia Louise Wrench**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephanie Padilla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stacy Eva Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

ER-0842

CM/ECF - California Central District

**Plaintiff**

**Immigrant Defenders Law Center**          represented by  **Alison Brooke Steffel**
Immigrant Defenders Law Center
634 South Spring Street, 10th Fl.
Los Angeles, CA 90014
213-674-9435
Fax: 213-282-3133
Email: asteffel@immdef.org
*ATTORNEY TO BE NOTICED*

**Alvaro M Huerta**
Immigration Defenders Law Center
634 South Spring Street 10th Floor
Los Angeles, CA 90014
213-338-7542
Fax: 213-282-3133
Email: ahuerta@immdef.org
*ATTORNEY TO BE NOTICED*

**Brynna Rhiannon Bolt**
Immigrant Defenders Law Center
634 Suite Spring Street 10th Floor
Los Angeles, CA 90014
213-340-6583
Fax: 213-282-3133
Email: bbolt@immdef.org
*ATTORNEY TO BE NOTICED*

**Gina Bianca Amato**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Helia Bidad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mack Eric Jenkins**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark D Rosenbaum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew J. Craig**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Sarah Brown**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ritu Mahajan**
(See above for address)

CM/ECF - California Central District

*ATTORNEY TO BE NOTICED*

**Sophia Louise Wrench**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stacy Eva Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**Los Angeles Worker Center Network**          represented by **Anne Lai**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bree A. Bernwanger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brisa Yaneth Velazquez Oatis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dae Keun Kwon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Diana Sanchez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eva Lucia Bitran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gina Bianca Amato**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Henry David Shreffler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacob S Kreilkamp**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jamie Byrne Luma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jessica Karp Bansal**
(See above for address)
*ATTORNEY TO BE NOTICED*

CM/ECF - California Central District

**Kyle Anthony Groves**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren M. Wilfong**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Maggie Jane Bushell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark D Rosenbaum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mayra Beatriz Joachin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mohammad K. Tajsar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oliver Ma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Sarah Brown**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ritu Mahajan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sara H. Worth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sophia Louise Wrench**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephanie Padilla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stacy Eva Tolchin**
(See above for address)
*ATTORNEY TO BE NOTICED*

ER-0845

V.

**Movant**

**State Of California**                            represented by **Jesse Basbaum**
                                                    Office of the California Attorney General
                                                    1515 Clay Street, 21st Floor
                                                    P.O. Box 70550
                                                    Oakland, CA 94612
                                                    510-879-0280
                                                    Email: jesse.basbaum@doj.ca.gov
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Dennis Ojogho**
                                                    Office of the Attorney General of California
                                                    300 S. Spring Street, Ste 1702
                                                    Los Angeles, CA 90013-1256
                                                    213-269-6545
                                                    Email: dennis.ojogho@doj.ca.gov
                                                    *ATTORNEY TO BE NOTICED*


V.

**Petitioner**

**Pedro Vasquez Perdomo**                          represented by **Stacy Eva Tolchin**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Anne Lai**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Bree A. Bernwanger**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Brisa Yaneth Velazquez Oatis**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Dae Keun Kwon**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Diana Sanchez**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Eva Lucia Bitran**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

ER-0846

CM/ECF - California Central District

**Henry David Shreffler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacob S Kreilkamp**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jamie Byrne Luma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kyle Anthony Groves**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren M. Wilfong**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Maggie Jane Bushell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mayra Beatriz Joachin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan A Brewer**
Law Offices of Stacy Tolchin
776 East Green Street Suite 210
Pasadena, CA 91101
213-622-7450
Fax: 213-622-7233
Email: megan@tolchinimmigration.com
*TERMINATED: 07/02/2025*

**Mohammad K. Tajsar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oliver Ma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sara H. Worth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephanie Padilla**
(See above for address)
*ATTORNEY TO BE NOTICED*

ER-0847

CM/ECF - California Central District

**Petitioner**

**Osorto Carlos**                    represented by    **Stacy Eva Tolchin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anne Lai**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bree A. Bernwanger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brisa Yaneth Velazquez Oatis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dae Keun Kwon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Diana Sanchez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eva Lucia Bitran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Henry David Shreffler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacob S Kreilkamp**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jamie Byrne Luma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kyle Anthony Groves**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren M. Wilfong**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Maggie Jane Bushell**
(See above for address)
*ATTORNEY TO BE NOTICED*

CM/ECF - California Central District

**Mayra Beatriz Joachin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan A Brewer**
(See above for address)
*TERMINATED: 07/02/2025*

**Mohammad K. Tajsar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oliver Ma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sara H. Worth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephanie Padilla**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Petitioner**</u>

**Isaac Villegas Molina**                    represented by    **Stacy Eva Tolchin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anne Lai**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bree A. Bernwanger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brisa Yaneth Velazquez Oatis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dae Keun Kwon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Diana Sanchez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eva Lucia Bitran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Henry David Shreffler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacob S Kreilkamp**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jamie Byrne Luma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kyle Anthony Groves**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauren M. Wilfong**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Maggie Jane Bushell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mayra Beatriz Joachin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan A Brewer**
(See above for address)
*TERMINATED: 07/02/2025*

**Mohammad K. Tajsar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oliver Ma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sara H. Worth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephanie Padilla**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Rodney S. Scott**
*In his official capacity as Commissioner,*
*U.S. Customs and Border Patrol*

represented by **Pauline Helen Alarcon**
AUSA - Office of US Attorney
300 North Los Angeles Street, Suite 7516
Los Angeles, CA 90012
213-894-3992
Fax: 213-894-7819
Email: Pauline.Alarcon@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Layne Farrell**
AUSA - Office of US Attorney
Civil Division
300 North Los Angeles Street, Suite 7516
Los Angeles, CA 90012
213-894-5557
Fax: 213-894-7819
Email: alexander.farrell@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Aniello DeSimone**
U.S. Department of Justice
450 5th Street
Washington, DC 20001
202-532-5239
Email: Aniello.DeSimone@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Daniel A Beck**
AUSA - Office of US Attorney
Civil Division
300 North Los Angeles Street Suite 7516
Los Angeles, CA 90012
213-894-2574
Fax: 213-894-7819
Email: daniel.beck@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Jacob Bashyrov**
US Department of Justice
Civil Division - Office of Immigration
Litigation
PO Box 878 Ben Franklin Station
Washington, DC 20044
202-598-0919
Email: Jacob.Bashyrov@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Jason Kyle Zubata**
US Department of Justice
OIL- DCS
PO Box 868, Ben Franklin Station
Washington, DC 20044
202-532-4143

CM/ECF - California Central District

Fax: 202-305-7000
Email: jason.k.zubata@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Jonathan Kevin Ross**
US Department of Justice
Civil Division - Office of Immigration
Litigation
PO Box 878 Ben Franklin Station
Washington, DC 20044
202-305-7662
Email: Jonathan.K.Ross@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Ryan C. Chapman**
AUSA - Office of US Attorney
300 North Los Angeles Street Suite 7516
Los Angeles, CA 90012
213-894-2471
Fax: 213-894-7819
Email: Ryan.Chapman@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Sean Skedzielewski**
U.S. Department of Justice, Civil Division
950 Pennsylvania Ave NW
Washington, DC 20530
202-307-1697
Email: Sean.Skedzielewski@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Michael W. Banks**                    represented by **Pauline Helen Alarcon**
*In his official capacity as Chief of U.S.*              (See above for address)
*Border Patrol*                                          *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Alexander Layne Farrell**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Aniello DeSimone**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Daniel A Beck**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Jacob Bashyrov**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Jason Kyle Zubata**

CM/ECF - California Central District

(See above for address)
*ATTORNEY TO BE NOTICED*

**Jonathan Kevin Ross**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Chapman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Skedzielewski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kash Patel**                                    represented by   **Pauline Helen Alarcon**
*In his official capacity as Director, Federal*                    (See above for address)
*Bureau of Investigation*                                          *LEAD ATTORNEY*
                                                                   *ATTORNEY TO BE NOTICED*

                                                  **Alexander Layne Farrell**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Aniello DeSimone**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Daniel A Beck**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Jacob Bashyrov**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Jason Kyle Zubata**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Jonathan Kevin Ross**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Ryan C. Chapman**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **Sean Skedzielewski**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

**Defendant**

CM/ECF - California Central District

**Ernesto Santacruz, Jr.**                    represented by  **Pauline Helen Alarcon**
*In his official capacity as Acting Field*                    (See above for address)
*Office Director for Los Angeles, U.S.*                    *LEAD ATTORNEY*
*Immigration and Customs Enforcement*                    *ATTORNEY TO BE NOTICED*

                                              **Alexander Layne Farrell**
                                              (See above for address)
                                              *ATTORNEY TO BE NOTICED*

                                              **Aniello DeSimone**
                                              (See above for address)
                                              *ATTORNEY TO BE NOTICED*

                                              **Daniel A Beck**
                                              (See above for address)
                                              *ATTORNEY TO BE NOTICED*

                                              **Jacob Bashyrov**
                                              (See above for address)
                                              *ATTORNEY TO BE NOTICED*

                                              **Jason Kyle Zubata**
                                              (See above for address)
                                              *ATTORNEY TO BE NOTICED*

                                              **Jonathan Kevin Ross**
                                              (See above for address)
                                              *ATTORNEY TO BE NOTICED*

                                              **Ryan C. Chapman**
                                              (See above for address)
                                              *ATTORNEY TO BE NOTICED*

                                              **Sean Skedzielewski**
                                              (See above for address)
                                              *ATTORNEY TO BE NOTICED*

**Defendant**

**Eddy Wang**                    represented by  **Pauline Helen Alarcon**
*Special Agent in Charge for Los Angeles,*                    (See above for address)
*Homeland Security Investigations, U.S.*                    *LEAD ATTORNEY*
*Immigration and Customs Enforcement*                    *ATTORNEY TO BE NOTICED*

                                              **Alexander Layne Farrell**
                                              (See above for address)
                                              *ATTORNEY TO BE NOTICED*

                                              **Aniello DeSimone**
                                              (See above for address)
                                              *ATTORNEY TO BE NOTICED*

                                              **Daniel A Beck**
                                              (See above for address)
                                              *ATTORNEY TO BE NOTICED*

CM/ECF - California Central District

**Jacob Bashyrov**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Kyle Zubata**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jonathan Kevin Ross**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Chapman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Skedzielewski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Gregory K. Bovino**
*In his official capacity as Chief Patrol Agent for El Centro Sector of the U.S. Border Patrol*

represented by **Pauline Helen Alarcon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Layne Farrell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Aniello DeSimone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel A Beck**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacob Bashyrov**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Kyle Zubata**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jonathan Kevin Ross**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Chapman**
(See above for address)
*ATTORNEY TO BE NOTICED*

CM/ECF - California Central District

<table>
<tr><td></td><td></td><td>Sean Skedzielewski<br>(See above for address)<br><i>ATTORNEY TO BE NOTICED</i></td></tr>
</table>

**Defendant**

**Jeffrey D. Stalnaker**
*In his official capacity as Acting Chief Patrol Agent, San Diego Sector of the U.S. Border Patrol*

represented by **Pauline Helen Alarcon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Layne Farrell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Aniello DeSimone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel A Beck**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacob Bashyrov**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Kyle Zubata**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jonathan Kevin Ross**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Chapman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Skedzielewski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Akil Davis**
*In his official capacity as Assistant Director in Charge, Los Angeles Office, Federal Bureau of Investigation*

represented by **Pauline Helen Alarcon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Layne Farrell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Aniello DeSimone**

ER-0856

CM/ECF - California Central District

(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel A Beck**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacob Bashyrov**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Kyle Zubata**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jonathan Kevin Ross**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Chapman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Skedzielewski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bilal A. Essayli**
*In his official capacity as U.S. Attorney for
the Central District of California*

represented by **Pauline Helen Alarcon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Layne Farrell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Aniello DeSimone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel A Beck**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jacob Bashyrov**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Kyle Zubata**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jonathan Kevin Ross**

CM/ECF - California Central District

                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

**Ryan C. Chapman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sean Skedzielewski**
(See above for address)
*ATTORNEY TO BE NOTICED*

## V.
### Respondent

**Kristi Noem**
*Secretary, Department of Homeland
Security*

represented by  **Assistant 2241-194 US Attorney LA-CV**
AUSA - Office of US Attorney
Criminal Division - US Courthouse
312 North Spring Street 12th Floor
Los Angeles, CA 90012-4700
213-894-2434
Email: USACAC.Habeas@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**OIL-DCS Trial Attorney**
Office of Immigration Litigation
District Court Section
PO Box 868 Ben Franklin Station
Washington, DC 20044
202-353-8806
Email: oil-dcs.cacd@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Pauline Helen Alarcon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Layne Farrell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Aniello DeSimone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jonathan Kevin Ross**
(See above for address)
*ATTORNEY TO BE NOTICED*

### Respondent

ER-0858

CM/ECF - California Central District

**Pam Bondi**                     represented by    **Assistant 2241-194 US Attorney LA-CV**
*Attorney General*                                  (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **OIL-DCS Trial Attorney**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Pauline Helen Alarcon**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Alexander Layne Farrell**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Aniello DeSimone**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Jonathan Kevin Ross**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Respondent**

**Immigration and Customs Enforcement**    represented by    **Assistant 2241-194 US Attorney LA-CV**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **OIL-DCS Trial Attorney**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Pauline Helen Alarcon**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Alexander Layne Farrell**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Aniello DeSimone**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Respondent**

**Todd Lyons**                    represented by    **Assistant 2241-194 US Attorney LA-CV**
*Acting Los Angeles Field Office Director,*         (See above for address)

ER-0859

*Immigration and Customs Enforcement*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**OIL-DCS Trial Attorney**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Pauline Helen Alarcon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Layne Farrell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Aniello DeSimone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jonathan Kevin Ross**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor**

**CITY OF LOS ANGELES**                represented by **Daniel Benjamin Levin**
Munger Tolles and Olson
350 South Grand Avenue Suite 50th Floor
Los Angeles, CA 90071
213-683-9135
Fax: 213-687-3702
Email: daniel.levin@mto.com
*ATTORNEY TO BE NOTICED*

**E. Martin Estrada**
Munger, Tolles and Olson
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
213-683-9100
Fax: 213-687-3702
Email: Martin.Estrada@mto.com
*ATTORNEY TO BE NOTICED*

**Hydee Rose Feldstein Soto**
Office of the Los Angeles City Attorney
200 North Main Street, 8th Floor
Los Angeles, CA 90012
213-978-6900
Fax: 213-978-8785
Email: hydee.feldsteinsoto@lacity.org
*ATTORNEY TO BE NOTICED*

**John L Schwab**

Munger Tolles and Olson LLP
355 South Grand Avenue 50th Floor
Los Angeles, CA 90071-3426
213-683-9100
Fax: 213-687-3702
Email: john.schwab@mto.com
*ATTORNEY TO BE NOTICED*

**Maria Louise Cousineau**
Office of the Los Angeles City Attorney
Public Rights Branch
201 North Figueroa Street, 13th Floor
Los Angeles, CA 90012
213-978-8080
Email: maria.cousineau@lacity.org
*ATTORNEY TO BE NOTICED*

**Michael J Dundas**
Los Angeles City Attorneys Office
City Hall East
200 North Main Street Suite 800
Los Angeles, CA 90012
213-978-8130
Fax: 213-978-8312
Email: mike.dundas@lacity.org
*ATTORNEY TO BE NOTICED*

**Randall G Sommer**
Office of the Los Angeles City Attorney
200 North Spring Street, 21st Floor
Los Angeles, CA 90012
213-759-8940
Fax: 213-482-9549
Email: randall.sommer@lacity.org
*ATTORNEY TO BE NOTICED*

