No. 25-4312

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

PEDRO VASQUEZ PERDOMO, *et al.*,

Plaintiffs - Appellees,

v.

KRISTI NOEM, *et al.*,

Defendants - Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

PROPOSED *AMICUS CURIAE* BRIEF OF FEDERATION FOR
AMERICAN IMMIGRATION REFORM
IN SUPPORT OF DEFENDANTS-APPELLANTS

MATT A. CRAPO
DAVID L. JAROSLAV
Federation for American Immigration Reform
25 Massachusetts Ave., NW, Suite 330
Washington, DC 20001
Telephone: (202) 328-7004
mcrapo@irli.org

Counsel for *Amicus Curiae*
Federation for American Immigration Reform

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* Federation for American Immigration Reform makes the following disclosures:

1) For non-governmental corporate parties please list all parent corporations: None.

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock: None.


DATED: August 18, 2025                     Respectfully submitted,

                                           /s/ Matt Crapo

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS........................................................................... ii

TABLE OF AUTHORITIES ........................................................................ iii

INTEREST OF AMICUS CURIAE ................................................................1

SUMMARY OF ARGUMENT .....................................................................2

ARGUMENT ........................................................................................3

   A. The District Court erred in applying a higher standard for temporary detentions than the reasonable suspicion standard required by the Fourth Amendment. .......................................................................................3

   B. The Fourth Amendment is less demanding in the immigration context than in the criminal context ........................................................................8

   C. The District Court erred in failing to apply the Border Search Exception Doctrine........................................................................................13

CONCLUSION ....................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alabama v. White*, 496 U. S. 325 (1990) ........................................................4

*Alasaad v. Mayorkas*, 988 F.3d 8 (1st Cir. 2021) ......................................17

*Almeida-Sanchez v. United States*, 413 U.S. 266 (1973)...........................17

*Beck v. Ohio*, 379 U.S. 89 (1964) .................................................................3

*Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) .....................5

*Boyd v. United States*, 116 U.S. 616 (1886) ..............................................14

*Cabell v. Chavez-Salido*, 454 U.S. 432 (1982)............................................9

*Carroll v. United States*, 267 U.S. 132 (1925) ......................................3, 16

*Cotzojay v. Holder*, 725 F.3d 172 (2d Cir. 2013) ......................................10

*Cruz v. Barr*, 926 F.3d 1128 (9th Cir. 2019) ............................................10

*DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020)................................ 12, 13

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................ 9, 10, 11

*Florida v. Bostick*, 501 U.S. 429 (1991)......................................................6

*Florida v. White*, 526 U.S. 559 (1999) ........................................................6

*Foley v. Connelie*, 435 U.S. 291 (1978) ......................................................9

*Illinois v. Lafayette*, 462 U.S. 640 (1983).................................................5

*Illinois v. Wardlow*, 528 U. S. 119 (2000)...................................................4

*INS v. Delgado*, 466 U.S. 210 (1984) ..........................................................6

*INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984) ..........................................16

*Landon v. Plasencia*, 459 U.S. 21 (1982) ...................................................... 11, 12

*Leng May Ma v. Barber*, 357 U.S. 185 (1958) ...........................................13

*Martinez Carcamo v. Holder*, 713 F.3d 916 (8th Cir. 2013) ....................................10

*Muehler v. Mena*, 544 U.S. 93 (2005) ...................................................6

*Navarette v. California*, 572 U. S. 393 (2014) .......................................4

*Nishimura Ekiu v. United States*, 142 U.S. 651 (1892) ...........................................12

*Martinez-Aguero v. Gonzalez*, 459 F.3d 618 (5th Cir. 2006) ....................................11

*Ornelas v. United States*, 517 U. S. 690 (1996) ...................................4

*Perdomo v. Noem*, No. 25-4312, 2025 U.S. App. LEXIS 19503 (9th Cir. Aug. 1, 2025) ....................................................................7

*Riley v. California*, 573 U.S. 373 (2014) ...................................17

*Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953) ...........................13

*Terry v. Ohio*, 392 U.S. 1 (1968) ...................................................3

*United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950) .......................12

*United States v. Brignoni-Ponce*, 422 U.S. 873 (1975) ................................... 14, 15

*United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013) ....................................17

*United States v. Cortez*, 449 U.S. 411 (1981) ...........................................4