**Shubhra Shivpuri**
Office of the Loss Angeles City Attorney
200 N. Spring Street, 21st Floor
Los Angeles, CA 90012
213-913-4226
Fax: 213-482-9549
Email: shubhra.shivpuri@lacity.org
*ATTORNEY TO BE NOTICED*

**Valerie L Flores**
Office of the Los Angeles City Attorney
200 North Spring Street, 21st Floor
Los Angeles, CA 90012
213-978-7178
Fax: 213-978-2222
Email: valerie.flores@lacity.org
*ATTORNEY TO BE NOTICED*

CM/ECF - California Central District

**Victor Roman Leal**
Munger, Tolle and Olson LP
560 Mission Street, 27th Floor
San Francisco, CA 94105
415-512-4023
Email: roman.leal@mto.com
*ATTORNEY TO BE NOTICED*

**Virginia Grace Davis**
Munger Tolles and Olson, LLP
560 Mission Street 27th Floor
San Francisco, CA 94105
415-512-4083
Fax: 415-512-4083
Email: grace.davisfisher@mto.com
*ATTORNEY TO BE NOTICED*

**Wendy Qiuyu Xiao**
Munger Tolles and Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
213-683-9100
Fax: 213-687-3702
Email: wendy.xiao@mto.com
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Culver City**                    represented by    **Daniel Benjamin Levin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**E. Martin Estrada**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John L Schwab**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Victor Roman Leal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Virginia Grace Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Wendy Qiuyu Xiao**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor**

**City of Montebello**              represented by    **Daniel Benjamin Levin**
(See above for address)

ER-0862

CM/ECF - California Central District

*ATTORNEY TO BE NOTICED*

**E. Martin Estrada**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John L Schwab**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Victor Roman Leal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Virginia Grace Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Wendy Qiuyu Xiao**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor**

**City of Monterey Park**                represented by   **Daniel Benjamin Levin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**E. Martin Estrada**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John L Schwab**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Victor Roman Leal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Virginia Grace Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Wendy Qiuyu Xiao**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor**

**City of Pico Rivera**                represented by   **Daniel Benjamin Levin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**E. Martin Estrada**
(See above for address)

ER-0863

CM/ECF - California Central District

*ATTORNEY TO BE NOTICED*

**John L Schwab**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Victor Roman Leal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Virginia Grace Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Wendy Qiuyu Xiao**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor**

**City of West Hollywood**                    represented by    **Daniel Benjamin Levin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**E. Martin Estrada**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John L Schwab**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Victor Roman Leal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Virginia Grace Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Wendy Qiuyu Xiao**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor**

**City of Santa Monica**                    represented by    **Daniel Benjamin Levin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**E. Martin Estrada**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John L Schwab**
(See above for address)

ER-0864

CM/ECF - California Central District

*ATTORNEY TO BE NOTICED*

**Victor Roman Leal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Virginia Grace Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Wendy Qiuyu Xiao**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor**

**COUNTY OF LOS ANGELES**            represented by  **Victor Roman Leal**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Virginia Grace Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wendy Qiuyu Xiao**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brigit Greeson Alvarez**
Office of the Los Angeles County Counsel
500 West Temple Street, Suite 6th Floor
Los Angeles, CA 90012-2713
213-361-1531
Fax: 213-633-1915
Email:
bgreesonalvarez@counsel.lacounty.gov
*ATTORNEY TO BE NOTICED*

**E. Martin Estrada**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John L Schwab**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Liliana Campos**
Office of The County Counsel
648 Kenneth Hahn Hall of Admin
500 West Temple Street, 6th Floor
Los Angeles, CA 90012
213-808-8729

ER-0865

CM/ECF - California Central District

Fax: 213-633-1915
Email: lcampos@counsel.lacounty.gov
*ATTORNEY TO BE NOTICED*

**Nicole Amber Davis Tinkham**
Office of the County Counsel
500 W Temple St Room 648
Los Angeles, CA 90012
213-681-0402
Email: ntinkham@counsel.lacounty.gov
*ATTORNEY TO BE NOTICED*

**Intervenor**

**City of Pasadena**                    represented by  **Victor Roman Leal**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Virginia Grace Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wendy Qiuyu Xiao**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Karl Aaronian**
Pasadena City Attorney's Office
100 N. Garfield Avenue, Room N210
Pasadena, CA 91101
626-744-4141
Fax: 626-744-4190
Email: aaaronian@cityofpasadena.net
*ATTORNEY TO BE NOTICED*

**Arnold F Lee**
Office of the Pasadena City Attorney
100 North Garfield Avenue Suite N210
Pasadena, CA 91109
626-744-4141
Fax: 626-744-4190
Email: aflee@cityofpasadena.net
*ATTORNEY TO BE NOTICED*

**E. Martin Estrada**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John L Schwab**
(See above for address)
*ATTORNEY TO BE NOTICED*

CM/ECF - California Central District

**Michele Beal Bagneris**
City of Pasadena Attorney's Office
100 N. Garfield Ave., Room N210
Pasadena, CA 91101
626-744-4141
Email: mbagneris@cityofpasadena.net
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/20/2025 | 1 | PETITION for Writ of Habeas Corpus by a Person in Federal Custody (28 USC 2241), Receipt No. ACACDC-39940959 for $5 filing fee, filed by Petitioners Pedro Vasquez Perdomo, Isaac Villegas Molina, Osorto Carlos. (Attorney Stacy Eva Tolchin added to party Osorto Carlos (pty:pet), Attorney Stacy Eva Tolchin added to party Pedro Vasquez Perdomo(pty:pet), Attorney Stacy Eva Tolchin added to party Isaac Villegas Molina(pty:pet))(Tolchin, Stacy) (Entered: 06/20/2025) |
| 06/20/2025 | 2 | NOTICE of Interested Parties filed by Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, (Tolchin, Stacy) (Entered: 06/20/2025) |
| 06/20/2025 | 3 | CIVIL COVER SHEET filed by Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina. (Tolchin, Stacy) (Entered: 06/20/2025) |
| 06/20/2025 | 4 | EX PARTE APPLICATION for Temporary Restraining Order as to Transfer from District filed by Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina. (Attachments: # 1 Declaration Stacy Tolchin, # 2 Declaration Cynthia Lucas, # 3 Proposed Order, # 4 Proof of Service) (Tolchin, Stacy) (Entered: 06/20/2025) |
| 06/20/2025 | 5 | NOTICE OF REFERENCE to a U.S. Magistrate Judge. This case has been assigned to the calendar of the Honorable District Judge Maame Ewusi-Mensah Frimpong and referred to Magistrate Judge Sheri Pym, who is authorized to consider preliminary matters and conduct all further hearings as may be appropriate or necessary. Pursuant to Local Rule 83-2.4, the Court must be notified within five (5) days of any address change. See notice for additional details. (sh) (Entered: 06/20/2025) |
| 06/20/2025 | 6 | DECLARATION of Roxana Muro in support of EX PARTE APPLICATION for Temporary Restraining Order as to Transfer from District 4 filed by Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina. (Tolchin, Stacy) (Entered: 06/20/2025) |
| 06/20/2025 | 7 | SCHEDULING NOTICE TEXT ONLY ENTRY by Judge Maame Ewusi-Mensah Frimpong: The Court is in receipt of Petitioners' Ex Parte Application for Temporary Restraining Order and Order to Show Cause. ECF No. 4 . Respondents are ORDERED to file an opposition with supporting declarations by no later than June 21, 2025, at 5:00 p.m. Petitioners are ORDERED to file a reply by no later than noon on June 22, 2025. The Court will hold a hearing on the Ex Parte Application at 9:00 a.m. on June 23, 2025. Respondents are ORDERED to advise Petitioners' counsel and this Court IMMEDIATELY via email if they become aware that Petitioners are to be transported out of this judicial district prior to this Court's ruling on the Ex Parte Application. IT IS SO ORDERED. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dbe) TEXT ONLY ENTRY (Entered: 06/20/2025) |
| 06/20/2025 | 8 | Notice of Appearance or Withdrawal of Counsel: for attorney Pauline Helen Alarcon counsel for Respondents Pam Bondi, Immigration and Customs Enforcement, Todd Lyons, Kristi Noem. Adding Pauline H. Alarcon as counsel of record for Kristi Noem, Pam Bondi, Immigration and Customs Enforcement, Todd Lyons for the reason indicated |

ER-0867

| | | |
|---|---|---|
| | | in the G-123 Notice. Filed by Defendants Kristi Noem, Pam Bondi, Immigration and Customs Enforcement, Todd Lyons. (Attorney Pauline Helen Alarcon added to party Pam Bondi(pty:res), Attorney Pauline Helen Alarcon added to party Immigration and Customs Enforcement(pty:res), Attorney Pauline Helen Alarcon added to party Todd Lyons(pty:res), Attorney Pauline Helen Alarcon added to party Kristi Noem(pty:res)) (Alarcon, Pauline) (Entered: 06/20/2025) |
| 06/20/2025 | 9 | STIPULATION to Withdraw Motion EX PARTE APPLICATION for Temporary Restraining Order as to Transfer from District 4 filed by Respondents Pam Bondi, Immigration and Customs Enforcement, Todd Lyons, Kristi Noem. (Attachments: # 1 Proposed Order)(Alarcon, Pauline) (Entered: 06/20/2025) |
| 06/20/2025 | 10 | Notice of Withdrawal of Motion for Temporary Restraining Order, 4 filed by Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina. (Tolchin, Stacy) (Entered: 06/20/2025) |
| 06/23/2025 | 11 | ORDER GRANTING JOINT STIPULATION FOR WITHDRAWAL OF PETITIONERS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION 9 by Judge Maame Ewusi-Mensah Frimpong. For the reasons set forth in the Stipulation, the Court ORDERS that the briefing schedule and the hearing on June 23, 2025, are VACATED. (iv) (Entered: 06/23/2025) |
| 06/23/2025 | 12 | (Text Only Entry) Telephone Conference set for Tuesday, June 24, 2025 at 1:00 p.m. before Magistrate Judge Sheri Pym. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kca) TEXT ONLY ENTRY (Entered: 06/24/2025) |
| 06/24/2025 | 13 | (TEXT ONLY ENTRY) A Telephone Conference was held in this matter on June 24, 2025. The court and counsel conferred regarding the pending case. At the parties request, the court will refrain from issuing a briefing schedule pending petitioners efforts to schedule immigration bond hearings. The court sets this matter for a Telephonic Status Conference on Thursday, July 3, 2025 at 10:00 a.m. The status conference may be vacated or continued on stipulation of the parties with respect to the status of petitioners efforts and any agreement the parties may reach as to briefing and related matters. Attorney for Petitioners: Stacy Eva Tolchin. Attorney for Respondents: Daniel Beck and Pauline Helene Alarcon. Courtroom Deputy: Kimberly Carter. Time: 00.06. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. Court Recorder: CS-RS-4. (kca) (Entered: 06/25/2025) |
| 06/27/2025 | 14 | STIPULATION to Vacate Status Conference filed by Respondents Pam Bondi, Immigration and Customs Enforcement, Todd Lyons, Kristi Noem. (Attachments: # 1 Proposed Order)(Alarcon, Pauline) Modified on 7/1/2025 (kca). (Entered: 06/27/2025) |
| 07/01/2025 | 15 | ORDER by Magistrate Judge Sheri Pym: VACATING July 3, 2025 STATUS CONFERENCE [NOTE CHANGES MADE BY THECOURT] (SEE ORDER FOR DETAILS). (kca) (Entered: 07/01/2025) |
| 07/02/2025 | 16 | FIRST AMENDED COMPLAINT against Respondents and Defendants Pam Bondi, Todd Lyons, Kristi Noem, Rodney S. Scott, Michael W. Banks, Kash Patel, Ernesto Santacruz, Jr., Eddy Wang, Gregory K. Bovino, Jeffrey D. Stalnaker, Akil Davis, Bilal A. Essayli amending Petition for Writ of Habeas Corpus, 1 , filed by Petitioners and Plaintiffs Isaac Villegas Molina, Osorto Carlos, Pedro Vasquez Perdomo, Jorge Hernandez Viramontes, United Farm Workers, Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Immigrant Defenders Law Center, Los Angeles Worker Center Network (Attachments: # 1 Redlined Complaint)(Attorney Stacy Eva Tolchin added to party Jorge Hernandez Viramontes(pty:pla), Attorney Stacy Eva Tolchin added to party Jason Brian Gavidia(pty:pla), Attorney Stacy Eva Tolchin added to party Los Angeles |

| | | |
|---|---|---|
| | | Worker Center Network(pty:pla), Attorney Stacy Eva Tolchin added to party United Farm Workers (pty:pla), Attorney Stacy Eva Tolchin added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Stacy Eva Tolchin added to party Immigrant Defenders Law Center(pty:pla))(Tolchin, Stacy) (Entered: 07/02/2025) |
| 07/02/2025 | 17 | AMENDED CIVIL COVER SHEET filed by Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Immigrant Defenders Law Center, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes. (Tolchin, Stacy) (Entered: 07/02/2025) |
| 07/02/2025 | 18 | Request for Clerk to Issue Summons on Amended Complaint/Petition,,,, 16 , Civil Cover Sheet (CV-71), 17 filed by Petitioners and Plaintiffs Osorto Carlos, Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Immigrant Defenders Law Center, Los Angeles Worker Center Network, United Farm Workers, Pedro Vasquez Perdomo, Isaac Villegas Molina, Jorge Hernandez Viramontes. (Tolchin, Stacy) (Entered: 07/02/2025) |
| 07/02/2025 | 19 | NOTICE of Interested Parties filed by Petitioners and Plaintiffs Osorto Carlos, Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Immigrant Defenders Law Center, Los Angeles Worker Center Network, United Farm Workers, Pedro Vasquez Perdomo, Isaac Villegas Molina, Jorge Hernandez Viramontes, identifying N/A. (Tolchin, Stacy) (Entered: 07/02/2025) |
| 07/02/2025 | 20 | NOTICE of Appearance filed by attorney Mohammad K. Tajsar on behalf of Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes (Attorney Mohammad K. Tajsar added to party Osorto Carlos (pty:pet), Attorney Mohammad K. Tajsar added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Mohammad K. Tajsar added to party Jason Brian Gavidia(pty:pla), Attorney Mohammad K. Tajsar added to party Los Angeles Worker Center Network(pty:pla), Attorney Mohammad K. Tajsar added to party United Farm Workers (pty:pla), Attorney Mohammad K. Tajsar added to party Pedro Vasquez Perdomo(pty:pet), Attorney Mohammad K. Tajsar added to party Isaac Villegas Molina(pty:pet), Attorney Mohammad K. Tajsar added to party Jorge Hernandez Viramontes(pty:pla))(Tajsar, Mohammad) (Entered: 07/02/2025) |
| 07/02/2025 | 21 | First NOTICE of Appearance filed by attorney Mark D Rosenbaum on behalf of Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Immigrant Defenders Law Center, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes (Attorney Mark D Rosenbaum added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Mark D Rosenbaum added to party Jason Brian Gavidia(pty:pla), Attorney Mark D Rosenbaum added to party Immigrant Defenders Law Center(pty:pla), Attorney Mark D Rosenbaum added to party Los Angeles Worker Center Network(pty:pla), Attorney Mark D Rosenbaum added to party United Farm Workers (pty:pla), Attorney Mark D Rosenbaum added to party Jorge Hernandez Viramontes(pty:pla))(Rosenbaum, Mark) (Entered: 07/02/2025) |
| 07/02/2025 | 22 | First NOTICE of Appearance filed by attorney Rebecca Sarah Brown on behalf of Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Immigrant Defenders Law Center, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes (Attorney Rebecca Sarah Brown added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Rebecca Sarah Brown added to party Jason Brian Gavidia(pty:pla), Attorney Rebecca Sarah Brown added to party Immigrant Defenders Law Center(pty:pla), Attorney Rebecca Sarah Brown added to party Los Angeles Worker Center Network(pty:pla), Attorney Rebecca Sarah Brown added to party |