*United States v. Gutierrez-Casada*, 553 F. Supp. 2d 1259 (D.Kan.). ....................11

*United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018) ...........................................17

*United States v. Martinez-Fuerte*, 428 U.S. 543 (1976) ...........................................17

*United States v. Portillo-Muñoz*, 643 F.3d 437 (5th Cir. 2011) ....................... 10, 11

*United States v. Ramsay*, 431 U.S. 606, 616-17 (1977) ................................... 16, 17

iv

*United States v. Sokolow*, 490 U. S. 1 (1989)...................................................................4

*United States v. Touset*, 890 F.3d 1227 (11th Cir. 2018) ...........................................17

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ...........................9, 10, 11

*Yanez-Marquez v. Lynch*, 789 F.3d 434 (4th Cir. 2015)...........................................10

*Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) .....................................11, 13

## STATUTES

8 U.S.C. § 1225(a)(1)....................................................................................12

8 U.S.C. § 1357(a)(3)....................................................................................13

42 U.S.C. § 1983 ...........................................................................................5

## REGULATIONS

8 C.F.R. § 287.1(a)(1) ..................................................................................15

8 C.F.R. § 287.1(a)(2) ..................................................................................15

8 C.F.R. § 287.8(f) ........................................................................................7

## CONSTITUTIONAL PROVISIONS

U.S. Const., pmbl. ........................................................................................8, 9

U.S. Const., art. I, § 2, cl. 1.........................................................................8, 9

U.S. Const., amend. I ...................................................................................8, 9

U.S. Const., amend. II..................................................................................8, 9

U.S. Const., amend. IV .......................................................................3, *passim*

U.S. Const., amend. V..................................................................................8, 9

U.S. Const., amend. VI ................................................................................9

U.S. Const., amend. IX ................................................................8, 9

U.S. Const., amend. X.................................................................8, 9

U.S. Const., amend. XIV ............................................................8, 9

U.S. Const., amend. XVII ...............................................................8

# INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Amicus curiae Federation for American Immigration Reform (FAIR) is a nonprofit corporation and membership organization that was founded in 1979 and has its principal place of business in Washington, D.C. FAIR's mission is to inform the public about the effects of both unlawful and lawful immigration, and to defend American citizens, American workers, and the nation's environment by limiting overall immigration, enhancing border security, and ending illegal immigration. In short, FAIR seeks to protect all Americans against the substantial harms of mass migration by attaining strongly-enforced, patriotic immigration reform. To that end, FAIR has been involved in more 100 legal cases since 1980, either as a party or as *amicus curiae*, in which it has consistently defended American interests against illegal immigration into the United States.

The decision in this case will likely have a substantial impact on the tools available to the executive branch of the federal government in dealing efficiently, fairly, and safely with an illegal alien population estimated to exceed 18 million people in the United States. Amicus FAIR has direct and vital interests in

---

[1] All parties have consented to the filing of this *amicus* brief by Federation for American Immigration Reform. No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

defending the executive branch's authority to address the current illegal alien crisis.

## SUMMARY OF ARGUMENT

The Fourth Amendment to the Constitution of the United States requires merely that searches and seizures be "reasonable." The Supreme Court has long held that for temporary investigative "stops" or detentions, this requirement of reasonableness is met by "reasonable suspicion," a low standard that, both generally and even more so in the specific context of immigration law enforcement, is significantly short of the probable cause standard required for an arrest.

While purporting to apply the reasonable suspicion standard, however, the District Court imposed a vastly higher and more exacting standard. Indeed, the District Court should have lowered, not raised, this standard because many illegal aliens in the Central District of California are not part of "the people" protected by the Fourth Amendment at all. Also, the District Court erred in failing to apply the longstanding Border Search Exception Doctrine, which applies to much of the Central District.

Because the District Court erred in determining that Plaintiffs are likely to succeed on the merits, this Court should reverse the District Court's judgment and vacate the injunction.

## ARGUMENT

### A. The District Court erred in applying a higher standard for temporary detentions than the reasonable suspicion standard required by the Fourth Amendment.

The Fourth Amendment to the Constitution of the United States is straightforward: searches and seizures must be "reasonable." U.S. Const. amend IV. Petitioners have shown a strong likelihood of prevailing on the merits because reasonable suspicion under the Fourth Amendment requires far less than the requirements the District Court imposed.