ER-0869

|  |  | United Farm Workers (pty:pla), Attorney Rebecca Sarah Brown added to party Jorge Hernandez Viramontes(pty:pla))(Brown, Rebecca) (Entered: 07/02/2025) |
|---|---|---|
| 07/02/2025 | 23 | Notice of Appearance or Withdrawal of Counsel: for attorney Matthew J. Craig counsel for Plaintiffs Coalition for Humane Immigrant Rights, Immigrant Defenders Law Center. Adding Matthew J. Craig as counsel of record for Coalition for Humane Immigrant Rights, Immigrant Defenders Law Center for the reason indicated in the G-123 Notice. Filed by Plaintiffs Coalition for Humane Immigrant Rights, Immigrant Defenders Law Center. (Attorney Matthew J. Craig added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Matthew J. Craig added to party Immigrant Defenders Law Center(pty:pla))(Craig, Matthew) (Entered: 07/02/2025) |
| 07/02/2025 | 24 | Notice of Appearance or Withdrawal of Counsel: for attorney Mack Eric Jenkins counsel for Plaintiffs Coalition for Humane Immigrant Rights, Immigrant Defenders Law Center. Adding Mack E. Jenkins as counsel of record for Coalition for Humane Immigrant Rights, Immigrant Defenders Law Center for the reason indicated in the G-123 Notice. Filed by Plaintiffs Coalition for Humane Immigrant Rights, Immigrant Defenders Law Center. (Attorney Mack Eric Jenkins added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Mack Eric Jenkins added to party Immigrant Defenders Law Center(pty:pla))(Jenkins, Mack) (Entered: 07/02/2025) |
| 07/02/2025 | 25 | First NOTICE of Appearance filed by attorney Ritu Mahajan on behalf of Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Immigrant Defenders Law Center, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes (Attorney Ritu Mahajan added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Ritu Mahajan added to party Jason Brian Gavidia(pty:pla), Attorney Ritu Mahajan added to party Immigrant Defenders Law Center(pty:pla), Attorney Ritu Mahajan added to party Los Angeles Worker Center Network(pty:pla), Attorney Ritu Mahajan added to party United Farm Workers (pty:pla), Attorney Ritu Mahajan added to party Jorge Hernandez Viramontes(pty:pla))(Mahajan, Ritu) (Entered: 07/02/2025) |
| 07/02/2025 | 26 | First NOTICE of Appearance filed by attorney Eva Lucia Bitran on behalf of Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes (Attorney Eva Lucia Bitran added to party Osorto Carlos (pty:pet), Attorney Eva Lucia Bitran added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Eva Lucia Bitran added to party Jason Brian Gavidia(pty:pla), Attorney Eva Lucia Bitran added to party Los Angeles Worker Center Network(pty:pla), Attorney Eva Lucia Bitran added to party United Farm Workers (pty:pla), Attorney Eva Lucia Bitran added to party Pedro Vasquez Perdomo(pty:pet), Attorney Eva Lucia Bitran added to party Isaac Villegas Molina(pty:pet), Attorney Eva Lucia Bitran added to party Jorge Hernandez Viramontes(pty:pla))(Bitran, Eva) (Entered: 07/02/2025) |
| 07/02/2025 | 27 | First NOTICE of Appearance filed by attorney Mayra Beatriz Joachin on behalf of Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes (Attorney Mayra Beatriz Joachin added to party Osorto Carlos (pty:pet), Attorney Mayra Beatriz Joachin added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Mayra Beatriz Joachin added to party Jason Brian Gavidia(pty:pla), Attorney Mayra Beatriz Joachin added to party Los Angeles Worker Center Network(pty:pla), Attorney Mayra Beatriz Joachin added to party United Farm Workers (pty:pla), Attorney Mayra Beatriz Joachin added to party Pedro Vasquez Perdomo(pty:pet), Attorney Mayra Beatriz Joachin added |

CM/ECF - California Central District

| | | |
|---|---|---|
| | | to party Isaac Villegas Molina(pty:pet), Attorney Mayra Beatriz Joachin added to party Jorge Hernandez Viramontes(pty:pla)(Joachin, Mayra) (Entered: 07/02/2025) |
| 07/02/2025 | 28 | First NOTICE of Appearance filed by attorney Oliver Ma on behalf of Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes (Attorney Oliver Ma added to party Osorto Carlos (pty:pet), Attorney Oliver Ma added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Oliver Ma added to party Jason Brian Gavidia(pty:pla), Attorney Oliver Ma added to party Los Angeles Worker Center Network(pty:pla), Attorney Oliver Ma added to party United Farm Workers (pty:pla), Attorney Oliver Ma added to party Pedro Vasquez Perdomo(pty:pet), Attorney Oliver Ma added to party Isaac Villegas Molina(pty:pet), Attorney Oliver Ma added to party Jorge Hernandez Viramontes(pty:pla)(Ma, Oliver) (Entered: 07/02/2025) |
| 07/02/2025 | 29 | First NOTICE of Appearance filed by attorney Stephanie Padilla on behalf of Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes (Attorney Stephanie Padilla added to party Osorto Carlos (pty:pet), Attorney Stephanie Padilla added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Stephanie Padilla added to party Jason Brian Gavidia(pty:pla), Attorney Stephanie Padilla added to party Los Angeles Worker Center Network(pty:pla), Attorney Stephanie Padilla added to party United Farm Workers (pty:pla), Attorney Stephanie Padilla added to party Pedro Vasquez Perdomo(pty:pet), Attorney Stephanie Padilla added to party Isaac Villegas Molina(pty:pet), Attorney Stephanie Padilla added to party Jorge Hernandez Viramontes(pty:pla)(Padilla, Stephanie) (Entered: 07/02/2025) |
| 07/02/2025 | 30 | First NOTICE of Appearance filed by attorney Diana Sanchez on behalf of Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes (Attorney Diana Sanchez added to party Osorto Carlos (pty:pet), Attorney Diana Sanchez added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Diana Sanchez added to party Jason Brian Gavidia(pty:pla), Attorney Diana Sanchez added to party Los Angeles Worker Center Network(pty:pla), Attorney Diana Sanchez added to party United Farm Workers (pty:pla), Attorney Diana Sanchez added to party Pedro Vasquez Perdomo(pty:pet), Attorney Diana Sanchez added to party Isaac Villegas Molina(pty:pet), Attorney Diana Sanchez added to party Jorge Hernandez Viramontes(pty:pla)(Sanchez, Diana) (Entered: 07/02/2025) |
| 07/02/2025 | 31 | Notice of Appearance or Withdrawal of Counsel: for attorney Megan A Brewer counsel for Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina. Megan Brewer is no longer counsel of record for the aforementioned party in this case for the reason indicated in the G-123 Notice. Filed by Petitioners Pedro VASQUEZ PERDOMO, Carlos Alexander OSORTO, and Isaac VILLEGAS MOLINA. (Brewer, Megan) (Entered: 07/02/2025) |
| 07/02/2025 | 32 | Notice of Appearance or Withdrawal of Counsel: for attorney Brynna Rhiannon Bolt counsel for Plaintiff Immigrant Defenders Law Center. Adding Brynna Bolt as counsel of record for Immigrant Defenders Law Center for the reason indicated in the G-123 Notice. Filed by Plaintiff Attorney for Plaintiff. (Attorney Brynna Rhiannon Bolt added to party Immigrant Defenders Law Center(pty:pla))(Bolt, Brynna) (Entered: 07/02/2025) |
| 07/02/2025 | 33 | Notice of Appearance or Withdrawal of Counsel: for attorney Alison Brooke Steffel counsel for Plaintiff Immigrant Defenders Law Center. Adding Alison Brooke Steffel as counsel of record for Immigrant Defenders Law Center for the reason indicated in the G- |

| | | |
|---|---|---|
| | | 123 Notice. Filed by Plaintiff Attorney for Plaintiff. (Attorney Alison Brooke Steffel added to party Immigrant Defenders Law Center(pty:pla))(Steffel, Alison) (Entered: 07/02/2025) |
| 07/02/2025 | 34 | Notice of Appearance or Withdrawal of Counsel: for attorney Alvaro M Huerta counsel for Plaintiff Immigrant Defenders Law Center. Adding Alvaro M. Huerta as counsel of record for Immigrant Defenders Law Center for the reason indicated in the G-123 Notice. Filed by Plaintiff Attorney for Plaintiff. (Attorney Alvaro M Huerta added to party Immigrant Defenders Law Center(pty:pla))(Huerta, Alvaro) (Entered: 07/02/2025) |
| 07/02/2025 | 35 | First NOTICE of Appearance filed by attorney Dae Keun Kwon on behalf of Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes (Attorney Dae Keun Kwon added to party Osorto Carlos (pty:pet), Attorney Dae Keun Kwon added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Dae Keun Kwon added to party Jason Brian Gavidia(pty:pla), Attorney Dae Keun Kwon added to party Los Angeles Worker Center Network(pty:pla), Attorney Dae Keun Kwon added to party United Farm Workers (pty:pla), Attorney Dae Keun Kwon added to party Pedro Vasquez Perdomo(pty:pet), Attorney Dae Keun Kwon added to party Isaac Villegas Molina(pty:pet), Attorney Dae Keun Kwon added to party Jorge Hernandez Viramontes(pty:pla))(Kwon, Dae) (Entered: 07/02/2025) |
| 07/02/2025 | 36 | Notice Following Status Conference filed by Respondents Pam Bondi, Immigration and Customs Enforcement, Todd Lyons, Kristi Noem. (Alarcon, Pauline) (Entered: 07/02/2025) |
| 07/02/2025 | 37 | NOTICE of Appearance filed by attorney Anne Lai on behalf of Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes (Attorney Anne Lai added to party Osorto Carlos (pty:pet), Attorney Anne Lai added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Anne Lai added to party Jason Brian Gavidia(pty:pla), Attorney Anne Lai added to party Los Angeles Worker Center Network(pty:pla), Attorney Anne Lai added to party United Farm Workers (pty:pla), Attorney Anne Lai added to party Pedro Vasquez Perdomo(pty:pet), Attorney Anne Lai added to party Isaac Villegas Molina(pty:pet), Attorney Anne Lai added to party Jorge Hernandez Viramontes(pty:pla)) (Lai, Anne) (Entered: 07/02/2025) |
| 07/02/2025 | 38 | EX PARTE APPLICATION for Temporary Restraining Order as to and Order to Show Cause Re: Preliminary Injunction filed by Plaintiff Coalition for Humane Immigrant Rights, Immigrant Defenders Law Center. (Attachments: # 1 Proposed Order Proposed Temporary Restraining Order and Order to Show Cause, # 2 Declaration Declaration of Mark Rosenbaum re Notice to Defendants, # 3 Declaration Declaration of Veronica Barba, # 4 Declaration Declaration of C.B., # 5 Declaration Declaration of Chris Duran, # 6 Declaration Declaration of S.K., # 7 Declaration Declaration of S.A.R., # 8 Declaration Declaration of R.P.R., # 9 Declaration Declaration of Angelica Salas, # 10 Declaration Declaration of Nicolas Thompson-Lleras, # 11 Declaration Declaration of Lindsay Toczylowski, # 12 Declaration Declaration of Martha Vasquez) (Rosenbaum, Mark) (Entered: 07/02/2025) |
| 07/02/2025 | 39 | NOTICE of Appearance filed by attorney Daniel A Beck on behalf of Defendants Michael W. Banks, Gregory K. Bovino, Akil Davis, Bilal A. Essayli, Kash Patel, Ernesto Santacruz, Jr., Rodney S. Scott, Jeffrey D. Stalnaker, Eddy Wang (Attorney Daniel A Beck added to party Michael W. Banks(pty:dft), Attorney Daniel A Beck added to party Gregory K. Bovino(pty:dft), Attorney Daniel A Beck added to party Akil Davis(pty:dft), |

| | | |
|---|---|---|
| | | Attorney Daniel A Beck added to party Bilal A. Essayli(pty:dft), Attorney Daniel A Beck added to party Kash Patel(pty:dft), Attorney Daniel A Beck added to party Ernesto Santacruz, Jr. (pty:dft), Attorney Daniel A Beck added to party Rodney S. Scott(pty:dft), Attorney Daniel A Beck added to party Jeffrey D. Stalnaker(pty:dft), Attorney Daniel A Beck added to party Eddy Wang(pty:dft))(Beck, Daniel) (Entered: 07/02/2025) |
| 07/03/2025 | 40 | EX PARTE APPLICATION for Extension of Time to File to Oppose Plaintiffs' Ex Parte Application for TRO and Order to Show Cause filed by Defendants Michael W. Banks, Gregory K. Bovino, Akil Davis, Bilal A. Essayli, Kash Patel, Ernesto Santacruz, Jr., Rodney S. Scott, Jeffrey D. Stalnaker, Eddy Wang. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Proposed Order) (Beck, Daniel) (Entered: 07/03/2025) |
| 07/03/2025 | 41 | Notice of Appearance or Withdrawal of Counsel: for attorney Ryan Casey Chapman counsel for Defendants Michael W. Banks, Gregory K. Bovino, Akil Davis, Bilal A. Essayli, Kash Patel, Ernesto Santacruz, Jr., Rodney S. Scott, Jeffrey D. Stalnaker, Eddy Wang. Adding Ryan C. Chapman as counsel of record for Michael W. Banks; Gregory K. Bovino; Akil Davis; Bilal A. Essayli; Kash Patel; Ernesto Santacruz, Jr.; Rodney S. Scott; Jeffrey D. Stalnaker; Eddy Wang for the reason indicated in the G-123 Notice. Filed by Defendants Michael W. Banks; Gregory K. Bovino; Akil Davis; Bilal A. Essayli; Kash Patel; Ernesto Santacruz, Jr.; Rodney S. Scott; Jeffrey D. Stalnaker; Eddy Wang. (Attorney Ryan Casey Chapman added to party Michael W. Banks(pty:dft), Attorney Ryan Casey Chapman added to party Gregory K. Bovino(pty:dft), Attorney Ryan Casey Chapman added to party Akil Davis(pty:dft), Attorney Ryan Casey Chapman added to party Bilal A. Essayli(pty:dft), Attorney Ryan Casey Chapman added to party Kash Patel(pty:dft), Attorney Ryan Casey Chapman added to party Ernesto Santacruz, Jr. (pty:dft), Attorney Ryan Casey Chapman added to party Rodney S. Scott(pty:dft), Attorney Ryan Casey Chapman added to party Jeffrey D. Stalnaker(pty:dft), Attorney Ryan Casey Chapman added to party Eddy Wang(pty:dft))(Chapman, Ryan) (Entered: 07/03/2025) |
| 07/03/2025 | 42 | (IN CHAMBERS) ORDER TEXT ONLY ENTRY by Judge Maame Ewusi-Mensah Frimpong: The Court is in receipt of Plaintiffs' Ex Parte Application for Temporary Restraining Order, ECF No. 38 , and Defendants' Ex Parte Application for Extension of Time to File to Oppose, ECF No. 40 . The Court GRANTS Defendants Ex Parte Application. Defendants are ORDERED to file a Response to Plaintiffs' Ex Parte Application by 5:00 pm on Tuesday, July 8, 2025. Plaintiffs are ORDERED to file a Reply by 5:00 pm, Wednesday, July 9, 2025. The Court sets a hearing on the Ex Parte Application on Thursday, July 10, 2025, at 3:00 pm. IT IS SO ORDERED. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. TEXT ONLY ENTRY (Entered: 07/03/2025) |
| 07/03/2025 | 43 | ORDER by Judge Maame Ewusi-Mensah Frimpong: EX PARTE APPLICATION for Extension of Time to File GRANTED. Please see ECF No. 42 . IT IS SO ORDERED. THERE IS NO PDF ATTACHMENT.(dbe) (Entered: 07/03/2025) |
| 07/03/2025 | 44 | Notice of Appearance or Withdrawal of Counsel: for attorney Sean Skedzielewski counsel for Defendants Michael W. Banks, Gregory K. Bovino, Akil Davis, Bilal A. Essayli, Kash Patel, Ernesto Santacruz, Jr., Rodney S. Scott, Jeffrey D. Stalnaker, Eddy Wang. Adding Sean Skedzielewski as counsel of record for All Defendants for the reason indicated in the G-123 Notice. Filed by Defendants Michael W. Banks, Gregory K. Bovino, Akil Davis, Bilal A. Essayli, Kash Patel, Ernesto Santacruz, Jr., Rodney S. Scott, Jeffrey D. Stalnaker, Eddy Wang. (Attorney Sean Skedzielewski added to party Michael W. Banks(pty:dft), Attorney Sean Skedzielewski added to party Gregory K. Bovino(pty:dft), Attorney Sean Skedzielewski added to party Akil Davis(pty:dft), Attorney Sean Skedzielewski added to party Bilal A. Essayli(pty:dft), Attorney Sean Skedzielewski added to party Kash |