The standard a court must look to in analyzing the reasonableness under the Fourth Amendment of a temporary investigative "stop" or detention has remained fundamentally the same since the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1 (1968). "[I]n justifying the particular intrusion the police officer must be able to point to *specific and articulable facts* which, taken together with *rational inferences from those facts*, reasonably warrant that intrusion." *Id.* at 21 (emphases added). The *Terry* Court stressed that the officer must have more than a hunch or good faith; rather, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id.* at 21-22 (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925), and citing *Beck v. Ohio*, 379 U.S. 89, 96-97 (1964)).

Reasonable suspicion, therefore, is a clear standard, but it is a relatively low standard, less than the probable cause standard required for a formal arrest. And in applying this standard, courts must look to the "totality of the circumstances—the whole picture," *United States v. Cortez*, 449 U.S. 411, 417-18 (1981), while also accounting for officers' training and experience in drawing rational inferences from particular facts, that is, determining whether reasonable suspicion justifies a stop "not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id.* at 418.

As the Supreme Court elaborated in *Kansas v. Glover*, 589 U.S. 376, 380-81 (2020):

> "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Prado Navarette v. California*, 572 U. S. 393, 397, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (2014) (quotation altered); *United States v. Sokolow*, 490 U. S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989).
>
> Because it is a "less demanding" standard, "reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause." *Alabama v. White*, 496 U. S. 325, 330, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990). The standard "depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Navarette*, *supra*, at 402, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (quoting *Ornelas v. United States*, 517 U. S. 690, 695, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996) (emphasis added; internal quotation marks omitted)). Courts "cannot reasonably demand scientific certainty . . . where none exists." *Illinois v. Wardlow*, 528 U. S. 119, 125, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). Rather, they must permit officers to make "commonsense judgments and inferences about human

behavior." *Ibid.*; see also *Navarette*, *supra*, at 403, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (noting that an officer "'need not rule out the possibility of innocent conduct'").

Reasonable suspicion is inherently a fact-specific inquiry suited to determinations after an individual stop has taken place and that stop has led to particularized individual proceeding, not to blanket determinations made beforehand and with respect to millions of people. And individual stops, if ultimately determined not to meet reasonable suspicion, allow for individually tailored remedies in the context of specific proceedings arising out of those individual stops. For example, suppression of evidence, which is available not only in criminal court but also in immigration court, *see INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984), or monetary damages in a Section 1983 or *Bivens* action. *See* 42 U.S.C. § 1983 (providing for a federal cause of action for monetary damages against state or local officials who violate civil rights "under color of state law"); *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) (setting forth an analogous federal cause of action against federal officials).

Further, whether there is reasonable suspicion is not decided by a strict scrutiny analysis: whether an officer's suspicion and acts pursuant to that suspicion were reasonable "does not necessarily or invariably turn on the existence of alternative "'less intrusive'" means." *Illinois v. Lafayette*, 462 U.S. 640, 647 (1983).

Finally, courts must consider the extent of a detainee's reasonable expectation of privacy in determining whether an officer had reasonable suspicion, needed reasonable suspicion, or could properly develop reasonable suspicion under the circumstances. For example, an officer generally need not have reasonable suspicion to enter areas of a business held open to the public, or to take a position immediately outside such areas, and could develop reasonable suspicion based on observations or other evidence subsequent to doing so. *See, e.g.*, *Florida v. White*, 526 U.S. 559 (1999); *INS v. Delgado*, 466 U.S. 210 (1984). And an officer asking someone for their name, date and place of birth, or immigration status is not "a discrete Fourth Amendment event" requiring independent reasonable suspicion at all. *See Muehler v. Mena*, 544 U.S. 93, 100-01 (2005) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)) ("mere police questioning does not constitute a seizure").

The District Court enjoined the government from relying on the following four factors, "alone or in combination, to form reasonable suspicion for a detentive stop":

- "Apparent race or ethnicity";

- "Speaking Spanish or speaking English with an accent";

- "Presence at a particular location (e.g. bus stop, car wash, tow yard, day laborer pick up site, agricultural site, etc.)"; and

• "The type of work one does."