CM/ECF - California Central District

| | | |
|---|---|---|
| | | Patel(pty:dft), Attorney Sean Skedzielewski added to party Ernesto Santacruz, Jr. (pty:dft), Attorney Sean Skedzielewski added to party Rodney S. Scott(pty:dft), Attorney Sean Skedzielewski added to party Jeffrey D. Stalnaker(pty:dft), Attorney Sean Skedzielewski added to party Eddy Wang(pty:dft))(Skedzielewski, Sean) (Entered: 07/03/2025) |
| 07/03/2025 | 45 | EX PARTE APPLICATION for Temporary Restraining Order *and Order to Show Cause* filed by Plaintiffs Osorto Carlos, Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Pedro Vasquez Perdomo, Isaac Villegas Molina, Jorge Hernandez Viramontes. (Attachments: # 1 Exhibit 1 - Pedro Vasquez Perdomo Decl., # 2 Exhibit 2 - Carlos Osorto Decl., # 3 Exhibit 3 - Isaac Villegas Molina Decl., # 4 Exhibit 4 - Jorge Luis Hernandez Viramontes Decl., # 5 Exhibit 5 - Omar Andres Gamez Decl., # 6 Exhibit 6 - Elvira Padilla Decl., # 7 Exhibit 7 - A.L. Decl., # 8 Exhibit 8 - Elizabeth Strater Decl., # 9 Exhibit 9 - Jason Brian Gavidia Decl., # 10 Exhibit 10 - Jesus Aristeo Cruz Uitz Decl., # 11 Exhibit 11 - Jose Antonio Valdez Rios Decl., # 12 Exhibit 12 - Armando Gudino Decl., # 13 Exhibit 13 - Flor Melendrez Decl., # 14 Exhibit 14 - B.V. Decl., # 15 Exhibit 15 - M.N. Decl., # 16 Exhibit 16 - R.H.D. Decl., # 17 Exhibit 17 - Rev. Tanya Lopez Decl., # 18 Exhibit 18 - Todd W. Price Decl., # 19 Exhibit 19 - Diana Sanchez Decl,, # 20 Exhibit 20 - Stacy Tolchin Decl., # 21 Exhibit 21 - German Molina Decl., # 22 Proposed Order) (Tajsar, Mohammad) (Entered: 07/03/2025) |
| 07/03/2025 | 46 | NOTICE OF LODGING filed re EX PARTE APPLICATION for Temporary Restraining Order *and Order to Show Cause* 45 (Tajsar, Mohammad) (Entered: 07/03/2025) |
| 07/07/2025 | 47 | First NOTICE of Appearance filed by attorney Bree A. Bernwanger on behalf of Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes (Attorney Bree A. Bernwanger added to party Osorto Carlos (pty:pet), Attorney Bree A. Bernwanger added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Bree A. Bernwanger added to party Jason Brian Gavidia(pty:pla), Attorney Bree A. Bernwanger added to party Los Angeles Worker Center Network(pty:pla), Attorney Bree A. Bernwanger added to party United Farm Workers (pty:pla), Attorney Bree A. Bernwanger added to party Pedro Vasquez Perdomo(pty:pet), Attorney Bree A. Bernwanger added to party Isaac Villegas Molina(pty:pet), Attorney Bree A. Bernwanger added to party Jorge Hernandez Viramontes(pty:pla))(Bernwanger, Bree) (Entered: 07/07/2025) |
| 07/07/2025 | 48 | APPLICATION of Non-Resident Attorney Carl J. T. Bergquist to Appear Pro Hac Vice on behalf of Plaintiff Coalition for Humane Immigrant Rights (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-40038487) filed by Plaintiff Coalition for Humane Immigrant Rights. (Attachments: # 1 Proposed Order) (Brown, Rebecca) (Entered: 07/07/2025) |
| 07/07/2025 | 49 | NOTICE OF MOTION AND MOTION to File Amicus Brief filed by Amicus Curiae State Of California. (Attachments: # 1 Exhibit [PROPOSED] BRIEF OF AMICI CURIAE STATES OF CALIFORNIA, ARIZONA, COLORADO, CONNECTICUT, HAWAII, ILLINOIS, MASSACHUSETTS, MARYLAND, MAINE, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON, VERMONT, AND WASHINGTON IN SUPPORT OF STOP/ARREST PLAINTIFFS APPLICATION FOR TEMPORARY RESTRAINING ORDER [ECF 45], # 2 Proposed Order [PROPOSED] ORDER GRANTING MOTION FOR LEAVE TO FILE BRIEF OF AMICI CURIAE IN SUPPORT OF STOP/ARREST PLAINTIFFS APPLICATION FOR TEMPORARY RESTRAINING ORDER [ECF 45]) (Attorney Jesse Basbaum added to party State Of California(pty:bkmov)) (Basbaum, Jesse) (Entered: 07/07/2025) |

ER-0874

CM/ECF - California Central District

| | | |
|---|---|---|
| 07/07/2025 | 50 | NOTICE of Appearance filed by attorney Jesse Basbaum on behalf of Movant State Of California (Basbaum, Jesse) (Entered: 07/07/2025) |
| 07/07/2025 | 51 | SCHEDULING NOTICE TEXT ONLY ENTRY by Judge Maame Ewusi-Mensah Frimpong: The Court is in receipt of Plaintiffs' second Ex Parte Application for Temporary Restraining order and Order to Show Cause Regarding Preliminary Injunction. ECF No. 45 . The parties are ordered to fully brief the second Ex Parte Application in compliance with the briefing schedule outlined in the Courts Order in ECF No. 42 . The Court sets a hearing on both Plaintiffs Ex Parte Applications (ECF Nos. 38 , 45 ) on Thursday, July 10, 2025, at the new time of 1:00 pm. The Court notes that this briefing schedule is what Defendants requested in their Ex Parte Application to Extend Defendants Time to Oppose Plaintiffs' Ex Parte Applications. ECF No. 40 . IT IS SO ORDERED. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dbe) TEXT ONLY ENTRY (Entered: 07/07/2025) |
| 07/07/2025 | 52 | ORDER GRANTING MOTION FOR LEAVE TO FILE BRIEF OF AMICI CURIAE IN SUPPORT OF STOP/ARREST PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER [ECF 45 ] by Judge Maame Ewusi-Mensah Frimpong, it is hereby ORDERED that this Motion for Leave be and hereby is GRANTED, and that the brief submitted as Exhibit 1 to the motion be filed. (es) (Entered: 07/07/2025) |
| 07/08/2025 | 53 | NOTICE of Appearance filed by attorney Sophia Louise Wrench on behalf of Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Immigrant Defenders Law Center, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes (Attorney Sophia Louise Wrench added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Sophia Louise Wrench added to party Jason Brian Gavidia(pty:pla), Attorney Sophia Louise Wrench added to party Immigrant Defenders Law Center(pty:pla), Attorney Sophia Louise Wrench added to party Los Angeles Worker Center Network(pty:pla), Attorney Sophia Louise Wrench added to party United Farm Workers (pty:pla), Attorney Sophia Louise Wrench added to party Jorge Hernandez Viramontes(pty:pla))(Wrench, Sophia) (Entered: 07/08/2025) |
| 07/08/2025 | 54 | Notice of Appearance or Withdrawal of Counsel: for attorney Alexander Layne Farrell counsel for Defendants Michael W. Banks, Gregory K. Bovino, Akil Davis, Bilal A. Essayli, Kash Patel, Ernesto Santacruz, Jr., Rodney S. Scott, Jeffrey D. Stalnaker, Eddy Wang, Respondents Pam Bondi, Immigration and Customs Enforcement, Todd Lyons, Kristi Noem. Adding Alexander L. Farrell as counsel of record for Michael W. Banks; Pam Bondi; Gregory K. Bovino; Akil Davis; Bilal A. Essayli; Immigration and Customs Enforcement; Todd Lyons; Kristi Noem; Kash Patel; Ernesto Santacruz, Jr.; Rodney S. Scott; Jeffrey D. Stalnaker; Eddy Wang for the reason indicated in the G-123 Notice. Filed by Defendants and Respondents Michael W. Banks; Pam Bondi; Gregory K. Bovino; Akil Davis; Bilal A. Essayli; Immigration and Customs Enforcement; Todd Lyons; Kristi Noem; Kash Patel; Ernesto Santacruz, Jr.; Rodney S. Scott; Jeffrey D. Stalnaker; Eddy Wang. (Attorney Alexander Layne Farrell added to party Michael W. Banks(pty:dft), Attorney Alexander Layne Farrell added to party Pam Bondi(pty:res), Attorney Alexander Layne Farrell added to party Gregory K. Bovino(pty:dft), Attorney Alexander Layne Farrell added to party Akil Davis(pty:dft), Attorney Alexander Layne Farrell added to party Bilal A. Essayli(pty:dft), Attorney Alexander Layne Farrell added to party Immigration and Customs Enforcement(pty:res), Attorney Alexander Layne Farrell added to party Todd Lyons(pty:res), Attorney Alexander Layne Farrell added to party Kristi Noem(pty:res), Attorney Alexander Layne Farrell added to party Kash Patel(pty:dft), Attorney Alexander Layne Farrell added to party Ernesto Santacruz, Jr. (pty:dft), Attorney Alexander Layne Farrell added to party Rodney S. Scott(pty:dft), Attorney Alexander Layne Farrell added to party Jeffrey D. Stalnaker(pty:dft), Attorney |

ER-0875

| | | |
|---|---|---|
| | | Alexander Layne Farrell added to party Eddy Wang(pty:dft))(Farrell, Alexander) (Entered: 07/08/2025) |
| 07/08/2025 | 55 | ORDER by Judge Maame Ewusi-Mensah Frimpong: granting 48 Non-Resident Attorney Carl J. T. Bergquist APPLICATION to Appear Pro Hac Vice on behalf of Plaintiff Coalition for Humane Immigrant Rights, designating Rebecca Brown as local counsel. THERE IS NO PDF ASSOCIATED WITH THIS ENTRY(aus) (Entered: 07/08/2025) |
| 07/08/2025 | 56 | Notice of Appearance or Withdrawal of Counsel: for attorney E. Martin Estrada counsel for Intervenor Parties CITY OF LOS ANGELES, Culver City, City of Montebello, City of Monterey Park, City of Pico Rivera, City of West Hollywood, City of Santa Monica. Adding E. Martin Estrada as counsel of record for Proposed Intervenors for the reason indicated in the G-123 Notice. Filed by Proposed Intervenor City of Los Angeles, Culver City, City of Montebello, City of Monterey Park, City of Pico Rivera, City of West Hollywood, City of Santa Monica. (Attorney E. Martin Estrada added to party CITY OF LOS ANGELES(pty:intv), Attorney E. Martin Estrada added to party Culver City(pty:intv), Attorney E. Martin Estrada added to party City of Montebello(pty:intv), Attorney E. Martin Estrada added to party City of Monterey Park(pty:intv), Attorney E. Martin Estrada added to party City of Pico Rivera(pty:intv), Attorney E. Martin Estrada added to party City of West Hollywood(pty:intv), Attorney E. Martin Estrada added to party City of Santa Monica(pty:intv))(Estrada, E.) (Entered: 07/08/2025) |
| 07/08/2025 | 57 | Notice of Appearance or Withdrawal of Counsel: for attorney Virginia Grace Davis counsel for Intervenor Parties CITY OF LOS ANGELES, City of Montebello, City of Monterey Park, City of Pico Rivera, City of Santa Monica, City of West Hollywood, Culver City. Adding V. Grace Davis as counsel of record for City of Los Angeles, Culver City, City of Montebello, City of Monterey Park, City of Pico Rivera, City of West Hollywood, City of Santa Monica for the reason indicated in the G-123 Notice. Filed by Proposed Intervenor City of Los Angeles, Culver City, City of Montebello, City of Monterey Park, City of Pico Rivera, City of West Hollywood, City of Santa Monica. (Attorney Virginia Grace Davis added to party CITY OF LOS ANGELES(pty:intv), Attorney Virginia Grace Davis added to party City of Montebello(pty:intv), Attorney Virginia Grace Davis added to party City of Monterey Park(pty:intv), Attorney Virginia Grace Davis added to party City of Pico Rivera(pty:intv), Attorney Virginia Grace Davis added to party City of Santa Monica(pty:intv), Attorney Virginia Grace Davis added to party City of West Hollywood(pty:intv), Attorney Virginia Grace Davis added to party Culver City(pty:intv))(Davis, Virginia) (Entered: 07/08/2025) |
| 07/08/2025 | 58 | Notice of Appearance or Withdrawal of Counsel: for attorney Daniel Benjamin Levin counsel for Intervenor Parties CITY OF LOS ANGELES, City of Montebello, City of Monterey Park, City of Pico Rivera, City of Santa Monica, City of West Hollywood, Culver City. Adding Daniel B. Levin as counsel of record for City of Los Angeles, Culver City, City of Montebello, City of Monterey Park, City of Pico Rivera, City of West Hollywood, City of Santa Monica for the reason indicated in the G-123 Notice. Filed by Proposed Intervenor City of Los Angeles, Culver City, City of Montebello, City of Monterey Park, City of Pico Rivera, City of West Hollywood, City of Santa Monica. (Attorney Daniel Benjamin Levin added to party CITY OF LOS ANGELES(pty:intv), Attorney Daniel Benjamin Levin added to party City of Montebello(pty:intv), Attorney Daniel Benjamin Levin added to party City of Monterey Park(pty:intv), Attorney Daniel Benjamin Levin added to party City of Pico Rivera(pty:intv), Attorney Daniel Benjamin Levin added to party City of Santa Monica(pty:intv), Attorney Daniel Benjamin Levin added to party City of West Hollywood(pty:intv), Attorney Daniel Benjamin Levin added to party Culver City(pty:intv))(Levin, Daniel) (Entered: 07/08/2025) |
| 07/08/2025 | 59 | Notice of Appearance or Withdrawal of Counsel: for attorney John L Schwab counsel for Intervenor Parties CITY OF LOS ANGELES, City of Montebello, City of Monterey Park, |