ECF No. 87 at 50. The motions panels declined to stay the injunction (for the most part) because the four factors "describe only a broad profile and do not demonstrate reasonable suspicion for any particular stop." *Perdomo v. Noem*, No. 25-4312, 2025 U.S. App. LEXIS 19503, at *56 (9th Cir. Aug. 1, 2025) (internal quotation omitted). Regulations, however, rightly recognize that presence at particular locations, such as locations at which illegal aliens are known to be picked up for work, alone are probative of unlawful presence and expressly permit ICE to question any person whom the officer believes to be an alien at various work sites without any particularized suspicion. *See, e.g.*, 8 C.F.R. § 287.8(f) ("Nothing in this section prohibits an immigration officer from entering into any area of a business or other activity to which the general public has access or onto open fields that are not farms or other outdoor agricultural operations without a warrant, consent, *or any particularized suspicion* in order to question any person whom the officer believes to be an alien concerning his or her right to be or remain in the United States.") (emphasis added).

By enjoining the government from relying to any degree on four factors that obviously are probative of reasonable suspicion, especially to those with the specialized knowledge officers possess, the District Court flipped the hierarchy of standards on its head, making reasonable suspicion a far higher and more exacting

standard than probable cause and "demand[ing]" the very "scientific certainty" that the Supreme Court has expressly rejected. *Glover*, 589 U.S. at 380. Even those with a cursory knowledge of current conditions, let alone trained and experienced officers, would reasonably suspect that persons meeting the District Court's four factors were illegal aliens; the reasonable suspicion standard demands no more.

Because the District Court imposed a standard beyond that required by the Fourth Amendment, it erred in determining that Plaintiffs are likely to succeed on the merits, and the injunction should be vacated.

**B. The Fourth Amendment is less demanding in the immigration context than in the criminal context.**

The Fourth Amendment states that "[t]he right of *the people* to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated …" U.S. Const., amend IV (emphasis added). Who are "the people" whose rights are protected by this provision? The Constitution uses the term "the people" in a number of provisions, *see id.*; *see also* U.S. Const., pmbl.; art. I, § 2, cl. 1; amends. I, II, IV, IX, X, XVII, while it uses "persons" in others. *See, e.g.*, U.S. Const., amends. V, XIV. Most famously, of course, in the Preamble it is "We the People" who "ordain and establish" the entire Constitution itself: in other words, it is "the people" who are the sovereign authority upon which the Constitution's legitimacy rests. *See* U.S. Const., pmbl. In the Preamble, at least, the people must be seen as coterminous with U.S. citizens, for aliens, whatever

their connections with and length of residence in the United States, have no right to vote or assume other governing functions, and have been near-universally excluded from doing so—hardly characteristics of members of a "sovereign" People. *See, e.g., Foley v. Connelie*, 435 U.S. 291, 297 (1978) (holding that "the right to govern is reserved to citizens").

The Supreme Court stated in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), that, at minimum, "the people" refers to those "persons who are part of a national community," *id.* at 265, or who have "*substantial connections*" to the United States. *Id.* at 271 (emphasis added).

The Court narrowed this statement in *District of Columbia v. Heller*, stating that "the people" "refers to all members of the political community," 554 U.S. 570, 580 (2008), a reading in line with the Court's prior restriction of the self-governing people to citizens. *See, e.g., Cabell v. Chavez-Salido*, 454 U.S. 432, 439-40 (1982) ("The exclusion of aliens from basic governmental processes is not a deficiency in the democratic system but a necessary consequence of the community's process of political self-definition. Self-government, whether direct or through representatives, begins by defining the scope of the community of the governed and thus of the governors as well: Aliens are by definition those outside of this community.").

Lower courts have divided over whether illegal aliens must establish that they have "substantial connections" to the United States in order to be afforded the protections of the Fourth Amendment at all; this Court, however, has never entirely answered this question. *See Cruz v. Barr*, 926 F.3d 1128 (9th Cir. 2019) (holding that suspicionless detention of an unlawfully present alien, who had resided in the United States for more than a decade, violated the Fourth Amendment). *But see United States v. Portillo-Muñoz*, 643 F.3d 437, 440 (5th Cir. 2011) ("[N]either this court nor the Supreme Court has held that the Fourth Amendment extends to a native and citizen of another nation who entered and remained in the United States illegally"); *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 625 (5th Cir. 2006) ("There may be cases in which an alien's connection with the United States is so tenuous that he cannot reasonably expect the protection of its constitutional guarantees; the nature and duration of [a Mexican national's] contacts with the United States, however, are sufficient to confer Fourth Amendment rights"); *United States v. Gutierrez-Casada*, 553 F. Supp. 2d 1259, 1272 (D. Kan.) (holding that a previously deported felonious alien who had unlawfully reentered the United States fell outside of Fourth Amendment protections).