CM/ECF - California Central District

| | | |
|---|---|---|
| | | City of Pico Rivera, City of Santa Monica, City of West Hollywood, Culver City. Adding John L. Schwab as counsel of record for City of Los Angeles, Culver City, City of Montebello, City of Monterey Park, City of Pico Rivera, City of West Hollywood, City of Santa Monica for the reason indicated in the G-123 Notice. Filed by Proposed Intervenor City of Los Angeles, Culver City, City of Montebello, City of Monterey Park, City of Pico Rivera, City of West Hollywood, City of Santa Monica. (Attorney John L Schwab added to party CITY OF LOS ANGELES(pty:intv), Attorney John L Schwab added to party City of Montebello(pty:intv), Attorney John L Schwab added to party City of Monterey Park(pty:intv), Attorney John L Schwab added to party City of Pico Rivera(pty:intv), Attorney John L Schwab added to party City of Santa Monica(pty:intv), Attorney John L Schwab added to party City of West Hollywood(pty:intv), Attorney John L Schwab added to party Culver City(pty:intv))(Schwab, John) (Entered: 07/08/2025) |
| 07/08/2025 | 60 | Notice of Appearance or Withdrawal of Counsel: for attorney Wendy Qiuyu Xiao counsel for Intervenor Parties CITY OF LOS ANGELES, City of Montebello, City of Monterey Park, City of Pico Rivera, City of Santa Monica, City of West Hollywood, Culver City. Adding Wendy Q. Xiao as counsel of record for City of Los Angeles, Culver City, City of Montebello, City of Monterey Park, City of Pico Rivera, City of West Hollywood, City of Santa Monica for the reason indicated in the G-123 Notice. Filed by Proposed Intervenor City of Los Angeles, Culver City, City of Montebello, City of Monterey Park, City of Pico Rivera, City of West Hollywood, City of Santa Monica. (Attorney Wendy Qiuyu Xiao added to party CITY OF LOS ANGELES(pty:intv), Attorney Wendy Qiuyu Xiao added to party City of Montebello(pty:intv), Attorney Wendy Qiuyu Xiao added to party City of Monterey Park(pty:intv), Attorney Wendy Qiuyu Xiao added to party City of Pico Rivera(pty:intv), Attorney Wendy Qiuyu Xiao added to party City of Santa Monica(pty:intv), Attorney Wendy Qiuyu Xiao added to party City of West Hollywood(pty:intv), Attorney Wendy Qiuyu Xiao added to party Culver City(pty:intv)) (Xiao, Wendy) (Entered: 07/08/2025) |
| 07/08/2025 | 61 | NOTICE OF MOTION AND MOTION to Intervene filed by Proposed Intervenors CITY OF LOS ANGELES, City of Montebello, City of Monterey Park, City of Pico Rivera, City of Santa Monica, City of West Hollywood, Culver City, COUNTY OF LOS ANGELES, City of Pasadena. Motion set for hearing on 8/21/2025 at 10:00 AM before Judge Maame Ewusi-Mensah Frimpong. (Attachments: # 1 Exhibit A, # 2 Declaration of Martin Estrada ISO Motion to Intervine, # 3 Exhibit A to Estrada Declaration, # 4 Exhibit B to Estrada Declaration, # 5 Exhibit C to Estrada Declaration, # 6 Exhibit D to Estrada Declaration, # 7 Exhibit E to Estrada Declaration, # 8 Exhibit F to Estrada Declaration, # 9 Exhibit G to Estrada Declaration, # 10 Exhibit H to Estrada Declaration, # 11 Exhibit I to Estrada Declaration, # 12 Exhibit J to Estrada Declaration, # 13 Exhibit K to Estrada Declaration, # 14 Exhibit L to Estrada Declaration, # 15 Exhibit M to Estrada Declaration, # 16 Exhibit N to Estrada Declaration, # 17 Exhibit O to Estrada Declaration, # 18 Exhibit P to Estrada Declaration, # 19 Exhibit Q to Estrada Declaration, # 20 Exhibit R to Estrada Declaration) (Attorney E. Martin Estrada added to party COUNTY OF LOS ANGELES(pty:intv), Attorney E. Martin Estrada added to party City of Pasadena(pty:intv)) (Estrada, E.) (Entered: 07/08/2025) |
| 07/08/2025 | 62 | Notice (JOINT) FOLLOWING ORDER VACATING STATUS CONFERENCE filed by Respondents Pam Bondi, Immigration and Customs Enforcement, Todd Lyons, Kristi Noem. (Alarcon, Pauline) (Entered: 07/08/2025) |
| 07/08/2025 | 63 | EX PARTE APPLICATION to Participate in July 10 TRO Hearing filed by Proposed Intervenors CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, City of Montebello, City of Monterey Park, City of Pasadena, City of Pico Rivera, City of Santa Monica, City of West Hollywood, Culver City. (Attachments: # 1 Declaration of John Schwab ISO Unopposed Ex Parte Application, # 2 Proposed Order) (Attorney John L |

ER-0877

| | | |
|---|---|---|
| | | Schwab added to party COUNTY OF LOS ANGELES(pty:intv), Attorney John L Schwab added to party City of Pasadena(pty:intv)) (Schwab, John) (Entered: 07/08/2025) |
| 07/08/2025 | 64 | NOTICE of Appearance filed by attorney Nicole Amber Davis Tinkham on behalf of Intervenor COUNTY OF LOS ANGELES (Attorney Nicole Amber Davis Tinkham added to party COUNTY OF LOS ANGELES(pty:intv))(Davis Tinkham, Nicole) (Entered: 07/08/2025) |
| 07/08/2025 | 65 | Notice of Appearance or Withdrawal of Counsel: for attorney Victor Roman Leal counsel for Intervenor Parties CITY OF LOS ANGELES, City of Montebello, City of Monterey Park, City of Pico Rivera, City of Santa Monica, City of West Hollywood, Culver City. Adding V. Roman Leal as counsel of record for City of Los Angeles, Culver City, City of Montebello, City of Monterey Park, City of Pico Rivera, City of West Hollywood, City of Santa Monica for the reason indicated in the G-123 Notice. Filed by Proposed Intervenor City of Los Angeles, Culver City, City of Montebello, City of Monterey Park, City of Pico Rivera, City of West Hollywood, City of Santa Monica. (Attorney Victor Roman Leal added to party CITY OF LOS ANGELES(pty:intv), Attorney Victor Roman Leal added to party City of Montebello(pty:intv), Attorney Victor Roman Leal added to party City of Monterey Park(pty:intv), Attorney Victor Roman Leal added to party City of Pico Rivera(pty:intv), Attorney Victor Roman Leal added to party City of Santa Monica(pty:intv), Attorney Victor Roman Leal added to party City of West Hollywood(pty:intv), Attorney Victor Roman Leal added to party Culver City(pty:intv)) (Leal, Victor) (Entered: 07/08/2025) |
| 07/08/2025 | 66 | Notice of Appearance or Withdrawal of Counsel: for attorney Arnold F Lee counsel for Intervenor City of Pasadena. Adding Arnold F. Lee as counsel of record for City of Pasadena for the reason indicated in the G-123 Notice. Filed by Defendant City of Pasadena. (Attorney Arnold F Lee added to party City of Pasadena(pty:intv))(Lee, Arnold) (Entered: 07/08/2025) |
| 07/08/2025 | 67 | Notice of Appearance or Withdrawal of Counsel: for attorney Andrew Karl Aaronian counsel for Intervenor City of Pasadena. Adding Andrew K. Aaronian as counsel of record for City of Pasadena for the reason indicated in the G-123 Notice. Filed by Defendant City of Pasadena. (Attorney Andrew Karl Aaronian added to party City of Pasadena(pty:intv))(Aaronian, Andrew) (Entered: 07/08/2025) |
| 07/08/2025 | 68 | NOTICE of Appearance filed by attorney Gina Bianca Amato on behalf of Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Immigrant Defenders Law Center, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes (Attorney Gina Bianca Amato added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Gina Bianca Amato added to party Jason Brian Gavidia(pty:pla), Attorney Gina Bianca Amato added to party Immigrant Defenders Law Center(pty:pla), Attorney Gina Bianca Amato added to party Los Angeles Worker Center Network(pty:pla), Attorney Gina Bianca Amato added to party United Farm Workers (pty:pla), Attorney Gina Bianca Amato added to party Jorge Hernandez Viramontes(pty:pla))(Amato, Gina) (Entered: 07/08/2025) |
| 07/08/2025 | 69 | ORDER GRANTING INTERVENORS' UNOPPOSED EX PARTE APPLICATION TO PARTICIPATE IN JULY 10 TRO HEARING 63 by Judge Maame Ewusi-Mensah Frimpong: The Court, hereby GRANTS the Unopposed Ex Parte Application and ORDERS that Intervenors shall be permitted to participate in the July 10 TRO Hearing. (es) (Entered: 07/08/2025) |
| 07/08/2025 | 70 | OPPOSITION re: EX PARTE APPLICATION for Temporary Restraining Order as to and Order to Show Cause Re: Preliminary Injunction 38 filed by Defendants Michael W. Banks, Gregory K. Bovino, Akil Davis, Bilal A. Essayli, Kash Patel, Ernesto Santacruz, Jr., Rodney S. Scott, Jeffrey D. Stalnaker, Eddy Wang. (Attachments: # 1 Declaration of |

| | | |
|---|---|---|
| | | Lilia A. Uyeda)(Attorney Pauline Helen Alarcon added to party Michael W. Banks(pty:dft), Attorney Pauline Helen Alarcon added to party Gregory K. Bovino(pty:dft), Attorney Pauline Helen Alarcon added to party Akil Davis(pty:dft), Attorney Pauline Helen Alarcon added to party Bilal A. Essayli(pty:dft), Attorney Pauline Helen Alarcon added to party Kash Patel(pty:dft), Attorney Pauline Helen Alarcon added to party Ernesto Santacruz, Jr. (pty:dft), Attorney Pauline Helen Alarcon added to party Rodney S. Scott(pty:dft), Attorney Pauline Helen Alarcon added to party Jeffrey D. Stalnaker(pty:dft), Attorney Pauline Helen Alarcon added to party Eddy Wang(pty:dft)) (Alarcon, Pauline) (Entered: 07/08/2025) |
| 07/08/2025 | 71 | OPPOSITION re: EX PARTE APPLICATION for Temporary Restraining Order *and Order to Show Cause* 45 filed by Defendants Michael W. Banks, Gregory K. Bovino, Akil Davis, Bilal A. Essayli, Kash Patel, Ernesto Santacruz, Jr., Rodney S. Scott, Jeffrey D. Stalnaker, Eddy Wang. (Attachments: # 1 Declaration of Andre Quinones, # 2 Declaration of Kyle Harvick)(Alarcon, Pauline) (Entered: 07/08/2025) |
| 07/09/2025 | 72 | Notice of Appearance or Withdrawal of Counsel: for attorney Maria Louise Cousineau counsel for Intervenor CITY OF LOS ANGELES. Adding Maria Cousineau as counsel of record for The City of Los Angeles for the reason indicated in the G-123 Notice. Filed by Intervenor City of Los Angeles. (Attorney Maria Louise Cousineau added to party CITY OF LOS ANGELES(pty:intv))(Cousineau, Maria) (Entered: 07/09/2025) |
| 07/09/2025 | 73 | Notice of Appearance or Withdrawal of Counsel: for attorney Maria Louise Cousineau counsel for Intervenor CITY OF LOS ANGELES. Adding Randall Sommer as counsel of record for The City of Los Angeles for the reason indicated in the G-123 Notice. Filed by Intervenor City of Los Angeles. (Cousineau, Maria) (Entered: 07/09/2025) |
| 07/09/2025 | 74 | Notice of Appearance or Withdrawal of Counsel: for attorney Maria Louise Cousineau counsel for Intervenor CITY OF LOS ANGELES. Adding Valerie Flores as counsel of record for The City of Los Angeles for the reason indicated in the G-123 Notice. Filed by Intervenor City of Los Angeles. (Cousineau, Maria) (Entered: 07/09/2025) |
| 07/09/2025 | 75 | NOTICE of Appearance filed by attorney Michael J Dundas on behalf of Intervenor CITY OF LOS ANGELES (Attorney Michael J Dundas added to party CITY OF LOS ANGELES(pty:intv))(Dundas, Michael) (Entered: 07/09/2025) |
| 07/09/2025 | 76 | Notice of Appearance or Withdrawal of Counsel: for attorney Liliana Campos counsel for Intervenor COUNTY OF LOS ANGELES. Adding Liliana Campos as counsel of record for County of Los Angeles for the reason indicated in the G-123 Notice. Filed by Intervenor County of Los Angeles. (Attorney Liliana Campos added to party COUNTY OF LOS ANGELES(pty:intv))(Campos, Liliana) (Entered: 07/09/2025) |
| 07/09/2025 | 77 | Notice of Appearance or Withdrawal of Counsel: for attorney Brigit G Alvarez counsel for Intervenor COUNTY OF LOS ANGELES. Adding Brigit Greeson Alvarez as counsel of record for County of Los Angeles for the reason indicated in the G-123 Notice. Filed by Intervenor County of Los Angeles. (Attorney Brigit G Alvarez added to party COUNTY OF LOS ANGELES(pty:intv))(Alvarez, Brigit) (Entered: 07/09/2025) |
| 07/09/2025 | 78 | Notice of Appearance or Withdrawal of Counsel: for attorney Brisa Yaneth Velazquez Oatis counsel for Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes. Adding Brisa Velazquez Oatis as counsel of record for Pedro VASQUEZ PERDOMO; Carlos Alexander OSORTO; and Isaac VILLEGAS MOLINA; Jorge HERNANDEZ VIRAMONTES; Jason Brian GAVIDIA; LOS ANGELES WORKER CENTER NETWORK; UNITED FARM WORKERS; COALITION FOR HUMANE IMMIGRANT RIGHTS for the reason indicated in the G-123 Notice. Filed by plaintiff |