In fact, what the Constitution generally and the Fourth Amendment more specifically require with respect to aliens in the context of immigration law enforcement can frequently be less than what they require in the context of

criminal prosecution. *See, e.g., Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders"); *Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative").

The Supreme Court discussed more than a century of binding precedent on the subject of what constitutional rights arriving aliens have in *DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020):

> In 1892, the Court wrote that as to "foreigners who have never been naturalized, nor acquired any domicil or residence within the United States, nor even been admitted into the country pursuant to law," "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law." *Nishimura Ekiu*, 142 U. S., at 660, 12 S. Ct. 336, 35 L. Ed. 1146. Since then, the Court has often reiterated this important rule. *See, e.g., Knauff*, 338 U. S., at 544, 70 S. Ct. 309, 94 L. Ed. 317 ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned"); *Mezei*, 345 U. S., at 212, 73 S. Ct. 625, 97 L. Ed. 956 (same); *Landon v. Plasencia*, 459 U. S. 21, 32, 103 S. Ct. 321, 74 L. Ed. 2d 21 (1982) ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative").
>
> Respondent argues that this rule does not apply to him because he was not taken into custody the instant he attempted to enter the country (as would have been the case had he arrived at a lawful port of entry). Because he succeeded in making it 25 yards into U. S. territory before

he was caught, he claims the right to be treated more favorably. The Ninth Circuit agreed with this argument.

We reject it. It disregards the reason for our century-old rule regarding the due process rights of an alien seeking initial entry. That rule rests on fundamental propositions: "[T]he power to admit or exclude aliens is a sovereign prerogative," *id.*, at 32; the Constitution gives "the political department of the government" plenary authority to decide which aliens to admit, *Nishimura Ekiu*, 142 U. S., at 659, 12 S. Ct. 336, 35 L. Ed. 1146; and a concomitant of that power is the power to set the procedures to be followed in determining whether an alien should be admitted, *see Knauff*, 338 U. S., at 544, 70 S. Ct. 309, 94 L. Ed. 317.

This rule would be meaningless if it became inoperative as soon as an arriving alien set foot on U. S. soil. When an alien arrives at a port of entry—for example, an international airport—the alien is on U.S. soil, but the alien is not considered to have entered the country for the purposes of this rule. On the contrary, aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are "treated" for due process purposes "as if stopped at the border." *Mezei*, 345 U. S., at 215, 73 S. Ct. 625, 97 L. Ed. 956; *see Leng May Ma v. Barber*, 357 U. S. 185, 188-190, 78 S. Ct. 1072, 2 L. Ed. 2d 1246 (1958); *Kaplan v. Tod*, 267 U. S. 228, 230-231, 45 S. Ct. 257, 69 L. Ed. 585 (1925).

The same must be true of an alien like respondent. As previously noted, an alien who tries to enter the country illegally is treated as an "applicant for admission," §1225(a)(1), and an alien who is detained shortly after unlawful entry cannot be said to have "effected an entry," *Zadvydas v. Davis*, 533 U. S. 678, 693, 121 S. Ct. 2491, 150 L. Ed. 2d 653 (2001).

Whatever the meaning of "shortly," the Fourth Amendment's protections surely do not apply to every one of the two million illegal aliens estimated to reside in the Central District of California.

Because the District Court made the reasonable suspicion standard in the immigration context higher than in the criminal context, rather than appropriately

lowering it, it erred in determining that Plaintiffs are likely to succeed on the merits.

## C. The District Court erred in failing to apply the Border Search Exception Doctrine.

Even if the Fourth Amendment's protections would normally apply to some set of individuals covered by the injunction, the District Court erred in failing to apply the Border Search Exception Doctrine.

For example, while the Supreme Court held that the Border Patrol could not simply stop vehicles either at random or based solely on the apparent Mexican ancestry of occupants in *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975), the Court recognized that "[t]he Government makes a convincing demonstration that the public interest demands effective measures to prevent the illegal entry of aliens at the Mexican border," *id.* at 879, holding that "*[e]xcept at the border and its functional equivalents*, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Id.* at 885 (emphasis added).