|  |  |  |
|---|---|---|
|  |  | Pedro VASQUEZ PERDOMO; Carlos Alexander OSORTO; and Isaac VILLEGAS MOLINA; Jorge HERNANDEZ VIRAMONTES; Jason Brian GAVIDIA; LOS ANGELES WORKER CENTER NETWORK; UNITED FARM WORKERS; COALITION FOR HUMANE IMMIGRANT RIGHTS. (Attorney Brisa Yaneth Velazquez Oatis added to party Osorto Carlos (pty:pet), Attorney Brisa Yaneth Velazquez Oatis added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Brisa Yaneth Velazquez Oatis added to party Jason Brian Gavidia(pty:pla), Attorney Brisa Yaneth Velazquez Oatis added to party Los Angeles Worker Center Network(pty:pla), Attorney Brisa Yaneth Velazquez Oatis added to party United Farm Workers (pty:pla), Attorney Brisa Yaneth Velazquez Oatis added to party Pedro Vasquez Perdomo(pty:pet), Attorney Brisa Yaneth Velazquez Oatis added to party Isaac Villegas Molina(pty:pet), Attorney Brisa Yaneth Velazquez Oatis added to party Jorge Hernandez Viramontes(pty:pla))(Velazquez Oatis, Brisa) (Entered: 07/09/2025) |
| 07/09/2025 | 79 | Notice of Appearance or Withdrawal of Counsel: for attorney Maria Louise Cousineau counsel for Intervenor CITY OF LOS ANGELES. Adding Shubhra Shivpuri as counsel of record for The City of Los Angeles for the reason indicated in the G-123 Notice. Filed by Intervenor City of Los Angeles. (Cousineau, Maria) (Entered: 07/09/2025) |
| 07/09/2025 | 80 | Notice of Appearance or Withdrawal of Counsel: for attorney Maria Louise Cousineau counsel for Intervenor CITY OF LOS ANGELES. Adding Hydee Feldstein Soto as counsel of record for The City of Los Angeles for the reason indicated in the G-123 Notice. Filed by Intervenor City of Los Angeles. (Cousineau, Maria) (Entered: 07/09/2025) |
| 07/09/2025 | 81 | REPLY in Support of EX PARTE APPLICATION for Temporary Restraining Order *and Order to Show Cause* 45 filed by Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes. (Attachments: # 1 Exhibit 1 - Stacy Tolchin Decl., # 2 Exhibit 2 - Maegan Ortiz Decl.)(Tajsar, Mohammad) (Entered: 07/09/2025) |
| 07/09/2025 | 82 | REPLY Plaintiffs Coalition for Humane Immigrant Firhgts and Immigrant Defenders Law Center's Reply in Support of Ex Parte Application for Temporary Restraining Order and Order to Show Cause re: Preliminary Injunction EX PARTE APPLICATION for Temporary Restraining Order as to and Order to Show Cause Re: Preliminary Injunction 38 filed by Plaintiffs Coalition for Humane Immigrant Rights, Immigrant Defenders Law Center. (Attachments: # 1 Declaration, # 2 Declaration, # 3 Declaration, # 4 Declaration, # 5 Declaration, # 6 Declaration)(Rosenbaum, Mark) (Entered: 07/09/2025) |
| 07/10/2025 | 83 | Notice of Appearance or Withdrawal of Counsel: for attorney Michele Beal Bagneris counsel for Intervenor City of Pasadena. Adding Michele Beal Bagneris as counsel of record for City of Pasadena for the reason indicated in the G-123 Notice. Filed by Defendant City of Pasadena. (Attorney Michele Beal Bagneris added to party City of Pasadena(pty:intv))(Beal Bagneris, Michele) (Entered: 07/10/2025) |
| 07/10/2025 | 84 | FOR COURT USE ONLY: STATISTICAL CORRECTION terminating 49 MOTION to File Amicus Brief re 52 Order (es) (Entered: 07/10/2025) |
| 07/10/2025 | 114 | HEARING REGARDING EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER 38 45 held before Judge Maame Ewusi-Mensah Frimpong. For the reasons stated on the record, the matter is taken under submission. Order to issue. It IS SO ORDERED. (See document for further details) Court Reporter: Courtsmart. (yl) (Entered: 07/23/2025) |
| 07/11/2025 | 85 | Notice of Appearance or Withdrawal of Counsel: for attorney Helia Bidad counsel for Plaintiffs Coalition for Humane Immigrant Rights, Immigrant Defenders Law Center. |

| | | |
|---|---|---|
| | | Adding Helia Bidad as counsel of record for Coalition for Humane Immigrant Rights, Immigrant Defenders Law Center for the reason indicated in the G-123 Notice. Filed by Plaintiffs Coalition for Humane Immigrant Rights, Immigrant Defenders Law Center. (Attorney Helia Bidad added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Helia Bidad added to party Immigrant Defenders Law Center(pty:pla))(Bidad, Helia) (Entered: 07/11/2025) |
| 07/11/2025 | 86 | TRANSCRIPT ORDER as to defendant Michael W. Banks, Pam Bondi, Gregory K. Bovino, Akil Davis, Bilal A. Essayli, Immigration and Customs Enforcement, Todd Lyons, Kristi Noem, Kash Patel, Ernesto Santacruz, Jr., Rodney S. Scott, Jeffrey D. Stalnaker, Eddy Wang DCN number: R25CACA0916 for Court Smart (CS). (Farrell, Alexander) (Entered: 07/11/2025) |
| 07/11/2025 | 87 | ORDER GRANTING Plaintiffs' Ex Parte Applications for Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction [ECF Nos. 38 , 45 ] by Judge Maame Ewusi-Mensah Frimpong. The joint status report shall be filed by 5pm, Wednesday, 7/16/2025. See document for further details. (jp) (Entered: 07/11/2025) |
| 07/11/2025 | 88 | TRANSCRIPT ORDER as to Plaintiff Coalition for Humane Immigrant Rights, Immigrant Defenders Law Center for Court Smart (CS). Court will contact Helia Bidad at hbidad@heckerfink.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (Bidad, Helia) (Entered: 07/11/2025) |
| 07/13/2025 | 89 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Defendant Michael W. Banks, Pam Bondi, Gregory K. Bovino, Akil Davis, Bilal A. Essayli, Immigration and Customs Enforcement, Todd Lyons, Kristi Noem, Kash Patel, Ernesto Santacruz, Jr., Rodney S. Scott, Jeffrey D. Stalnaker, Eddy Wang. Appeal of Order on Motion for Temporary Restraining Order, 87 . (Appeal Fee - Not Required for US Goverment.) (Farrell, Alexander) (Entered: 07/13/2025) |
| 07/14/2025 | 90 | TRANSCRIPT for proceedings held on 7/10/2025. Court Reporter/Electronic Court Recorder: EXCEPTIONAL REPORTING SERVICES, INC., phone number (361) 949-2988. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 8/4/2025. Redacted Transcript Deadline set for 8/14/2025. Release of Transcript Restriction set for 10/14/2025. (aa) (Entered: 07/14/2025) |
| 07/14/2025 | 91 | NOTICE OF FILING TRANSCRIPT filed for proceedings 7/10/2025 re Transcript 90 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (aa) TEXT ONLY ENTRY (Entered: 07/14/2025) |
| 07/14/2025 | 92 | Notice of Appearance or Withdrawal of Counsel: for attorney Jonathan Kevin Ross counsel for Defendants Michael W. Banks, Gregory K. Bovino, Akil Davis, Bilal A. Essayli, Kash Patel, Ernesto Santacruz, Jr., Rodney S. Scott, Jeffrey D. Stalnaker, Eddy Wang, Respondents Pam Bondi, Todd Lyons, Kristi Noem. Adding Jonathan K. Ross as counsel of record for All federal defendants for the reason indicated in the G-123 Notice. Filed by Defendants Jonathan K. Ross. (Attorney Jonathan Kevin Ross added to party Michael W. Banks(pty:dft), Attorney Jonathan Kevin Ross added to party Pam Bondi(pty:res), Attorney Jonathan Kevin Ross added to party Gregory K. Bovino(pty:dft), Attorney Jonathan Kevin Ross added to party Akil Davis(pty:dft), Attorney Jonathan Kevin Ross added to party Bilal A. Essayli(pty:dft), Attorney Jonathan Kevin Ross added to party Todd Lyons(pty:res), Attorney Jonathan Kevin Ross added to party Kristi Noem(pty:res), Attorney Jonathan Kevin Ross added to party Kash Patel(pty:dft), Attorney Jonathan Kevin Ross added to party Ernesto Santacruz, Jr. (pty:dft), Attorney |

| | | |
|---|---|---|
| | | Jonathan Kevin Ross added to party Rodney S. Scott(pty:dft), Attorney Jonathan Kevin Ross added to party Jeffrey D. Stalnaker(pty:dft), Attorney Jonathan Kevin Ross added to party Eddy Wang(pty:dft))(Ross, Jonathan) (Entered: 07/14/2025) |
| 07/14/2025 | 93 | EX PARTE APPLICATION to Shorten Time for Hearing on re NOTICE OF MOTION AND MOTION to Intervene 61 to July 18, 2025 *and Advance Briefing Schedule* filed by Proposed Intervenors CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, City of Montebello, City of Monterey Park, City of Pasadena, City of Pico Rivera, City of Santa Monica, City of West Hollywood, Culver City. (Attachments: # 1 Declaration of John Schwab ISO Ex Parte Application to Advance Briefing Schedule, # 2 Proposed Order) (Schwab, John) (Entered: 07/14/2025) |
| 07/14/2025 | 94 | EX PARTE APPLICATION to Stay pending Temporary Restraining Order Order on Motion for Temporary Restraining Order, 87 filed by Defendants Michael W. Banks, Pam Bondi, Gregory K. Bovino, Akil Davis, Bilal A. Essayli, Immigration and Customs Enforcement, Todd Lyons, Kristi Noem, Kash Patel, Ernesto Santacruz, Jr., Rodney S. Scott, Jeffrey D. Stalnaker, Eddy Wang. (Attachments: # 1 Exhibit A - Declaration of Andre Quinones, # 2 Exhibit B - Declaration of Daniel I. Parra, # 3 Proposed Order) (Farrell, Alexander) (Entered: 07/14/2025) |
| 07/14/2025 | 95 | MINUTE ORDER IN CHAMBERS re Order Regarding Notice of Appeal [ECF No. 89] and Ex Parte Application [ECF No. 93] by Judge Maame Ewusi-Mensah Frimpong: The Court is in receipt of the Notice of Appeal filed by Defendants (ECF No. 89) and the Ex Parte Application to Advance Briefing Schedule on Motion to Intervene filed by the Proposed Intervenors (ECF No. 93 ("Ex Parte Application")). The parties (excluding the Proposed Intervenors) are ORDERED to meet and confer and file a joint status report by 5pm Tuesday, July 15, 2025, regarding whether the TRO Order is appealable and whether the Notice of Appeal divests this Court of jurisdiction. Should the parties not agree, the parties shall submit separate submissions on this question by the same deadline. (see document for further details) (bm) (Entered: 07/14/2025) |
| 07/14/2025 | 98 | NOTIFICATION from Ninth Circuit Court of Appeals of case number assigned and briefing schedule. Appeal Docket No. 25-4312 assigned to Notice of Appeal to 9th Circuit Court of Appeals, 89 as to Defendants Michael W. Banks, Pam Bondi, Gregory K. Bovino, Akil Davis, Bilal A. Essayli, Immigration and Customs Enforcement, Todd Lyons, Kristi Noem, Kash Patel, Ernesto Santacruz, Jr., Rodney S. Scott, Jeffrey D. Stalnaker, Eddy Wang. (sh) (Entered: 07/15/2025) |
| 07/15/2025 | 96 | (IN CHAMBERS) ORDER TEXT ONLY ENTRY by Judge Maame Ewusi-Mensah Frimpong: The Court is in receipt of Defendants' Ex Parte Application for Stay of Order Granting Temporary Restraining Order. ECF No. 94 . Plaintiffs (and not the Proposed Intervenors) are ORDERED to file a response to the Ex Parte Application by 5pm July 15, 2025. IT IS SO ORDERED. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dbe) TEXT ONLY ENTRY (Entered: 07/15/2025) |
| 07/15/2025 | 97 | Opposition Re: re: EX PARTE APPLICATION to Shorten Time for Hearing on re NOTICE OF MOTION AND MOTION to Intervene 61 to July 18, 2025 *and Advance Briefing Schedule* 93 filed by Defendants Michael W. Banks, Gregory K. Bovino, Akil Davis, Bilal A. Essayli, Kash Patel, Ernesto Santacruz, Jr., Rodney S. Scott, Jeffrey D. Stalnaker, Eddy Wang, Respondents Pam Bondi, Immigration and Customs Enforcement, Todd Lyons, Kristi Noem. (Farrell, Alexander) (Entered: 07/15/2025) |
| 07/15/2025 | 99 | First APPLICATION of Non-Resident Attorney Lauren Michel Wilfong to Appear Pro Hac Vice on behalf of Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-40100352) filed by plaintiff |

| | | |
|---|---|---|
| | | Osorto Carlos, Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Pedro Vasquez Perdomo, Isaac Villegas Molina, Jorge Hernandez Viramontes. (Attachments: # 1 Proposed Order granting Pro Hac Vice application) (Sanchez, Diana) (Entered: 07/15/2025) |
| 07/15/2025 | 100 | OPPOSITION to EX PARTE APPLICATION to Stay pending Temporary Restraining Order Order on Motion for Temporary Restraining Order, 87 94 filed by Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes. (Tajsar, Mohammad) (Entered: 07/15/2025) |
| 07/15/2025 | 101 | STATUS REPORT *RE: JURISDICTION (DOCKET NO. 95)* filed by Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes. (Tajsar, Mohammad) (Entered: 07/15/2025) |
| 07/15/2025 | 102 | NOTICE OF ERRATA filed by Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes. correcting Response in Opposition to Motion, 100 (Attachments: # 1 CORRECTED Opposition to Defendants' Ex Parte Application (Dkt. 94))(Tajsar, Mohammad) (Entered: 07/15/2025) |
| 07/16/2025 | 103 | ORDER by Judge Maame Ewusi-Mensah Frimpong: granting 99 Non-Resident Attorney Lauren Michel Wilfong APPLICATION to Appear Pro Hac Vice on behalf of Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes, designating Diana Sanchez as local counsel. THERE IS NO PDF ASSOCIATED WITH THIS ENTRY(aus) (Entered: 07/16/2025) |
| 07/16/2025 | 104 | STATUS REPORT - *Joint Status Report in Response to ECF No. 87, re OSC Hearing and PI Briefing Schedule,* filed by Defendants Michael W. Banks, Gregory K. Bovino, Akil Davis, Bilal A. Essayli, Kash Patel, Ernesto Santacruz, Jr., Rodney S. Scott, Jeffrey D. Stalnaker, Eddy Wang, Respondents Pam Bondi, Immigration and Customs Enforcement, Todd Lyons, Kristi Noem. (Ross, Jonathan) (Entered: 07/16/2025) |
| 07/16/2025 | 105 | Notice of Appearance or Withdrawal of Counsel: for attorney Dennis Ojogho counsel for Movant State Of California. Filed by Amicus Curiae State of California. (Attorney Dennis Ojogho added to party State Of California(pty:bkmov))(Ojogho, Dennis) (Entered: 07/16/2025) |