The "functional equivalents" of the border are not necessarily limited to the border plus ports of entry. Rather, Congress has drawn a line by statute: under § 287(a)(3) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1357(a)(3), immigration officers:

under regulations prescribed by the Attorney General shall have power without warrant … within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States

Regulations promulgated by the Attorney General pursuant to this statutory grant of authority define "reasonable distance" as "within 100 air miles from any external boundary of the United States" (or shorter distances if set at the discretion of specified officials). 8 C.F.R. § 287.1(a)(2). "External boundary" in turn "means the land boundaries and the territorial sea of the United States extending 12 nautical miles from the baselines of the United States determined in accordance with international law." 8 C.F.R. § 287.1(a)(1). Taken together this clearly covers much if not most of the Central District of California and certainly most of its populated area.

Courts both before and after the enactment of the INA have repeatedly held that searches and seizures at or near the border are more presumptively reasonable and valid than further into the interior. As the Supreme Court explained in *United States v. Ramsay*, 431 U.S. 606, 616-17 (1977) (citing *Carroll*, supra, 267 U.S. at 153-154; *Boyd v. United States*, 116 U.S. 616, 623 (1886)):

That searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of

14

the fact that they occur at the border, should, by now, require no extended demonstration. The Congress which proposed the Bill of Rights, including the Fourth Amendment, to the state legislatures on September 25, 1789, 1 Stat. 97, had, some two months prior to that proposal, enacted the first customs statute, Act of July 31, 1789, c. 5, 1 Stat. 29. Section 24 of this statute granted customs officials "full power and authority" to enter and search "any ship or vessel, in which they shall have reason to suspect any goods, wares or merchandise subject to duty shall be concealed . . . ." This acknowledgment of plenary customs power was differentiated from the more limited power to enter and search "any particular dwelling-house, store, building, or other place . . ." where a warrant upon "cause to suspect" was required. The historical importance of the enactment of this customs statute by the same Congress which proposed the Fourth Amendment is, we think, manifest.

Indeed, therefore, "[t]his longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless 'reasonable' has a history as old as the Fourth Amendment itself." *Id.* at 619.

The Border Search Exception Doctrine is why "it was 'without doubt' that the power to exclude aliens 'can be effectuated by routine inspections and searches of individuals or conveyances seeking to cross our borders.'" *Id.* (quoting *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973)). Such "routine" inspections have been held to include checkpoints on a major highway near to but not immediately adjacent to the border: such searches are "reasonable" without being based on individualized suspicion. *See United States v. Martinez-Fuerte*, 428 U.S. 543 (1976).

The current principal divide between the Courts of Appeals over the Border Exception Doctrine is over whether a search warrant is required for forensic searches of electronic devices seized at the border, in the wake of the Supreme Court's holding in *Riley v. California*, 573 U.S. 373 (2014), that warrants are otherwise generally required for such searches even when incident to a lawful arrest. *Compare Alasaad v. Mayorkas*, 988 F.3d 8 (1st Cir. 2021) (holding that no warrant was required); *United States v. Touset*, 890 F.3d 1227 (11th Cir. 2018) (no warrant required); *United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018) (warrant required); *United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013) (warrant required).

If the Border Search Exception can even conceivably apply to such vastly more intrusive searches and seizures, though, it undoubtedly applies to such routine stops as are at issue in this case. Because the District Court failed to apply the Border Search Exception, it erred in concluding that Plaintiffs are likely to succeed on the merits, and this Court should reverse the District Court's judgment and vacate the injunction.

# CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the

District Court and vacate its July 11 injunction.

DATED: August 18, 2025   Respectfully submitted,

        /s/ Matt Crapo
        Matt A. Crapo
        David L. Jaroslav
        Federation for American Immigration Reform
        25 Massachusetts Ave., NW, Suite 330
        Washington, DC 20001
        Telephone: (202) 328-7004

        Counsel for *Amicus Curiae*
        Federation for American Immigration Reform

# CERTIFICATE OF COMPLIANCE

1. The foregoing brief complies with the type-volume limitation of Fed. Fed. R. App. P. 29(a)(5) because:

This brief contains 4,173 words, including footnotes, but excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

DATED: August 18, 2025             Respectfully submitted,

                                   /s/ Matt Crapo

# CERTIFICATE OF SERVICE

I certify that on August 18, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system. All parties were served electronically through the ACMS system.


/s/ Matt Crapo