| 07/16/2025 | 109 | ORDER from Ninth Circuit Court of Appeals filed re: Notice of Appeal to 9th Circuit Court of Appeals, 89 filed by Akil Davis, Bilal A. Essayli, Gregory K. Bovino, Ernesto Santacruz, Jr., Todd Lyons, Jeffrey D. Stalnaker, Kash Patel, Kristi Noem, Eddy Wang, Pam Bondi, Michael W. Banks, Immigration and Customs Enforcement, Rodney S. Scott. CCA # 25-4312. Defendants filed two motions with this court requesting a stay pending appeal of the district court's temporary restraining order. Under Federal Rule of Appellate Procedure 8(a)(1)(C), a "party must ordinarily move first in the district court" for a stay pending appeal before filing with this court. As noted, Defendants have now moved in the district court for a stay pending appeal, but the district court has not yet ruled. Neither the motions nor any supplement thereto contain the statements regarding the district court's actions required by Fed. R. App. P. 8(a)(2)(A)(ii). For these reasons, we deny the motions for stay pending appeal (Dockets 5 and 6) for failure to comply with Rule 8, without prejudice should defendants file renewed compliant motions. [See Order for further information] (car) (Entered: 07/18/2025) |
| 07/17/2025 | 106 | Notice (JOINT) FOLLOWING ORDER VACATING STATUS CONFERENCE filed by Respondents Pam Bondi, Immigration and Customs Enforcement, Todd Lyons, Kristi Noem. (Alarcon, Pauline) (Entered: 07/17/2025) |
| 07/17/2025 | 107 | Notice Re: Appellate Stay Motion Status and Request for Expedited Ruling on Ex Parte Application to Stay [Dkt. 94] filed by Defendants Michael W. Banks, Pam Bondi, Gregory K. Bovino, Akil Davis, Bilal A. Essayli, Immigration and Customs Enforcement, Todd Lyons, Kristi Noem, Kash Patel, Ernesto Santacruz, Jr., Rodney S. Scott, Jeffrey D. Stalnaker, Eddy Wang. (Attachments: # 1 Ninth Circuit Case No. 25-4312, Dkt 9.1 (Order))(Ross, Jonathan) (Entered: 07/17/2025) |
| 07/17/2025 | 108 | MINUTES (IN CHAMBERS) Order DENYING Defendants' Ex Parte Application for Stay of Order Granting Temporary Restraining Order [ECF No. 94]; Order DENYING AS MOOT Proposed Intervenor's Ex Parte Application to Advance Briefing Schedule on Motion to Intervene [ECF No. 93]; and Order Setting the Briefing Schedule and Hearing on Plaintiffs' Mot ion for Preliminary Injunction and Order to Show Cause [ECF No. 104] by Judge Maame Ewusi-Mensah Frimpong Finding as Moot 93 EX PARTE APPLICATION to Shorten Time for Hearing; Denying 94 EX PARTE APPLICATION to Stay: DEFENDANTS' EX PARTE APPLICATION FOR STAY OF ORDER GRANTING TEMPORARY RESTRAINING ORDER [ECF NO. 94]: Because Defendants have failed to show that they will be irreparably injured absent a stay, the Court DENIES the Stay Ex Parte Application. EX PARTE APPLICATION TO ADVANCE BRIEFING SCHEDULE ON MOTION TO INTERVENE [ECF NO. 93]: As such, the Court DENIES AS MOOT the Intervenor Ex Parte Application. BRIEFING SCHEDULE AND HEARING ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND ORDER TO SHOW CAUSE [ECF NO. 104]: The Court is in receipt of the parties' Joint Status Report in Response to Court's Order on OSC Hearing and PI Briefing Schedule. ECF No. 104. The Court ORDERS the following briefing schedule and hearing date for the Motion for Preliminary Injunction and Order to Show Cause hearing. Preliminary Hearing Motion: Monday, July 28, 2025; Opposition: Monday, August 25, 2025; Reply: Monday, September 8, 2025; Hearing: Wednesday, September 24, 2025, at 9:00 a.m. (see document for further details) (bm) (Entered: 07/17/2025) |
| 07/18/2025 | 110 | Notice of Defendants Clarification to Joint Status Report filed by Defendants Michael W. Banks, Pam Bondi, Gregory K. Bovino, Akil Davis, Bilal A. Essayli, Immigration and Customs Enforcement, Todd Lyons, Kristi Noem, Kash Patel, Ernesto Santacruz, Jr., Rodney S. Scott, Jeffrey D. Stalnaker, Eddy Wang. (Ross, Jonathan) (Entered: 07/18/2025) |
| 07/18/2025 | 124 | ORDER from Ninth Circuit Court of Appeals filed re: Notice of Appeal to 9th Circuit Court of Appeals, 89 filed by Akil Davis, Bilal A. Essayli, Gregory K. Bovino, Ernesto |

| | | |
|---|---|---|
| | | Santacruz, Jr., Todd Lyons, Jeffrey D. Stalnaker, Kash Patel, Kristi Noem, Eddy Wang, Pam Bondi, Michael W. Banks, Immigration and Customs Enforcement, Rodney S. Scott. CCA # 25-4312. The briefing schedule for this motion for a stay pending appeal will proceed as follows: appellees' response brief to the motions to stay is due on July 21, 2025, and appellants reply brief is due on July 23, 2025. Oral argument will be held on July 28, 2025 at 1 PM PDT by videoconference.(mat) (Entered: 07/25/2025) |
| 07/21/2025 | [111](#) | EX PARTE APPLICATION for Relief from IMMIGRATION CUSTODY filed by Petitioner Osorto Carlos. (Attachments: # [1](#) Declaration Stacy Tolchin, # [2](#) Proposed Order) (Tolchin, Stacy) (Entered: 07/21/2025) |
| 07/21/2025 | [112](#) | REQUEST to Strike Defendants' "Notice of Clarification" [ECF 110] Notice (Other), [110](#) *Defendants' Notice of Clarification to Joint Status Report* filed by Plaintiffs Osorto Carlos, Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Immigrant Defenders Law Center, Los Angeles Worker Center Network, United Farm Workers, Pedro Vasquez Perdomo, Isaac Villegas Molina, Jorge Hernandez Viramontes. (Attachments: # [1](#) Declaration of Mohammad Tajsar & Exhibit 1) (Tajsar, Mohammad) (Entered: 07/21/2025) |
| 07/22/2025 | [113](#) | OPPOSITION re: EX PARTE APPLICATION for Relief from IMMIGRATION CUSTODY [111](#) filed by Respondents Pam Bondi, Immigration and Customs Enforcement, Todd Lyons, Kristi Noem. (Attachments: # [1](#) Declaration of Pauline H. Alarcon, # [2](#) Exhibit A, # [3](#) Exhibit B, # [4](#) Exhibit C, # [5](#) Exhibit D)(Alarcon, Pauline) (Entered: 07/22/2025) |
| 07/23/2025 | 115 | (TEXT ONLY ENTRY) A Telephone Conference was held in this matter on July 23, 2025. The court and counsel conferred regarding Petitioner Carlos Osortos Ex Parte Application for Relief from Immigration Custody [111](#) . Respondent may file a further opposition on or before Friday, July 25, 2025. Petitioner may file a reply on or before July 28, 2025. Attorney for Petitioners: Stacy Eva Tolchin. Attorney for Respondents: Daniel Beck, Pauline Helene Alarcon and Sean Skedzielewski. Courtroom Deputy: Kimberly Carter. Time: 00.17. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. Court Recorder: CS-RS-4. (kca) (Entered: 07/23/2025) |
| 07/23/2025 | [116](#) | RESPONSE filed by Defendants Michael W. Banks, Gregory K. Bovino, Akil Davis, Bilal A. Essayli, Kash Patel, Ernesto Santacruz, Jr., Rodney S. Scott, Jeffrey D. Stalnaker, Eddy Wang, Respondents Pam Bondi, Immigration and Customs Enforcement, Todd Lyons, Kristi Noemto REQUEST to Strike Defendants' "Notice of Clarification" [ECF 110] Notice (Other), [110](#) *Defendants' Notice of Clarification to Joint Status Report* [112](#) (Ross, Jonathan) (Entered: 07/23/2025) |
| 07/23/2025 | [117](#) | 60 DAY Summons Issued re Amended Complaint/Petition, [16](#) as to All Defendants. (san) (Entered: 07/23/2025) |
| 07/23/2025 | [118](#) | Notice of Appearance or Withdrawal of Counsel: for attorney Jacob S Kreilkamp counsel for Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes. Adding Jacob Kreilkamp as counsel of record for Pedro Vasquez Perdomo; Carlos Alexander Osorto; Isaac Villegas Molina; Jorge Hernandez Viramontes; Jason Brian Gavidia; Los Angeles Worker Center Network (LA WCN); United Farm Workers (UFW); Coalition for Humane Immigrant Rights (CHIRLA) for the reason indicated in the G-123 Notice. Filed by Petitioners and Plaintiffs Pedro Vasquez Perdomo; Carlos Alexander Osorto; Isaac Villegas Molina; Jorge Hernandez Viramontes; Jason Brian Gavidia; Los Angeles Worker Center Network (LA WCN); United Farm Workers (UFW); Coalition for Humane Immigrant Rights (CHIRLA). (Attorney Jacob S Kreilkamp added to party Osorto Carlos (pty:pet), Attorney Jacob S Kreilkamp added to party Coalition for Humane Immigrant |

| | | |
|---|---|---|
| | | Rights(pty:pla), Attorney Jacob S Kreilkamp added to party Jason Brian Gavidia(pty:pla), Attorney Jacob S Kreilkamp added to party Los Angeles Worker Center Network(pty:pla), Attorney Jacob S Kreilkamp added to party United Farm Workers (pty:pla), Attorney Jacob S Kreilkamp added to party Pedro Vasquez Perdomo(pty:pet), Attorney Jacob S Kreilkamp added to party Isaac Villegas Molina(pty:pet), Attorney Jacob S Kreilkamp added to party Jorge Hernandez Viramontes(pty:pla))(Kreilkamp, Jacob) (Entered: 07/23/2025) |
| 07/23/2025 | 119 | Notice of Appearance or Withdrawal of Counsel: for attorney Sara H. Worth counsel for Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes. Adding Sara Worth as counsel of record for Pedro Vasquez Perdomo; Carlos Alexander Osorto; Isaac Villegas Molina; Jorge Hernandez Viramontes; Jason Brian Gavidia; Los Angeles Worker Center Network (LA WCN); United Farm Workers (UFW); Coalition for Humane Immigrant Rights (CHIRLA) for the reason indicated in the G-123 Notice. Filed by Petitioners and Plaintiffs Pedro Vasquez Perdomo; Carlos Alexander Osorto; Isaac Villegas Molina; Jorge Hernandez Viramontes; Jason Brian Gavidia; Los Angeles Worker Center Network (LA WCN); United Farm Workers (UFW); Coalition for Humane Immigrant Rights (CHIRLA). (Attorney Sara H. Worth added to party Osorto Carlos (pty:pet), Attorney Sara H. Worth added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Sara H. Worth added to party Jason Brian Gavidia(pty:pla), Attorney Sara H. Worth added to party Los Angeles Worker Center Network(pty:pla), Attorney Sara H. Worth added to party United Farm Workers (pty:pla), Attorney Sara H. Worth added to party Pedro Vasquez Perdomo(pty:pet), Attorney Sara H. Worth added to party Isaac Villegas Molina(pty:pet), Attorney Sara H. Worth added to party Jorge Hernandez Viramontes(pty:pla))(Worth, Sara) (Entered: 07/23/2025) |
| 07/23/2025 | 120 | Notice of Appearance or Withdrawal of Counsel: for attorney Maggie Jane Bushell counsel for Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes. Adding Maggie Bushell as counsel of record for Pedro Vasquez Perdomo; Carlos Alexander Osorto; Isaac Villegas Molina; Jorge Hernandez Viramontes; Jason Brian Gavidia; Los Angeles Worker Center Network (LA WCN); United Farm Workers (UFW); Coalition for Humane Immigrant Rights (CHIRLA) for the reason indicated in the G-123 Notice. Filed by Petitioners and Plaintiffs Pedro Vasquez Perdomo; Carlos Alexander Osorto; Isaac Villegas Molina; Jorge Hernandez Viramontes; Jason Brian Gavidia; Los Angeles Worker Center Network (LA WCN); United Farm Workers (UFW); Coalition for Humane Immigrant Rights (CHIRLA). (Attorney Maggie Jane Bushell added to party Osorto Carlos (pty:pet), Attorney Maggie Jane Bushell added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Maggie Jane Bushell added to party Jason Brian Gavidia(pty:pla), Attorney Maggie Jane Bushell added to party Los Angeles Worker Center Network(pty:pla), Attorney Maggie Jane Bushell added to party United Farm Workers (pty:pla), Attorney Maggie Jane Bushell added to party Pedro Vasquez Perdomo(pty:pet), Attorney Maggie Jane Bushell added to party Isaac Villegas Molina(pty:pet), Attorney Maggie Jane Bushell added to party Jorge Hernandez Viramontes(pty:pla))(Bushell, Maggie) (Entered: 07/23/2025) |
| 07/23/2025 | 121 | Notice of Appearance or Withdrawal of Counsel: for attorney Kyle Anthony Groves counsel for Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes. Adding Kyle A. Groves as counsel of record for Pedro Vasquez Perdomo; Carlos Alexander Osorto; Isaac Villegas Molina; Jorge Hernandez Viramontes; Jason Brian Gavidia; Los |

ER-0886

| | | |
|---|---|---|
| | | Angeles Worker Center Network (LA WCN); United Farm Workers (UFW); Coalition for Humane Immigrant Rights (CHIRLA) for the reason indicated in the G-123 Notice. Filed by Petitioners and Plaintiffs Pedro Vasquez Perdomo; Carlos Alexander Osorto; Isaac Villegas Molina; Jorge Hernandez Viramontes; Jason Brian Gavidia; Los Angeles Worker Center Network (LA WCN); United Farm Workers (UFW); Coalition for Humane Immigrant Rights (CHIRLA). (Attorney Kyle Anthony Groves added to party Osorto Carlos (pty:pet), Attorney Kyle Anthony Groves added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Kyle Anthony Groves added to party Jason Brian Gavidia(pty:pla), Attorney Kyle Anthony Groves added to party Los Angeles Worker Center Network(pty:pla), Attorney Kyle Anthony Groves added to party United Farm Workers (pty:pla), Attorney Kyle Anthony Groves added to party Pedro Vasquez Perdomo(pty:pet), Attorney Kyle Anthony Groves added to party Isaac Villegas Molina(pty:pet), Attorney Kyle Anthony Groves added to party Jorge Hernandez Viramontes(pty:pla))(Groves, Kyle) (Entered: 07/23/2025) |
| 07/24/2025 | [122](#) | Notice of Appearance or Withdrawal of Counsel: for attorney Henry David Shreffler counsel for Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes. Adding Henry D. Shreffler as counsel of record for Pedro Vasquez Perdomo; Carlos Alexander Osorto; Isaac Villegas Molina; Jorge Hernandez Viramontes; Jason Brian Gavidia; Los Angeles Worker Center Network (LA WCN); United Farm Workers (UFW); Coalition for Humane Immigrant Rights (CHIRLA) for the reason indicated in the G-123 Notice. Filed by Petitioner; Plaintiff Pedro Vasquez Perdomo; Carlos Alexander Osorto; Isaac Villegas Molina; Jorge Hernandez Viramontes; Jason Brian Gavidia; Los Angeles Worker Center Network (LA WCN); United Farm Workers (UFW); Coalition for Humane Immigrant Rights (CHIRLA). (Attorney Henry David Shreffler added to party Osorto Carlos (pty:pet), Attorney Henry David Shreffler added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Henry David Shreffler added to party Jason Brian Gavidia(pty:pla), Attorney Henry David Shreffler added to party Los Angeles Worker Center Network(pty:pla), Attorney Henry David Shreffler added to party United Farm Workers (pty:pla), Attorney Henry David Shreffler added to party Pedro Vasquez Perdomo(pty:pet), Attorney Henry David Shreffler added to party Isaac Villegas Molina(pty:pet), Attorney Henry David Shreffler added to party Jorge Hernandez Viramontes(pty:pla))(Shreffler, Henry) (Entered: 07/24/2025) |
| 07/24/2025 | [123](#) | Notice of Appearance or Withdrawal of Counsel: for attorney Jamie Byrne Luma counsel for Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes. Adding Jamie Luma as counsel of record for Pedro Vasquez Perdomo; Carlos Alexander Osorto; Isaac Villegas Molina; Jorge Hernandez Viramontes; Jason Brian Gavidia; Los Angeles Worker Center Network (LA WCN); United Farm Workers (UFW); Coalition for Humane Immigrant Rights (CHIRLA) for the reason indicated in the G-123 Notice. Filed by Petitioners; Plaintiffs Pedro Vasquez Perdomo; Carlos Alexander Osorto; Isaac Villegas Molina; Jorge Hernandez Viramontes; Jason Brian Gavidia; Los Angeles Worker Center Network (LA WCN); United Farm Workers (UFW); Coalition for Humane Immigrant Rights (CHIRLA). (Attorney Jamie Byrne Luma added to party Osorto Carlos (pty:pet), Attorney Jamie Byrne Luma added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Jamie Byrne Luma added to party Jason Brian Gavidia(pty:pla), Attorney Jamie Byrne Luma added to party Los Angeles Worker Center Network(pty:pla), Attorney Jamie Byrne Luma added to party United Farm Workers (pty:pla), Attorney Jamie Byrne Luma added to party Pedro Vasquez Perdomo(pty:pet), Attorney Jamie Byrne Luma added to party Isaac Villegas Molina(pty:pet), Attorney |

ER-0887

| | | |
|---|---|---|
| | | Jamie Byrne Luma added to party Jorge Hernandez Viramontes(pty:pla))(Luma, Jamie) (Entered: 07/24/2025) |
| 07/25/2025 | 125 | MEMORANDUM in Opposition to EX PARTE APPLICATION for Relief from IMMIGRATION CUSTODY 111 filed by Respondents Pam Bondi, Immigration and Customs Enforcement, Todd Lyons, Kristi Noem. (Alarcon, Pauline) (Entered: 07/25/2025) |
| 07/26/2025 | 126 | REPLY Support of Motion EX PARTE APPLICATION for Relief from IMMIGRATION CUSTODY 111 filed by Petitioner Osorto Carlos. (Attachments: # 1 Declaration Tolchin Supplemental Declaration)(Tolchin, Stacy) (Entered: 07/26/2025) |
| 07/28/2025 | 127 | NOTICE OF MOTION AND MOTION for Preliminary Injunction re enjoining and prohibiting Defendants from violating the Fifth Amendment right to counsel for detainees held in the basement holding area known as B-18 in the Federal Building in Downtown Los Angeles. *Notice of Motion; Motion; and Memorandum of Points and Authorities* filed by Plaintiffs Coalition for Humane Immigrant Rights, Immigrant Defenders Law Center. Motion set for hearing on 9/24/2025 at 09:00 AM before Judge Maame Ewusi-Mensah Frimpong. (Attachments: # 1 Declaration of Andrew Freire, # 2 Declaration of Kristen Hunsberger, # 3 Declaration of Nicolas Thompson-Lleras, # 4 Declaration of Ming Tanigawa-Lau, # 5 Declaration of Sophia Wrench, # 6 Proposed Order Granting Plaintiffs CHIRLA and ImmDef Motion for Preliminary Injunction) (Rosenbaum, Mark) (Entered: 07/28/2025) |
| 07/28/2025 | 128 | NOTICE OF MOTION AND MOTION for Preliminary Injunction filed by Plaintiffs Osorto Carlos, Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Pedro Vasquez Perdomo, Isaac Villegas Molina, Jorge Hernandez Viramontes. Motion set for hearing on 9/24/2025 at 09:00 AM before Judge Maame Ewusi-Mensah Frimpong. (Attachments: # 1 Exhibit 1 - Second Stacy Tolchin Decl., # 2 Exhibit 2 - Javier Ramirez Decl., # 3 Exhibit 3 - FHS Decl., # 4 Exhibit 4 - JDS Decl., # 5 Exhibit 5 - ECP Decl., # 6 Exhibit 6 - GVC Decl., # 7 Exhibit 7 - Second Pedro Vasquez Perdomo Decl., # 8 Exhibit 8 - Second Isaac Villegas Molina Decl., # 9 Exhibit 9 - Second Elizabeth Strater Decl., # 10 Exhibit 10 - Second Flor Melendrez Decl., # 11 Exhibit 11 - Second Angelica Salas Decl., # 12 Exhibit 12 - Aleca Le Blanc Decl., # 13 Proposed Order) (Joachin, Mayra) (Entered: 07/28/2025) |
| 07/29/2025 | 129 | (IN CHAMBERS) ORDER GRANTING MOTION TO INTERVENE 61 by Judge Maame Ewusi-Mensah Frimpong. For the foregoing reasons, the Court ORDERS as follows: The Motion to Intervene, ECF No. 61, is GRANTED. The hearing for the Motion, scheduled for August 21, 2025, is VACATED. The Proposed Intervenors Proposed Complaint in Intervention, ECF No. 61-1, DEEMED FILED as of the date of this Order. IT IS SO ORDERED. (SEE DOCUMENT FOR FURTHER DETAILS) (yl) (Entered: 07/29/2025) |
| 07/29/2025 | 130 | INTERVENOR COMPLAINT against Defendant Michael W. Banks, Gregory K. Bovino, Osorto Carlos, Akil Davis, Bilal A. Essayli, Kash Patel, Ernesto Santacruz, Jr., Rodney S. Scott, Jeffrey D. Stalnaker, Eddy Wang, filed by Intervenor City of Monterey Park, Culver City, City of Montebello, City of Pico Rivera, COUNTY OF LOS ANGELES, City of Pasadena, CITY OF LOS ANGELES, City of Santa Monica, and City of West Hollywood.(yl) (Entered: 07/29/2025) |
| 07/30/2025 | 131 | NOTICE of Appearance filed by attorney Jason Kyle Zubata on behalf of Defendants Michael W. Banks, Gregory K. Bovino, Akil Davis, Bilal A. Essayli, Kash Patel, Ernesto Santacruz, Jr., Rodney S. Scott, Jeffrey D. Stalnaker, Eddy Wang (Attorney Jason Kyle Zubata added to party Michael W. Banks(pty:dft), Attorney Jason Kyle Zubata added to party Gregory K. Bovino(pty:dft), Attorney Jason Kyle Zubata added to party Akil Davis(pty:dft), Attorney Jason Kyle Zubata added to party Bilal A. Essayli(pty:dft), |

Attorney Jason Kyle Zubata added to party Kash Patel(pty:dft), Attorney Jason Kyle Zubata added to party Ernesto Santacruz, Jr. (pty:dft), Attorney Jason Kyle Zubata added to party Rodney S. Scott(pty:dft), Attorney Jason Kyle Zubata added to party Jeffrey D. Stalnaker(pty:dft), Attorney Jason Kyle Zubata added to party Eddy Wang(pty:dft)) (Zubata, Jason) (Entered: 07/30/2025)

| 07/30/2025 | 132 | MEMORANDUM OPINION AND ORDER GRANTING PETITIONER OSORTOS EX PARTE APPLICATION FOR RELEASE FROM IMMIGRATION CUSTODY 111 by Magistrate Judge Sheri Pym. Petitioner Carlos Osorto shall be immediately released from immigration custody subject to the posting of a $5,000 bond, and subject to the condition that he be placed on location monitoring with an ankle monitor (SEE ORDER FOR DETAILS). (kca) (Entered: 07/30/2025) |
| 07/30/2025 | 133 | NOTICE TO FILER OF DEFICIENCIES in Electronic Filed Document regarding Motions 128 and 127 . The following error was found: The hearing information is incorrect. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (yl) (Entered: 07/30/2025) |
| 07/31/2025 | 134 | Notice of Appearance or Withdrawal of Counsel: for attorney Aniello DeSimone counsel for Defendants Michael W. Banks, Gregory K. Bovino, Akil Davis, Bilal A. Essayli, Kash Patel, Ernesto Santacruz, Jr., Rodney S. Scott, Jeffrey D. Stalnaker, Eddy Wang, Respondents Pam Bondi, Immigration and Customs Enforcement, Todd Lyons, Kristi Noem. Adding Aniello DeSimone as counsel of record for Defendants for the reason indicated in the G-123 Notice. Filed by Defendant Defendant. (Attorney Aniello DeSimone added to party Michael W. Banks(pty:dft), Attorney Aniello DeSimone added to party Pam Bondi(pty:res), Attorney Aniello DeSimone added to party Gregory K. Bovino(pty:dft), Attorney Aniello DeSimone added to party Akil Davis(pty:dft), Attorney Aniello DeSimone added to party Bilal A. Essayli(pty:dft), Attorney Aniello DeSimone added to party Immigration and Customs Enforcement(pty:res), Attorney Aniello DeSimone added to party Todd Lyons(pty:res), Attorney Aniello DeSimone added to party Kristi Noem(pty:res), Attorney Aniello DeSimone added to party Kash Patel(pty:dft), Attorney Aniello DeSimone added to party Ernesto Santacruz, Jr. (pty:dft), Attorney Aniello DeSimone added to party Rodney S. Scott(pty:dft), Attorney Aniello DeSimone added to party Jeffrey D. Stalnaker(pty:dft), Attorney Aniello DeSimone added to party Eddy Wang(pty:dft))(DeSimone, Aniello) (Entered: 07/31/2025) |
| 08/01/2025 | 135 | ORDER from Ninth Circuit Court of Appeals filed re: Notice of Appeal to 9th Circuit Court of Appeals, 89 filed by Akil Davis, Bilal A. Essayli, Gregory K. Bovino, Ernesto Santacruz, Jr., Todd Lyons, Jeffrey D. Stalnaker, Kash Patel, Kristi Noem, Eddy Wang, Pam Bondi, Michael W. Banks, Immigration and Customs Enforcement, Rodney S. Scott. CCA # 25-4312. We GRANT Defendants' motion to stay as to the except as permitted by law clause in paragraph b., and otherwise DENY it. [See document for all details].(mat) (Entered: 08/04/2025) |
| 08/05/2025 | 136 | NOTICE OF MOTION AND MOTION for Reconsideration re Order on Motion to Intervene, 129 filed by Defendants Michael W. Banks, Pam Bondi, Gregory K. Bovino, Akil Davis, Bilal A. Essayli, Immigration and Customs Enforcement, Todd Lyons, Kristi Noem, Kash Patel, Ernesto Santacruz, Jr., Rodney S. Scott, Jeffrey D. Stalnaker, Eddy Wang. Motion set for hearing on 10/2/2025 at 10:00 AM before Judge Maame Ewusi-Mensah Frimpong. (Attachments: # 1 Memorandum, # 2 Proposed Order) (DeSimone, Aniello) (Entered: 08/05/2025) |
| 08/06/2025 | 137 | NOTICE of Appearance filed by attorney Jacob Bashyrov on behalf of Defendants Michael W. Banks, Gregory K. Bovino, Akil Davis, Bilal A. Essayli, Kash Patel, Ernesto |

ER-0889

| | | |
|---|---|---|
| | | Santacruz, Jr., Rodney S. Scott, Jeffrey D. Stalnaker, Eddy Wang (Attorney Jacob Bashyrov added to party Michael W. Banks(pty:dft), Attorney Jacob Bashyrov added to party Gregory K. Bovino(pty:dft), Attorney Jacob Bashyrov added to party Akil Davis(pty:dft), Attorney Jacob Bashyrov added to party Bilal A. Essayli(pty:dft), Attorney Jacob Bashyrov added to party Kash Patel(pty:dft), Attorney Jacob Bashyrov added to party Ernesto Santacruz, Jr. (pty:dft), Attorney Jacob Bashyrov added to party Rodney S. Scott(pty:dft), Attorney Jacob Bashyrov added to party Jeffrey D. Stalnaker(pty:dft), Attorney Jacob Bashyrov added to party Eddy Wang(pty:dft))(Bashyrov, Jacob) (Entered: 08/06/2025) |
| 08/06/2025 | 138 | (IN CHAMBERS) ORDER GRANTING PLAINTIFF'S REQUEST TO STRIKE DEFENDANTS' NOTICE of Clarification [ECF NO. 112 ] by Judge Maame Ewusi-Mensah Frimpong. For the foregoing reasons, the Court GRANTS Plaintiffs' Request, ECF No. 112, and STRIKES Defendants Notice, ECF No. 110. IT IS SO ORDERED. (SEE DOCUMENT FOR FURTHER DETAILS) (yl) (Entered: 08/07/2025) |
| 08/07/2025 | 139 | Notice of Appearance or Withdrawal of Counsel: for attorney Jessica Karp Bansal counsel for Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes. Adding Jessica Karp Bansal as counsel of record for Coalition for Humane Immigrant Rights; Jason Brian Gavidia; Los Angeles Worker Center Network; United Farm Workers; Jorge Hernandez Viramontes for the reason indicated in the G-123 Notice. Filed by Plaintiffs Coalition for Humane Immigrant Rights; Jason Brian Gavidia; Los Angeles Worker Center Network; United Farm Workers; Jorge Hernandez Viramontes. (Attorney Jessica Karp Bansal added to party Coalition for Humane Immigrant Rights(pty:pla), Attorney Jessica Karp Bansal added to party Jason Brian Gavidia(pty:pla), Attorney Jessica Karp Bansal added to party Los Angeles Worker Center Network(pty:pla), Attorney Jessica Karp Bansal added to party United Farm Workers (pty:pla), Attorney Jessica Karp Bansal added to party Jorge Hernandez Viramontes(pty:pla))(Bansal, Jessica) (Entered: 08/07/2025) |
| 08/07/2025 | 140 | NOTICE OF MOTION AND MOTION to Certify Class *(Suspicionless Stop Class)* filed by Plaintiffs Osorto Carlos, Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Los Angeles Worker Center Network, United Farm Workers, Pedro Vasquez Perdomo, Isaac Villegas Molina, Jorge Hernandez Viramontes. Motion set for hearing on 9/24/2025 at 09:00 AM before Judge Maame Ewusi-Mensah Frimpong. (Attachments: # 1 Exhibit Exhibit 1 - Kreilkamp Decl., # 2 Exhibit Exhibit 2 - Bitran Decl., # 3 Exhibit Exhibit 3 - Lai Decl., # 4 Exhibit Exhibit 4 - Tolchin Decl., # 5 Exhibit Exhibit 5 - Bansal Decl., # 6 Exhibit Exhibit 6 - Brown Decl., # 7 Exhibit Exhibit 7 - Perdomo Decl., # 8 Exhibit Exhibit 8 - Molina Decl., # 9 Exhibit Exhibit 9 - Viramontes Decl., # 10 Exhibit Exhibit 10 - Gavidia Decl., # 11 Exhibit Exhibit 11 - Gudino Decl., # 12 Exhibit Exhibit 12 - Posada Decl., # 13 Exhibit Exhibit 13 - Strater Decl., # 14 Exhibit Exhibit 14 - Salas Decl., # 15 Exhibit Exhibit 15 - Blair Decl., # 16 Proposed Order) (Padilla, Stephanie) (Entered: 08/07/2025) |
| 08/08/2025 | 141 | First AMENDED COMPLAINT against Defendants All Defendants amending Intervenor Complaint, 130 , filed by Intervenors City of Monterey Park, Culver City, City of Montebello, City of Pico Rivera, COUNTY OF LOS ANGELES, City of Pasadena, CITY OF LOS ANGELES, City of Santa Monica, City of West Hollywood(Estrada, E.) (Entered: 08/08/2025) |
| 08/08/2025 | 142 | NOTICE OF MOTION AND MOTION to Notice of Filing of First Amended Complaint in Intervention, or in the Alternative, Notice of Motion and Motion for Leave to File First Amended Complaint in Intervention filed by Intervenors CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, City of Montebello, City of Monterey Park, City of Pasadena, City of Pico Rivera, City of Santa Monica, City of West Hollywood, Culver |

CM/ECF - California Central District

| | | |
|---|---|---|
| | | City. Motion set for hearing on 10/2/2025 at 10:00 AM before Judge Maame Ewusi-Mensah Frimpong. (Attachments: # 1 Exhibit A - Proposed First Amended Complaint, # 2 Exhibit B - Proposed First Amended Complaint (Redline), # 3 Declaration of V Grace Davis, # 4 Proposed Order) (Estrada, E.) (Entered: 08/08/2025) |
| 08/08/2025 | 143 | STATUS REPORT *REGARDING CASE RE-DESIGNATION* filed by Petitioners Osorto Carlos, Pedro Vasquez Perdomo, Isaac Villegas Molina, Plaintiffs Coalition for Humane Immigrant Rights, Jason Brian Gavidia, Immigrant Defenders Law Center, Los Angeles Worker Center Network, United Farm Workers, Jorge Hernandez Viramontes, Respondent Immigration and Customs Enforcement. (Tajsar, Mohammad) (Entered: 08/08/2025) |

### PACER Service Center
#### Transaction Receipt
08/11/2025 07:30:27

| PACER Login: | jonathankross | Client Code: | |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 2:25-cv-05605-MEMF-SP End date: 8/11/2025 |
| Billable Pages: | 30 | Cost: | 3.00 |

ER-0891